## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------- x

: 

In re:                         :    Chapter 11

: 

HYGEA HOLDINGS CORP., *et al.*,    :    Case No. 20-10361 (___)

: 

           Debtors.[1]             :    (Joint Administration Pending)

: 

---------------------------------------------------------- x

**MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) USE CASH COLLATERAL AND (B) INCUR POSTPETITION SECURED INDEBTEDNESS; (II) GRANTING LIENS AND PROVIDING SUPER-PRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION TO BRIDGING FINANCE INC., AS ADMINISTRATIVE AGENT; AND (IV) MODIFYING THE AUTOMATIC STAY**

Hygea Holdings Corporation and its affiliated debtors (collectively, the "Debtors"), by and through their proposed counsel, Cole Schotz P.C., hereby submit this motion (the "Motion"), pursuant to sections 105(a), 361, 362, 363, 364, 503 and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1(b) and 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), for entry of an interim order, substantially in the form attached

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are: All Care Management Services, Inc. (6484); First Harbour Health Management, LLC (0941); First Harbour Medical Centers, LLC (3861); Florida Group Healthcare LLC (7956); Gemini Healthcare Fund, LLC (4928); Hygea Acquisition Longwood, LLC (1649); Hygea Acquisition Orlando, LLC (3507); Hygea Health Holdings, Inc. (8926); Hygea Holdings Corp. (2605); Hygea IGP of Central Florida, Inc. (9453); Hygea IGP, LLC (7724); Hygea Medical Centers of Florida, LLC (5301); Hygea Medical Partners, LLC (4486); Hygea of Delaware, LLC (4830); Hygea of Georgia, LLC (5862); Hygea of Pembroke Pines, LLC (6666); Hygea Primum Acquisition, Inc. (8567); Medlife Activity Center, LLC (2311); Mobile Clinic Services, LLC (9758); Palm A.C. MSO, LLC (2585); Palm Allcare Medicaid MSO, Inc. (6956); Palm Allcare MSO, Inc. (0319); Palm Medical Group, Inc. (5028); Palm Medical MSO LLC (7738); Palm Medical Network, LLC (9158); Palm MSO System, Inc. (2178); Palm PGA MSO, Inc. (8468); Physician Management Associates East Coast, LLC (7319); Physician Management Associates SE, LLC (3883); Physicians Group Alliance, LLC (7824); Primum Alternatives, Inc. (7441); Primum Healthcare, LLC (0157); and Professional Health Choice, Inc. (6850). The address of the Debtors' corporate headquarters is 8700 W Flagler Street, Suite 280, Miami, FL 33174.

hereto as **Exhibit 1** (the "Interim Order") and a final order (i) authorizing the Debtors to (a) use cash collateral and (b) incur postpetition secured indebtedness; (ii) granting liens and providing super-priority administrative expense status; (iii) granting adequate protection to Bridging Finance Inc. or DIP Agent (as defined below); and (iv) modifying the automatic stay.  In support of this Motion, the Debtors rely upon and incorporate by reference the *Declaration of Keith Collins, M.D. in Support of Chapter 11 Petitions and First-Day Pleadings* (the "First Day Declaration"),[2] filed contemporaneously with this Motion.  In further support of this Motion, the Debtors respectfully state as follows:

## JURISDICTION

1.      The United States Bankruptcy Court for the District of Delaware (this "Court") has jurisdiction over these Cases, the Debtors, property of the Debtors' estates and this matter under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      Pursuant to Local Rule 9013-1(f) the Debtors consent to the entry of a final judgment or order with respect to this Motion if it is determined that this Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

3.      Venue of these Cases in this district is proper under 28 U.S.C. §§ 1408 and 1409.

---

[2]  Capitalized terms used but not otherwise defined in this Motion shall have the meanings ascribed to them in the First Day Declaration.

4.      The statutory bases for the relief requested in this Motion are sections 105(a), 361, 362, 363, 364, 503 and 507 of title 11 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014, and Local Rules 2002-1(b) and 4001-2.

## BACKGROUND

### A.      General Background

5.      On the date hereof (the "Petition Date"), each Debtor commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases").  The Debtors have requested that the Chapter 11 Cases be jointly administered.  The factual background regarding the Debtors, including their business operations, their capital and debt structure, and the events leading to the filing of the Chapter 11 Cases, is set forth in the First Day Declaration, which is fully incorporated into this Motion by reference.

6.      The Debtors continue to manage and operate their businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

7.      To date, no creditors' committee has been appointed in the Chapter 11 Cases by the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee").  No trustee or examiner has been appointed in the Chapter 11 Cases.

### B.      The Restructuring Support Agreement

8.      Before the Petition Date, the Debtors and Bridging Finance Inc., as Administrative Agent (the "Prepetition Agent") for the lender, Bridging Income Fund LP, f/k/a Sprott Bridging Income Fund LP (the "Prepetition Lender") (the Prepetition Agent in such capacity, together with the Prepetition Lender, collectively referred to as "Bridging" or the "Prepetition Secured Parties") negotiated the framework for a potential chapter 11 plan of reorganization (the "Plan") to address, among other things, the Debtors' inability to service their debt obligations and numerous events

3

of default under the Debtors' prepetition credit agreement with Bridging.  After several months of good faith, arm's-length negotiations between the Debtors and Bridging, during which Bridging provided, pursuant to a series of Forbearance Agreements, over $6 million in emergency funding to the Debtors, the parties agreed upon the material terms of a Plan, and embodied those terms in that certain Restructuring Support Agreement, dated as of February 10, 2020, by and among the Debtors and Bridging (the "RSA").  Pursuant to the RSA, Bridging has agreed to provide postpetition financing and has agreed to allow the Debtors to continue using Bridging's cash collateral during the pendency of these Chapter 11 Cases subject to certain terms and conditions.

9.      As set forth in the RSA, the Plan contemplates a reorganization of the Debtors pursuant to which, among other things, (i) a portion of Bridging's existing secured debt would be reinstated in an amount equal to the debt capacity of the reorganized debtors (the "Reorganized Debtors"); (ii) all of the Reorganized Debtors' equity will be transferred to Bridging on account of the balance of Bridging's claim; (iii) a liquidating trust would be created for the benefit of the Debtors' unsecured creditors; and (iv) priority tax and other priority claims would be paid pursuant to section 1129(a)(9)(c) and other sections of the Bankruptcy Code.  To the extent the Plan process is unsuccessful, the RSA provides for a sale of substantially all the Debtors' assets (the "Sale") pursuant to section 363 of the Bankruptcy Code with Bridging designated as the stalking horse bidder and permitted to credit bid its prepetition and DIP loan debt.  Both the Plan process and Sale process will be subject to higher and better offers.

