**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

------------------------------------------------------------- x
                               :

In re:                          :     Chapter 11
                                 :

HYGEA HOLDINGS CORP., *et al.*,   :     Case No. 20-10361 (___)
                                 :

          Debtors.[1]           :     (Joint Administration Pending)
                                 :
------------------------------------------------------------- x

**DECLARATION OF KEITH COLLINS, M.D. IN SUPPORT**
**OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, Keith Collins, M.D., pursuant to section 1746 of title 28 of the United States Code,

hereby declare that the following is true and correct to the best of my knowledge, information

and belief:

      1.     I am the Chief Executive Officer ("CEO") and President of Hygea Holdings Corp.

("HHC"), a Nevada corporation and one of the debtors and debtors-in-possession (together with

its affiliated debtors, the "Debtors" or "Hygea") in the above-captioned chapter 11 cases (the

"Chapter 11 Cases"), and a member of HHC's board of directors (the "Board").  I have been a

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are: All Care Management Services, Inc. (6484); First Harbour Health Management, LLC (0941); First Harbour Medical Centers, LLC (3861); Florida Group Healthcare LLC (7956); Gemini Healthcare Fund, LLC (4928); Hygea Acquisition Longwood, LLC (1649); Hygea Acquisition Orlando, LLC (3507); Hygea Health Holdings, Inc. (8926); Hygea Holdings Corp. (2605); Hygea IGP of Central Florida, Inc. (9453); Hygea IGP, LLC (7724); Hygea Medical Centers of Florida, LLC (5301); Hygea Medical Partners, LLC (4486); Hygea of Delaware, LLC (4830); Hygea of Georgia, LLC (5862); Hygea of Pembroke Pines, LLC (6666); Hygea Primum Acquisition, Inc. (8567); Medlife Activity Center, LLC (2311); Mobile Clinic Services, LLC (9758); Palm A.C. MSO, LLC (2585); Palm Allcare Medicaid MSO, Inc. (6956); Palm Allcare MSO, Inc. (0319); Palm Medical Group, Inc. (5028); Palm Medical MSO LLC (7738); Palm Medical Network, LLC (9158); Palm MSO System, Inc. (2178); Palm PGA MSO, Inc. (8468); Physician Management Associates East Coast, LLC (7319); Physician Management Associates SE, LLC (3883); Physicians Group Alliance, LLC (7824); Primum Alternatives, Inc. (7441); Primum Healthcare, LLC (0157); and Professional Health Choice, Inc. (6850).  The address of the Debtors' corporate headquarters is 8700 W Flagler Street, Suite 280, Miami, FL 33174.

member of the Board since March 1, 2013, and was appointed as the CEO effective as of April 23, 2018.

2.      I submit this declaration (the "Declaration") in support of the Debtors' (a) voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), and (b) first day motions and pleadings (collectively, the "First Day Pleadings").[2]  I am over the age of 18, competent to testify and authorized to submit this Declaration on behalf of the Debtors.

3.      As a result of my role with the Debtors, my review of relevant documents and my discussions with the Debtors' employees, consultants and professionals, I am familiar with the Debtors' day-to-day operations, business affairs and books and records.

4.      Except as otherwise noted, all facts set forth in this Declaration are based on my personal knowledge, my discussions with the Debtors' employees, consultants and professionals, my review of relevant documents or my opinion, based on my experience and knowledge of the Debtors' operations and financial condition.  In making this Declaration, I also have relied on information and materials that the Debtors' personnel and advisors have gathered, prepared, verified and provided to me, in each case under my ultimate supervision, at my direction and/or for my benefit in preparing this Declaration.  If I were called to testify as a witness in this matter, I would testify competently to the facts set forth herein.

5.      This Declaration is divided into two parts.  Part I provides background information regarding the Debtors, their businesses, their capital structure and the circumstances

---

[2] Except as otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to such terms in the relevant First Day Pleading.

surrounding the commencement of the Chapter 11 Cases.  Part II sets forth the relevant facts in

support of each of the First Day Pleadings.

# PART I

# BACKGROUND

## A.    The Chapter 11 Filings

6.    On the date hereof (the "Petition Date"), each Debtor filed a voluntary petition in

this Court for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to manage

and operate their businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the

Bankruptcy Code.

## B.    The Debtors' Businesses

7.    Founded in 2007, Hygea is a consolidated enterprise of several companies

aggregated through a series of acquisitions that focus on the delivery of primary-care-based

health care to commercial, Medicare and Medicaid patients.  The Debtors currently provide

health care related services to approximately 190,000 patients in the southeast United States

through two platforms: (i) individual physician practices and physician group practices

(collectively, the "Physician Practices") with a primary care physician ("PCP") focus and

(ii) management services organizations ("MSOs").

8.    The Debtors are headquartered in Miami, Florida and currently employ more than

150 individuals.

### 1.    The Physician Practices

9.    The Physician Practices consist of approximately seventeen (17) active brick and

mortar locations throughout South and Central Florida and Georgia.  The Debtors either manage

or wholly own the assets of the Physician Practices and employ the personnel of the Physician

Practices, including the physicians.  The physicians still own the equity in the corporate entities

3

of the Physician Practices (except for First Harbour Medical Centers, LLC, which is wholly owned by the Debtors).

10.     The Physician Practices focus on family medicine, internal medicine, clinical cardiology and other concentrated disciplines.  Through these practices, the Debtors directly employ in excess of seventy (70) clinical staff (physicians, physician assistants, nurse practitioners, clinical technicians and medical assistants).

11.     Historically, acquisitions of physician practices and clinics were an integral component of the Debtors' business model.  Since its inception, Hygea acquired approximately thirty-five (35) physician practices, many of which the Debtors no longer operate.  In a typical purchase transaction, the Debtors purchased the physical assets of a medical practice and obtained an option to purchase the equity or ownership interest in the corporate entity of the practice itself.  The Debtors, however, generally did not exercise the option to purchase the ownership interest in the practice.  As consideration for the asset purchase, the selling physician or physicians received a combination of cash and stock in HHC with a put option at a set minimum price per share.

12.     Contemporaneously with the asset acquisition, the Debtors typically entered into (i)  a management services agreement (the "MSA") with the physician practice and (ii) employment agreements with the physicians.  Pursuant to the MSAs, certain of the Debtors manage the day-to-day business operations of the Physician Practices, thereby allowing the physicians to focus on the practice of medicine.  The management related services provided to the Physician Practices include staffing, payroll services and centralized benefits including healthcare coverage.

13.     The Physician Practices earn revenue through fee for service billing ("FFS") or capitation payments (as described below).  Under traditional FFS reimbursement, physicians are paid a specified amount for a patient visit based upon the appropriate coding for such visits.  Physician compensation is related solely to the volume of patient visits, procedures performed, and tests ordered.  As of the Petition Date, approximately 52% of the Debtors' revenue comes from FFS payments.

14.     Although the Physician Practices traditionally have relied upon the FSS payment model, in recent years Hygea has shifted its focus toward the capitation model by entering into value-based performance contracts with various insurance companies.  Capitation is a type of health care payment system in which a doctor is paid a fixed amount per patient for a prescribed period of time by an insurer or physician association.  As of the Petition Date, approximately 19% of the Debtors' revenue comes from capitation payments.

