## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------- x

In re:

HYGEA HOLDINGS CORP., *et al.*,

        Debtors.[1]

------------------------------------------------------------- x

: Chapter 11
:
: Case No. 20-10361 (KBO)
:
: (Jointly Administered)
: **Hrg. Date: 3/24/2020 at 2:00 p.m. (ET)**
: **Obj. Deadline: 3/17/2020 at 4:00 p.m. (ET)**

## DEBTORS' MOTION FOR ORDER WAIVING APPOINTMENT OF PATIENT CARE OMBUDSMAN PURSUANT TO 11 U.S.C. § 333

Hygea Holdings Corp., and certain of its affiliates, the debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors" or "Hygea"), hereby move (this "Motion") this Court for entry of an order, substantially in the form attached hereto as Exhibit A (the "Proposed Order"), pursuant to section 333 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") and Rule 2007.2 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), finding that the appointment of a patient care ombudsman is not required in these chapter 11 cases. In support of this Motion, the Debtors submit the accompanying *Declaration of Keith Collins, M.D. in Support of Debtors' Motion for Order Waiving Appointment of Patient Care Ombudsman Pursuant to 11 U.S.C. § 333* (the "Collins

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are: All Care Management Services, Inc. (6484); First Harbour Health Management, LLC (0941); First Harbour Medical Centers, LLC (3861); Florida Group Healthcare LLC (7956); Gemini Healthcare Fund, LLC (4928); Hygea Acquisition Longwood, LLC (1649); Hygea Acquisition Orlando, LLC (3507); Hygea Health Holdings, Inc. (8926); Hygea Holdings Corp. (2605); Hygea IGP of Central Florida, Inc. (9453); Hygea IGP, LLC (7724); Hygea Medical Centers of Florida, LLC (5301); Hygea Medical Partners, LLC (4486); Hygea of Delaware, LLC (4830); Hygea of Georgia, LLC (5862); Hygea of Pembroke Pines, LLC (6666); Hygea Primum Acquisition, Inc. (8567); Medlife Activity Center, LLC (2311); Mobile Clinic Services, LLC (9758); Palm A.C. MSO, LLC (2585); Palm Allcare Medicaid MSO, Inc. (6956); Palm Allcare MSO, Inc. (0319); Palm Medical Group, Inc. (5028); Palm Medical MSO LLC (7738); Palm Medical Network, LLC (9158); Palm MSO System, Inc. (2178); Palm PGA MSO, Inc. (8468); Physician Management Associates East Coast, LLC (7319); Physician Management Associates SE, LLC (3883); Physicians Group Alliance, LLC (7824); Primum Alternatives, Inc. (7441); Primum Healthcare, LLC (0157); and Professional Health Choice, Inc. (6850). The address of the Debtors' corporate headquarters is 8700 W Flagler Street, Suite 280, Miami, FL 33174.

Declaration"), filed contemporaneously herewith.  The Debtors also incorporate by reference the *Declaration of Keith Collins, M.D. in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 13] (the "First Day Declaration").  In further support of this Motion, the Debtors respectfully represent as follows:

## PRELIMINARY STATEMENT

1.      The Debtors assert that the requirements of section 333 of the Bankruptcy Code regarding the appointment of a patient care ombudsman do not apply to the Debtors.  As a threshold matter, the Debtors are not a "health care business" as defined by section 101(27A) of the Bankruptcy Code.  The physician practice segment of the Debtors' business consists mostly of practices that the Debtors do not own, but rather manage pursuant to certain management services agreements (the "Managed Practices").  The Managed Practices are not debtors in these bankruptcy cases.  Consequently, the Managed Practices will continue to operate and provide compliant patient-centered quality care without interruption during the pendency of these cases. Although Debtor First Harbour Medical Centers, LLC ("First Harbour") directly owns and operates two physician practices (the "First Harbour Practices"), one of those practices is slated to be closed and the other represents only a fraction of the Debtors' business.  In addition, the Debtors believe that neither the Managed Practices nor the First Harbour Practices (together the "Physician Practices") independently meet the Bankruptcy Code's definition of a health care business because they do not provide "surgical, drug treatment, psychiatric, or obstetric care", nor do they provide inpatient or long-term care services.  *See* 11 U.S.C. § 101(27A)(A)-(B).