## DEBTORS' PREPETITION DEBT

10.      Hygea Holdings Corporation and Hygea Health Holdings, Inc., as borrowers, together with certain affiliates and subsidiaries designated as "Obligors" are parties, with the Prepetition Secured Parties, as Agent and Lender, to (i) that certain Amended and Restated Credit

Agreement, dated as of January 31, 2017 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"); (ii) that certain Amended and Restated Guaranty and Security Agreement, dated as of January 31, 2017 (as amended, supplemented or otherwise modified from time to time, the "Security Agreement"); (iii) that certain Forbearance Agreement, dated as of October 31, 2019 (the "Forbearance Agreement"); (iv) that certain First Amendment to Forbearance Agreement, dated as of November 15, 2019 (the "First Amendment"); (v) that certain Second Amendment to Forbearance Agreement, dated as of December 20, 2019 (the "Second Amendment"); (vi) that certain Third Amendment to Forbearance Agreement, dated as of January 12, 2020 (the "Third Amendment"); (vii) that certain Fourth Amendment to Forbearance Agreement, dated as of January 30, 2020 (the "Fourth Amendment"); and (viii) that certain Fifth Amendment to Forbearance Agreement, dated as of February 13, 2020 (the "Fifth Amendment" and together with the Credit Agreement, Security Agreement, Forbearance Agreement, First Amendment, Second Amendment, Third Amendment, Fourth Amendment, Fifth Amendment and any and all documents, agreements and instruments related to the foregoing, the "Prepetition Loan Documents").  Pursuant to the Prepetition Loan Documents, Bridging loaned the Debtors not less than $162,128,837.15 (Canadian) (together with accrued and unpaid interest, fees, expenses, and other amounts of whatever nature owing, whether or not contingent, whenever rising, accrued, accruing, due, owing or chargeable in respect of the Prepetition Loan Documents, the "Prepetition Loan").

11.    As of the Petition Date and pursuant to the Prepetition Loan Documents, the Debtors have further stipulated that Bridging has a first priority lien and security interest in substantially all of the Debtors' assets, including all accounts, chattel paper, deposit accounts,

documents, equipment, goods, money, general intangibles, instruments, all subject to and as described more fully in the Security Agreement (collectively, the "Prepetition Collateral").

## ALTERNATIVE FINANCING EFFORTS

12.    As noted in the First Day Declaration, in October 2019, following an unsuccessful sale process, the Debtors retained Alvarez & Marsal North America, LLC ("A&M"), a financial advisory firm, to locate other possible sources of financing and otherwise advise the Debtors with respect to possible strategic alternatives to address the Prepetition Loan.

13.    When A&M was retained, the Debtors were suffering a liquidity crisis. Indeed, A&M concluded that without additional funding, the Debtors would soon run out of cash and be forced to cease operating. To fund this shortfall, the Debtors, based on the prepetition liens and claims of Bridging, assessed the futility of soliciting alternative financing sources before the Petition Date to provide financing to the Debtors during these Chapter 11 Cases.  In exchange for providing post-petition financing, every financing source would have required a first-priority priming lien on all of the assets of the Debtors securing all amounts advanced by such lender. Bridging would not consent to such priming liens and would have argued that the Debtors could not have provided adequate protection for the proposed financing. The Debtors and Bridging believe Bridging to be drastically under collateralized and A&M and the Debtors further believe that the possibility of obtaining priming financing or loans secured solely by an administrative claim are nonexistent.

14.    Accordingly, because of the Debtors' deeply distressed financial condition, the Prepetition Lender's unwillingness to subordinate to a new lender, and the terms of the DIP Loan proposed by Bridging attendant to a Plan, A&M advised the Debtors that there would be little to gain from embarking on a futile search for alternative DIP financing.

6

**RELIEF REQUESTED**

15.    By this Motion, the Debtors seek entry of an interim order, substantially in the form

attached hereto as **Exhibit 1** (the "Interim Order"):

    a)    authorizing Hygea Holdings Corp., as borrower (the "Borrower"), to obtain, and the Debtors to guarantee (in such capacities, the "Guarantors", and together with the Borrower, the "DIP Credit Parties") up to an aggregate sum of $9,980,303.00, to support the going concern operations of the Debtors in the form of senior secured, superpriority post-petition financing (the "DIP Financing" or "DIP Facility") pursuant to, and in accordance with the terms of, that certain *Secured Superpriority Debtor-In-Possession Credit Agreement*, by and among the DIP Credit Parties, Bridging, not individually but as administrative agent on behalf of the DIP Lenders (in such capacity, the "DIP Agent"), and Bridging Income Fund L.P. or the Persons party thereto (as defined in the DIP Credit Agreement) (collectively, in such capacity, the "DIP Lenders"), and together with the DIP Agent, the "DIP Secured Parties"), substantially in the form attached to the Interim Order as **Exhibit C** (as the same may be amended, restated, supplemented, waived, extended, or otherwise modified from time to time, the "DIP Credit Agreement" and together with all other related agreements, documents, guaranties, security agreements, or pledge agreements, including the Interim Order and the Final Order, collectively, the "DIP Loan Documents"), which DIP Facility shall be available as a delayed draw term loan (the "DIP Loans") to the Debtors upon entry of the Interim Order and satisfaction of the other conditions set forth in the DIP Loan Documents in an initial amount not to exceed $1,740,627.00 (the "Initial DIP Loan") until the entry of the Final Order (as defined below), with the remainder of the DIP Facility available upon entry of the Final Order and satisfaction of the other conditions set forth in the DIP Loan Documents;

    b)    authorizing the Borrower and the other Debtors to enter into the DIP Credit Agreement and the other DIP Loan Documents and to take such other and further acts as may be required in connection with the DIP Loan Documents;

    c)    authorizing the Debtors to pay any and all amounts due, whether now existing or hereafter arising, under the DIP Loans, the DIP Credit Agreement or any related financing document, owed or owing to Bridging by the Debtors, whether absolute or contingent, direct or indirect, secured or unsecured, due or not due, primary or secondary, joint or several, arising by operation of law or otherwise, and all interest and other charges thereon, including post-petition interest to the extent allowed under section 506(b) of the Bankruptcy Code (collectively, the "DIP Obligations"), subject to the terms of the Interim Order;

    d)    authorizing the Debtors to use proceeds of the Initial DIP Loan, effective immediately upon entry of the Interim Order, as expressly provided in the DIP Loan Documents and solely in accordance with the Interim Order and the

Budget (as defined below) (subject to permitted variances and other exclusions set forth in the Interim and Final Orders and DIP Loan Documents) to provide financing for working capital and for other general corporate purposes of the Debtors in accordance with the approved budget (the "Budget") attached to the Interim Order as **Exhibit B**;

e)  granting approval of superpriority administrative expense claim status to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, in respect of all DIP Obligations, subject only to the Carve-Out (as defined below) and Prior Senior Liens (as defined below);

f)  granting the DIP Secured Parties valid, enforceable, non-avoidable, automatically and fully perfected DIP Liens (as defined below) in all Collateral (as defined below);

g)  authorizing the Debtors to use any Cash Collateral in which Bridging may have an interest, solely in accordance with the Budget (subject to permitted variances and other exclusions set forth in the DIP Orders;

h)  granting adequate protection to Bridging solely to the extent of any postpetition diminution in the value of Bridging's interests in the Prepetition Collateral as a result of the use by the Debtors of Cash Collateral after the Petition Date ("Diminution");

i)  modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Orders and the DIP Loan Documents;

j)  subject to entry of a final order granting the relief requested in the Motion on a final basis which shall be in a form and substance acceptable to Bridging (the "Final Order", and with the Interim Order, the "DIP Orders"), (i) waiving the Debtors' ability to surcharge pursuant to section 506(c) of the Bankruptcy Code against any Prepetition Collateral and DIP Collateral, and (ii) any right of the Debtors under the "equities of the case" exception in section 552(b) of the Bankruptcy Code;

k)  waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of the Interim Order;

l)  scheduling a final hearing on the Motion (the "Final Hearing") to consider entry of the Final Order; and

m)  granting the Debtors such other and further relief as is just and proper.