### 2.     Management Service Organizations (MSOs)

15.     An MSO is an entity that, under contract, arranges for medical and medically related services to patients on behalf of a health plan.  The following entities comprise the Debtors' active MSOs: First Harbour Health Management, LLC; Florida Group Healthcare, LLC; and Palm Medical Network, LLC.

16.     The Debtors' MSOs have entered into "at risk" contracts with Medicare Advantage Health Maintenance Organizations ("HMOs") to manage the delivery of healthcare services to Medicare enrolled patients throughout Florida (the "Enrollees").  An "at risk" contract is when the MSO agrees to assume either a portion or all of the financial risk or exposure for potential losses incurred by their patient base participating in that HMO.  The Debtors currently have three (3) active "at risk" agreements with Humana, Inc. ("Humana") and

subsidiaries of Humana, pursuant to which the MSOs provide or arrange for medical and related healthcare services to the Enrollees either through the Physician Practices or third-party physician groups ("Providers").

17.     The Debtors' MSO model is to improve the management of high-risk patients, resulting in better quality outcomes.  The MSOs work closely with the PCP to ensure the patient receives the necessary care to achieve optimal health outcomes.  The Debtors' MSOs enhance their profitability by restraining medical costs.  By emphasizing preventive care and attempting to avoid turning chronic conditions into acute conditions, the Debtors' MSOs are increasingly focused on keeping patients healthier as a means to reduce costs and decrease utilization.

18.     The HMO receives a "risk adjusted" monthly amount for each Enrollee from the Centers for Medicare & Medicaid Services ("CMS"), which amount can change based upon various factors personal to each Enrollee, including health, age and demographics.  The HMO is entitled to a monthly fee (usually a percentage of the fixed amount paid by CMS) and the balance is allocated to the MSO (the "Allocated Amounts").  The Allocated Amounts are used to pay claims either on an FFS basis or at a capitated rate.  After claims are reconciled and paid, any surplus remaining from the monthly Allocated Amounts are paid to the MSO.  As the MSOs generate surplus payments, the Debtors are obligated to downstream a percentage of that surplus to the Providers, pursuant to various contracts between the MSOs and the Providers.  As of the Petition Date, approximately 29% of the Debtors' revenue comes from surplus payments to the Debtors' MSOs.

### 3.     The Palm Network

19.     In 2008, Hygea acquired the Palm Network, which, at the time, was one of the largest independent physician associations ("IPAs") in Florida, representing more than seventy-

six (76) different medical specialties, including more than eight hundred (800) primary care providers.  However, in today's healthcare climate, IPAs, such as the Palm Network, have proven to be an inferior business model compared to MSOs.  As of the Petition Date, the Palm Network is not a direct source of revenue for the Debtors.  Nonetheless, through the Palm Network, the Debtors are able to maintain and develop new relationships with third party physician practice groups with whom the Debtors contract with to provide care to HMO Enrollees.

**C.    The Debtors' Corporate Structure**

20.    HHC was formed on August 26, 2008, as Piper Acquisition II, Inc.  On May 16, 2011, HHC changed its name to Hygea Holdings Corp.  On that same date, HHC entered into a Share Exchange Agreement with the shareholders of Hygea Health Holdings, Inc., a Florida corporation ("Hygea Health"), an entity founded in March of 2007 by Manuel E. Iglesias, Edward Moffly and Dr. Manuel I. Iglesias, pursuant to which HHC acquired 99.9% of the outstanding securities of Hygea Health in exchange for 135,519,339 shares of HHC common stock.

21.    As set forth on the organizational chart attached hereto as Exhibit A, HHC has a myriad of direct and indirect subsidiaries.  As of the Petition Date, several of these subsidiaries, some of which consist of former MSO entities, are inactive.  The majority of the Debtors' business operations (described above) are conducted through Hygea Health.

**D.    The Debtors' Prepetition Capital Structure**

22.    As of the date hereof, the Debtors have assets on a consolidated basis of approximately $77.3 million and liabilities of approximately $212.2 million, consisting of approximately $76.3 million in current liabilities and approximately $135.9 million in long-term liabilities.

60437/0001-18840387v12

23.    The Debtors' long-term liabilities relate to in excess of approximately $160 million Canadian (approximately $121 million in U.S. Dollars) under that certain Amended and Restated Credit Agreement, dated as of January 31, 2017 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), by and among HHC, certain of the other Debtors, as obligors, Bridging Income Fund LP (formerly known as Sprott Bridging Income Fund LP) (the "Lender") and Bridging Finance Inc. (the "Administrative Agent" and together with the Lender, "Bridging").

24.    As of the Petition Date, the Debtors had unsecured debt in the form of accounts payable, accrued liabilities and other liabilities.  The liabilities consist of, among other things, contingent, unliquidated and disputed litigation claims in excess of $50 million and payroll tax liabilities in excess of $10 million, including interest and penalties.

**E.    Events Leading to the Chapter 11 Filings**

25.    Since 2017, the Debtors have confronted liquidity challenges and operational issues that threaten their ability to continue as a going concern.  The Debtors' financial situation has been deteriorating over time due to a variety of reasons.

26.    Over the last several years, the Debtors pursued an aggressive growth strategy, expanding their acquisition of Physician Practices and other healthcare businesses.  In some cases, the Debtors purchased certain Physician Practices with minimal net profit.  At the time of acquisition, the Debtors projected increased profitability for those practices as a result of performance improvements.  The Debtors, however, failed to properly integrate the underperforming acquisitions.  Consequently, the Debtors have been burdened with supporting a number of losing operations, that even with performance improvements will never be profitable. The operating losses of those practices, along with the associated acquisition costs, have caused a substantial drain on the Debtors' liquidity.

27.     The Debtors' failed acquisition of certain MSOs similarly contributed to the current liquidity constraints.  The Debtors purchased certain MSOs that, at the time of acquisition, had sufficient infrastructure to generate profit.  The Debtors, however, were unable to maintain the investment required to support those MSOs and the MSOs performance dropped significantly and below acceptable levels for the HMOs.  As a result, the HMOs terminated their contracts with those MSOs.  Those terminations resulted in several large acquisitions becoming worthless while the Debtors remained obligated for the costs associated with such acquisitions.

28.     The Debtors' acquisition of the Palm Network similarly proved to be unsuccessful in terms of generating direct profits.  Nonetheless, the Palm Network still provides certain value to the Debtors in terms of helping the Debtors maintain and develop new business relationships with physicians and HMOs.

29.     In addition to failed acquisitions, the Debtors' historical financial reporting was inadequate, causing deficiencies in their financial forecasting as well as cash management. Those inadequacies caused the Debtors to overspend in the face of an already unsustainable debt load.

30.     Given these operational challenges, the Debtors were never profitable on a cash basis and, therefore, were dependent on constant debt and equity fundraising activities to cover losses.  The Debtors have been unable to raise additional capital to fund those losses due to, in part, pending litigation stemming from shareholder and contractual disputes.  The Debtors do not have the liquidity to defend or settle these lawsuits.