2.      The other segment of the Debtors' business, the Management Services Organizations ("MSOs"), does not provide any direct health care related services.  Accordingly, the Debtors also do not believe that the MSOs meet the definition of a "health care business"

2

under section 101(27A) of the Bankruptcy Code, and therefore the appointment of patient care ombudsman is not required.[2]

3.        Even assuming section 333 of the Bankruptcy Code is applicable (which it is not), the facts and circumstances of these cases justify the Court's exercise of its discretion to decline to appoint an ombudsman because "such ombudsman is not necessary for the protection of patients under the specific facts of the case." *See* 11 U.S.C. § 333(a)(1).  As discussed in detail herein and in the Collins Declaration, the bankruptcy proceedings will not have a negative impact on patient care.  The Debtors expect to seek confirmation of a plan on an expedited basis. During the short pendency of the Chapter 11 cases, the Debtors do not anticipate any material changes in their daily operations that would impair patient care.  The Debtors have sufficient safeguards in place to adequately protect patients and ensure that the quality of patient care provided will continue unaffected by these Chapter 11 proceedings.  The appointment of a patient care ombudsman is not necessary for the protection of patients under the specific facts of these Chapter 11 Cases.

## JURISDICTION AND VENUE

4.        This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware* dated February 29, 2012.  This is a core proceeding under 28 U.S.C. § 157(b) and, pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the

---

[2]  The Debtors have consulted with the U.S. Trustee (defined herein) regarding the appointment of a patient care ombudsman in these Chapter 11 Cases.  The Debtors advised the U.S. Trustee that they did not believe the appointment of a patient care ombudsman was required, prompting the filing of this Motion.

Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

5.      Venue of these cases and the Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

6.      The statutory and legal predicates for the relief requested herein are section 333 of the Bankruptcy Code and Bankruptcy Rule 2007.2.

## RELIEF REQUESTED

7.      By this Motion, and in an abundance of caution, the Debtors request entry of the Proposed Order waiving the appointment of a patient care ombudsman and finding that an ombudsman is not necessary for the protection of patients in these Chapter 11 Cases.

## BACKGROUND

8.      On February 19, 2020 (the "Petition Date"), each Debtor commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases").  The Chapter 11 Cases are being jointly administered.  The factual background regarding the Debtors, including their business operations, their capital and debt structure, and the events leading to the filing of the Chapter 11 Cases, is set forth in the First Day Declaration.

9.      The Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

10.     To date, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") has not appointed a creditors' committee in the Chapter 11 Cases, nor has any trustee or examiner been appointed herein.

11.     As set forth in the First Day Declaration, before the Petition Date, the Debtors confronted liquidity challenges and operational issues that threatened their ability to continue as a going concern.  As a result of the Debtors' significant operating losses, the Debtors were

4

unable to service their debt to Bridging Finance Inc. ("Bridging"), their pre-petition lender. Given the Debtors' dire financial situation and lack of any other viable alternatives, the Debtors entered into a Restructuring Support Agreement (the "RSA") with Bridging which provides for (i) the consensual reorganization of the Debtors and (ii) the provision of nearly $10 million of post-petition financing (the "DIP Loan") to enable the Debtors to operate their businesses during the Chapter 11 Cases pursuant to an approved budget (the "DIP Budget").

## DESCRIPTION OF THE DEBTORS' BUSINESSES

12.     As set forth in detail herein, the Debtors' business model is primarily comprised of two platforms: (1) the Physician Practices, consisting of 17 brick and mortar locations in Florida and Georgia; and (2) the MSOs.

### A.     The Physician Practices

13.     Historically, acquisitions of physician practices or physician practices group were an integral component of the Debtors' business model.  In a typical practice acquisition, the Debtors purchased the physical assets of a medical practice pursuant to an asset purchase agreement and contemporaneously entered into a management services agreement with the medial practice and employment contracts with the individual physician sellers of the practice. Under the terms of the management services agreement and employment contracts, the Debtors assumed responsibility for the day-to-day business operations of the practice, while the individual physicians remained responsible for all health care treatment decisions.  In connection with the acquisitions, the Debtors also typically obtained an option to later purchase the equity or ownership interest in the practice, which option the Debtors rarely exercised.  The Managed Practices were acquired in this manner.

5

14.     In contrast, the Debtors acquired the First Harbour Practices in a relatively unique transaction, pursuant to which Hygea purchased the stock in Debtor First Harbour.[3]  The two First Harbour Practices are located in East Bradenton, Florida ("FH Bradenton") and Sarasota, Florida ("FH Sarasota").