## SUMMARY OF THE PRINCIPAL TERMS OF THE DIP FACILITY

16.    Pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2, the following is a concise summary of the proposed material terms of the DIP Loan Documents.[3]

| | |
|---|---|
| **Borrower**<br>*Bankruptcy Rule 4001(c)(1)(B)* | Hygea Holdings Corp.<br>See DIP Credit Agreement, Recitals |
| **Guarantors**<br>*Bankruptcy Rule 4001(c)(1)(B)* | All subsidiaries of the Borrower listed on Schedule 1.1(B) to the DIP Credit Agreement.<br>See DIP Credit Agreement, Recitals, Schedule 1.1(B) |
| **DIP Agent**<br>*Bankruptcy Rule 4001(c)(1)(B)* | Bridging Finance Inc.<br>See DIP Credit Agreement, Section 1.1 |
| **DIP Lenders**<br>*Bankruptcy Rule 4001(c)(1)(B)* | The Parties that are or may from time to time become parties to the DIP Credit Agreement (together with their respective successors and assigns)<br>See DIP Credit Agreement, Recitals |
| **DIP Facility/Borrowing Limits**<br>*Bankruptcy Rule 4001(c)(1)(B)*<br>*Local Bankruptcy Rule 4001-2(a)(ii)* | The DIP Facility shall consist of a new money senior secured, superpriority, priming debtor-in-possession delayed draw term loan in an aggregate principal amount not to exceed $9,980,303.00 to be funded as set forth in the DIP Loan Documents and in accordance with the Budget.<br>See DIP Credit Agreement, Annex A |
| **Interest Rates**<br>*Bankruptcy Rule 4001(c)(1)(B)*<br>*Local Bankruptcy Rule 4001-2(a)(ii)* | The DIP Facility shall accrue interest at a rate equal to LIBOR + 8% per annum, which shall be payable monthly in cash on the last business day of each calendar month.  Default rate shall be an incremental 2% per annum. |

---

[3]  Capitalized terms used in this summary but not otherwise defined herein shall have the meanings ascribed to such terms in the DIP Loan Documents. This statement is qualified in its entirety by reference to the applicable provisions of the DIP Loan Documents, including the Interim Order. To the extent there is any inconsistency between this concise statement and the provisions of the DIP Loan Documents, the provisions of the DIP Loan Documents shall control. To the extent there is any inconsistency between this concise statement and the provisions of the DIP Loan Documents, and the Interim Order, the provisions of the Interim Order shall control.

60437/0001-19435356v4

| | |
|---|---|
| | Interest shall be calculated on the basis of the actual number of days elapsed in a 360 day a year.<br><br>See DIP Credit Agreement, § 4.1 |
| **Expenses and Fees**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | Borrower shall pay DIP Lender from the first DIP advance a fully earned, non-refundable closing fee of 2% of the commitments under the DIP Facility, due and payable at the closing of the DIP Facility.<br><br>See Interim Order, ¶ 8. |
| **Maturity**<br><br>*Bankruptcy Rule 4001(c)(1)(B)*<br><br>*Local Bankruptcy Rule 4001-2(a)(ii)* | "Termination Date" means the earliest to occur of (a) June 15, 2020, (b) the effective date with respect to any Plan of Reorganization, (c) the date a sale of all or substantially all of the Debtors' assets is consummated under Section 363 of the Bankruptcy Code, and (d) the acceleration of the Obligations by the DIP Agent (acting at the direction of the Required DIP Lenders) following the occurrence of an Event of Default.<br><br>See DIP Credit Agreement, Section 1.1 |
| **DIP Collateral**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | As security for the DIP Obligations, effective and perfected upon the date of entry of the Interim Order, and without the necessity of the execution or recordation of filings by the Debtors of security agreements, pledge agreements, fixture filings, mortgages, hypothecations, deeds of trust, control agreements, financing statements or other similar documents, or the possession or control by Bridging, continuing, valid, binding, enforceable, non-avoidable and properly perfected security interests in and liens are hereby granted to Bridging on and over all property and other assets of the Debtors, and their respective estates of every kind or type whatsoever, tangible, intangible, real, personal or mixed, whether now owned or hereafter acquired or arising, and whether or not encumbered prior to the Petition Date, wherever located, including all property of the Debtors within the meaning of section 541 of the Bankruptcy Code and all proceeds, rents and products of the foregoing (collectively, all of the foregoing property and assets of the Debtors, and/or their estates, "Property"), which Property includes but is not limited to: (i) all accounts generated post-petition and proceeds thereof, (ii) all prepetition accounts and proceeds thereof, (iii) all intangibles of the Debtors, (iv) all real property, the improvements, fixtures thereon and all real property leases of the Debtors, (v) all other assets of the Debtors including but not limited to inventory and equipment, (vi) any and all cash of the Debtors, (vii) all other property of the Debtors and their estates, (viii) claims and causes of action under sections 502(d), 544, 545, 547, 548, |

| | |
|---|---|
| | 550 and 553 of the Bankruptcy Code, and any other avoidance actions under Chapter 5 of the Bankruptcy Code or applicable state law, and (ix) the proceeds of all the foregoing (clauses (i) through (ix) collectively, the "Collateral"), *provided* that the term "Collateral" shall not include claims and causes of action under sections 502(d), 544, 545, 547, 548, 550 (exclusive of transferees under section 549) and 553 of the Bankruptcy Code, and any other avoidance actions under Chapter 5 of the Bankruptcy Code or applicable state law, unless and until approved by a Final Order, and *further provided* that the DIP liens shall be subject to Prior Senior Liens, as defined in the Interim Order.<br><br>See Interim Order, ¶ 9. |
| **DIP Liens/Super Priority Administrative Claim Status**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(i)*<br><br>*Bankruptcy Rule 4001(c)(1)(B)(iii)* | In addition to the DIP Liens granted pursuant to paragraph 9 of the Interim Order, in the event the DIP Collateral does not satisfy the DIP Obligations in full, all of the DIP Obligations shall, subject to the Carve Out, constitute senior super priority administrative expense claims as set forth in paragraph 10 of the Interim Order, with priority over any and all other administrative expense claims, including without limitation, such claims under sections 503(b) and 507(b) of the Bankruptcy Code<br><br>See Interim Order, ¶ 10. |
| **Milestones**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | As further adequate protection against Diminution, and as further consideration for the DIP Loans and the use of Bridging's Cash Collateral, the Debtors shall comply with the following milestones (the "Milestones"):<br><br>a.    Debtors shall have filed a chapter 11 plan (the "Plan") and disclosure statement with respect to the Plan (the "Disclosure Statement"), in each case in accordance with the terms of the RSA and in a form satisfactory to Bridging by no later than twenty (20) days after the Petition Date;<br><br>b.    Entry by the Bankruptcy Court of an order approving the RSA no later than thirty (30) days after the Petition Date (subject to the Bankruptcy Court's availability);<br><br>c.    Entry by the Bankruptcy Court of an order approving the Disclosure Statement in form and substance acceptable to Bridging by no later than forty-five (45) days after the Petition Date (subject to the Bankruptcy Court's availability); and<br><br>d.    Entry by the Bankruptcy Court of an order confirming the Plan in form and substance acceptable to Bridging by no later than seventy-five (75) days after the Petition Date |