31.     As a result of the foregoing issues, the Debtors have been unable to service their debt obligations to the Lender and certain events of default occurred under the Credit Agreement.  Accordingly, in or around January 2018, the Debtors hired 4Front Capital Partners

9

Inc. ("4Front"), an investment banking firm, to assist the Debtors in evaluating strategic alternatives and commencing a formal marketing process for the sale and/or refinancing of Hygea. Although Hygea and 4Front contacted almost 100 parties with respect to a potential transaction, only 15 executed a non-disclosure agreement. These parties were provided access to a dataroom containing confidential information regarding the Debtors, their businesses and their assets. Of these 15 parties who had access to the dataroom, only one expressed further interest in participating in a transaction and had further discussions with the Debtors and 4Front regarding potential transactions. Ultimately, the last party declined to move forward with a transaction.

32.     Following the unsuccessful sale process and continued operating losses of approximately $327,000 per week, in late October 2019 the Debtors engaged Alvarez & Marsal North America, LLC ("A&M") to assist the Debtors with, among other things, financial and operational support and strategic advice relating to a corporate reorganization. On or about October 31, 2019, the Debtors and Bridging entered into a Forbearance Agreement, as subsequently amended (collectively, the "Forbearance Agreements"), pursuant to which, among other things, Bridging agreed to forbear from exercising its rights and remedies under the Credit Agreement and provided in excess of $6 million of emergency funding to the Debtors, which enabled the Debtors to satisfy critical expenses such as payroll.

33.     Given the Debtors' dire financial situation and the lack of any other viable alternatives, contemporaneous with entry into the Forbearance Agreements, the Debtors and Bridging began discussing the framework of a chapter 11 Plan. After months of negotiating, the parties agreed upon the material terms of a Chapter 11 plan, and embodied those terms in a restructuring term sheet (the "Restructuring Term Sheet"). Thereafter, the Debtors and Bridging engaged in significant arms'-length negotiations that led to them entering into that certain

Restructuring Support Agreement, dated as of February 7, 2020, by and among the Debtors and Bridging (the "RSA"), pursuant to which, among other things, the Debtors agreed to commence the Chapter 11 Cases and pursue a consensual restructuring to be implemented through a chapter 11 plan (the "Plan"), if possible, or a sale under section 363 of the Bankruptcy Code.[3]  Within twenty (20) days hereof, the Debtors will file the proposed Plan that provides for, among other things, the (i) transfer of the Debtors' equity to the Lender on account of its pre-petition secured claim, (ii) creation of a liquidating trust for the benefit of the Debtors' unsecured creditors and (iii) payment of priority tax claims pursuant to section 1129(a)(9)(C) of the Bankruptcy Code including the outstanding payroll tax liability.  Pursuant to the RSA, Bridging has agreed to provide the Debtors with debtor-in-possession financing to support the administrative and operational expenses of these Chapter 11 Cases.  The Debtors believe the restructuring contemplated by the RSA provides a clear path to emergence from these Chapter 11 cases and will allow the Debtors to succeed as restructured companies after emergence.

## PART II

## FIRST DAY PLEADINGS

34.     In furtherance of the Debtors' efforts to reorganize under Chapter 11, the Debtors have filed the First Day Pleadings, and respectfully request that the Court enter the proposed orders granting the relief sought in such pleadings.  I have reviewed each of the First Day Pleadings and the facts set forth therein are true and correct to the best of my knowledge, information and belief.  Moreover, I believe that the relief sought in each of the First Day Pleadings (a) is vital to enable the Debtors to make the transition to, and operate in, chapter 11

---

[3] In the event the Plan (defined herein) is withdrawn or an order denying confirmation of the Plan is entered by the Court, the Debtors have agreed to file a motion under section 363 of the Bankruptcy Code to sell substantially all of their assets to Bridging as a stalking horse bidder through a credit bid.

with minimum interruption or disruption to their businesses or loss of productivity or value and

(b) constitutes a critical element in maximizing value during the Chapter 11 Cases.

A.    **Administrative and Procedural First Day Pleadings**

      1.    **Joint Administration Motion**

35.    The Debtors are requesting that the Chapter 11 Cases be jointly administered for

procedural purposes only.  As set forth above, each of the Debtors is affiliated with the others.

Joint administration of these cases will avoid the unnecessary time and expense of duplicative

motions, applications, orders and other papers and related notices that otherwise would need to

be filed in all of the cases absent joint administration.  Moreover, joint administration will relieve

this Court of the burden of entering duplicative orders and maintaining duplicative files and will

ease the burden on the U.S. Trustee in supervising these cases.  Accordingly, joint administration

will save considerable time and expense for all parties in interest and this Court.

      2.    **Consolidated Creditors Matrix Motion**

36.    The Debtors seek entry of an order authorizing the Debtors to file a consolidated

list of creditors in lieu of submitting separate mailing matrices for each Debtor.  I believe that

permitting the Debtors to maintain a single consolidated list of creditors, in lieu of filing a

separate creditor matrix for each Debtor, is warranted.  Requiring the Debtors to segregate and

convert their computerized records to a Debtor-specific creditor matrix format would be

burdensome and result in duplicate mailings.

      3.    **Epiq Retention Application**

37.    The Debtors seek authority to retain Epiq Corporate Restructuring, LLC ("Epiq")

as claims and noticing agent in the Chapter 11 Cases.  I understand that requesting such

appointment is required by the rules of this Court given that the Debtors have more than 200

creditors and/or parties in interest listed on their creditor matrix.  I believe that Epiq's retention is

the most effective and efficient manner of noticing creditors and parties in interest of the filing of

the Chapter 11 Cases and other developments in the Chapter 11 Cases.  In addition, Epiq will

transmit, receive, docket and maintain proofs of claim filed in connection with the Chapter 11

Cases.  Accordingly, I believe that retention of Epiq, an independent third party with significant

experience in this role, to act as an agent of this Court, is in the best interests of the Debtors and

their estates and their creditors.[4]

### 4.    <u>Patient Confidentiality Motion</u>

38.    The Debtors seek entry of an order authorizing certain procedures to maintain and

protect the confidentiality of patient information as required by the Health Insurance Portability

and Accountability Act of 1996 ("<u>HIPAA</u>"), while providing required disclosure in these

Chapter 11 Cases (the "<u>Privacy Procedures</u>").

39.    HIPAA and its corresponding regulations impose stringent standards on

healthcare providers and establish significant penalties for any health care provider that uses or

discloses patient information.  *See* 42 U.S.C. § 1302d, *et. seq.* and 45 C.F.R. § 164.502.  Because

certain of the Debtors qualify as health care providers that transmit health information or

otherwise have access to PHI (as defined below), they may be considered "covered entities"

under 45 C.F.R. § 160.103.  This designation prevents the Debtors from disclosing, except in

limited circumstances, "individually identifiable health information."  45 C.F.R. § 164.502.

HIPAA defines "individually identifiable health information" as any information relating to the

individual's "past, present or future physical or mental health or condition, the provision of

health care to the individual, or the past, present or future payment for the provision of health

---

[4]  The Debtors intend to file a subsequent application to retain Epiq to perform certain administrative services under section 327 of the Bankruptcy Code.

care to the individual" that also "identifies the individual or for which there is a reasonable basis

to believe that the information can be used to identify the individual." 42 U.S.C. § 1302d(6).