(i)     *The Managed Practices*

15.     The Managed Practices provide two different types of treatment: (i) routine family and internal medicine services including treatment for acute conditions that do not require immediate intervention and (ii) cardiology related services for the study and treatment of disorders of the heart and blood vessels.  Some of the cardiology practices also provide diagnostic testing, such as stress tests and ultrasounds.  Each of the Managed Practices are outpatient facilities.  They do not provide any long-term care, shelter, or sustenance to patients. None of the Managed Practices offer surgical, drug addiction or dependency services, psychiatric or obstetric care.[4]

16.     Each Managed Practice operates under its own business name.  Indeed, Hygea's name is not displayed at the practice location or in any marketing materials associated with the practice.

17.     Hygea's role with respect to each Managed Practice is contractually limited to providing management and administrative responsibilities.  Specifically, Hygea provides the practices with staffing, payroll, benefits management, accounts payable processing, malpractice insurance, lease negotiations, fee-for-service billing and collection services, and similar business functions.  Hygea also provides certain quality management, utilization management and

---

[3] In the same transaction, Hygea also purchased Debtor First Harbour Health Management, LLC, an active MSO.

[4] Certain of the cardiologists perform procedures, such as catheterizations, stents and pacemakers.  However, those procedures are not performed at the Physician Practices.  Instead, they are performed at third party hospital facilities.

6

compliance services.  Hygea does not, however, interact directly with the patients, dictate

treatment decisions, or offer patient referrals.  Instead, the physicians are solely responsible for

all treatment related decisions and are required to deliver patient care according to their clinical

judgment and prevailing professional standards.

*(ii)*     <u>*The First Harbour Practices*</u>[5]

18.     The First Harbour Practices provide routine internal medicine and family health

care services, as well as treatment for acute conditions that do not require immediate

intervention.  Both practices are outpatient, and neither practice provides surgical, drug addiction

or dependency services, psychiatric or obstetric care.

19.     FH Bradenton has three (3) health care providers that work out of the facility.

Those providers see approximately 180 patients per week on average.  The FH Bradenton

practice represents a small portion of the Debtors' monthly income, approximately $28,000 per

week.  FH Sarasota only has one (1) health care provider that works out of the facility.  This

provider treats about twenty-five (25) patients per week, and income for this practice is

approximately $5,000 per month.  Importantly, given the operating losses associated with the

practice and the waning number of patients, the Debtors intend to close FH Sarasota in the short

term.[6]

20.     Although the Debtors directly own the First Harbour Practices, the individual

physicians retain their independent discretion and right to exercise independent judgment in

---

[5]  First Harbour is identified as a "health care business" on its bankruptcy petition.  This was done out of an abundance of caution because the Debtors believed that the U.S. Trustee might reasonably take the position that First Harbour qualifies as a health care business within the meaning of the Bankruptcy Code.  However, the Debtors do not concede this fact, and do not believe that by checking the box on First Harbour's petition, the Debtors waived any argument that First Harbour does not qualify as a health care business for purposes of determining whether appointment of a patient care ombudsman is required under section 333 of the Bankruptcy Code.

[6]  The Debtors will separately seek authority to close the FH Sarasota practice in an orderly fashion and in compliance with applicable laws and procedures.

7

regard to the diagnosis and treatment of patients.  The physicians are free to determine the means by which the results of their medical services with respect to such diagnosis and treatment are to be accomplished.

### B.      The MSO Business

21.      The MSOs do not provide any health care services or facilities to the public. Instead, the MSOs contract with Health Maintenance Organizations ("HMOs") to manage the delivery of health care services to Medicare enrolled patients ("Enrollees").  The MSOs in turn contract with third-party health care providers and physician groups, who provide health care services to the Enrollees or, in some cases, the services are provided by the Physician Practices. Thus, the MSOs act as contractual intermediaries between the HMOs and health care providers and provide certain administrative services to the health care providers, including billing coding services.[7]  The MSOs do not maintain treatment facilities or employ physicians for treatment purposes.

### C.      Compliance With Health Care and Privacy Laws

22.      The physicians at the Physician Practices are licensed health care providers in their respective states (either Florida or Georgia).  The physicians are individually responsible for rendering medical services in accordance with applicable federal and state statutes, rules, regulations, the professional ethical standards of the medical community in which the physicians practice, as well as those of applicable national, state and local medical societies and licensing agencies.