60437/0001-19435356v4

| | |
|---|---|
| | (subject to the Bankruptcy Court's availability) (the "<u>Plan Confirmation Milestone</u>").<br><br><u>See</u> Interim Order ¶ 23. |
| **Events of Default**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | A Termination Event shall be deemed to have occurred five (5) business days after receipt of written notice sent by Bridging to the Debtors, their counsel, the Committee, their counsel, and the U.S. Trustee of the occurrence of any of the following:<br><br>(i)    the payment or incurrence by any of the Debtors of any expense of a type not set forth in the Budget;<br><br>(ii)    the payment of any expenses that would cause the aggregate expenditures to exceed one hundred one hundred ten percent (110%) of the total budgeted expenses for that same period (a "<u>Measuring Period</u>"). This "<u>Variance</u>" shall be measured, on a rolling four week basis.  Any budgeted expenditures not paid in a particular budget period may be paid during a subsequent period and, for the purpose of calculating rolling four week variances set forth above, the Budget will be revised to move such expenditures to the later period.  Expenditures may be paid in an earlier period in the reasonable discretion of the Debtors, in which event, the Budget shall be deemed amended to move the expenditure into the week of the actual expenditure for the purpose of calculating rolling four week variances set forth above.  The Debtors will provide a written explanation in reasonable detail explaining the amount of and the reason for the prepayment or delay in payment. The Variance shall not apply to the payment of Bridging's expenses related to the Chapter 11 Cases, including professional fees and costs;<br><br>(iii)    the failure of the Debtors to pay, within ten (10) days of the applicable due date, all undisputed administrative expenses in full in accordance with their terms as provided for in the Budget;<br><br>(iv)    the failure of the Debtors to timely pay all fees due under 28 U.S.C. § 1930;<br><br>(v)    the transfer of venue of these Chapter 11 Cases;<br><br>(vi)    an Event of Default has occurred under the terms of the DIP Credit Agreement, subject to any cure periods set forth therein or in the Interim Order (provided, however, no notice shall be required if such default is among those listed |

60437/0001-19435356v4

in paragraph 25 of the Interim Order);

(vii)    the failure of the Debtors to comply with, keep, observe or perform any of its agreements or undertakings under the Interim Order, including meeting the Milestones by each date set forth in paragraph 23;

(viii)   the failure of the Debtors to comply with, keep, observe or perform any of their agreements or undertakings under the RSA;

(ix)     the failure of the Debtors to file a motion seeking to sell substantially all of their assets with Bridging as the stalking horse within seven (7) Business Days of the earlier of (a) the Plan Confirmation Milestone; (b) the date of withdrawal of the Plan; or (c) the date of an order denying confirmation of the Plan; and

(x)      The failure of the Debtors to obtain approval for the assumption or assumption and assignment of any Material Contract or the termination of any Material Contract.  A list of "Material Contracts" shall be agreed upon by the Debtors and Bridging.

See Interim Order, ¶ 24.

The authority of the Debtors to draw upon the DIP Loans and to use the proceeds of Cash Collateral hereunder shall terminate without any further action by this Court and a Termination Event shall occur following the occurrence of any of the following:

(i)      any of the Chapter 11 Cases of the Debtors are dismissed or converted to a case under Chapter 7 of the Bankruptcy Code;

(ii)     the earlier of (y) the date of the entry of an order of this Court appointing a Chapter 11 Trustee or an examiner with respect to any of the Debtors; or (z) the date the Debtors file a motion, application or other pleading consenting to or acquiescing in any such appointment;

(iii)    this Court suspends the Chapter 11 Cases of any of the Debtors under section 305 of the Bankruptcy Code;

(iv)     this Interim Order becomes stayed, reversed, vacated, amended or otherwise modified in any

13

|  | respect without the prior written consent of Bridging; |
|  |  |
|  | (v)    an order is entered in the Chapter 11 Cases over the objection of Bridging approving financing pursuant to section 364 of the Bankruptcy Code that would grant an additional security interest or a lien on any Collateral or granting a superpriority administrative claim that is equal or superior to the superpriority administrative claim granted to Bridging under this Interim Order; |
|  | (vi)    an adversary proceeding or contested matter is commenced by the Debtors or any other party challenging the amount, validity, enforceability, priority or extent of Bridging's liens, security interests or claims; |
|  | (vii)    June 15, 2020; and |
|  | (viii)    The occurrence of the Termination Date (as defined in the DIP Credit Agreement). |
|  | See Interim Order, ¶ 25. |
| **Carve -Out**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | For purposes of this Motion and the Interim Order, the "Carve Out" means the aggregate of (i), (ii), and (iii) below:<br><br>a.    the fees and expenses of professionals retained by the Debtors (above the amounts of any retainer) or the Committee (the "Professional Fees and Expenses") in an aggregate amount not to exceed the sum of:<br><br>  i.    the dollar amount of such fees and expenses (including expenses of a member of the Committee) to the extent (A) such fees and expenses are incurred or accrued prior to a Termination Event and remain unpaid, (B) such fees and expenses are provided for under the Budget, and (C) such fees and expenses were previously or are subsequently allowed by Court order; plus<br><br>  ii.    the Professional Fees and Expenses in an amount of up to $100,000.00 incurred after a Termination Event; plus<br><br>  iii.    the statutory fees of the U.S. Trustee pursuant to 28 U.S.C. § 1930 and the fees of the Clerk of this Court. |

| | |
|---|---|
| | <u>See</u> Interim Order, ¶ 29. |
| **Purposes for Use of DIP Funds and Cash Collateral**<br><br>*Bankruptcy Rule 4001(b)(1)(B)(ii)* | The DIP Loan shall be used solely to fund amounts set forth in the Budget including: (a) the payment of all accrued and budgeted administrative expenses prior to the Termination Date, (b) customary transaction fees and expenses (including accrued and unpaid expenses of DIP Agent and DIP Lenders) in connection with the Chapter 11 Cases and (c) costs and expenses to maintain and preserve the Collateral.<br><br><u>See</u> DIP Credit Agreement, § 10.6 |
| **Entities with Interests in Cash Collateral**<br><br>*Bankruptcy Rule 4001(b)(1)(B)(i)* | Bridging<br><br><u>See</u> Interim Order, ¶ F. |
| **Borrowing Conditions**<br><br>*Bankruptcy Rule 4001(c)(1)(B)*<br><br>*Local Bankruptcy Rule 4001-2(a)(ii)* | The obligation of each DIP Lender to make each Loan is subject to the following further conditions precedent:<br><br><u>Compliance with Warranties, No Default, etc.</u>  Both before and after giving effect to any borrowing, the following statements are true and correct:<br><br>(a)    the representations and warranties of each Loan Party set forth in the DIP Credit Agreement and the other Loan Documents are true and correct in all material respects (unless any such representation or warranty is by its terms qualified by concepts of materiality, in which that representation or warranty is true and correct in all respects) with the same effect as if then made (except to the extent stated to relate to a specific earlier date, in which case that representation or warranty is true and correct in all material respects or in all respects, as applicable, as of that earlier date);<br><br>(b)    no Default or Event of Default has occurred and is continuing; and<br><br>(c)    no fact, event or circumstance has occurred that could reasonably be expected to result in a Material Adverse Effect.<br><br><u>Notice of Borrowing</u>.  Borrower shall have delivered a Notice of Borrowing in accordance with <u>Section 2.2.2</u> of the DIP Credit Agreement, certifying the satisfaction of the conditions set forth in <u>Section 12.2.1</u> of the DIP Credit Agreement. |