Individually identifiable health information is referred to as "patient health information" ("PHI")

under HIPAA.  The Debtors could be subjected to significant monetary penalties for the

unauthorized disclosure of PHI. 45 C.F.R. § 160.402.  Such penalties can be imposed even if a

person "did not know and, by exercising reasonable diligence, would not have known" that a

violation occurred.  *Id.* § 160.404(b)(2)(i).

40.     I believe that the requirements to maintain patient confidentiality under HIPAA

conflict with certain requirements to disclose information under the Bankruptcy Code as I

understand them, including the duty to file a list of all creditors under section 521(a)(1)(A) of the

Bankruptcy Code and the duty to file schedules of all assets and liabilities under section

521(a)(1)(B)(i) of the Bankruptcy Code.  Therefore, I believe that the relief requested in the

Patient Confidentiality Motion appropriately balances the need to maintain confidential patient

information under HIPAA with the need for adequate disclosure under the Bankruptcy Code.

Given the nature of any information that may reveal even the identity of patients, confidentiality

in this context is of paramount importance.

**B.      Operational First Day Pleadings**

**1.      Cash Management Motion**

41.     The Debtors respectfully request entry of interim and final orders (a) authorizing,

but not directing, the Debtors to maintain their existing cash-management system and bank

accounts; (b) modifying certain operating guidelines relating to bank accounts set forth in the

United States Department of Justice, Office of the United States Trustee: Operating Guidelines

for Chapter 11 Cases (the "U.S. Trustee Guidelines"); (c) authorizing, but not directing, the

payment of related prepetition obligations; (d) authorizing, but not directing, the Debtors to

continue using existing checks, business letterhead, purchase orders, invoices, envelopes, promotional materials, and other business forms and correspondence (collectively, the "Business Forms"); and (e) authorizing, but not directing, the continuation of various transactions relating to (i) the business relationship between the Debtors and (ii) certain shared management and/or other similar services between the Debtors (the "Intercompany Transactions") and the accordance of administrative expense priority status to all claims arising postpetition in the ordinary course of business as a result of an Intercompany Transaction.

42.    *Cash-Management System.*  The Debtors' existing cash management system (the "Cash Management System") aids reporting, monitors collection and disbursement of funds, reduces administrative expenses by facilitating the movement of funds and the development of more timely and accurate balance and presentment information and administers the various Bank Accounts (as defined below) required to effect the Debtors' collection, disbursement and movement of cash.  Specifically, deposits are received from insurance companies as monthly surplus payments for the Debtors' MSOs and through co-payments as daily receipts under the Debtors' FFS business line.  The account into which the deposits are made relates to, as applicable, the contract counterparty with the applicable insurance company or the Physician Practice that bills the patient.  For example, City National Bank account ending in 3367 receives FFS payments under contracts between insurance plans and Debtor Hygea Medical Centers of Florida, LLC and Wells Fargo Bank account ending in 6859 receives MSO payments from CarePlus.  The Debtors then review the insurance transmittal information and record revenue based on the practice that generated the revenue.

43.    The Debtors transfer a majority of their surplus cash to, and receive funding from the Lender in, City National account ending in 7320.  When a transfer is made, the Debtors

record the entry in their accounting system and create an intercompany liability and asset. Specifically, the entity that sends cash records an intercompany receivable (*i.e.*, an asset) and the receiving entity records an intercompany payable (*i.e.*, a liability).

44.    Although operating disbursements are paid out of twenty-five (25) different bank accounts, depending on cash levels, the majority of the Debtors' disbursements come from City National Bank account ending in 4145 (for wire and ACH disbursements) and from City National Bank account ending in 3367 (for check disbursements).  Employee payroll is paid out of one centralized payroll account (City National Bank account ending 0630) that is funded from the Debtors' various depository accounts.

45.    Certain of the bank accounts in the Cash Management System are not in the name of a Debtor entity, but rather in the name of medical providers for which certain of the Debtors provide management services (collectively, the "Managed Entities").  The Debtors, however, are entitled to all of the receipts in those accounts pursuant to management agreements entered into between certain of the Debtors and the Managed Entities.  Additionally, the Debtors control the disbursement of cash from such accounts, subject to the rights of the Lender pursuant to deposit account control agreements with respect to a subset of such accounts.  Other providers with whom the Debtors have a contractual relationship control their own bank accounts.

46.    In connection with the Cash Management System, the Debtors may incur fees and other charges in connection with (a) checks which have been dishonored or returned for insufficient funds in the applicable account, and (b) any reimbursement or other payment obligations, such as overdrafts, arising under any agreements governing the Bank Accounts, including, without limitation, any prepetition cash management agreements or treasury services agreements.

47.     *Business Forms*. The Debtors use various Business Forms, such as checks, invoices, and letterhead, in the ordinary course of business.  Because the Business Forms were used prepetition, they do not reference the Debtors' current status as debtors-in-possession. Nonetheless, most parties doing business with the Debtors will be aware of the Debtors' status as debtors-in-possession as a result of the publicity surrounding the Chapter 11 Cases and the notice of commencement served on parties-in-interest.

48.     *Intercompany Transactions*.  In the ordinary course of business, the Debtors engage in various transactions relating to expenses and obligations that various segments of the Debtors' business incur in the course of operations.  In particular, as described above, various Debtors disburse funds from depository accounts to operating accounts and receive revenue payments on behalf of the other Debtors.  These Intercompany Transactions also relate to payroll charges, as Hygea Health pays the employees of other Debtors on such entities' behalf.  The Intercompany Transactions reduce administrative costs and ensure the orderly and efficient operation of the Debtors' enterprise. When funds from the operating accounts are disbursed for the benefit of Debtors not named on such accounts, Intercompany Transactions are recorded and booked.

49.     Although the Intercompany Transactions discussed herein occur among the Debtors, certain of the Debtors routinely engage in transactions with the Managed Entities, which are required to maintain separate legal entities.  Thus, in the ordinary course of business, the Debtors routinely engage in transactions with both Debtor and non-Debtor Physician Practices.  These transactions are traceable and the Debtors keep records accounting for them.

50.     In the ordinary course of business, the Debtors also may engage in additional routine Intercompany Transactions.  The Debtors anticipate that the Intercompany Transactions

will continue postpetition in the ordinary course of business.  Such transactions are necessary to the efficient operation of the Debtors' businesses.  Because the Debtors engaged in the Intercompany Transactions on a regular basis prepetition and such transactions are common for enterprises like the Debtors, the Debtors believe that they may continue the Intercompany Transactions in the ordinary course under section 363(c)(1) of the Bankruptcy Code, without court approval.  Nonetheless, out of an abundance of caution, the Debtors seek express authority, but not direction, to continue engaging in the Intercompany Transactions.  Consistent with their prepetition practice, the Debtors will maintain records of all transfers and can ascertain, trace and account for all of the Intercompany Transactions.  In addition, the Debtors request that the postpetition Intercompany Transactions be granted administrative expense priority status, which will facilitate the orderly and efficient operation of the Debtors' enterprise.

51.    I believe that the relief sought in the Cash Management Motion is appropriate and in the best interest of the Debtors.