---

[7]  Hygea has a large staff of qualified and experienced "Professional Coders," who review every patient encounter to ensure (i) that providers maintain accurate and complete medical records and documentation of the services they provide; (ii) that the claims submitted for payment are supported by the documentation; and (iii) that patients receive appropriate care.

23.     The First Harbour Practices are licensed as health care clinics by the Florida

Agency for Health Care Administration ("AHCA").  Hygea has internal measures in place to

ensure that the First Harbour Practices comply with AHCA's strict guidelines and regulations for

patient safety, documentation, reporting, quality, and appropriateness of care.  As required by

AHCA, each First Harbour Practice has an onsite Medical Director who, in addition to patient

care duties, is responsible for developing and monitoring compliance with medical care policies

and procedures.  Keith Collins, Hygea's President and CEO, is also the Chief Medical Officer for

the company.  Mr. Collins develops company-wide standards and policies, and monitors the

quality management, utilization management, and medical compliance functions.

24.     Hygea also has procedures in place to ensure that all physicians comply with all

aspects of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").

Training, education and oversight are provided for physicians, nurses and other staff members.

In addition, with the passage of the Patient Protection and Affordable Care Act of 2010, Hygea's

providers who treat Medicare and Medicaid beneficiaries follow a separate compliance program.

### D.      History and Quality of Patient Care

25.     The Physician Practices have a strong patient care record.  To the best of Hygea's

knowledge, in the past year, no complaints have been made to regulators regarding patient care,

and no patient care issue has risen to the level of a complaint or dispute.  Indeed, the Debtors'

bankruptcy cases were not caused by, or related to, any patient-care issues or malpractice claims.

26.     All providers employed by Hygea, or contracted to Hygea through a network, are

required to inform Hygea of any complaint to the medical board.  In the event a complaint is

submitted to the medical board (and none have been in the last year), in addition to any action by

the medical board, Hygea undertakes its own internal investigation of the complaint, and if an

9

issue of patient safety, appropriateness of care, integrity, or other issues affecting patient care is found, Hygea may decide on appropriate corrective action.

E.    **The Debtors' Go-Forward Plan and the Potential Effect on Patient Care**

27.    As set forth in the RSA, the Debtors anticipate filing a plan of reorganization (the "Plan") that transfers to Bridging the Debtors' equity on account of Bridging's pre-petition secured claim.  The Debtors do not anticipate a need to close a large portion of the Physician Practices or to substantially reduce the number of health care providers and staff currently in place.[8]

28.    To the extent that the Debtors are required to close multiple practices (which is not anticipated), the Debtors do not believe that this would be a significant burden to patients. Given that the Debtors do not provide any emergency related services, inpatient care, surgical treatment, drug addiction or dependency services, psychiatric or obstetric care, they anticipate that patients would be able to find replacement care relatively easily and that the time it may take to obtain such care would not present a major risk to patient health.

29.    Further, the Debtors and their staff understand the importance of complying with HIPAA and other privacy and record keeping laws both while a practice is operating and after closure.  The Debtors are capable of ensuring compliance with such laws in the event that Physician Practices are closed.  Nevertheless, the Debtors will seek an appropriate order from the Court to ensure that any practice closures are carried out in an orderly manner and in compliance with HIPAA.

---

[8]  Specifically, at this moment, only FH Sarasota is planned for closure.  This has been planned for months, and time is being given for patients to transition care to another practice.  In addition, the Debtors are in the process of returning one of the Managed Practices, Cardiology Consultants of West Broward, P.A., to the seller-physicians. The Debtors are separately seeking an order from the Court to reject the associated management agreement and take appropriate measures to ensure the protection of  patients' privacy rights.

60437/0001-19878152v3

F.      **The Impact of an Ombudsman on the Likelihood of a Successful Reorganization**

30.     The Debtors do not believe that cost of an ombudsman would amount to a corresponding material benefit to the patients in these Chapter 11 Cases.  As set forth above, the health care services that the Debtors provide do not create a high level of patient dependency. The Debtors believe that they are more than capable of ensuring the patients' safety and privacy rights are sufficiently protected in light of the services provided by the Physician Practices without the appointment of an ombudsman in these Chapter 11 Cases.