60437/0001-19435356v4

<u>DIP Orders</u>.  The entry by the Bankruptcy Court of:

(a)   the Interim DIP Order no later than two (2) days after the Petition Date in form and substance acceptable to the DIP Agent and the DIP Lenders in their sole discretion, inter alia, approving the Loan Documents and the transactions contemplated thereby on an interim basis, and authorizing the Debtors to grant the DIP Agent, for the benefit of itself and the DIP Lenders, valid, duly perfected priming senior priority liens and superiority administrative expense claims as set forth herein and such interim period shall last no more than thirty (30) days following the Petition Date;

(b)   orders granting the "first day" motions in form and substance reasonably acceptable to the DIP Agent;

(c)   the Final DIP Order no later than thirty (30) days following the Petition Date, in form and substance acceptable to the DIP Agent and the DIP Lenders in their sole discretion, approving the Loan Documents and the transactions contemplated thereby, and, inter alia, authorizing the Debtors to enter into the Loan Documents and granting the DIP Agent, for the benefit of itself and the DIP Lenders, valid, duly perfected priming senior priority liens as set forth herein and superiority administrative expense claims as set forth herein on a final basis.

<u>Definitive Documentation</u>.  Within one day after the entry of the Final DIP Order, DIP Agent has received (a) the DIP Credit Agreement, duly executed and dated as of the date of the Final DIP Order (or any earlier date satisfactory to the DIP Agent) and (b) if requested by a DIP Lender, Notes made payable to such DIP Lender, duly executed and dated as of the Closing Date, in each case, in form and substance acceptable to the DIP Agent in its sole discretion.

<u>Approved Budget</u>.  The DIP Agent shall have received the Approved Budget and any "to date" projections and cash flows requested by the DIP Agent.

<u>Certificates, etc.</u>  The DIP Agent shall have received such documents and certificates as the DIP Agent or its counsel may reasonably request relating to the organization, existence and good standing of each Loan Party, the authorization of the transactions contemplated by the Loan Documents and any other legal matters relating to the Loan Parties, the Loan Documents and the transactions contemplated thereby.

<u>Fees and Expenses</u>.  The DIP Agent (or its relevant Affiliates) shall have received for the account of the DIP Agent, its Affiliates and the DIP Lenders, payment of all outstanding fees then due and payable pursuant to the DIP Credit Agreement, payment of closing costs and expenses of Agent, including Attorney Costs and other amounts due and payable thereunder on or prior to the Closing Date, and to the extent invoiced at least one (1) Business Day prior to the Closing Date, reimbursement or payment of all reasonable documented out-of-pocket expenses required to be reimbursed or paid by any Borrower under the DIP Credit Agreement or under any other Loan Document.

<u>Consents and Approvals</u>.  All material governmental and third-party approvals necessary to be obtained prior to the Closing Date shall have been obtained and be in full force and effect.

<u>See</u> DIP Credit Agreement, § 12.

In addition, except as set forth in paragraph 20 of the Interim Order, no proceeds of Cash Collateral or any DIP Loan shall be used for the purpose of: (i) objecting to, or contesting in any manner, or raising any defense to, the validity, amount, extent, perfection, priority, or enforceability of the Prepetition Loan Documents, the Prepetition Collateral, the Secured Claim, the DIP Loans or any liens or security interests with respect thereto, or any other rights or interests of Bridging therein; (ii) asserting any claims or defenses or causes of action against Bridging, Bridging Income Fund, the DIP Lenders or their respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors including, without limitation, any actions under Chapter 5 of the Bankruptcy Code, including with respect to payments made pursuant to the Interim Order or the Prepetition Loan Documents; (iii) seeking to modify any of the rights granted to Bridging under the Interim Order; (iv) paying any amounts not included in the Budget; or (v) paying any amounts on account of claims arising before the Petition Date, except to the extent provided for in the Budget and approved by the Court.  Notwithstanding the foregoing, not more than $50,000.00 of the Cash Collateral may be made available to reimburse the Committee, upon appropriate application therefor, for the Committee's fees and expenses solely for the purposes of reviewing the validity, priority, perfection and enforceability of Bridging's liens in the Prepetition Collateral.

<u>See</u> Interim Order, ¶ 20.

| | |
|---|---|
| **Adequate Protection**<br><br>*Bankruptcy Rules 4001(b)(1)(B)(ii)* | <u>Rollover Lien</u>.  As adequate protection for any diminution in the value of Cash Collateral and other Prepetition Collateral resulting from the use by the Debtors of Cash Collateral after the Petition Date ("<u>Diminution</u>"), Bridging shall continue to have a valid, perfected and |

enforceable continuing replacement lien and security interest (the "Rollover Lien") in all assets of the Debtors existing on or after the Petition Date of the same type as the Prepetition Collateral, together with the proceeds, rents, products and profits thereof, whether acquired or arising before or after the Petition Date, to the same extent, validity, perfection, enforceability and priority of the liens and security interests of Bridging as of the Petition Date (the "Postpetition Collateral"). The Rollover Lien shall be subject to only (i) the DIP Liens; (ii) Prior Senior Liens, if any, existing as of the Petition Date with priority over Bridging's liens; and (iii) the Carve Out.

Supplemental Lien.    As additional adequate protection for any Diminution, Bridging shall have a valid, perfected and enforceable continuing supplemental lien and security interest (the "Supplemental Lien") in all of the assets of the Debtors of any kind or nature whatsoever within the meaning of section 541 of the Bankruptcy Code, whether acquired or arising prepetition or postpetition, together with all proceeds, rents, products, and profits thereof, exclusive of causes of action under Chapter 5 of the Bankruptcy Code (other than section 549 and 550 as made applicable by section 549) (the "Supplemental Collateral" and, collectively with the "Postpetition Collateral", the "Collateral"). The Supplemental Lien shall be subject to only (i) the DIP Liens; (ii) the Prior Senior Liens, if any, existing as of the Petition Date with priority over Bridging's liens; and (iii) the Carve Out.

Superpriority Claims.    As additional adequate protection for any Diminution, Bridging shall have a super-priority administrative expense claim pursuant to section 507(b) of the Bankruptcy Code, with recourse to and payable from any and all assets of the estates of the Debtors (the "Secured Party Superpriority Claims"). The Secured Party Superpriority Claims shall be subject to only (i) DIP Liens; (ii) Prior Senior Liens; and (iii) the Carve Out, and shall otherwise have priority over any and all administrative expenses, diminution claims and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all other administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code, and shall at all times be senior to the rights of the Debtors, any successor trustee or any creditor in these Chapter 11 Cases or any subsequent proceedings under the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment which allowed claims shall be payable from and have recourse to all pre- and post-petition property of the Debtors, and all proceeds thereof.