**2.    <u>Employee Wages Motion</u>**

52.    I believe that it is critically important that the Debtors continue to honor a number of prepetition obligations to their employees in order to minimize the personal hardship that the Debtors' employees will suffer if those obligations are not honored as well as to prevent that harm that could occur to the Debtors if they do not maintain employee morale.  In particular, I believe it is necessary for the Debtors to:

a)    pay and/or perform, as applicable, prepetition obligations to current employees (collectively, the "<u>Employees</u>"), including accrued prepetition wages, salaries, processing services related thereto and other cash and non-cash compensation claims (collectively, the "<u>Employee Claims</u>");

b)    pay obligations to or on account of independent contractors, consultants and third-party service providers (collectively, the "<u>Contractor Claims</u>");

c)      honor and continue in the ordinary course of business, until further notice, and pay (but not assume) the prepetition amounts associated with, the Debtors' holiday, flex and sick time policies (collectively, "PTO");

d)      honor and continue in the ordinary course of business, until further notice, and pay (but not assume) the prepetition amounts associated with employee benefit plans and programs and workers' compensation plans and programs (collectively, and together with PTO, the "Employee Benefit Programs"), and to pay fees and costs in connection therewith, except as otherwise set forth herein (collectively, the "Employee Benefit Obligations");

e)      reimburse Employees and members of HHC's board of directors for prepetition Reimbursable Expenses (as defined below), consisting of out-of-pocket expenses incurred in the ordinary course of business; and

f)      pay over to the appropriate parties all prepetition withholdings from Employees and payroll-related taxes associated with the Employee Claims and the Employee Benefit Obligations (the "Employee Withholdings" and, together with the Employee Claims, the Contractor Claims, the Employee Benefit Obligations and the Reimbursable Expenses, the "Prepetition Employee Obligations").

53.     The Debtors have 157 Employees, approximately 139 of whom work-full time and approximately 18 of whom work part-time.  The Debtors pay salaries to 51 of their Employees and pay hourly wages to 106 of their Employees.  All Employees are employed by Hygea Health.  The Debtors' Employees serve a number of roles, including but not limited to office and medical assistants, physicians, technicians and accounting professionals.  The Debtors do not have any unionized employees.

54.     The Debtors also use the services of approximately 31 individuals who are engaged through various agreements or arrangements as independent contractors, consultants and third-party service providers (collectively, the "Contractors").[5]  The Contractors provide a variety of necessary functions for the Debtors, including but not limited to medical, technical, healthcare, operational and accounting services.  For example, Bruce Romanello, through Halos

---

[5] I am compensated as an independent contractor, not an Employee.

Systems LLC, currently provides services to Debtor First Harbour Health Management, LLC including, among other things, managing the contractual and business relationship between the Debtors and Humana, which relationship provides the basis for the Debtors' most significant income stream.[6]  Additionally, the Debtors outsource certain functions to Care Optimize, L.L.C., a healthcare consultant, that provides the Debtors with, among other services, operational support.  As of the Petition Date, the Debtors estimate that approximately $56,119.64 is accrued and owing to the Contractors.

55.     *Wages and Salaries*.  The average monthly payroll for the Debtors' Employees is approximately $1,180,833.00 (which amount includes recurring car and mobile phone allowances described below), including payroll taxes.  Substantially all of the Debtors' payroll functions are administered externally using Automatic Data Processing, Inc. ("ADP").[7]  The Debtors' internal accounting department processes and issues the actual payroll checks.  The average monthly payment to or on account of the Contractors is approximately $261,870.00. Employees are paid on a bi-weekly basis (*i.e.*, 26 times per year).  Contractors are paid either on a bi-weekly, semi-monthly or monthly basis.

56.     The Debtors pay payroll one week in arrears for the immediately preceding bi-weekly period ending on Friday.  On the Petition Date, the Debtors will have accrued payroll and

---

[6] Mr. Romanello is owed an earn-out in the amount of approximately $800,000.00 pursuant to that certain Master Purchase and Framework Agreement, dated as of June 14, 2017, by and between Mr. Romanello, RCH Management, LLC and Hygea Health.  The Debtors are not currently seeking to pay any portion of the earn-out.

[7] The Debtors use ADP to provide accounting, tax computation and various administrative services.  The Debtors pay ADP approximately $13,338.27 per month for such services. As of Petition Date, the Debtors estimate that they owe approximately $27,246.53 to ADP on account of such services.

payroll taxes from February 2, 2020 to February 18, 2020, or approximately $654,000.00.[8]  The next payroll funding date is February 21, 2020.

57.     Additionally, the Debtors' non-salaried Employees are eligible to earn overtime if they work more than 40 hours in a work week.  Any such overtime must be preapproved by a supervisor.  The Debtors spend roughly $12,250.00 per month on overtime wages.  The remainder of the Debtors' Employees, who are salaried, are not eligible to receive overtime compensation.

58.     *Discretionary and Contractual Bonuses*.  The Debtors have historically paid bonuses to their non-physician employees on a discretionary basis.  Additionally, the physicians with whom the Debtors maintain an employment agreement are paid annual bonuses pursuant to the terms of their employment agreements.

59.     *Other Compensation: Holidays, Flex and Sick Time and Business Expenses*.  The Debtors offer their Employees other forms of compensation, including paid holidays, flex time, sick time and reimbursement of certain business expenses.  These forms of compensation are usual, customary and necessary for the Debtors to retain qualified employees during the reorganization process.  Employees are not entitled to rollover, carryover or payouts on account of PTO for any calendar year.

60.     The Debtors provide holiday time in accordance with an approved holiday schedule.  The Debtors designate 8 holidays during each calendar year and also permit Employees to take one floating holiday per calendar year.

---

[8] Prior to the Petition Date the Debtors pre-funded $39,535.66 of payroll for 6 Employees that had accrued more than the $13,650 priority cap during the pre-petition period.

61.     The Debtors provide flex time each calendar year to all Employees.  Employees

accrue such time as follows: 24 hours during the first 6 months of employment; 80 hours on a

prorated basis through the Employee's first anniversary of employment; 80 hours annually from

the Employee's first anniversary through his or her third year of employment; 120 hours on a

prorated basis after three years through the Employee's fourth anniversary of employment; and

120 hours annually after four full years of employment.

62.     The Debtors provide sick time each calendar year to all Employees.  Employees

accrue such time as follows: 16 hours after 60 days through the Employee's first anniversary of

employment; 24 hours annually from the Employee's first through third year of employment; 32

hours annually from the Employee's fourth through fifth year of employment; and 40 hours

annually after the Employee's sixth year of employment.

63.     *Business Expenses.*  The Debtors routinely reimburse their Employees and

members of the Board for various business expenses, including travel, mileage, phone expenses

and, in certain cases, car reimbursements (collectively, the "Reimbursable Expenses").

Employees collect their receipts and submit an expense report for reimbursement prior to each

pay period.  Reimbursable Expenses are subject to a monthly review and approval process.

Following such approval, the Debtors reimburse Employees directly.

64.     Certain prepetition Reimbursable Expenses may not have been reimbursed as of

the Petition Date because, among other reasons, Employees had not yet submitted a request for

reimbursement or approval of an expense report was still pending.  Thus, there may be a lag time

between the time expenses are incurred and the time expenses are reimbursed and, as such, it is

difficult for the Debtors to determine with precision the actual amount of incurred, but not

reported, Reimbursable Expenses as of any particular time.  The average aggregate monthly amount expended by the Debtors for Reimbursable Expenses varies and can be up to $19,009.00.