31.     In addition, the Debtors believe that the appointment of an ombudsman would have a negative impact on the Debtors' ability to reorganize and would unnecessarily reduce the recovery to their creditors without providing a material benefit to patients.  After review of other cases in which an ombudsman was appointed, the Debtors estimate that an ombudsman in these Chapter 11 Cases, based on the current timeline under the RSA, could cost at least $200,000. While the Debtors have been provided access to post-petition financing, the DIP Loan is limited to operational expenses and the critical administrative costs of the Chapter 11 Cases as set forth on the DIP Budget.   The DIP Budget does not contemplate the appointment of a patient care ombudsman or the funding of fees and expenses related thereto.

## LEGAL BASIS FOR THE RELIEF SOUGHT

32.     Section 333(a)(1) of the Bankruptcy Code provides that "[i]f the debtor … is a health care business, the court shall order … the appointment of an ombudsman to monitor the quality of patient care and to represent the interests of the patients of the health care business unless the court finds that the appointment of such ombudsman is not necessary for the protection of patients under the specific facts of the case."  11 U.S.C. § 333(a)(1).

33.     Under section 333(a)(1) of the Bankruptcy Code, the appointment of a patient care ombudsman is only required if (1) the debtor is a health care business, as that term is defined under section 101(27A) of the Bankruptcy Code, *and* (2) under the specific facts of the case, appointment is necessary for the protection of patients.  *See id.*

34.     Here, the Debtors are not a "health care business" and therefore the requirements of section 333(a)(1) are not applicable.  However, in the event the Court disagrees, the Debtors respectfully submit that the appointment of a patient care ombudsman is not necessary for the protection of patients based on the specific facts and circumstances of these Chapter 11 Cases, and no patient would be prejudiced without an ombudsman.  The Court, therefore, should exercise its discretion to waive the appointment of an ombudsman.

I.     **The Debtors Are Not a "Health Care Business" As Defined by Section 101(27A) of the Bankruptcy Code.**

35.     Section 101(27A) of the Bankruptcy Code defines a "health care business" as "any public or private entity … that is primarily engaged in offering to the general public facilities and services for (i) the diagnosis of treatment of injury, deformity or disease; and (ii) surgical, drug treatment, psychiatric, or obstetric care …."  11 U.S.C. § 101(27A)(A).  Subsection (B) goes on to provide a list of businesses that meet the definition.  *See id.* § 101(27A)(B).

36.     Numerous courts have interpreted section 101(27A) of the Bankruptcy Code as requiring four elements for a debtor to qualify as a health care business: (1) the debtor must be a public or private entity; (2) the debtor must be primarily engaged in offering to the general public facilities and services; (3) the debtor's facilities and services must be offered to the public for the diagnosis or treatment of injury, deformity or disease; and (4) the facilities and services must be offered to the public for surgical care, drug treatment, psychiatric care or obstetric care.  *In re*

12

*Smiley Dental Arlington*, PLLC, 503 B.R. 680, 685-86 (Bankr. N.D. Tex. 2013); *In re Alternate*

*Family Care*, 377 B.R. 754, 757 (Bankr. S.D. Fla. 2007); *In re Med. Assocs. of Pinellas, L.L.C.*,

360 B.R. 356, 359 (Bankr. M.D. Fla. 2007).

37.     In addition, some courts have interpreted the list set forth in section 101(27A)(B)

as creating a fifth element that requires the debtor's business to involve "' direct and ongoing

contact with patients' that provide[s] patients with 'shelter and sustenance in addition to medical

treatment.'" *In re Banes*, 355 B.R. 532, 535 (Bankr. M.D.N.C. 2006) (quoting *In re 7–Hills*

*Radiology*, LLC, 350 B.R. 902, 904 (Bankr. D. Nev. 2006)); *but see In re Smiley Dental*

*Arlington*, 503 B.R. at 687 (finding that such interpretation "misconstrues the statute").

38.     As set forth herein, the Debtors' business does not satisfy all of the necessary

elements of a "health care business".

### A.     The Debtors are Not Primarily Engaged in Offering Health Care Facilities or Services to the Public.

39.     The Debtors are not "primarily engaged" in offering health care facilities or

services to the public so as to meet the definition of a "health care business" under section

101(27A) of the Bankruptcy Code.

40.     As explained above, the Debtors' business model is comprised of two platforms:

(1) the Physician Practices; and (2) the MSOs.  Other than with respect to the First Harbour

Practices, the Debtors do not provide any health care services or facilities to the public.  Rather,

the Debtors provide management and administrative services to the Managed Practices.