| | |
|---|---|
| | See Interim Order, ¶¶ 17-19. |
| **Waiver of Marshaling Doctrine and Equities of Case Exception**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(viii)* | All payments or proceeds remitted to Bridging pursuant to the provisions of the Interim Order or otherwise shall, be received by Bridging, free and clear of all claims, charges, assessments or other liabilities including, without limitation, any such claim or charge arising out of or based on section 506(c) or 552(b) of the Bankruptcy Code subject to entry of the Final Order, whether directly or indirectly, all of which are waived by the Debtors.<br><br>See Interim Order, ¶ 14. |
| **Modification of Automatic Stay**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(iv)* | The Interim Order provides that the automatic stay imposed by section 362 of the Bankruptcy Code is vacated and modified insofar as necessary to permit Bridging to: (i) receive payments to be made by the Debtors to Bridging, and (ii) take any action specifically authorized or contemplated by the Interim Order.<br><br>See Interim Order, ¶ 30. |
| **Modification of Authority to file a Plan**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(v)* | None |
| **Indemnification**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(ix)* | In consideration of the execution and delivery of the DIP Credit Agreement by DIP Agent and the DIP Lenders and the agreement to extend the Commitments provided under the DIP Credit Agreement, the Loan Parties hereby agrees to indemnify, exonerate, and hold harmless DIP Agent, each DIP Lender and each of the officers, directors, employees, Affiliates, agents, and Approved Funds of DIP Agent and each DIP Lender (each, a "DIP Lender Party") from and against any and all actions, causes of action, suits, losses, liabilities, damages, and expenses, including Attorney Costs (collectively, the "Indemnified Liabilities"), incurred by the DIP Lender Parties or any of them as a result of, or arising out of, or relating to (a) the Loans, any transaction financed or proposed to be financed in whole or in part, directly or indirectly, with the proceeds of any of the Loans; (b) the use, handling, release, emission, discharge, transportation, storage, treatment or disposal of any Hazardous Substance at any property owned or leased by any Loan Party; (c) any violation of any Environmental Laws with respect to conditions at any property owned or leased by any Loan Party or the operations conducted thereon; (d) the investigation, cleanup or remediation of offsite locations at which any Loan Party or their respective predecessors are alleged to have directly or indirectly disposed of Hazardous Substances; or (e) the execution, delivery, performance, or enforcement of the DIP Credit |

60437/0001-19435356v4

|  | Agreement or any other Loan Document by any of the DIP Lender Parties, in each case except for any such Indemnified Liabilities arising on account of the applicable DIP Lender Party's gross negligence or willful misconduct as determined by a final, non-appealable judgment by a court of competent jurisdiction.  If and to the extent that the foregoing undertaking is unenforceable for any reason, Borrower hereby agrees to make the maximum contribution to the payment and satisfaction of each of the Indemnified Liabilities which is permissible under applicable law.  All obligations provided for in <u>Section 15.17</u> of the DIP Credit Agreement will survive repayment of the Loans, cancellation of the Notes, any foreclosure under, or any modification, release, or discharge of, any or all of the Loan Documents and termination of the DIP Credit Agreement.  <u>Section 15.17</u> of the DIP Credit Agreement shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.<br><br>See DIP Credit Agreement, § 15.17. |
|---|---|
| **Challenge Period**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | the later of (i) 75 days after the Petition Date and (ii) 60 days after the formation of the Committee<br>See Interim Order, ¶ 32. |
| **Section 506(c) Waiver**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(x)* | All payments or proceeds remitted to Bridging pursuant to the provisions of the Interim Order or otherwise shall, be received by Bridging, free and clear of all claims, charges, assessments or other liabilities including, without limitation, any such claim or charge arising out of or based on section 506(c) or 552(b) of the Bankruptcy Code subject to entry of the Final Order, whether directly or indirectly, all of which are waived by the Debtors.<br>See Interim Order, ¶ 14. |
| **Lien on Avoidance Actions**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(xi)* | Upon the entry of the Final Order, DIP Liens shall attach to and the DIP Superpriority Claims may be paid out of avoidance action proceeds.<br>See Interim Order, ¶ 9. |

### Highlighted Provisions Under Local Rule 4001-2(a)(i)

17.     The Interim Order includes certain terms that constitute material provisions requiring explicit disclosure under the Local Rules.[4]  The provisions described in Local Rule 4001-2(a)(i), to the extent applicable, are set forth at the following sections of the Interim Order:

      a.     **Local Rule 4001-2(a)(i)(A) – Cross-Collateralization.** N/A.  The DIP Facility does not contemplate a roll-up of any amounts owed under the Prepetition Loan Documents.

      b.     **Local Rule 4001-2(a)(i)(B) – Validity, Perfection, and Amount of Prepetition Liens**.  The liens and security interests of Bridging are stipulated to be valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination immediately upon entry of the Interim Order, but subject to a Challenge.  *See* Interim Order ¶ 32.

      c.     **Local Rule 4001-2(a)(i)(C) – Section 506(c) Waiver.**  Subject to the entry of a Final Order, all payments or proceeds remitted to Bridging pursuant to the provisions of the Interim Order or otherwise shall, be received by Bridging, free and clear of all claims, charges, assessments or other liabilities including, without limitation, any such claim or charge arising out of or based on section 506(c) or 552(b) of the Bankruptcy Code.  *See* Interim Order ¶ 14.

      d.     **Local Rule 4001-2(a)(i)(D) – Liens on Avoidance Actions.**  Subject to the entry of a Final Order, the DIP Liens shall attach to any proceeds or property recovered in respect of any avoidance actions.  *See* Interim Order ¶ 9.

      e.     **Local Rule 4001-2(a)(i)(E) – Provisions Deeming Prepetition Debt to be Postpetition Debt.**  N/A.

      f.     **Local Rule 4001-2(a)(i)(F) – Disparate Treatment of Professionals Retained by the Committee.** The Interim Order contains no provisions for disparate treatment for any professionals retained by any Committee with respect to the Carve-Out, provided that only up to $50,000 of Cash Collateral will be made available to any Committee for reviewing the validity, priority, perfection and enforceability of Bridging's liens in the Prepetition Collateral. *See* Interim Order, ¶ 20.

      g.     **Local Rule 4001-2(a)(i)(G) – Non-Consensual Priming.**  N/A.

---

[4]  While the Debtors have attempted to highlight the provisions required by the Bankruptcy Rules and Local Rules, as well as certain other material provisions, the Debtors reserve the right to supplement this list at the hearing to consider this Motion on an interim basis.

h.      **Local Rule 4001-2(a)(i)(H) – Provisions Affecting the Court's Power to Consider Equities of the Case.**  Subject to the entry of a Final Order, all payments or proceeds remitted to Bridging pursuant to the provisions of the Interim Order or otherwise shall, be received by Bridging, free and clear of all claims, charges, assessments or other liabilities including, without limitation, any such claim or charge arising out of or based on section 506(c) or 552(b) of the Bankruptcy Code.  *See* Interim Order ¶ 14.

## BASIS FOR RELIEF

I.      **The DIP Facility Should Be Approved**.

A.      **Entering into the DIP Loan Documents Is an Exercise of the Debtor's Sound Business Judgment**.

18.      The Court should authorize the Debtors, as an exercise of the Debtors' sound business judgment, to enter into the DIP Loan Documents, obtain access to the DIP Facility, and use Cash Collateral.  Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below.  Courts grant a debtor-in-possession considerable deference in acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See*, *e.g.*, *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("Cases permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy

process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest.").

19.     Specifically, to determine whether the business judgment standard is met, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

20.     Furthermore, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).  The Court may also appropriately take into consideration non-economic benefits to the debtor offered by a proposed postpetition facility.

21.     The Debtors' determination to move forward with the DIP Facility is an exercise of their sound business judgment following an arms'-length process and careful evaluation of their lack of alternatives.  The DIP Agent and DIP Lenders were the only parties willing to provide financing to the Debtors.  Accordingly, the Debtors negotiated the DIP Loan Documents with the DIP Agent and DIP Lenders in good faith, at arms'-length, and with the assistance of their advisors. The Debtors believe that they have obtained the best and only financing available.  Entry into the

DIP Facility is in the best interests of the Debtors' Estates and is an exercise of the Debtors' sound business judgment and should be approved.