65.    I believe that the Debtors' ability to reimburse the Reimbursable Expenses has a significant effect on the Debtors' Employees, who are critical to the Debtors' business.  I also believe that reimbursement of the Reimbursable Expenses is critical to the morale of the Debtors' Employees, which, in turn, is paramount to maximizing the value of the estates.  The Reimbursable Expenses represent a relatively minimal cost to the Debtors' estates in light of the overall benefits achieved.

66.    *Employee Benefits*.  The Debtors provide benefit packages to Employees, including a medical plan, dental plans, a vision plan, supplemental and GAP insurance plans and other ancillary benefits, which are described in more detail below.

67.    The Debtors provide their Employees with medical benefits pursuant to the Humana NPOS16 medical plan (the "Medical Plan").

68.    As of the Petition Date, approximately 92 Employees have elected individual coverage under the Medical Plan, 13 Employees have elected to cover themselves and a dependent under the Medical Plan and 5 Employees have elected family coverage under the Medical Plan.

69.    The Medical Plan is funded through contributions by participating Employees and by the Debtors.  Approximately 75% of the cost of the Medical Plan is borne by the Debtors. Employees contribute to the Medical Plan through payroll deductions to pay for the balance of the Medical Plan cost.  The Debtors collect Employee contributions as a prorated amount each payroll period.  Thus, payments to the Medical Plan consist of both trust-fund payments (*i.e.*, Employee contributions) and contributions from the Debtors.  The total monthly cost of the

Medical Plan to the Debtors is approximately $58,466.31. As of the Petition Date, the Debtors estimate that there are $37,585.00 in accrued prepetition liabilities owed under the Medical Plan.

70.     The Debtors also offer their Employees dental benefits pursuant to two separate dental plans (collectively, the "Dental Plans") through Humana. As of the Petition Date, approximately 100 Employees have elected individual coverage. The Dental Plans are funded entirely through contributions by participating Employees. The Debtors do not pay any costs associated with the Dental Plans.

71.     The Debtors also offer their Employees vision benefits pursuant to a vision plan (the "Vision Plan") through UnitedHealthcare. As of the Petition Date, approximately 75 Employees have elected coverage. The Vision Plan is funded entirely through contributions by participating Employees. The Debtors do not pay any costs associated with the Vision Plan.

72.     The Debtors provide Employees with the option of purchasing GAP insurance the ("GAP Insurance Plan") through CWI Benefits LLC ("CWI"), designed to "fill the gaps" of the Medical Plan by reimbursing some of the Employees' out-of-pocket expenses. The cost of the GAP Insurance Plan is borne solely by Employees who elect such coverage, with the Debtors remitting applicable Employees' contributions to CWI.

73.     Employees may obtain certain types of supplemental "group" insurance coverage for themselves and their spouses and dependents at their own expense through Unum, including life insurance, accidental death and dismemberment, short-term disability insurance and long-term disability insurance (collectively, the "Supplemental Insurance Plans").

74.     In particular, at their own expense, Employees may obtain supplemental life and accidental death and dismemberment insurance coverage for themselves of up to $500,000. Employees who elect supplemental life insurance coverage for themselves may also obtain, at

their own expense, life insurance coverage of up to $500,000.00 for their spouse and up to
$10,000.00 per child.  The short-term disability insurance policy pays 60% of the Employee's
weekly earnings up to a maximum of $1,500.00 per week if the Employee is unable to work for a
period of 14 days or longer, for a maximum period of 11 weeks as long as the illness or injury is
certified by a physician.  The long-term disability insurance policy pays 60% of the Employee's
monthly earnings up to a maximum of $6,000.00 per month after approval from Unum.  The cost
of the Supplemental Insurance Plans is borne solely by Employees who elect such coverage, with
the Debtors remitting applicable Employees' contributions to Unum.

75.    The Debtors also offer their Employees access to (i) an employee assistance
program administered by Unum; (ii) a travel assistance program administered by Assist America,
Inc.; (iii) an identity theft recovery service administered by Unum; (iv) discounted travel and
entertainment tickets though the TicketsatWork program; and (v) national and local discounts
through the LifeMart employee discount program.  These programs are provided at no additional
cost to the Debtors' Employees.

76.    *Administrative Fees for Legacy 401(k) Plan*.  An entity that the Debtors manage,
Mid Florida Adult Medicine, LLC, maintains a 401(k) plan with Employee Fiduciary, LLC.
Certain of the Debtors' employees also work at this entity.  Although the Debtors do not make
any contributions to the 401(k) program, they prepare annual filings which require a payment of
$1,200.00 each year.  The Debtors have sought to terminate the 401(k) program, including
imploring participants to roll their contributions into a different plan.

77.    *Workers' Compensation*. I have been advised that under the laws of the various
jurisdictions in which they operate, the Debtors are required to maintain policies and programs to
provide Employees with workers' compensation benefits (the "Workers' Compensation

Programs"). In accordance with this obligation, the Debtors maintain workers' compensation insurance policies in all jurisdictions where they operate. The workers' compensation benefits provided by the Debtors are covered primarily under the Debtors' workers' compensation insurance program administered by Travelers Indemnity Company of America ("Travelers"). The premium on the Workers' Compensation Program policy is paid on a monthly basis by the Debtors through First Insurance Funding Corp. ("First Insurance"), a premium insurance financing company. For the current policy period, June 20, 2019, to June 20, 2020, premiums to Travelers for workers' compensation and employers' liability coverage are approximately $87,165.00. No amounts under the Workers' Compensation Programs remain outstanding as of the Petition Date and no claims are pending.

78.     *Social Security, Income Tax, and Other Withholdings*. The Debtors routinely withhold from Employee paychecks amounts that the Debtors are required to transmit to third parties. Examples include Social Security, FICA, federal and state income taxes, garnishments, charitable donations, health care payments, other insurance payments and certain other voluntary payroll deductions. The Debtors believe that such withheld funds, to the extent that they remain in the Debtors' possession, constitute monies held in trust and therefore are not property of the Debtors' bankruptcy estates.

79.     *Severance*. In addition to the Debtors' other benefit plans and programs, employment agreements between the Debtors and certain Employees provide for severance to such Employees.[9] The severance terms of each such agreement varies by the applicable

---

[9] One prior Employee currently receives continuing health care coverage pursuant to 28 U.S.C. § 1161 (COBRA) at his own expense.

Employee.  Additionally, Employees without an employment agreement traditionally are paid accrued PTO upon termination.

80.    *Continuation of Employee Programs*.  The Debtors seek to continue their ordinary-course Employee compensation (including wages and salaries), PTO, payment of Reimbursable Expenses, Medical Plan, Dental Plans, Vision Plan, GAP Insurance Plan, Supplemental Life Insurance Plans and Workers' Compensation Programs and related programs during the postpetition reorganization process.  I believe the continuation of these programs is essential to the success of the Debtors' reorganization.