Additionally, through the MSOs, the Debtors maintain contractual relationships with the HMOs

and healthcare providers as well as provide certain administrative and billing functions.

41.     The relationship between the Debtors and the Managed Practices closely

resembles the facts in *Pinellas*, 360 B.R. 356.  In that case, the court held that a debtor who

13

provided primarily administrative support services to a group of physicians did not meet the "health care business" definition under section 101(27A) of the Bankruptcy Code. *Id.* The court noted, the debtor's "business concept was to create an efficiency for its doctors by combining common needs for non-medical services, such as billing, insurance, human resources, and related financial services." *Id.* at 360. Hygea's business is primarily based on the same business model.

42.    Although the Debtors do own the First Harbour Practices, those practices represent a small fraction of the Debtors' overall business. The First Harbour Practices only employ three health care providers and, collectively, treat 205 patients a week. In addition, one practice, FH Sarasota will likely be closing in the short term. Notwithstanding the Debtors' ownership of the First Harbour Practices, the individual physicians (and not Hygea) are contractually responsible for all treatment related decisions and are obligated to treat patients based on their independent professional judgment.

43.    Based on these facts, the Debtors submit that their overall business is not "primarily engaged" in offering health care services or facilities to the public so as to qualify as a health care business under section 101(27A) of the Bankruptcy Code.

**B.    The Physician Practices Do Not Provide the Type of Health Care Services that Would Qualify the Debtors As a Health Care Business Under Section 101(27A) of the Bankruptcy Code.**

44.    In order to meet the statutory definition of a health care business, the Debtors' business must satisfy each subsection of section 101(27A). *See In re Banes*, 355 B.R. at 534 ("Because every section of this statute is connected by the conjunctive, a health care business must meet the requirements of every subsection to require the appointment of an ombudsman."); *see also Pinellas*, 360 B.R. at 359 (identifying four elements of a health care business). Thus, to qualify as a health care business, the Debtors must provide "surgical, drug treatment, psychiatric, or obstetric care." *See* 11 U.S.C. § 101(27A)(A)(ii). In *Pinella*, the court expressly rejected an

14

argument that the reference to "drug treatment" in this subsection meant merely the ability to write prescriptions, which could include all doctors and pharmacies. 360 B.R. at 360 n.3. Rather, the court interpreted the phrase "drug treatment" as applying to "facilities that treat drug treatment and dependency." *Id.*

45.    The Physician Practices, including the First Harbour Practices, do not provide surgical, drug treatment, psychiatric, or obstetric care. Rather, they provide primary care as well as cardiology related services. Those type of services simply do not meet the statutory definition set forth in section 101(27A) subsection (A)(ii) of the Bankruptcy Code.

46.    Relatedly, the list set forth in section 101(27A)(B) indicates that only inpatient facilities may qualify as a health care business. *See In re Banes*, 355 B.R. at 535 ("[T]he types of businesses listed are all of such a similar nature in that they provide both housing and treatment ... it is difficult to imagine that the legislature would have intended a business that is so fundamentally different, such as an outpatient dental practice, to be read into the definition."); *Pinellas*, 360 B.R. at 361 ("[T]he examples included in subparagraph (b) appear to contemplate something more than a doctor's office and clearly require more than an administrative support facility … that does not deal with the general public."). Here, all of the Physician Practices are outpatient facilities. They do not involve direct and ongoing contact with patients or provide them with shelter or sustenance.

47.    Accordingly, the Debtors do not meet the statutory definition of a "health care business" so as to require the appointment of a patient care ombudsman under section 333 of the Bankruptcy Code.

## II.    Appointment of a Patient Care Ombudsman is Not Necessary to Protect Patients Under the Facts of these Chapter 11 Cases.

48.    Even if section 333 of the Bankruptcy Code does apply, the appointment of a patient care ombudsman is not necessary for the protection of patients under the specific facts of these Chapter 11 Cases.  *See* 11 U.S.C. § 333(a)(1).  In evaluating whether the appointment of a patient care ombudsman is necessary, courts have considered the following factors:

(1) the cause of the bankruptcy;
(2) the presence and role of licensing or supervising entities;
(3) debtor's past history of patient care;
(4) the ability of the patients to protect their rights;
(5) the level of dependency of the patients on the facility;
(6) the likelihood of tension between the interests of the patients and the debtor;
(7) the potential injury to the patients if the debtor drastically reduced its level of patient care;
(8) the presence and sufficiency of internal safeguards to ensure appropriate level of care; and
(9) the impact of the cost of an ombudsman on the likelihood of a successful reorganization.