## B.      The Debtors Should Be Authorized to Grant Liens and Superpriority Claims.

22.      The Debtors propose to obtain financing under the DIP Facility, by providing superpriority claims and liens pursuant to section 364(c) of the Bankruptcy Code.  Specifically, the Debtors propose to provide the DIP Lenders with (a) a valid and perfected security interest in and lien upon all of the Debtors' current or future (i) assets constituting Prepetition Collateral, (ii) any assets of the Debtors that, as of the Petition Date, were not otherwise subject to a valid, perfected, enforceable, and unavoidable security interest, including any assets comprising Excluded Collateral (under any of the Prepetition Loan Documents), and (b) fully consensual priming of the Prepetition Liens on the Prepetition Collateral.  The Debtors also propose providing Bridging with Superpriority Claims as adequate protection.

23.      The statutory requirement for obtaining postpetition credit under section 364(c) of the Bankruptcy Code is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code]." 11 U.S.C. § 364(c). *See In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (stating that secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained). Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether: (i) the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim; (ii) the credit transaction is necessary to preserve the assets of the estate; and (iii) the terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor-borrower and proposed lenders. *See In re L.A. Dodgers LLC*, 457 B.R. at 312 (Bankr. D. Del. 2011); *In re Ames*

24

*Dep't Stores*, 115 B.R. at 37–40; *see also In re St. Mary Hosp.*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *In re Crouse Grp.*, 71 B.R. at 549.

24.     As described above and as set forth in the First Day Declaration, the Debtors are in need of an immediate capital infusion, yet substantially all of the Debtors' operating assets are encumbered under their existing capital structure. In light of the foregoing, the Debtors, in consultation with their advisors, have concluded that the success of the Chapter 11 Cases hinges on whether any DIP Financing had the support of, or could be provided by, the Prepetition Secured Parties.

25.     Without DIP Financing, the Debtors lack sufficient funds to operate their businesses, continue paying their debts as they come due, pursue the sale of their assets, or cover the projected costs of the Chapter 11 Cases. Absent the DIP Facility, which will provide the Debtors with sufficient liquidity to administer their estates in a chapter 11 reorganization, the value of the Debtors' estates would be significantly impaired to the detriment of all creditors and stakeholders.  Given the current circumstances, the Debtors believe that the terms of the DIP Facility, as set forth in the DIP Loan Documents, are fair, reasonable and adequate. For all these reasons, the Debtors submit that they have met the standard for obtaining postpetition financing.

### C.     The DIP Financing is Necessary to Preserve the Value of the Debtors' Estates.

26.     The Debtors have an urgent and immediate need for access to funds available under the DIP Facility and the use of the Cash Collateral. Such funding is necessary in order for the Debtors to have sufficient liquidity to operate their business, satisfy their vendor and patient obligations, and pay their employees. Without immediate access to the DIP Facility and Cash Collateral, the Debtors would be forced to terminate operations and liquidate their assets, which would put numerous employees out of work and irreparably damage the Debtors' efforts to maintain going concern value. Accordingly, the Debtors strongly urge the Court to authorize the

DIP Facility and continued use of Cash Collateral on the terms contemplated herein, initially on an interim basis and, following a final hearing, on a final basis.

      **D.**      **The Terms of the DIP Financing are Fair**, **Reasonable**, **and Appropriate.**

      27.      After appropriate investigation and analysis, the Debtors have concluded that the DIP Financing presents the best route available under the circumstances. Bankruptcy courts routinely defer to a debtor's business judgment on substantive business decisions, including the decision to borrow money, unless such decisions fail the arbitrary and capricious standard. *See Ames*, 115 B.R. at 40 (court should approve borrowings pursuant to § 364(c) and (d) if the debtor was within its business judgment); *In re Mid-State Raceway, Inc.*, 323 B.R. 40, 58–59 (Bankr. N.D.N.Y. 2005) (same); *see also In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that approval of an interim loan, receivables facility, and asset-based facility "reflect[ed] sound and prudent business judgement... [was] reasonable under the circumstances and in the best interest of [the debtor] and its creditors."). Indeed, "more exacting scrutiny would slow the administration of the Debtor's estate and increase its cost, interference with the Bankruptcy Code's provision for private control of administration of the estate and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985) (*citations omitted*).

      28.      The terms and conditions of the DIP Financing are fair and reasonable. As discussed above, the Debtors properly assessed their financing needs and the DIP Financing proposal, and in the sound exercise of the Debtors' business judgment, the DIP Financing represents the best option available under the circumstances.

      29.      The proposed DIP Financing subjects the security interests and secured claims of the DIP Agent and DIP Lenders to the Carve-Out, thereby ensuring that, in the event of a default under the DIP Credit Agreement, the Debtors' estates and other parties-in-interest are not directly

or indirectly deprived of possible rights and powers by restricting the services for which professionals may be paid in these Chapter 11 Cases.  In *Ames*, the Court found such carve-outs for professional fees not only reasonable, but necessary to ensure that official committees and the debtors' estate could retain assistance from counsel.  *See Ames*, 115 B.R. at 38–40 ("Absent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced.").

30.     Likewise, the Milestones are a crucial element of the terms of the DIP Financing, and their inclusion in the DIP Orders is important to ensure that these Chapter 11 Cases proceed in a strategic, value-maximizing fashion.   In similar contexts, other courts in this district have entered financing orders—including on an interim basis—that included express milestones for the progress of a debtor's case.  *See, e.g. In re Horsehead Holding,* Case No. 16-10287 (CSS) (Bankr D. Del. Feb. 2, 2016) (approving case milestones in interim DIP financing order); *In re Verso Corporation*, Case No. 16-10163 (KG) (Bankr. D. Del Jan. 27, 2016); *In re Cal Dive International,* Case No. 15-10458 (CSS) (Bankr. D. Del March 9, 2015) (interim order approving DIP financing with case milestones); *In re ADI Liquidation, Inc. (f/k/a AWI Delaware, Inc.)*, Case No. 14-12092 (KJC) (Bankr. D. Del. Sept. 9, 2014) (interim DIP financing order with case milestones); *In re Handy Hardware Wholesale, Inc.*, Case No. 13-10060 (MFW) (Bankr. D. Del Jan. 14, 2013) (approving case milestones in interim DIP financing order).  Thus, for these reasons and the reasons set forth above, the DIP Facility should be approved.

**E.     The Use of Cash Collateral is Appropriate.**

31.     Section 363 of the Bankruptcy Code generally governs the use of estate property. Section 363(c)(2) provides that:

The trustee may not use, sell or lease cash collateral... unless—

(A)     each entity that has an interest in such collateral consents; or

(B)     the court, after notice and a hearing, authorizes such use, sale or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2). Section 363(e) provides for adequate protection of interests in property when a debtor uses cash collateral.

32.     Prior to the Petition Date, the Debtors' Cash Collateral was encumbered by the Prepetition Lender.  However, under the terms of the DIP Facility, the Prepetition Agent shall remit to the Debtors (pursuant to wire instructions provided by the Debtors), Cash Collateral in an amount set forth in the Interim Order.