81.    Moreover, I believe that failing to honor these obligations would severely hamper the Debtors' ability to operate their businesses during these Chapter 11 Cases and, thus, endanger the Debtors' reorganization.  The Debtors' Employees possess knowledge unique to the Debtors' businesses and operations.  Replacing the Employees' institutional knowledge would require the Debtors and their remaining Employees to expend significant time, capital and effort, all of which, I believe, would distract the Debtors from the task at hand in these Chapter 11 Cases.  Thus, the loss of valuable Employees would diminish the Debtors' ability to execute their value-maximizing strategy and would harm the Debtors' stakeholders.  I, therefore, believe that authorization to pay the Prepetition Employee Obligations is critical to maximize the value of the Debtors' estates for all creditors and stakeholders.

**3.    Insurance Motion**

82.    In the ordinary course of business, the Debtors maintain approximately eight (8) insurance policies (each an "Insurance Policy" and together, the "Insurance Policies") for, among other things, the Debtors' property, general commercial liability, workers' compensation

liability, automobile liability, umbrella liability, directors and officers liability, and medical malpractice (the "Malpractice Policy").

83.     The aggregate annual premium amount for the Insurance Policies is approximately $680,708.00, plus applicable taxes and surcharges.  The premiums for each Insurance Policy, except for the Malpractice Policy, are financed pursuant to a commercial premium finance agreement ("PFA") with First Insurance.  Prior to the Petition Date, the Debtors made average monthly payments of approximately $16,407.00 on account of the PFA, in addition to a one-time annual down payment in May 2019 of $43,742.00.  The Debtors estimate that approximately $32,814.00 remains due under the PFA.  I believe that the ability to finance the Insurance Policies and avoid paying a lump sum premium for such policies in advance provides significant benefits to the Debtors' liquidity position.

84.     The Malpractice Policy is the only policy that is not financed.  The premium for the Malpractice Policy is paid on a quarterly basis.  The average quarterly premium payment under the Malpractice Policy is $105,000.00.

85.     Each Insurance Policy, except for the Malpractice Policy, expires in June 2020. The Malpractice Policy expires in May 2020.  None of the Insurance Policies provide the Debtors with a right to renew the policies automatically.  The Debtors acquired each of the Insurance Policies from the same broker, Arthur J. Gallagher & Co.

86.     I believe that no amounts currently are outstanding on the Insurance Policies. However, out of an abundance of caution, the Debtors are seeking authorization to make payments of Insurance Obligations attributable to the prepetition period (plus any unforeseen deductible payment amounts for prepetition claims), including any premium adjustments that might come due after the Petition Date.

87.     If the Debtors are unable to make any payments that may be owed on account of the Insurance Policies, including on account of premium adjustments, the unpaid Insurance carriers may seek relief from the automatic stay to terminate such Insurance Policies.  The Debtors would then be required to obtain replacement insurance on an expedited basis and at a significant cost.  Even if these Insurance carriers were not permitted to terminate the agreements, I believe that any interruption of payment would have an adverse effect on the Debtors' ability to obtain future policies at reasonable rates.

88.     The Insurance Policies are essential to the preservation of the value of the Debtors' businesses, property and assets.  Not only are some of the Insurance Policies required by various regulations, laws and contracts that govern the Debtors' commercial activities, but I am informed by counsel that failure to maintain insurance could result in conversion or dismissal of the Chapter 11 Cases or a failure to comply with applicable U.S. Trustee Guidelines.

89.     In light of the importance of maintaining insurance coverage with respect to their business activities, the Debtors believe it is in the best interest of their estates to receive Court approval to honor their obligations under the Insurance Policies and, as necessary, renew or enter into new such agreements.

**4.     Tax Motion**

90.     In the ordinary course of business, the Debtors (a) incur income, sales, property and other taxes; (b) pay or remit such taxes to various taxing, licensing and other governmental authorities; and (c) pay fees to such authorities for licenses, permits and regulatory assessments required in the ordinary course of business (the "Taxes"), and have generally paid such tax liabilities as they become due.  As of the Petition Date, the Debtors were substantially current in the payment of assessed and undisputed Taxes that came due and payable prior to the Petition

Date; however, certain Taxes and Assessments attributable to the prepetition period are not yet due.

91.     Many of the Taxes constitute so-called trust fund obligations that the Debtors are required to collect from third parties and held in trust for payment to the taxing and regulatory authorities.  I understand that the funds that would be used to pay the trust fund Taxes are not property of the Debtors' estates.

92.     I have also been advised that the nonpayment of certain of the Taxes that constitute trust fund obligations and are not property of the Debtors' estates may result in personal liability for the Debtors' officer and directors.  Efforts by Taxing Authorities to collect such trust fund amounts would unnecessarily divert the Debtors' officer and directors from tasks relating to the restructuring and ongoing management of the Debtors' businesses.

93.     Additionally, the Taxing Authorities may cause the Debtors to be audited if the Taxes are not paid immediately.  Such audits will unnecessarily divert the Debtors' attention away from the reorganization process and may cause expense and distraction in excess of the relatively minimal amount of the Taxes.  In all cases, the Debtors' failure to pay Taxes could have an adverse impact on their ability to operate in the ordinary course of business.

**5.     Utilities Motion**

94.     In connection with the operation of their businesses and the management of their properties, the Debtors receive electricity, telephone/fax, internet, gas, water and similar utility products and services (collectively, the "Utility Services") from various utility companies (the "Utility Companies").  The Debtors have filed a motion requesting that this Court approve the Debtors' proposed form of adequate assurance of postpetition payment (the "Proposed Adequate Assurance") to the Utility Companies, as that term is used in section 366 of the Bankruptcy

Code, approving procedures for resolving any objections by the Utility Companies relating to the Proposed Adequate Assurance, and prohibiting the Utility Companies from altering, refusing or discontinuing service to, or discriminating against, the Debtors.

95.     In particular, the Debtors have proposed for the Utility Companies the establishment of a newly created, interest-bearing segregated account in which the Debtors will place a deposit equal to approximately two weeks of Utility Services (the "Utility Deposit Account").  I believe that creation of the Utility Deposit Account and the additional procedures set forth in the motion adequately protect the rights that I have been advised are provided to the Utility Companies under the Bankruptcy Code, while also protecting the Debtors' need to continue to receive, for the benefit of their estates, the Utility Services upon which their businesses depend.  The Debtors estimate the aggregate of all the Utility Deposits will be approximately $16,871.60.

96.     I believe that any interruption in Utility Services, even for a brief period of time, would disrupt the Debtors' ability to continue operations.  Such a result could potentially jeopardize the Debtors' ability to perform under their customer contracts and impair the Debtors' reorganization efforts and, ultimately, the value of the Debtors' business.  In my opinion, it is critical that Utility Services continue uninterrupted during the Chapter 11 Cases.

**6.     DIP Financing Motion**

97.     Pursuant to the DIP Financing Motion, the Debtors request authority to enter into a postpetition financing arrangement, in an aggregate principal amount of $9,980,303.00 (the "DIP Loan"), on the terms as set forth in that certain Secured Superpriority Debtor-in-Possession Credit Agreement, by and among HHC, certain guarantors thereto, various financial institutions

party thereto, as DIP lenders and the Administrative Agent, as DIP Agent, authorizing the use of cash collateral, granting adequate protection to the Lender and scheduling a final hearing.