*In re Alternate Family Care*, 377 B.R. at 758; *see also In re N. Shore Hematology-Oncology Assocs., P.C.*, 400 B.R. 7, 11 (Bankr. E.D.N.Y. 2008) (same).

49.    The weight accorded to each factor is committed to the sound discretion of the Court.  *In re N. Shore*, 400 B.R. at 11 (citing *In re Valley Health Sys.*, 381 B.R. 756, 762 (Bankr. C.D. Cal. 2008)).

50.    First, as discussed above, the Debtors' bankruptcy filings are unrelated to any deficiencies in patient care, and the Debtors are unaware of any complaints or claims related to patient care asserted within the past year.  The fact that the Chapter 11 Cases were not promoted by treatment-related issues or claims weighs against the appointment of a patient care ombudsman.  *See, e.g.*, *In re Pediatrics at Whitlock, P.C.*, 507 B.R. 10, 12 (Bankr. N.D. Ga. 2014) (finding appointment of an ombudsman unnecessary, and noting that "[n]othing in the record indicates that Debtor's bankruptcy was predicated by deficiencies in patient care, and the

16

Motion asserts that 'No claims have been made against Debtor's malpractice insurance' and 'Debtor is unaware of any professional malpractice claims, or incidents that could result in claims, against anyone associated with Debtor.'"); *In re Denali Family Servs.*, No. A13-00114-GS, 2013 WL 1755481, at *3 (Bankr. D. Alaska Apr. 24, 2013) (holding ombudsman unnecessary where "[debtor's] bankruptcy was precipitated by discovery of substantial unpaid federal employment taxes rather than patient care issues"); *In re William L. Saber, M.D., P.C.*, 369 B.R. 631, 637 (Bankr. D. Colo. 2007) (finding that bankruptcy was not precipitated by patient care quality or privacy concerns, rather it stemmed from litigation regarding a contractual employment dispute); *In re Total Woman Healthcare Center, P.C.*, 2006 WL 3708164, at *2 (Bankr. M.D. Ga. Dec. 14, 2006) (finding that debtor's primary obligation for taxes did not arise from deficient patient care).

51.     <u>Second</u>,  the Managed Practices are all operated by independently licensed health care providers who are overseen by governmental and regulatory authorities at both the state and federal level, including, but not limited to, the Centers for Medicare and Medicaid Services and the respective state agencies in Florida and Georgia.  In addition, the First Harbour Practices are duly licensed health care clinics under AHCA.  As a result, they are subject to numerous AHCA guidelines and regulations concerning patient safety, documentation, reporting, quality, and appropriateness of care.  The continued oversight of the Physician Practices by state and federal authorities also weighs against the appointment of a patient care ombudsman.  *See, e.g.*, *In re Denali Family Servs.*, 2013 WL 1755481, at *3 (finding that "appointment of an ombudsman would be redundant" where the debtor was already subject to governmental supervision of its patient care); *In re Valley Health*, 381 B.R. at 761-62 (monitoring by multiple federal and state agencies weight against appointment of an ombudsman).

17

52.     <u>Third</u>, the Debtors maintain a strong patient care record at the Managed Practices

and the First Harbour Practices.  Given the provision of funding under the DIP Loan, the Debtors

possess the financial wherewithal to continue to provide that same level of patient care during

the Chapter 11 Cases.  The Physician Practices' history of strong patient care along with their

ability to continue such care weighs against appointing a patient care ombudsman.  *See In re N.*

*Shore*, 400 B.R. at 13 (finding appointment of an ombudsman unnecessary where debtor had

financial ability to continue to pay for patient treatments and a history of strong patient care

practices).

53.     <u>Fourth</u>, the Debtors have in place internal controls and monitoring procedures that

help ensure patients' treatment needs are being met and that their privacy rights under HIPAA

are being protected.  These robust internal controls are reflected in the Physician Practices' track

record of strong patient care and weigh against the need for an ombudsman.  *See e.g.*, *In re*

*Denali Family Servs.*, 2013 WL 1755481, at * 4 (debtor's internal monitoring program weight

against appointing ombudsman); *In re N. Shore*, 400 B.R at 13 (ability of patient to file

complaint with the state medical board and debtor's procedures to address complaints were

relevant to the court's decision not to appoint a patient care ombudsman).