33.     Prior to the Petition Date, the Debtors relied on cash on hand, cash generated from their operations and most importantly, from the funds provided under the Prepetition Loans Agreement.  During these Chapter 11 Cases, the Debtors will need access to their Cash Collateral (as well as the DIP Facility) to satisfy various critical administrative obligations, as well as to make any other payments that are essential for the continued operation of the Debtors' business and to effectuate the Debtors' chapter 11 goals.  An inability to use funds during these Chapter 11 Cases could severely impact the success of these Chapter 11 Cases.  Indeed, without access to Cash Collateral, the Debtors and their estates will suffer immediate and irreparable harm.  Accordingly, the Debtors respectfully submit that the use of Cash Collateral is fully consensual, is in the best interests of the Debtors' estates and should be approved.

**F.      Modification of the Automatic Stay is Appropriate.**

34.     Section 362 of the Bankruptcy Code provides for an automatic stay upon the filing of a bankruptcy petition.  The DIP Loan Documents require a modification of the automatic stay to implement the terms of the DIP Financing.

35.     Stay modification provisions of this kind are ordinary and standard features of postpetition DIP financing facilities and, in the Debtors' business judgment, are reasonable under

the present circumstances.  As noted above, the Debtors are unable to obtain unsecured credit

allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code in an

amount sufficient and readily available.  Further, the Debtors have not been able to obtain DIP

financing on terms more favorable than those proposed herein.  The terms and conditions of the

DIP Financing, including the modification of stay provisions, are fair and reasonable, and were

negotiated in good faith and at arms' length by parties represented by sophisticated counsel.

Accordingly, in light of the circumstances and the material benefits afforded to the Debtors by the

DIP Financing, the modification of the automatic stay is warranted and appropriate.

> **G.      The Section 506(c) and 552(b) Waivers are Appropriate.**

36.      The Court should approve the Debtors' waivers of any right (subject to entry of a

final order) to surcharge any or all of Bridging or the DIP Lenders, their respective claims, or their

respective collateral and to invoke the "equities of the case" exception of section 552(b).

Agreeing to the waivers allowed the Debtors to obtain critical financing under the DIP Facility.

Further, such waivers and provisions are standard and customary under financings between

sophisticated parties.  As one court noted in discussing such waivers, "the Trustee and Debtors-

in-Possession in this case had significant interests in asserting claims under § 506(c) and have

made use of their rights against the Lender under § 506(c) by waiving them in exchange for

concessions to the estate (including a substantial Carve Out for the benefit of administrative

creditors)."  *In re Molten Metal Tech., Inc*., 244 B.R. 515, 527 (Bankr. D. Mass. 2000); *see

also Ansel Props., Inc. v. Nutri/Sys. of Fla. Assocs. (In re Nutri/Sys. of Fla. Assocs.)*, 178 B.R.

645, 649 (E.D. Pa. 1995) (noting that debtor had waived § 506(c) rights in obtaining debtor in

possession financing).  In *In re Towne, Inc.* in 2013, the Third Circuit denied surcharge in the

absence of an explicit waiver, indicating that the Bankruptcy Code's surcharge provisions are to be interpreted narrowly. *See* No. 12-3069, at *7–8 (3d Cir. Aug. 29, 2013).

**H.      A Final Hearing Should be Set.**

37.      Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing as soon as practicable, but in no event later than thirty (30) days following the Petition Date.

38.      The Debtors request authorization to serve a copy of the signed Interim Order, which fixes the time and date for the filing of objections, if any, by first class mail upon the notice parties set forth below. The Debtors request that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001.

## IMMEDIATE AND UNSTAYED RELIEF IS NECESSARY

39.      Bankruptcy Rule 6003 provides that the relief requested in this Motion may be granted if the "relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003; *see also In re First NLC Fin. Servs., LLC*, 382 B.R. 547, 549 (Bankr. S.D. Fla. 2008) (holding that Bankruptcy Rule 6003 permits entry of retention orders on an interim basis to avoid irreparable harm). The Third Circuit has interpreted the language "immediate and irreparable harm" in the context of preliminary injunctions. In that context, the court has instructed that irreparable harm is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation. *See, e.g., Norfolk S. Ry. Co. v. City of Pittsburgh*, 235 F. App'x 907, 910 (3d Cir. 2007) (citing *Glasco v. Hills*, 558 F.2d 179, 181 (3d Cir. 1977)). Furthermore, the harm must be shown to be actual and imminent, not speculative or unsubstantiated. *See, e.g., Acierno v. New Castle Cnty.*, 40 F.3d 645, 653-55

30

(3d Cir. 1994).  The Debtors submit that for the reasons already set forth herein, the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors.

40.     The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  As described above, the relief that the Debtors seek in this Motion is necessary for the Debtors to operate their businesses without interruption and to preserve value for their estates.  Accordingly, the Debtors respectfully request that the Court waive the fourteen-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

41.     The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  As described above, the relief that the Debtors seek in this Motion is necessary for the Debtors to operate their businesses without interruption and to preserve value for their estates.  Accordingly, the Debtors respectfully request that the Court waive the fourteen-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

## RESERVATION OF RIGHTS

42.     Nothing contained herein is intended or should be construed as an admission regarding the validity of any claim against the Debtors, a waiver of the Debtors' rights to dispute any claim, or an approval or assumption of any agreement, contract, or policy under section 365 of the Bankruptcy Code.  The Debtors expressly reserve their right to contest any claim related to

the relief sought herein.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to an order of the Court is not intended to be nor should it be construed as an admission as to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## NOTICE

43.     Notice of this Motion will be given to: (a) the U.S. Trustee; (b) counsel to the Prepetition Secured Parties; (c) counsel to the DIP Secured Parties; (d) the parties listed on the Debtors' consolidated list of their 40 largest unsecured creditors; (e) the United States Securities and Exchange Commission; (f) the Internal Revenue Service; (g) the Office of the United States Attorney for the District of Delaware; (h) Delaware State Treasury; (i) Delaware Secretary of State, Division of Corporations, Franchise Tax; and (j) all parties that have requested notice pursuant to Bankruptcy Rule 2002.  As this Motion is seeking "first day" relief, the Debtors will serve this Motion and any order entered with respect to this Motion as required by Local Rule 9013-1(m). The Debtors submit that no other or further notice is required.

*[remainder of page intentionally blank]*

## CONCLUSION

**WHEREFORE**, the Debtors respectfully request that the Court (i) enter an order, substantially in the form attached hereto as **Exhibit 1**, granting the relief requested in this Motion, and (ii) grant such other and further relief as the Court may deem just and proper.

Dated:  Wilmington, Delaware
          February 19, 2020

                              COLE SCHOTZ P.C.


                              */s/ Katherine M. Devanney*
                              J. Kate Stickles (I.D. No. 2917)
                              Katherine M. Devanney (I.D. No. 6356)
                              500 Delaware Avenue, Suite 1410
                              Wilmington, Delaware 19801
                              Telephone: (302) 652-3131
                              Facsimile: (302) 652-3117

                              – and –

                              Michael D. Sirota (*pro hac vice* admission pending)
                              Stuart Komrower (*pro hac vice* admission pending)
                              Felice R. Yudkin (*pro hac vice* admission pending)
                              Jacob S. Frumkin (*pro hac vice* admission pending)
                              Michael Trentin (*pro hac vice* admission pending)
                              25 Main Street
                              Hackensack, New Jersey 07601
                              Telephone: (201) 489-3000
                              Facsimile: (201) 489-3479

                              *Proposed Counsel for Debtors and*
                              *Debtors-in-Possession*

33