98.    *Efforts to Obtain Alternative Financing.*  As noted above, following an unsuccessful sale process, in late October 2019 the Debtors retained A&M to advise the Debtors with respect to possible strategic alternatives to address the Bridging debt.  During that time, A&M also assisted the Debtors with locating other possible sources of financing.

99.    When A&M was retained the Debtors were suffering a liquidity crisis.  Indeed, A&M concluded that without additional funding the Debtors would soon run out of cash and be forced to cease operating.  To fund this shortfall, the Debtors, based on the prepetition liens and claims of Bridging, assessed the futility of soliciting alternative financing sources for the Chapter 11 cases. The Debtors and I believe that Bridging is drastically under-collateralized and that the possibility of obtaining priming financing or loans secured solely by an administrative claim are nonexistent.

100.    Accordingly, because of the Debtors' deeply distressed financial condition, Bridging's unwillingness to subordinate to a new lender and the terms of the DIP Loan proposed by Bridging attendant to the Plan, A&M advised the Debtors and me that there would be little to gain from embarking on a futile search for alternative DIP financing.

101.    *The DIP Facility Should be Approved.*  The Debtors' determination to move forward with the DIP Facility is an exercise of their sound business judgment following an arms'-length process and careful evaluation of their lack of alternatives.  The DIP Agent and DIP Lenders were the only parties willing to provide financing to the Debtors.  Accordingly, the Debtors negotiated the DIP Loan Documents with the DIP Agent and DIP Lenders in good faith, at arms'-length and with the assistance of their advisors.  The Debtors and I believe that the

Debtors have obtained the best and only financing available.  Additionally, the Debtors and I believe that entry into the DIP Facility is in the best interests of the Debtors' estates and is an exercise of the Debtors' sound business judgment and should be approved.

102.    As described above, the Debtors require an immediate capital infusion, yet substantially all of their operating assets are encumbered under their existing capital structure.  In light of the foregoing, the Debtors and I, in consultation with our advisors, have concluded that the success of the Chapter 11 Cases hinges on whether any DIP Financing had the support of, or could be provided by, Bridging.  Without the DIP Financing, the Debtors lack sufficient funds to operate their businesses, continue paying their debts as they come due, pursue the sale of their assets or cover the projected costs of the Chapter 11 Cases.  Absent the DIP Facility, which will provide the Debtors with sufficient liquidity to administer their estates in a chapter 11 reorganization, the value of the Debtors' estates would be significantly impaired to the detriment of all creditors and stakeholders.  Given the current circumstances, the Debtors and I believe that the terms of the DIP Facility, as set forth in the DIP Loan Documents, including the carve-out and the DIP milestones, are fair, reasonable and adequate.  For all these reasons, the Debtors and I submit that the standards for obtaining postpetition financing and the use of cash collateral, as they have been explained to us by our advisors, have been satisfied.

### 7.    RSA Motion

103.    The Debtors seek entry of an order authorizing the Debtors to assume the RSA pursuant to sections 105(a), 362 and 365(a) of the Bankruptcy Code.  Although the Debtors filed the RSA Motion on the Petition Date, the Debtors are not seeking first day relief with respect to the RSA Motion.  Rather, the Debtors will seek to have the RSA Motion heard at the "second-

day" hearing in these Chapter 11 Cases.  Nonetheless, the RSA Motion is addressed herein because it relates to the DIP Motion as well as certain of the other First Day Pleadings.

104.    As set forth above, given the Debtors' dire financial situation and the lack of any other viable alternatives, in or about October 2019 the Debtors and Bridging began discussing the framework of a chapter 11 Plan.  After months of negotiating, the parties entered into the Restructuring Term Agreement, which is incorporated in the RSA.  The RSA and the Restructuring Term Sheet are by-products of good faith, arms'-length negotiations between the Debtors and Bridging.

105.    As set forth in the Restructuring Term Sheet, the Plan contemplates a reorganization of the Debtors pursuant to which, among other things, (i) Bridging's existing secured debt would be reinstated in an amount equal to the debt capacity of the reorganized debtors (the "Reorganized Debtors"); (ii) all of the Reorganized Debtors' equity would be transferred to Bridging on account of its claim; (iii) a liquidating trust would be created for the benefit of the Debtors' unsecured creditors; and (iv) prepetition payroll tax claims entitled to payment under section 1129(a)(9)(c) of the Bankruptcy Code would be satisfied in full.

106.    The RSA is necessary to preserve the value of the Debtors' businesses.  One of the most profitable aspects of the Debtors' businesses are their MSOs.  The viability of the Debtors' MSO business depends on: (a) the ability of the Debtors to continue to perform under their HMO payor and Provider contracts; (b) the Debtors maintaining goodwill and a strong working relationship with the HMOs and Providers; and (c) the Debtors ensuring that there MSO businesses remain in compliance with the numerous contractual and regulatory requirements imposed by the Payor agreements.

107.    The Debtors and I believe that the Debtors' MSO business likely would suffer a significant loss in value in a contentious and drawn-out chapter 11 process because the HMOs could attempt to direct their insureds (enrollees) to other MSOs or providers absent immediate assurance of the Debtors' ability to continue to perform and to exit these cases.  Therefore, the only realistic way to preserve value for the Debtors' estates is to emerge quickly from chapter 11 with a viable business plan.  To that end, the Debtors undertook significant efforts to negotiate a restructuring process and case timeline that would protect the value of the Debtors' businesses and enable a timely and seamless transition of such businesses to Bridging through the Plan. Accordingly, strict compliance with the process and milestones set forth in the RSA and the Restructuring Term Sheet is critical.

108.    To the extent the Plan process is unsuccessful, the Restructuring Term Sheet provides for a sale of substantially all of the Debtors' assets (the "Sale") pursuant to section 363 of the Bankruptcy Code at which Bridging would credit bid all or a portion of its secured debt. Both the Plan process and Sale process would be subject to higher and better offers and Bridging would have no obligation to ensure that it is the successful bidder.

109.    As noted above, in order to accomplish the goals of these Chapter 11 Cases as set forth in the RSA, Bridging has agreed to provide critical DIP financing.  Bridging also has agreed to provide the Reorganized Debtors with a working capital loan to fund the Reorganized Debtors' post-effective date working capital needs.

110.    Importantly, the RSA contains a "fiduciary out" provision.  This provision ensures that, although the Debtors are contractually bound to comply with the RSA, the Debtors retain the right to pursue an alternative restructuring path in compliance with their fiduciary duties.

35

111.    Accordingly, I believe that the relief requested in the RSA Motion is an exercise of the Debtors' sound business judgment, is in the best interests of their estates, and should be approved.

*[Remainder of Page Intentionally Left Blank]*

## CONCLUSION

The Debtors' ultimate goal in these Chapter 11 Cases is to maximize the value of the

Debtors' estates for the benefit of all the Debtors' constituents.  In the immediate term, however,

the Debtors' most pressing objective is to minimize the disruption to the Debtors' operations to

the greatest extent possible as they enter chapter 11.  I believe that if the Court grants the relief

requested in each of the First Day Pleadings, the prospect for achieving this objective and, in

turn, the overriding goal in these Chapter 11 Cases, will be substantially increased.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct to the best of my knowledge, information and belief.


Keith Collins, M.D.
President and Chief Executive Officer
Hygea Holdings Corp.

Dated: February 19, 2020