54.     <u>Fifth</u>, the Debtors do not anticipate the need to close a large portion of their

Physician Practices or to substantially reduce the number of health care providers currently in

place.  However, the Debtors also do not believe that the type of medical services they provide

create a high level of patient dependency.  As explained above, the Physician Practices do not

provide emergency related services, inpatient care, surgical treatment, drug addiction or

dependency services, psychiatric or obstetric care.  Therefore, to the extent the Debtors are

required to close certain Physician Practices or terminate existing health care providers, the

18

Debtors believe that patients would be able obtain alternate care relatively easily and that the time it may take to obtain such care would not cause major health risks.  The Debtors believe that this factor strongly weighs against the appointment of an ombudsman.  *See, e.g.*, *In re N. Shore*, 400 B.R. at 12 (finding that ombudsman was not required, in part, because the debtor did not plan to make significant reductions to the number of skilled workers and because the debtor did not provide any in-patient services).

55.     Lastly, the Debtors believe that the appointment of an ombudsman would have a negative impact on the Debtors' ability to achieve a successful reorganization.  The fees incurred by an ombudsman and his/her professionals would saddle the Debtors' estates with additional administrative liabilities without materially enhancing patient health and safety or any providing benefit to the Debtors, their estates or creditors.  *See In re Saber*, 369 at 638 (expressing concern over the costs associated with the appointment of an ombudsman hampering the debtor's ability to reorganize).  Moreover, the expedited anticipated timing upon which the Debtors must achieve confirmation of a Plan under the RSA further minimizes any potential role for a patient care ombudsman.

56.     Based on the foregoing, a patient care ombudsman is not necessary to protect patients.  Therefore, the Debtors respectfully request that the Court waive the requirement that a patient care ombudsman be appointed, pursuant to section 333(a)(1) of the Bankruptcy Code.

## III.     Subsequent Appointment of a Patient Care Ombudsman is Within the Court's Discretion.

57.     Additionally, Bankruptcy Rule 2007.2(b) states that "[i]f the court has ordered that appointment of an ombudsman is not necessary . . . the court, on motion of the United States trustee or a party in interest, may order the appointment at any time during the case if the court finds that the appointment of an ombudsman is necessary to protect patients."  Fed. R. Bankr. P.

2007.2(b); *see, e.g., In re Valley Health*, 381 B.R. at 765-66 ("[T]he court . . . may order the appointment of a patient care ombudsman at any time during the pendency of this case if the court finds a change in circumstances or newly discovered evidence that demonstrates the necessity of an ombudsman to monitor the quality of patient care and protect the interests of patients."). Therefore, if at any time the U.S. Trustee or any other party in interest believes that patient care is at risk, they are not without recourse and may request that this Court reevaluate its decision not to appoint a patient care ombudsman.

## NOTICE

58.    Notice of this Motion will be given to: (a) the U.S. Trustee; (b) counsel to the Debtors' prepetition secured lender; (c) the parties included on the Debtors' consolidated list of their 40 largest unsecured creditors; and (d) all parties entitled to notice pursuant to Local Rule 2002-1(b). The Debtors submit that no other or further notice is required.

*[Remainder of page intentionally left blank]*

## <u>CONCLUSION</u>

WHEREFORE, the Debtors respectfully request that the Court enter an order,

substantially in the form attached hereto, granting the relief requested herein and such other and

further relief as may be just and proper.

Dated:  Wilmington, Delaware
       March 6, 2020

                                    COLE SCHOTZ P.C.

                                    */s/ J. Kate Stickles*
                                    J. Kate Stickles (I.D. No. 2917)
                                    500 Delaware Avenue, Suite 1410
                                    Wilmington, Delaware 19801
                                    Telephone: (302) 652-3131
                                    Facsimile: (302) 652-3117
                                    kstickles@coleschotz.com

                                    – and –

                                    Michael D. Sirota (admitted *pro hac vice*)
                                    Felice R. Yudkin (admitted *pro hac vice*)
                                    Jacob S. Frumkin (admitted *pro hac vice*)
                                    Michael Trentin (admitted *pro hac vice*)
                                    25 Main Street
                                    Hackensack, New Jersey 07601
                                    Telephone: (201) 489-3000
                                    Facsimile: (201) 489-3479

                                    *Proposed Counsel for Debtors and*
                                    *Debtors-in-Possession*

60437/0001-19878152v3