<u>EXHIBIT A</u>

<u>May 1 Disclosure Statement</u>

**THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE COURT**
**This proposed Disclosure Statement is not a solicitation of acceptance or rejection of the First Amended Joint Chapter 11 Plan of Reorganization of Hygea Holdings Corp. and its Affiliated Debtors. Acceptances or rejections may not be solicited until the Bankruptcy Court has approved this Disclosure Statement under section 1125 of the Bankruptcy Code. This proposed Disclosure Statement is being submitted for approval only, and has not yet been approved by the Bankruptcy Court.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------- x
                      :

In re:                    :    Chapter 11

HYGEA HOLDINGS CORP., *et al.*,   :    Case No. 20-10361 (KBO)

        Debtors.[1]        :    (Jointly Administered)
                    :

-------------------------------------------------------- x

## FIRST AMENDED DISCLOSURE STATEMENT WITH RESPECT TO FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF HYGEA HOLDINGS CORP. AND ITS AFFILIATED DEBTORS

**COLE SCHOTZ P.C.**
J. Kate Stickles (I.D. No. 2917)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone: (302) 652-3131
kstickles@coleschotz.com

Michael D. Sirota

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are: All Care Management Services, Inc. (6484); First Harbour Health Management, LLC (0941); First Harbour Medical Centers, LLC (3861); Florida Group Healthcare LLC (7956); Gemini Healthcare Fund, LLC (4928); Hygea Acquisition Longwood, LLC (1649); Hygea Acquisition Orlando, LLC (3507); Hygea Health Holdings, Inc. (8926); Hygea Holdings Corp. (2605); Hygea IGP of Central Florida, Inc. (9453); Hygea IGP, LLC (7724); Hygea Medical Centers of Florida, LLC (5301); Hygea Medical Partners, LLC (4486); Hygea of Delaware, LLC (4830); Hygea of Georgia, LLC (5862); Hygea of Pembroke Pines, LLC (6666); Hygea Primum Acquisition, Inc. (8567); Medlife Activity Center, LLC (2311); Mobile Clinic Services, LLC (9758); Palm A.C. MSO, LLC (2585); Palm Allcare Medicaid MSO, Inc. (6956); Palm Allcare MSO, Inc. (0319); Palm Medical Group, Inc. (5028); Palm Medical MSO LLC (7738); Palm Medical Network, LLC (9158); Palm MSO System, Inc. (2178); Palm PGA MSO, Inc. (8468); Physician Management Associates East Coast, LLC (7319); Physician Management Associates SE, LLC (3883); Physicians Group Alliance, LLC (7824); Primum Alternatives, Inc. (7441); Primum Healthcare, LLC (0157); and Professional Health Choice, Inc. (6850). The address of the Debtors' corporate headquarters is 8700 W Flagler Street, Suite 280, Miami, FL 33174.

Stuart Komrower
Felice R. Yudkin
Jacob S. Frumkin
Michael Trentin
25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000

*Counsel for the Debtors and*
*Debtors-in-Possession*

May 1, 2020

2

# DISCLAIMER[2]

THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, INCLUDING THE EXHIBITS ANNEXED HERETO, IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF HYGEA HOLDINGS CORP. AND ITS AFFILIATED DEBTORS AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN HOW TO VOTE ON THE PLAN.  NO PERSON IS AUTHORIZED BY THE DEBTORS IN CONNECTION WITH THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION REGARDING THIS DISCLOSURE STATEMENT OR THE PLAN OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS ANNEXED HERETO, INCORPORATED BY REFERENCE OR REFERRED TO HEREIN, AND IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTORS.

ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE ADVISED AND ENCOURAGED TO (I) READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETIES; (II) CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING, IMPORTANTLY, THE RISK FACTORS DESCRIBED IN ARTICLE VIII OF THIS DISCLOSURE STATEMENT; AND (III) CONSULT WITH THEIR OWN ADVISORS WITH RESPECT TO REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN AND ALL DOCUMENTS THAT ARE ATTACHED TO THE PLAN AND DISCLOSURE STATEMENT BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.

PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT WITH RESPECT TO THE PLAN ARE QUALIFIED IN THEIR ENTIRETIES BY REFERENCE TO THE PLAN, THE EXHIBITS ATTACHED TO THE PLAN AND ANY PLAN SUPPLEMENT(S).  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT ANY TIME AFTER THE DATE HEREOF.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NON-BANKRUPTCY LAWS.  THIS DISCLOSURE STATEMENT HAS NEITHER BEEN APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "*SEC*"), AND THE SEC HAS NOT PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.  PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OR CLAIMS OF THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSES FOR WHICH THEY WERE PREPARED.

---

[2] Terms used in this Disclaimer that are not otherwise defined shall have the meanings ascribed to such terms elsewhere in this Disclosure Statement.

**AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.  THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO CONSTITUTE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN AS IT RELATES TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE DEBTORS.**

## <u>TABLE OF CONTENTS</u>

ARTICLE I INTRODUCTION ...............................................................................1
    A.    Purpose of the Disclosure Statement ...................................................1
    B.    Disclosure Statement Enclosures ........................................................2
           1.    Order Approving the Disclosure Statement ...............................2
           2.    Ballot ........................................................................................2
           3.    Notice .......................................................................................2
    C.    Final Approval of the Disclosure Statement and Confirmation of the Plan ...........2
           1.    Requirements ............................................................................2
           2.    Approval of the Plan and Confirmation Hearing .......................2
           3.    Effect of Confirmation .............................................................2
            4.    Only Impaired Classes Vote .....................................................2
    D.    Treatment and Classification of Claims and Equity Interests; Impairment ...........3
    E.    Voting Procedures and Voting Deadline ..............................................7
    F.    Confirmation Hearing .........................................................................8

ARTICLE II GENERAL INFORMATION REGARDING THE DEBTORS .............9
    A.    The Debtors' Businesses ......................................................................9
           1.    General Overview ....................................................................9
           2.    The Physician Practices ...........................................................9
           3.    Management Service Organizations (MSOs) ...........................10
           4.    The Palm Network ..................................................................11
    B.    The Debtors' Corporate Structure .....................................................11
    C.    The Debtors' Prepetition Capital Structure ........................................11
    D.    Summary of Events Leading to the Chapter 11 Filing ........................12

ARTICLE III THE CHAPTER 11 CASES ...........................................................13
    A.    Commencement of the Chapter 11 Cases ...........................................13
    B.    "First Day" Motions ..........................................................................14
    C.    Retention of Professionals and Appointment of the Committee .........15
           1.    Retention of Debtors' Professionals .......................................15
           2.    Appointment of Committee and Retention of Committee Professionals ...........................................................................15
    D.    Significant Events During the Chapter 11 Cases ................................15
           1.    Debtor-in-Possession Financing .............................................15
           2.    Patient Care Ombudsman Motion ...........................................16
           3.    Lease Rejection Motions .........................................................16
           4.    The Claims Process .................................................................17
                 a.    Schedules and Statements ...........................................17
                 b.    Bar Date Order ............................................................17
                 c.    Claims Objections .......................................................17
           5.    Litigation and Discovery ........................................................18
                 a.    Committee ...................................................................18
                 b.    Nevada 5 ......................................................................18
    E.    The Global Settlement .......................................................................20
    F.    Formal and Informal Objections to Approval of the Disclosure Statement .........21

ARTICLE IV SUMMARY OF PLAN .................................................................21
  A.    Classification and Treatment of Claims and Equity Interests..............22
      1.    Unclassified Claims ...........................................................23
          a.    Administrative Expense Claim ............................23
          b.    Accrued Professional Compensation Claims................24
          c.    Priority Tax Claims ...........................................25
      2.    Unimpaired Claims ...........................................................25
          a.    Class 1:  Other Priority Claims ..........................25
          b.    Class 2: Other Secured Claims ...........................25
      3.    Impaired Claims ...............................................................26
          a.    Class 3: Bridging's Secured Claim .....................26
          b.    Class 4: General Unsecured Claims.....................26
          c.    Class 5: Subordinated Claims .............................27
      4.    Interests ............................................................................27
          a.    Class 6: Equity Interests....................................27
      5.    Special Provision Regarding Unimpaired Claims ..............27
      6.    Discharge of Claims..........................................................27
      7.    Subordinated Claims ........................................................28
      8.    Elimination of Vacant Classes..........................................28
  B.    Acceptance or Rejection of the Plan ..........................................28
      1.    Presumed Acceptance of Plan............................................28
      2.    Presumed Rejection of Plan ...............................................28
      3.    Voting Class .....................................................................28
      4.    Acceptance by Impaired Classes of Claims.......................28
      5.    Cramdown ........................................................................29
  C.    Means for Implementation ........................................................29
      1.    General Settlement of Claims.............................................29
      2.    Corporate Existence ..........................................................29
      3.    Vesting of Assets in the Reorganized Debtors ...................30
      4.    New Secured Debt .............................................................30
      5.    Sources of Cash for Certain Plan Distributions .................31
      6.    Issuance of Reorganized Debtor Equity and Related
          Documentation..................................................................31
      7.    Section 1145 Exemption....................................................32
      8.    Employee Matters and Retiree Benefits ............................32
      9.    Release of Liens, Claims, and Equity Interests..................32
      10.    New Organizational Documents ........................................33
      11.    Resignation of Directors and Officers ...............................33
      12.    Managers and Officers of the Reorganized Debtors...............33
      13.    Corporate Action...............................................................34
      14.    Cancellation of Agreements, Security Interests, and Other Interests ........34
      15.    Dissolved Debtors.............................................................34
  D.    Creditors' Trust......................................................................35
      1.    Establishment of the Creditors' Trust ...............................35
      2.    Creditors' Trust Funding...................................................35
      3.    Appointment of the Trustee ..............................................35

|  | 4. | Beneficiaries of Creditors' Trust ........................................................ | 35 |
|  | 5. | Vesting and Transfer of Creditors' Trust Assets to the Creditors' Trust ........................................................................................... | 36 |
|  | 6. | Retention of Professionals .............................................................. | 36 |
|  | 7. | Creditors' Trust Expenses ............................................................... | 36 |
|  | 8. | Certain Powers and Duties of the Creditors' Trust and Trustee. ........... | 36 |
|  |  | a. General Powers of the Trustee. ..................................... | 36 |
|  |  | b. Investments of Cash. .................................................... | 37 |
|  |  | c. Reporting. ................................................................... | 37 |
|  |  | d. Tax Reporting. ............................................................ | 37 |
|  | 9. | Preservation of Right to Conduct Investigations ............................... | 38 |
|  | 10. | Prosecution and Resolution of Causes of Action ............................... | 38 |
|  |  | a. The Creditors' Trust's Exclusive Authority to Pursue, Settle, or Abandon Causes of Action. ................................ | 38 |
|  |  | b. Settlement of Causes of Action. ..................................... | 39 |
|  | 11. | Federal Income Tax Treatment of the Creditors' Trust ........................ | 39 |
|  | 12. | Limitation of Liability .................................................................... | 39 |
|  | 13. | Term of Creditors' Trust ................................................................ | 40 |
|  | 14. | Conflicts Between the Creditors' Trust Agreement and the Plan .......... | 40 |
| E. | Distributions ...................................................................................... | | 40 |
|  | 1. | Distribution Record Date ................................................................ | 40 |
|  | 2. | Timing of Distributions .................................................................. | 40 |
|  | 3. | Disbursing Agent .......................................................................... | 41 |
|  | 4. | Rights and Powers of Disbursing Agent ........................................... | 41 |
|  | 5. | Delivery of Distributions in General ................................................ | 41 |
|  | 6. | Payments and Distributions on Disputed Claims ................................ | 41 |
|  | 7. | Manner of Payment ....................................................................... | 41 |
|  | 8. | Undeliverable Distributions and Unclaimed Property .......................... | 42 |
|  | 9. | Withholding and Reporting Requirements ......................................... | 42 |
|  | 10. | Surrender Instruments .................................................................... | 42 |
|  | 11. | Setoffs ........................................................................................ | 42 |
|  | 12. | Insurance Claims ........................................................................... | 43 |
|  | 13. | Applicability of Insurance Policies .................................................. | 43 |
|  | 14. | No Postpetition Interest .................................................................. | 43 |
|  | 15. | Distributions Free and Clear ........................................................... | 43 |
|  | 16. | Fractional Dollars; De Minimis Distributions .................................... | 43 |
| F. | Procedures for Disputed Claims ........................................................... | | 44 |
|  | 1. | Allowance of Claims and Equity Interests ........................................ | 44 |
|  | 2. | Objections to Claims ...................................................................... | 44 |
|  | 3. | Estimation of Claims ..................................................................... | 44 |
|  | 4. | No Distribution Pending Allowance ................................................ | 45 |
|  | 5. | Distributions after Allowance ......................................................... | 45 |
|  | 6. | Preservations of Rights to Settle Claims ........................................... | 45 |
|  | 7. | Disallowed Claims ........................................................................ | 45 |
| G. | Executory Contracts and Unexpired Leases ........................................... | | 45 |

|  |  |  |  |
|---|---|---|---|
|  | 1. | Assumption and Rejection of Executory Contracts and Unexpired Leases | 45 |
|  | 2. | Inclusiveness | 46 |
|  | 3. | Rejection Claims | 46 |
|  | 4. | Cure of Defaults | 46 |
|  | 5. | Reservation of Rights | 47 |
|  | 6. | D&O Liability Insurance Policies | 47 |
| H. | Conditions Precedent to Consummation of the Plan | | 48 |
|  | 1. | Conditions Precedent to Confirmation | 48 |
|  | 2. | Conditions Precedent to the Effective Date | 48 |
|  | 3. | Waiver of Conditions | 49 |
|  | 4. | Effect of Failure of Conditions | 49 |
| I. | Effect of Confirmation | | 49 |
|  | 1. | Immediate Binding Effect | 49 |
|  | 2. | Compromise and Settlement of Claims, Interests and Controversies | 50 |
|  | 3. | Releases by the Debtors | 50 |
|  | 4. | Releases by Holders of Claims | 50 |
|  | 5. | Exculpation | 51 |
|  | 6. | Injunction | 51 |
|  | 7. | Term of Injunctions or Stays | 53 |
|  | 8. | Injunction Against Interference with Plan | 53 |
|  | 9. | Effectuating Documents and Further Transactions | 53 |
|  | 10. | Preservation of Causes of Action of the Debtors | 53 |
| J. | Modification, Revocation or Withdrawal of the Plan | | 54 |
|  | 1. | Modification and Amendments | 54 |
|  | 2. | Effect of Confirmation on Modifications | 54 |
|  | 3. | Revocation or Withdrawal of the Plan | 54 |
| K. | Retention of Jurisdiction | | 54 |
| L. | Miscellaneous Provisions | | 56 |
|  | 1. | Payment of Statutory Fees | 56 |
|  | 2. | Dissolution of the Committee | 56 |
|  | 3. | Section 382 Limitation on Net Operating Losses and Built-In Losses | 57 |
|  | 4. | Section 1125(e) Good Faith Compliance | 57 |
|  | 5. | Substantial Consummation | 57 |
|  | 6. | Section 1146 Exemption | 57 |
|  | 7. | Closing of the Chapter 11 Cases | 57 |
|  | 8. | Plan Supplement | 57 |
|  | 9. | Further Assurances | 58 |
|  | 10. | Exhibits Incorporated | 58 |
|  | 11. | Inconsistency | 58 |
|  | 12. | No Admissions | 58 |
|  | 13. | Reservation of Rights | 58 |
|  | 14. | Successors and Assigns | 58 |
|  | 15. | Entire Agreement | 59 |
|  | 16. | Notices | 59 |

17.    Severability ...........................................................................59
18.    Governing Law ......................................................................59
19.    Request for Confirmation ......................................................59

ARTICLE V VOTING REQUIREMENTS; ACCEPTANCE AND CONFIRMATION
OF THE PLAN ......................................................................................................60
  A.    General ...........................................................................................60
  B.    Parties in Interest Entitled to Vote ................................................60
  C.    Classes Impaired and Entitled to Vote under the Plan...................60
  D.    Voting Procedures and Requirements............................................60
      1.    Ballots ...................................................................................60
      2.    Returning Ballots ..................................................................61
      3.    Voting ...................................................................................61
  E.    Acceptance of Plan .......................................................................62
  F.    Confirmation Without Necessary Acceptances; Cramdown ...........62
      1.    No Unfair Discrimination ......................................................63
      2.    Fair and Equitable Test .........................................................63

ARTICLE VI FEASIBILITY AND BEST INTERESTS OF CREDITORS ..............64
  A.    Best Interests Test .........................................................................64
  B.    Feasibility.....................................................................................64

ARTICLE VII EFFECT OF CONFIRMATION .....................................................66
  A.    Binding Effect of Confirmation ....................................................66
  B.    Good Faith ....................................................................................66

ARTICLE VIII CERTAIN RISK FACTORS TO BE CONSIDERED.......................66
  A.    Plan May Not Be Accepted............................................................66
  B.    Certain Bankruptcy Law Considerations .......................................66
  C.    Distributions to Holders of Allowed Claims Under the Plan ..........67
  D.    Conditions Precedent to Consummation of the Plan .......................67
  E.    Certain Tax Considerations............................................................67

ARTICLE IX CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE
PLAN ..................................................................................................................67
  A.    Tax Consequences to Creditors .....................................................68
      1.    Holders of Claims .................................................................68
      2.    Non-United States Persons ....................................................69
  B.    Tax Treatment of the Creditors' Trust ...........................................69
      1.    Classification of the Creditors' Trust.....................................69
      2.    General Tax Reporting by the Trust and Beneficiaries ...........70
      3.    Allocations of Taxable Income and Loss................................71
  C.    Importance of Obtaining Professional Tax Assistance .........................72

ARTICLE X RECOMMENDATION AND CONCLUSION .....................................73

60437/0001-20296303v3

**TABLE OF EXHIBITS**

| Exhibit | Title |
|---------|-------|
| A | First Amended Joint Chapter 11 Plan of Reorganization of Hygea Holdings Corp. and its Affiliated Debtors |
| B | Liquidation Analysis |
| C | Financial Projections |
| D | Global Settlement Term Sheet |

i

# ARTICLE I

# INTRODUCTION

## A.    Purpose of the Disclosure Statement

On February 19, 2020 (the "*Petition Date*"), Hygea Holdings Corp. ("*HHC*") and its affiliated debtors and debtors-in-possession (collectively, the "*Debtors*") each filed voluntary petitions for relief (the "*Chapter 11 Cases*") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "*Bankruptcy Code*"), in the United States Bankruptcy Court for the District of Delaware (the "*Bankruptcy Court*").

The Debtors have filed the First Amended Joint Chapter 11 Plan of Reorganization of Hygea Holdings Corp. and its Affiliated Debtors (including all exhibits thereto, and as may be amended, altered, modified or supplemented from time to time, the "*Plan*") with the Bankruptcy Court.  A copy of the Plan is attached hereto as <u>Exhibit A</u>.

**Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Plan; *provided*, *however*, that any capitalized term used herein that is not defined herein or in the Plan, but is defined in the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure (the "*Bankruptcy Rules*") will have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.**

The Debtors submit this disclosure statement (as may be amended, altered, modified or supplemented from time to time, the "*Disclosure Statement*") pursuant to section 1125 of the Bankruptcy Code to Holders of certain Claims against the Debtors in connection with (i) the solicitation of acceptances of the Plan and (ii) the Confirmation Hearing.

The purpose of this Disclosure Statement is to describe the Plan and its provisions and to provide certain information, as required under section 1125 of the Bankruptcy Code, to Creditors who will have the right to vote on the Plan so they can make informed decisions in doing so. Creditors entitled to vote to accept or reject the Plan will receive a Ballot (as defined herein) together with this Disclosure Statement to enable them to vote on the Plan.

This Disclosure Statement includes, among other things, information pertaining to the Debtors' prepetition business operations and financial history and the events leading to the filing of the Chapter 11 Cases.  This Disclosure Statement also contains information regarding significant events that have occurred during the Chapter 11 Cases.  In addition, an overview of the Plan is included, which overview sets forth certain terms and provisions of the Plan, the effects of Confirmation of the Plan, certain risk factors associated with the Plan and the manner in which Distributions will be made under the Plan.  This Disclosure Statement also discusses the Confirmation process and the procedures for voting, which procedures must be followed by the Holders of Claims entitled to vote under the Plan for their votes to be counted.

B.  **Disclosure Statement Enclosures**

Accompanying this Disclosure Statement are:

1.  <u>Order Approving the Disclosure Statement</u>.  A copy of the Bankruptcy Court's order (the "***Solicitation Procedures Order***") approving this Disclosure Statement and, among other things, establishing procedures for voting on the Plan, setting the deadline for objecting to the Plan and scheduling the Confirmation Hearing.

2.  <u>Ballot</u>.  A ballot (the "***Ballot***") for voting to accept or reject the Plan, if you are the record Holder of a Claim in a Class entitled to vote on the Plan (each, a "***Voting Class***").

3.  <u>Notice</u>.  A notice setting forth: (i) the deadline for casting Ballots either accepting or rejecting the Plan; (ii) the deadline for filing objections to Confirmation of the Plan; and (iii) the date, time and location of the Confirmation Hearing (the "***Notice***").

C.  **Final Approval of the Disclosure Statement and Confirmation of the Plan**

1.  <u>Requirements</u>.  The requirements for Confirmation of the Plan are set forth in section 1129 of the Bankruptcy Code.  The requirements for the Disclosure Statement are set forth in section 1125 of the Bankruptcy Code.

2.  <u>Approval of the Plan and Confirmation Hearing</u>.  Before entering an order confirming the Plan (the "***Confirmation Order***"), the Bankruptcy Court must hold a hearing to determine whether the Plan meets the requirements of section 1129 of the Bankruptcy Code.

3.  <u>Effect of Confirmation</u>.  Confirmation serves to make the Plan binding upon the Debtors and all Creditors, Holders of Equity Interests and other parties in interest, regardless of whether they cast a Ballot to accept or reject the Plan.

4.  <u>Only Impaired Classes Vote</u>.  Pursuant to the provisions of the Bankruptcy Code, only classes of claims or equity interests that are "impaired" under a plan may vote to accept or reject such plan.  Generally, a claim or equity interest is impaired under a plan if a holder's legal, equitable or contractual rights are changed under such plan.  In addition, if the holders of claims or equity interests in an impaired class do not receive or retain any property under a plan on account of such claims or equity interests, such impaired class is deemed to have rejected such plan under section 1126(g) of the Bankruptcy Code and, therefore, such holders do not need to vote on such plan.

Under the Plan, Holders of Claims in Classes 1 and 2 are Unimpaired and therefore deemed to accept the Plan; Holders of Claims in Classes 3 and 4 are Impaired and are entitled to vote on the Plan; and Holders of Claims in Class 5 and Equity Interests in Class 6 are deemed to reject the Plan and are not entitled to vote on the Plan.

**Accordingly, a Ballot for acceptance or rejection of the Plan is being provided only to Holders of Claims in Classes 3 and 4.**

2

### D.    Treatment and Classification of Claims and Equity Interests; Impairment

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes, including voting, Confirmation and Distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  For a summary of the treatment of each Class of Claims and Equity Interests, see Article IV, "Summary of Plan," below.

| Class Description | Status | Proposed Treatment |
|---|---|---|
| Administrative Expense Claims<br>Estimated Claims Pool: $2,250,000.00<br>Estimated Recovery: 100% | Unclassified | Except to the extent that a Holder of an Allowed Administrative Expense Claim agrees to different treatment with the Debtors or Reorganized Debtors, each Holder of an Allowed Administrative Expense Claim will receive Cash in an amount equal to the unpaid amount of such Allowed Administrative Expense Claim on the later of the Effective Date or the date on which such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is reasonably practicable; *provided, however*, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors, as Debtors-in-Possession, or liabilities arising under obligations incurred by the Debtors, as Debtors-in-Possession, prior to the Effective Date, will be paid by the Debtors in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions, including, but not limited to, the Budget, DIP Orders and all other orders entered by the Bankruptcy Court related to the foregoing.  In addition, Allowed Administrative Expense Claims of the United States Trustee for statutory fees under 28 U.S.C. § 1930 incurred prior to the Effective Date will be paid on the Effective Date by the Debtors, and thereafter, as such fees may thereafter accrue and be due and payable, by the Creditors' Trust in accordance with the applicable schedule for payment of such fees. |

60437/0001-20296303v3

| Accrued Professional Compensation Claims<br>Estimated Claims Pool: $2,000,000.00<br>Estimated Recovery: 100% | Unclassified | Except as otherwise provided in the Plan, all Professionals seeking payment of Accrued Professional Compensation Claims will (i) file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred in the Chapter 11 Cases by the date that is thirty (30) days after the Effective Date and (ii) be paid (a) the full unpaid amount as is Allowed by the Bankruptcy Court within five (5) Business Days after the date that such Claim is Allowed by order of the Bankruptcy Court, or (b) upon such other terms as may be mutually agreed upon between the Holder of such an Allowed Accrued Professional Compensation Claim and the Debtors or Reorganized Debtors.  Any Accrued Professional Compensation Claim that is not asserted in accordance with Section 2.2 of the Plan will be deemed disallowed under the Plan, waived, and will be forever barred against the Debtors, the Debtors' Estates, the Reorganized Debtors, the Creditors' Trust, or any of their Assets or property, and the Holder thereof will be enjoined from commencing or continuing any action, employment of process or act to collect, offset, recoup, or recover such Claim.<br><br>Accrued Professional Compensation Claims filed by the Committee's Professionals will be subject to a cap of One Million Three Hundred and Twenty-Five Thousand Dollars ($1,325,000.00) (the "***Committee Budget***") as described in the DIP Orders.  To the extent the Committee Budget is insufficient to pay the Allowed Accrued Professional Compensation Claims of the Committee's Professionals, such Allowed Claims may be paid from the Creditors' Trust.  The Committee Budget will not be subject to the Variance.<br><br>To the extent any excess funds remain under the Debtors' professional fee budgeted amounts and/or the Committee Budget under the DIP Orders (collectively, the "***Professional Budget Surplus***"), such funds will be deposited into the Creditors' Trust on the Effective Date, or after payment of such Professionals' Accrued Professional Compensation Claims.<br><br>The Professional Budget Surplus will not be used to repay the Creditors' Trust Loan. |

4

| Priority Tax Claims<br>Estimated Claims Pool: $10,426,750.00<br>Estimated Recovery: 100% | Unclassified | Except as otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim or as soon as reasonably practicable thereafter), each Holder of an Allowed Priority Tax Claim will receive in full satisfaction, settlement, discharge, and release of, and in exchange for, such Allowed Priority Tax Claim pursuant to and in accordance with sections 1129(a)(9)(C) and 1129(a)(9)(D) of the Bankruptcy Code, Cash in an aggregate amount of such Allowed Priority Tax Claim payable in regular installment payments over a period ending not more than five (5) years after the Petition Date, plus simple interest at the rate required by applicable non-bankruptcy law on any outstanding balance from the Effective Date, or such lesser rate as is agreed to in writing by a particular taxing authority and the Debtors or Reorganized Debtors, as applicable, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; provided, however, that Priority Tax Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.  Any installment payments to be made under clause (C) or (D) above will be made in equal quarterly Cash payments beginning on the first applicable Subsequent Distribution Date, and continuing on each Subsequent Distribution Date thereafter until payment in full of the applicable Allowed Priority Tax Claim. |
| Class 1: Other Priority Claims<br>Estimated Claims Pool: $1,965.00<br>Estimated Recovery: 100% | Unimpaired | Except to the extent that a Holder of an Allowed Other Priority Claim against the Debtors has agreed to a different treatment of such Claim, each such Holder will receive, in full satisfaction of such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date; (ii) the date the Other Priority Claim becomes an Allowed Claim; or (iii) the date for payment provided by any agreement or arrangement between the Reorganized Debtors and the Holder of the Allowed Other Priority Claim against the Debtors. |

5

| | | |
|---|---|---|
| Class 2: Other Secured Claims<br>Estimated Claims Pool: $0.00<br>Estimated Recovery: 100% | Unimpaired | In full satisfaction of an Allowed Other Secured Claim, on the later of the Effective Date and the date on which the Other Secured Claim is Allowed, each Holder of an Allowed Other Secured Claim will receive, at the sole and exclusive option of the Reorganized Debtors:  (a) Cash equal to the amount of such Claim; (b) the Collateral securing such Claim; or (c) satisfaction of such Claim pursuant to such other terms and conditions as may be agreed upon by the Reorganized Debtors and the Holder of such Other Secured Claim. |
| Class 3: Bridging's Secured Claim<br>Estimated Claims Pool: $122,539,900.00<br>Estimated Recovery: Unknown | Impaired | Upon the terms and subject to the conditions set forth in the Plan, in full and final satisfaction, settlement, release, and discharge of Bridging's Secured Claim, Bridging or such Entity designated by Bridging and Centurion, respectively, will receive, on the Effective Date or as soon as practicable thereafter, (i) the Debtors' Cash on hand on the Effective Date in excess of Cash necessary to operate the Reorganized Debtors' business, following funding of the Creditors' Trust Loan to be allocated 90.86% to Bridging and 9.14% to Centurion; (ii) the New Secured Debt in accordance with Section 6.4 of the Plan; and (iii) 86.317% of the Reorganized Debtor Equity will be issued to Bridging or its designee and 8.683% of the Reorganized Debtor Equity will be issued to Centurion or its designee.<br><br>To the extent the Debtors' Cash on hand as of the Effective Date is not sufficient to make payments under the Plan, fund operations and fund the Creditors' Trust Loan, Bridging will advance the necessary funds to the Reorganized Debtors with such amount to be added to the Working Capital Loan.  All distributions made on account of Bridging's Secured Claim will be paid to Bridging and Centurion, as applicable.  Bridging will have the right to vote Bridging's Secured Claim. |
| Class 4: General Unsecured Claims<br>Estimated Claims Pool: $281,457,060.00<br>Estimated Recovery: Unknown | Impaired | This Class consists of all General Unsecured Claims against the Debtors, including Bridging's Deficiency Claim.  Except to the extent that a Holder of an Allowed General Unsecured Claim against the Debtors agrees to a different treatment of such Claim, in full and final satisfaction of each Allowed General Unsecured Claim against the Debtors, each Holder of an Allowed General Unsecured Claim against the Debtors will receive its Pro Rata share of Creditors' Trust Distributable Assets as soon as practicable as determined by the Trustee.  Bridging will have the right to vote the Bridging Deficiency Claim but will waive any Distributions to Bridging and its participants on account of Bridging's Deficiency Claim. |

6

| | | |
|---|---|---|
| Class 5: Subordinated Claims<br>Estimated Claims Pool: Unknown<br>Estimated Recovery: 0% | Impaired | This Class consists of all Subordinated Claims against the Debtors.  Holders of Subordinated Claims against the Debtors will not receive or retain any property under the Plan on account of such Subordinated Claims, and the obligations of the Debtors on account of Subordinated Claims will be discharged. |
| Class 6: Equity Interests<br>Estimated Recovery: 0% | Impaired | Holders of an Equity Interest in the Debtors will not receive or retain any property under the Plan on account of such Equity Interests, and the obligations of the Debtors on account of the Equity Interests will be discharged. |

## E.    Voting Procedures and Voting Deadline

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan.  To ensure your vote is counted, you must (i) complete the Ballot, (ii) indicate your decision either to accept or reject the Plan in the boxes provided and (iii) sign and return the Ballot(s) in the envelope provided.

**To be counted, your Ballot with your original signature indicating your acceptance or rejection of the Plan must be received no later than 4:00 p.m. (Eastern Time) on June 8, 2020 (the "Voting Deadline").**

The following Ballots will not be counted or considered for any purpose in determining whether the Plan has been accepted or rejected:

(i)      any Ballot received after the Voting Deadline (unless extended by the Debtors);

(ii)     any Ballot that is illegible or contains insufficient information to permit the identification of the claimant;

(iii)    any Ballot cast by a Person or Entity that does not hold a Claim or Equity Interest in a Class that is entitled to vote to accept or reject the Plan;

(iv)     any Ballot cast for a Claim scheduled as Contingent, unliquidated or Disputed or as zero or unknown in amount and for which no Rule 3018(a) Motion has been filed by the Rule 3018(a) Motion Deadline (as such terms are defined in the Solicitation Procedures Order);

(v)      any Ballot that indicates neither an acceptance nor a rejection, or indicates both an acceptance and a rejection, of the Plan;

(vi)     any Ballot that casts part of its vote in the same Class to accept the Plan and part to reject the Plan;

(vii)    any form of Ballot other than the official form sent by Epiq Corporate Restructuring, LLC ("*Epiq*," the "*Claims Agent*" or the "*Voting Agent*"), or a copy thereof;

(viii)   any Ballot received that the Voting Agent cannot match to an existing database record;

(ix)     any Ballot that does not contain an original signature;

(x)      any Ballot that is submitted by facsimile, email or by other electronic means; or

(xi)     any Ballot sent to the Debtors' professionals.

In order for the Plan to be accepted by an Impaired Class of Claims, a majority in number and two-thirds in dollar amount of the Claims voting in such Class must vote to accept the Plan. At least one Voting Class, excluding the votes of insiders, must actually vote to accept the Plan.

**You are urged to complete, date, sign and promptly mail the Ballot enclosed with the notice. Please be sure to complete the Ballot properly and legibly, and identify the exact amount of your Claim and the name of the Creditor. If you are a Holder of a Claim entitled to vote on the Plan and you did not receive a Ballot, you received a damaged Ballot or you lost your Ballot, or if you have any questions concerning the Disclosure Statement, the Plan or procedures for voting on the Plan, please contact the Voting Agent, Epiq Corporate Restructuring, LLC, at (866) 897-6433 (U.S., and Canada, toll free), (646) 282-2500 (International) or at hygeatabulation@epiqglobal.com. The Voting Agent is not authorized to and will not provide legal advice.**

**F.      Confirmation Hearing**

The Bankruptcy Court has scheduled a hearing to consider confirmation of the Plan for June 12, 2020 at 10:00 a.m. (Eastern Time) in the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 6th Floor, Courtroom No. 3, Wilmington, Delaware 19801 (the "*Confirmation Hearing*"). The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be filed and served on or before June 5, 2020 at 4:00 p.m. (Eastern Time) in the manner described in the Notice accompanying this Disclosure Statement. The Confirmation Hearing may be adjourned from time to time by way of announcement of such continuance in open court or otherwise, without further notice to parties in interest.

**The Debtors urge all Holders of Claims entitled to vote on the Plan to vote to accept the Plan.**

60437/0001-20296303v3

## ARTICLE II

## GENERAL INFORMATION REGARDING THE DEBTORS[3]

**A.    The Debtors' Businesses**

**1.    General Overview**

Founded in 2007, Hygea is a consolidated enterprise of several companies aggregated through a series of acquisitions that focus on the delivery of primary-care-based health care to commercial, Medicare and Medicaid patients.  The Debtors currently provide health care related services to approximately 190,000 patients in the southeast United States through two platforms: (i) individual physician practices and physician group practices (collectively, the "***Physician Practices***") with a primary care physician ("***PCP***") focus and (ii) management services organizations ("***MSOs***").  The Debtors are headquartered in Miami, Florida and currently employ more than 150 individuals.

**2.    The Physician Practices**

As of the Petition Date, the Physician Practices consisted of approximately seventeen (17) active brick and mortar locations throughout South and Central Florida and Georgia.  The Debtors either manage or wholly own the assets of the Physician Practices and employ the personnel of the Physician Practices, including the physicians.  Other than Debtor First Harbour Medical Centers, LLC, which is wholly-owned by Debtor Hygea Health Holdings, Inc. ("***HHH***"), the physicians still own the equity in the corporate entities of the Physician Practices.

The Physician Practices focus on family medicine, internal medicine or clinical cardiology.  Through these practices, the Debtors directly employ in excess of seventy (70) clinical staff (physicians, physician assistants, nurse practitioners, clinical technicians and medical assistants).

Historically, acquisitions of physician practices and clinics were an integral component of the Debtors' business model.  Since its inception, Hygea acquired approximately thirty-five (35) physician practices, many of which the Debtors no longer operate.  In a typical purchase transaction, the Debtors purchased the physical assets of a medical practice and obtained an option to purchase the equity or ownership interest in the corporate entity of the practice itself.  The Debtors, however, generally did not exercise the option to purchase the ownership interest in the practice.  As consideration for the asset purchase, the selling physician received a combination of cash and stock in HHC with a put option at a set minimum price per share.

Contemporaneously with the asset acquisition, the Debtors typically entered into (i) a management services agreement (the "***MSA***") with the physician practice and (ii) employment agreements with the physicians.  Pursuant to the MSAs, certain of the Debtors manage the day-to-day business operations of the Physician Practices, thereby allowing the physicians to focus

---

[3]  The information herein is solely for informational purposes and nothing herein shall be deemed an admission by the Debtors in any Cause of Action.

on the practice of medicine.  The management related services provided to the Physician Practices include staffing, payroll services and centralized benefits including healthcare coverage.

The Physician Practices earn revenue through fee for service billing ("**FFS**") or capitation payments (as described below).  Under traditional FFS reimbursement, physicians are paid a specified amount for a patient visit based upon the appropriate coding for such visits.  Physician compensation is related solely to the volume of patient visits, procedures performed, and tests ordered.  As of the Petition Date, approximately 52% of the Debtors' revenue came from FFS payments.

Although the Physician Practices traditionally have relied upon the FSS payment model, in recent years Hygea has shifted its focus toward the capitation model by entering into value-based performance contracts with various insurance companies.  Capitation is a type of a health care payment system in which a doctor is paid a fixed amount per patient for a prescribed period of time by an insurer or physician association.  As of the Petition Date, approximately 19% of the Debtors' revenue came from capitation payments.

### 3.  Management Service Organizations (MSOs)

An MSO is an entity that, under contract, arranges for medical and medically related services to patients on behalf of a health plan.  The following entities comprise the Debtors' active MSOs: First Harbour Health Management, LLC; Florida Group Healthcare, LLC; and Palm Medical Network, LLC.

The Debtors' MSOs have entered into "at risk" contracts with Medicare Advantage Health Maintenance Organizations ("**HMOs**") to manage the delivery of healthcare services to Medicare enrolled patients throughout Florida (the "**Enrollees**").  An "at risk" contract is when the MSO agrees to assume either a portion or all of the financial risk or exposure for potential losses incurred by their patient base participating in that HMO.  The Debtors currently have three (3) active "at risk" agreements with Humana, Inc. ("**Humana**") and subsidiaries of Humana, pursuant to which the MSOs provide or arrange for medical and related healthcare services to the Enrollees either through the Physician Practices or third-party physician groups.

The Debtors' MSO model is to improve the management of high-risk patients, resulting in better quality outcomes.  The MSOs work closely with the PCP to ensure the patient receives the necessary care to achieve optimal health outcomes.  The Debtors' MSOs enhance their profitability by restraining medical costs.  By emphasizing preventive care and attempting to avoid turning chronic conditions into acute conditions, the Debtors' MSOs are increasingly focused on keeping patients healthier as a means to reduce costs and decrease utilization.

The HMO receives a "risk adjusted" monthly amount for each Enrollee from the Centers for Medicare & Medicaid Services ("**CMS**"), which amount can change based upon various factors personal to each Enrollee, including health, age and demographics.  The HMO is entitled to a monthly fee (usually a percentage of the fixed amount paid by CMS) and the balance is allocated to the MSO (the "**Allocated Amounts**").  The Allocated Amounts are used to pay claims either on an FFS basis or at a capitated rate.  After claims are reconciled and paid, any

10

surplus remaining from the monthly Allocated Amounts are paid to the MSO. As the MSOs generate surplus payments, the Debtors are obligated to downstream a percentage of that surplus to the medical providers, pursuant to various contracts between the MSOs and third-party practice groups. As of the Petition Date, approximately 29% of the Debtors' revenue came from surplus payments to the Debtors' MSOs.

### 4.     The Palm Network

In 2008, Hygea acquired the Palm Network, which, at the time, was one of the largest independent physician associations ("**IPAs**") in Florida, representing more than seventy-six (76) different medical specialties, including more than eight hundred (800) primary care providers. However, in today's healthcare climate, IPAs, such as the Palm Network, have proven to be an inferior business model compared to MSOs. As of the Petition Date, the Palm Network was not a direct source of revenue for the Debtors. Nonetheless, through the Palm Network, the Debtors are able to maintain and develop new relationships with third party physician practice groups with whom the Debtors contract with to provide care to HMO Enrollees.

## B.     The Debtors' Corporate Structure

HHC was formed on August 26, 2008, as Piper Acquisition II, Inc. On May 16, 2011, HHC changed its name to Hygea Holdings Corp. On that same date, HHC entered into a Share Exchange Agreement with the shareholders of Hygea Health Holdings, Inc., a Florida corporation ("**Hygea Health**"), an entity founded in March of 2007 by Manuel E. Iglesias, Edward Moffly and Dr. Manuel I. Iglesias, pursuant to which HHC acquired 99.9% of the outstanding securities of Hygea Health in exchange for 135,519,339 shares of HHC common stock.

As set forth on the organizational chart attached to the First Day Declaration [Docket No. 13], HHC has myriad direct and indirect subsidiaries. As of the Petition Date, several of these subsidiaries, some of which consist of former MSO entities, were inactive. The majority of the Debtors' business operations (described above) are conducted through Hygea Health.

## C.     The Debtors' Prepetition Capital Structure

As of the Petition Date, the Debtors had assets on a consolidated basis of approximately $77.3 million and liabilities of approximately $212.2 million, consisting of approximately $76.3 million in current liabilities and approximately $135.9 million in long-term liabilities.

The Debtors' long-term liabilities relate to approximately $162.0 million Canadian (approximately $122.0 million in U.S. Dollars) under that certain Amended and Restated Credit Agreement, dated as of January 31, 2017 (as amended, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), by and among HHC, certain of the other Debtors, as obligors, Bridging Income Fund LP (formerly known as Sprott Bridging Income Fund LP) (the "**Lender**") and Bridging Finance Inc., as administrative agent (together with the Lender, "**Bridging**"). Pursuant to the related Amended and Restated Guaranty and Security Agreement, dated as of January 31, 2017, Bridging has a first priority lien and security interest in substantially all of the Debtors' assets.

As of the Petition Date, the Debtors had unsecured debt in the form of accounts payable, accrued liabilities and other liabilities.  The liabilities consist of, among other things, contingent, unliquidated and disputed litigation claims in excess of $50 million and payroll tax liabilities in excess of $10 million, including interest and penalties.

**D.      Summary of Events Leading to the Chapter 11 Filing**

Since 2017, the Debtors had confronted liquidity challenges and operational issues that threatened their ability to continue as a going concern.  The Debtors' financial situation had been deteriorating over time due to a variety of reasons.

Over the last several years, the Debtors pursued an aggressive growth strategy, expanding their acquisition of Physician Practices.  In some cases, the Debtors purchased certain Physician Practices with minimal net profit.  At the time of acquisition, the Debtors projected increased profitability for those practices as a result of performance improvements.  The Debtors, however, failed to properly integrate the underperforming acquisitions.  Consequently, the Debtors have been burdened with supporting a number of losing operations, that even with performance improvements will never be profitable.  The operating losses of those practices, along with the associated acquisition costs, have caused a substantial drain on the Debtors' liquidity.

The Debtors' failed acquisition of certain MSOs similarly contributed to the current liquidity constraints.  The Debtors purchased certain MSOs that, at the time of acquisition, had sufficient infrastructure to generate profit.  The Debtors, however, were unable to maintain the investment required to support those MSOs and the MSOs performance dropped significantly and below acceptable levels for the HMOs.  As a result, the HMOs terminated their contracts with those MSOs.  Those terminations resulted in several large acquisitions becoming worthless while the Debtors remained obligated for the costs associated with such acquisitions.

The Debtors' acquisition of the Palm Network similarly proved to be unsuccessful in terms of generating direct profits.  Nonetheless, the Palm Network still provides certain value to the Debtors in terms of helping the Debtors maintain and develop new business relationships with physicians and HMOs.

In addition to failed acquisitions, the Debtors' historical financial reporting was inadequate, causing deficiencies in their financial forecasting as well as cash management.  Those inadequacies caused the Debtors to overspend in the face of an already unsustainable debt load.

Given those operational challenges, the Debtors were never profitable on a cash basis and, therefore, were dependent on constant debt and equity fundraising activities to cover losses.  The Debtors have been unable to raise additional capital to fund those losses due to, in part, pending litigation stemming from shareholder and contractual disputes.  The Debtors do not have the liquidity to defend or settle these lawsuits.

As a result of the foregoing issues, the Debtors were unable to service their debt obligations to the Lender and certain events of default occurred under the Credit Agreement.  Accordingly, in or around January 2018, the Debtors hired 4Front Capital Partners Inc. ("**4Front**"), an investment banking firm, to assist the Debtors in evaluating strategic alternatives

and commencing a formal marketing process for the sale and/or refinancing of Hygea. Although Hygea and 4Front contacted almost 100 parties with respect to a potential transaction, only 15 executed an NDA. These parties were provided access to a dataroom containing confidential information regarding the Debtors, their businesses and their assets. Of these 15 parties who had access to the dataroom, only one expressed further interest in participating in a transaction and had further discussions with the Debtors and 4Front regarding potential transactions. Ultimately, the last party declined to move forward with a transaction.

Following the unsuccessful sale process, in late October 2019 the Debtors engaged Alvarez & Marsal North America, LLC to assist the Debtors with, among other things, financial and operational support and strategic advice relating to a corporate reorganization. Shortly thereafter, on or about October 31, 2019, the Debtors and Bridging entered into a Forbearance Agreement (as subsequently amended, the "***Forbearance Agreement***"). Pursuant to the Forbearance Agreement, Bridging agreed to forbear from exercising its rights and remedies under the Credit Agreement and provided in excess of $6 million of emergency funding to the Debtors.

Thereafter, the Debtors and Bridging engaged in significant arms'-length negotiations that led to them entering into that certain Restructuring Support Agreement, dated as of February 7, 2020, by and among the Debtors and Bridging (the "***RSA***"), pursuant to which, among other things, the Debtors agreed to commence the Chapter 11 Cases and pursue a consensual restructuring to be implemented through a chapter 11 plan, if possible, or a sale under section 363 of the Bankruptcy Code.[4] The proposed plan described in the RSA provided for, among other things, the (i) transfer of the Debtors' equity to Bridging on account of its pre-petition secured claim, (ii) creation of a liquidating trust for the benefit of the Debtors' unsecured creditors and (iii) payment of priority tax claims pursuant to section 1129(a)(9)(c) of the Bankruptcy Code. Pursuant to the RSA, Bridging agreed to provide the Debtors with debtor-in-possession financing to support the administrative and operational expenses of these Chapter 11 Cases. As discussed in greater detail below, the plan structure contemplated by the RSA was modified to address, among other things, a global settlement (the "***Global Settlement***") by and among the Debtors, the Committee and Bridging (collectively, the "***Global Settlement Parties***").

## ARTICLE III

## THE CHAPTER 11 CASES

### A.    Commencement of the Chapter 11 Cases

As set forth above, on the Petition Date the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court. No trustee or examiner has been appointed in the Chapter 11 Cases.

---

[4] In the event the Plan is withdrawn or an order denying confirmation of the Plan is entered by the Court, the Debtors have agreed to file a motion under section 363 of the Bankruptcy Code to sell substantially all of their assets to Bridging as a stalking horse bidder through a credit bid.

Since the Petition Date, the Debtors have continued to operate their businesses and manage their property as debtors and debtors-in-possession.

**B.     "First Day" Motions**

On the Petition Date, the Debtors filed ten (10) "first-day" motions designed to ease their transition into chapter 11 and to minimize the effects of the commencement of the Chapter 11 Cases.  On February 20, 2020, the Debtors filed a motion seeking entry of an order authorizing them to assume the RSA [Docket No. 41].  On February 21, 2020, the Bankruptcy Court entered orders providing certain of the requested first-day relief, including:

> (i)     authorizing the Debtors' Chapter 11 Cases to be jointly administered for procedural purposes only [Docket No. 42];

> (ii)    authorizing the Debtors to file a consolidated creditor matrix in lieu of submitting separate mailing matrices for each Debtor [Docket No. 44]

> (iii)   authorizing the Debtors to retain Epiq as their claims and noticing agent [Docket No. 45]

> (iv)    approving certain procedures to maintain and protect the confidentiality of patient information as required by the Health Insurance Portability and Accountability Act of 1996, while providing required disclosure in these Chapter 11 Cases [Docket No. 46] (final order entered March 19, 2020 [Docket No. 178]);

> (v)     authorizing the Debtors to continue use of their existing bank accounts and business forms [Docket No. 47] (final order entered March 20, 2020 [Docket No. 198]);

> (vi)    authorizing the Debtors to pay prepetition wages and continue certain employee benefit programs in the ordinary course [Docket No. 43] (final order entered March 20, 2020 [Docket No. 197]);

> (vii)   authorizing the Debtors to maintain their existing insurance policies and continue their insurance premium financing arrangement with respect to such policies [Docket No. 50] (final order entered March 19, 2020 [Docket No. 182]);

> (viii)  authorizing the Debtors to pay certain prepetition taxes and related obligations [Docket No. 48] (final order entered March 19, 2020 [Docket No. 181]); and

> (ix)    prohibiting the Debtors' utility companies from altering, refusing or discontinuing service to, or discriminating against, the Debtors and approving the form of adequate assurance of postpetition payment to such utility companies [Docket No. 49] (final order entered March 20, 2020 [Docket No. 200]).

C.      **Retention of Professionals and Appointment of the Committee**

1.      **Retention of Debtors' Professionals**

The Debtors were authorized to retain the following bankruptcy professionals in the Chapter 11 Cases: (i) Cole Schotz P.C., as their bankruptcy counsel [Docket No. 179]; (ii) Alvarez & Marsal North America, LLC ("*A&M*"), as their financial advisors [Docket No. 180]; and (iii) Epiq as their administrative advisor [Docket No. 177].

The Debtors also were authorized to retain certain professionals utilized by the Debtors in the ordinary course of business prior to the Petition Date pursuant to an order [Docket No. 186] entered by the Bankruptcy Court on March 19, 2020.

2.      **Appointment of Committee and Retention of Committee Professionals**

On March 10, 2020, the Office of the United States Trustee for the District of Delaware appointed an official committee of unsecured creditors (the "*Committee*") pursuant to section 1102(a) of the Bankruptcy Code [Docket No. 118].  The members of the Committee are: (i) Manasota Medical Management Consultants, LLC, (ii) Claudio F. Arellano; (iii) NextGen Healthcare, Inc.; (iv) Cardiology Consultants of West Broward, P.A. ("*CCWB*"); and (iv) Adaptive Healthcare Solutions, LLC.

The Committee was authorized to retain the following bankruptcy professionals in the Chapter 11 Cases: (i) Lowenstein Sandler LLP, as its counsel [Docket No. 335]; and (ii) Morris James LLP, as its co-counsel [Docket No. 341].  The Committee's application to retain FTI Consulting, Inc. ("*FTI*"), as its financial advisor [Docket No. 219] remains pending.

D.      **Significant Events During the Chapter 11 Cases**

In addition to the relief described above, the Debtors have sought and received authority with respect to various matters designed to assist in the administration of the Chapter 11 Cases and to maximize the value of the Debtors' Estates.  Material events since the commencement of the Chapter 11 Cases are summarized below and include:

1.      **Debtor-in-Possession Financing**

When the Debtors filed their Chapter 11 Cases, all of their cash was the cash collateral of Bridging.  Moreover, even if the Debtors had been given free access to their cash, they still would not have had sufficient liquidity to conduct the Chapter 11 Cases or otherwise maximize value of their assets for the benefit of creditors.  Accordingly, at the Debtors' request, Bridging extended post-petition financing in the maximum amount of $9,853,308.00 to the Debtors on very reasonable terms that did not include, among other common features, a roll-up of Bridging's prepetition debt or cross-collateralization.  The proposed financing was designed to provide the Debtors with stability and funding for the plan process that is expected to maximize value for the estates and creditors.

In connection therewith, on the Petition Date, the Debtors filed a motion seeking entry of an order authorizing the Debtors to enter into a post-petition financing arrangement with,

15

permitting the use cash collateral of, and granting adequate protection to, Bridging [Docket No. 63] (the "***DIP Motion***"). On February 24, 2020, the Bankruptcy Court entered an order granting the DIP Motion on an interim basis [Docket No. 63]. Thereafter, Nevada 5, Inc. ("***Nevada 5***") and N5HYG, LLC ("***N5HYG***") filed an objection to the DIP Motion [Docket No. 152] and Centurion Asset Management, Inc. ("***Centurion***") filed a preliminary response thereto [Docket No. 208]. After a telephonic hearing conducted on March 25, 2020 and ensuing discussions among counsel for the Debtors, the Committee and other parties, on April 2, 2020 the Bankruptcy Court entered a second interim DIP order [Docket No. 288].

On April 10, 2020, the Committee filed a reservation of rights with respect to the DIP Motion [Docket No. 309] and informally raised with the Debtors a number of concerns regarding the proposed final DIP order (the "***Final DIP Order***"). As noted in the reservation of rights, at the time of the filing, the Global Settlement Parties were in the process of working towards the Global Settlement, as described in more detail below. Attendant to that process, the Global Settlement Parties reached an agreement on the Final DIP Order, which reflected numerous concessions by Bridging, including (i) Bridging's agreement that various claims and causes of action would not be subject to the DIP Liens (as defined in the DIP Motion), (ii) a modification of the Committee's deadline to assert a challenge to the Debtors' stipulations with Bridging in the interim DIP orders to April 24, 2020, and (iii) clarification that the Committee had standing to challenge both the Debtors' stipulations as well as the more general Challenges (as defined in the Final DIP Order).

Thereafter, the concerns of Centurion and CCWB were resolved by the inclusion of additional language in the Final DIP Order and the agreement to clarify certain terms of the Plan. After a contested hearing on the Final DIP Order, certain language requested by Nevada 5 and N5HYG was included in the Final DIP Order. Pursuant to the Final DIP Order, the deadline for parties in interest (other than the Committee) to assert a Challenge is May 11, 2020. Additionally, the Final DIP Order reserved the rights of the Committee, Nevada 5 and N5HYG to contest a credit bid of Bridging in the event of a sale of the Debtors' assets.

On April 17, 2020, the Bankruptcy Court entered the Final DIP Order [Docket No. 342].

### 2.    Patient Care Ombudsman Motion

On March 6, 2020, the Debtors filed a motion [Docket No. 108] (the "***PCO Motion***") seeking entry of an order waiving the appointment of a patient care ombudsman pursuant to section 333 of the Bankruptcy Code. On March 19, 2020, the Bankruptcy Court entered an order [Docket No. 184] granting the PCO Motion.

### 3.    Lease Rejection Motions

On March 10, 2020, the Debtors filed an omnibus motion [Docket No. 123] (the "***Omnibus Rejection Motion***") seeking entry of an order authorizing the rejection of (i) seven (7) executory contracts as of the Petition Date and (i) one (1) unexpired lease effective as of March 31, 2020. On March 19, 2020, the Bankruptcy Court entered an order [Docket No. 183] granting the Omnibus Rejection Motion.

16

On March 10, 2020, the Debtors filed a motion [Docket No. 124] (the "***CCWB Rejection Motion***") seeking entry of an order authorizing the rejection (i) a management agreement between the Debtors and CCWB effective as of the date of entry of the order granting the motion and (ii) an unexpired lease of real property between the Debtors and Cypress Real Estate Investments, LLC effective *nunc pro tunc* to February 28, 2020.  After extensive negotiations between the Debtors and CCWB, on April 8, 2020, the Bankruptcy Court entered an order [Docket No. 296] granting the CCWB Rejection Motion.

4.      **The Claims Process**

a.      **Schedules and Statements**

On April 1, 2020, the Debtors filed their Schedules of Assets and Liabilities and Statements of Financial Affairs [Docket Nos. 221-286] (together, the "Schedules and Statements").  Among other things, the Schedules and Statements set forth the Claims of known Creditors against the Debtors as of the Petition Date, based upon the Debtors' books and records. The Debtors retain the right to amend the Schedules and Statement during the pendency of the Chapter 11 Cases.

b.      **Bar Date Order**

On March 19, 2020, the Bankruptcy Court entered an order [Docket No. 291] (the "Bar Date Order") establishing the deadlines for filing Claims against the Debtors (collectively, the "Bar Dates"), including the following:

> General Bar Date.  Each Person or Entity, except any Governmental Unit, holding or asserting a Claim against the Debtors that arose (or is deemed to have arisen) on or before the Petition Date, including any 503(b)(9) Claims, is required to file a Proof of Claim form so that it is actually received by the Claims Agent on or before May 6, 2020 at 5:00 p.m. (Eastern Time).

> Governmental Bar Date.  Each Governmental Unit holding or asserting a Claim against the Debtors that arose (or is deemed to have arisen) on or before the Petition Date is required to file a Proof of Claim form so that it is actually received by the Claims Agent on or before August 17, 2020 at 5:00 p.m. (Eastern Time).

c.      **Claims Objections**

The Debtors and their professionals are investigating each of the Claims filed against the Debtors to determine the validity of such Claims and anticipate filing objections to Claims that are filed in improper amounts or classifications, or are otherwise subject to objection under the Bankruptcy Code or other applicable law.  As of the filing of this Disclosure Statement the Debtors have not filed any objections to Claims.

5. **Litigation and Discovery**

a. **Committee**

Since the Committee's formation, it has sought discovery from the Debtors pursuant to numerous avenues, including: (i) a detailed "lien review" request, sent on March 11, 2020; (ii) *The Official Committee of Unsecured Creditors' First Set of Request for Documents from Debtors*, dated March 19, 2020; (iii) an e-mail request for additional lien review documents, sent on Mach 25, 2020; and (iv) various informal e-mails requesting documents related to, among other things, the Debtors' insurance policies, operations, taxes and finances. These various requests required the Debtors and their professionals to engage in an expensive and time consuming electronically stored information ("**ESI**") production of emails and documents from the Debtors' server, using multiple search terms provided by the Committee's counsel, in addition to traditional paper discovery. In response, the Debtors have produced a large volume of materials to the Committee, often times on an expedited and rolling basis due to the time constraints imposed by the Committee. In addition, A&M produced directly to FTI extensive documents, answered numerous lines of inquiry and engaged in myriad conference calls with the Committee's representatives.

On April 3, 2020 and April 7, 2020, counsel for the Committee requested the production of ESI and paper discovery for additional and broader categories, and from additional custodians, including bank documents, employee personnel files, evidence of transfers to third parties and numerous other categories. Notwithstanding that the Debtors and their advisors had been 100% responsive and cooperative with the Committee since its formation and had consensually produced massive amounts of relevant material, on April 9, 2020, the Committee filed *The Official Committee of Unsecured Creditors Motion for an Order Pursuant to Bankruptcy Rule 2004 and Local Bankruptcy Rule 2004-1 Directing the Production of Documents by Debtors* [Docket No. 302] (the "**Committee 2004 Motion**"), and a related motion to shorten the notice period and set an expedited hearing thereon [Docket No. 303]. On April 13, 2020, the Bankruptcy Court entered an order [Docket No. 316] denying the motion to shorten and scheduling a status conference on the Committee 2004 Motion for April 15, 2020 (the "**Discovery Conference**"). In advance of the Discovery Conference, the Debtors and the Committee agreed to hold the Committee 2004 Motion in abeyance until May 15, 2020. Since that date, the Debtors have produced in excess of 65,000 pages of additional documents to the Committee, which production remains ongoing.

b. **Nevada 5**

Over the last two years, Nevada 5 and N5HYG have been pursuing litigation against certain of the Debtors, certain of their current and former directors and officers, and more recently, against Bridging, to recover on a failed investment. Despite having never obtained any success with such efforts, and even being sanctioned by a court in Nevada for approximately $800,000, Nevada 5 and N5HYG have continued to pursue an aggressive litigation strategy in these Chapter 11 Cases and a prepetition litigation pending against, among others, HHH in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida (the "**Florida Action**").

18

On February 24, 2020, Nevada 5 filed an *Emergency Precautionary Motion for Relief from the Automatic Stay* [Docket No. 59] (the "***Nevada 5 Stay Relief Motion***") and a related motion [Docket No. 61] seeking to shorten the notice period and setting an expedited hearing on the Nevada 5 Stay Relief Motion.  Pursuant to the Nevada 5 Stay Relief Motion, Nevada 5 sought relief from the automatic stay to file a second amended complaint and to pursue discovery against HHH in connection with the Florida Action.  The Debtors filed an objection to the motion to shorten [Docket No. 68] and both the Debtors [Docket No. 76] and Nevada 5 [Docket No. 78] filed objections to the Nevada 5 Stay Relief Motion.  On February 28, 2020, the Bankruptcy Court held a telephonic hearing on the Nevada 5 Stay Relief Motion and ruled, in pertinent part, that Nevada 5 was not entitled to discovery from the Debtors related to the Florida Action, but that Nevada 5 could revisit such request in 90 days.  The Bankruptcy Court entered an order to that effect on March 3, 2020 (the "***Nevada 5 Stay Order***") [Docket No. 97].  That same day, Nevada 5 served on the Debtors *Nevada 5, Inc.'s Expedited Interrogatories and Requests for Production of Documents to Hygea Holdings Corp. and Hygea Health Holdings, Inc.* (the "***Nevada 5 Document Requests***"), which sought to require the Debtors to respond to 18 interrogatories and 32 document requests on an expedited basis by March 17, 2020.  Several of the Nevada 5 Document Requests sought information that related to Nevada 5's claims in the Florida Action, notwithstanding the explicit language in the Nevada 5 Stay Order.  The Debtors have produced numerous documents to Nevada 5 in response to the Nevada 5 Document Requests.

Nevada 5 also sought to obtain discovery through other mechanisms during the Chapter 11 Cases.  For example, on April 7, 2020, Nevada 5 served document requests on both the Debtors and Bridging related to the Plan and the Disclosure Statement.  *See* Docket Nos. 293 and 294.  Moreover, on April 22, 2020, Nevada 5 served a subpoena on the Committee.  *See* Docket Nos. 348 and 352.  On April 27, 2020, the Debtors served on Nevada 5 their responses and objections to the document requests.  *See* Docket No. 369.

On April 21, 2020, Nevada 5 filed a *Motion for Entry of Order Permitting Use of State Court Documents* [Docket No. 351] (the "***Document Use Motion***"), seeking to use materials in the Chapter 11 Cases that Nevada 5 covertly obtained from FTI in the Florida Action.  On that same date, Nevada 5 filed a motion to shorten the notice period and set an expedited hearing with respect to the Document Use Motion [Docket No. 305], which the Bankruptcy Court denied on April 24, 2020.  *See* Docket No. 360.  The deadline to object to the Document Use Motion is May 6, 2020, and a telephonic hearing has been scheduled for May 13, 2020.  *See* Docket No. 362.  The Debtors intend to vigorously oppose the Documents Use Motion.

On April 29, 2020, the Debtors filed an *Initial Submission in Support of Motion for Entry of an Order Enforcing the Automatic Stay and for Sanctions for a Willful Stay Violation* [Docket No. 377] (the "***Stay Violation Motion***").  As set forth in the Stay Violation Motion, the Debtors assert that Nevada 5 secretly and unlawfully obtained documents constituting property of the Debtors' estates from FTI, a pre-petition financial advisor to the Debtors.  The Debtors further assert that such actions violated the Nevada 5 Stay Order as well as the automatic stay provisions of Section 362 of the Bankruptcy Code.  By way of the Stay Violation Motion, the Debtors have requested that the Bankruptcy Court impose sanctions against Nevada 5 consisting of (i) reasonable counsel fees incurred by the Debtors as a result of Nevada 5's stay violation and

19

(ii) punitive damages to punish Nevada 5 for its blatant disregard of the Nevada 5 Stay Order and the automatic stay.  A hearing on the Stay Violation Motion has been scheduled for May 13, 2020.

## E.    The Global Settlement

As discussed above, the Committee investigated the allowance and priority of Bridging's Secured Claim and ultimately concluded that Bridging's Secured Claim constitutes a properly perfected, valid secured claim against the Debtors.  Thus, the Committee did not pursue a Challenge of Bridging's Secured Claim in accordance with the Final DIP Order.  The Committee, however, raised several issues in connection with the RSA and the initial draft of the Plan.  In an effort to avoid further costs and delay associated with a contested confirmation hearing, the Global Settlement Parties began engaging in extensive, arm's-length and good faith negotiations that concluded in the Global Settlement, which paved the way for the proposed Plan.  The terms of the Global Settlement, which are memorialized in the term sheet attached hereto as Exhibit D (the "***Global Settlement Term Sheet***") and incorporated into the Plan, include, among other things:

(a)    The creation of a creditors' trust (the "***Creditors' Trust***"), which is responsible for the administration of Claims and Distributions to holders of Allowed General Unsecured Claims;

(b)    On the Effective Date, Bridging will fund $550,000 in the form of a non-recourse loan payable from the proceeds of causes of action assigned to the Creditors' Trust, for the benefit of holders of Allowed General Unsecured Claims;

(c)    On the Effective Date, Bridging, or the equity sponsor under the Plan, will provide for 5% of the equity in the Reorganized Debtors to be contributed to the Creditors' Trust, which equity consideration will be (i) freely assignable by the Creditors' Trust and (ii) subject to the right of the Creditors' Trust to "put" such equity consideration to the Reorganized Debtors, subject to a formula;

(d)    On the Effective Date, the Debtors will transfer to the Creditors' Trust: (i)  Avoidance Actions; (ii) commercial tort claims as defined in Article 9 of the UCC; (iii) the non-exclusive right to seek a determination by the Bankruptcy Court of any tax, fine or penalty relating to a tax, or any addition to a tax, under section 505 of the Bankruptcy Code; and (iv) all other rights, claims or causes of action not transferred to Bridging pursuant to the Plan;

(e)    Bridging's agreement to include in the DIP budget payment of the Committee's professionals allowed fees and expenses in an amount up to $1.325 million;

(f)    The Committee will include a letter in the Plan solicitation package encouraging general unsecured creditors to vote in favor of the Plan; and

(g)    Bridging's Deficiency Claim will be temporarily allowed and treated as a General Unsecured Claim for purposes of voting on the Plan, but will be deemed satisfied on the Effective Date and will not be allowed for Distribution purposes.

Without the Global Settlement and Bridging's significant concessions and support under the Global Settlement, the Debtors do not believe that a plan of reorganization or liquidation would be feasible in the Chapter 11 Cases.  Accordingly, the Debtors believe that that confirmation and consummation of the Plan is in the best interests of the Debtors, the Estates and their Creditors.

**F.    Formal and Informal Objections to Approval of the Disclosure Statement**

On April 23, 2020, the U.S. Trustee provided the Debtors with various comments to the initial disclosure statement that was filed on March 10, 2020 [Docket No. 120].  Thereafter, the Debtors revised this Disclosure Statement to address all of the U.S. Trustee's comments that were not related to confirmation of the Plan.  Consequently, the U.S. Trustee informed the Debtors that his informal objections to approval of the Disclosure Statement have been resolved.

On April 24, 2020, Shutlander, LLC, Jose Prida, LLC and Gabriella & Bella Castillo Trust (collectively, the "***Trusts***"), filed a preliminary objection and reservation of rights [Docket No. 361] (the "***Trust Disclosure Statement Objection***") with respect to the Debtors' solicitation procedure motion [Docket No. 121].  The Trusts assert that this Disclosure Statement provides an "inaccurate financial picture" with respect to, among other things, historical billing/invoicing and provider credentialing, and that the Debtors are more profitable than what is shown in the financial projections annexed hereto.  The Debtors disagree with the Trusts' assertions set forth in the Trust Disclosure Statement Objection.  On April 30, 2020, the Debtors filed a reply to the Trust Disclosure Statement Objection.  *See* Docket No. 381.

## ARTICLE IV

## SUMMARY OF PLAN

**This section provides a summary of the structure and means for implementation of the Plan and the classification and treatment of Claims and Equity Interests under the Plan.  This section is qualified in its entirety by and is subject to the Plan as well as the exhibits thereto and definitions therein.  The Plan is attached to this Disclosure Statement as Exhibit A.**

**The statements contained in this Disclosure Statement include summaries of the provisions contained in the Plan and in documents referred to therein.  The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein.  Reference is made to the Plan and to such documents for the full and complete statements of such terms and provisions.**

**The Plan and the documents referred to therein control the actual treatment of Claims against and Equity Interests in the Debtors under the Plan.  Upon occurrence of the Effective Date, the Plan and all such documents will be binding upon all Holders of Claims**

**against and Equity Interests in the Debtors and their Estates and all other parties in interest. In the event of any conflict between this Disclosure Statement, on the one hand, and the Plan or any other operative document, on the other hand, the terms of the Plan or such other operative document will control**.

**A.      Classification and Treatment of Claims and Equity Interests**

Section 1123 of the Bankruptcy Code provides that a plan must classify the claims and equity interests of a debtor's creditors and equity interest holders. In accordance with section 1123 of the Bankruptcy Code, the Plan divides Claims and Equity Interests into Classes and sets forth the treatment for each Class (other than the Administrative Expense Claims, Accrued Professional Compensation Claims and Priority Tax Claims, which pursuant to section 1123(a)(1) of the Bankruptcy Code need not be and have not been classified). The Debtors also are required, under section 1122 of the Bankruptcy Code, to classify Claims against and Equity Interests in the Debtors (except for certain Claims classified for administrative convenience) into Classes that contain Claims and Equity Interests that are substantially similar to the other Claims and Equity Interests in such Class.

The Bankruptcy Code also requires that a plan provide the same treatment for each claim or equity interest of a particular class unless the claim holder or interest holder agrees to a less favorable treatment of its claim or equity interest. The Debtors believe that they have complied with such standard. If the Bankruptcy Court finds otherwise, however, it could deny Confirmation of the Plan if the Claimholders and Equity Interest Holders affected do not consent to the treatment afforded them under the Plan.

A Claim or Equity Interest is placed in a particular Class only to the extent that the Claim or Equity Interest falls within the description of that Class, and is classified in other Classes to the extent that any portion of the Claim or Equity Interest falls within the description of such other Classes. A Claim also is placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released or otherwise settled prior to the Effective Date.

The Debtors believe that the Plan has classified all Claims and Equity Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law. It is possible that a Holder of a Claim or Equity Interest may challenge the Debtors' classification of Claims and Equity Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. If such a situation develops, the Debtors intend, in accordance with the terms of the Plan, to make such permissible modifications to the Plan as may be necessary to permit its confirmation. Any such reclassification could adversely affect Holders of Claims or Equity Interests by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of the Plan. **Unless such modification of classification materially adversely affects the treatment of a Holder of a Claim or Equity Interest and requires resolicitation, acceptance of the Plan by any Holder of a Claim or Equity Interest pursuant to this solicitation will be deemed to be a consent to the Plan's treatment of such Holder of a Claim or Equity Interest regardless of the Class as to which such Holder ultimately is deemed to be a member**.

The amount of any Impaired Claim that ultimately is Allowed by the Bankruptcy Court may vary from any estimated Allowed amount of such Claim and, accordingly, the total Claims that are ultimately Allowed by the Bankruptcy Court with respect to each Impaired Class of Claims also may vary from any estimates contained herein with respect to the aggregate Claims in any Impaired Class.  Thus, the value of property that ultimately will be received by a particular Holder of an Allowed Claim may be adversely or favorably affected by the aggregate amount of Claims Allowed in the applicable Class.

The classification of Claims and Equity Interests and the nature of Distributions to members of each Class are summarized below.  The Debtors believe that the consideration, if any, provided under the Plan to holders of Claims and Equity Interests reflects an appropriate resolution of their Claims and Equity Interests, taking into account the differing nature and priority (including applicable contractual subordination) of such Claims and Equity Interests. The Bankruptcy Court must find, however, that a number of statutory tests are met before it may confirm the Plan.  Many of these tests are designed to protect the interests of Holders of Claims or Equity Interests who are not entitled to vote on the Plan, or do not vote to accept the Plan, but who will be bound by the provisions of the Plan if it is confirmed by the Bankruptcy Court.

### 1.    Unclassified Claims

### a.    Administrative Expense Claim

An Administrative Expense Claim is a Claim for costs and expenses of administration of the Chapter 11 Cases that are Allowed under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including, without limitation:  (a) any actual and necessary costs and expenses incurred on or after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Accrued Professional Compensation Claims and any other compensation for legal, financial, advisory, accounting, and other services and reimbursement of expenses Allowed by the Bankruptcy Court under sections 328, 330, 331 or 503(b) of the Bankruptcy Code to the extent incurred on or after the Petition Date and through the Effective Date; and (c) all fees and charges assessed against the Estates under section 1930, chapter 123, of title 28, United States Code.

Except to the extent that a Holder of an Allowed Administrative Expense Claim agrees to different treatment with the Debtors or Reorganized Debtors, each Holder of an Allowed Administrative Expense Claim will receive Cash in an amount equal to the unpaid amount of such Allowed Administrative Expense Claim on the later of the Effective Date or the date on which such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is reasonably practicable; *provided, however*, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors, as Debtors-in-Possession, or liabilities arising under obligations incurred by the Debtors, as Debtors-in-Possession, prior to the Effective Date, will be paid by the Debtors in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions, including, but not limited to, the Budget, DIP Orders and all other orders entered by the Bankruptcy Court related to the foregoing.  In addition, Allowed Administrative Expense Claims of the United States Trustee for statutory fees

under 28 U.S.C. § 1930 incurred prior to the Effective Date will be paid on the Effective Date by the Debtors, and thereafter, as such fees may thereafter accrue and be due and payable, by the Creditors' Trust in accordance with the applicable schedule for payment of such fees.

To be eligible to receive Distributions under the Plan on account of an Administrative Expense Claim that is not otherwise Allowed by the Plan, a request for payment of an Administrative Expense Claim must have been or be filed with the Bankruptcy Court on or before the Administrative Expense Claims Bar Date. Any Administrative Expense Claim that is not asserted in accordance with the Plan will be deemed disallowed under the Plan and will be forever barred against the Debtors, the Debtors' Estates, the Reorganized Debtors, the Creditors' Trust, or any of their Assets or property, and the Holder thereof will be enjoined from commencing or continuing any action, employment of process or act to collect, offset, recoup or recover such Claim.

### b.    Accrued Professional Compensation Claims

An Accrued Professional Compensation Claim is a Claim for all accrued fees and reimbursable expenses for services rendered by a Professional in the Chapter 11 Cases through and including such date, to the extent that such fees and expenses have not been previously paid whether under a retention order with respect to such Professional or otherwise. To the extent that there is a Final Order denying some or all of a Professional's fees or expenses, such denied amounts will no longer be considered an Accrued Professional Compensation Claim.

Except as otherwise provide in the Plan, all Professionals seeking payment of Accrued Professional Compensation Claims will (i)  file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred in the Chapter 11 Cases by the date that is thirty (30) days after the Effective Date and (ii) be paid (a) the full unpaid amount as is Allowed by the Bankruptcy Court within five (5) Business Days after the date that such Claim is Allowed by order of the Bankruptcy Court, or (b) upon such other terms as may be mutually agreed upon between the Holder of such an Allowed Accrued Professional Compensation Claim and the Debtors or Reorganized Debtors. Any Accrued Professional Compensation Claim that is not asserted in accordance with Section 2.2 of the Plan will be deemed disallowed under the Plan, waived, and will be forever barred against the Debtors, the Debtors' Estates, the Reorganized Debtors, the Creditors' Trust, or any of their Assets or property, and the Holder thereof will be enjoined from commencing or continuing any action, employment of process or act to collect, offset, recoup, or recover such Claim.

Accrued Professional Compensation Claims filed by the Committee's Professionals will be subject to the Committee Budget as described in the DIP Orders. To the extent the Committee Budget is insufficient to pay the Allowed Accrued Professional Compensation Claims of the Committee's Professionals, such Allowed Claims may be paid from the Creditors' Trust. The Committee Budget will not be subject to the Variance.

To the extent a Professional Budget Surplus exists, such funds will be deposited into the Creditors' Trust on the Effective Date, or after payment of such Professionals' Accrued Professional Compensation Claims.

The Professional Budget Surplus will not be used to repay the Creditors' Trust Loan.

### c.    Priority Tax Claims

A Priority Tax Claim is a Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

Except as otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim or as soon as reasonably practicable thereafter), each Holder of an Allowed Priority Tax Claim will receive in full satisfaction, settlement, discharge, and release of, and in exchange for, such Allowed Priority Tax Claim pursuant to and in accordance with sections 1129(a)(9)(C) and 1129(a)(9)(D) of the Bankruptcy Code, Cash in an aggregate amount of such Allowed Priority Tax Claim payable in regular installment payments over a period ending not more than five (5) years after the Petition Date, plus simple interest at the rate required by applicable non-bankruptcy law on any outstanding balance from the Effective Date, or such lesser rate as is agreed to in writing by a particular taxing authority and the Debtors or Reorganized Debtors, as applicable, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; provided, however, that Priority Tax Claims incurred by any Debtors in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtors or Reorganized Debtors in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.  Any installment payments to be made under clause (C) or (D) above will be made in equal quarterly Cash payments beginning on the first applicable Subsequent Distribution Date, and continuing on each Subsequent Distribution Date thereafter until payment in full of the applicable Allowed Priority Tax Claim.

### 2.    Unimpaired Claims

### a.    Class 1:  Other Priority Claims

An Other Priority Claim is a Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Expense Claim.

Except to the extent that a Holder of an Allowed Other Priority Claim against the Debtors has agreed to a different treatment of such Claim, each such Holder will receive, in full satisfaction of such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date; (ii) the date the Other Priority Claim becomes an Allowed Claim; or (iii) the date for payment provided by any agreement or arrangement between the Reorganized Debtors and the Holder of the Allowed Other Priority Claim against the Debtors.

### b.    Class 2: Other Secured Claims

An Other Secured Claim is a Secured Claim other than Bridging's Secured Claim.

In full satisfaction of an Allowed Other Secured Claim, on the later of the Effective Date and the date on which the Other Secured Claim is Allowed, each Holder of an Allowed Other Secured Claim will receive, at the sole and exclusive option of the Reorganized Debtors: (a) Cash equal to the amount of such Claim; (b) the Collateral securing such Claim; or (c) satisfaction of such Claim pursuant to such other terms and conditions as may be agreed upon by the Reorganized Debtors and the Holder of such Other Secured Claim

### 3.    Impaired Claims

#### a.    Class 3: Bridging's Secured Claim

The Bridging Secured Claim means the Secured Claim of Bridging arising under or in connection with the Prepetition Loan Documents.  Bridging's Secured Claim is an Allowed Claim.

Upon the terms and subject to the conditions set forth in the Plan, in full and final satisfaction, settlement, release, and discharge of Bridging's Secured Claim, Bridging or such Entity designated by Bridging and Centurion, respectively, will receive, on the Effective Date or as soon as practicable thereafter, (i) the Debtors' Cash on hand on the Effective Date in excess of Cash necessary to operate the Reorganized Debtors' business, following funding of the Creditors' Trust Loan to be allocated 90.86% to Bridging and 9.14% to Centurion; (ii) the New Secured Debt in accordance with Section 6.4 of the Plan; and (iii) 86.317% of the Reorganized Debtor Equity will be issued to Bridging or its designee and 8.683% of the Reorganized Debtor Equity will be issued to Centurion or its designee.

To the extent the Debtors' Cash on hand as of the Effective Date is not sufficient to make payments under the Plan, fund operations and fund the Creditors' Trust Loan, Bridging will advance the necessary funds to the Reorganized Debtors with such amount to be added to the Working Capital Loan.  All distributions made on account of Bridging's Secured Claim will be paid to Bridging and Centurion, as applicable.  Bridging will have the right to vote Bridging's Secured Claim.

#### b.    Class 4: General Unsecured Claims

A General Unsecured Claim is a Deficiency Claim and any Claim asserted against the Debtors which is not included within the other specifically defined Classes under the Plan.

Except to the extent that a Holder of an Allowed General Unsecured Claim against the Debtors agrees to a different treatment of such Claim, in full and final satisfaction of each Allowed General Unsecured Claim against the Debtors, each Holder of an Allowed General Unsecured Claim against the Debtors will receive its Pro Rata share of Creditors' Trust Distributable Assets as soon as practicable as determined by the Trustee.  Bridging will have the right to vote the Bridging Deficiency Claim but will waive any Distributions to Bridging and its participants on account of Bridging's Deficiency Claim.

### c.    Class 5: Subordinated Claims

A Subordinated Claim is any Claim subordinated by law or contract including pursuant to section 510(b) of the Bankruptcy Code, which will include, but not be limited to, any claim filed by Nevada 5, Inc. and N5HYG, LLC in the Chapter 11 Cases.

Holders of Subordinated Claims against the Debtors will not receive or retain any property under the Plan on account of such Subordinated Claims, and the obligations of the Debtors on account of Subordinated Claims will be discharged.

### 4.    Interests

### a.    Class 6: Equity Interests

Equity Interests are any Equity Security in any of the Debtors, including, without limitation, all issued, unissued, authorized or outstanding units and other ownership interests, including limited liability company interests, together with (a) any options, warrants or contractual rights to purchase or acquire any such Equity Securities at any time with respect to any Debtors, and all rights arising with respect thereto and (b) the rights of any Entity to purchase or demand the issuance of any of the foregoing and will include:  (i) conversion, exchange, voting, participation, dividend and distribution rights; (ii) liquidation preferences; (iii) options, warrants, and call and put rights; (iv) share-appreciation rights; and (v) all unexercised Equity Interests.

Holders of an Equity Interest in the Debtors will not receive or retain any property under the Plan on account of such Equity Interests, and the obligations of the Reorganized Debtors on account of the Equity Interests will be discharged.

### 5.    Special Provision Regarding Unimpaired Claims

Except as otherwise provided in the Plan, nothing under the Plan will affect or limit the Debtors', the Reorganized Debtors' or the Trustee's rights and defenses (whether legal or equitable) in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

### 6.    Discharge of Claims

Except as otherwise provided in the Plan and effective as of the Effective Date:  (i) the rights afforded in the Plan and the treatment of all Claims and Equity Interests will be in exchange for and in complete satisfaction, settlement, discharge, and release of all Claims and Equity Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors or any of their Assets, property, or Estates; (ii) the Plan will bind all Holders of Claims and Equity Interests, notwithstanding whether any such Holders abstained from voting to accept or reject the Plan or voted to reject the Plan; (iii) all Claims and Equity Interests will be satisfied, discharged, and released in full, and the Debtors' liability with respect thereto will be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (iv) all Entities will be precluded

27

from asserting against the Debtors, the Debtors' Estates, the Reorganized Debtors, each of their successors and assigns, and each of their Assets and properties, any other Claims or Equity Interests based upon any documents, instruments or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.

### 7. Subordinated Claims

The allowance, classification, and treatment of all Allowed Claims and Equity Interests and the respective distributions and treatments under the Plan will take into account and conform to the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Under section 510 of the Bankruptcy Code, the Debtors or the Trustee, as applicable, reserve the right to re-classify any Allowed Claim or Allowed Equity Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

### 8. Elimination of Vacant Classes

Any Class of Claims that is not occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or a Claim temporarily allowed under Bankruptcy Rule 3018, or as to which no vote is cast, will be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class under section 1129(a)(8) of the Bankruptcy Code.

## B. Acceptance or Rejection of the Plan

### 1. Presumed Acceptance of Plan

Classes 1 and 2 are Unimpaired under the Plan and, therefore, are deemed to have accepted the Plan pursuant to section 1126 of the Bankruptcy Code.

### 2. Presumed Rejection of Plan

Classes 5 and 6 are Impaired and will receive no distribution under the Plan on account of such Subordinated Claims and Equity Interests and, therefore, are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

### 3. Voting Class

Each Holder of an Allowed Claim as of the Voting Record Date in Classes 3 and 4 will be entitled to vote to accept or reject the Plan.

### 4. Acceptance by Impaired Classes of Claims

Pursuant to section 1126(c) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted the Plan if the Holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims in such Class actually voting have voted to accept the Plan.

5.      **Cramdown**

If all applicable requirements for confirmation of the Plan are met as set forth in section 1129(a) of the Bankruptcy Code except subsection (8) thereof, the Debtors may request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code on the bases that the Plan is fair and equitable and does not discriminate unfairly with respect to each Class of Claims or Equity Interests that is Impaired under, and has not accepted or is deemed to reject, the Plan.

C.      **Means for Implementation**

1.      **General Settlement of Claims**

To the extent provided for by the Bankruptcy Code in consideration for the classification, distributions, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan will constitute a good faith compromise and settlement of all Claims and Equity Interests and controversies resolved pursuant to the Plan.

2.      **Corporate Existence**

Unless otherwise provided in the Plan Supplement, the Debtors will continue to exist after the Effective Date as separate legal entities, with all of the powers of corporations, limited liability companies, partnerships, associations, or other business entities pursuant to the applicable law in their states of incorporation or organization.  As may be set forth in the Plan Supplement, a new holding company may be created to hold the Reorganized Debtor Equity. After the Effective Date, the Reorganized Debtors will exist with all of the powers pursuant to the New Organizational Documents.  The Plan Supplement will include appropriate corporate organizational documents governing the post-Effective Date governance of the Reorganized Debtors and the rights of the holders of the Reorganized Debtor Equity.

On the Effective Date or as soon thereafter as is reasonably practicable, and without need for any notice to or any vote, consent, authorization, approval, ratification, or other action by any Entity or any director, stockholder, security holder, manager, member, or partner (or board thereof) of any Entity, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, or necessary or appropriate to effectuate the Plan (the "***Restructuring Transactions***"), including, without limitation:  (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation, or reorganization containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; (c) the filing of appropriate certificates of incorporation, merger, or consolidation with the appropriate governmental authorities under applicable law; and (d) all other actions that the Debtors or the Reorganized Debtors, as applicable, and Bridging determine are necessary or appropriate.

The Confirmation Order will be deemed to, under both section 1123 and section 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or

appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

### 3.    Vesting of Assets in the Reorganized Debtors

Except as otherwise provided in the Plan or the Confirmation Order, on or after the Effective Date, all property and Assets of the Estates and any property and Assets acquired by the Debtors pursuant to the Plan will vest in the Reorganized Debtors, free and clear of all Liens, Claims, charges or other encumbrances. Except as may be otherwise provided in the Plan, on and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the Confirmation Order. Without limiting the foregoing, the Reorganized Debtors will pay the charges that they incur after the Effective Date for Professionals' fees, disbursements, expenses or related support services (including reasonable fees relating to the preparation of Professional fee applications) in the ordinary course of business and without application or notice to, or order of, the Bankruptcy Court. For the avoidance of doubt, the Creditors' Trust Assets will not revest in the Reorganized Debtors and instead the Creditors' Trust Assets will vest in the Creditors' Trust pursuant to Section 7 of the Plan.

### 4.    New Secured Debt

On the Effective Date, the Reorganized Debtors will execute the New Secured Debt Documents which will govern and evidence the New Secured Debt of the Reorganized Debtors. The New Secured Debt Documents will be at least as favorable to Bridging and Centurion as lenders as the Prepetition Loan Documents, with additional usual and customary terms for a syndicated loan (including direct ability to obtain information, access to records, regular reporting requirements and consent rights for each of the lenders). The portion of the New Secured Debt attributable to the DIP Loan and Working Capital Loan will be issued and allocated to Bridging or its designee. The Remaining Secured Debt will be issued to Bridging or its designee and Centurion and allocated (directly and not as a participation) as follows: (i)  90.86% of the Remaining Secured Debt will be issued to Bridging or its designee; and (ii) 9.14% of the Remaining Secured Debt will be issued to Centurion or its designee.

Payment of the New Secured Debt will be secured by a first priority lien on substantially all of the assets of the Reorganized Debtors, subject to customary exceptions to be set forth in the New Secured Debt Documents, with priority granted to Bridging or its designee with respect to the amounts attributable to the DIP Loan and Working Capital Loan. The New Secured Debt will be divided into two tranches. The first tranche of the New Secured Debt, totaling Forty Million Dollars ($40,000,000.00), will provide for payments-in-kind of interest for the first two years following the Effective Date upon which date the Reorganized Debtors will be required to make payments of principal and interest in accordance with the terms of the New Secured Debt Documents. In the event the Reorganized Debtors achieve certain operational milestones, Bridging and Centurion will have the right to convert a proportionate share of their equity into an additional Thirty Million Dollars ($30,000,000.00) of New Secured Debt.

On the Effective Date, the Reorganized Debtors will be authorized to execute and deliver the New Secured Debt Documents, and any related instruments and documents, and will be authorized to execute, deliver, file, record and issue any other notes, guarantees, security agreements, documents (including UCC financing statements, intellectual property security agreements to be filed in the U.S. Patent & Trademark Office and deposit account control agreements with the Debtors' depositary banks), amendments to the foregoing, or agreements in connection therewith, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule and without need for any notice to or any vote, consent, authorization, approval, ratification or other action by any Entity or any director, stockholder, security holder, manager, member, or partner (or board thereof) of any Entity.

5.      **Sources of Cash for Certain Plan Distributions**

Except as otherwise provided in the Plan or the Confirmation Order, all Cash necessary for the Reorganized Debtors to make payments required pursuant to the Plan with respect to Allowed Administrative Expense Claims, Accrued Professional Compensation Claims and Priority Tax Claims will be obtained from funding advanced under the DIP Credit Agreement, the Working Capital Loan and/or the Reorganized Debtors' Cash balances, including Cash from operations.

6.      **Issuance of Reorganized Debtor Equity and Related Documentation**

On the Effective Date, the Reorganized Debtors will be authorized to and will issue the Reorganized Debtor Equity without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule and without need for any notice to or any vote, consent, authorization, approval, ratification or other action by any Entity or any director, stockholder, security holder, manager, member, or partner (or board thereof) of any Entity from and after the Effective Date.  The Reorganized Debtor Equity will be deemed issued to and held as follows: (i) 86.317% will be issued to and held by Bridging or its designee; (ii) 8.683% will be issued to and held by Centurion; and (iii) 5% will be issued to and held by the Creditors' Trust (the "*Creditor Committee Equity*").  The Reorganized Debtor Equity will be governed by the New Equity Documents which will be in a form acceptable to Bridging, the Committee and Centurion and filed as part of the Plan Supplement.

With respect to the Creditor Committee Equity, the Creditors' Trust will receive typical minority shareholder protections (e.g., tags, drags, etc.) as more fully described in the New Equity Documents.  Further, the Creditor Committee Equity will be freely assignable by the Creditors' Trust.

The Creditor Committee Equity will entitle the Creditors' Trust to 5% of the Net Proceeds of a sale of the Reorganized Debtors.  In the event the Reorganized Debtors are not sold by the fifth anniversary of the Effective Date (the "*Put Election Date*"), the Creditors' Trust will have the right to put the Creditor Committee Equity to the Reorganized Debtors (the "*Put Election*") at an amount equal to five percent (5%) of the "*Put Amount*."  The Put Amount will be determined as follows: (EBITDA amount as of the Put Election Date multiplied by the applicable EBITDA multiple set forth in the chart below) less the total amount of secured debt as

31

of the Put Election Date plus the total amount of unrestricted cash, cash equivalents and investments on the balance sheet as of the Put Election Date.

| LIVES MANAGED UNDER MANAGEMENT | REORGANIZED DEBTORS' EBITDA MULTIPLE FOR THE 12 MONTHS PRIOR TO EXERCISING THE PUT ELECTION |
|---|---|
| 5,000 to 7,500 | 7 |
| 7,501 to 10,000 | 7.5 |
| 10,001 to 12,500 | 8 |
| 12,501 to 15,000 | 8.5 |
| More than 15,000 | 9 |

### 7.    Section 1145 Exemption

The Reorganized Debtor Equity of the Reorganized Debtors to be issued and distributed under the Plan will be exempt from registration under (a) the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder and (b) any state or local law requiring registration for the offer, issuance, or distribution of securities pursuant to section 1145 of the Bankruptcy Code, or, if applicable, section 4(a)(2) of the Securities Act of 1933, without further act or action by any entity.  The Reorganized Debtor Equity will be freely tradable by the recipients thereof, subject to (w) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act of 1933; (x) compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments; (y) the restrictions, if any, on the transferability of such securities contained in the New Organizational Documents; and (z) applicable regulatory approval.

### 8.    Employee Matters and Retiree Benefits

Unless otherwise set forth in the schedule of assumed Executory Contracts and Unexpired Leases included in the Plan Supplement, all material employee compensation and benefit Plans, and employment, severance, retirement, indemnification, and other similar employee-related agreement or arrangements in place as of the Effective Date with the Debtors will be rejected by the Debtors.  Nothing in the Plan will limit, diminish or otherwise alter the Debtors' defenses, Claims, Causes of Action, or other rights with respect to any such contracts, agreements, policies, programs, and Plans.  Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, on and after the Effective Date, all retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code), if any, will continue to be paid in accordance with applicable law.

### 9.    Release of Liens, Claims, and Equity Interests

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all Liens, Claims, Equity Interests, mortgages, deeds of trust, or other security interests against the

property of the Estates will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule and without need for any notice to or any vote, consent, authorization, approval, ratification or other action by any Entity or any director, stockholder, security holder, manager, member, or partner (or board thereof) of any Entity.  Any Entity holding such Liens or Equity Interests will, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Reorganized Debtors such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Reorganized Debtors.

### 10.    New Organizational Documents

The New Organizational Documents will satisfy the provisions of the Plan and the Bankruptcy Code, and will (i) include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting Equity Securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code; (ii) authorize the issuance of the Reorganized Debtor Equity; (iii) to the extent necessary or appropriate, include restrictions on the transfer of Reorganized Debtor Equity; and (iv) to the extent necessary or appropriate, include such provisions as may be needed to effectuate and consummate the Plan and the transactions contemplated in the Plan.  After the Effective Date, the Reorganized Debtors may amend and/or restate the New Organizational Documents and other applicable organizational documents, as permitted by applicable law and in a manner consistent with the Plan.

### 11.    Resignation of Directors and Officers

Upon the Effective Date, the Debtors' boards of directors and officers will be deemed to have resigned and will be replaced by the New Board.

### 12.    Managers and Officers of the Reorganized Debtors

Except as set forth in the Plan, the existing directors and managers of the Debtors will be deemed to have resigned on and as of the Effective Date, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule and without need for any notice to or any vote, consent, authorization, approval, ratification or other action by any Entity or any other Person or any director, stockholder, security holder, manager, member, or partner (or board thereof) of any Entity.

Except as otherwise provided in the Plan, the New Board will be designated by Bridging, including a lead director who will have such authority and duties as the New Board may determine.  Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose, prior to the Confirmation Hearing, the identity and affiliations of any Person proposed to serve on the New Board or as an officer of the Reorganized Debtors and, to the extent such Person is an insider other than by virtue of being a director or officer, the nature of any compensation for such Person.  Each such manager, director, and officer will serve from and after the Effective Date pursuant to applicable law and the terms of the New Organizational Documents and the other constituent and organizational documents of the Reorganized Debtors.  Centurion will be entitled to appoint one (1) director on the New Board with voting authority and one (1) director

with observation rights only. Additionally, the Creditors' Trust will be entitled to New Board observation rights.

The identity of the Reorganized Debtors' managers and officers will be disclosed in the Plan Supplement.

### 13. Corporate Action

Upon the Effective Date, all actions contemplated by the Plan will be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Equity Interests, directors, managers, or officers of the Debtors, the Reorganized Debtors, or any other Entity, including: (1) assumption of Executory Contracts and Unexpired Leases; (2) selection of the directors, managers, and officers for the Reorganized Debtors; (3) the execution of and entry into the New Organizational Documents; (4) the issuance and distribution of the Reorganized Debtor Equity as provided in the Plan; and (5) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan involving the company structure of the Debtors and any company action required by the Debtors in connection therewith will be deemed to have occurred on and will be in effect as of the Effective Date without any requirement of further action by the security holders, directors, managers, authorized persons, or officers of the Debtors.

### 14. Cancellation of Agreements, Security Interests, and Other Interests

Except for the purpose of evidencing a right to a distribution under the Plan and except as otherwise set forth in the Plan, on the Effective Date, all agreements, instruments, Equity Securities and other documents evidencing any prepetition Claim against or Equity Interest in any of the Reorganized Debtors and any rights of any holder in respect thereof will be deemed cancelled, discharged, and of no force or effect. The holders of or parties to such cancelled instruments, Equity Securities and other documentation will have no rights arising from or related to such instruments, Equity Securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to the Plan and the obligations of the Debtors thereunder or in any way related thereto will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule and without need for any notice to or any vote, consent, authorization, approval, ratification or other action by any Entity or other Person or any director, stockholder, manager, member, or partner (or board thereof) of any Entity.

### 15. Dissolved Debtors

On the Effective Date, the Dissolved Debtors will be deemed dissolved without any requirement for further action by Holders of Claims or Equity Interests, directors, managers, or officers of the Debtors, the Reorganized Debtors, or any other Entity.

### D.    Creditors' Trust

#### 1.    Establishment of the Creditors' Trust

The Creditors' Trust will be governed by the Creditors' Trust Agreement.  On the Effective Date, the Trustee will execute the Creditors' Trust Agreement and, in his capacity as Trustee, accept all Creditors' Trust Assets on behalf of the Beneficiaries thereof, and be authorized to obtain, seek the turnover, liquidate, and collect all of the Creditors' Trust Assets not in his possession.  The Creditors' Trust will then be deemed created and effective without any further action by the Bankruptcy Court or any Person as of the Effective Date.  The Creditors' Trust will be established for the purposes of (i) liquidating any non-Cash Creditors' Trust Assets; (ii) maximizing recovery of the Creditors' Trust Assets for the benefit of the Beneficiaries; and (iii) distributing the proceeds of the Creditors' Trust Assets to the Beneficiaries in accordance with the Plan and the Creditors' Trust Agreement, with no objective to continue or engage in the conduct of a trade or business, except only in the event and to the extent necessary for, and consistent with, the purpose of the Creditors' Trust.

#### 2.    Creditors' Trust Funding

On the Effective Date, Bridging or its designee will fund Five Hundred and Fifty Thousand Dollars ($550,000.00) as a non-recourse loan to the Creditors' Trust (the "***Creditors' Trust Loan***").  The Creditors' Trust Loan will be payable only from the proceeds of the Creditors' Trust Causes of Action.  The first One Million One Hundred Thousand Dollars ($1,100,000.00) distributed from the Creditors' Trust will be distributed evenly (50/50) between Bridging or its designee and the Creditors' Trust to repay the Creditors' Trust Loan.  Upon repayment of the Creditors' Trust Loan, Bridging will not be entitled to any additional Distributions from the Creditors' Trust.

#### 3.    Appointment of the Trustee

The Trustee, together with his agents, representatives and professionals, will have the power to administer the Creditors' Trust Assets and make Distributions in accordance with the terms of the Plan and the Creditors' Trust Agreement.  The Trustee will be appointed pursuant to the Confirmation Order and subject to removal only by the Bankruptcy Court upon application or motion by a Beneficiary of the Creditors' Trust, after notice and a hearing, and for cause shown, including (i) the willful and continued refusal by the Trustee to perform his duties under the Plan and the Creditors' Trust Agreement, and (ii) gross negligence, gross misconduct, fraud, embezzlement or theft.  The Trustee will be chosen by the Committee.  During the term of the Creditors' Trust, the Trustee will be entitled to compensation payable from the Creditors' Trust Assets as set forth in the Creditors' Trust Agreement.

#### 4.    Beneficiaries of Creditors' Trust

The Holders of Allowed General Unsecured Claims against the Debtors that are entitled to Distributions will be the Beneficiaries of the Creditors' Trust.  Such Beneficiaries will be bound by the Creditors' Trust Agreement.  The interests of the Beneficiaries in the Creditors' Trust will be uncertificated and nontransferable except upon death of the interest holder or by

35

operation of law. Neither Bridging nor any of its participants will be entitled to any Distributions from the Creditors' Trust on account of Bridging's Deficiency Claim.

5.      **Vesting and Transfer of Creditors' Trust Assets to the Creditors' Trust**

On the Effective Date, pursuant to section 1141(b) of the Bankruptcy Code, the Creditors' Trust Assets will vest in the Creditors' Trust free and clear of all Liens, Claims and Equity Interests, except as otherwise specifically provided in the Plan or in the Confirmation Order; provided, however, that the Trustee may abandon or otherwise not accept any non-Cash Creditors' Trust Assets that the Trustee believes, in good faith, have no value to the Creditors' Trust. Any non-Cash Creditors' Trust Assets that the Trustee so abandons or otherwise does not accept will not be property of the Creditors' Trust.

6.      **Retention of Professionals**

The Trustee will have the right to retain the services of attorneys, accountants, and other professionals (collectively, the "Creditors' Trust Professionals") that are necessary to assist the Trustee in the performance of his duties pursuant to the Plan, the Creditors' Trust Agreement and the Confirmation Order. The reasonable fees and expenses of such professionals will be paid by the Trustee from the Creditors' Trust Assets and, if necessary, the Creditors' Trust Assets upon submission of monthly statements ("Creditors' Trust Monthly Fee Statements") for services rendered and costs incurred to the Trustee and Bridging for review and approval. The Trustee will have thirty (30) days from receipt of each Creditors' Trust Monthly Fee Statement to object to the Creditors' Trust Monthly Fee Statement. In the event that any objection is received by the relevant Creditors' Trust Professional that cannot be promptly resolved by the Creditors' Trust Professional and the objecting party, the dispute will be submitted by the Trustee to the Bankruptcy Court for adjudication. The Bankruptcy Court will retain jurisdiction to adjudicate objections to Creditors' Trust Monthly Fee Statements. In the event that no objection is raised to a Creditors' Trust Monthly Fee Statement within the thirty (30) day period, the requested amount in the Creditors' Trust Monthly Fee Statement will be promptly paid by the Trustee, subject to any requirements under the Plan.

7.      **Creditors' Trust Expenses**

Subject to the provisions of the Creditors' Trust Agreement, all costs, expenses, and obligations incurred by the Trustee in administering the Plan, the Creditors' Trust, or in any manner connected, incidental or related thereto, in effecting distributions from, as applicable, the Creditors' Trust will be a charge against the Creditors' Trust Assets and, if necessary, the Creditors' Trust Assets remaining from time to time in the hands of the Trustee. Such expenses will be paid in accordance with the Creditors' Trust Agreement.

8.      **Certain Powers and Duties of the Creditors' Trust and Trustee.**

a.      **General Powers of the Trustee.**

The Trustee will be the exclusive trustee of the Creditors' Trust and the Creditors' Trust Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3). The powers, rights, and

36

responsibilities of the Trustee will be specified in the Creditors' Trust Agreement and will include the authority and responsibility to: (a) receive, manage, invest, supervise, and protect the Creditors' Trust Assets; (b) pay taxes or other obligations incurred by the Creditors' Trust; (c) retain and compensate, without further order of the Bankruptcy Court, the services of employees, professionals and consultants to advise and assist in the administration, prosecution and distribution of Creditors' Trust Assets; (d) calculate and implement Distributions of Creditors' Trust Assets; (e) investigate, prosecute, compromise, and settle, in accordance with the specific terms of the Creditors' Trust Agreement, the Creditors' Trust Causes of Action; (f) resolve issues involving Claims and Equity Interests in accordance with the Plan; and (g) undertake all administrative functions of the Chapter 11 Cases, including the payment of fees payable to the United States Trustee incurred after the Effective Date and the ultimate closing of the Chapter 11 Cases. The Creditors' Trust is the successor to the Debtors and their Estates.

### b.   Investments of Cash.

The Creditors' Trust may invest Cash (including any earnings thereon or proceeds therefrom) as permitted by section 345 of the Bankruptcy Code or in other prudent investments, provided, however, that such investments are permitted to be made by a Creditors' Trust within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings, or other controlling authorities.

### c.   Reporting.

In no event later than thirty (30) days after the end of the first full month following the Effective Date and on a quarterly basis thereafter until all Cash in the Creditors' Trust has been distributed in accordance with the Plan, the Trustee will file with the Bankruptcy Court a report setting forth the amounts, recipients and dates of all Distributions made by the Trustee under the Plan through each applicable reporting period.

### d.   Tax Reporting.

The Trustee will file tax returns for the Creditors' Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with the Plan. The Creditors' Trust also will annually (for tax years in which Distributions from the Creditors' Trust are made) send to each Beneficiary a separate statement setting forth the Beneficiary's share of items of income, gain, loss, deduction or credit and all such holders will report such items on their federal income tax returns; provided, however, that no such statement need be sent to any Class that is not expected to receive any Distribution from the Creditors' Trust. The Creditors' Trust's taxable income, gain, loss, deduction or credit will be allocated to the Creditors' Trust's Beneficiaries in accordance with their relative beneficial interests in the Creditors' Trust.

As soon as possible after the Effective Date, the Creditors' Trust will make a good faith valuation of assets of the Creditors' Trust, and such valuation will be used consistently by all parties for all federal income tax purposes. The Creditors' Trust also will file (or cause to be filed) any other statements, returns, or disclosures relating to the Creditors' Trust that are required by any Governmental Unit for taxing purposes. The Creditors' Trust may request an expedited determination of taxes of the Debtors or of the Creditors' Trust under section 505(b) of

the Bankruptcy Code for all tax returns filed for, or on behalf of, the Debtors and the Creditors' Trust for all taxable periods through the dissolution of the Creditors' Trust.

The Creditors' Trust will be responsible for filing all federal, state, and local tax returns for the Debtors and the Creditors' Trust. The Creditors' Trust will comply with all withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions made by the Creditors' Trust will be subject to any such withholding and reporting requirements; provided, however, that, if the Trustee fails to withhold in respect of amounts received or distributable with respect to any Beneficiaries and the Trustee is later held liable for the amount of such withholding, such Beneficiaries will reimburse the Trustee for such liability. All such amounts withheld and paid to the appropriate taxing authority will be treated as amounts distributed to such Beneficiaries for all purposes of the Creditors' Trust Agreement. The Trustee will be authorized to collect such tax information from the Beneficiaries (including, without limitation, social security numbers or other tax identification numbers) as it, in its sole discretion, deems necessary to effectuate the Plan, the Creditors' Trust Agreement and the Confirmation Order. In order to receive distributions under the Plan, all Beneficiaries will need to identify themselves to the Trustee and provide tax information and the specifics of their holdings, to the extent the Trustee deems appropriate (including completing the appropriate Form W-8 or Form W-9, as applicable). The failure to provide such tax information will result in the disallowance of such Claim without a further order from the Bankruptcy Court.

## 9.    Preservation of Right to Conduct Investigations

The preservation for the Creditors' Trust of any and all rights to conduct investigations pursuant to Bankruptcy Rule 2004 is necessary and relevant to the liquidation and administration of the Creditors' Trust Assets. Accordingly, any and all rights to conduct investigations pursuant to Bankruptcy Rule 2004 held by the Debtors prior to the Effective Date will vest with the Creditors' Trust and will continue until dissolution of the Creditors' Trust.

## 10.    Prosecution and Resolution of Causes of Action.

### a.    The Creditors' Trust's Exclusive Authority to Pursue, Settle, or Abandon Causes of Action.

From and after the Effective Date, prosecution and settlement of all Creditors' Trust Causes of Action, including Avoidance Actions, transferred to the Creditors' Trust will be the sole responsibility of the Creditors' Trust pursuant to the Plan and the Confirmation Order. From and after the Effective Date, the Creditors' Trust will have exclusive rights, powers, and interests of the Debtors' Estates to pursue, settle or abandon such Causes of Action as the sole representative of the Debtors' Estates pursuant to section 1123(b)(3) of the Bankruptcy Code. Proceeds recovered from all Causes of Action will be deposited into the Creditors' Trust and will be distributed by the Trustee to the Beneficiaries in accordance with the provisions of the Plan and Creditors' Trust Agreement. All Causes of Action, including Avoidance Actions, that are not expressly released or waived under the Plan are reserved and preserved and vest in the Creditors' Trust in accordance with the Plan. No Person may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors, Reorganized Debtors or Trustee will not pursue any

and all available Causes of Action against such Person.  The Trustee expressly reserves all Creditors' Trust Causes of Action, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, will apply to such Creditors' Trust Causes of Action upon, after, or as a consequence of confirmation or consummation of the Plan.  No claims or Causes of Action against the Released Parties expressly released or waived pursuant to the Plan will be transferred to the Creditors' Trust, the Trustee will not have standing to pursue such claims or Causes of Action, and all such claims and Causes of Action will be waived, released and discharged pursuant to the Plan.

> b.      **Settlement of Causes of Action.**

Settlement by the Creditors' Trust of any Creditors' Trust Cause of Action transferred to the Creditors' Trust will require:  (i) approval only of the Trustee if the amount claimed by the Creditors' Trust against a defendant is less than One Hundred Thousand Dollars ($100,000.00); and (ii) approval of the Trustee and the Creditors' Trust Oversight Committee, if the amount claimed by the Creditors' Trust against a defendant is unliquidated or equals to or exceeds One Hundred Thousand Dollars ($100,000.00).

## 11.      Federal Income Tax Treatment of the Creditors' Trust

For federal income tax purposes, it is intended that the Creditors' Trust be classified as a Creditors' Trust under section 301.7701-4 of the Treasury regulations and that such trust be owned by its beneficiaries.  Accordingly, for federal income tax purposes, it is intended that the Beneficiaries be treated as if they had received a distribution from the Debtors' Estates of an undivided interest in each of the Creditors' Trust Assets in satisfaction of their Allowed Claims (to the extent of the value of their respective share in the applicable assets) and then contributed such interests to the Creditors' Trust in exchange for their interests in the Creditors' Trust, and the Creditors' Trust's Beneficiaries will be treated as the grantors and owners thereof.

## 12.      Limitation of Liability

No recourse will ever be had, directly or indirectly, against the Trustee or his or her respective employees, professionals, representatives, agents, successors, or assigns, by legal or equitable proceedings or by virtue of any statute or otherwise, or any deed of trust, mortgage, pledge or note, nor upon any promise, contract, instrument, undertaking, obligation, covenant or agreement whatsoever executed by the Creditors' Trust under the Plan or by reason of the creation of any indebtedness by the Creditors' Trust or the Trustee under the Plan.  All such liabilities under the Plan will be enforceable only against, and will be satisfied only out of, the Creditors' Trust Assets.  The Creditors' Trust and the Trustee and their respective officers, directors, employees, professionals, representatives, agents, successors or assigns will not be liable for any act they may do, or omit to do hereunder in good faith and in the exercise of their sound judgment; *provided, however*, that this section will not apply to any gross negligence or willful misconduct by the Creditors' Trust and the Trustee or their respective officers, directors, employees, professionals, representatives, agents, successors, or assigns.

13.     **Term of Creditors' Trust**

The Trustee will be discharged and the Creditors' Trust will be terminated, at such time as (i) all of the Creditors' Trust Assets have been liquidated, (ii) all duties and obligations of the Trustee under the Creditors' Trust Agreement have been fulfilled, (iii) all Distributions required to be made by the Creditors' Trust under the Plan and the Creditors' Trust Agreement have been made, and (iv) the Chapter 11 Cases have been closed; *provided, however*, that in no event will the Creditors' Trust be dissolved later than five (5) years from the Effective Date unless the Bankruptcy Court, upon motion within the six-month period prior to the fifth anniversary (or the end of any extension period approved by the Bankruptcy Court), determines that a fixed period extension not to exceed one (1) year is necessary to facilitate or complete the recovery and liquidation of the Creditors' Trust Assets.

14.     **Conflicts Between the Creditors' Trust Agreement and the Plan**

In the event of any inconsistencies or conflict between the Creditors' Trust Agreement and the Plan, the terms and provisions of the Plan will control.

E.     **Distributions**

1.     **Distribution Record Date**

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Equity Interests as maintained by the Debtors or their agents will be deemed closed, and there will be no further changes in the record Holders of any of the Claims or Equity Interests.  The Debtors will have no obligation to recognize any ownership transfer of the Claims or Equity Interests occurring after the Distribution Record Date.  The Debtors will be entitled to recognize and deal for all purposes under the Plan only with those record Holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

2.     **Timing of Distributions**

Except as otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtors will receive the full amount of the Distributions that the Plan provides for Allowed Claims in the applicable Class and in the manner provided therein.  Distributions made after the Effective Date to Holders of Allowed Claims will be deemed to have been made on the Effective Date and, except as otherwise provided in the Plan, no interest will be payable by the Debtors with respect to such Claims or any Distribution related thereto.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but will be deemed to have been completed as of the required date.  If there are Disputed Claims, Distributions on account of any such Disputed Claims will be made pursuant to the provisions set forth in the Plan.  Except as otherwise provided in the Plan, Holders of Claims will not be

entitled to interest, dividends or accruals on Distributions provided for thereunder, regardless of whether such Distributions are delivered on or at any time after the Effective Date.

### 3.      Disbursing Agent

Except as otherwise provided in the Plan, all Distributions under the Plan will be made by the Reorganized Debtors or the Trustee, as applicable, as "Disbursing Agent" or such other Person designated by the Reorganized Debtors or the Trustee as a Disbursing Agent on the Effective Date.

### 4.      Rights and Powers of Disbursing Agent

The Disbursing Agent will be empowered to:  (a) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan; (b) make all Distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

### 5.      Delivery of Distributions in General

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims will be made to Holders of record as of the Distribution Record Date by the Disbursing Agent. Distributions to Holders of Allowed Claims will be made at the address of each such Holder as set forth in the Debtors' books and records.  Distributions under the Plan on account of such Allowed Claims will not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim will have and receive the benefit of the distributions in the manner set forth in the Plan.  None of the Debtors, the Reorganized Debtors, and the Disbursing Agent will incur any liability whatsoever on account of any distributions under the Plan.

### 6.      Payments and Distributions on Disputed Claims

Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims will be deemed to have been made on the Effective Date.  Notwithstanding any provision otherwise in the Plan and except as may be agreed to by the Debtors or the Reorganized Debtors, on the one hand, and the Holder of a Disputed Claim, on the other hand, no partial payments and no partial Distributions will be made with respect to any Disputed Claim until all Disputed Claims held by the Holder of such Disputed Claim have become Allowed Claims or have otherwise been resolved by settlement or Final Order.

### 7.      Manner of Payment

Any Distributions to be made by or on behalf of the Debtors, Reorganized Debtors, or the Trustee, as applicable, pursuant to the Plan will be made by checks drawn on accounts maintained by the Debtors, Reorganized Debtors, or the Trustee, respectively, or by wire transfer if circumstances justify, at the option of the Debtors, Reorganized Debtors, or the Trustee, as

41

applicable; *provided, however*, any payments made to Bridging or Centurion will be made by wire transfer.

### 8.    Undeliverable Distributions and Unclaimed Property

In the event that any Distribution to any Holder is returned as undeliverable, no Distribution to such Holder will be made unless and until the Disbursing Agent has determined the then current address of such Holder, at which time such Distribution will be made as soon as practicable after such Distribution has become deliverable; *provided, however*, that such Distributions will be deemed unclaimed property under section 347(b) of the Bankruptcy Code and forfeited at the expiration of six months from the date of the Distribution.  After such date, all "unclaimed property" or interests in property will revert to the Reorganized Debtors or the Creditors' Trust, as applicable (notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary), and the Claim of any Holder to such property will be discharged and forever barred.

### 9.    Withholding and Reporting Requirements

In connection with the Plan and all instruments issued in connection therewith, the Disbursing Agent will comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all Distributions under the Plan will be subject to any such withholding or reporting requirements.

### 10.    Surrender Instruments

Pursuant to section 1143 of the Bankruptcy Code, as a condition precedent to receiving any Distribution under the Plan, each holder of a certificated instrument or note must surrender such instrument or note held by it to the Disbursing Agent or its designee.  Any such holder of such instrument or note that fails to (i) surrender the instrument or note or (ii) execute and deliver an affidavit of loss and/or indemnity reasonably satisfactory to the Disbursing Agent, as applicable, before the fifth anniversary of the Confirmation Date will be deemed to have forfeited all rights and claims and may not participate in any Distribution hereunder.  Any Distribution so forfeited will become property of the Reorganized Debtors or the Creditors' Trust, as applicable.

### 11.    Setoffs

Except for the payments to be made to Bridging or Centurion, the Debtors, the Reorganized Debtors and/or the Trustee may, but will not be required to, set off against any Claim (for purposes of determining the Allowed amount of such Claim on which a Distribution will be made), any claims of any nature whatsoever that the Debtors and the Reorganized Debtors may have against the Holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder will constitute a waiver or release by the Debtors, the Reorganized Debtors and/or the Trustee of any such claim the Debtors, the Reorganized Debtors and/or the Trustee may have against the Holder of such Claim.

### 12. Insurance Claims

Except for the payments to be made to Bridging or Centurion, no Distributions under the Plan will be made on account of Allowed Claims until the Holder of such Allowed Claim has exhausted all remedies with respect to the Debtors' Insurance Policies. To the extent that the Debtors' insurers agree to satisfy in full a Claim, then immediately upon such insurers' agreement, such Claim may be expunged without a Claims objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court.

### 13. Applicability of Insurance Policies

Except as otherwise provided in the Plan, Distributions to Holders of Allowed Claims will be made in accordance with the provisions of any applicable Insurance Policy. Nothing contained in the Plan will constitute or be deemed a waiver of any Cause of Action that the Debtors, Reorganized Debtors, or any Person may hold against any insurers under any of the Debtors' Insurance Policies, nor will anything contained in the Disclosure Statement or in the Plan constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

### 14. No Postpetition Interest

Unless otherwise specifically provided for in the Plan or in the Confirmation Order, or required by applicable bankruptcy law, postpetition interest will not accrue or be paid on any Claims or Equity Interests, and no Holder of a Claim or Equity Interest will be entitled to interest accruing on or after the Petition Date on such Claim or Equity Interest. Notwithstanding the foregoing, nothing in the Plan will prohibit Bridging or Centurion from allocating payments received from the Debtors to principal or interest on Bridging's Secured Claim, in their sole discretion in accordance with applicable law.

### 15. Distributions Free and Clear

Except as may be otherwise provided in the Plan, all Distributions under the Plan will be free and clear of any Liens, Claims, encumbrances, and other interests.

### 16. Fractional Dollars; De Minimis Distributions

Notwithstanding any other provision of the Plan, Cash payments of fractions of dollars will not be made. Whenever any Distribution to a Holder of a Claim would otherwise call for Distribution of Cash in a fractional dollar amount, the actual Distribution of such Cash will be rounded to the nearest whole dollar (up or down), with half dollars (or less) being rounded down. Neither the Debtors, the Reorganized Debtors nor the Trustee will be required to make any Cash payment of less than ten dollars ($10.00) with respect to any Claim unless a request therefor is made in writing to the Debtors, the Reorganized Debtors or the Trustee, as applicable; *provided, however*, that neither the Debtors, the Reorganized Debtors or the Trustee will have any obligation to make any Distribution, whether final or not, unless and until the total amount of such Distribution to a specific Holder of an Allowed Claim is equal to or greater than ten dollars ($10.00).

**F.     Procedures for Disputed Claims**

The provisions described below related to Disputed Claims will not be applicable to Bridging's Secured Claim and Bridging's Deficiency Claim which are Allowed Claims. Bridging's Deficiency Claim is Allowed for voting purposes only.  Bridging will not be entitled to any Distributions on account of Bridging's Deficiency Claim.

**1.     Allowance of Claims and Equity Interests**

Except as expressly provided in the Plan, or in any order entered in the Chapter 11 Cases prior to the Effective Date, including the Confirmation Order, no Claim or Equity Interest will be deemed Allowed unless and until such Claim or Equity Interest is deemed Allowed under the Plan or the Bankruptcy Code or Allowed by the Bankruptcy Court by entry of a Final Order allowing such Claim or Equity Interest.  On and following the Effective Date, the Reorganized Debtors and Trustee, as applicable, will be vested with any and all rights and defenses the Debtors had with respect to any Claim or Equity Interest immediately prior to the Effective Date.

**2.     Objections to Claims**

Except as expressly provided in the Plan, the Debtors (before the Effective Date) or the Reorganized Debtors or the Trustee (on or after the Effective Date), as applicable, will have the exclusive authority to file, settle, compromise, withdraw, or litigate to judgment any objections to Claims as permitted under the Plan.  With respect to Administrative Claims, Accrued Professional Compensation Claims, and Other Priority Claims, the Debtors and the Reorganized Debtors and the Trustee will have standing to object to any such Claims. Any objections to Claims will be filed and served on or before the later of (i) one hundred eighty (180) days after the Effective Date or (ii) such date as may be fixed by the Bankruptcy Court.  From and after the Effective Date, the Trustee may settle or compromise any Disputed Claim without approval of the Bankruptcy Court.  The Debtors, the Reorganized Debtors and the Trustee reserve all rights to resolve any Disputed Claim outside the Bankruptcy Court under applicable governing law.

**3.     Estimation of Claims**

The Debtors (before the Effective Date) or the Trustee (on or after the Effective Date) may, at any time, and from time to time, request that the Bankruptcy Court estimate any Contingent Claim or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether an objection was previously filed with the Bankruptcy Court with respect to such Claim, or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to such objection.  In the event that the Bankruptcy Court estimates any Contingent Claim or Disputed Claim, the amount so estimated will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors or the Trustee may pursue supplementary proceedings to object to the allowance of such Claim; *provided, however*, the Trustee may elect not to pursue such supplementary

proceedings, instead electing to treat such maximum amount as the Allowed amount of such Claim.

### 4.    No Distribution Pending Allowance

Notwithstanding any other provision of the Plan, if any portion of a Claim is Disputed, no payment or distribution provided hereunder will be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

### 5.    Distributions after Allowance

At such time as a Contingent Claim or a Disputed Claim becomes an Allowed Claim, a Distribution will be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan as soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Contingent Claim or Disputed Claim becomes a Final Order. To the extent that all or a portion of a Contingent Claim or a Disputed Claim is disallowed, the Holder of such Claim will not receive any Distribution on account of the portion of such Claim that is disallowed.

### 6.    Preservations of Rights to Settle Claims

In accordance with section 1123(b) of the Bankruptcy Code, the Trustee will have the discretion to retain and enforce, sue on, settle, or compromise all claims, rights, causes of action, suits, and proceedings, whether in law or in equity, whether known or unknown, that the Debtors or their Estates may hold against any person or entity without the approval of the Bankruptcy Court, subject to the terms of the Plan, the Confirmation Order, and any contract, instrument, release, indenture, or other agreement entered into in connection herewith. The Trustee may pursue such retained claims, rights, or causes of action, suits, or proceedings, as appropriate, in accordance with the best interests of the Creditors' Trust.

### 7.    Disallowed Claims

All Claims held by persons or entities against whom or which the Debtors or Trustee has commenced a proceeding asserting a cause of action under sections 542, 543, 544, 545, 547, 548, 549, and/or 550 of the Bankruptcy Code will be deemed Disallowed Claims pursuant to section 502(d) of the Bankruptcy Code and Holders of such Claims will not be entitled to vote to accept or reject the Plan. Disallowed Claims pursuant to Section 9.7 of the Plan will continue to be Disallowed Claims for all purposes until the avoidance action against such party has been settled or resolved by Final Order and any sums due to the Debtors or Trustee from such party have been paid.

## G.    Executory Contracts and Unexpired Leases

### 1.    Assumption and Rejection of Executory Contracts and Unexpired Leases

Except with respect to the Material Contracts or as otherwise provided in the Plan or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, each of the Executory Contracts and Unexpired Leases of the Debtors

45

will be deemed rejected as of the Effective Date, unless such Executory Contract or Unexpired Lease:  (1) was assumed or rejected previously by the Debtor; (2) expired or terminated pursuant to its own terms before the Effective Date; or (3) is the subject of a motion to assume or reject filed on or before the Effective Date.

The Debtors will assume the Material Contracts.  Entry of the Confirmation Order will constitute a Bankruptcy Court order approving assumption of such Material Contracts and such assumption will be effective as of the Effective Date.  Each Material Contract assumed pursuant to the Plan will be fully enforceable by the Reorganized Debtors in accordance with its terms, except as such terms may have been modified by any order of the Bankruptcy Court or as otherwise agreed to by the Debtors and the applicable counterparty to the Material Contract.

**2.    Inclusiveness**

Unless otherwise specified, each Executory Contract and Unexpired Lease assumed or rejected by the Debtors will include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such Executory Contract or Unexpired Lease.

**3.    Rejection Claims**

Except as otherwise provided in orders entered by the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Claims Agent and served on the Creditors' Trust (and counsel, if known) within thirty (30) days after service of notice of entry of the Confirmation Order; *provided, that* any such Claims arising from the rejection of an Unexpired Lease will be subject to the cap on rejection damages imposed by section 502(b)(6) of the Bankruptcy Code. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed within such time will be automatically disallowed, forever barred from assertion and will not be enforceable against the Debtors, the Reorganized Debtors, the Debtors' Estates or their property without the need for any objection by the Debtors, the Reorganized Debtors or the Creditors' Trust or further notice to, or action, order or approval of the Bankruptcy Court.  All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases will be classified as General Unsecured Claims against the Debtors and will be treated in accordance with the Plan.

**4.    Cure of Defaults**

Any defaults under the Materials Contracts will be satisfied, pursuant to and to the extent required by section 365(b)(1) of the Bankruptcy Code, by payment of the applicable default amount in Cash on the Effective Date or on such other terms as the Bankruptcy Court may order or the parties to such Materials Contracts may otherwise agree in writing (the "***Cure Amount***"). The Debtors will file, as part of the Plan Supplement, a schedule of the Material Contracts and associated Cure Amounts.

Any objection by a counterparty to a Material Contract to a Cure Amount must be filed, served and actually received by the Debtors on or prior to thirty (30) days after the Effective Date.  Any counterparty to a Material Contract that fails to object timely to the proposed Cure

Amount will be deemed to have consented to such matters and will be deemed to have forever released and waived any objection to such Cure Amount. The Confirmation Order will constitute an order of the Bankruptcy Court approving the assumption of the Material Contracts pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

In the event of a dispute regarding (a) the amount of any Cure Amount, (b) the ability of any Debtor or assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under any Material Contract to be assumed, or assumed and assigned or (c) any other matter pertaining to assumption, the applicable payment of the Cure Amount required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order resolving the dispute and approving such assumption. If such objection is sustained by Final Order of the Bankruptcy Court, the Debtors or the Reorganized Debtors may reject such Material Contract in lieu of assuming it. The Debtors or the Reorganized Debtors, as applicable, will be authorized to effect such rejection by filing a written notice of rejection with the Bankruptcy Court and serving such notice on the applicable counterparty within thirty (30) days of the entry of such Final Order.

Subject to the payment of any Cure Amount, assumption of any Material Contract pursuant to the Plan will result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Material Contract at any time prior to the effective date of assumption, in each case as provided in section 365 of the Bankruptcy Code. Any Proofs of Claim filed with respect to a Material Contract that has been assumed by Final Order will be deemed disallowed and expunged (subject to the payment of a Cure Amount), without further notice to or action, order, or approval of the Bankruptcy Court.

### 5.    Reservation of Rights

Nothing contained in the Plan or the Plan Supplement will constitute an admission by the Debtors or the Reorganized Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Debtors or the Reorganized Debtors have any liability thereunder.

### 6.    D&O Liability Insurance Policies

To the extent that the D&O Liability Insurance Policies are considered to be Executory Contracts, notwithstanding anything in the Plan to the contrary, effective as of the Effective Date, the Debtors will be deemed to have assumed all unexpired D&O Liability Insurance Policies with respect to the Debtors' directors, managers, officers, and employees serving on or after the Petition Date pursuant to section 365(a) of the Bankruptcy Code. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtors' assumption of each of the unexpired D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan or Confirmation Order, confirmation of the Plan will not discharge, impair, or otherwise modify any indemnity obligations of the insurers under the D&O Liability Insurance Policies assumed by the foregoing assumption of the D&O Liability Insurance Policies, any agreements, documents, and instruments related thereto, and each such

indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be filed.

## H.    Conditions Precedent to Consummation of the Plan

### 1.    Conditions Precedent to Confirmation

Confirmation of the Plan will not occur, and the Confirmation Order will not be entered, until each of the following conditions precedent have been satisfied or waived pursuant to the provisions of the Plan:

a)    The Bankruptcy Court will have entered an order, which will not be subject to any stay or subject to an unresolved request for revocation under section 1144 of the Bankruptcy Code, in form and substance acceptable to the Debtors and Bridging, approving the Disclosure Statement with respect to the Plan and the solicitation of votes thereon as being in compliance with section 1125 of the Bankruptcy Code and applicable non-bankruptcy law;

b)    The proposed Confirmation Order will be in form and substance satisfactory in all respects to the Debtors, the Committee and Bridging;

c)    Unless otherwise authorized by the Confirmation Order, the Bankruptcy Court will have entered one or more orders, in form and substance acceptable to the Debtors and Bridging, authorizing the assumption of the Material Contracts; and

d)    The Plan and the Plan Supplement, including any schedules, documents, supplements, and exhibits thereto will be, in form and substance, acceptable to the Debtors, the Committee and Bridging.

### 2.    Conditions Precedent to the Effective Date

The Effective Date will not occur until each of the following conditions precedent have been satisfied or waived pursuant to the provisions of the Plan:

a)    All documents and agreements necessary to implement the Plan, including without limitation, the Reorganized Debtor Equity and the New Organizational Documents and the New Secured Debt Documents, in each case in form and substance acceptable to the Debtors, Bridging, the Committee and Centurion, as applicable, will have (a) been tendered for delivery and (b) been effected by, executed by, or otherwise deemed binding upon, all Entities party thereto.  All conditions precedent to such documents and agreements will have been satisfied or waived pursuant to the terms of such documents or agreements

b)    All consents, actions, documents, certificates and agreements necessary to implement the Plan, including, without limitation, the New Organizational Documents, will have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws;

c) All Material Contracts will have been assumed by the Reorganized Debtors;

d) The Debtors will have implemented the Restructuring Transactions in a manner consistent with the Plan pursuant to the documentation acceptable to the Debtors, Bridging, the Committee and Centurion, as applicable; and

e) All actions, documents, certificates, and agreements necessary to implement the Plan, including, without limitation, the Creditors' Trust Agreement, will have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws.

### 3.     Waiver of Conditions

The conditions to consummation of the Plan set forth in Section 11 of the Plan may be waived by the Debtors with the consent of Bridging and the Committee without notice, leave, or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.  To the extent that a condition to consummation of the Plan requires the consent of Bridging and/or the Committee, such conditions may only be waived by the Debtors with the consent of Bridging or the Committee, as applicable.  The failure to satisfy or waive a condition to confirmation or the Effective Date may be asserted by the Debtors or the Reorganized Debtors, or Bridging regardless of the circumstances giving rise to the failure of such condition to be satisfied.  The failure of the Debtors, the Reorganized Debtors or Bridging to exercise any of the foregoing rights will not be deemed a waiver of any other rights, and each right will be deemed an ongoing right that may be asserted at any time.

### 4.     Effect of Failure of Conditions

If the consummation of the Plan does not occur, the Plan will be null and void in all respects and nothing contained in the Plan or the Disclosure Statement will: (a) constitute a waiver or release of any claims by or Claims against or Equity Interests in the Debtors; (b) prejudice in any manner the rights of the Debtors, any Holders or any other Entity; (c) constitute an Allowance of any Claim or Equity Interest; or (d) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any Holders or any other Entity in any respect.

## I.     Effect of Confirmation

### 1.     Immediate Binding Effect

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or any other Bankruptcy Rule, upon the occurrence of the Effective Date, the terms of the Plan and the Creditors' Trust Agreement will be immediately effective and enforceable and deemed binding upon the Debtors, Reorganized Debtors, the Trustee, the Creditors' Trust and any and all Holders of Claims or Equity Interests (irrespective of whether such Claims or Equity Interests are deemed to have accepted the Plan), all Persons that are parties to or are subject to the settlements, compromises, releases, discharges and injunctions described in the Plan, each Person acquiring property under

the Plan, and any and all non-Debtors parties to Executory Contracts and Unexpired Leases with the Debtors.

2.      **Compromise and Settlement of Claims, Interests and Controversies**

To the extent provided for by the Bankruptcy Code and in consideration for the Distributions and other benefits provided pursuant to the Plan, on the Effective Date, the provisions of the Plan will constitute a good faith compromise of all Claims, Equity Interests and controversies relating to the contractual, legal and subordination rights that a Holder of a Claim or Equity Interest may have with respect to any Allowed Claim or Equity Interest, or any Distribution to be made on account of such Allowed Claim or Equity Interest. The entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Equity Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Equity Interests and is fair, equitable, and reasonable.

3.      **Releases by the Debtors**

Pursuant to section 1123(b) of the Bankruptcy Code and except as otherwise specifically provided in the Plan or the Plan Supplement, for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious reorganization of the Debtors and the consummation of the transactions contemplated by the Plan, on and after the Effective Date, the Released Parties are deemed released and discharged by the Debtors and their Estates from any and all claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, that the Debtors or their Estates would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, or the transactions or events giving rise to any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between the Debtors and any Released Party, the restructuring of Claims and Equity Interests before or during the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, the Disclosure Statement, any Plan Supplement or related agreements, instruments or other documents, other than Debtor Released Claims against a Released Party arising out of the gross negligence, willful misconduct, intentional fraud, or criminal liability of any such person or entity (the "***Debtor Released Claims***").

4.      **Releases by Holders of Claims**

**ON THE EFFECTIVE DATE, EXCEPT AS OTHERWISE PROVIDED IN THE PLAN AND EXCEPT FOR THE RIGHT TO ENFORCE THE PLAN, ALL PERSONS WHO (I) ARE DEEMED TO HAVE VOTED TO ACCEPT THE PLAN UNDER SECTION 1126(F) OF THE BANKRUPTCY CODE; OR (II) ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN AND MARK THEIR BALLOTS AS OPTING-IN TO THE RELEASES GRANTED UNDER SECTION 12.4 OF THE PLAN, WILL, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, BE DEEMED TO**

**FOREVER RELEASE, WAIVE AND DISCHARGE THE RELEASED PARTIES OF AND FROM ALL LIENS, CLAIMS, CAUSES OF ACTION, LIABILITIES, ENCUMBRANCES, SECURITY INTERESTS, INTERESTS OR CHARGES OF ANY NATURE OR DESCRIPTION WHATSOEVER RELATING TO THE DEBTORS, THE CHAPTER 11 CASES OR AFFECTING PROPERTY OF THE ESTATES, WHETHER KNOWN OR UNKNOWN, SUSPECTED OR UNSUSPECTED, SCHEDULED OR UNSCHEDULED, CONTINGENT OR NOT CONTINGENT, UNLIQUIDATED OR FIXED, ADMITTED OR DISPUTED, MATURED OR UNMATURED, SENIOR OR SUBORDINATED, WHETHER ASSERTABLE DIRECTLY OR DERIVATIVELY BY, THROUGH, OR RELATED TO ANY OF THE RELEASED PARTIES AND THEIR SUCCESSORS AND ASSIGNS WHETHER AT LAW, IN EQUITY OR OTHERWISE, BASED UPON ANY CONDITION, EVENT, ACT, OMISSION OCCURRENCE, TRANSACTION OR OTHER ACTIVITY, INACTIVITY, INSTRUMENT OR OTHER AGREEMENT OF ANY KIND OR NATURE OCCURRING, ARISING OR EXISTING PRIOR TO THE EFFECTIVE DATE IN ANY WAY RELATING TO OR ARISING OUT OF, IN WHOLE OR IN PART, THE DEBTORS, THE CHAPTER 11 CASES, THE PURSUIT OF CONFIRMATION OF THE PLAN, THE CONSUMMATION OF THE PLAN OR THE ADMINISTRATION OF THE PLAN, INCLUDING WITHOUT LIMITATION, THE NEGOTIATION AND SOLICITATION OF THE PLAN, ALL REGARDLESS OF WHETHER (A) A PROOF OF CLAIM OR EQUITY INTEREST HAS BEEN FILED OR IS DEEMED TO HAVE BEEN FILED, (B) SUCH CLAIM OR EQUITY INTEREST IS ALLOWED OR (C) THE HOLDER OF SUCH CLAIM OR EQUITY INTEREST HAS VOTED TO ACCEPT OR REJECT THE PLAN, EXCEPT FOR WILLFUL MISCONDUCT OR GROSS NEGLIGENCE. FOR THE AVOIDANCE OF DOUBT, NOTHING CONTAINED IN THE PLAN WILL IMPACT THE RIGHT OF ANY HOLDER OF AN ALLOWED CLAIM TO RECEIVE A DISTRIBUTION ON ACCOUNT OF ITS ALLOWED CLAIM IN ACCORDANCE WITH SECTION 4 OF THE PLAN.**

     5.      **Exculpation**

None of the Exculpated Parties will have or incur any liability to any Holder of a Claim or Equity Interest, or other party in interest, or any of their respective members, officers, directors, employees, advisors, professionals, attorneys or agents, or any of their successors and assigns, with respect to any Exculpated Claim, including, without limitation, any act or omission in connection with, related to, or arising out of, in whole or in part, the Chapter 11 Cases, except for their willful misconduct or gross negligence as determined by a Final Order of a court of competent jurisdiction.

     6.      **Injunction**

**FROM AND AFTER THE EFFECTIVE DATE, ALL PERSONS WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS AGAINST OR EQUITY INTEREST IN THE DEBTORS ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY CAUSE OF ACTION RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER.**

FROM AND AFTER THE EFFECTIVE DATE, TO THE EXTENT OF THE RELEASES AND EXCULPATION GRANTED IN THE PLAN, THE RELEASING PARTIES WILL BE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE RELEASED PARTIES AND THE EXCULPATED PARTIES AND THEIR ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, ACTION OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST, OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, THE PLAN SUPPLEMENT OR RELATED DOCUMENTS, OR FOR OBLIGATIONS PURSUANT TO THE PLAN, ALL PERSONS WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS OR EQUITY INTERESTS THAT HAVE BEEN RELEASED, DISCHARGED, OR ARE SUBJECT TO EXCULPATION, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS:  (A) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR EQUITY INTERESTS; (B) ENFORCING, ATTACHING, COLLECTING OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH PERSONS ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR EQUITY INTERESTS; (C) CREATING, PERFECTING OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH PERSONS OR THE PROPERTY OR ESTATES OF SUCH PERSONS ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR EQUITY INTERESTS; AND (D) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR EQUITY INTERESTS RELEASED, SETTLED OR DISCHARGED PURSUANT TO THE PLAN.

THE RIGHTS AFFORDED IN THE PLAN AND THE TREATMENT OF ALL CLAIMS AND EQUITY INTERESTS THEREUNDER WILL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF ALL CLAIMS AND EQUITY INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, AGAINST THE DEBTORS OR ANY OF THEIR ASSETS, PROPERTY OR ESTATES.  ON THE EFFECTIVE DATE, ALL SUCH CLAIMS AGAINST THE DEBTORS WILL BE FULLY RELEASED, AND THE INTERESTS WILL BE CANCELLED (EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN).

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR IN THE PLAN OR IN OBLIGATIONS PURSUANT THERETO FROM AND AFTER THE EFFECTIVE DATE, ALL CLAIMS AGAINST THE DEBTORS WILL BE FULLY RELEASED, AND ALL INTERESTS WILL BE CANCELLED, AND THE DEBTORS' LIABILITY WITH RESPECT THERETO WILL BE EXTINGUISHED COMPLETELY, INCLUDING ANY

60437/0001-20296303v3

**LIABILITY OF THE KIND SPECIFIED UNDER SECTION 502(G) OF THE BANKRUPTCY CODE.**

**ALL PERSONS WILL BE PRECLUDED FROM ASSERTING AGAINST THE DEBTORS, THE DEBTORS' ESTATES, THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, AND THEIR ASSETS AND PROPERTIES, ANY OTHER CLAIMS OR EQUITY INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS OR ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE.**

7.    **Term of Injunctions or Stays**

Unless otherwise provided in the Plan or Confirmation Order, all injunctions or stays provided for under the Plan and ordered in the Confirmation Order or pursuant to sections 105 or 362 of the Bankruptcy Code arising under or entered during the Chapter 11 Cases, or otherwise, and in existence on the Confirmation Date, will remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay and to the extent consistent with the terms and provisions of the Plan or the Confirmation Order, as applicable.

8.    **Injunction Against Interference with Plan**

Upon the Bankruptcy Court's entry of the Confirmation Order, all Holders of Claims and Equity Interests, the Debtors, and other parties in interest, along with their respective present or former employees, agents, officers, directors, or principals, will be enjoined from taking any actions to interfere with the Debtors', Reorganized Debtors', the Creditors' Trust's, the Trustee's, and their respective affiliates', employees', advisors', officers' and directors', and agents' implementation or consummation of the Plan.

9.    **Effectuating Documents and Further Transactions**

The Debtors or the Reorganized Debtors, as applicable, all Holders of Claims or Equity Interests receiving distributions hereunder and all other Entities will, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.  On or before the Effective Date, the Debtors will file with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

10.    **Preservation of Causes of Action of the Debtors**

In accordance with section 1123(b) of the Bankruptcy Code, and except where such Causes of Action have been expressly released (including, for the avoidance of doubt, pursuant to the releases by the Debtors and exculpation provisions provided in the Plan), the Debtors and Trustee will retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action.

60437/0001-20296303v3

**J.      Modification, Revocation or Withdrawal of the Plan**

**1.      Modification and Amendments**

The Plan or any exhibits thereto may be amended, modified, or supplemented by the Debtors in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code. In addition, after the Confirmation Date, the Debtors, Reorganized Debtors, or Trustee may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes and effects of the Plan.

**2.      Effect of Confirmation on Modifications**

Entry of a Confirmation Order will mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

**3.      Revocation or Withdrawal of the Plan**

The Debtors reserve the right to, consistent with their fiduciary duties, revoke or withdraw the Plan before the Effective Date.  If the Debtors revoke or withdraw the Plan, or if the Confirmation Date does not occur, then:  (a) the Plan will be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Equity Interest or Class of Claims or Equity Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, will be deemed null and void; and (c) nothing contained in the Plan will:  (i) constitute a waiver or release of any Claims or Equity Interests; (ii) prejudice in any manner the rights of the Debtors or any other Person; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Person.

**K.      Retention of Jurisdiction**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court will retain jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan, including, but not limited to, jurisdiction to:

      a)      allow, disallow, determine, liquidate, classify, estimate or establish the priority, secured or unsecured status or amount of any Claim or Equity Interest, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims;

      b)      decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of

expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

c)     resolve any matters related to:  (i) the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which the Debtors are a party or with respect to which the Debtors may be liable in any manner and to hear, determine and, if necessary, liquidate, any Claims arising therefrom, including rejection Claims and cure Claims, pursuant to section 365 of the Bankruptcy Code or any other matter related to such Executory Contract or Unexpired Lease; (ii) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; and (iii) any dispute regarding whether a contract or lease is or was executory or expired;

d)     ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

e)     adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters and any other matters, and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

f)     adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters and any other matters, including, but not limited to, the Causes of Action, involving the Trustee or the Creditors' Trust;

g)     adjudicate, decide, or resolve any and all matters related to any Cause of Action;

h)     adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

i)     enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

j)     issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person with consummation or enforcement of the Plan;

k)     resolve any cases, controversies, suits, disputes or Causes of Action with respect to the discharge, releases, injunctions, exculpations, indemnifications, and other provisions contained in the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

l)     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

m)    resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, the Creditors' Trust, the Creditors' Trust Agreement, any transactions or payments contemplated thereby, or any contract, instrument, release, indenture, or other agreement or document relating to any of the foregoing;

n)    adjudicate any and all disputes arising from or relating to Distributions under the Plan;

o)    consider any modifications of the Plan, cure any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

p)    determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

q)    hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

r)    hear and determine all disputes involving the existence, nature or scope of the Debtors' discharge;

s)    enforce all orders previously entered by the Bankruptcy Court;

t)    hear any other matter not inconsistent with the Bankruptcy Code; and

u)    enter a final decree closing the Chapter 11 Cases.

## L.    Miscellaneous Provisions

### 1.    Payment of Statutory Fees

All fees payable pursuant to 28 U.S.C. § 1930 will be paid on the earlier of when due or the Effective Date by the Debtors.  After the Effective Date, the Trustee will be liable for payment of any such fees until entry of a final decree closing the Chapter 11 Cases.

### 2.    Dissolution of the Committee

On the Effective Date, the Committee and any other statutory committee formed in connection with the Chapter 11 Cases will dissolve automatically and all members thereof will be released and discharged from all rights, duties, and responsibilities arising from, or related to, the Chapter 11 Cases.

### 3.      Section 382 Limitation on Net Operating Losses and Built-In Losses

With respect to the Debtors' net operating losses, the Debtors and the Reorganized Debtors reserve the right to seek the exception set forth in 26 U.S.C. § 382(l)(5).

### 4.      Section 1125(e) Good Faith Compliance

As of and subject to the occurrence of the Confirmation Date, the Debtors and their Related Persons will be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation.

### 5.      Substantial Consummation

On the Effective Date, the Plan will be deemed to be substantially consummated within the meaning set forth in section 1101 and pursuant to section 1127(b) of the Bankruptcy Code.

### 6.      Section 1146 Exemption

To the fullest extent permitted under section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of any security under or pursuant to the Plan, and the execution, delivery, or recording of any instrument of transfer under or pursuant to the Plan, and the revesting, transfer, or sale of any property of or to the Creditors' Trust will not be taxed under any state or local law imposing a stamp tax, transfer tax, or similar tax or fee.  Consistent with the foregoing, each recorder of deeds or similar official for any county, city or other Governmental Unit in which any instrument hereunder is to be recorded in accordance with the Plan will, pursuant to the Confirmation Order, be ordered and directed to accept such instrument, without requiring the payment of any documentary stamp tax, deed stamps, stamp tax, transfer tax, mortgage recording tax, intangible tax, or similar tax.

### 7.      Closing of the Chapter 11 Cases

Upon the earlier of (i) the date upon which all payments on account of Allowed Administrative Expense Claims and Accrued Professional Compensation Claims have been paid or (ii) sixty (60) days after the Effective Date, the Reorganized Debtors will seek authority from the Bankruptcy Court to close the Chapter 11 Cases in accordance with the Bankruptcy Code and Bankruptcy Rules.

### 8.      Plan Supplement

Any exhibits or schedules not filed with the Plan may be contained in the Plan Supplement, if any, and the Debtors hereby reserve the right to file such exhibits or schedules as a Plan Supplement.

9.      **Further Assurances**

The Debtors, Reorganized Debtors, or the Trustee may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors, Reorganized Debtors, the Trustee, and all Holders of Claims receiving Distributions pursuant to the Plan and all other parties in interest will, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

10.      **Exhibits Incorporated**

All exhibits to the Plan, including the Plan Supplement, are incorporated into and are part of the Plan as if fully set forth in the Plan.

11.      **Inconsistency**

In the event of any inconsistency among the Plan, the Disclosure Statement, and any exhibit to the Disclosure Statement, the provisions of the Plan will govern.

12.      **No Admissions**

If the Effective Date does not occur, the Plan will be null and void in all respects, and nothing contained in the Plan will (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtors, (b) prejudice in any manner the rights of the Debtors or any other party in interest, or (c) constitute an admission of any sort by the Debtors or other party in interest.

13.      **Reservation of Rights**

Except as expressly set forth in the Plan, the Plan will have no force or effect unless the Bankruptcy Court will enter the Confirmation Order and the Effective Date has occurred.  None of the Plan, any statement or provision contained in the Plan or any action taken or not taken by the Debtors with respect to the Plan, the Disclosure Statement or the Plan Supplement will be or will be deemed to be an admission or waiver of any rights of the Debtors with respect to the Holders of Claims or Equity Interests before the Effective Date.

14.      **Successors and Assigns**

The rights, benefits, and obligations of any Person named or referred to in the Plan will be binding on, and will inure to the benefit of, any heir, executor, administrator, successor or assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiaries or guardian, if any, of each Person.

60437/0001-20296303v3

15.    **Entire Agreement**

On the Effective Date, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

16.    **Notices**

All notices, requests, and demands to or upon the Debtors in the Chapter 11 Cases will be in writing and, unless otherwise provided in the Plan, will be deemed to have been duly given or made when actually delivered or, if by facsimile transmission, when received and telephonically confirmed to the recipients set forth in Section 15.16 of the Plan.

All notices and requests to Persons holding any Claim or Equity Interest in any Class will be sent to them at their last known address or to the last known address of their attorney of record in the Chapter 11 Cases.  Any such Holder of a Claim or Equity Interest may designate in writing any other address for purposes of Section 15.16 of the Plan, which designation will be effective upon receipt by the Debtors.

17.    **Severability**

If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision, and such term or provision will then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

18.    **Governing Law**

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Delaware, without giving effect to the principles of conflicts of laws, will govern the rights, obligations, construction, and implementation of the Plan and the transactions consummated or to be consummated in connection therewith.

19.    **Request for Confirmation**

The Debtors request entry of the Confirmation Order under section 1129(a) of the Bankruptcy Code and, to the extent necessary, section 1129(b) of the Bankruptcy Code.

## ARTICLE V

## VOTING REQUIREMENTS;
## ACCEPTANCE AND CONFIRMATION OF THE PLAN

### A.      General

The Bankruptcy Code requires that, in order to confirm the Plan, the Bankruptcy Court must make a series of findings concerning the Plan and the Debtors, including that (i) the Plan has classified Claims and Equity Interests in a permissible manner; (ii) the Plan complies with applicable provisions of the Bankruptcy Code; (iii) the Plan has been proposed in good faith and not by any means forbidden by law; (iv) the disclosure required by section 1125 of the Bankruptcy Code has been made; (v) the Plan has been accepted by the requisite votes of Holders of Claims (except to the extent that cramdown is available under section 1129(b) of the Bankruptcy Code) and Interests; (vi) the Plan is feasible and Confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors unless such liquidation or reorganization is proposed in the Plan; (vii) the Plan is in the "best interests" of all Holders of Claims in an Impaired Class by providing to such Holders on account of their Claims property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holders would receive or retain in a chapter 7 liquidation, unless each Holder of a Claim in such Class has accepted the Plan; and (viii) all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of such fees on the Effective Date.

### B.      Parties in Interest Entitled to Vote

Pursuant to the Bankruptcy Code, only Classes of Claims and Equity Interests that are "impaired" (as defined in section 1124 of the Bankruptcy Code) under the Plan are entitled to vote to accept or reject the Plan.  A Class is Impaired if the legal, equitable or contractual rights to which the Claims or Equity Interests of that Class entitle the Holders of such Claims or Equity Interests are modified, other than by curing defaults and reinstating the Claims or Equity Interests.  Classes that are not Impaired are not entitled to vote on the Plan and are conclusively presumed to have accepted the Plan.  In addition, Classes that receive no Distributions under the Plan are not entitled to vote on the Plan and are deemed to have rejected the Plan.

### C.      Classes Impaired and Entitled to Vote under the Plan

Holders of Claims in Classes 3 and 4 are Impaired under the Plan and entitled to vote thereon.

### D.      Voting Procedures and Requirements

### 1.      Ballots

The Solicitation Procedures Order sets May 6, 2020 as the record date for voting on the Plan (the "***Record Date***").  Accordingly, only Holders of record as of the Record Date that are otherwise entitled to vote under the Plan will receive a Ballot and may vote on the Plan.

In voting for or against the Plan, please use only the Ballot sent to you with this Disclosure Statement.  If you are a Holder of a Claim in Class 3 or 4 and did not receive a Ballot, your Ballot is damaged or lost or you have any questions concerning voting procedures, please contact the Voting Agent at (866) 897-6433 (U.S., and Canada, toll free), (646) 282-2500 (International) or at hygeatabulation@epiqglobal.com.

> **2.      Returning Ballots**

If you are entitled to vote to accept or reject the Plan, you should read carefully, complete, sign and return your Ballot, with original signature, in the enclosed envelope.

> **To be counted, your Ballot with your original signature indicating your acceptance or rejection of the Plan must be received no later than the Voting Deadline**.

> **3.      Voting**

Pursuant to section 105(a) of the Bankruptcy Code, Bankruptcy Rules 2002(a)(7) and 3003(c)(2) and the Bar Date Order, any Creditors whose Claims (a) are Scheduled in the Debtors' Schedules as Disputed, Contingent or unliquidated and which are not the subject of a timely-Filed Proof of Claim, or a Proof of Claim deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any order of the Bankruptcy Court, or otherwise deemed timely Filed under applicable law; or (b) are not Scheduled and are not the subject of a timely-Filed Proof of Claim, or a Proof of Claim deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any order of the Bankruptcy Court, or otherwise deemed timely Filed under applicable law, will be denied treatment as Creditors with respect to such Claims for purposes of (a) voting on the Plan, (b) receiving Distributions under the Plan and (c) receiving notices, other than by publication, regarding the Plan.

For purposes of voting, the amount of a Claim used to calculate acceptance or rejection of the Plan under section 1126 of the Bankruptcy Code will be determined in accordance with the following hierarchy:

> a.      if an order has been entered by the Bankruptcy Court determining the amount of such Claim, whether pursuant to Bankruptcy Rule 3018 or otherwise, then in the amount prescribed by the order;

> b.      if no such order has been entered, then in the liquidated amount contained in a timely-Filed Proof of Claim that is not the subject of an objection as of the Claims Objection Deadline (as defined in the Solicitation Procedures Order); and

> c.      if no such Proof of Claim has been timely Filed, then in the liquidated, noncontingent and undisputed amount contained in the Debtors' Schedules.

For purposes of voting, the following conditions will apply to determine the amount and/or classification of a Claim:

a.      if a Claim is partially liquidated and partially unliquidated, such Claim will be allowed for voting purposes only in the liquidated amount;

b.      if a Scheduled or Filed Claim has been paid, such Claim will be disallowed for voting purposes; and

c.      the Holder of a timely-Filed Proof of Claim that is filed in a wholly unliquidated, Contingent, Disputed and/or unknown amount, and is not the subject of an objection as of the Claims Objection Deadline (as defined in the Solicitation Procedures Order), is entitled to vote in the amount of $1.00.

Pursuant to the Solicitation Procedures Order, the deadline for filing and serving motions pursuant to Bankruptcy Rule 3018(a) seeking temporary allowance of claims for the purpose of accepting or rejecting the Plan will be May 27, 2020 at 4:00 a.m. (Eastern Time) (the "***Rule 3018(a) Motion Deadline***").

**E.      Acceptance of Plan**

As a condition to confirmation of a plan, the Bankruptcy Code requires that each class of impaired claims vote to accept the plan, except under certain circumstances.  See "Confirmation Without Necessary Acceptances; Cramdown" below.  A plan is accepted by an impaired class of claims if holders of at least two-thirds in dollar amount and more than one-half in number of claims of those that vote in such class vote to accept the plan.  A plan is accepted by an impaired class of interests if holders of at least two-thirds in amount of interests of those that vote in such class vote to accept the plan.  Only those holders of claims and equity interests who actually vote count in these tabulations.  Holders of claims and equity interests who fail to vote are not counted as either accepting or rejecting a plan.

In addition to this voting requirement, section 1129 of the Bankruptcy Code requires that a plan be accepted by each holder of a claim or equity interest in an impaired class or that the plan otherwise be found by a court to be in the best interests of each holder of a claim or equity interest in such class.  See "Best Interests Test" below.  Moreover, each impaired class must accept the plan for the plan to be confirmed without application of the "fair and equitable" and "unfair discrimination" tests set forth in section 1129(b) of the Bankruptcy Code discussed below.  See "Confirmation Without Necessary Acceptances; Cramdown" below.

**F.      Confirmation Without Necessary Acceptances; Cramdown**

In the event that any impaired class of claims or equity interests does not accept a plan, a debtor nevertheless may move for confirmation of the plan.  A plan may be confirmed, even if it is not accepted by all impaired classes, if the plan has been accepted by at least one impaired class of claims, and the plan meets the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code.  Section 1129(b) of the Bankruptcy Code requires that a court find that a plan (i) "does not discriminate unfairly" and (ii) is "fair and equitable," with respect to each non-accepting impaired class of claims or equity interests.

Here, because Classes 5 and 6 are deemed to reject the Plan, the Debtors will seek Confirmation of the Plan from the Bankruptcy Court by satisfying the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. The Debtors believe that such requirements are satisfied as no Claim or Equity Interest Holder junior to those in Classes 5 or 6 will receive any property under the Plan.

### 1.    No Unfair Discrimination

A plan "does not discriminate unfairly" if (a) the legal rights of a nonaccepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are similar to those of the nonaccepting class, and (b) no class receives payments in excess of that which it is legally entitled to receive for its claims or equity interests. The Debtors believe that under the Plan all Impaired Classes of Claims and Equity Interests are treated in a manner that is consistent with the treatment of other Classes of Claims and Equity Interests that are similarly situated, if any, and no Class of Claims or Equity Interests will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims or Allowed Interests in such Class. Accordingly, the Debtors believe the Plan does not discriminate unfairly as to any Impaired Class of Claims or Equity Interests.

### 2.    Fair and Equitable Test

With respect to a dissenting class of claims or equity interests, the "fair and equitable" standard requires that a plan provide that either the claims or equity interests in each class received everything to which they are legally entitled or that classes junior in priority to the class receive nothing. The strict requirement of the allocation of full value to dissenting classes before any junior class can receive distribution is known as the "absolute priority rule."

The Bankruptcy Code establishes different "fair and equitable" tests for holders of secured claims, unsecured claims and equity interests, which may be summarized as follows:

a.    Secured Claims. Either (i) each holder of a claim in an impaired class of secured claims retains its liens securing its secured claim and it receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim; (ii) each holder of a claim in an impaired class of secured claims realizes the indubitable equivalent of its allowed secured claim; or (iii) the property securing the claim is sold free and clear of liens, with such liens to attach to the proceeds and the treatment of such liens on proceeds as provided in clause (i) or (ii) of this subparagraph.

b.    Unsecured Claims. Either (i) each holder of a claim in an impaired class of unsecured claims receives or retains under the plan property of a value equal to the amount of its allowed claim; or (ii) the holders of claims and equity interests that are junior to the claims of the dissenting class will not receive any property under the chapter 11 plan, subject to the applicability of the judicial doctrine of contributing new value.

c.    Equity Interests. Either (i) each holder of an equity interest in an impaired class of interests will receive or retain under the chapter 11 plan property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such stock or (b) the value of the stock; or (ii) the holders of interests that are junior to the stock will not receive any

property under the chapter 11 plan, subject to the applicability of the judicial doctrine of contributing new value.

As discussed above, the Debtors believe that the Distributions provided under the Plan satisfy the absolute priority rule.

## ARTICLE VI

## FEASIBILITY AND BEST INTERESTS OF CREDITORS

### A.    Best Interests Test

Before the Plan may be confirmed, the Bankruptcy Court must find the Plan provides, with respect to each Impaired Class, that each Holder of a Claim in such Class either (i) has accepted the Plan or (ii) will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount such Holder would receive or retain if the Debtors liquidated under chapter 7 of the Bankruptcy Code.

Under the Plan, Classes 3, 4, 5 and 6 are Impaired.  Classes 5 and 6 will not receive or retain any property under either the Plan or in a chapter 7 liquidation.  Classes 3 and 4 are Impaired, but are projected to receive a Distribution under the Plan.  To the extent that Class 3 or 4 does not vote in favor of the Plan, the Holders in such Classes must receive at least as much value under the Plan as they would in a chapter 7 liquidation in order for the Plan to be confirmable by the Bankruptcy Court.  As a result of the Global Settlement Term Sheet, the Debtors anticipate that Class 3 will vote in favor of the Plan.  Although the Debtors anticipate that most Holders of Class 4 Claims also will vote in favor of the Plan, it is doubtful that every such Holder will do so.  As such, in order to confirm the Plan, the Debtors must establish that the Claim Holders in Class 4 will receive at least as much value under the Plan as they would in a chapter 7 liquidation.

A comparison of the relative recoveries to Holders of General Unsecured Claims under the Plan and in a chapter 7 liquidation is attached hereto as <u>Exhibit B</u>.  For the reasons set forth on <u>Exhibit B</u> hereto, the Debtors believe that Holders of Claims in Class 4 will receive or retain under the Plan property of a value, as of the Effective Date, that is greater than the amount that such Holders would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  Moreover, the failure to confirm the Plan likely would lead to material delays in Distributions to Classes 3 and 4, further reducing the effective recoveries to Holders in such Classes.

### B.    Feasibility

In connection with confirmation of the Plan, the Bankruptcy Court will be required to determine that the Plan is feasible pursuant to section 1129(a)(11) of the Bankruptcy Code, which means that the confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors.

To support their belief in the feasibility of the Plan, the Debtors have relied upon the financial projections that are annexed to this Disclosure Statement as Exhibit C (the "***Financial Projections***").

The Financial Projections indicate that the Reorganized Debtors should have sufficient cash flow to pay and service their debt obligations and to fund their operations after the Effective Date. Accordingly, the Debtors believe that the Plan complies with the financial feasibility standard of section 1129(a)(11) of the Bankruptcy Code.

The Financial Projections are based on numerous assumptions, including Confirmation of the Plan in accordance with its terms, the occurrence of the Effective Date such that the Plan will have become fully consummated ("***Consummation***"), realization of the operating strategy of Reorganized Debtors, no material adverse changes in applicable legislation or regulations, or the administration thereof, or generally accepted accounting principles, no material adverse changes in general business and economic conditions, no material adverse changes in competition, the Reorganized Debtors' retention of certain key physicians, the absence of material contingent or unliquidated litigation, indemnity or other claims, and other matters, many of which will be beyond the control of the Reorganized Debtors and some or all of which may not materialize.

To the extent that the assumptions inherent in the Financial Projections are based upon future business decisions and objectives, they are subject to change. In addition, although they are presented with numerical specificity and are based on assumptions considered reasonable by the Debtors, the assumptions and estimates underlying the Financial Projections are subject to significant business and economic uncertainties and contingencies, many of which will be beyond the control of the Reorganized Debtors. Accordingly, the Financial Projections are only estimates and are necessarily speculative in nature. It can be expected that some or all of the assumptions in the Financial Projections will not be realized and that actual results will vary from the Financial Projections, which variations may be material and are likely to increase over time. In light of the foregoing, readers are cautioned not to place undue reliance on the Financial Projections. The Financial Projections were not prepared in accordance with standards for projections promulgated by the American Institute of Certified Public Accountants or with a view to compliance with published guidelines of the SEC regarding projections or forecasts. The Financial Projections have not been audited, reviewed or compiled by the Debtors' independent public accountants. The projected financial information contained in this Disclosure Statement should not be regarded as a representation or warranty by the Debtors, the Debtors' advisors or any other Person that the Financial Projections can or will be achieved.

The Financial Projections should be read together with the information in Article VIII of this Disclosure Statement entitled "Certain Risk Factors to be Considered," which sets forth important factors that could cause actual results to differ from those in the Financial Projections.

The Debtors do not intend to update or otherwise revise the Financial Projections, including any revisions to reflect events or circumstances existing or arising after the date of this Disclosure Statement or to reflect the occurrence of unanticipated events, even if any or all of the underlying assumptions do not come to fruition. Further, the Debtors do not intend to update or revise the Financial Projections to reflect changes in general economic or industry conditions.

## ARTICLE VII

## EFFECT OF CONFIRMATION

### A.    Binding Effect of Confirmation

Confirmation will bind the Debtors and all Holders of Claims and Equity Interests to the provisions of the Plan, whether or not the Claim or Equity Interest of any such Holder is Impaired under the Plan and whether or not any such Holder of a Claim or Equity Interest has accepted the Plan.

### B.    Good Faith

Confirmation of the Plan will constitute a finding that: (i) the Plan has been proposed in good faith and in compliance with applicable provisions of the Bankruptcy Code; and (ii) all solicitations of acceptances or rejections of the Plan have been in good faith and in compliance with applicable provisions of the Bankruptcy Code.

## ARTICLE VIII

## CERTAIN RISK FACTORS TO BE CONSIDERED

**The Plan and its implementation are subject to certain risks, including, but not limited to, the risk factors set forth below.  Holders of Claims who are entitled to vote on the Plan should read and carefully consider the risk factors, as well as the other information set forth in this Disclosure Statement and the Plan, before deciding whether to vote to accept or reject the Plan.**

### A.    Plan May Not Be Accepted

There can be no assurance that the requisite acceptances to confirm the Plan will be obtained.  Thus, while the Debtors believe the Plan is confirmable under the standards set forth in section 1129 of the Bankruptcy Code, there is no guarantee that the Plan will be accepted by the requisite Classes entitled to vote on the Plan.

### B.    Certain Bankruptcy Law Considerations

Even if the Holders of Claims who are entitled to vote accept the Plan, the Bankruptcy Court, which may exercise substantial discretion as a court of equity, may choose not to confirm the Plan.  Section 1129 of the Bankruptcy Code requires, among other things, a showing that confirmation of the Plan will not be followed by the liquidation or the need for further financial reorganization of the Debtors, and that the value of Distributions to dissenting Holders of Claims or Equity Interests may not be less than the value such Holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  Although the Debtors believe the Plan meets such requirements, there can be no assurance the Bankruptcy Court will reach the same conclusion.

C.      **Distributions to Holders of Allowed Claims Under the Plan**

On the Effective Date, each Holder of an Allowed General Unsecured Claim will, by operation of the Plan, receive its Pro Rata share of the Creditors' Trust Distributable Assets.  A substantial amount of time may elapse between the Effective Date and the receipt of Distributions because of the time required to achieve final resolution of Disputed Claims. Moreover, although the Debtors have made a good faith estimate of projected recoveries to holders of Allowed General Unsecured Claims under the Plan, such recoveries will be less than projected if, among other things, (i) the aggregate amount of General Unsecured Claims asserted against the Debtors which ultimately are Allowed exceeds the estimated amount of such Claims or (ii) the recoveries from the litigation of Causes of Action are less than estimated by the Debtors and the Committee.

D.      **Conditions Precedent to Consummation of the Plan**

The Plan provides for certain conditions that must be satisfied (or waived) prior to Consummation of the Plan.  As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions to Consummation of the Plan will be satisfied (or waived).  Accordingly, there can be no assurance that the Plan, even if confirmed by the Bankruptcy Court, will be consummated.

E.      **Certain Tax Considerations**

There are a number of material income tax considerations, risks and uncertainties associated with Consummation of the Plan.  Holders of Claims voting on the Plan should read carefully the discussion of certain federal income tax consequences of the Plan set forth below.

**ARTICLE IX**

**CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**

The following discussion is a summary of certain United States federal income tax consequences of the Plan to the Holders of General Unsecured Claims.[5]  This discussion is based on the Internal Revenue Code of 1986, as amended (the "**Tax Code**"), Treasury Regulations promulgated and proposed thereunder, judicial decisions and published administrative rules and pronouncements of the Internal Revenue Service ("**IRS**"), all as in effect on the date hereof.

Due to the complexity of certain aspects of the Plan, the lack of applicable legal precedent, the possibility of changes in the law, the differences in the nature of the Claims, each Holder's status and method of accounting and the potential for disputes as to legal and factual matters with the IRS, the tax consequences described herein are uncertain.  No legal opinions have been requested from counsel with respect to any of the tax aspects of the Plan and no

---

[5]  Because certain of the Debtors are "pass through" entities for taxation purposes, the Plan does not have tax consequences for those Debtors themselves.  Moreover, while the Plan will have tax consequences for the Holders of Class 3 Claims, the Holders of such Claims are sophisticated commercial entities that were able to evaluate such tax consequences prior to entering into the RSA.

rulings have been or will be requested from the IRS with respect to the any of the issues discussed below.  Further, legislative, judicial or administrative changes may occur, perhaps with retroactive effect, which could affect the accuracy of the statements and conclusions set forth below as well as the tax consequences to the Debtors and the Holders of General Unsecured Claims.

This discussion does not purport to address all aspects of United States federal income taxation that may be relevant to the Debtors or the Holders of General Unsecured Claims in light of their personal circumstances, nor does the discussion deal with tax issues with respect to taxpayers subject to special treatment under the United States federal income tax laws (including, for example, insurance companies, financial institutions, real estate investment trusts, tax-exempt organizations, small business investment companies, regulated investment companies, a holder of a Claim that is not a "United States person," as such term is defined in the Tax Code, persons whose functional currency is not the United States dollar, persons subject to the alternative minimum tax, persons holding Claims or Equity Interests as part of a "straddle," "hedge," "constructive sale" or "conversion transaction" with other investments), and entities treated as partnerships for United States federal income tax purposes or beneficial owners of such entities. This discussion does not address the tax consequences to Holders of General Unsecured Claims who did not acquire such Claims at the issue price on original issue.  No aspect of foreign, state, local or estate and gift taxation is addressed.

This discussion does not address the United States federal income tax consequences to Holders of General Unsecured Claims who (a) are Unimpaired or otherwise entitled to payment in full in Cash on the Effective Date under the Plan or (b) are otherwise not entitled to vote under the Plan.  Moreover, the discussion assumes that the various debt and other arrangements to which the Debtors and Reorganized Debtors are or will be parties will be respected for United States federal income tax purposes in accordance with their form.

Each Holder of a General Unsecured Claim is urged to consult with such Holder's tax advisors concerning the United States federal, state and local, and non-United States and other tax consequences of the Plan.

### A.      Tax Consequences to Creditors

#### 1.      Holders of Claims

Generally, a Holder of a Claim should in most, but not all circumstances, recognize gain or loss equal to the difference between the "amount realized" by such Holder in exchange for its Claim and such Holder's adjusted tax basis in the Claim.  The "amount realized" is equal to the sum of the cash and the fair market value of any other consideration received under a plan of reorganization in respect of a Holder's Claim.  The tax basis of a Holder in a Claim will generally be equal to the Holder's cost.  To the extent applicable, the character of any recognized gain or loss (*e.g.*, ordinary income, or short-term or long-term capital gain or loss) will depend upon the status of the Holder, the nature of the Claim in the Holder's hands, the purpose and circumstances of its acquisition, the Holder's holding period of the Claim, and the extent to which the Holder previously claimed a deduction for the worthlessness of all or a portion of the Claim.  Generally, if the Claim is a capital asset in the Holder's hands, any gain or loss realized

generally will be characterized as capital gain or loss, and will constitute long-term capital gain or loss if the Holder has held such Claim for more than one year.

A Holder who received Cash (or other consideration) in satisfaction of its Claims may recognize ordinary income or loss to the extent that any portion of such consideration is characterized as accrued interest.  A Holder who did not previously include in income accrued but unpaid interest attributable to its Claim, and who receives a distribution on account of its Claim pursuant to the Plan, will be treated as having received interest income to the extent that any consideration received is characterized for United States federal income tax purposes as interest, regardless of whether such Holder realizes an overall gain or loss as a result of surrendering its Claim.  A Holder who previously included in its income accrued but unpaid interest attributable to its Claim should recognize an ordinary loss to the extent that such accrued but unpaid interest is not satisfied, regardless of whether such Holder realizes an overall gain or loss as a result of the distribution it may receive under the Plan on account of its Claim.

### 2.       Non-United States Persons

A Holder of a Claim that is a non-United States Person generally will not be subject to United States federal income tax with respect to property (including money) received in exchange for such Claim pursuant to the Plan, unless (i) such Holder is (or was) engaged in a trade or business in the United States to which income, gain or loss from the exchange is (or was) "effectively connected" for United States federal income tax purposes, or (ii) if such Holder is an individual, such Holder is present in the United States for 183 days or more during the taxable year of the exchange and certain other requirements are met.

### B.       Tax Treatment of the Creditors' Trust

Upon the Effective Date, the Creditors' Trust will be established for the benefit of Holders of Allowed General Unsecured Claims, whether allowed on or after the Effective Date.

### 1.       Classification of the Creditors' Trust

The Creditors' Trust is intended to qualify as a liquidating trust for federal income tax purposes.  In general, a liquidating trust is not a separate taxable entity but rather is treated for federal income tax purposes as a "grantor" trust (*i.e.*, a pass-through entity).  The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan.  The Creditors' Trust has been structured with the intention of complying with such general criteria.  Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including the Trustee and the Holders of beneficial interests in the Creditors' Trust) are required to treat for United States federal income tax purposes the Creditors' Trust as a grantor trust of which the Holders of Allowed General Unsecured Claims are the owners and grantors.  While the following discussion assumes that the Creditors' Trust would be so treated for United States federal income tax purposes, no ruling has been requested from the IRS concerning the tax status of the Creditors' Trust as a grantor trust.  Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Creditors' Trust as a grantor trust.  If the IRS were to

69

challenge successfully such classification, the United States federal income tax consequences to the Creditors' Trust and the Holders of Claims could vary from those discussed herein.

## 2.    General Tax Reporting by the Trust and Beneficiaries

For all United States federal income tax purposes, all parties (including the Trustee and the Holders of beneficial interests in the Creditors' Trust) will be required to treat the transfer of assets to the Creditors' Trust, in accordance with the terms of the Plan, as a transfer of those assets directly to the Holders of Allowed General Unsecured Claims followed by the transfer of such assets by such Holders to the Creditors' Trust. Consistent therewith, all parties are required to treat the Creditors' Trust as a grantor trust of which such Holders are to be owners and grantors. Thus, such Holders (and any subsequent Holders of interests in the Creditors' Trust) will be treated as the direct owners of an undivided beneficial interest in the assets of the Creditors' Trust for all federal income tax purposes. Accordingly, each Holder of a beneficial interest in the Creditors' Trust will be required to report on its federal income tax return(s) the Holder's allocable share of all income, gain, loss, deduction or credit recognized or incurred by the Creditors' Trust.

The United States federal income tax reporting obligation of a Holder of a beneficial interest in the Creditors' Trust is not dependent upon the Creditors' Trust distributing any cash or other proceeds. Therefore, a Holder of a beneficial interest in the Creditors' Trust may incur a United States federal income tax liability regardless of the fact that the Creditors' Trust has not made, or will not make, any concurrent or subsequent distributions to the Holder. If a Holder incurs a federal tax liability but does not receive distributions commensurate with the taxable income allocated to it in respect of its beneficial interests in the Creditors' Trust it holds, the Holder may be allowed a subsequent or offsetting loss.

The Trustee will file tax returns with the IRS for the Trust as a grantor trust pursuant to Treasury Regulations section 1.671-4(a). The Trustee will also send to each Holder of a beneficial interest in the Creditors' Trust a separate statement setting forth the Holder's share of items of income, gain, loss, deduction or credit and will instruct the Holder to report such items on its federal income tax return.

All payments to Creditors are subject to any applicable withholding (including employment tax withholding). Under the Tax Code, interest, dividends and other reportable payments may, under certain circumstances, be subject to "backup withholding" then in effect. Backup withholding generally applies if the Holder (a) fails to furnish his or her social security number or other taxpayer identification number ("*TIN*"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is his correct number and that he is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax if an appropriate refund claim is filed with the IRS. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

### 3.    Allocations of Taxable Income and Loss

Allocations of taxable income of the Creditors' Trust among Holders of Claims will be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed Distribution, the Creditors' Trust had distributed all of its respective assets to the Holders of the beneficial interests in the Creditors' Trust, adjusted for prior taxable income and loss and taking into account all prior and concurrent Distributions from the Creditors' Trust. Similarly, taxable loss of the Creditors' Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining Creditors' Trust assets.

After the Effective Date, any amount a Holder receives as a Distribution from the Creditors' Trust in respect of its beneficial interest in the Creditors' Trust should not be included, for United States federal income tax purposes, in the Holder's amount realized in respect of its Allowed Claim but should be separately treated as a Distribution received in respect of such Holder's beneficial interest in the Creditors' Trust.

In general, a Holder's aggregate tax basis in its undivided beneficial interest in the assets transferred to the Creditors' Trust will equal the fair market value of such undivided beneficial interest as of the Effective Date and the Holder's holding period in such assets will begin the day following the Effective Date. Distributions to any Holder of an Allowed Claim will be allocated first to the original principal portion of such Claim as determined for United States federal income tax purposes, and then, to the extent the consideration exceeds such amount, to the remainder of such Claim. However, there is no assurance that the IRS will respect such allocation for United States federal income tax purposes.

The tax book value of the Creditors' Trust assets for this purpose will equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the Tax Code, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements. Uncertainties with regard to United States federal income tax consequences of the Plan may arise due to the inherent nature of estimates of value that will impact tax liability determinations.

As soon as practicable after the Effective Date, the Trustee (to the extent that it deems it necessary or appropriate in the reasonable exercise of its discretion) will, in good faith, value the Creditors' Trust Assets, and, as appropriate, will apprise the Holders of beneficial interests in the Creditors' Trust of such valuation. The valuation is required to be used consistently by all parties (including the Debtors, the Reorganized Debtors, the Trustee and the Holders) for all United States federal income tax purposes. The Bankruptcy Court will resolve any dispute regarding the valuation of the Assets. No valuation will be deemed an admission or be admissible in any Cause of Action.

The Creditors' Trust's taxable income will be allocated to the Holders of beneficial interests in the Creditors' Trust in accordance with each such Holder's Pro Rata share of the Creditors' Trust's interests. The character of items of income, deduction and credit to any

Holder and the ability of such Holder to benefit from any deductions or losses may depend on the particular situation of such Holder.

Events subsequent to the date of this Disclosure Statement, such as the enactment of additional tax legislation, could also change the United States federal income tax consequences of the Plan and the transactions contemplated thereunder.

C.      **Importance of Obtaining Professional Tax Assistance**

**The foregoing discussion is intended only as a summary of certain United States federal income tax consequences of the Plan.  The above discussion is for informational purposes only and is not tax advice.  The tax consequences are in many cases uncertain and may vary depending on a Holder's particular circumstances.  Accordingly, Holders are urged to consult their own tax advisors about the United States federal, state and local, and applicable non-United States income and other tax consequences of the Plan**.

*[Remainder of Page Intentionally Left Blank]*

## ARTICLE X

## RECOMMENDATION AND CONCLUSION

This Disclosure Statement was approved by the Bankruptcy Court after notice and a hearing. The Bankruptcy Court has determined that this Disclosure Statement contains information adequate to permit Holders of Claims to make an informed judgment about the Plan. Such approval, however, does not mean that the Bankruptcy Court recommends either acceptance or rejection of the Plan.

The Debtors believe that confirmation and consummation of the Plan is in the best interests of the Debtors, the Estates and their Creditors. The Plan provides for an equitable distribution to Creditors. The Debtors believe that any alternative to confirmation of the Plan, such as liquidation under chapter 7 of the Bankruptcy Code, could result in significant delay, litigation and additional costs, as well as a material reduction in the Distributions to Holders of Claims in Classes 3 and 4. Consequently, the Debtors urge all eligible Holders of Impaired Claims in Classes 3 and 4 to vote to ACCEPT the Plan, and to complete and return their Ballots so that they will be RECEIVED by the Voting Agent on or before the Voting Deadline.

Dated: Wilmington, Delaware
     May 1, 2020

HYGEA HOLDINGS CORP. ET AL.
Debtors and Debtors-in-Possession

By: _____
    Keith Collins, M.D.
    Authorized Signatory

COLE SCHOTZ P.C.

By: /s/ J. Kate Stickles_____
    J. Kate Stickles (I.D. No. 2917)
    500 Delaware Avenue, Suite 1410
    Wilmington, Delaware 19801
    Telephone: (302) 652-3131
    kstickles@coleschotz.com

    – and –

    Michael D. Sirota
    Stuart Komrower
    Felice R. Yudkin
    Jacob S. Frumkin
    Michael Trentin
    25 Main Street
    Hackensack, New Jersey 07601
    Telephone: (201) 489-3000

    *Counsel for Debtors and*
    *Debtors-in-Possession*

EXHIBIT A TO DISCLOSURE STATEMENT

Plan of Reorganization

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------- x
                         :

In re:                        :     Chapter 11
                         :

HYGEA HOLDINGS CORP., *et al.*,  :     Case No. 20-10361 (KBO)
                         :

        Debtors.[1]       :     (Jointly Administered)
                         :

---------------------------------------------------------- x

## FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF
## HYGEA HOLDINGS CORP. AND ITS AFFILIATED DEBTORS

COLE SCHOTZ, P.C.
J. Kate Stickles (Bar No. 2917)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone: (302) 652-3131
kstickles@coleschotz.com

– and –

Michael D. Sirota
Stuart Komrower
Felice R. Yudkin
Jacob S. Frumkin
Michael Trentin
25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000

*Counsel for the Debtors and
Debtors-in-Possession*

May 1, 2020

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are: All Care Management Services, Inc. (6484); First Harbour Health Management, LLC (0941); First Harbour Medical Centers, LLC (3861); Florida Group Healthcare LLC (7956); Gemini Healthcare Fund, LLC (4928); Hygea Acquisition Longwood, LLC (1649); Hygea Acquisition Orlando, LLC (3507); Hygea Health Holdings, Inc. (8926); Hygea Holdings Corp. (2605); Hygea IGP of Central Florida, Inc. (9453); Hygea IGP, LLC (7724); Hygea Medical Centers of Florida, LLC (5301); Hygea Medical Partners, LLC (4486); Hygea of Delaware, LLC (4830); Hygea of Georgia, LLC (5862); Hygea of Pembroke Pines, LLC (6666); Hygea Primum Acquisition, Inc. (8567); Medlife Activity Center, LLC (2311); Mobile Clinic Services, LLC (9758); Palm A.C. MSO, LLC (2585); Palm Allcare Medicaid MSO, Inc. (6956); Palm Allcare MSO, Inc. (0319); Palm Medical Group, Inc. (5028); Palm Medical MSO LLC (7738); Palm Medical Network, LLC (9158); Palm MSO System, Inc. (2178); Palm PGA MSO, Inc. (8468); Physician Management Associates East Coast, LLC (7319); Physician Management Associates SE, LLC (3883); Physicians Group Alliance, LLC (7824); Primum Alternatives, Inc. (7441); Primum Healthcare, LLC (0157); and Professional Health Choice, Inc. (6850). The address of the Debtors' corporate headquarters is 8700 W Flagler Street, Suite 280, Miami, FL 33174.

60437/0001-20344430v5

# TABLE OF CONTENTS

SECTION 1. DEFINITIONS, RULES OF INTERPRETATION, AND CONSTRUCTION ........1

    1.1    Defined Terms ................................................................................................................1

    1.2    Interpretation, Application of Definitions and Rules of Construction...........................12

    1.3    Computation of Time...................................................................................................13

SECTION 2. ADMINISTRATIVE AND PRIORITY CLAIMS ..................................................13

    2.1    Administrative Expense Claims...................................................................................13

    2.2    Accrued Professional Compensation Claims................................................................14

    2.3    Priority Tax Claims....................................................................................................14

SECTION 3. CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS ...........................15

    3.1    Summary ....................................................................................................................15

SECTION 4. TREATMENT OF CLAIMS AND EQUITY INTERESTS....................................16

    4.1    Other Priority Claims (Class 1)...................................................................................16

    4.2    Other Secured Claims (Class 2)..................................................................................16

    4.3    Bridging's Secured Claim (Class 3) ...........................................................................16

    4.4    General Unsecured Claims (Class 4) ...........................................................................17

    4.5    Subordinated Claims (Class 5)....................................................................................17

    4.6    Equity Interests (Class 6)............................................................................................17

    4.7    Special Provision Governing Unimpaired Claims .......................................................17

    4.8    Discharge of Claims...................................................................................................17

    4.9    Subordinated Claims ..................................................................................................18

    4.10    Elimination of Vacant Classes ..................................................................................18

SECTION 5. ACCEPTANCE OR REJECTION OF THE PLAN ..............................................18

    5.1    Presumed Acceptance of Plan.....................................................................................18

    5.2    Presumed Rejection of Plan ........................................................................................18

    5.3    Voting Class ...............................................................................................................18

    5.4    Acceptance by Impaired Classes of Claims ................................................................18

    5.5    Cramdown ..................................................................................................................19

SECTION 6. MEANS FOR IMPLEMENTATION OF THE PLAN..........................................19

    6.1    General Settlement of Claims .....................................................................................19

    6.2    Corporate Existence ...................................................................................................19

    6.3    Vesting of Assets in the Reorganized Debtors ...........................................................20

    6.4    New Secured Debt .....................................................................................................20

6.5     Sources of Cash for Certain Plan Distributions ................................................21

6.6     Issuance of Reorganized Debtor Equity and Related Documentation ..........................21

6.7     Section 1145 Exemption ................................................22

6.8     Employee Matters and Retiree Benefits ................................................22

6.9     Release of Liens, Claims, and Equity Interests ................................................23

6.10    New Organizational Documents ................................................23

6.11    Resignation of Directors and Officers ................................................23

6.12    Managers and Officers of the Reorganized Debtors ................................................23

6.13    Corporate Action ................................................24

6.14    Cancellation of Agreements, Security Interests, and Other Interests ..........................24

6.15    Dissolved Debtors ................................................25

SECTION 7. CREDITORS' TRUST ................................................25

7.1     Establishment of the Creditors' Trust ................................................25

7.2     Creditors' Trust Funding ................................................25

7.3     Appointment of the Trustee ................................................25

7.4     Beneficiaries of Creditors' Trust ................................................26

7.5     Vesting and Transfer of Creditors' Trust Assets to the Creditors' Trust ......................26

7.6     Retention of Professionals ................................................26

7.7     Creditors' Trust Expenses ................................................26

7.8     Certain Powers and Duties of the Creditors' Trust and Trustee. ..............................27

7.9     Preservation of Right to Conduct Investigations ................................................28

7.10    Prosecution and Resolution of Causes of Action ................................................28

7.11    Federal Income Tax Treatment of the Creditors' Trust ................................................29

7.12    Limitation of Liability ................................................29

7.13    Term of Creditors' Trust ................................................30

7.14    Conflicts Between the Creditors' Trust Agreement and the Plan ................................30

SECTION 8. DISTRIBUTIONS ................................................30

8.1     Distribution Record Date ................................................30

8.2     Timing of Distributions ................................................30

8.3     Disbursing Agent ................................................31

8.4     Rights and Powers of Disbursing Agent ................................................31

8.5     Delivery of Distributions in General ................................................31

8.6     Payments and Distributions on Disputed Claims ................................................31

8.7     Manner of Payment ................................................31

8.8     Undeliverable Distributions and Unclaimed Property ................................................32

8.9     Withholding and Reporting Requirements ...................................................32

8.10    Surrender Instruments .................................................................................32

8.11    Setoffs ........................................................................................................32

8.12    Insurance Claims ........................................................................................33

8.13    Applicability of Insurance Policies ............................................................33

8.14    No Postpetition Interest ..............................................................................33

8.15    Distributions Free and Clear .......................................................................33

8.16    Fractional Dollars; De Minimis Distributions ............................................33

SECTION 9. PROCEDURES FOR DISPUTED CLAIMS ............................................34

9.1     Allowance of Claims and Interests .............................................................34

9.2     Objections to Claims ...................................................................................34

9.3     Estimation of Claims ...................................................................................34

9.4     No Distribution Pending Allowance ...........................................................35

9.5     Distributions after Allowance .....................................................................35

9.6     Preservations of Rights to Settle Claims ....................................................35

9.7     Disallowed Claims ......................................................................................35

SECTION 10. EXECUTORY CONTRACTS AND UNEXPIRED LEASES...................35

10.1    Assumption and Rejection of Executory Contracts and Unexpired Leases ..................35

10.2    Inclusiveness ...............................................................................................36

10.3    Rejection Claims .........................................................................................36

10.4    Cure of Defaults ..........................................................................................36

10.5    Full Release and Satisfaction ......................................................................37

10.6    Reservation of Rights ..................................................................................37

10.7    D&O Liability Insurance Policies ...............................................................37

SECTION 11. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN ............38

11.1    Conditions Precedent to Confirmation........................................................38

11.2    Conditions Precedent to the Effective Date ................................................38

11.3    Waiver of Conditions ..................................................................................39

11.4    Effect of Failure of Conditions ...................................................................39

SECTION 12. EFFECT OF CONFIRMATION .............................................................39

12.1    Immediate Binding Effect............................................................................39

12.2    Compromise and Settlement of Claims, Interests and Controversies...........40

12.3    Releases by the Debtors ..............................................................................40

12.4    Releases by Holders of Claims ...................................................................40

12.5    Exculpation .................................................................................................41

| 12.6 | Injunction | 41 |
| 12.7 | Term of Injunctions or Stays | 43 |
| 12.8 | Injunction Against Interference with Plan | 43 |
| 12.9 | Effectuating Documents and Further Transactions | 43 |
| 12.10 | Preservation of Causes of Action of the Debtors | 43 |

**SECTION 13. MODIFICATION, REVOCATION OR WITHDRAWAL OF THIS PLAN** ....... 44

| 13.1 | Modification and Amendments | 44 |
| 13.2 | Effect of Confirmation on Modifications | 44 |
| 13.3 | Revocation or Withdrawal of this Plan | 44 |

**SECTION 14. RETENTION OF JURISDICTION** ..... 44

**SECTION 15. MISCELLANEOUS PROVISIONS** ..... 46

| 15.1 | Payment of Statutory Fees | 46 |
| 15.2 | Dissolution of the Committee | 46 |
| 15.3 | Section 382 Limitation on Net Operating Losses and Built-In Losses | 46 |
| 15.4 | Section 1125(e) Good Faith Compliance | 46 |
| 15.5 | Substantial Consummation | 47 |
| 15.6 | Section 1146 Exemption | 47 |
| 15.7 | Closing of the Chapter 11 Cases | 47 |
| 15.8 | Plan Supplement | 47 |
| 15.9 | Further Assurances | 47 |
| 15.10 | Exhibits Incorporated | 48 |
| 15.11 | Inconsistency | 48 |
| 15.12 | No Admissions | 48 |
| 15.13 | Reservation of Rights | 48 |
| 15.14 | Successors and Assigns | 48 |
| 15.15 | Entire Agreement | 48 |
| 15.16 | Notices | 48 |
| 15.17 | Severability | 49 |
| 15.18 | Governing Law | 49 |
| 15.19 | Request for Confirmation | 50 |

# INTRODUCTION

Hygea Holdings Corp. and its affiliates and subsidiaries in the above-captioned Chapter 11 Cases, as debtors and debtors-in-possession, hereby propose this first amended joint plan of reorganization for the resolution of outstanding claims against and equity interests in the Debtors. Capitalized terms used in the Plan and not otherwise defined have the meanings ascribed to such terms in section 1.1 of this Plan.

Reference is made to the Disclosure Statement, filed contemporaneously with the Plan, for a discussion of the Debtors' history, businesses, historical financial information, valuation, liquidation analysis, projections, and operations as well as a summary and analysis of the Plan and certain related matters, including distributions to be made under this Plan.

As discussed in greater detail in the Disclosure Statement, this Plan is the result of extensive, arm's length negotiations among the Debtors, Bridging and the Committee and represents a resolution of all issues among them.

## SECTION 1.  DEFINITIONS, RULES OF INTERPRETATION, AND CONSTRUCTION

### 1.1    Defined Terms

For the purpose of the Plan, the following terms set forth in this section 1.1 shall have the respective meanings set forth below.

*"Accrued Professional Compensation Claim"* means, at any date, a Claim for all accrued fees and reimbursable expenses for services rendered by a Professional in the Chapter 11 Cases through and including such date, to the extent that such fees and expenses have not been previously paid whether under a retention order with respect to such Professional or otherwise.  To the extent that there is a Final Order denying some or all of a Professional's fees or expenses, such denied amounts shall no longer be considered an Accrued Professional Compensation Claim.

*"Administrative Expense Claim"* means a Claim for costs and expenses of administration of the Chapter 11 Cases that are Allowed under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including, without limitation:  (a) any actual and necessary costs and expenses incurred on or after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Accrued Professional Compensation Claims and any other compensation for legal, financial, advisory, accounting, and other services and reimbursement of expenses Allowed by the Bankruptcy Court under sections 328, 330, 331 or 503(b) of the Bankruptcy Code to the extent incurred on or after the Petition Date and through the Effective Date; and (c) all fees and charges assessed against the Estates under section 1930, chapter 123, of title 28, United States Code.

*"Administrative Expense Claim Bar Date"* means the first Business Day that is thirty (30) days after the Effective Date or such other date ordered by the Bankruptcy Court.

*"Affiliate"* means, with respect to any Entity, an "affiliate" as defined in section 101(2) of the Bankruptcy Code.

"**Allowed**" means, with reference to any Claim against the Debtors, a Claim (i) as to which no objection or request for estimation has been filed on or before any deadline therefor set by the Bankruptcy Court or the expiration of such other applicable period fixed by the Bankruptcy Court or this Plan; (ii) as to which any objection has been settled, waived, withdrawn, or denied by a Final Order or in accordance with this Plan; or (iii) that is allowed (a) by a Final Order, (b) by an agreement between the Holder of such Claim and the Debtors, Reorganized Debtors or Trustee, or (c) pursuant to the terms of this Plan; *provided, however*, that, notwithstanding anything herein to the contrary, by treating a Claim as "Allowed" under clause (i) above (the expiration of the applicable deadline), neither the Debtors, the Reorganized Debtors nor the Trustee waive their rights to contest the amount and validity of any disputed, contingent, and/or unliquidated Claim in the time, manner and venue in which such Claim would have been determined, resolved, or adjudicated if the Chapter 11 Cases had not been commenced.  An Allowed Claim shall be net of any valid setoff exercised with respect to such Claim pursuant to the provisions of the Bankruptcy Code and applicable law.  Moreover, any portion of a Claim that is satisfied, released, or waived during the Chapter 11 Cases is not an Allowed Claim.  Unless otherwise specified in this Plan, in section 506(b) of the Bankruptcy Code or by Final Order of the Bankruptcy Court, Allowed Claims shall not, for purposes of Distributions under this Plan, include interest on such Claim accruing from and after the Petition Date.

"**Assets**" means all assets of the Debtors of any nature whatsoever, including, without limitation, all property of the Estates pursuant to section 541 of the Bankruptcy Code, Cash (including proceeds from the sale of Assets), Causes of Action, accounts receivable, tax refunds, claims of right, interests and property, real and personal, tangible and intangible, and proceeds from all of the foregoing.

"**Avoidance Actions**" means any and all avoidance, recovery, subordination, or similar actions or remedies that may be brought by and on behalf of the Debtors or their Estates under the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, actions or remedies arising under chapter 5 of the Bankruptcy Code.

"**Ballots**" means the ballots upon which Holders of Impaired Claims entitled to vote on this Plan have indicated their acceptance or rejection of this Plan in accordance with the instructions regarding voting.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time and as applicable to the Chapter 11 Cases.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware, or any other court having original jurisdiction over the Chapter 11 Cases.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure and the Local Rules, in each case as amended from time to time and as applicable to the Chapter 11 Cases.

"**Beneficiaries**" means Holders of Allowed General Unsecured Claims and Deficiency Claims against the Debtors' Estates as beneficiaries of the Creditors' Trust, as defined in the Creditors' Trust Agreement.

2

**"Bridging"** means, collectively, Bridging Finance and Bridging Income Fund.

**"Bridging Finance"** means Bridging Finance Inc., as administrative agent to Bridging Income Fund.

**"Bridging Income Fund"** means Bridging Income Fund LP (formerly known as Sprott Bridging Income Fund LP).

**"Bridging's Deficiency Claim"** means the unsecured Deficiency Claim of Bridging arising under or in connection with the Prepetition Loan Documents which shall be allocated (directly and not as a participation) as follows: (i) 90.86% of Bridging's Deficiency Claim shall be allocated to Bridging or its designee; and (ii) 9.14% of Bridging's Deficiency Claim shall be allocated to Centurion.

**"Bridging's Secured Claim"** means the Secured Claim of Bridging arising under or in connection with the Prepetition Loan Documents which shall be allocated (directly and not as a participation) as follows: (i) 90.86% of Bridging's Deficiency Claim shall be allocated to Bridging or its designee; and (ii) 9.14% of Bridging's Deficiency Claim shall be allocated to Centurion

**"Budget"** shall mean the budget agreed to between the Debtors and the DIP Lender governing the use of cash collateral and funding under the DIP Credit Agreement attached to the DIP Orders.

**"Business Day"** means any day except a Saturday, Sunday, or "legal holiday" as such term is defined in Bankruptcy Rule 9006(a).

**"Cash"** means cash and cash equivalents denominated in U.S. dollars.

**"Causes of Action"** means any claim, cause of action, controversy, demand, agreement, right (including to legal or equitable remedies), action, lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law, asserted or which may be asserted by or on behalf of the Debtors and/or the Estates, including: (a) any right of setoff, counterclaim, or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity; (b) the right to object to Claims or Equity Interests; (c) any Avoidance Action; and (d) any claim or defense including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

**"Centurion"** means Centurion Asset Management Inc., the funds or entities managed or advised by Centurion Asset Management Inc., and 2209021 Ontario Inc. in its capacity as sub-participant of Centurion's interest in the obligations under the Prepetition Loan Documents.

**"Chapter 11 Case(s)"** means (a) when used with reference to a particular Debtor, the case under chapter 11 of the Bankruptcy Code commenced by such Debtor in the Bankruptcy Court,

and (b) when used with reference to all Debtors, the jointly administered chapter 11 cases for all of the Debtors.

*"Claim"* means a "claim," as defined in section 101(5) of the Bankruptcy Code, against a Debtor, whether or not asserted, whether or not the facts or legal bases therefor are known or unknown, and specifically including, without express or implied limitation, any rights under sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, any claim of a derivative nature, any potential or unmatured contract claims, and any other contingent claim.

"*Claims Agent*" means Epiq Corporate Restructuring, LLC, or any successor thereto.

"*Class"* means a category of Claims or Equity Interests set forth in Section 3 of the Plan.

*"Collateral"* means any property or interest in property of the Estates subject to a Lien, charge or other encumbrance to secure the payment or performance of a Claim, which Lien, charge or other encumbrance is not subject to avoidance or otherwise invalid under the Bankruptcy Code or other applicable law.

*"Committee"* means the Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

"*Committee Budget*" shall have the meaning set forth in section 2.2 hereof.

*"Confirmation Date"* means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court in the Chapter 11 Cases.

*"Confirmation Hearing"* means the hearing held by the Bankruptcy Court under section 1128 of the Bankruptcy Code to consider confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

*"Confirmation Order"* means the order of the Bankruptcy Court confirming this Plan under section 1129 of the Bankruptcy Code, including all exhibits, appendices, supplements, and related documents.

*"Contingent Claim"* means any contingent or unliquidated Claim asserted or which may be asserted against the Debtors.

*"Creditor"* means a Holder of a Claim.

*"Creditors' Trust"* means the grantor trust to be created upon the Effective Date for the benefit of the Beneficiaries.

*"Creditors' Trust Agreement"* means the agreement, substantially in the form included in the Plan Supplement, governing the operations of the Creditors' Trust, as it may be subsequently modified from time to time.  The Creditors' Trust Agreement shall be materially consistent with this Plan and acceptable to the Debtors, Bridging and the Committee.

4

**"Creditors' Trust Assets"** means the assets held in the Creditors' Trust comprised of (i) the Creditors' Trust Loan; (ii) the Creditors' Trust Causes of Action, and (iii) all other unencumbered assets of the Debtors' Estates remaining after all required payments have been made pursuant to the Plan, Confirmation Order, and Creditors' Trust Agreement, as applicable.

**"Creditors' Trust Causes of Action"** means (i) Avoidance Actions; (ii) commercial tort claims as defined in Article 9 of the UCC, including, for the avoidance of doubt, direct or derivative claims or causes of action against any and all current and former officers, directors, shareholders, members, mangers, employees, affiliates or insiders of the Debtors, including but not limited to for breach of fiduciary duty or aiding and abetting breach of fiduciary duty, or under and pursuant to any D&O or fiduciary insurance policies (including for bad faith) maintained by the Debtors; (iii) the non-exclusive right to seek a determination by the Bankruptcy Court of any tax, fine or penalty relating to a tax, or any addition to a tax, under section 505 of the Bankruptcy Code; and (iv) all other rights, claims or causes of action not transferred to the DIP Secured Parties pursuant to the Plan; *provided, however*, the Creditors' Trust Causes of Action shall not include those Causes of Actions (i) released under this Plan; (ii) identified by Bridging as part of the Plan Supplement related to the operations of the Reorganized Debtors; or (iii) related to Bridging's Liens under the Prepetition Loan Documents or the DIP Credit Agreement.

**"Creditors' Trust Distributable Assets"** means all distributions to the Creditors' Trust under the Plan, including the Reorganized Debtors Equity allocable to the Creditors' Trust, and the Cash available to make Distributions to the Beneficiaries of the Creditors' Trust at any time that the Trustee deems is appropriate to make such Distributions.

**"Creditors' Trust Loan"** shall have the meaning set forth in section 7.4 hereof.

**"Creditors' Trust Monthly Fee Statements"** shall have the meaning set forth in section 7.6.

**"Creditors' Trust Oversight Committee"** means the three-member oversight committee, chosen by the Committee, that will oversee the functions and activities of the Trustee in relation to the Creditors' Trust.

**"Creditors' Trust Professionals"** shall have the meaning set forth in section 7.6.

**"Cure Amount"** has the meaning set forth in section 10.4 hereof.

**"D&O Liability Insurance Policies"** means any insurance policy, including tail insurance policies, providing coverage for directors, officers, managers and employees maintained by the Debtors' Estates as of the Effective Date.

**"Debtors"** means, collectively, All Care Management Services, Inc.; First Harbour Health Management, LLC ; First Harbour Medical Centers, LLC; Florida Group Healthcare LLC; Gemini Healthcare Fund, LLC; Hygea Acquisition Longwood, LLC; Hygea Acquisition Orlando, LLC; Hygea Health Holdings, Inc.; Hygea Holdings Corp.; Hygea IGP of Central Florida, Inc.; Hygea IGP, LLC; Hygea Medical Centers of Florida, LLC; Hygea Medical Partners, LLC; Hygea of Delaware, LLC; Hygea of Georgia, LLC; Hygea of Pembroke Pines, LLC; Hygea Primum

5

Acquisition, Inc.; Medlife Activity Center, LLC; Mobile Clinic Services, LLC; Palm A.C. MSO, LLC; Palm Allcare Medicaid MSO, Inc.; Palm Allcare MSO, Inc; Palm Medical Group, Inc.; Palm Medical MSO LLC; Palm Medical Network, LLC; Palm MSO System, Inc.; Palm PGA MSO, Inc.; Physician Management Associates East Coast, LLC; Physician Management Associates SE, LLC; Physicians Group Alliance, LLC; Primum Alternatives, Inc.; Primum Healthcare, LLC; and Professional Health Choice, Inc.

*"Debtors-in-Possession"* means the Debtors in their capacity as debtors-in-possession in the Chapter 11 Cases pursuant to sections 1101, 1107(a), and 1108 of the Bankruptcy Code.

*"Debtor Released Claims"* has the meaning set forth in section 12.3 hereof.

*"Deficiency Claim"* means a General Unsecured Claim for the difference between (a) the aggregate amount of an Allowed Claim and (b) the value received on account of the portion of such Allowed Claim that is a Secured Claim.

*"DIP Credit Agreement"* means that certain Secured Superpriority Debtor-in-Possession Credit Agreement, by and among Hygea Holdings Corp., as borrower, the other guarantors party thereto, and the DIP Lender, as lender, as amended, modified, or supplemented from time to time.

*"DIP Lender"* means Bridging Income Fund and the other lending parties that may from time to time become parties to the DIP Credit Agreement.

*"DIP Loan"* means the total unpaid amount under the DIP Credit Agreement as of the Effective Date.

*"DIP Orders"* means the interim and final order(s) of the Bankruptcy Court authorizing, among other things, the Debtors to enter into, make borrowings and guaranty obligations under the DIP Credit Agreement, and granting certain rights, protections, and liens to and for the benefit of the DIP Lender.

*"Disallowed Claim"* means any Claim or portion thereof which has been disallowed by a Final Order and includes any Claim which is not an Allowed Claim for any other reason.

*"Disclosure Statement"* means the disclosure statement (including all exhibits and schedules thereto or referenced therein) that relates to the Plan, as such disclosure statement may be altered, modified, or amended.

*"Disputed Claim"* means a Claim that has neither been Allowed nor disallowed pursuant to a Final Order of the Bankruptcy Court, and (a) if no Proof of Claim has been filed by the applicable deadline:  (i) a Claim that has been or hereafter is listed on the Schedules as disputed, contingent, or unliquidated; or (ii) a Claim that has been or hereafter is listed on the Schedules as other than disputed, contingent, or unliquidated, but as to which the Debtors, Reorganized Debtors, Trustee, or any other party in interest has interposed an objection or request for estimation which has not been withdrawn or determined by a Final Order; or (b) if a Proof of Claim or other request for payment has been filed by the applicable deadline:  (i) a Claim for which no corresponding Claim has been or hereafter is listed on the Schedules or Allowed in this Plan; (ii) a Claim for

6

which a corresponding Claim has been or hereafter is listed on the Schedules as other than disputed, contingent, or unliquidated, but the nature or amount of the Claim or as asserted in the Proof of Claim varies from the nature and amount of such Claim as listed on the Schedules to the extent of such positive variance; (iii) a Claim for which a corresponding Claim has been or hereafter is listed on the Schedules as disputed, contingent, or unliquidated; or (iv) a Claim for which a timely objection or request for estimation is interposed by the Debtors, Reorganized Debtors, Trustee, or any other party in interest which has not been withdrawn or determined by a Final Order.

**"*Dissolved Debtors*"** means those Debtors identified by Bridging Finance in the Plan Supplement which will be dissolved on the Effective Date.

**"*Distribution*"** means Cash, property, interests in property, or other value distributed to Holders of Allowed Claims, or their designated agents, under this Plan.

**"*Distribution Record Date*"** means five (5) Business Days prior to the Confirmation Date.

**"*Effective Date*"** means the first Business Day selected by the Debtors on which (a) the conditions specified in section 11.2 of this Plan have been satisfied or waived in accordance with the terms of section 11, and (b) no stay of the Confirmation Order is in effect.

**"*Effective Date Debt Limit*"** means Seventy Million Dollars ($70,000,000.00).

**"*Entity*"** is as defined in section 101(15) of the Bankruptcy Code.

**"*Equity Interest*"** means any Equity Security in any of the Debtors, including, without limitation, all issued, unissued, authorized or outstanding units and other ownership interests, including limited liability company membership interests, together with (a) any options, warrants or contractual rights to purchase or acquire any such Equity Securities at any time with respect to any Debtors, and all rights arising with respect thereto and (b) the rights of any Entity to purchase or demand the issuance of any of the foregoing and shall include: (i) conversion, exchange, voting, participation, dividend and distribution rights; (ii) liquidation preferences; (iii) options, warrants, and call and put rights; (iv) share-appreciation rights; and (v) all unexercised Equity Interests.

**"*Equity Security*"** is as defined in section 101(16) of the Bankruptcy Code.

**"*Estate(s)*"** means, individually, the estate of each of the Debtors and, collectively, the estates of all of the Debtors created under section 541 of the Bankruptcy Code.

**"*Exculpated Claim*"** means any claim or Cause of Action related to any act or omission in connection with, relating to or arising out of (i) any in-court or out-of-court forbearance or restructuring arrangement involving the Debtors and their current and former employees, agents, representatives, advisors, consultants, and attorneys including the Restructuring Support Agreement dated February 7, 2020, (ii) the Chapter 11 Cases, (iii) the negotiation, administration or consummation of any cash collateral arrangement or debtor-in-possession financing in the Chapter 11 Cases, (iv) the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement or this Plan or any contract, instrument, release, or other agreement or

7

document created or entered into in connection with the Disclosure Statement or this Plan, (v) the filing of the Chapter 11 Cases, (vi) the pursuit of confirmation of this Plan, (vii) the administration and implementation of this Plan, or (vii) the Distribution of property under this Plan and/or any other related agreement; *provided, however*, that Exculpated Claims shall not include any act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct under applicable non-bankruptcy law.   No Cause of Action, obligation or liability expressly preserved by the Plan or the Plan Supplement constitutes an Exculpated Claim.

*"Exculpated Parties"* means, collectively, and in each case in their capacity as such: (i) the Debtors; (ii) the Reorganized Debtors; (iii) the DIP Lender; (iv) the Committee; (v) Centurion; (vi) Bridging; and (vii) with respect to each of the foregoing Entities, each of their respective Related Persons that served in such capacity.

*"Executory Contract"* means all contracts and leases to which any Debtors are a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

*"Final Order"* means an order or judgment of the Bankruptcy Court, or court of competent jurisdiction with respect to the subject matter, as entered on the docket in any Chapter 11 Case or the docket of any court of competent jurisdiction, and as to which the time to appeal, or seek *certiorari* or move for a new trial, reargument, or rehearing has expired and no appeal or petition for *certiorari* or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for *certiorari* that has been or may be timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing shall have been denied, resulted in no stay pending appeal of such order, or has otherwise been dismissed with prejudice; *provided, however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order shall not preclude such order from being a Final Order.

*"General Unsecured Claim"* means a Deficiency Claim and any Claim asserted against the Debtors which is not included within the other specifically defined Classes hereunder.

*"Governmental Unit"* is as defined in section 101(27) of the Bankruptcy Code.

*"Holder"* means the legal or beneficial holder of a Claim or Equity Interest.

*"Impaired"* means, when used in reference to a Claim or Equity Interest, a Claim or Equity Interest that is "impaired" within the meaning of section 1124 of the Bankruptcy Code.

*"Insurance Policy"* and, collectively, the *"Insurance Policies"* means each of the insurance policies issued to or for the benefit of any Debtor(s) or any of their predecessors-in-interest and any agreements, documents, or instruments related thereto.

*"Intercompany Claim"* means any Claim against a Debtor held by another Debtor or by a non-Debtor subsidiary of a Debtor.

8

*"Lien"* means a "lien" as defined in section 101(37) of the Bankruptcy Code, and, with respect to any property or asset, includes, without limitation, any mortgage, deed of trust, lien, pledge, charge, security interest or other encumbrance of any kind, or any other type of preferential arrangement that has the practical effect of creating a security interest, in respect of such property or asset.

*"Local Rules"* means the Local Rules of Bankruptcy Practice and Procedure of the Bankruptcy Court.

*"Material Contracts"* means each of the contracts designated as such in the Plan Supplement.

*"New Board"* means the initial board of directors, members, or managers, as applicable, of the Reorganized Debtors whose identities will be disclosed in the Plan Supplement.

*"New Equity Documents"* means any shareholder agreement, organizational documents, evidence of equity interests (including share certificates or other mutually agreed evidence of equity interests), or other governance documents for the Reorganized Debtors.

*"New Organizational Documents"* means the New Equity Documents, the form of certificates or articles of incorporation, bylaws, charter or such other applicable formation documents of each of the Reorganized Debtors reasonably satisfactory to the Debtors, the Committee, Centurion and Bridging Finance, as applicable.

*"Net Proceeds"* means the gross proceeds of the sale of the Reorganized Debtors, net of any fees and expenses related to such sale, including, without limitation, any success fees owed to third parties.

*"New Secured Debt"* means the obligation of the Reorganized Debtors to Bridging or its designee and Centurion, as applicable, in an amount equal to: (i) the DIP Loan; (ii) the Working Capital Loan; and (iii) the Remaining Secured Debt; *provided, however* that the amount of the New Secured Debt shall not exceed the Effective Date Debt Limit.

*"New Secured Debt Documents"* means the Credit Agreement governing the New Secured Debt and the related notes, guarantees, and security documents, as the case may be, each in form and substance mutually agreed between the Debtors, Bridging and Centurion, as applicable, which shall be included in the Plan Supplement.

*"Other Priority Claim"* means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Expense Claim.

*"Other Secured Claim"* means a Secured Claim other than Bridging's Secured Claim.

*"Person"* means a "person" as defined in section 101(41) of the Bankruptcy Code and also includes any natural person, corporation, general or limited partnership, limited liability company,

9

firm, trust, association, government, governmental agency or other Entity, whether acting in an individual, fiduciary or other capacity.

*"Petition Date"* means February 19, 2020.

*"Plan"* means this plan of reorganization under Chapter 11 of the Bankruptcy Code, including, without limitation, the exhibits, appendices, and schedules hereto to be filed with the Plan Supplement, as such may be altered, amended, or otherwise modified from time to time.

*"Plan Supplement"* means the compilation of documents and forms of documents, schedules, and exhibits to this Plan, to be filed fourteen (14) days prior to the Confirmation Hearing, as amended, supplemented, or modified from time to time in accordance with the terms hereof, the Bankruptcy Code and the Bankruptcy Rules.

*"Prepetition Loan Documents"* means (i) that certain Amended and Restated Credit Agreement, dated as of January 31, 2017, by and among the Debtors, the other subsidiaries of the Debtors that are parties thereto, and Bridging; (ii) that certain Amended and Restated Guaranty and Security Agreement, dated as of January 31, 2017; (iii) and any and all documents, agreements and instruments related to the foregoing.

*"Priority Claim"* means any Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code, other than (i) an Administrative Claim or (ii) a Priority Tax Claim.

*"Priority Tax Claim"* means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

*"Pro Rata"* shall mean the proportion that the amount of a Claim in a particular Class or Classes bears to the aggregate amount of all Claims in such Class or Classes, unless the Plan otherwise provides.

"*Professional Budget Surplus*" shall have the meaning set forth in section 2.2 hereof.

*"Professionals"* means all professionals employed in the Chapter 11 Cases pursuant to sections 327, 363, and 1103 of the Bankruptcy Code.

*"Proof of Claim"* means a proof of Claim filed against any of the Debtors in the Chapter 11 Cases.

*"Put Amount"* shall have the meaning set forth in section 6.6 hereof**.**

*"Put Election"* shall have the meaning set forth in section 6.6 hereof.

*"Put Election Date"* shall have the meaning set forth in section 6.6 hereof.

*"Related Persons"* means, with respect to any Person, such Person's predecessors, successors, assigns, and present and former Affiliates (whether by operation of law or otherwise) and each of their respective subsidiaries, and each of their respective current and former officers, directors, principals, employees, shareholders, members (including *ex officio* members and

10

managing members), managers, managed accounts or funds, participants, management companies, fund advisors, advisory board members, partners, agents, financial advisors, attorneys, accountants, investment bankers, investment advisors, consultants, representatives, and other professionals, and any Person claiming by or through any of them, including such Related Persons' respective heirs, executors, estates, servants, and nominees; *provided, however*, that no insurer of any Debtors shall constitute a Related Person of any Debtors or Reorganized Debtors.

***"Released Party"*** means (i) the Debtors (excluding current and former officers, directors members, managers, shareholders and employees); (ii) the Reorganized Debtors; (iii) the DIP Lender and its Related Persons; (iv) Bridging and its Related Persons (including Centurion); (v) the Committee and its members; (vi) the Trustee; and (vii) the Creditors' Trust.

***"Remaining Secured Debt"*** means senior secured debt in the amount of the Effective Date Debt Limit less the amount of the DIP Loan and Working Capital Loan

***"Reorganized Debtors"*** means collectively each of the Debtors, or any successors thereto, by merger, consolidation, or otherwise on or after the Effective Date, including any new entity formed to directly or indirectly acquire the assets or equity of the Debtors. Reorganized Debtors shall not include the Dissolved Debtors.

***"Reorganized Debtor Equity"*** means the Equity Interests in the Reorganized Debtors which may be indirectly issued under the Plan through a newly created holding company as may be set forth in the Plan Supplement.

***"Restructuring Transactions"*** shall have the meaning set forth in section 6.3 hereof.

***"Schedules"*** means, unless otherwise specified, the respective schedules of assets and liabilities, the list of holders of Equity Interests, and the statements of financial affairs filed by the Debtors in accordance with section 521 of the Bankruptcy Code and the Bankruptcy Rules, as such schedules and statements have been or may be supplemented or amended on or prior to the Confirmation Date.

***"Secured Claim"*** means any Claim of a Creditor that is secured by property of the Debtors' Estates, to the extent of the value of the Creditor's interest in the Estates' interest in such property, as provided in section 506(a) of the Bankruptcy Code. Secured Claim also means a Claim of a Creditor that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the amount subject to setoff, as provided in section 506(a) of the Bankruptcy Code. To the extent the value of any property securing such Claim is less than the amount of such Claim, the difference between such value and such Claim is a "Deficiency Claim" unless the holder of such Claim validly elects under section 1111(b) of the Bankruptcy Code to have such Claim treated as a Secured Claim to the extent allowed.

***"Subordinated Claim"*** means any Claim subordinated by law or contract including pursuant to section 510(b) of the Bankruptcy Code, which shall include, but not be limited to, any claim filed by Nevada 5, Inc. and N5HYG, LLC in the Chapter 11 Cases.

*"Subsequent Distribution Date"* means the last Business Day of the month following the end of each calendar quarter after the Effective Date; *provided, however*, that if the Effective Date is within thirty (30) days of the end of a calendar quarter, then the first Subsequent Distribution Date will be the last Business Day of the month following the end of the first (1st) calendar quarter after the calendar quarter in which the Effective Date falls.

*"Taxing Authorities"* means all federal and state taxing agencies.

*"Trustee"* means the individual or entity designated and retained as the trustee to the Creditors' Trust, as of the Effective Date or as soon as reasonably practicable thereafter, as the fiduciary responsible for administering the Creditors' Trust.

*"Unexpired Lease"* means a lease to which any Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

*"Unimpaired"* means any Class of Claims or Equity Interests that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

*"United States Trustee"* means the Office of the United States Trustee for the District of Delaware.

*"Variance"* shall have the meaning set forth in the DIP Orders.

*"Voting Record Date"* shall have the meaning ascribed to such term in the Disclosure Statement.

*"Working Capital Loan"* means the amount which shall be loaned by Bridging Income Fund or a Related Person to the Reorganized Debtors to meet their post-Effective Date working capital needs.

## 1.2    Interpretation, Application of Definitions and Rules of Construction

Unless otherwise specified, all section or exhibit references in this Plan are to the respective section in, or exhibit to, this Plan, as the same may be amended, supplemented, waived, or modified from time to time. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to this Plan as a whole and not to any particular section, subsection, or clause contained therein. A term used herein that is not defined herein shall have the meaning assigned to that term in the Bankruptcy Code. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to this Plan. The headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. Unless otherwise provided, any reference in this Plan to an existing document, exhibit or schedule means such document, exhibit or schedule as it may have been amended, restated, revised, supplemented, or otherwise modified. If a time or date is specified for any payments or other Distribution under this Plan, it shall mean on or as soon as reasonably practicable thereafter. Further, where appropriate from a contextual reading of a term, each term includes the singular and plural form of the term regardless of how the term is stated and each stated pronoun is gender neutral. In the event of any ambiguity or conflict between this Plan and the Disclosure Statement, the provisions of this Plan

12

shall govern.  Any reference to the "Trustee" shall be deemed to include a reference to the "Creditors' Trust" and any reference to the "Creditors' Trust" shall be deemed to include a reference to the "Trustee" unless the context otherwise requires.

### 1.3    Computation of Time

Unless otherwise specifically stated in the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed in the Plan.  If the date on which a transaction may occur under the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.  Any references to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter unless otherwise specified herein

## SECTION 2.  ADMINISTRATIVE AND PRIORITY CLAIMS

### 2.1    Administrative Expense Claims

(a)    Except to the extent that a Holder of an Allowed Administrative Expense Claim agrees to different treatment with the Debtors or Reorganized Debtors, each Holder of an Allowed Administrative Expense Claim shall receive Cash in an amount equal to the unpaid amount of such Allowed Administrative Expense Claim on the later of the Effective Date or the date on which such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is reasonably practicable; *provided, however*, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors, as Debtors-in-Possession, or liabilities arising under obligations incurred by the Debtors, as Debtors-in-Possession, prior to the Effective Date, shall be paid by the Debtors in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions, including, but not limited to, the Budget, DIP Orders and all other orders entered by the Bankruptcy Court related to the foregoing.  In addition, Allowed Administrative Expense Claims of the United States Trustee for statutory fees under 28 U.S.C. § 1930 incurred prior to the Effective Date shall be paid on the Effective Date by the Debtors, and thereafter, as such fees may thereafter accrue and be due and payable, by the Creditors' Trust in accordance with the applicable schedule for payment of such fees.

(b)    **Administrative Expense Claims Bar Date**.  To be eligible to receive Distributions under the Plan on account of an Administrative Expense Claim that is not otherwise Allowed by the Plan, a request for payment of an Administrative Expense Claim must have been or be filed with the Bankruptcy Court on or before the Administrative Expense Claims Bar Date.  Any Administrative Expense Claim that is not asserted in accordance herewith shall be deemed disallowed under the Plan and shall be forever barred against the Debtors, the Debtors' Estates, the Reorganized Debtors, the Creditors' Trust, or any of their Assets or property, and the Holder thereof shall be enjoined from commencing or continuing any action, employment of process or act to collect, offset, recoup or recover such Claim.

### 2.2    Accrued Professional Compensation Claims

Except as otherwise provided herein, all Professionals seeking payment of Accrued Professional Compensation Claims shall (i) file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred in the Chapter 11 Cases by the date that is thirty (30) days after the Effective Date and (ii) be paid (a) the full unpaid amount as is Allowed by the Bankruptcy Court within five (5) Business Days after the date that such Claim is Allowed by order of the Bankruptcy Court, or (b) upon such other terms as may be mutually agreed upon between the Holder of such an Allowed Accrued Professional Compensation Claim and the Debtors or Reorganized Debtors.  Any Accrued Professional Compensation Claim that is not asserted in accordance with this section 2.2 shall be deemed disallowed under this Plan, waived, and shall be forever barred against the Debtors, the Debtors' Estates, the Reorganized Debtors, the Creditors' Trust, or any of their Assets or property, and the Holder thereof shall be enjoined from commencing or continuing any action, employment of process or act to collect, offset, recoup, or recover such Claim.

Accrued Professional Compensation Claims filed by the Committee's Professionals shall be subject to a cap of One Million Three Hundred and Twenty-Five Thousand Dollars ($1,325,000.00) (the "***Committee Budget***") as described in the DIP Orders.  To the extent the Committee Budget is insufficient to pay the Allowed Accrued Professional Compensation Claims of the Committee's Professionals, such Allowed Claims may be paid from the Creditors' Trust. The Committee Budget shall not be subject to the Variance.

To the extent any excess funds remain under the Debtors' professional fee budgeted amounts and/or the Committee Budget under the DIP Orders (collectively, the "***Professional Budget Surplus***"), such funds shall be deposited into the Creditors' Trust on the Effective Date, or after payment of such Professionals' Accrued Professional Compensation Claims.

The Professional Budget Surplus shall not be used to repay the Creditors' Trust Loan.

### 2.3    Priority Tax Claims

Except as otherwise provided in this Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim or as soon as reasonably practicable thereafter), each Holder of an Allowed Priority Tax Claim shall receive in full satisfaction, settlement, discharge, and release of, and in exchange for, such Allowed Priority Tax Claim pursuant to and in accordance with sections 1129(a)(9)(C) and 1129(a)(9)(D) of the Bankruptcy Code, Cash in an aggregate amount of such Allowed Priority Tax Claim payable in regular installment payments over a period ending not more than five (5) years after the Petition Date, plus simple interest at the rate required by applicable non-bankruptcy law on any outstanding balance from the Effective Date, or such lesser rate as is agreed to in writing by a particular taxing authority and the Debtors or Reorganized Debtors, as applicable, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; *provided, however*, that Priority Tax Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.  Any installment payments to be made under clause (C) or (D)

14

above shall be made in equal quarterly Cash payments beginning on the first applicable Subsequent Distribution Date and continuing on each Subsequent Distribution Date thereafter until payment in full of the applicable Allowed Priority Tax Claim.

## SECTION 3.  CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

### 3.1  **Summary**

Except as set forth herein, all Claims against and Equity Interests in the Debtors are placed in a particular Class.  The Debtors have not classified Administrative Expense Claims, Accrued Professional Compensation Claims, and Priority Tax Claims.

The following table classifies Claims against and Equity Interests in the Debtors for all purposes, including voting, confirmation, and Distribution pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  This Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class.  A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.  Each Class set forth below is treated hereunder as a distinct Class for voting and Distribution purposes.

Subject to all other applicable provisions of this Plan (including its Distribution provisions), classified Claims shall receive the treatment described in section 4 herein.  This Plan will not provide any Distributions on account of a Claim to the extent that such Claim has been disallowed, released, withdrawn, waived, or otherwise satisfied or paid as of the Effective Date, including, without limitation, payments by third parties.

The following table designates the Classes of Claims against and Equity Interests in the Debtors and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code, (iii) deemed to reject the Plan, or (iv) deemed to accept the Plan.

| Class | Class | Status | Entitled to Vote |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | No (Deemed to accept) |
| 2 | Other Secured Claims | Unimpaired | No (Deemed to accept) |
| 3 | Bridging's Secured Claim | Impaired | Yes |
| 4 | General Unsecured Claims | Impaired | Yes |
| 5 | Subordinated Claims | Impaired | No (Deemed to reject) |
| 6 | Equity Interests | Impaired | No (Deemed to reject) |

15

**SECTION 4.  TREATMENT OF CLAIMS AND EQUITY INTERESTS**

4.1    **Other Priority Claims (Class 1)**

This Class consists of all Allowed Other Priority Claims against the Debtors that are specified as having priority in section 507(a) of the Bankruptcy Code (excepting claims of Taxing Authorities), if any such Claims exist as of the Effective Date.  Except to the extent that a Holder of an Allowed Other Priority Claim against the Debtors has agreed to a different treatment of such Claim, each such Holder shall receive, in full satisfaction of such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date; (ii) the date the Other Priority Claim becomes an Allowed Claim; or (iii) the date for payment provided by any agreement or arrangement between the Reorganized Debtors and the Holder of the Allowed Other Priority Claim against the Debtors.

4.2    **Other Secured Claims (Class 2)**

This Class consists of all Other Secured Claims against the Debtors.  In full satisfaction of an Allowed Other Secured Claim, on the later of the Effective Date and the date on which the Other Secured Claim is Allowed, each Holder of an Allowed Other Secured Claim shall receive, at the sole and exclusive option of the Reorganized Debtors:  (a) Cash equal to the amount of such Claim; (b) the Collateral securing such Claim; or (c) satisfaction of such Claim pursuant to such other terms and conditions as may be agreed upon by the Reorganized Debtors and the Holder of such Other Secured Claim

4.3    **Bridging's Secured Claim (Class 3)**

This Class consists of Bridging's Secured Claim.  Bridging's Secured Claim is an Allowed Claim.  Upon the terms and subject to the conditions set forth in this Plan, in full and final satisfaction, settlement, release, and discharge of Bridging's Secured Claim, Bridging or such Entity designated by Bridging and Centurion, respectively, shall receive, on the Effective Date or as soon as practicable thereafter, (i) the Debtors' Cash on hand on the Effective Date in excess of Cash necessary to operate the Reorganized Debtors' business, following funding of the Creditors' Trust Loan to be allocated 90.86% to Bridging and 9.14% to Centurion; (ii) the New Secured Debt in accordance with section 6.4 below; and (iii) 86.317% of the Reorganized Debtor Equity shall be issued to Bridging or its designee and 8.683% of the Reorganized Debtor Equity shall be issued to Centurion or its designee.

To the extent the Debtors' Cash on hand as of the Effective Date is not sufficient to make payments under the Plan, fund operations and fund the Creditors' Trust Loan, Bridging will advance the necessary funds to the Reorganized Debtors with such amount to be added to the Working Capital Loan.  All distributions made on account of Bridging's Secured Claim shall be paid to Bridging and Centurion, as applicable.  Bridging shall have the right to vote Bridging's Secured Claim.

16

### 4.4    General Unsecured Claims (Class 4)

This Class consists of all General Unsecured Claims against the Debtors, including Bridging's Deficiency Claim.  Except to the extent that a Holder of an Allowed General Unsecured Claim against the Debtors agrees to a different treatment of such Claim, in full and final satisfaction of each Allowed General Unsecured Claim against the Debtors, each Holder of an Allowed General Unsecured Claim against the Debtors will receive its Pro Rata share of Creditors' Trust Distributable Assets as soon as practicable as determined by the Trustee.  Bridging shall have the right to vote the Bridging Deficiency Claim but will waive any Distributions to Bridging and its participants on account of Bridging's Deficiency Claim.

### 4.5    Subordinated Claims (Class 5)

This Class consists of all Subordinated Claims against the Debtors.  Holders of Subordinated Claims against the Debtors shall not receive or retain any property under this Plan on account of such Subordinated Claims, and the obligations of the Debtors on account of Subordinated Claims shall be discharged.

### 4.6    Equity Interests (Class 6)

Holders of an Equity Interest in the Debtors shall not receive or retain any property under this Plan on account of such Equity Interests, and the obligations of the Debtors on account of the Equity Interests shall be discharged.

### 4.7    Special Provision Governing Unimpaired Claims

Except as otherwise provided herein, nothing under this Plan shall affect or limit the Debtors', Reorganized Debtors' or Trustee's rights and defenses (whether legal or equitable) in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

### 4.8    Discharge of Claims

Except as otherwise provided in the Plan and effective as of the Effective Date:  (i) the rights afforded herein and the treatment of all Claims and Equity Interests will be in exchange for and in complete satisfaction, settlement, discharge, and release of all Claims and Equity Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors or any of their Assets, property, or Estates; (ii) the Plan will bind all Holders of Claims and Equity Interests, notwithstanding whether any such Holders abstained from voting to accept or reject the Plan or voted to reject the Plan; (iii) all Claims and Equity Interests will be satisfied, discharged, and released in full, and the Debtors' liability with respect thereto will be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (iv) all Entities will be precluded from asserting against the Debtors, the Debtors' Estates, the Reorganized Debtors, each of their successors and assigns, and each of their Assets and properties, any other Claims or Equity Interests based upon any documents, instruments or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.

17

4.9     **Subordinated Claims**

The allowance, classification, and treatment of all Allowed Claims and Equity Interests and the respective distributions and treatments under the Plan shall take into account and conform to the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Under section 510 of the Bankruptcy Code, the Debtors or the Trustee, as applicable, reserve the right to re-classify any Allowed Claim or Allowed Equity Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

4.10     **Elimination of Vacant Classes**

Any Class of Claims that is not occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or a Claim temporarily allowed under Bankruptcy Rule 3018, or as to which no vote is cast, shall be deemed eliminated from this Plan for purposes of voting to accept or reject this Plan and for purposes of determining acceptance or rejection of this Plan by such Class under section 1129(a)(8) of the Bankruptcy Code.

## SECTION 5.  ACCEPTANCE OR REJECTION OF THE PLAN

5.1     **Presumed Acceptance of Plan**

Classes 1 and 2 are Unimpaired under the Plan and, therefore, is deemed to have accepted the Plan pursuant to section 1126 of the Bankruptcy Code.

5.2     **Presumed Rejection of Plan**

Classes 5 and 6 are Impaired and shall receive no distribution under the Plan on account of such Subordinated Claims and Equity Interests and, therefore, are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

5.3     **Voting Class**

Each Holder of an Allowed Claim as of the Voting Record Date in Classes 3 and 4 will be entitled to vote to accept or reject the Plan.

5.4     **Acceptance by Impaired Classes of Claims**

Pursuant to section 1126(c) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted the Plan if the Holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims in such Class actually voting have voted to accept the Plan.

18

5.5    **Cramdown**

If all applicable requirements for confirmation of this Plan are met as set forth in section 1129(a) of the Bankruptcy Code except subsection (8) thereof, the Debtors may request that the Bankruptcy Court confirm this Plan in accordance with section 1129(b) of the Bankruptcy Code on the bases that this Plan is fair and equitable and does not discriminate unfairly with respect to each Class of Claims or Equity Interests that is Impaired under, and has not accepted or is deemed to reject, this Plan.

## SECTION 6.  MEANS FOR IMPLEMENTATION OF THE PLAN

6.1    **General Settlement of Claims**

To the extent provided for by the Bankruptcy Code and in consideration for the classification, distributions, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan will constitute a good faith compromise and settlement of all Claims and Equity Interests and controversies resolved pursuant to the Plan.

6.2    **Corporate Existence**

Unless otherwise provided in the Plan Supplement, the Debtors will continue to exist after the Effective Date as separate legal entities, with all of the powers of corporations, limited liability companies, partnerships, associations, or other business entities pursuant to the applicable law in their states of incorporation or organization.  As may be set forth in the Plan Supplement, a new holding company may be created to hold the Reorganized Debtor Equity.  After the Effective Date, the Reorganized Debtors shall exist with all of the powers pursuant to the New Organizational Documents.  The Plan Supplement shall include appropriate corporate organizational documents governing the post-Effective Date governance of the Reorganized Debtors and the rights of the holders of the Reorganized Debtor Equity.

On the Effective Date or as soon thereafter as is reasonably practicable, and without need for any notice to or any vote, consent, authorization, approval, ratification, or other action by any Entity or any director, stockholder, security holder, manager, member, or partner (or board thereof) of any Entity, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, or necessary or appropriate to effectuate this Plan (the "***Restructuring Transactions***"), including, without limitation:  (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation, or reorganization containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; (c) the filing of appropriate certificates of incorporation, merger, or consolidation with the appropriate governmental authorities under applicable law; and (d) all other actions that the Debtors or the Reorganized Debtors, as applicable, and Bridging determine are necessary or appropriate.

The Confirmation Order shall be deemed to, under both section 1123 and section 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate

19

to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

### 6.3    Vesting of Assets in the Reorganized Debtors

Except as otherwise provided in the Plan or the Confirmation Order, on or after the Effective Date, all property and Assets of the Estates and any property and Assets acquired by the Debtors pursuant to the Plan will vest in the Reorganized Debtors, free and clear of all Liens, Claims, charges or other encumbrances. Except as may be otherwise provided in the Plan, on and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the Confirmation Order. Without limiting the foregoing, the Reorganized Debtors will pay the charges that they incur after the Effective Date for Professionals' fees, disbursements, expenses or related support services (including reasonable fees relating to the preparation of Professional fee applications) in the ordinary course of business and without application or notice to, or order of, the Bankruptcy Court. For the avoidance of doubt, the Creditors' Trust Assets shall not revest in the Reorganized Debtors and instead the Creditors' Trust Assets shall vest in the Creditors' Trust pursuant to Section 7 of this Plan.

### 6.4    New Secured Debt

(a)    On the Effective Date, the Reorganized Debtors will execute the New Secured Debt Documents which shall govern and evidence the New Secured Debt of the Reorganized Debtors. The New Secured Debt Documents shall be at least as favorable to Bridging and Centurion as lenders as the Prepetition Loan Documents, with additional usual and customary terms for a syndicated loan (including direct ability to obtain information, access to records, regular reporting requirements and consent rights for each of the lenders). The portion of the New Secured Debt attributable to the DIP Loan and Working Capital Loan shall be issued and allocated to Bridging or its designee. The Remaining Secured Debt will be issued to Bridging or its designee and Centurion and allocated (directly and not as a participation) as follows: (i) 90.86% of the Remaining Secured Debt shall be issued to Bridging or its designee; and (ii) 9.14% of the Remaining Secured Debt shall be issued to Centurion or its designee.

(b)    Payment of the New Secured Debt shall be secured by a first priority lien on substantially all of the assets of the Reorganized Debtors, subject to customary exceptions to be set forth in the New Secured Debt Documents, with priority granted to Bridging or its designee with respect to the amounts attributable to the DIP Loan and Working Capital Loan. The New Secured Debt shall be divided into two tranches. The first tranche of the New Secured Debt, totaling Forty Million Dollars ($40,000,000.00), shall provide for payments-in-kind of interest for the first two years following the Effective Date upon which date the Reorganized Debtors will be required to make payments of principal and interest in accordance with the terms of the New Secured Debt Documents. In the event the Reorganized Debtors achieve certain operational milestones, Bridging and Centurion shall have the right to convert a proportionate share of their equity into an additional Thirty Million Dollars ($30,000,000.00) of New Secured Debt.

(c)     On the Effective Date, the Reorganized Debtors will be authorized to execute and deliver the New Secured Debt Documents, and any related instruments and documents, and will be authorized to execute, deliver, file, record and issue any other notes, guarantees, security agreements, documents (including UCC financing statements, intellectual property security agreements to be filed in the U.S. Patent & Trademark Office and deposit account control agreements with the Debtors' depositary banks), amendments to the foregoing, or agreements in connection therewith, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule and without need for any notice to or any vote, consent, authorization, approval, ratification or other action by any Entity or any director, stockholder, security holder, manager, member, or partner (or board thereof) of any Entity.

### 6.5     Sources of Cash for Certain Plan Distributions

Except as otherwise provided in the Plan or the Confirmation Order, all Cash necessary for the Reorganized Debtors to make payments required pursuant to the Plan with respect to Allowed Administrative Expense Claims, Accrued Professional Compensation Claims and Other Priority Claims will be obtained from funding advanced under the DIP Credit Agreement, the Working Capital Loan and/or the Reorganized Debtors' Cash balances, including Cash from operations.

### 6.6     Issuance of Reorganized Debtor Equity and Related Documentation

On the Effective Date, the Reorganized Debtors will be authorized to and will issue the Reorganized Debtor Equity without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule and without need for any notice to or any vote, consent, authorization, approval, ratification or other action by any Entity or any director, stockholder, security holder, manager, member, or partner (or board thereof) of any Entity from and after the Effective Date.  The Reorganized Debtor Equity shall be deemed issued to and held as follows: (i) 86.317% shall be issued to and held by Bridging or its designee; (ii) 8.683% shall be issued to and held by Centurion; and (iii) 5% shall be issued to and held by the Creditors' Trust (the "*Creditor Committee Equity*").  The Reorganized Debtor Equity shall be governed by the New Equity Documents which shall be in a form acceptable to Bridging, the Committee and Centurion and filed as part of the Plan Supplement.

With respect to the Creditor Committee Equity, the Creditors' Trust shall receive typical minority shareholder protections (e.g., tags, drags, etc.) as more fully described in the New Equity Documents.  Further, the Creditor Committee Equity shall be freely assignable by the Creditors' Trust.

The Creditor Committee Equity will entitle the Creditors' Trust to 5% of the Net Proceeds of a sale of the Reorganized Debtors.  In the event the Reorganized Debtors are not sold by the fifth anniversary of the Effective Date (the "*Put Election Date*"), the Creditors' Trust shall have the right to put the Creditor Committee Equity to the Reorganized Debtors (the "*Put Election*") at an amount equal to five percent (5%) of the "*Put Amount*."  The Put Amount shall be determined as follows: (EBITDA amount as of the Put Election Date multiplied by the applicable EBITDA multiple set forth in the chart below) less the total amount of secured debt as of the Put Election Date plus the total amount of unrestricted cash, cash equivalents and investments on the balance sheet as of the Put Election Date.

21

| LIVES MANAGED UNDER MANAGEMENT | REORGANIZED DEBTORS' EBITDA MULTIPLE FOR THE 12 MONTHS PRIOR TO EXERCISING THE PUT ELECTION |
|---|---|
| 5,000 to 7,500 | 7 |
| 7,501 to 10,000 | 7.5 |
| 10,001 to 12,500 | 8 |
| 12,501 to 15,000 | 8.5 |
| More than 15,000 | 9 |

6.7 **Section 1145 Exemption**

The Reorganized Debtor Equity of the Reorganized Debtors to be issued and distributed under the Plan shall be exempt from registration under (a) the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder and (b) any state or local law requiring registration for the offer, issuance, or distribution of securities pursuant to section 1145 of the Bankruptcy Code, or, if applicable, section 4(a)(2) of the Securities Act of 1933, without further act or action by any entity. The Reorganized Debtor Equity shall be freely tradable by the recipients thereof, subject to (w) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act of 1933; (x) compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments; (y) the restrictions, if any, on the transferability of such securities contained in the New Organizational Documents; and (z) applicable regulatory approval.

6.8 **Employee Matters and Retiree Benefits**

Unless otherwise set forth in the schedule of assumed Executory Contracts and Unexpired Leases included in the Plan Supplement, all material employee compensation and benefit Plans, and employment, severance, retirement, indemnification, and other similar employee-related agreement or arrangements in place as of the Effective Date with the Debtors shall be rejected by the Debtors. Nothing in the Plan shall limit, diminish or otherwise alter the Debtors' defenses, Claims, Causes of Action, or other rights with respect to any such contracts, agreements, policies, programs, and Plans. Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, on and after the Effective Date, all retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

### 6.9    Release of Liens, Claims, and Equity Interests

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all Liens, Claims, Equity Interests, mortgages, deeds of trust, or other security interests against the property of the Estates will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule and without need for any notice to or any vote, consent, authorization, approval, ratification or other action by any Entity or any director, stockholder, security holder, manager, member, or partner (or board thereof) of any Entity.  Any Entity holding such Liens or Equity Interests will, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Reorganized Debtors such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Reorganized Debtors.

### 6.10    New Organizational Documents

The New Organizational Documents shall satisfy the provisions of the Plan and the Bankruptcy Code, and will (i) include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting Equity Securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code; (ii) authorize the issuance of the Reorganized Debtor Equity; (iii) to the extent necessary or appropriate, include restrictions on the transfer of Reorganized Debtor Equity; and (iv) to the extent necessary or appropriate, include such provisions as may be needed to effectuate and consummate the Plan and the transactions contemplated herein.  After the Effective Date, the Reorganized Debtors may amend and/or restate the New Organizational Documents and other applicable organizational documents, as permitted by applicable law and in a manner consistent with the Plan.

### 6.11    Resignation of Directors and Officers

Upon the Effective Date, the Debtors' boards of directors and officers shall be deemed to have resigned and shall be replaced by the New Board.

### 6.12    Managers and Officers of the Reorganized Debtors

Except as set forth herein, the existing directors and managers of the Debtors will be deemed to have resigned on and as of the Effective Date, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule and without need for any notice to or any vote, consent, authorization, approval, ratification or other action by any Entity or any other Person or any director, stockholder, security holder, manager, member, or partner (or board thereof) of any Entity.

Except as otherwise provided in this Plan, the New Board will be designated by Bridging, including a lead director who shall have such authority and duties as the New Board may determine.  Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose, prior to the Confirmation Hearing, the identity and affiliations of any Person proposed to serve on the New Board or as an officer of the Reorganized Debtors and, to the extent such Person is an insider

other than by virtue of being a director or officer, the nature of any compensation for such Person. Each such manager, director, and officer will serve from and after the Effective Date pursuant to applicable law and the terms of the New Organizational Documents and the other constituent and organizational documents of the Reorganized Debtors. Centurion shall be entitled to appoint one (1) director on the New Board with voting authority and one (1) director with observation rights only. Additionally, the Creditors' Trust shall be entitled to New Board observation rights.

The identity of the Reorganized Debtors' managers and officers shall be disclosed in the Plan Supplement.

### 6.13    Corporate Action

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Equity Interests, directors, managers, or officers of the Debtors, the Reorganized Debtors, or any other Entity, including: (1) assumption of Executory Contracts and Unexpired Leases; (2) selection of the directors, managers, and officers for the Reorganized Debtors; (3) the execution of and entry into the New Organizational Documents; (4) the issuance and distribution of the Reorganized Debtor Equity as provided herein; and (5) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan involving the company structure of the Debtors and any company action required by the Debtors in connection therewith shall be deemed to have occurred on and shall be in effect as of the Effective Date without any requirement of further action by the security holders, directors, managers, authorized persons, or officers of the Debtors.

### 6.14    Cancellation of Agreements, Security Interests, and Other Interests

Except for the purpose of evidencing a right to a distribution under this Plan and except as otherwise set forth in this Plan, on the Effective Date, all agreements, instruments, Equity Securities and other documents evidencing any prepetition Claim against or Equity Interest in any of the Reorganized Debtors and any rights of any holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect. The holders of or parties to such cancelled instruments, Equity Securities and other documentation will have no rights arising from or related to such instruments, Equity Securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to this Plan and the obligations of the Debtors thereunder or in any way related thereto will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule and without need for any notice to or any vote, consent, authorization, approval, ratification or other action by any Entity or other Person or any director, stockholder, manager, member, or partner (or board thereof) of any Entity.

24

### 6.15    Dissolved Debtors

On the Effective Date, the Dissolved Debtors shall be deemed dissolved without any requirement for further action by Holders of Claims or Equity Interests, directors, managers, or officers of the Debtors, the Reorganized Debtors, or any other Entity.

## SECTION 7.  CREDITORS' TRUST

### 7.1    Establishment of the Creditors' Trust

The Creditors' Trust shall be governed by the Creditors' Trust Agreement.  On the Effective Date, the Trustee shall execute the Creditors' Trust Agreement and, in his capacity as Trustee, accept all Creditors' Trust Assets on behalf of the Beneficiaries thereof, and be authorized to obtain, seek the turnover, liquidate, and collect all of the Creditors' Trust Assets not in his possession.  The Creditors' Trust will then be deemed created and effective without any further action by the Bankruptcy Court or any Person as of the Effective Date.  The Creditors' Trust shall be established for the purposes of (i) liquidating any non-Cash Creditors' Trust Assets; (ii) maximizing recovery of the Creditors' Trust Assets for the benefit of the Beneficiaries; and (iii) distributing the proceeds of the Creditors' Trust Assets to the Beneficiaries in accordance with this Plan and the Creditors' Trust Agreement, with no objective to continue or engage in the conduct of a trade or business, except only in the event and to the extent necessary for, and consistent with, the purpose of the Creditors' Trust.

### 7.2    Creditors' Trust Funding

On the Effective Date, Bridging or its designee will fund Five Hundred and Fifty Thousand Dollars ($550,000.00) as a non-recourse loan to the Creditors' Trust (the "***Creditors' Trust Loan***").  The Creditors' Trust Loan shall be payable only from the proceeds of the Creditors' Trust Causes of Action.  The first One Million One Hundred Thousand Dollars ($1,100,000.00) distributed from the Creditors' Trust shall be distributed evenly (50/50) between Bridging or its designee and the Creditors' Trust to repay the Creditors' Trust Loan.  Upon repayment of the Creditors' Trust Loan, Bridging shall not be entitled to any additional Distributions from the Creditors' Trust.

### 7.3    Appointment of the Trustee

The Trustee, together with his agents, representatives and professionals, will have the power to administer the Creditors' Trust Assets and make distributions in accordance with the terms of this Plan and the Creditors' Trust Agreement.  The Trustee shall be appointed pursuant to the Confirmation Order and subject to removal only by the Bankruptcy Court upon application or motion by a Beneficiary of the Creditors' Trust, after notice and a hearing, and for cause shown, including (i) the willful and continued refusal by the Trustee to perform his duties under this Plan and the Creditors' Trust Agreement, and (ii) gross negligence, gross misconduct, fraud, embezzlement or theft.  The Trustee will be chosen by the Committee.  During the term of the Creditors' Trust, the Trustee shall be entitled to compensation payable from the Creditors' Trust Assets as set forth in the Creditors' Trust Agreement.

25

### 7.4    Beneficiaries of Creditors' Trust

The Holders of Allowed General Unsecured Claims against the Debtors that are entitled to Distributions shall be the Beneficiaries of the Creditors' Trust.  Such Beneficiaries shall be bound by the Creditors' Trust Agreement.  The interests of the Beneficiaries in the Creditors' Trust shall be uncertificated and nontransferable except upon death of the interest holder or by operation of law.  Neither Bridging nor any of its participants shall be entitled to any Distributions from the Creditors' Trust on account of Bridging's Deficiency Claim.

### 7.5    Vesting and Transfer of Creditors' Trust Assets to the Creditors' Trust

On the Effective Date, pursuant to section 1141(b) of the Bankruptcy Code, the Creditors' Trust Assets shall vest in the Creditors' Trust free and clear of all Liens, Claims and Equity Interests, except as otherwise specifically provided in this Plan or in the Confirmation Order; *provided, however*, that the Trustee may abandon or otherwise not accept any non-Cash Creditors' Trust Assets that the Trustee believes, in good faith, have no value to the Creditors' Trust.  Any non-Cash Creditors' Trust Assets that the Trustee so abandons or otherwise does not accept shall not be property of the Creditors' Trust.

### 7.6    Retention of Professionals

The Trustee shall have the right to retain the services of attorneys, accountants, and other professionals (collectively, the "***Creditors' Trust Professionals***") that are necessary to assist the Trustee in the performance of his duties pursuant to this Plan, the Creditors' Trust Agreement and the Confirmation Order.  The reasonable fees and expenses of such professionals shall be paid by the Trustee from the Creditors' Trust Assets and, if necessary, the Creditors' Trust Assets upon submission of monthly statements ("***Creditors' Trust Monthly Fee Statements***") for services rendered and costs incurred to the Trustee and Bridging for review and approval.  The Trustee will have thirty (30) days from receipt of each Creditors' Trust Monthly Fee Statement to object to the Creditors' Trust Monthly Fee Statement.  In the event that any objection is received by the relevant Creditors' Trust Professional that cannot be promptly resolved by the Creditors' Trust Professional and the objecting party, the dispute will be submitted by the Trustee to the Bankruptcy Court for adjudication.  The Bankruptcy Court will retain jurisdiction to adjudicate objections to Creditors' Trust Monthly Fee Statements.  In the event that no objection is raised to a Creditors' Trust Monthly Fee Statement within the thirty (30) day period, the requested amount in the Creditors' Trust Monthly Fee Statement will be promptly paid by the Trustee, subject to any requirements under the Plan.

### 7.7    Creditors' Trust Expenses

Subject to the provisions of the Creditors' Trust Agreement, all costs, expenses, and obligations incurred by the Trustee in administering this Plan, the Creditors' Trust, or in any manner connected, incidental or related thereto, in effecting distributions from, as applicable, the Creditors' Trust shall be a charge against the Creditors' Trust Assets and, if necessary, the Creditors' Trust Assets remaining from time to time in the hands of the Trustee.  Such expenses shall be paid in accordance with the Creditors' Trust Agreement.

7.8    **Certain Powers and Duties of the Creditors' Trust and Trustee.**

(a)    **General Powers of the Trustee**.  The Trustee shall be the exclusive trustee of the Creditors' Trust and the Creditors' Trust Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3).  The powers, rights, and responsibilities of the Trustee shall be specified in the Creditors' Trust Agreement and shall include the authority and responsibility to: (a) receive, manage, invest, supervise, and protect the Creditors' Trust Assets; (b) pay taxes or other obligations incurred by the Creditors' Trust; (c) retain and compensate, without further order of the Bankruptcy Court, the services of employees, professionals and consultants to advise and assist in the administration, prosecution and distribution of Creditors' Trust Assets; (d) calculate and implement Distributions of Creditors' Trust Assets; (e) investigate, prosecute, compromise, and settle, in accordance with the specific terms of the Creditors' Trust Agreement, the Creditors' Trust Causes of Action; (f) resolve issues involving Claims and Equity Interests in accordance with this Plan; and (g) undertake all administrative functions of the Chapter 11 Cases, including the payment of fees payable to the United States Trustee incurred after the Effective Date and the ultimate closing of the Chapter 11 Cases.  The Creditors' Trust is the successor to the Debtors and their Estates.

(b)    **Investments of Cash**.  The Creditors' Trust may invest Cash (including any earnings thereon or proceeds therefrom) as permitted by section 345 of the Bankruptcy Code or in other prudent investments, *provided, however*, that such investments are permitted to be made by a Creditors' Trust within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings, or other controlling authorities.

(c)    **Reporting**.  In no event later than thirty (30) days after the end of the first full month following the Effective Date and on a quarterly basis thereafter until all Cash in the Creditors' Trust has been distributed in accordance with this Plan, the Trustee shall file with the Bankruptcy Court a report setting forth the amounts, recipients and dates of all Distributions made by the Trustee under this Plan through each applicable reporting period.

(d)    **Tax Reporting**.  The Trustee shall file tax returns for the Creditors' Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with this Plan.  The Creditors' Trust also shall annually (for tax years in which Distributions from the Creditors' Trust are made) send to each Beneficiary a separate statement setting forth the Beneficiary's share of items of income, gain, loss, deduction or credit and all such holders shall report such items on their federal income tax returns; *provided, however,* that no such statement need be sent to any Class that is not expected to receive any Distribution from the Creditors' Trust. The Creditors' Trust's taxable income, gain, loss, deduction or credit will be allocated to the Creditors' Trust's Beneficiaries in accordance with their relative beneficial interests in the Creditors' Trust.

As soon as possible after the Effective Date, the Creditors' Trust shall make a good faith valuation of assets of the Creditors' Trust, and such valuation shall be used consistently by all parties for all federal income tax purposes.  The Creditors' Trust also shall file (or cause to be filed) any other statements, returns, or disclosures relating to the Creditors' Trust that are required

by any Governmental Unit for taxing purposes. The Creditors' Trust may request an expedited determination of taxes of the Debtors or of the Creditors' Trust under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, the Debtors and the Creditors' Trust for all taxable periods through the dissolution of the Creditors' Trust.

The Creditors' Trust shall be responsible for filing all federal, state, and local tax returns for the Debtors and the Creditors' Trust. The Creditors' Trust shall comply with all withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions made by the Creditors' Trust shall be subject to any such withholding and reporting requirements; *provided, however*, that, if the Trustee fails to withhold in respect of amounts received or distributable with respect to any Beneficiaries and the Trustee is later held liable for the amount of such withholding, such Beneficiaries shall reimburse the Trustee for such liability. All such amounts withheld and paid to the appropriate taxing authority shall be treated as amounts distributed to such Beneficiaries for all purposes of the Creditors' Trust Agreement. The Trustee shall be authorized to collect such tax information from the Beneficiaries (including, without limitation, social security numbers or other tax identification numbers) as it, in its sole discretion, deems necessary to effectuate the Plan, the Creditors' Trust Agreement and the Confirmation Order. In order to receive distributions under the Plan, all Beneficiaries will need to identify themselves to the Trustee and provide tax information and the specifics of their holdings, to the extent the Trustee deems appropriate (including completing the appropriate Form W-8 or Form W-9, as applicable). The failure to provide such tax information will result in the disallowance of such Claim without a further order from the Bankruptcy Court.

### 7.9    Preservation of Right to Conduct Investigations

The preservation for the Creditors' Trust of any and all rights to conduct investigations pursuant to Bankruptcy Rule 2004 is necessary and relevant to the liquidation and administration of the Creditors' Trust Assets. Accordingly, any and all rights to conduct investigations pursuant to Bankruptcy Rule 2004 held by the Debtors prior to the Effective Date shall vest with the Creditors' Trust and shall continue until dissolution of the Creditors' Trust.

### 7.10    Prosecution and Resolution of Causes of Action.

(a)    **The Creditors' Trust's Exclusive Authority to Pursue, Settle, or Abandon Causes of Action**. From and after the Effective Date, prosecution and settlement of all Creditors' Trust Causes of Action, including Avoidance Actions, transferred to the Creditors' Trust shall be the sole responsibility of the Creditors' Trust pursuant to the Plan and the Confirmation Order. From and after the Effective Date, the Creditors' Trust shall have exclusive rights, powers, and interests of the Debtors' Estates to pursue, settle or abandon such Causes of Action as the sole representative of the Debtors' Estates pursuant to section 1123(b)(3) of the Bankruptcy Code. Proceeds recovered from all Causes of Action will be deposited into the Creditors' Trust and will be distributed by the Trustee to the Beneficiaries in accordance with the provisions of the Plan and Creditors' Trust Agreement. All Causes of Action, including Avoidance Actions, that are not expressly released or waived under the Plan are reserved and preserved and vest in the Creditors' Trust in accordance with this Plan. No Person may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of

28

Action against it as any indication that the Debtors, Reorganized Debtors or Trustee will not pursue any and all available Causes of Action against such Person. The Trustee expressly reserves all Creditors' Trust Causes of Action, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Creditors' Trust Causes of Action upon, after, or as a consequence of confirmation or consummation of the Plan. No claims or Causes of Action against the Released Parties expressly released or waived pursuant to the Plan shall be transferred to the Creditors' Trust, the Trustee shall not have standing to pursue such claims or Causes of Action, and all such claims and Causes of Action shall be waived, released and discharged pursuant to the Plan.

(b) **Settlement of Causes of Action**. Settlement by the Creditors' Trust of any Creditors' Trust Cause of Action transferred to the Creditors' Trust shall require: (i) approval only of the Trustee if the amount claimed by the Creditors' Trust against a defendant is less than One Hundred Thousand Dollars ($100,000.00); and (ii) approval of the Trustee and the Creditors' Trust Oversight Committee, if the amount claimed by the Creditors' Trust against a defendant is unliquidated or equals to or exceeds One Hundred Thousand Dollars ($100,000.00).

### 7.11   **Federal Income Tax Treatment of the Creditors' Trust**

For federal income tax purposes, it is intended that the Creditors' Trust be classified as a Creditors' Trust under section 301.7701-4 of the Treasury regulations and that such trust be owned by its beneficiaries. Accordingly, for federal income tax purposes, it is intended that the Beneficiaries be treated as if they had received a distribution from the Debtors' Estates of an undivided interest in each of the Creditors' Trust Assets in satisfaction of their Allowed Claims (to the extent of the value of their respective share in the applicable assets) and then contributed such interests to the Creditors' Trust in exchange for their interests in the Creditors' Trust, and the Creditors' Trust's Beneficiaries will be treated as the grantors and owners thereof.

### 7.12   **Limitation of Liability**

No recourse will ever be had, directly or indirectly, against the Trustee or his or her respective employees, professionals, representatives, agents, successors, or assigns, by legal or equitable proceedings or by virtue of any statute or otherwise, or any deed of trust, mortgage, pledge or note, nor upon any promise, contract, instrument, undertaking, obligation, covenant or agreement whatsoever executed by the Creditors' Trust under this Plan or by reason of the creation of any indebtedness by the Creditors' Trust or the Trustee under this Plan. All such liabilities under this Plan will be enforceable only against, and will be satisfied only out of, the Creditors' Trust Assets. The Creditors' Trust and the Trustee and their respective officers, directors, employees, professionals, representatives, agents, successors or assigns will not be liable for any act they may do, or omit to do hereunder in good faith and in the exercise of their sound judgment; *provided, however*, that this section will not apply to any gross negligence or willful misconduct by the Creditors' Trust and the Trustee or their respective officers, directors, employees, professionals, representatives, agents, successors, or assigns.

29

7.13    **Term of Creditors' Trust**

The Trustee shall be discharged and the Creditors' Trust shall be terminated, at such time as (i) all of the Creditors' Trust Assets have been liquidated, (ii) all duties and obligations of the Trustee under the Creditors' Trust Agreement have been fulfilled, (iii) all Distributions required to be made by the Creditors' Trust under this Plan and the Creditors' Trust Agreement have been made, and (iv) the Chapter 11 Cases have been closed; *provided, however*, that in no event shall the Creditors' Trust be dissolved later than five (5) years from the Effective Date unless the Bankruptcy Court, upon motion within the six-month period prior to the fifth anniversary (or the end of any extension period approved by the Bankruptcy Court), determines that a fixed period extension not to exceed one (1) year is necessary to facilitate or complete the recovery and liquidation of the Creditors' Trust Assets.

7.14    **Conflicts Between the Creditors' Trust Agreement and the Plan**

In the event of any inconsistencies or conflict between the Creditors' Trust Agreement and this Plan, the terms and provisions of this Plan shall control.

## SECTION 8.  DISTRIBUTIONS

8.1    **Distribution Record Date**

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Equity Interests as maintained by the Debtors or their agents shall be deemed closed, and there shall be no further changes in the record Holders of any of the Claims or Equity Interests.  The Debtors shall have no obligation to recognize any ownership transfer of the Claims or Equity Interests occurring after the Distribution Record Date.  The Debtors shall be entitled to recognize and deal for all purposes under the Plan only with those record Holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

8.2    **Timing of Distributions**

Except as otherwise provided in this Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtors shall receive the full amount of the Distributions that the Plan provides for Allowed Claims in the applicable Class and in the manner provided therein.  Distributions made after the Effective Date to Holders of Allowed Claims shall be deemed to have been made on the Effective Date and, except as otherwise provided in the Plan, no interest shall be payable by the Debtors with respect to such Claims or any Distribution related thereto.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If there are Disputed Claims, Distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in the Plan.  Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends or accruals on

30

Distributions provided for thereunder, regardless of whether such Distributions are delivered on or at any time after the Effective Date.

### 8.3    Disbursing Agent

Except as otherwise provided in this Plan, all Distributions under this Plan shall be made by the Reorganized Debtors or the Trustee, as applicable, as "Disbursing Agent" or such other Person designated by the Reorganized Debtors or the Trustee as a Disbursing Agent on the Effective Date.

### 8.4    Rights and Powers of Disbursing Agent

The Disbursing Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under this Plan; (b) make all Distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to this Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of this Plan.

### 8.5    Delivery of Distributions in General

Except as otherwise provided in this Plan, distributions to Holders of Allowed Claims shall be made to Holders of record as of the Distribution Record Date by the Disbursing Agent. Distributions to Holders of Allowed Claims will be made at the address of each such Holder as set forth in the Debtors' books and records.  Distributions under this Plan on account of such Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in this Plan.  None of the Debtors, the Reorganized Debtors, and the Disbursing Agent shall incur any liability whatsoever on account of any distributions under this Plan.

### 8.6    Payments and Distributions on Disputed Claims

Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.  Notwithstanding any provision otherwise in this Plan and except as may be agreed to by the Debtors or the Reorganized Debtors, on the one hand, and the Holder of a Disputed Claim, on the other hand, no partial payments and no partial Distributions shall be made with respect to any Disputed Claim until all Disputed Claims held by the Holder of such Disputed Claim have become Allowed Claims or have otherwise been resolved by settlement or Final Order.

### 8.7    Manner of Payment

Any Distributions to be made by or on behalf of the Debtors, Reorganized Debtors, or the Trustee, as applicable, pursuant to this Plan shall be made by checks drawn on accounts maintained by the Debtors, Reorganized Debtors, or the Trustee, respectively, or by wire transfer if circumstances justify, at the option of the Debtors, Reorganized Debtors, or the Trustee, as

applicable; *provided, however*, any payments made to Bridging or Centurion shall be made by wire transfer.

### 8.8 Undeliverable Distributions and Unclaimed Property

In the event that any Distribution to any Holder is returned as undeliverable, no Distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then current address of such Holder, at which time such Distribution shall be made as soon as practicable after such Distribution has become deliverable; *provided, however*, that such Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and forfeited at the expiration of six months from the date of the Distribution. After such date, all "unclaimed property" or interests in property shall revert to the Reorganized Debtors or the Creditors' Trust, as applicable (notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary), and the Claim of any Holder to such property shall be discharged and forever barred.

### 8.9 Withholding and Reporting Requirements

In connection with this Plan and all instruments issued in connection therewith, the Disbursing Agent shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all Distributions under this Plan shall be subject to any such withholding or reporting requirements.

### 8.10 Surrender Instruments

Pursuant to section 1143 of the Bankruptcy Code, as a condition precedent to receiving any Distribution under the Plan, each holder of a certificated instrument or note must surrender such instrument or note held by it to the Disbursing Agent or its designee. Any such holder of such instrument or note that fails to (i) surrender the instrument or note or (ii) execute and deliver an affidavit of loss and/or indemnity reasonably satisfactory to the Disbursing Agent, as applicable, before the fifth anniversary of the Confirmation Date shall be deemed to have forfeited all rights and claims and may not participate in any Distribution hereunder. Any Distribution so forfeited shall become property of the Reorganized Debtors or the Creditors' Trust, as applicable.

### 8.11 Setoffs

Except for the payments to be made to Bridging or Centurion, the Debtors, the Reorganized Debtors and/or the Trustee may, but shall not be required to, set off against any Claim (for purposes of determining the Allowed amount of such Claim on which a Distribution shall be made), any claims of any nature whatsoever that the Debtors and the Reorganized Debtors may have against the Holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors, the Reorganized Debtors and/or the Trustee of any such claim the Debtors, the Reorganized Debtors and/or the Trustee may have against the Holder of such Claim.

### 8.12    Insurance Claims

Except for the payments to be made to Bridging or Centurion, no Distributions under this Plan shall be made on account of Allowed Claims until the Holder of such Allowed Claim has exhausted all remedies with respect to the Debtors' Insurance Policies.  To the extent that the Debtors' insurers agree to satisfy in full a Claim, then immediately upon such insurers' agreement, such Claim may be expunged without a Claims objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court.

### 8.13    Applicability of Insurance Policies

Except as otherwise provided in this Plan, Distributions to Holders of Allowed Claims shall be made in accordance with the provisions of any applicable Insurance Policy.  Nothing contained in this Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors, Reorganized Debtors, or any Person may hold against any insurers under any of the Debtors' Insurance Policies, nor shall anything contained in the Disclosure Statement or herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

### 8.14    No Postpetition Interest

Unless otherwise specifically provided for herein or in the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims or Equity Interests, and no Holder of a Claim or Equity Interest shall be entitled to interest accruing on or after the Petition Date on such Claim or Equity Interest.  Notwithstanding the foregoing, nothing in this Plan shall prohibit Bridging or Centurion from allocating payments received from the Debtors to principal or interest on Bridging's Secured Claim, in their sole discretion in accordance with applicable law.

### 8.15    Distributions Free and Clear

Except as may be otherwise provided herein, all Distributions under this Plan shall be free and clear of any Liens, Claims, encumbrances, and other interests.

### 8.16    Fractional Dollars; De Minimis Distributions

Notwithstanding any other provision of this Plan, Cash payments of fractions of dollars shall not be made.  Whenever any Distribution to a Holder of a Claim would otherwise call for Distribution of Cash in a fractional dollar amount, the actual Distribution of such Cash shall be rounded to the nearest whole dollar (up or down), with half dollars (or less) being rounded down. Neither the Debtors, the Reorganized Debtors nor the Trustee shall be required to make any Cash payment of less than ten dollars ($10.00) with respect to any Claim unless a request therefor is made in writing to the Debtor, the Reorganized Debtors or the Trustee, as applicable; *provided, however*, that neither the Debtor, the Reorganized Debtors nor the Trustee shall have any obligation to make any Distribution, whether final or not, unless and until the total amount of such Distribution to a specific Holder of an Allowed Claim is equal to or greater than ten dollars ($10.00).

# SECTION 9.  PROCEDURES FOR DISPUTED CLAIMS

The provisions of this section 9 shall not be applicable to Bridging's Secured Claim and Bridging's Deficiency Claim which are Allowed Claims.  Bridging's Deficiency Claim is Allowed for voting purposes only.  Bridging shall not be entitled to any Distributions on account of Bridging's Deficiency Claim.

### 9.1    Allowance of Claims and Interests

Except as expressly provided herein, or in any order entered in the Chapter 11 Cases prior to the Effective Date, including the Confirmation Order, no Claim or Equity Interest shall be deemed Allowed unless and until such Claim or Equity Interest is deemed Allowed under this Plan or the Bankruptcy Code or Allowed by the Bankruptcy Court by entry of a Final Order allowing such Claim or Equity Interest.  On and following the Effective Date, the Reorganized Debtors and Trustee, as applicable, shall be vested with any and all rights and defenses the Debtors had with respect to any Claim or Equity Interest immediately prior to the Effective Date.

### 9.2    Objections to Claims

Except as expressly provided herein, the Debtors (before the Effective Date) or the Reorganized Debtors or Trustee (on or after the Effective Date), as applicable, shall have the exclusive authority to file, settle, compromise, withdraw, or litigate to judgment any objections to Claims as permitted under this Plan.  With respect to Administrative Claims, Accrued Professional Compensation Claims and Other Priority Claims, the Debtors, the Reorganized Debtors and the Trustee shall have standing to object to any such Claims.  Any objections to Claims shall be filed and served on or before the later of (i) one hundred eighty (180) days after the Effective Date or (ii) such date as may be fixed by the Bankruptcy Court.  From and after the Effective Date, the Trustee may settle or compromise any Disputed Claim without approval of the Bankruptcy Court. The Debtors, the Reorganized Debtors and the Trustee reserve all rights to resolve any Disputed Claim outside the Bankruptcy Court under applicable governing law.

### 9.3    Estimation of Claims

The Debtors (before the Effective Date) or the Trustee (on or after the Effective Date) may, at any time, and from time to time, request that the Bankruptcy Court estimate any Contingent Claim or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether an objection was previously filed with the Bankruptcy Court with respect to such Claim, or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to such objection.  In the event that the Bankruptcy Court estimates any Contingent Claim or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors or the Trustee may pursue supplementary proceedings to object to the allowance of such Claim; *provided, however*, the Trustee may elect not to pursue such supplementary proceedings, instead electing to treat such maximum amount as the Allowed amount of such Claim.

9.4 **No Distribution Pending Allowance**

Notwithstanding any other provision of this Plan, if any portion of a Claim is Disputed, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

9.5 **Distributions after Allowance**

At such time as a Contingent Claim or a Disputed Claim becomes an Allowed Claim, a Distribution shall be made to the Holder of such Allowed Claim in accordance with the provisions of this Plan as soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Contingent Claim or Disputed Claim becomes a Final Order. To the extent that all or a portion of a Contingent Claim or a Disputed Claim is disallowed, the Holder of such Claim shall not receive any Distribution on account of the portion of such Claim that is disallowed.

9.6 **Preservations of Rights to Settle Claims**

In accordance with section 1123(b) of the Bankruptcy Code, the Trustee shall have the discretion to retain and enforce, sue on, settle, or compromise all claims, rights, causes of action, suits, and proceedings, whether in law or in equity, whether known or unknown, that the Debtors or their Estates may hold against any person or entity without the approval of the Bankruptcy Court, subject to the terms of this Plan, the Confirmation Order, and any contract, instrument, release, indenture, or other agreement entered into in connection herewith. The Trustee may pursue such retained claims, rights, or causes of action, suits, or proceedings, as appropriate, in accordance with the best interests of the Creditors' Trust.

9.7 **Disallowed Claims**

All Claims held by persons or entities against whom or which the Debtors or Trustee has commenced a proceeding asserting a cause of action under sections 542, 543, 544, 545, 547, 548, 549, and/or 550 of the Bankruptcy Code shall be deemed Disallowed Claims pursuant to section 502(d) of the Bankruptcy Code and Holders of such Claims shall not be entitled to vote to accept or reject the Plan. Disallowed Claims pursuant to this Section shall continue to be Disallowed Claims for all purposes until the avoidance action against such party has been settled or resolved by Final Order and any sums due to the Debtors or Trustee from such party have been paid.

**SECTION 10. EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

10.1 **Assumption and Rejection of Executory Contracts and Unexpired Leases**

Except with respect to the Material Contracts or as otherwise provided in this Plan or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with this Plan, each of the Executory Contracts and Unexpired Leases of the Debtors shall be deemed rejected as of the Effective Date, unless such Executory Contract or Unexpired Lease: (1) was assumed or rejected previously by the Debtor; (2) expired or terminated pursuant

35

to its own terms before the Effective Date; or (3) is the subject of a motion to assume or reject filed on or before the Effective Date.

The Debtors shall assume the Material Contracts. Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving assumption of such Material Contracts and such assumption shall be effective as of the Effective Date. Each Material Contract assumed pursuant to the Plan shall be fully enforceable by the Reorganized Debtors in accordance with its terms, except as such terms may have been modified by any order of the Bankruptcy Court or as otherwise agreed to by the Debtors and the applicable counterparty to the Material Contract.

### 10.2 **Inclusiveness**

Unless otherwise specified, each Executory Contract and Unexpired Lease assumed or rejected by the Debtors shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such Executory Contract or Unexpired Lease.

### 10.3 **Rejection Claims**

Except as otherwise provided in orders entered by the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Claims Agent and served on the Creditors' Trust (and counsel, if known) within thirty (30) days after service of notice of entry of the Confirmation Order; *provided, that* any such Claims arising from the rejection of an Unexpired Lease shall be subject to the cap on rejection damages imposed by section 502(b)(6) of the Bankruptcy Code. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed within such time will be automatically disallowed, forever barred from assertion and shall not be enforceable against the Debtors or the Reorganized Debtors, the Debtors' Estates or their property without the need for any objection by the Debtors, the Reorganized Debtors or the Creditors' Trust or further notice to, or action, order or approval of the Bankruptcy Court. All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims against the Debtors and shall be treated in accordance with this Plan.

### 10.4 **Cure of Defaults**

Any defaults under the Materials Contracts shall be satisfied, pursuant to and to the extent required by section 365(b)(1) of the Bankruptcy Code, by payment of the applicable default amount in Cash on the Effective Date or on such other terms as the Bankruptcy Court may order or the parties to such Materials Contracts may otherwise agree in writing (the "***Cure Amount***"). The Debtors shall file, as part of the Plan Supplement, a schedule of the Material Contracts and associated Cure Amounts.

Any objection by a counterparty to a Material Contract to a Cure Amount must be filed, served and actually received by the Debtors on or prior to thirty (30) days after the Effective Date. Any counterparty to a Material Contract that fails to object timely to the proposed Cure Amount will be deemed to have consented to such matters and will be deemed to have forever released and

36

waived any objection to such Cure Amount. The Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumption of the Material Contracts pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

In the event of a dispute regarding (a) the amount of any Cure Amount, (b) the ability of any Debtor or assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under any Material Contract to be assumed, or assumed and assigned or (c) any other matter pertaining to assumption, the applicable payment of the Cure Amount required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving such assumption. If such objection is sustained by Final Order of the Bankruptcy Court, the Debtors or the Reorganized Debtors may reject such Material Contract in lieu of assuming it. The Debtors or the Reorganized Debtors, as applicable, shall be authorized to effect such rejection by filing a written notice of rejection with the Bankruptcy Court and serving such notice on the applicable counterparty within thirty (30) days of the entry of such Final Order.

### 10.5    Full Release and Satisfaction

Subject to the payment of any Cure Amount, assumption of any Material Contract pursuant to the Plan shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Material Contract at any time prior to the effective date of assumption, in each case as provided in section 365 of the Bankruptcy Code. Any Proofs of Claim filed with respect to a Material Contract that has been assumed by Final Order shall be deemed disallowed and expunged (subject to the payment of a Cure Amount), without further notice to or action, order, or approval of the Bankruptcy Court.

### 10.6    Reservation of Rights

Nothing contained in this Plan or the Plan Supplement shall constitute an admission by the Debtors or the Reorganized Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Debtors or the Reorganized Debtors have any liability thereunder.

### 10.7    D&O Liability Insurance Policies

To the extent that the D&O Liability Insurance Policies are considered to be Executory Contracts, notwithstanding anything in the Plan to the contrary, effective as of the Effective Date, the Debtors shall be deemed to have assumed all unexpired D&O Liability Insurance Policies with respect to the Debtors' directors, managers, officers, and employees serving on or after the Petition Date pursuant to section 365(a) of the Bankruptcy Code. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtors' assumption of each of the unexpired D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan or Confirmation Order, confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations of the insurers under the D&O Liability Insurance Policies assumed by the foregoing assumption of the D&O Liability Insurance Policies, any agreements, documents, and instruments related thereto, and each such indemnity obligation will be deemed and treated as

37

an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be filed.

## SECTION 11.  CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

### 11.1    Conditions Precedent to Confirmation

Confirmation of this Plan shall not occur, and the Confirmation Order shall not be entered, until each of the following conditions precedent have been satisfied or waived pursuant to the provisions of this Plan:

(a)    The Bankruptcy Court shall have entered an order, which shall not be subject to any stay or subject to an unresolved request for revocation under section 1144 of the Bankruptcy Code, in form and substance acceptable to the Debtors and Bridging, approving the Disclosure Statement with respect to this Plan and the solicitation of votes thereon as being in compliance with section 1125 of the Bankruptcy Code and applicable non-bankruptcy law;

(b)    The proposed Confirmation Order shall be in form and substance satisfactory in all respects to the Debtors, the Committee and Bridging;

(c)    Unless otherwise authorized by the Confirmation Order, the Bankruptcy Court shall have entered one or more orders, in form and substance acceptable to the Debtors and Bridging, authorizing the assumption of the Material Contracts; and

(d)    The Plan and the Plan Supplement, including any schedules, documents, supplements, and exhibits thereto shall be, in form and substance, acceptable to the Debtors, the Committee and Bridging.

### 11.2    Conditions Precedent to the Effective Date

The Effective Date shall not occur until each of the following conditions precedent have been satisfied or waived pursuant to the provisions of this Plan:

(a)    All documents and agreements necessary to implement the Plan, including without limitation, the Reorganized Debtor Equity, the New Organizational Documents, and the New Secured Debt Documents, in each case in form and substance acceptable to the Debtors, Bridging, the Committee and Centurion, as applicable, will have (a) been tendered for delivery and (b) been effected by, executed by, or otherwise deemed binding upon, all Entities party thereto.  All conditions precedent to such documents and agreements will have been satisfied or waived pursuant to the terms of such documents or agreements;

(b)    All consents, actions, documents, certificates and agreements necessary to implement the Plan, including, without limitation, the New Organizational Documents, will have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws;

38

(c)    All Material Contracts shall have been assumed by the Reorganized Debtors;

(d)    The Debtors shall have implemented the Restructuring Transactions in a manner consistent with the Plan pursuant to the documentation acceptable to the Debtors, Bridging, the Committee and Centurion, as applicable; and

(e)    All actions, documents, certificates, and agreements necessary to implement this Plan, including, without limitation, the Creditors' Trust Agreement, shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws.

### 11.3    **Waiver of Conditions**

The conditions to consummation of the Plan set forth in this section 11 may be waived by the Debtors with the consent of Bridging and the Committee without notice, leave, or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan. To the extent that a condition to consummation of the Plan requires the consent of Bridging and/or the Committee, such conditions may only be waived by the Debtors with the consent of Bridging or the Committee, as applicable. The failure to satisfy or waive a condition to confirmation or the Effective Date may be asserted by the Debtors, the Reorganized Debtors or Bridging regardless of the circumstances giving rise to the failure of such condition to be satisfied. The failure of the Debtors, the Reorganized Debtors or Bridging to exercise any of the foregoing rights will not be deemed a waiver of any other rights, and each right will be deemed an ongoing right that may be asserted at any time.

### 11.4    **Effect of Failure of Conditions**

If the consummation of the Plan does not occur, the Plan will be null and void in all respects and nothing contained in the Plan or the Disclosure Statement will: (a) constitute a waiver or release of any claims by or Claims against or Equity Interests in the Debtors; (b) prejudice in any manner the rights of the Debtors, any Holders or any other Entity; (c) constitute an Allowance of any Claim or Equity Interest; or (d) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any Holders or any other Entity in any respect.

## SECTION 12.  EFFECT OF CONFIRMATION

### 12.1    **Immediate Binding Effect**

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or any other Bankruptcy Rule, upon the occurrence of the Effective Date, the terms of this Plan and the Creditors' Trust Agreement shall be immediately effective and enforceable and deemed binding upon the Debtors, Reorganized Debtors, the Trustee, the Creditors' Trust and any and all Holders of Claims or Equity Interests (irrespective of whether such Claims or Equity Interests are deemed to have accepted this Plan), all Persons that are parties to or are subject to the settlements, compromises, releases, discharges and injunctions described in this Plan, each Person acquiring property under this Plan,

and any and all non-Debtors parties to Executory Contracts and Unexpired Leases with the Debtors.

### 12.2 Compromise and Settlement of Claims, Interests and Controversies

To the extent provided for by the Bankruptcy Code and in consideration for the Distributions and other benefits provided pursuant to this Plan, on the Effective Date, the provisions of this Plan shall constitute a good faith compromise of all Claims, Equity Interests and controversies relating to the contractual, legal and subordination rights that a Holder of a Claim or Equity Interest may have with respect to any Allowed Claim or Equity Interest, or any Distribution to be made on account of such Allowed Claim or Equity Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Equity Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Equity Interests and is fair, equitable, and reasonable.

### 12.3 Releases by the Debtors

Pursuant to section 1123(b) of the Bankruptcy Code and except as otherwise specifically provided in this Plan or the Plan Supplement, for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious reorganization of the Debtors and the consummation of the transactions contemplated by the Plan, on and after the Effective Date, the Released Parties are deemed released and discharged by the Debtors and their Estates from any and all claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, that the Debtors or their Estates would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, or the transactions or events giving rise to any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between the Debtors and any Released Party, the restructuring of Claims and Equity Interests before or during the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, the Disclosure Statement, any Plan Supplement or related agreements, instruments or other documents, other than Debtor Released Claims against a Released Party arising out of the gross negligence, willful misconduct, intentional fraud, or criminal liability of any such person or entity (the "***Debtor Released Claims***").

### 12.4 Releases by Holders of Claims

**ON THE EFFECTIVE DATE, EXCEPT AS OTHERWISE PROVIDED HEREIN AND EXCEPT FOR THE RIGHT TO ENFORCE THIS PLAN, ALL PERSONS WHO (I) ARE DEEMED TO HAVE VOTED TO ACCEPT THIS PLAN UNDER SECTION 1126(F) OF THE BANKRUPTCY CODE; OR (II) ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THIS PLAN AND MARK THEIR BALLOTS AS OPTING-IN TO THE RELEASES GRANTED UNDER THIS SECTION, SHALL, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, BE DEEMED TO FOREVER RELEASE, WAIVE**

40

**AND DISCHARGE THE RELEASED PARTIES OF AND FROM ALL LIENS, CLAIMS, CAUSES OF ACTION, LIABILITIES, ENCUMBRANCES, SECURITY INTERESTS, INTERESTS OR CHARGES OF ANY NATURE OR DESCRIPTION WHATSOEVER RELATING TO THE DEBTORS, THE CHAPTER 11 CASES OR AFFECTING PROPERTY OF THE ESTATES, WHETHER KNOWN OR UNKNOWN, SUSPECTED OR UNSUSPECTED, SCHEDULED OR UNSCHEDULED, CONTINGENT OR NOT CONTINGENT, UNLIQUIDATED OR FIXED, ADMITTED OR DISPUTED, MATURED OR UNMATURED, SENIOR OR SUBORDINATED, WHETHER ASSERTABLE DIRECTLY OR DERIVATIVELY BY, THROUGH, OR RELATED TO ANY OF THE RELEASED PARTIES AND THEIR SUCCESSORS AND ASSIGNS WHETHER AT LAW, IN EQUITY OR OTHERWISE, BASED UPON ANY CONDITION, EVENT, ACT, OMISSION OCCURRENCE, TRANSACTION OR OTHER ACTIVITY, INACTIVITY, INSTRUMENT OR OTHER AGREEMENT OF ANY KIND OR NATURE OCCURRING, ARISING OR EXISTING PRIOR TO THE EFFECTIVE DATE IN ANY WAY RELATING TO OR ARISING OUT OF, IN WHOLE OR IN PART, THE DEBTORS, THE CHAPTER 11 CASES, THE PURSUIT OF CONFIRMATION OF THIS PLAN, THE CONSUMMATION OF THIS PLAN OR THE ADMINISTRATION OF THIS PLAN, INCLUDING WITHOUT LIMITATION, THE NEGOTIATION AND SOLICITATION OF THIS PLAN, ALL REGARDLESS OF WHETHER (A) A PROOF OF CLAIM OR EQUITY INTEREST HAS BEEN FILED OR IS DEEMED TO HAVE BEEN FILED, (B) SUCH CLAIM OR EQUITY INTEREST IS ALLOWED OR (C) THE HOLDER OF SUCH CLAIM OR EQUITY INTEREST HAS VOTED TO ACCEPT OR REJECT THIS PLAN, EXCEPT FOR WILLFUL MISCONDUCT OR GROSS NEGLIGENCE.  FOR THE AVOIDANCE OF DOUBT, NOTHING CONTAINED HEREIN SHALL IMPACT THE RIGHT OF ANY HOLDER OF AN ALLOWED CLAIM TO RECEIVE A DISTRIBUTION ON ACCOUNT OF ITS ALLOWED CLAIM IN ACCORDANCE WITH SECTION 4 OF THIS PLAN.**

### 12.5   Exculpation

None of the Exculpated Parties shall have or incur any liability to any Holder of a Claim or Equity Interest, or other party in interest, or any of their respective members, officers, directors, employees, advisors, professionals, attorneys or agents, or any of their successors and assigns, with respect to any Exculpated Claim, including, without limitation, any act or omission in connection with, related to, or arising out of, in whole or in part, the Chapter 11 Cases, except for their willful misconduct or gross negligence as determined by a Final Order of a court of competent jurisdiction.

### 12.6   Injunction

**FROM AND AFTER THE EFFECTIVE DATE, ALL PERSONS WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS AGAINST OR INTEREST IN THE DEBTORS ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY CAUSE OF ACTION RELEASED OR TO BE RELEASED PURSUANT TO THIS PLAN OR THE CONFIRMATION ORDER.**

**FROM AND AFTER THE EFFECTIVE DATE, TO THE EXTENT OF THE RELEASES AND EXCULPATION GRANTED IN THIS PLAN, THE RELEASING PARTIES SHALL BE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE RELEASED PARTIES AND THE EXCULPATED PARTIES AND THEIR ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, ACTION OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST, OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO THIS PLAN.**

**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS PLAN, THE PLAN SUPPLEMENT OR RELATED DOCUMENTS, OR FOR OBLIGATIONS PURSUANT TO THIS PLAN, ALL PERSONS WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED, DISCHARGED, OR ARE SUBJECT TO EXCULPATION, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS:  (A) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (B) ENFORCING, ATTACHING, COLLECTING OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH PERSONS ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (C) CREATING, PERFECTING OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH PERSONS OR THE PROPERTY OR ESTATES OF SUCH PERSONS ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; AND (D) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED, SETTLED OR DISCHARGED PURSUANT TO THIS PLAN.**

**THE RIGHTS AFFORDED IN THIS PLAN AND THE TREATMENT OF ALL CLAIMS AND INTERESTS THEREUNDER SHALL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF ALL CLAIMS AND INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, AGAINST THE DEBTORS OR ANY OF THEIR ASSETS, PROPERTY OR ESTATES. ON THE EFFECTIVE DATE, ALL SUCH CLAIMS AGAINST THE DEBTORS SHALL BE FULLY RELEASED, AND THE INTERESTS SHALL BE CANCELLED (EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS PLAN).**

**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR IN THIS PLAN OR IN OBLIGATIONS PURSUANT THERETO FROM AND AFTER THE EFFECTIVE DATE, ALL CLAIMS AGAINST THE DEBTORS SHALL BE FULLY RELEASED, AND ALL INTERESTS SHALL BE CANCELLED, AND THE DEBTORS' LIABILITY WITH RESPECT THERETO SHALL BE EXTINGUISHED COMPLETELY, INCLUDING ANY**

42

LIABILITY OF THE KIND SPECIFIED UNDER SECTION 502(G) OF THE BANKRUPTCY CODE.

ALL PERSONS SHALL BE PRECLUDED FROM ASSERTING AGAINST THE DEBTORS, THE DEBTORS' ESTATES, THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, AND THEIR ASSETS AND PROPERTIES, ANY OTHER CLAIMS OR INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS OR ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE.

### 12.7    Term of Injunctions or Stays

Unless otherwise provided in this Plan or Confirmation Order, all injunctions or stays provided for under this Plan and ordered in the Confirmation Order or pursuant to sections 105 or 362 of the Bankruptcy Code arising under or entered during the Chapter 11 Cases, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay and to the extent consistent with the terms and provisions of this Plan or the Confirmation Order, as applicable.

### 12.8    Injunction Against Interference with Plan

Upon the Bankruptcy Court's entry of the Confirmation Order, all Holders of Claims and Equity Interests, the Debtors, and other parties in interest, along with their respective present or former employees, agents, officers, directors, or principals, shall be enjoined from taking any actions to interfere with the Debtors', Reorganized Debtors', the Creditors' Trust's, the Trustee's, and their respective affiliates', employees', advisors', officers' and directors', and agents' implementation or consummation of this Plan.

### 12.9    Effectuating Documents and Further Transactions

The Debtors or the Reorganized Debtors, as applicable, all Holders of Claims or Equity Interests receiving distributions hereunder and all other Entities shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan or the Confirmation Order.  On or before the Effective Date, the Debtors shall file with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

### 12.10   Preservation of Causes of Action of the Debtors

In accordance with section 1123(b) of the Bankruptcy Code, and except where such Causes of Action have been expressly released (including, for the avoidance of doubt, pursuant to the releases by the Debtors and exculpation provisions provided in the Plan), the Debtors and Trustee shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action.

43

# SECTION 13.  MODIFICATION, REVOCATION OR WITHDRAWAL OF THIS PLAN

### 13.1    Modification and Amendments

This Plan or any exhibits thereto may be amended, modified, or supplemented by the Debtors in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code. In addition, after the Confirmation Date, the Debtors, Reorganized Debtors, or Trustee may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in this Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes and effects of this Plan.

### 13.2    Effect of Confirmation on Modifications

Entry of a Confirmation Order shall mean that all modifications or amendments to this Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

### 13.3    Revocation or Withdrawal of this Plan

The Debtors reserve the right to, consistent with their fiduciary duties, revoke or withdraw this Plan before the Effective Date.  If the Debtors revoke or withdraw this Plan, or if the Confirmation Date does not occur, then:  (a) this Plan shall be null and void in all respects; (b) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount certain of any Claim or Equity Interest or Class of Claims or Equity Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by this Plan, and any document or agreement executed pursuant to this Plan, shall be deemed null and void; and (c) nothing contained in this Plan shall:  (i) constitute a waiver or release of any Claims or Equity Interests; (ii) prejudice in any manner the rights of the Debtors or any other Person; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Person.

# SECTION 14.  Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and this Plan, including, but not limited to, jurisdiction to:

(a)    allow, disallow, determine, liquidate, classify, estimate or establish the priority, secured or unsecured status or amount of any Claim or Equity Interest, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims;

(b)    decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or this Plan;

44

(c)     resolve any matters related to:  (i) the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which the Debtors are a party or with respect to which the Debtors may be liable in any manner and to hear, determine and, if necessary, liquidate, any Claims arising therefrom, including rejection Claims and cure Claims, pursuant to section 365 of the Bankruptcy Code or any other matter related to such Executory Contract or Unexpired Lease; (ii) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; and (iii) any dispute regarding whether a contract or lease is or was executory or expired;

(d)     ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of this Plan;

(e)     adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters and any other matters, and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

(f)     adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters and any other matters, including, but not limited to, the Causes of Action, involving the Trustee or the Creditors' Trust;

(g)     adjudicate, decide, or resolve any and all matters related to any Cause of Action;

(h)     adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

(i)     enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

(j)     issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person with consummation or enforcement of this Plan;

(k)     resolve any cases, controversies, suits, disputes or Causes of Action with respect to the discharge, releases, injunctions, exculpations, indemnifications, and other provisions contained in this Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

(l)     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

(m)     resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order, the Creditors' Trust, the Creditors' Trust Agreement, any transactions or payments contemplated thereby, or any contract, instrument, release, indenture, or other agreement or document relating to any of the foregoing;

60437/0001-20344430v5

(n)     adjudicate any and all disputes arising from or relating to Distributions under this Plan;

(o)     consider any modifications of this Plan, cure any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

(p)     determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

(q)     hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(r)     hear and determine all disputes involving the existence, nature or scope of the Debtors' discharge;

(s)     enforce all orders previously entered by the Bankruptcy Court;

(t)     hear any other matter not inconsistent with the Bankruptcy Code; and

(u)     enter a final decree closing the Chapter 11 Cases.

## SECTION 15.  MISCELLANEOUS PROVISIONS

### 15.1    Payment of Statutory Fees

All fees payable pursuant to 28 U.S.C. § 1930 shall be paid on the earlier of when due or the Effective Date by the Debtors.  After the Effective Date, the Trustee shall be liable for payment of any such fees until entry of a final decree closing the Chapter 11 Cases.

### 15.2    Dissolution of the Committee

On the Effective Date, the Committee and any other statutory committee formed in connection with the Chapter 11 Cases shall dissolve automatically and all members thereof shall be released and discharged from all rights, duties, and responsibilities arising from, or related to, the Chapter 11 Cases.

### 15.3    Section 382 Limitation on Net Operating Losses and Built-In Losses

With respect to the Debtors' net operating losses, the Debtors and the Reorganized Debtors reserve the right to seek the exception set forth in 26 U.S.C. § 382(l)(5).

### 15.4    Section 1125(e) Good Faith Compliance

As of and subject to the occurrence of the Confirmation Date, the Debtors and their Related Persons shall be deemed to have solicited acceptances of this Plan in good faith and in compliance

46

with the applicable provisions of the Bankruptcy Code and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation.

### 15.5    Substantial Consummation

On the Effective Date, the Plan shall be deemed to be substantially consummated within the meaning set forth in section 1101 and pursuant to section 1127(b) of the Bankruptcy Code.

### 15.6    Section 1146 Exemption

To the fullest extent permitted under section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of any security under or pursuant to this Plan, and the execution, delivery, or recording of any instrument of transfer under or pursuant to this Plan, and the revesting, transfer, or sale of any property of or to the Creditors' Trust shall not be taxed under any state or local law imposing a stamp tax, transfer tax, or similar tax or fee.  Consistent with the foregoing, each recorder of deeds or similar official for any county, city or other Governmental Unit in which any instrument hereunder is to be recorded in accordance with this Plan shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument, without requiring the payment of any documentary stamp tax, deed stamps, stamp tax, transfer tax, mortgage recording tax, intangible tax, or similar tax.

### 15.7    Closing of the Chapter 11 Cases

Upon the earlier of (i) the date upon which all payments on account of Allowed Administrative Expense Claims and Accrued Professional Compensation Claims have been paid or (ii) sixty (60) days after the Effective Date, the Reorganized Debtors shall seek authority from the Bankruptcy Court to close the Chapter 11 Cases in accordance with the Bankruptcy Code and Bankruptcy Rules.

### 15.8    Plan Supplement

Any exhibits or schedules not filed with this Plan may be contained in the Plan Supplement, if any, and the Debtors hereby reserve the right to file such exhibits or schedules as a Plan Supplement.

### 15.9    Further Assurances

The Debtors, Reorganized Debtors, or the Trustee may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.  The Debtors, Reorganized Debtors, the Trustee, and all Holders of Claims receiving Distributions pursuant to this Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan.

47

### 15.10  Exhibits Incorporated

All exhibits to the Plan, including the Plan Supplement, are incorporated into and are part of this Plan as if fully set forth herein.

### 15.11  Inconsistency

In the event of any inconsistency among this Plan, the Disclosure Statement, and any exhibit to the Disclosure Statement, the provisions of this Plan shall govern.

### 15.12  No Admissions

If the Effective Date does not occur, this Plan shall be null and void in all respects, and nothing contained in this Plan shall (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtors, (b) prejudice in any manner the rights of the Debtors or any other party in interest, or (c) constitute an admission of any sort by the Debtors or other party in interest.

### 15.13  Reservation of Rights

Except as expressly set forth herein, this Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order and the Effective Date has occurred.  None of this Plan, any statement or provision contained in this Plan or any action taken or not taken by the Debtors with respect to this Plan, the Disclosure Statement or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the Debtors with respect to the Holders of Claims or Equity Interests before the Effective Date.

### 15.14  Successors and Assigns

The rights, benefits, and obligations of any Person named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiaries or guardian, if any, of each Person.

### 15.15  Entire Agreement

On the Effective Date, this Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

### 15.16  Notices

All notices, requests, and demands to or upon the Debtors in the Chapter 11 Cases shall be in writing and, unless otherwise provided herein, shall be deemed to have been duly given or made when actually delivered or, if by facsimile transmission, when received and telephonically confirmed to the below recipients:

48

Hygea Holdings Corp., *et al.*
Attn: Keith Collins, M.D.
8700 W. Flagler Street, Suite 280
Miami, Florida 33174
Phone (855) 339-4095
E-mail: keith.collins@hygea.net

with copies to:

COLE SCHOTZ, P.C.
Attn:  Felice R. Yudkin
25 Main Street
Hackensack, New Jersey 07601
Tel: (201) 489-3000
E-mail:  fyudkin@coleschotz.com

All notices and requests to Persons holding any Claim or Interest in any Class shall be sent to them at their last known address or to the last known address of their attorney of record in the Chapter 11 Cases.  Any such Holder of a Claim or Interest may designate in writing any other address for purposes of this section, which designation will be effective upon receipt by the Debtors.

### 15.17  Severability

If, prior to the entry of the Confirmation Order, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### 15.18  Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Delaware, without giving effect to the principles of conflicts of laws, shall govern the rights, obligations, construction, and implementation of the Plan and the transactions consummated or to be consummated in connection therewith.

49

15.19  **Request for Confirmation**

The Debtors request entry of the Confirmation Order under section 1129(a) of the Bankruptcy Code and, to the extent necessary, section 1129(b) of the Bankruptcy Code.

Dated: May 1, 2020

Respectfully submitted,

Hygea Holdings Corp., *et al.*

By:  _____

Keith Collins, M.D.
Authorized Signatory

50

EXHIBIT B TO DISCLOSURE STATEMENT

Liquidation Analysis

**Hygea Holdings Corp.**
**Liquidation Analysis Assumptions**

**Liquidation Analysis:**

- Liquidation assumes forced shut-down, as all insurance counter-parties for Managed Service Organization ("MSO") contracts have 60-day termination clauses
- Analysis uses 9/30/2019 balance sheet, prepared for internal use
- Cash balance reflects actual available cash balance as of 3/4/2020
- Receivables from payors are offset by claims payable to payors under MSO contracts, remaining accounts receivables are estimated to have an 70-80% collection rate for Chapter 11 liquidation (60-70% for Chapter 7 liquidation)
- Inventory includes drugs, medical supplies and other supplies
- Notes receivables are to insiders, which have offsetting notes payables
- Prepaid assets are related to prepaid insurance
- New operations cease as of 3/31/20; one month of operating losses estimated using interim DIP funding amount
- For Chapter 11 liquidation, liquidation fees are estimated at 5% of net recoverable assets
- For Chapter 7 liquidation, Chapter 7 Trustee fees are estimated 3% of net recoverable assets, excluding cash
- For Chapter 7 liquidation, Chapter 11 professional fees represents professional fees billed for services
  for services through 3/31 per fee applications filed or invoices presented to Company

**Hygea Holdings Corp.**
**Consolidated Balance Sheet - unaudited**
*in USD 000s*

| | As of |
| --- | --- |
| | **9/30/2019** |
| **Assets** | |
| **Current assets** | |
| Cash and cash equivalents | $    2,198 |
| Accounts receivable, net | 3,766 |
| Prepaid and other current assets | 158 |
| Inventory | - |
| Due from related parties | 33,029 |
| **Total current assets** | **39,150** |
| | |
| Property and equipment, net | 2,557 |
| Intangible assets, net | 4,787 |
| Goodwill | 47,132 |
| Other assets | 437 |
| **Total assets** | **$   94,063** |
| | |
| **Liabilities and Equity** | |
| | |
| **Current liabilities** | |
| Accounts payable and accrued expenses | $   24,455 |
| Taxes payable | 132 |
| Claims payable | 10,692 |
| Common stock to be issued | 27,819 |
| Long-term debt, current portion | 5,031 |
| **Total current liabilities** | **68,129** |
| | |
| **Long-term liabilities** | |
| Long-term debt (net of current portion) | 126,072 |
| Due to related parties | 66,493 |
| **Total long-term liabilities** | **192,565** |
| | |
| **Total liabilities** | **260,694** |
| | |
| **Total equity** | **(166,631)** |
| **Total liabilities and equity** | **$   94,063** |

**Hygea Holdings Corp.**

**Liquidation Analysis - Chapter 7**

*in USD 000s*

| Chapter 7 |
|---|

| | As of 9/30/2019 | Adjustments | Available for Recovery | High Chapter 7 liquidation | | Low Chapter 7 liquidation | |
|---|---|---|---|---|---|---|---|
| | | | | Basis (%) | Value ($) | Basis (%) | Value ($) |
| **Assets** | | | | | | | |
| **Current assets** | | | | | | | |
| Cash and cash equivalents [1] | $ 2,198 | $ (906) | $ 1,291 | 100% | $ 1,291 | 95% | $ 1,227 |
| Accounts receivable, net [2] | 3,766 | - | 3,766 | 40% | 1,506 | 25% | 942 |
| Prepaid and other current assets | 158 | - | 158 | 30% | 47 | 15% | 24 |
| Inventory | - | - | - | 0% | | 0% | |
| Due from related parties | 33,029 | - | 33,029 | 0% | - | 0% | - |
| **Total current assets** | **39,150** | **(906)** | **38,244** | | **2,845** | | **2,192** |
| | | | | | | | |
| Property and equipment, net [3] | 2,557 | - | 2,557 | 12% | 295 | 5% | 118 |
| Intangible assets, net [4] | 4,787 | - | 4,787 | 10% | 479 | 5% | 239 |
| Goodwill [4] | 47,132 | - | 47,132 | 0% | - | 0% | - |
| Other assets | 437 | - | 437 | 0% | - | 0% | - |
| **Net recoverable assets** | $ 94,063 | $ (906) | $ 93,157 | | $ 3,619 | | $ 2,549 |
| | | | | | | | |
| Wind-Down Profit/(Loss) [5] | | | | | (1,741) | | (1,741) |
| Chapter 7 Trustee Fees [6] | | | | | (70) | | (40) |
| Chapter 7 Broker and Professional Fees [7] | | | | | (550) | | (535) |
| **Total Available for Distribution** | | | | | **$ 1,258** | | **$ 234** |

**Hygea Holdings Corp.**
**Liquidation Analysis - Chapter 7**
*in USD 000s*

| | As of 9/30/2019 | Adjustments | Available for Recovery | High Chapter 7 liquidation | | Low Chapter 7 liquidation | |
|---|---|---|---|---|---|---|---|
| **Total Available for Distribution** | | | | $ | 1,258 | $ | 234 |
| | | | | | | | |
| **Secured claims** | | | | | | | |
| Long-term debt [8] | 120,992 | - | 120,992 | 1% | 1,258 | 0% | 234 |
| **Secured claims** | **120,992** | **-** | **120,992** | **1%** | **1,258** | **0%** | **234** |
| | | | | | | | |
| **Administrative claims** | | | | | | | |
| Chapter 11 professional fees [9] | 1,132 | | 1,132 | 0% | - | 0% | - |
| Post-petition accounts payable | 115 | | 115 | 0% | - | 0% | - |
| 503(b)(9) [10] | 561 | - | 561 | 0% | - | 0% | - |
| **Subtotal Administrative Claims** | **561** | **-** | **561** | **0%** | **-** | **-** | **-** |
| | | | | | | | |
| **Priority tax claim** | | | | | | | |
| Payroll tax payable [11] | 10,427 | - | 10,427 | 0% | - | 0% | - |
| **Subtotal Priority tax claim** | **10,427** | **-** | **10,427** | **0%** | **-** | **-** | **-** |
| | | | | | | | |
| **Other priority claims** | | | | | | | |
| Accrued salaries and benefits [12] | 605 | - | 605 | 0% | - | 0% | - |
| **Other priority claims** | **605** | **-** | **605** | **0%** | **-** | **-** | **-** |
| | | | | | | | |
| | | | | | | | |
| **Unsecured claims** | | | | | | | |
| Accounts payable and accrued liabilities [13] | 36,888 | (11,593) | 25,295 | 0% | - | 0% | - |
| Claims payable [14] | 3,266 | - | 3,266 | 0% | - | 0% | - |
| Notes payable - related parties | 2,240 | - | 2,240 | 0% | - | 0% | - |
| Common stock to be issued - current | 29,611 | - | 29,611 | 0% | - | 0% | - |
| Claims payable under terminated risk contracts | 9,628 | - | 9,628 | 0% | - | 0% | - |
| **Unsecured claims** | **81,633** | **(11,593)** | **70,040** | **0%** | **-** | **0%** | **-** |
| | | | | | | | |
| **Equity** | **54,111** | **-** | **54,111** | **0%** | **-** | **0%** | **-** |

Chapter 7

**Hygea Holdings Corp.**

**Liquidation Analysis - Chapter 7**

*in USD 000s*

Chapter 7

**Notes**

(1) *Adjusted to 3/2/2020 available cash balance*

(2) *Accounts receivable are unadjusted for claims payable under existing MSO contracts, as they are unrelated to terminated contracts and therefore do not offset current A/R*

(3) *See detailed schedule for recovery % assumptions*

(4) *Goodwill and intangible assets related to acquisitions are estimated to not have recovery value, given current financial losses*

(5) *Assumed 1 month of operating losses using interim DIP amount*

(6) *Assumed that Chapter 7 Trustee fees are 3% of net recoverable assets, excluding cash*

(7) *Includes the estimated cost for advisors, attorneys, and other professionals retained by the Trustee*

(8) *Pre-petition balance, using 1.34 CAD to USD exchange rate*

(9) *Represents professional fees billed by Chapter 11 professionals for services through 3/31 per fee applications filed or invoices presented to Company*

(10) *Assumed that 2% of A/P balances would be 503(b)(9) claims.*

(11) *Based on company's latest estimates, includes estimates for fines and other penalties.*

(12) *Assumes one payroll cycle*

(13) *Excludes 503(b)(9), payroll tax payable and accrued salaries and benefits*

(14) *Claims payable are related to terminated MSO contracts and therefore do no offset A/R*

**Hygea Holdings Corp.**

**Liquidation Analysis - Chapter 11**

*in USD 000s*

**Chapter 11**

| Assets | As of 9/30/2019 | Adjustments | Available for Recovery | High Chapter 11 liquidation | | Low Chapter 11 liquidation | |
|---|---|---|---|---|---|---|---|
| | | | | Basis (%) | Value ($) | Basis (%) | Value ($) |
| **Current assets** | | | | | | | |
| Cash and cash equivalents [1] | $ 2,198 | $ (906) | $ 1,291 | 100% | $ 1,291 | 95% | $ 1,227 |
| Accounts receivable, net [2] | 3,766 | - | 3,766 | 80% | 3,013 | 70% | 2,636 |
| Prepaid and other current assets | 158 | - | 158 | 40% | 63 | 25% | 39 |
| Inventory | - | - | - | 0% | - | 0% | - |
| Due from related parties | 33,029 | - | 33,029 | 10% | 3,303 | 0% | - |
| **Total current assets** | **39,150** | **(906)** | **38,244** | | **7,670** | | **3,903** |
| | | | | | | | |
| Property and equipment, net [3] | 2,557 | - | 2,557 | 12% | 295 | 5% | 118 |
| Intangible assets, net [4] | 4,787 | - | 4,787 | 20% | 957 | 10% | 479 |
| Goodwill [4] | 47,132 | - | 47,132 | 0% | - | 0% | - |
| Other assets | 437 | - | 437 | 0% | - | 0% | - |
| **Net recoverable assets** | **$ 94,063** | **$ (906)** | **$ 93,157** | | **$ 8,922** | | **$ 4,499** |
| | | | | | | | |
| Wind-Down Profit/(Loss) [5] | | | | | (1,741) | | (1,741) |
| Liquidation Fees [6] | | | | | (446) | | (225) |
| **Total Available for Distribution** | | | | | **$ 6,736** | | **$ 2,534** |

**Hygea Holdings Corp.**

Liquidation Analysis - Chapter 11

*in USD 000s*

Chapter 11

| | As of 9/30/2019 | Adjustments | Available for Recovery | High Chapter 11 liquidation | | Low Chapter 11 liquidation | |
|---|---|---|---|---|---|---|---|
| **Total Available for Distribution** | | | | $ | 6,736 | $ | 2,534 |
| | | | | | | | |
| **Secured claims** | | | | | | | |
| Long-term debt [7] | 120,992 | - | 120,992 | 6% | 6,736 | 2% | 2,534 |
| **Secured claims** | **120,992** | **-** | **120,992** | **6%** | **6,736** | **2%** | **2,534** |
| | | | | | | | |
| **Administrative claims** | | | | | | | |
| 503(b)(9) [8] | 561 | - | 561 | 0% | - | 0% | - |
| **Subtotal Administrative Claims** | **561** | **-** | **561** | **0%** | **-** | **-** | **-** |
| | | | | | | | |
| **Priority tax claim** | | | | | | | |
| Payroll tax payable [9] | 10,427 | - | 10,427 | 0% | - | 0% | - |
| **Subtotal Priority tax claim** | **10,427** | **-** | **10,427** | **0%** | **-** | **-** | **-** |
| | | | | | | | |
| **Other priority claims** | | | | | | | |
| Accrued salaries and benefits [10] | 605 | - | 605 | 0% | - | 0% | - |
| **Other priority claims** | **605** | **-** | **605** | **0%** | **-** | **-** | **-** |
| | | | | | | | |
| **Unsecured claims** | | | | | | | |
| Accounts payable and accrued liabilities [11] | 36,888 | (11,593) | 25,295 | 0% | - | 0% | - |
| Claims payable [12] | 3,266 | - | 3,266 | 0% | - | 0% | - |
| Notes payable - related parties | 2,240 | - | 2,240 | 0% | - | 0% | - |
| Common stock to be issued - current | 29,611 | - | 29,611 | 0% | - | 0% | - |
| Claims payable under terminated risk contracts | 9,628 | - | 9,628 | 0% | - | 0% | - |
| **Unsecured claims** | **81,633** | **(11,593)** | **70,040** | **0%** | **-** | **0%** | **-** |
| | | | | | | | |
| **Equity** | **54,111** | **-** | **54,111** | **0%** | **-** | **0%** | **-** |

**Hygea Holdings Corp.**

**Liquidation Analysis - Chapter 11**

| | Chapter 11 |
|---|---|

*in USD 000s*

**Notes**

[1]  *Adjusted to 3/2/2020 available cash balance*

[2]  *Accounts receivable are unadjusted for claims payable under existing MSO contracts, as they are unrelated to terminated contracts and therefore do not offset current A/R*

[3]  *See detailed schedule for recovery % assumptions*

[4]  *Goodwill and intangible assets related to acquisitions are estimated to not have recovery value, given current financial losses*

[5]  *Assumed 1 month of operating losses using interim DIP amount*

[6]  *Assumed to be 5% of net recoverable assets*

[7]  *Pre-petition balance, using 1.34 CAD to USD exchange rate*

[8]  *Assumed that 2% of A/P balances would be 503(b)(9) claims.*

[10]  *Based on company's latest estimates, includes estimates for fines and other penalties.*

[10]  *Assumes one payroll cycle*

[11]  *Excludes 503(b)(9), payroll tax payable and accrued salaries and benefits*

[12]  *Claims payable are related to terminated MSO contracts and therefore do no offset A/R*

**Hygea Holdings Corp.**
**PP&E Details**
*in USD 000s*

| | Balance | % of total | High | | Low | |
|---|---|---|---|---|---|---|
| | | | Recovery % | Recovery | Recovery % | Recovery |
| Equipment | 647 | 11% | 25.0% | 162 | 10.0% | 65 |
| Automobiles | 95 | 2% | 25.0% | 24 | 10.0% | 9 |
| Furniture and fixtures | 1,230 | 21% | 0.0% | - | 0.0% | - |
| Computer and software | 1,942 | 33% | 0.0% | - | 0.0% | - |
| Leasehold improvements | 1,973 | 34% | 25.0% | 493 | 10.0% | 197 |
| **PP&E, gross** | **5,888** | **100%** | **11.5%** | **679** | **4.6%** | **271** |
| Accumulated depreciation | (3,331) | 100% | 11.5% | (384) | 4.6% | (154) |
| **PP&E, net** | **2,557** | **100%** | **11.5%** | **295** | **4.6%** | **118** |

<u>EXHIBIT C TO DISCLOSURE STATEMENT</u>

<u>Financial Projections</u>

**Hygea Holdings Corp., et al**
**Assumptions**

- 2019 actuals are based on 9/30/2019 financials, prepared for internal purposes
- The analysis separates the Hygea's business into two primary segments : Managed Services Organization ("MSO") and Fee for Service ("FFS");
  the two segments have different growth projections, but are inter-related and highly dependent on each other. Therefore, the FFS segment cannot be exited
  without significantly impacting the MSO segment.
- The MSO forecast assumes significant investment in overhead in 2020 to position the segment for growth in managed care lives and improved operating margins in future years
- The MSO segment is geographically concentrated in two distinct areas within Florida :
  - Southwestern Florida via the First Harbour MSO, which manages live on behalf of 3rd party physician practice organizations, such as Millennium Physician Partners,
    Community Health System and several others. These 3rd parties share in the surplus revenue at varying %s, which average 68% overall
  - Orlando metro area via Hygea's employed physicians, who do not share in the surplus
- The FFS segment assumes rejection of the management agreement with Cardiology Consultants of West Broward, P.A. ("CCWB"), which is currently losing $451k per year.
- Additional initiatives within the FFS business segment include : physician salary and benefits reductions of $984k for 7 physicians as well as consolidating office space, which
  saves $92k per year.
- The FFS segment is currently operating below industry average productivity trends. The company assumes improvement in productivity and the resulting increase in revenue
  per below:

| 2020 | 2021 | 2022 | 2023 |
|------|------|------|------|
| 25%  | 7.50% | 5%  | 5%   |

- Operating expenses in the FFS segment are expected to grow at 2% annually.
- Corporate overhead assumes hiring new management and significant reductions in external contractors and other professionals
- Debt capacity below assumes interest rate, term and Debt Service Coverage Ratio to calculate debt load that Free Cash Flow can support. The leverage ratio is derived from the
  debt assumptions

**Debt Capacity**
*in USD 000s*

| Interest rate | 8% |
|---|---|
| Term | 10 years |
| Debt Service Coverage Ratio | 1.25x |

**Debt Capacity Estimates**

|  | Free Cash Flow | Debt | Implied Leverage ratio |
|---|---|---|---|
| *Decrease of $3M* | $ 4,518 | $ 24,825 | 5.5x |
| *Decrease of $2M* | 5,518 | 30,320 | 5.5x |
| *Decrease of $1M* | 6,518 | 35,815 | 5.5x |
| **Expected Free Cash Flow in 2023** | **7,518** | **41,310** | **5.5x** |
| *Increase of $1M* | 8,518 | 46,804 | 5.5x |
| *Increase of $2M* | 9,518 | 52,299 | 5.5x |
| *Increase of $3M* | $ 10,518 | $ 57,794 | 5.5x |

**Hygea Holdings Corp., et al**
**Long-term forecast** [1]
*in USD 000s*

| | Actual 2019 | Proforma 2019 | 2020 [1] | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|
| **Managed services organization ("MSO")** | | | | | | |
| **Revenue** | | | | | | |
| Surplus | $ 6,000 | $ 6,000 | $ 9,257 | $ 14,038 | $ 19,838 | $ 26,159 |
| Capitation | 3,882 | 3,882 | 5,988 | 7,186 | 8,623 | 10,348 |
| **Total revenue** | **9,882** | **9,882** | **15,245** | **21,224** | **28,462** | **36,507** |
| **Operating expenses** | | | | | | |
| Salaries and wages | 676 | 676 | 3,737 | 3,828 | 3,921 | 4,016 |
| Employee benefits | 107 | 107 | 561 | 574 | 588 | 602 |
| Profit sharing & other expenses | 3,870 | 3,870 | 5,294 | 7,988 | 11,310 | 14,876 |
| **Total operating expenses** | **4,652** | **4,652** | **9,591** | **12,390** | **15,819** | **19,494** |
| **MSO Contribution margin** | **5,229** | **5,229** | **5,654** | **8,834** | **12,642** | **17,012** |
| | | | | | | |
| **Fee for service ("FFS")** [3] | | | | | | |
| **Revenue** | **10,864** | **7,630** | **9,538** | **10,253** | **10,766** | **11,304** |
| **Operating expenses** | | | | | | |
| Salaries and wages | 12,640 | 8,853 | 9,030 | 9,211 | 9,395 | 9,583 |
| Employee benefits | 1,992 | 1,524 | 1,555 | 1,586 | 1,618 | 1,650 |
| Other expenses | 4,608 | 4,103 | 4,185 | 4,269 | 4,354 | 4,441 |
| **Total operating expenses** | **19,241** | **14,481** | **14,770** | **15,066** | **15,367** | **15,674** |
| **Contribution margin** | **(8,377)** | **(6,850)** | **(5,232)** | **(4,812)** | **(4,601)** | **(4,370)** |
| Corporate overhead [4] | (7,410) | (7,410) | (3,886) | (3,964) | (4,044) | (4,124) |
| Settlements | (1,204) | - | - | - | - | - |
| **EBITDA** | **$ (11,761)** | **$ (9,031)** | **$ (3,465)** | **$ 58** | **$ 3,998** | **$ 8,518** |
| Capex | | | | - | (1,000) | (1,000) |
| **Free Cash Flow** | **$ (11,761)** | **$ (9,031)** | **$ (3,465)** | **$ 58** | **$ 2,998** | **$ 7,518** |

[1] *Excludes restructuring and other non-recurring expenses*

[2] *Assumes emergence from bankruptcy by middle of June, 2020.   No operating losses expected post-emergence.*

[3] *Assumes closure Cardiology Consultants of West Broward, P.A., along with operational improvements at underperforming clinics*

[4] *Assumes corporate overhead reductions due to redundancy in positions with MHP*

**Hygea Holdings Corp., et al**
**2019 Cash-based Financial Summary**
*in USD 000s*

| | Actual 2019 (YTD Sept 2019 Annualized) | | | | FFS Initiatives | | Proforma 2019 | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | MSO | FFS | Corp | Total | CCWB | Other Initiatives | MSO | FFS | Corp | Proforma 2019 |
| **Revenue** | | | | | | | | | | |
| Fee for service | $ - | $ 10,478 | $ - | $ 10,478 | $ (3,233) | $ - | $ - | $ 7,245 | $ - | $ 7,245 |
| Capitation | 3,882 | - | - | 3,882 | - | - | 3,882 | - | - | 3,882 |
| Surplus | 6,000 | - | - | 6,000 | - | - | 6,000 | - | - | 6,000 |
| Other | - | 386 | - | 386 | - | - | - | 386 | - | 386 |
| **Revenue** | $ 9,882 | $ 10,864 | $ - | $ 20,745 | $ (3,233) | $ - | $ 9,882 | $ 7,630 | $ - | $ 17,512 |
| | | | | | | | | | | |
| **Operating expenses** | | | | | | | | | | |
| Salaries and wages | 676 | 12,640 | 1,295 | 14,611 | (2,931) | (856) | 676 | 8,853 | 1,295 | 10,825 |
| Employee benefits | 73 | 1,360 | 139 | 1,572 | (293) | (128) | 73 | 939 | 139 | 1,151 |
| Employee reimbursements | 34 | 632 | 65 | 731 | (46) | - | 34 | 586 | 65 | 685 |
| Professional services | - | 2,401 | 2,401 | 4,802 | (219) | - | - | 2,181 | 2,401 | 4,582 |
| Capitation Expense | 1,946 | - | - | 1,946 | - | - | 1,946 | - | - | 1,946 |
| Management Expense | - | - | 3,072 | 3,072 | - | - | - | - | 3,072 | 3,072 |
| Rent expense | 1,406 | 182 | 125 | 1,713 | (87) | (92) | 1,406 | 4 | 125 | 1,534 |
| Insurance | - | 1,168 | 197 | 1,365 | (5) | - | - | 1,163 | 197 | 1,360 |
| Medical supplies | - | 611 | - | 611 | (42) | - | - | 569 | - | 569 |
| Utilities | 389 | 50 | 35 | 474 | (19) | - | 389 | 32 | 35 | 455 |
| IT and software | - | 178 | 9 | 188 | (22) | - | - | 156 | 9 | 166 |
| Repairs and maintenance | 75 | 10 | 7 | 91 | (9) | - | 75 | 1 | 7 | 82 |
| Equipment leases and rentals | 54 | 7 | 5 | 66 | (8) | - | 54 | (1) | 5 | 58 |
| Taxes and licenses | - | - | 60 | 60 | (2) | - | - | (2) | 60 | 58 |
| **Total operating expenses** | 4,652 | 19,241 | 7,410 | 31,303 | (3,684) | (1,076) | 4,652 | 14,481 | 7,410 | 26,543 |
| **EBITDA** | $ 5,229 | $ (8,377) | $ (7,410) | $ (10,557) | $ 451 | $ 1,076 | $ 5,229 | $ (6,850) | $ (7,410) | $ (9,031) |
| | | | | | | | | | | |
| Settlements | | | 1,204 | 1,204 | | (1,204) | | | | |
| **Net operating income** | 5,229 | (8,377) | (8,613) | (11,761) | 451 | 2,279 | 5,229 | (6,850) | (7,410) | (9,031) |

**Hygea Holdings Corp., et al**
**Corporate 2020 assumptions**
*in USD 000s*

| | Actual 2019 | Run-rate 2020 | Fav / (unfav) |
|---|---|---|---|
| Salaries & benefits | $ 1,499 | $ 1,499 | $ - |
| Mgmt salaries | - | 1,200 | 1,200 |
| Professional services | 5,473 | 750 | (4,723) |
| Rent expense | 125 | 125 | - |
| Insurance | 197 | 197 | - |
| Utilities | 35 | 35 | - |
| Taxes and licenses | 81 | 81 | - |
| **Corporate overhead** | **$ 7,410** | **$ 3,886** | **$ (3,523)** |

**Hygea Holdings Corp., et al**
**Combined MSO**
*in USDs*

| | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|
| Membership | 9,391 | 10,582 | 11,925 | 13,437 |
| *Growth rate* | 9% | 13% | 13% | 13% |
| *Membership max* | 25,000 | 25,000 | 25,000 | 25,000 |
| | | | | |
| Base rate | 850 | 850 | 850 | 850 |
| Medical risk adjustment ("MRA") | 1.189 | 1.225 | 1.250 | 1.273 |
| MRA growth | 2% | 3% | 2% | 2% |
| MRA max | 1.400 | 1.400 | 1.400 | 1.400 |
| Adjusted base rate | 1,011 | 1,041 | 1,062 | 1,082 |
| | | | | |
| Medical loss ratio ("MLR") | 75.8% | 73.3% | 70.8% | 68.9% |
| MLR decline | 0.30% | 0.30% | 0.30% | 0.30% |
| MLR min | 68.0% | 68.0% | 68.0% | 68.0% |
| | | | | |
| *in USDs* | | | | |
| | | | | |
| Adjusted premium | 114,661 | 133,061 | 152,946 | 175,629 |
| Less, admin fee | (18,346) | (21,290) | (24,471) | (28,101) |
| Less, medical losses | (87,059) | (97,733) | (108,637) | (121,370) |
| Surplus | 9,257 | 14,038 | 19,838 | 26,159 |
| Profit sharing | (5,294) | (7,988) | (11,310) | (14,876) |
| Overhead | (4,298) | (4,402) | (4,509) | (4,618) |
| **Net profit** | **(335)** | **1,648** | **4,019** | **6,664** |
| | | | | |
| **Capitation revenue** | **5,988** | **7,186** | **8,623** | **10,348** |
| | | | | |
| **MSO contribution margin** | **$ 5,654** | **$ 8,834** | **$ 12,642** | **$ 17,012** |
| | | | | |
| Admin fee % | 16% | 16% | 16% | 16% |
| Revenue share % | 57% | 57% | 57% | 57% |
| Overhead growth | 306% | 2% | 2% | 2% |

**Hygea Holdings Corp., et al**
**First Harbour MSO**
*in USDs*

| | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|
| Membership | 7,853 | 8,849 | 9,972 | 11,236 |
| *Growth rate* | 9% | 13% | 13% | 13% |
| *Membership max* | 15,000 | 15,000 | 15,000 | 15,000 |
| | | | | |
| Base rate | 850 | 850 | 850 | 850 |
| Medical risk adjustment ("MRA") | 1.126 | 1.153 | 1.181 | 1.210 |
| MRA growth | 2% | 2% | 2% | 2% |
| MRA max | 1.400 | 1.400 | 1.400 | 1.400 |
| Adjusted base rate | 957 | 980 | 1,004 | 1,028 |
| | | | | |
| Medical loss ratio ("MLR") | 75.4% | 72.7% | 70.1% | 68.1% |
| MLR decline | 0.30% | 0.30% | 0.30% | 0.30% |
| MLR min | 68.0% | 68.0% | 68.0% | 68.0% |

*in USDs*

| | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|
| Adjusted premium | 90,185 | 104,089 | 120,136 | 138,657 |
| Less, admin fee | (14,430) | (16,654) | (19,222) | (22,185) |
| Less, medical losses | (67,930) | (75,626) | (84,194) | (94,481) |
| Surplus | 7,826 | 11,808 | 16,720 | 21,991 |
| Profit sharing | (5,294) | (7,988) | (11,310) | (14,876) |
| Overhead | (3,070) | (3,144) | (3,221) | (3,299) |
| **Net profit** | **(538)** | **676** | **2,189** | **3,816** |
| | | | | |
| Admin fee % | 16% | 16% | 16% | 16% |
| Revenue share % | 68% | 68% | 68% | 68% |
| Overhead growth | 306.05% | 2.43% | 2.43% | 2.43% |

**Hygea Holdings Corp., et al**
**Orlando Market MSO**
*in USDs*

| | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|
| Membership | 1,538 | 1,733 | 1,953 | 2,201 |
| *Growth rate* | 9% | 13% | 13% | 13% |
| *Membership max* | 10,000 | 10,000 | 10,000 | 10,000 |
| | | | | |
| Base rate | 850 | 850 | 850 | 850 |
| Medical risk adjustment ("MRA") | 1.515 | 1.592 | 1.600 | 1.600 |
| MRA growth | 5% | 5% | 1% | 0% |
| MRA max | 1.400 | 1.400 | 1.400 | 1.400 |
| Adjusted base rate | 1,287 | 1,353 | 1,360 | 1,360 |
| | | | | |
| Medical loss ratio ("MLR") | 78.2% | 76.3% | 74.5% | 72.7% |
| MLR decline | 0.30% | 0.30% | 0.30% | 0.30% |
| MLR min | 68.0% | 68.0% | 68.0% | 68.0% |

*in USDs*

| | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|
| Adjusted premium | 24,476 | 28,973 | 32,810 | 36,972 |
| Less, admin fee | (3,916) | (4,636) | (5,250) | (5,915) |
| Less, medical losses | (19,129) | (22,107) | (24,442) | (26,888) |
| Surplus | 1,431 | 2,230 | 3,118 | 4,168 |
| Profit sharing | - | - | - | - |
| Overhead | (1,228) | (1,258) | (1,288) | (1,319) |
| Net profit | **203** | **972** | **1,830** | **2,848** |
| | | | | |
| Admin fee % | 16% | 16% | 16% | 16% |
| Revenue share % | 0% | 0% | 0% | 0% |
| Overhead growth | 306.05% | 2.43% | 2.43% | 2.43% |

<u>EXHIBIT D TO DISCLOSURE STATEMENT</u>

<u>Global Settlement Term Sheet</u>

# GLOBAL SETTLEMENT TERM SHEET
### *In re Hygea Holdings Corp., et al.*
### *April 30, 2020*

The terms outlined below in this term sheet (the "**Term Sheet**") are an abbreviated summary of the terms and conditions for a proposed settlement (the "**Settlement**") by and among the debtors and debtors-in-possession in the Chapter 11 proceeding styled Hygea Holdings Corp., et al. (collectively the "**Debtors**"), Case No. 20-10361 (KBO) (the "**Bankruptcy Case**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), the DIP Secured Parties, and the Committee (each as defined below).  This Term Sheet is non-binding and is being presented for discussion and settlement purposes and is entitled to protection from any use or disclosure pursuant to Federal Rule of Evidence 408 and any other rule of similar import. This term sheet is subject to the negotiation, documentation and execution of definitive documentation approved by all parties and approval by the Bankruptcy Court under Rule 9019.

| | |
|---|---|
| **Parties to Settlement** | Debtors[1] <br><br> DIP Secured Parties[2] <br><br> The Official Committee of Unsecured Creditors (the "**Committee**") |
| **Overview of Settlement** | The parties to this Term Sheet have reached an agreement in principle to globally resolve all of the disputes among them in the Bankruptcy Case and to proceed to a consensual confirmation of a plan of reorganization (the "**Plan**").  The Parties will work to file a Plan and related disclosure statement (the "**Disclosure Statement**") and will seek approval of the Disclosure Statement and Plan on the earliest date practicable. |

---

[1] All Care Management Services, Inc. (6484); First Harbour Health Management, LLC (0941); First Harbour Medical Centers, LLC (3861); Florida Group Healthcare LLC (7956); Gemini Healthcare Fund, LLC (4928); Hygea Acquisition Longwood, LLC (1649); Hygea Acquisition Orlando, LLC (3507); Hygea Health Holdings, Inc. (8926); Hygea Holdings Corp. (2605); Hygea IGP of Central Florida, Inc. (9453); Hygea IGP, LLC (7724); Hygea Medical Centers of Florida, LLC (5301); Hygea Medical Partners, LLC (4486); Hygea of Delaware, LLC (4830); Hygea of Georgia, LLC (5862); Hygea of Pembroke Pines, LLC (6666); Hygea Primum Acquisition, Inc. (8567); Medlife Activity Center, LLC (2311); Mobile Clinic Services, LLC (9758); Palm A.C. MSO, LLC (2585); Palm Allcare Medicaid MSO, Inc. (6956); Palm Allcare MSO, Inc. (0319); Palm Medical Group, Inc. (5028); Palm Medical MSO LLC (7738); Palm Medical Network, LLC (9158); Palm MSO System, Inc. (2178); Palm PGA MSO, Inc. (8468); Physician Management Associates East Coast, LLC (7319); Physician Management Associates SE, LLC (3883); Physicians Group Alliance, LLC (7824); Primum Alternatives, Inc. (7441); Primum Healthcare, LLC (0157); and Professional Health Choice, Inc. (6850). The address of the Debtors' corporate headquarters is 8700 W Flagler Street, Suite 280, Miami, FL 33174.

[2] Bridging Finance Inc., not individually but as administrative agent on behalf of Bridging Income Fund L.P. or the any natural person, corporation, partnership, trust, limited liability company, association, governmental authority or unit, or any other entity, whether acting in an individual, fiduciary or other capacity party thereto

| | |
|---|---|
| **Administrative and Priority Claims** | The Plan must provide for the payment, in full, of all allowed administrative and priority claims (priority tax claims will be paid over time by the Reorganized Debtors), including, without limitation, claims arising pursuant to section 503(b)(9) of the Bankruptcy Code.  The payment of such claims must be from a source other than the Creditors' Trust (as defined herein) or its assets except to the extent the professional fees and expenses of the Committee exceed the Committee Budget (as defined below). |
| **Creation and Governance of Creditors' Trust** | The Plan shall provide for the creation of a creditors' trust (the "**Creditors' Trust**"), which shall be responsible for the administration of claims and distributions to general unsecured creditors under the Plan.  The trustee of the Creditors' Trust (the "**Trustee**") shall be chosen by the Committee.<br><br>The "**Creditor Trust Agreement**" is the trust agreement that documents the powers, duties and responsibilities of the Trustee, and which agreement will be materially consistent with the Plan and otherwise reasonably acceptable to the Debtors and the Committee. The Creditor Trust Agreement will be filed with the Bankruptcy Court by the plan supplement filing date and incorporated in the confirmation order.<br><br>The Trustee, together with its agents, representatives and professionals, will have the power to administer the Creditors' Trust Assets and make distributions in accordance with the terms of the Plan.<br><br>All other Creditors' Trust governance issues shall be determined by the Committee in consultation with the Debtors. |
| **Cash Consideration** | On the "effective date" (the "**Effective Date**") of the Plan, the DIP Secured Parties will fund $550,000 in the form of a non-recourse loan payable only from the proceeds of causes of action described herein (the "**Trust Funding**") to the Creditors' Trust for the benefit of general unsecured creditors under the Plan.<br><br>The first $1,100,000 distributed from the Creditors' Trust shall be distributed evenly (50/50) between the DIP Secured Parties and the beneficiaries of the Creditors' Trust to repay the Trust Funding.  Upon repayment of the Trust Funding, the DIP Secured Parties shall not be entitled to any additional distributions from the Creditors' Trust. |

| Equity Consideration | On the Effective Date, the DIP Secured Parties, or equity sponsor under the Plan, shall provide for 5% of the equity in the Reorganized Debtors to be contributed to the Creditors' Trust (the "**Creditor Committee Equity**").<br><br>The Creditors' Trust shall receive typical minority shareholder protections (e.g., tags, drags, etc.).<br><br>The Creditor Committee Equity shall be freely assignable by the Creditors' Trust.<br><br>The Creditor Committee Equity will entitle the Creditors' Trust to 5% of the Net Proceeds (as such term will be defined in the Plan which shall be net of, among other things, payment of a management success fee) of a sale of the Reorganized Debtors.  In the event the Reorganized Debtors are not sold by the 5th Anniversary of the Effective Date (the "**Put Election Date**"), the Creditors' Trust shall have the right to put the Equity Consideration to the Reorganized Debtors (the "**Put Election**") at an amount equal to 5% of the "Put Amount."  The Put Amount shall be determined as follows: (EBITDA amount as of the Put Election Date multiplied by the applicable EBITDA multiple set forth in the chart below) less the total amount of secured debt as of the Put Election Date plus the total amount of unrestricted cash, cash equivalents and investments on the balance sheet as of the Put Election Date.<br><br><table><tr><td>LIVES MANAGED UNDER MANAGEMENT</td><td>REORGANIZED DEBTORS' EBITDA MULTIPLE FOR THE 12 MONTHS PRIOR TO EXERCISING THE PUT ELECTION</td></tr><tr><td>5,000 to 7,500</td><td>7</td></tr><tr><td>7,501 to 10,000</td><td>7.5</td></tr><tr><td>10,001 to 12,500</td><td>8</td></tr><tr><td>12,501 to 15,000</td><td>8.5</td></tr><tr><td>More than 15,000</td><td>9</td></tr></table> |
| **Estate Claims and Causes of Action** | On the Effective Date, the Debtors shall transfer to the Creditors' Trust: (1) Avoidance Actions; (2) commercial tort claims as defined in Article 9 of the UCC.  Such Estate Claims shall include for the avoidance of doubt direct or derivative claims or causes of action against any and all current and former officers, directors, shareholders, members, mangers, employees, affiliates or insiders of the Debtors, including but not limited to for breach of fiduciary duty or aiding and abetting breach of fiduciary duty, or under and pursuant |

| | |
|---|---|
| | to any D&O or fiduciary insurance policies (including for bad faith) maintained by the Debtors; (3) the non-exclusive right to seek a determination by the Bankruptcy Court of any tax, fine or penalty relating to a tax, or any addition to a tax, under section 505 of the Bankruptcy Code; and (4) all other rights, claims or causes of action not transferred to the DIP Secured Parties pursuant to the Plan.<br><br>"<u>Avoidance Actions</u>" means any and all causes of action and rights to recover or avoid transfers or to avoid any lien under chapter 5 of the Bankruptcy Code or applicable state law or otherwise. |
| **Payment of Committee Professional Fees** | In connection with administration of the Bankruptcy Case and conditioned on the Effective Date occurring as soon as possible after confirmation of the Plan, but in no event later than June 12, 2020, the DIP budget approved by the Bankruptcy Court shall provide the Committee with a budgeted amount of $1,325,000 (the "**Committee Budget**") for the payment of its professionals' allowed fees and expenses.  To the extent the Committee Budget is insufficient to pay all allowed fees and claims of the Committee's professionals, such allowed fees and expenses may be paid from the Creditors' Trust.  The Committee Budget shall not be subject to a variance.<br><br>To the extent any excess funds remain under the Debtors' professional fee budgeted amounts and/or the Committee Budget (collectively, the "**Professional Budget Surplus**"), such funds shall be deposited into the Creditors' Trust on the Effective Date, or after payment of all outstanding Debtors' and/or Committees' professionals' allowed fees and expenses.<br><br>The Professional Budget Surplus shall not be used to repay the Trust Funding. |
| **Costs of Claims Administration** | All costs of administration of the Creditors' Trust shall be payable from the assets of the Creditors' Trust, including, but not limited to, the Trust Funding. |
| **Reorganized Debtors' Board of Directors** | The Reorganized Debtors shall provide the Creditors' Trust with board observation rights. |
| **Releases/Exculpation** | The Plan shall provide for mutual releases/exculpation provisions for the DIP Secured Parties, Centurion Asset Management Inc., the Committee, its members and professionals, and the Debtors' current professionals.  To the extent permissible under applicable law, the Plan shall also provide a release of third-party claims against the DIP Secured Parties and Centurion Asset Management Inc. arising from or related to the Debtors' businesses.<br><br>Any releases or exculpations in favor of the DIP Secured Parties shall be conditioned on expiration of the Challenge Period and that no Challenge is pending or successful. |

| | |
|---|---|
| **Disclosure Statement and Plan** | The terms of this Term Sheet shall be set forth in the Disclosure Statement and Plan filed with the Bankruptcy Court. |
| **Letter to General Unsecured Creditors** | The Committee shall include a letter in the Plan solicitation package encouraging general unsecured creditors to vote in favor of the Plan. |
| **Deficiency Claims** | The DIP Secured Parties' deficiency claims shall be temporarily allowed and treated as general unsecured claims solely for purposes of voting on the Plan but shall be deemed satisfied on the Effective Date and shall not be allowed for distribution purposes.  The amount of such temporarily allowed claim shall be determined by agreement of the parties to this Term Sheet, subject to approval by the Bankruptcy Court to the extent necessary or desirable. |
| **Deadline for Confirmation** | The parties agree to use best efforts to obtain a final, non-appealable order confirming the Plan prior to June 12, 2020, unless such dates are extended by agreement of the DIP Secured Parties. |
| **Challenge Deadline** | The Challenge Period, as defined in *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Use Cash Collateral and (B) Incur Postpetition Secured Indebtedness; (II) Granting Liens and Providing Super-Priority Administrative Expense Status; (III) Granting Adequate Protection to Bridging Finance Inc. as Administrative Agent; and (IV) Modifying the Automatic Stay* [D.I. No. 11], shall expire upon the earlier of (i) entry of an order confirming the Plan or (ii) April 24, 2020. |

[*Signature pages follow*]

EAST\173746547.6

IN WITNESS WHEREOF, the undersigned have duly executed this Global Settlement Term Sheet as of the date first written above.

**DEBTORS:**

**ALL CARE MANAGEMENT SERVICES, INC.**

By: _____
Name:  Keith Collins, M.D.
Title:  Authorized Signatory

**FIRST HARBOUR HEALTH MANAGEMENT, LLC**

By: _____
Name:  Keith Collins, M.D.
Title:  Authorized Signatory

**FIRST HARBOUR MEDICAL CENTERS, LLC**

By: _____
Name:  Keith Collins, M.D.
Title:  Authorized Signatory

**FLORIDA GROUP HEALTHCARE LLC**

By: _____
Name:  Keith Collins, M.D.
Title:  Authorized Signatory

**GEMINI HEALTHCARE FUND, LLC**

By: _____
Name:  Keith Collins, M.D.
Title:  Authorized Signatory

**HYGEA ACQUISITION LONGWOOD, LLC**

By: _____
Name:  Keith Collins, M.D.
Title:  Authorized Signatory

**HYGEA ACQUISITION ORLANDO, LLC**

By: _____
Name:  Keith Collins, M.D.
Title:  Authorized Signatory

*[Signature Page to Global Settlement Term Sheet]*

**HYGEA HEALTH HOLDINGS, INC.**

By: _____
Name: Keith Collins, M.D.
Title: Authorized Signatory

**HYGEA HOLDINGS CORP.**

By: _____
Name: Keith Collins, M.D.
Title: Authorized Signatory

**HYGEA IGP OF CENTRAL FLORIDA, INC.**

By: _____
Name: Keith Collins, M.D.
Title: Authorized Signatory

**HYGEA IGP, LLC**

By: _____
Name: Keith Collins, M.D.
Title: Authorized Signatory

**HYGEA MEDICAL CENTERS OF FLORIDA, LLC**

By: _____
Name: Keith Collins, M.D.
Title: Authorized Signatory

**HYGEA MEDICAL PARTNERS, LLC**

By: _____
Name: Keith Collins, M.D.
Title: Authorized Signatory

**HYGEA OF DELAWARE, LLC**

By: _____
Name: Keith Collins, M.D.
Title: Authorized Signatory

*[Signature Page to Global Settlement Term Sheet]*

**HYGEA OF GEORGIA, LLC**

By: _____
Name: Keith Collins, M.D.
Title: Authorized Signatory

**HYGEA OF PEMBROKE PINES, LLC**

By: _____
Name: Keith Collins, M.D.
Title: Authorized Signatory

**HYGEA PRIMUM ACQUISITION, INC.**

By: _____
Name: Keith Collins, M.D.
Title: Authorized Signatory

**MEDLIFE ACTIVITY CENTER, LLC**

By: _____
Name: Keith Collins, M.D.
Title: Authorized Signatory

**MOBILE CLINIC SERVICES, LLC**

By: _____
Name: Keith Collins, M.D.
Title: Authorized Signatory

**PALM A.C. MSO, LLC**

By: _____
Name: Keith Collins, M.D.
Title: Authorized Signatory

**PALM ALLCARE MEDICAID MSO, INC.**

By: _____
Name: Keith Collins, M.D.
Title: Authorized Signatory

*[Signature Page to Global Settlement Term Sheet]*

**PALM ALLCARE MSO, INC.**

By: _____
Name: Keith Collins, M.D.
Title: Authorized Signatory

**PALM MEDICAL GROUP, INC.**

By: _____
Name: Keith Collins, M.D.
Title: Authorized Signatory

**PALM MEDICAL MSO LLC**

By: _____
Name: Keith Collins, M.D.
Title: Authorized Signatory

**PALM MEDICAL NETWORK, LLC**

By: _____
Name: Keith Collins, M.D.
Title: Authorized Signatory

**PALM MSO SYSTEM, INC.**

By: _____
Name: Keith Collins, M.D.
Title: Authorized Signatory

**PALM PGA MSO, INC.**

By: _____
Name: Keith Collins, M.D.
Title: Authorized Signatory

**PHYSICIAN MANAGEMENT ASSOCIATES EAST COAST, LLC**

By: _____
Name: Keith Collins, M.D.
Title: Authorized Signatory

*[Signature Page to Global Settlement Term Sheet]*

**PHYSICIAN MANAGEMENT ASSOCIATES SE, LLC**

By: _____
Name:  Keith Collins, M.D.
Title:  Authorized Signatory

**PHYSICIANS GROUP ALLIANCE, LLC**

By: _____
Name:  Keith Collins, M.D.
Title:  Authorized Signatory

**PRIMUM ALTERNATIVES, INC.**

By: _____
Name:  Keith Collins, M.D.
Title:  Authorized Signatory

**PRIMUM HEALTHCARE, LLC**

By: _____
Name:  Keith Collins, M.D.
Title:  Authorized Signatory

**PROFESSIONAL HEALTH CHOICE, INC.**

By: _____
Name:  Keith Collins, M.D.
Title:  Authorized Signatory

*[Signature Page to Global Settlement Term Sheet]*

**<u>BRIDGING FINANCE INC</u>.:**

By: _____

Name:  Natasha Sharpe

Title:  Chief Investment Officer


**<u>OFFICIAL COMMITTEE OF UNSECURED</u>
<u>CREDITORS</u>:**

By: _____

Name:  Claudio F. Arellano

Title:   Co-Chair of the Official Committee of Unsecured
          Creditors of Hygea Holdings Corp., et al.,


*[Signature Page to Global Settlement Term Sheet]*

**BRIDGING FINANCE INC.:**

By: _____
Name:  Natasha Sharpe
Title:  Chief Investment Officer

**OFFICIAL COMMITTEE OF UNSECURED
CREDITORS:**

By: _____
Name:  Claudio F. Arellano
Title:  Co-Chair of the Official Committee of Unsecured
         Creditors of Hygea Holdings Corp., et al.,

<u>EXHIBIT B</u>

<u>Disclosure Statement Blackline</u>

> **THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE COURT**
> This proposed Disclosure Statement is not a solicitation of acceptance or rejection of the **First Amended** Joint Chapter 11 Plan of Reorganization of Hygea Holdings Corp. and its Affiliated Debtors.  Acceptances or rejections may not be solicited until the Bankruptcy Court has approved this Disclosure Statement under section 1125 of the Bankruptcy Code.  This proposed Disclosure Statement is being submitted for approval only, and has not yet been approved by the Bankruptcy Court.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------- x

|  |  |
|---|---|
| In re: | Chapter 11 |
| HYGEA HOLDINGS CORP., *et al.*, | Case No. 20-10361 (KBO) |
| Debtors.[1] | (Jointly Administered) |

------------------------------------------------------- x

## FIRST AMENDED DISCLOSURE STATEMENT WITH RESPECT TO FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF HYGEA HOLDINGS CORP. AND ITS AFFILIATED DEBTORS

**COLE SCHOTZ P.C.**
J. Kate Stickles (I.D. No. 2917)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone: (302) 652-3131
kstickles@coleschotz.com

Michael D. Sirota
Stuart Komrower
Felice R. Yudkin
Jacob S. Frumkin

---

[1]  The Debtors and the last four digits of their respective taxpayer identification numbers are: All Care Management Services, Inc. (6484); First Harbour Health Management, LLC (0941); First Harbour Medical Centers, LLC (3861); Florida Group Healthcare LLC (7956); Gemini Healthcare Fund, LLC (4928); Hygea Acquisition Longwood, LLC (1649); Hygea Acquisition Orlando, LLC (3507); Hygea Health Holdings, Inc. (8926); Hygea Holdings Corp. (2605); Hygea IGP of Central Florida, Inc. (9453); Hygea IGP, LLC (7724); Hygea Medical Centers of Florida, LLC (5301); Hygea Medical Partners, LLC (4486); Hygea of Delaware, LLC (4830); Hygea of Georgia, LLC (5862); Hygea of Pembroke Pines, LLC (6666); Hygea Primum Acquisition, Inc. (8567); Medlife Activity Center, LLC (2311); Mobile Clinic Services, LLC (9758); Palm A.C. MSO, LLC (2585); Palm Allcare Medicaid MSO, Inc. (6956); Palm Allcare MSO, Inc. (0319); Palm Medical Group, Inc. (5028); Palm Medical MSO LLC (7738); Palm Medical Network, LLC (9158); Palm MSO System, Inc. (2178); Palm PGA MSO, Inc. (8468); Physician Management Associates East Coast, LLC (7319); Physician Management Associates SE, LLC (3883); Physicians Group Alliance, Inc. (7824); Primum Alternatives, Inc. (7441); Primum Healthcare, LLC (0157); and Professional Health Choice, Inc. (6850).  The address of the Debtors' corporate headquarters is 8700 W Flagler Street, Suite 280, Miami, FL 33174.

Michael Trentin
25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000

*Proposed Counsel for the Debtors and
Debtors-in-Possession*

~~March 10~~May 1, 2020

**DISCLAIMER**[2]

THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, INCLUDING THE EXHIBITS ANNEXED HERETO, IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE **FIRST AMENDED** JOINT CHAPTER 11 PLAN OF REORGANIZATION OF HYGEA HOLDINGS CORP. AND ITS AFFILIATED DEBTORS AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN HOW TO VOTE ON THE PLAN.  NO PERSON IS AUTHORIZED BY THE DEBTORS IN CONNECTION WITH THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION REGARDING THIS DISCLOSURE STATEMENT OR THE PLAN OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS ANNEXED HERETO, INCORPORATED BY REFERENCE OR REFERRED TO HEREIN, AND IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTORS.

ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE ADVISED AND ENCOURAGED TO (I) READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETIES; (II) CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING, IMPORTANTLY, THE RISK FACTORS DESCRIBED IN ARTICLE VIII OF THIS DISCLOSURE STATEMENT; AND (III) CONSULT WITH THEIR OWN ADVISORS WITH RESPECT TO REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN AND ALL DOCUMENTS THAT ARE ATTACHED TO THE PLAN AND DISCLOSURE STATEMENT BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.

PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT WITH RESPECT TO THE PLAN ARE QUALIFIED IN THEIR ENTIRETIES BY REFERENCE TO THE PLAN, THE EXHIBITS ATTACHED TO THE PLAN AND ANY PLAN SUPPLEMENT(S).  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT ANY TIME AFTER THE DATE HEREOF.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NON-BANKRUPTCY LAWS.  THIS DISCLOSURE STATEMENT HAS NEITHER BEEN APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "*SEC*"), AND THE SEC HAS NOT PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.  PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OR CLAIMS OF THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSES FOR WHICH THEY WERE PREPARED.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY,

---

[2] Terms used in this Disclaimer that are not otherwise defined shall have the meanings ascribed to such terms elsewhere in this Disclosure Statement.

**STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.  THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO CONSTITUTE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN AS IT RELATES TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE DEBTORS.**

**TABLE OF CONTENTS**

| | | |
|---|---|---|
| ARTICLE I INTRODUCTION | | 1 |
| A. | Purpose of the Disclosure Statement | 1 |
| B. | Disclosure Statement Enclosures | 2 |
| | 1. Order Approving the Disclosure Statement | 2 |
| | 2. Ballot | 2 |
| | 3. Notice | 2 |
| C. | Final Approval of the Disclosure Statement and Confirmation of the Plan | 2 |
| | 1. Requirements | 2 |
| | 2. Approval of the Plan and Confirmation Hearing | 2 |
| | 3. Effect of Confirmation | 2 |
| | 4. Only Impaired Classes Vote | 2 |
| D. | Treatment and Classification of Claims and Equity Interests; Impairment | 3 |
| E. | Voting Procedures and Voting Deadline | 67 |
| F. | Confirmation Hearing | 78 |
| | | |
| ARTICLE II GENERAL INFORMATION REGARDING THE DEBTORS | | 79 |
| A. | The Debtors' Businesses | 79 |
| | 1. General Overview | 79 |
| | 2. The Physician Practices | 89 |
| | 3. Management Service Organizations (MSOs) | 910 |
| | 4. The Palm Network | 911 |
| B. | The Debtors' Corporate Structure | 1011 |
| C. | The Debtors' Prepetition Capital Structure | 1011 |
| D. | Summary of Events Leading to the Chapter 11 Filing | 1012 |
| | | |
| ARTICLE III THE CHAPTER 11 CASES | | 1213 |
| A. | Commencement of the Chapter 11 Cases | 1213 |
| B. | 'First Day" Motions | 1214 |
| C. | Retention of Professionals and Appointment of the Committee | 1415 |
| | 1. Retention of Debtors' Professionals | 15 |
| | 2. Appointment of Committee and Retention of Committee Professionals | 15 |
| D. | Significant Events During the Chapter 11 Cases | 1415 |
| | 1. Debtor-in-Possession Financing | 15 |
| | 2. Patient Care Ombudsman Motion | 16 |
| | 3. Lease Rejection Motions | 16 |
| | 4. The Claims Process | 17 |
| | a. Schedules and Statements | 17 |
| | b. Bar Date Order | 17 |
| | c. Claims Objections | 17 |
| | 5. Litigation and Discovery | 18 |
| | a. Committee | 18 |
| | b. Nevada 5 | 18 |
| E. | The Global Settlement | 20 |

i

F.    Formal and Informal Objections to Approval of the Disclosure Statement 21

ARTICLE IV SUMMARY OF PLAN .................................................................................... ~~14~~21
    A.    Classification and Treatment of Claims and Equity Interests .............. ~~15~~22
        1.    Unclassified Claims ............................................................... ~~16~~23
            a.    Administrative Expense Claim ................................... ~~16~~23
            b.    Accrued Professional Compensation Claims ............... ~~17~~24
            c.    Priority Tax Claims ................................................... ~~17~~25
        2.    Unimpaired Claims ............................................................... ~~18~~25
            a.    Class 1:  Other Priority Claims ................................. ~~18~~25
       ~~3.~~    ~~Impaired Claims~~ ................................................................ ~~18~~
            ~~a~~
            b.    Class 2: Other Secured Claims ................................. ~~18~~25
            ~~b~~
        3.    Impaired Claims .................................................................. 26
            a.    Class 3: Bridging's Secured Claim ............................ ~~18~~26
            ~~e~~b.    Class 4: General Unsecured Claims ........................... ~~19~~26
            c.    Class 5: Subordinated Claims ................................... 27
        4.    Interests ............................................................................... ~~19~~27
            a.    Class ~~5~~6: Equity Interests ...................................... ~~19~~27
        5.    Special Provision Regarding Unimpaired Claims ................... ~~19~~27
        6.    Discharge of Claims .............................................................. ~~19~~27
        7.    Subordinated Claims ............................................................. ~~20~~28
        8.    Elimination of Vacant Classes ............................................... ~~20~~28
    B.    Acceptance or Rejection of the Plan ..................................................... ~~20~~28
        1.    Presumed Acceptance ~~by an Impaired Class~~ .................. ~~20~~of Plan 28
        2.    Presumed ~~Acceptances by Unimpaired Classes~~ ............... ~~20~~
       ~~3.~~    ~~Classes Deemed to Reject Plan~~ ............................... ~~20~~Rejection of Plan 28
        3.    Voting Class ......................................................................... 28
        4.    Acceptance by Impaired Classes of Claims ~~Entitled to Vote~~ ... ~~21~~28
       ~~5.~~    ~~Vacant Classes~~ ................................................................. ~~21~~
       ~~6.~~    ~~Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code~~
            ~~21~~
        5.    Cramdown ............................................................................ 29
    C.    Means for Implementation ................................................................... ~~21~~29
        1.    General Settlement of Claims ................................................ ~~21~~29
       ~~2.~~    ~~Substantive Consolidation for Plan Purposes Only~~ ............. ~~21~~
            ~~3~~
        2.    Corporate Existence .............................................................. ~~22~~29
       ~~4~~3.    Vesting of Assets in the Reorganized Debtors ....................... ~~23~~30
        4.    New Secured Debt ................................................................ 30
        5.    ~~New Secured Debt;~~ Sources of Cash for Certain Plan Distributions ~~23~~31
            ~~a.~~    ~~New Secured Debt~~ ................................................. ~~23~~
            ~~b.~~    ~~Sources of Cash for Plan Distribution~~ ..................... ~~24~~

| | | | |
|---|---|---|---|
| 6. | Issuance of Reorganized Debtor Equity and Related Documentation | ~~24~~31 |
| 7. | Section 1145 Exemption | ~~24~~32 |
| 8. | Employee Matters and Retiree Benefits | ~~24~~32 |
| 9. | Release of Liens, Claims, and Equity Interests | ~~25~~32 |
| 10. | New Organizational Documents | ~~25~~33 |
| 11. | Resignation of Directors and Officers | ~~25~~33 |
| 12. | Managers and Officers of the Reorganized Debtors | ~~25~~33 |
| 13. | Corporate Action | ~~26~~34 |
| 14. | Cancellation of Agreements, Security Interests, and Other Interests | ~~26~~34 |
| 15. | Dissolved Debtors | 34 |
| D. | ~~Liquidating~~Creditors' Trust | ~~26~~35 |
| 1. | Establishment of the ~~Liquidating~~Creditors' Trust | ~~26~~35 |
| 2. | ~~Liquidating~~Creditors' Trust ~~Reserve~~ | ~~27~~Funding 35 |
| 3. | Appointment of the ~~Liquidating~~ Trustee | ~~27~~35 |
| 4. | Beneficiaries of ~~Liquidating~~Creditors' Trust | ~~27~~35 |
| 5. | Vesting and Transfer of ~~Liquidating~~Creditors' Trust Assets to the ~~Liquidating~~Creditors' Trust | ~~28~~36 |
| 6. | Retention of Professionals | ~~28~~36 |
| 7. | ~~Liquidating~~Creditors' Trust Expenses | ~~28~~36 |
| 8. | Certain Powers and Duties of the ~~Liquidating~~Creditors' Trust and ~~Liquidating~~ Trustee. | ~~29~~36 |
| | a. | General Powers of the ~~Liquidating~~ Trustee ~~29~~ | 36 |
| | b. | Investments of Cash ~~29~~ | 37 |
| | c. | Reporting ~~29~~ | 37 |
| | d. | Tax Reporting ~~29~~ | 37 |
| 9. | Preservation of Right to Conduct Investigations | ~~30~~38 |
| 10. | Prosecution and Resolution of Causes of Action. | ~~30~~38 |
| | a. | The ~~Liquidating~~Creditors' Trust's Exclusive Authority to Pursue, Settle, or Abandon Causes of Action ~~30~~ | 38 |
| | b. | Settlement of Causes of Action ~~31~~ | 39 |
| 11. | Federal Income Tax Treatment of the ~~Liquidating~~Creditors' Trust ~~for the Liquidating Trust Assets~~ | ~~31~~ 39 |
| 12. | Limitation of Liability | ~~31~~39 |
| 13. | Term of ~~Liquidating~~Creditors' Trust | ~~32~~40 |
| 14. | Conflicts Between the ~~Liquidating~~Creditors' Trust Agreement and the Plan | ~~32~~40 |
| E. | Distributions | ~~32~~40 |
| 1. | Distribution Record Date | ~~32~~40 |
| 2. | Timing of Distributions | ~~32~~40 |
| 3. | Disbursing Agent | ~~33~~41 |
| 4. | Rights and Powers of Disbursing Agent | ~~33~~41 |
| 5. | Delivery of Distributions in General | ~~33~~41 |
| 6. | Payments and Distributions on Disputed Claims | ~~33~~41 |
| 7. | Manner of Payment | ~~34~~41 |

iii

| | | | |
|---|---|---|---|
| 8. | Undeliverable Distributions and Unclaimed Property | | ~~34~~42 |
| 9. | Withholding and Reporting Requirements | | ~~34~~42 |
| 10. | Surrender Instruments | | ~~34~~42 |
| 11. | Setoffs | | ~~34~~42 |
| 12. | Insurance Claims | | ~~35~~43 |
| 13. | Applicability of Insurance Policies | | ~~35~~43 |
| 14. | No Postpetition Interest | | ~~35~~43 |
| 15. | Distributions Free and Clear | | ~~35~~43 |
| 16. | Fractional Dollars; De Minimis Distributions | | ~~35~~43 |
| F. | Procedures for Disputed Claims | | ~~36~~44 |
| 1. | Allowance of Claims and Equity Interests | | ~~36~~44 |
| 2. | Objections to Claims | | ~~36~~44 |
| 3. | Estimation of Claims | | ~~36~~44 |
| 4. | No Distribution Pending Allowance | | ~~37~~45 |
| 5. | Distributions after Allowance | | ~~37~~45 |
| 6. | Preservations of Rights to Settle Claims | | ~~37~~45 |
| 7. | Disallowed Claims | | ~~37~~45 |
| G. | Executory Contracts and Unexpired Leases | | ~~37~~45 |
| 1. | Assumption and Rejection of Executory Contracts and Unexpired Leases | | ~~37~~45 |
| 2. | Inclusiveness | | ~~38~~46 |
| 3. | Rejection Claims | | ~~38~~46 |
| 4. | Cure of Defaults | | ~~38~~46 |
| 5. | Reservation of Rights | | ~~39~~47 |
| 6. | D&O Liability Insurance Policies | | 47 |
| H. | Conditions Precedent to Consummation of the Plan | | ~~39~~48 |
| 1. | Conditions Precedent to Confirmation | | ~~39~~48 |
| 2. | Conditions Precedent to the Effective Date | | ~~40~~48 |
| 3. | Waiver of Conditions | | ~~41~~49 |
| 4. | Effect of Failure of Conditions | | ~~41~~49 |
| I. | Effect of Confirmation | | ~~41~~49 |
| 1. | Immediate Binding Effect | | ~~41~~49 |
| 2. | Compromise and Settlement of Claims, Interests and Controversies | | ~~41~~50 |
| 3. | Releases by the Debtors | | ~~42~~50 |
| 4. | Releases by Holders of Claims | | ~~42~~50 |
| 5. | Exculpation | | ~~43~~51 |
| 6. | Injunction | | ~~43~~51 |
| 7. | Term of Injunctions or Stays | | ~~44~~53 |
| 8. | Injunction Against Interference with Plan | | ~~45~~53 |
| 9. | Effectuating Documents and Further Transactions | | ~~45~~53 |
| 10. | Preservation of Causes of Action of the Debtors | | ~~45~~53 |
| J. | Modification, Revocation or Withdrawal of the Plan | | ~~45~~54 |
| 1. | Modification and Amendments | | ~~45~~54 |
| 2. | Effect of Confirmation on Modifications | | ~~46~~54 |
| 3. | Revocation or Withdrawal of the Plan | | ~~46~~54 |

|     | K.  | Retention of Jurisdiction | ~~46~~54 |
|     | L.  | Miscellaneous Provisions | ~~48~~56 |
|     |     | 1.  | Payment of Statutory Fees | ~~48~~56 |
|     |     | 2.  | Dissolution of the Committee | ~~48~~56 |
|     |     | 3.  | Section 382 Limitation on Net Operating Losses and Built-In Losses | ~~48~~57 |
|     |     | 4.  | Section 1125(e) Good Faith Compliance | ~~48~~57 |
|     |     | 5.  | Substantial Consummation | ~~49~~57 |
|     |     | 6.  | Section 1146 Exemption | ~~49~~57 |
|     |     | 7.  | Closing of the Chapter 11 Cases | ~~49~~57 |
|     |     | 8.  | Plan Supplement | ~~49~~57 |
|     |     | 9.  | Further Assurances | ~~49~~58 |
|     |     | 10. | Exhibits Incorporated | ~~49~~58 |
|     |     | 11. | Inconsistency | ~~50~~58 |
|     |     | 12. | No Admissions | ~~50~~58 |
|     |     | 13. | Reservation of Rights | ~~50~~58 |
|     |     | 14. | Successors and Assigns | ~~50~~58 |
|     |     | 15. | Entire Agreement | ~~50~~59 |
|     |     | 16. | Notices | ~~50~~59 |
|     |     | 17. | Severability | ~~51~~59 |
|     |     | 18. | Governing Law | ~~51~~59 |
|     |     | 19. | Request for Confirmation | ~~51~~59 |

**ARTICLE V VOTING REQUIREMENTS; ACCEPTANCE AND CONFIRMATION OF THE PLAN** — ~~51~~60

|     | A.  | General | ~~51~~60 |
|     | B.  | Parties in Interest Entitled to Vote | ~~52~~60 |
|     | C.  | Classes Impaired and Entitled to Vote under the Plan | ~~52~~60 |
|     | D.  | Voting Procedures and Requirements | ~~52~~60 |
|     |     | 1.  | Ballots | ~~52~~60 |
|     |     | 2.  | Returning Ballots | ~~52~~61 |
|     |     | 3.  | Voting | ~~52~~61 |
|     | E.  | Acceptance of Plan | ~~54~~62 |
|     | F.  | Confirmation Without Necessary Acceptances; Cramdown | ~~54~~62 |
|     |     | 1.  | No Unfair Discrimination | ~~54~~63 |
|     |     | 2.  | Fair and Equitable Test | ~~55~~63 |

**ARTICLE VI FEASIBILITY AND BEST INTERESTS OF CREDITORS** — ~~55~~64

|     | A.  | Best Interests Test | ~~55~~64 |
|     | B.  | Feasibility | ~~56~~64 |

**ARTICLE VII EFFECT OF CONFIRMATION** — ~~57~~66

|     | A.  | Binding Effect of Confirmation | ~~57~~66 |
|     | B.  | Good Faith | ~~57~~66 |

**ARTICLE VIII CERTAIN RISK FACTORS TO BE CONSIDERED** — ~~58~~66

|     | A.  | Plan May Not Be Accepted | ~~58~~66 |

| | | |
|---|---|---|
| B. | Certain Bankruptcy Law Considerations | 5866 |
| C. | Distributions to Holders of Allowed Claims Under the Plan | 5867 |
| D. | Conditions Precedent to Consummation of the Plan | 5867 |
| E. | Certain Tax Considerations | 5967 |

ARTICLE IX CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN 5967

| | | | |
|---|---|---|---|
| A. | Tax Consequences to Creditors | | 6068 |
| | 1. | Holders of Claims | 6068 |
| | 2. | Non-United States Persons | 6069 |
| B. | Tax Treatment of the Liquidating Creditors' Trust | | 6169 |
| | 1. | Classification of the Liquidating Creditors' Trust | 6169 |
| | 2. | General Tax Reporting by the Trust and Beneficiaries | 6170 |
| | 3. | Allocations of Taxable Income and Loss | 6271 |
| C. | Importance of Obtaining Professional Tax Assistance | | 6372 |

ARTICLE X RECOMMENDATION AND CONCLUSION 6473

**TABLE OF EXHIBITS**

| Exhibit | Title |
|---------|-------|
| A | First Amended Joint Chapter 11 Plan of Reorganization of Hygea Holdings Corp. and its Affiliated Debtors |
| B | Liquidation Analysis |
| C | Financial Projections |
| D | Global Settlement Term Sheet |

60437/0001-19714805 20296303v3

# ARTICLE I

# INTRODUCTION

### A.    Purpose of the Disclosure Statement

On February 19, 2020 (the "***Petition Date***"), Hygea Holdings Corp. ("***HHC***") and its affiliated debtors and debtors-in-possession (collectively, the "***Debtors***") each filed voluntary petitions for relief (the "***Chapter 11 Cases***") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "***Bankruptcy Code***"), in the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***").

The Debtors have filed the First Amended Joint Chapter 11 Plan of Reorganization of Hygea Holdings Corp. and its Affiliated Debtors (including all exhibits thereto, and as may be amended, altered, modified or supplemented from time to time, the "***Plan***") with the Bankruptcy Court.  A copy of the Plan is attached hereto as Exhibit A.

**Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Plan; *provided*, *however*, that any capitalized term used herein that is not defined herein or in the Plan, but is defined in the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure (the "*Bankruptcy Rules*") will have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.**

The Debtors submit this disclosure statement (as may be amended, altered, modified or supplemented from time to time, the "***Disclosure Statement***") pursuant to section 1125 of the Bankruptcy Code to Holders of certain Claims against the Debtors in connection with (i) the solicitation of acceptances of the Plan and (ii) the Confirmation Hearing.

The purpose of this Disclosure Statement is to describe the Plan and its provisions and to provide certain information, as required under section 1125 of the Bankruptcy Code, to Creditors who will have the right to vote on the Plan so they can make informed decisions in doing so. Creditors entitled to vote to accept or reject the Plan will receive a Ballot (as defined herein) together with this Disclosure Statement to enable them to vote on the Plan.

This Disclosure Statement includes, among other things, information pertaining to the Debtors' prepetition business operations and financial history and the events leading to the filing of the Chapter 11 Cases.  This Disclosure Statement also contains information regarding significant events that have occurred during the Chapter 11 Cases.  In addition, an overview of the Plan is included, which overview sets forth certain terms and provisions of the Plan, the effects of Confirmation of the Plan, certain risk factors associated with the Plan and the manner in which Distributions will be made under the Plan.  This Disclosure Statement also discusses the Confirmation process and the procedures for voting, which procedures must be followed by the Holders of Claims entitled to vote under the Plan for their votes to be counted.

**B.      Disclosure Statement Enclosures**

Accompanying this Disclosure Statement are:

1.      <u>Order Approving the Disclosure Statement</u>.  A copy of the Bankruptcy Court's order (the "***Solicitation Procedures Order***") approving this Disclosure Statement and, among other things, establishing procedures for voting on the Plan, setting the deadline for objecting to the Plan and scheduling the Confirmation Hearing.

2.      <u>Ballot</u>.  A ballot (the "***Ballot***") for voting to accept or reject the Plan, if you are the record Holder of a Claim in a Class entitled to vote on the Plan (each, a "***Voting Class***").

3.      <u>Notice</u>.  A notice setting forth: (i) the deadline for casting Ballots either accepting or rejecting the Plan; (ii) the deadline for filing objections to Confirmation of the Plan; and (iii) the date, time and location of the Confirmation Hearing (the "***Notice***").

**C.      Final Approval of the Disclosure Statement and Confirmation of the Plan**

1.      <u>Requirements</u>.  The requirements for Confirmation of the Plan are set forth in section 1129 of the Bankruptcy Code.  The requirements for the Disclosure Statement are set forth in section 1125 of the Bankruptcy Code.

2.      <u>Approval of the Plan and Confirmation Hearing</u>.  Before entering an order confirming the Plan (the "***Confirmation Order***"), the Bankruptcy Court must hold a hearing to determine whether the Plan meets the requirements of section 1129 of the Bankruptcy Code.

3.      <u>Effect of Confirmation</u>.  Confirmation serves to make the Plan binding upon the Debtors and all Creditors, Holders of Equity Interests and other parties in interest, regardless of whether they cast a Ballot to accept or reject the Plan.

4.      <u>Only Impaired Classes Vote</u>.  Pursuant to the provisions of the Bankruptcy Code, only classes of claims or equity interests that are "impaired" under a plan may vote to accept or reject such plan.  Generally, a claim or equity interest is impaired under a plan if a holder's legal, equitable or contractual rights are changed under such plan.  In addition, if the holders of claims or equity interests in an impaired class do not receive or retain any property under a plan on account of such claims or equity interests, such impaired class is deemed to have rejected such plan under section 1126(g) of the Bankruptcy Code and, therefore, such holders do not need to vote on such plan.

Under the Plan, Holders of Claims in ~~Class~~Classes 1 and 2 are Unimpaired and therefore deemed to accept the Plan; Holders of Claims in Classes ~~2,~~3 and 4 are Impaired and are entitled to vote on the Plan; and Holders of Claims in Class 5 and Equity Interests in Class ~~5~~6 are deemed to reject the Plan and are not entitled to vote on the Plan.

**Accordingly, a Ballot for acceptance or rejection of the Plan is being provided only to Holders of Claims in Classes ~~2,~~3 and 4.**

**D.**    **Treatment and Classification of Claims and Equity Interests; Impairment**

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes, including voting, Confirmation and Distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  For a summary of the treatment of each Class of Claims and Equity Interests, see Article IV, "Summary of Plan," below.

| Class Description | Status | Proposed Treatment |
|---|---|---|
| Administrative Expense Claims<br>Estimated Claims Pool: $2,250,000.00<br>Estimated Recovery: 100% | Unclassified | Except to the extent that a Holder of an Allowed Administrative Expense Claim agrees to different treatment with the Debtors or Reorganized Debtors, each Holder of an Allowed Administrative Expense Claim will receive Cash in an amount equal to the unpaid amount of such Allowed Administrative Expense Claim on the later of the Effective Date or the date on which such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is reasonably practicable; *provided, however*, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors, as Debtors-in-Possession, or liabilities arising under obligations incurred by the Debtors, as Debtors-in-Possession, prior to the Effective Date, will be paid by the Debtors in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions, including, but not limited to, the Budget, DIP Orders and all other orders entered by the Bankruptcy Court related to the foregoing.  In addition, Allowed Administrative Expense Claims of the United States Trustee for statutory fees under 28 U.S.C. § 1930 incurred prior to the Effective Date will be paid on the Effective Date by the Debtors, and thereafter, as such fees may thereafter accrue and be due and payable, by the ~~Debtors or Reorganized Debtors~~Creditors' Trust in accordance with the applicable schedule for payment of such fees. |

| Accrued Professional Compensation Claims<br>Estimated Claims Pool: $—2,000,000.00<br>Estimated Recovery: 100% | Unclassified | AllExcept as otherwise provided in the Plan, all Professionals seeking payment of Accrued Professional Compensation Claims will (i) file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred in the Chapter 11 Cases by the date that is thirty (30) days after the Effective Date and (ii) be paid (a) the full unpaid amount as is Allowed by the Bankruptcy Court within five (5) Business Days after the date that such Claim is Allowed by order of the Bankruptcy Court, or (b) upon such other terms as may be mutually agreed upon between the Holder of such an Allowed Accrued Professional Compensation Claim and the Debtors or Reorganized Debtors.  Any Accrued Professional Compensation Claim that is not asserted in accordance with Section 2.2 of the Plan will be deemed disallowed under the Plan, waived, and will be forever barred against the Debtors, the Debtors' Estates, the Reorganized Debtors, the Creditors' Trust, or any of their Assets or property, and the Holder thereof will be enjoined from commencing or continuing any action, employment of process or act to collect, offset, recoup, or recover such Claim.<br><br>Accrued Professional Compensation Claims filed by the Committee's Professionals will be subject to a cap of One Million Three Hundred and Twenty-Five Thousand Dollars ($1,325,000.00) (the "*Committee Budget*") as described in the DIP Orders.  To the extent the Committee Budget is insufficient to pay the Allowed Accrued Professional Compensation Claims of the Committee's Professionals, such Allowed Claims may be paid from the Creditors' Trust.  The Committee Budget will not be subject to the Variance.<br><br>To the extent any excess funds remain under the Debtors' professional fee budgeted amounts and/or the Committee Budget under the DIP Orders (collectively, the "*Professional Budget Surplus*"), such funds will be deposited into the Creditors' Trust on the Effective Date, or after payment of such Professionals' Accrued Professional Compensation Claims.<br><br>The Professional Budget Surplus will not be used to repay the Creditors' Trust Loan. |
| Priority Tax Claims<br>Estimated Claims Pool: $—10,426,750.00<br>Estimated Recovery: 100% | Unclassified | Except as otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim or as soon as reasonably practicable thereafter), each Holder of an Allowed Priority Tax Claim will receive in full satisfaction, |

| | | settlement, discharge, and release of, and in exchange for, such Allowed Priority Tax Claim pursuant to and in accordance with sections 1129(a)(9)(C) and 1129(a)(9)(D) of the Bankruptcy Code, Cash in an aggregate amount of such Allowed Priority Tax Claim payable in regular installment payments over a period ending not more than five (5) years after the Petition Date, plus simple interest at the rate required by applicable non-bankruptcy law on any outstanding balance from the Effective Date, or such lesser rate as is agreed to in writing by a particular taxing authority and the Debtors or Reorganized Debtors, as applicable, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; provided, however, that Priority Tax Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.  Any installment payments to be made under clause (C) or (D) above will be made in equal quarterly Cash payments beginning on the first applicable Subsequent Distribution Date, and continuing on each Subsequent Distribution Date thereafter until payment in full of the applicable Allowed Priority Tax Claim. |
|---|---|---|
| Class 1: Other Priority Claims<br>Estimated Claims Pool: $—1,965.00<br>Estimated Recovery: 100% | Unimpaired | Except to the extent that a Holder of an Allowed Other Priority Claim against the Debtors has agreed to a different treatment of such Claim, each such Holder will receive, in full satisfaction of such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date; (ii) the date the Other Priority Claim becomes an Allowed Claim; or (iii) the date for payment provided by any agreement or arrangement between the Reorganized Debtors and the Holder of the Allowed Other Priority Claim against the Debtors. |
| Class 2: Other Secured Claims<br>$—<br>Estimated Claims Pool: $0.00<br>Estimated Recovery: —100% | ~~Impaired~~Unimpaired | In full satisfaction of an Allowed Other Secured Claim, on the later of the Effective Date and the date on which the Other Secured Claim is Allowed, each Holder of an Allowed Other Secured Claim will receive, at the sole and exclusive option of the Reorganized Debtors:  (a) Cash equal to the amount of such Claim; (b) the Collateral securing such Claim; or (c) satisfaction of such Claim pursuant to such other terms and conditions as may be agreed upon by the Reorganized Debtors and the Holder of such Other Secured Claim. |
| Class 3: Bridging's Secured Claim<br>$—<br>Estimated Claims Pool: $122,539,900.00<br>Estimated Recovery: —%Unknown | Impaired | Upon the terms and subject to the conditions set forth in the Plan, in full and final satisfaction, settlement, release, and discharge of Bridging's Secured Claim, Bridging or such Entity designated by Bridging and Centurion, respectively, will receive, on the Effective |

| | | |
|---|---|---|
| | | Date or as soon as practicable thereafter, (i) the Debtors' Cash on hand on the Effective Date in excess of Cash necessary to operate the Reorganized Debtors' business, following funding of the ~~Liquidating~~Creditors' Trust ~~Contribution~~Loan to be allocated 90.86% to Bridging and 9.14% to Centurion; (ii) the New Secured Debt in accordance with Section 6.4 of the Plan; and (iii) ~~100~~86.317% of the Reorganized Debtor Equity will be issued to Bridging or its designee and 8.683% of the Reorganized Debtor Equity will be issued to Centurion or its designee. |
| | | To the extent the Debtors' Cash on hand as of the Effective Date is not sufficient to make payments under the Plan, fund operations and fund the Creditors' Trust Loan, Bridging will advance the necessary funds to the Reorganized Debtors with such amount to be added to the Working Capital Loan.  All distributions made on account of Bridging's Secured Claim will be paid to Bridging and Centurion, as applicable.  Bridging will have the right to vote Bridging's Secured Claim. |
| Class 4: General Unsecured Claims<br>~~$__~~<br>Estimated Claims Pool: $281,457,060.00<br>Estimated Recovery: ~~__%~~Unknown | Impaired | This Class consists of all General Unsecured Claims against the Debtors, including Bridging's Deficiency Claim.  Except to the extent that a Holder of an Allowed General Unsecured Claim against the Debtors agrees to a different treatment of such Claim, in full and final satisfaction of each Allowed General Unsecured Claim against the Debtors, each Holder of an Allowed General Unsecured Claim against the Debtors will receive its Pro Rata share of ~~Liquidating~~Creditors' Trust Distributable ~~Cash~~Assets as soon as practicable as determined by the ~~Liquidating~~ Trustee.  Bridging will have the right to vote the Bridging Deficiency Claim but will waive any Distributions to Bridging and its participants on account of Bridging's Deficiency Claim. |
| Class 5: Subordinated Claims<br>Estimated Claims Pool: Unknown<br>Estimated Recovery: 0%<br>Class 6: Equity Interests<br>Estimated Recovery: 0% | Impaired<br>Impaired | This Class consists of all Subordinated Claims against the Debtors.  Holders of Subordinated Claims against the Debtors will not receive or retain any property under the Plan on account of such Subordinated Claims, and the obligations of the Debtors on account of Subordinated Claims will be discharged.<br>Holders of an Equity Interest in the Debtors will not receive or retain any property under the Plan on account of such Equity Interests, and the obligations of the Debtors on account of the Equity Interests will be discharged.  ~~Notwithstanding the foregoing, the Equity Interests in the Debtors will be reinstated upon the Effective Date and deemed issued to and held by Bridging.~~ |

### E.    Voting Procedures and Voting Deadline

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan.  To ensure your vote is counted, you must (i) complete the Ballot, (ii) indicate your decision either to accept or reject the Plan in the boxes provided and (iii) sign and return the Ballot(s) in the envelope provided.

**To be counted, your Ballot <u>with your original signature</u> indicating your acceptance or rejection of the Plan must be received no later than 4:00 p.m. (Eastern Time) on** ~~**————**~~ **June 8, 2020 (the '*Voting Deadline*').**

The following Ballots will not be counted or considered for any purpose in determining whether the Plan has been accepted or rejected:

(i)     any Ballot received after the Voting Deadline (unless extended by the ~~Debtor~~Debtors);

(ii)    any Ballot that is illegible or contains insufficient information to permit the identification of the claimant;

(iii)   any Ballot cast by a Person or Entity that does not hold a Claim or Equity Interest in a Class that is entitled to vote to accept or reject the Plan;

(iv)    any Ballot cast for a Claim scheduled as Contingent, unliquidated or Disputed or as zero or unknown in amount and for which no Rule 3018(a) Motion has been filed by the Rule 3018(a) Motion Deadline (as such terms are defined in the Solicitation Procedures Order);

(v)     any Ballot that indicates neither an acceptance nor a rejection, or indicates both an acceptance and a rejection, of the Plan;

(vi)    any Ballot that casts part of its vote in the same Class to accept the Plan and part to reject the Plan;

(vii)   any form of Ballot other than the official form sent by Epiq Corporate Restructuring, LLC ("*Epiq*," the "*Claims Agent*" or the "*Voting Agent*"), or a copy thereof;

(viii)  any Ballot received that the Voting Agent cannot match to an existing database record;

(ix)    any Ballot that does not contain an original signature;

(x)     any Ballot that is submitted by facsimile, email or by other electronic means; or

(xi)    any Ballot sent to the Debtors' professionals.

In order for the Plan to be accepted by an Impaired Class of Claims, a majority in number and two-thirds in dollar amount of the Claims voting in such Class must vote to accept the Plan. At least one Voting Class, excluding the votes of insiders, must actually vote to accept the Plan.

**You are urged to complete, date, sign and promptly mail the Ballot enclosed with the notice.  Please be sure to complete the Ballot properly and legibly, and identify the exact amount of your Claim and the name of the Creditor.  If you are a Holder of a Claim entitled to vote on the Plan and you did not receive a Ballot, you received a damaged Ballot or you lost your Ballot, or if you have any questions concerning the Disclosure Statement, the Plan or procedures for voting on the Plan, please contact the Voting Agent, Epiq Corporate Restructuring, LLC, at (866) 897-6433 (U.S., and Canada, toll free), (646) 282-2500 (International) or at hygeatabulation@epiqglobal.com.  The Voting Agent is not authorized to and will not provide legal advice.**

### F.    Confirmation Hearing

The Bankruptcy Court has scheduled a hearing to consider confirmation of the Plan for June 12, 2020 at 10:00 a.m. (Eastern Time) in the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 6th Floor, Courtroom No. 3, Wilmington, Delaware 19801 (the "***Confirmation Hearing***").  The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be filed and served on or before June 5, 2020 at 4:00 p.m. (Eastern Time) in the manner described in the Notice accompanying this Disclosure Statement.  The Confirmation Hearing may be adjourned from time to time by way of announcement of such continuance in open court or otherwise, without further notice to parties in interest.

**The Debtors urge all Holders of Claims entitled to vote on the Plan to vote to accept the Plan.**

## ARTICLE II

## GENERAL INFORMATION REGARDING THE DEBTORS[3]

### A.    The Debtors' Businesses

### 1.    General Overview

Founded in 2007, Hygea is a consolidated enterprise of several companies aggregated through a series of acquisitions that focus on the delivery of primary-care-based health care to commercial, Medicare and Medicaid patients.  The Debtors currently provide health care related services to approximately 190,000 patients in the southeast United States through two platforms: (i) individual physician practices and physician group practices (collectively, the "***Physician Practices***") with a primary care physician ("***PCP***") focus and (ii) management services

---

[3]  The information herein is solely for informational purposes and nothing herein shall be deemed an admission by the Debtors in any Cause of Action.

organizations ("*MSOs*").   The Debtors are headquartered in Miami, Florida and currently employ more than 150 individuals.

## 2.    The Physician Practices

As of the Petition Date, the Physician Practices consisted of approximately seventeen (17) active brick and mortar locations throughout South and Central Florida and Georgia.  The Debtors either manage or wholly own the assets of the Physician Practices and employ the personnel of the Physician Practices, including the physicians.  Other than Debtor First Harbour Medical Centers, LLC, which is wholly-owned by Debtor Hygea Health Holdings, Inc. ("*HHH*"), the physicians still own the equity in the corporate entities of the Physician Practices.

The Physician Practices focus on family medicine, internal medicine or clinical cardiology.  Through these practices, the Debtors directly employ in excess of seventy (70) clinical staff (physicians, physician assistants, nurse practitioners, clinical technicians and medical assistants).

Historically, acquisitions of physician practices and clinics were an integral component of the Debtors' business model.  Since its inception, Hygea acquired approximately thirty-five (35) physician practices, many of which the Debtors no longer operate.  In a typical purchase transaction, the Debtors purchased the physical assets of a medical practice and obtained an option to purchase the equity or ownership interest in the corporate entity of the practice itself.  The Debtors, however, generally did not exercise the option to purchase the ownership interest in the practice.  As consideration for the asset purchase, the selling physician received a combination of cash and stock in HHC with a put option at a set minimum price per share.

Contemporaneously with the asset acquisition, the Debtors typically entered into (i) a management services agreement (the "*MSA*") with the physician practice and (ii) employment agreements with the physicians.  Pursuant to the MSAs, certain of the Debtors manage the day-to-day business operations of the Physician Practices, thereby allowing the physicians to focus on the practice of medicine.  The management related services provided to the Physician Practices include staffing, payroll services and centralized benefits including healthcare coverage.

The Physician Practices earn revenue through fee for service billing ("*FFS*") or capitation payments (as described below).  Under traditional FFS reimbursement, physicians are paid a specified amount for a patient visit based upon the appropriate coding for such visits.  Physician compensation is related solely to the volume of patient visits, procedures performed, and tests ordered.  As of the Petition Date, approximately 52% of the Debtors' revenue ~~comes~~came from FFS payments.

Although the Physician Practices traditionally have relied upon the FSS payment model, in recent years Hygea has shifted its focus toward the capitation model by entering into value-based performance contracts with various insurance companies.  Capitation is a type of a health care payment system in which a doctor is paid a fixed amount per patient for a prescribed period of time by an insurer or physician association.  As of the Petition Date, approximately 19% of the Debtors' revenue ~~comes~~came from capitation payments.

### 3.    Management Service Organizations (MSOs)

An MSO is an entity that, under contract, arranges for medical and medically related services to patients on behalf of a health plan.  The following entities comprise the Debtors' active MSOs: First Harbour Health Management, LLC; Florida Group Healthcare, LLC; and Palm Medical Network, LLC.

The Debtors' MSOs have entered into "at risk" contracts with Medicare Advantage Health Maintenance Organizations ("***HMOs***") to manage the delivery of healthcare services to Medicare enrolled patients throughout Florida (the "***Enrollees***").  An "at risk" contract is when the MSO agrees to assume either a portion or all of the financial risk or exposure for potential losses incurred by their patient base participating in that HMO.  The Debtors currently have three (3) active "at risk" agreements with Humana, Inc. ("***Humana***") and subsidiaries of Humana, pursuant to which the MSOs provide or arrange for medical and related healthcare services to the Enrollees either through the Physician Practices or third-party physician groups.

The Debtors' MSO model is to improve the management of high-risk patients, resulting in better quality outcomes.  The MSOs work closely with the PCP to ensure the patient receives the necessary care to achieve optimal health outcomes.  The Debtors' MSOs enhance their profitability by restraining medical costs.  By emphasizing preventive care and attempting to avoid turning chronic conditions into acute conditions, the Debtors' MSOs are increasingly focused on keeping patients healthier as a means to reduce costs and decrease utilization.

The HMO receives a "risk adjusted" monthly amount for each Enrollee from the Centers for Medicare & Medicaid Services ("***CMS***"), which amount can change based upon various factors personal to each Enrollee, including health, age and demographics.  The HMO is entitled to a monthly fee (usually a percentage of the fixed amount paid by CMS) and the balance is allocated to the MSO (the "***Allocated Amounts***").  The Allocated Amounts are used to pay claims either on an FFS basis or at a capitated rate.  After claims are reconciled and paid, any surplus remaining from the monthly Allocated Amounts are paid to the MSO.  As the MSOs generate surplus payments, the Debtors are obligated to downstream a percentage of that surplus to the medical providers, pursuant to various contracts between the MSOs and third-party practice groups.  As of the Petition Date, approximately 29% of the Debtors' revenue ~~comes~~came from surplus payments to the Debtors' MSOs.

### 4.    The Palm Network

In 2008, Hygea acquired the Palm Network, which, at the time, was one of the largest independent physician associations ("***IPAs***") in Florida, representing more than seventy-six (76) different medical specialties, including more than eight hundred (800) primary care providers.  However, in today's healthcare climate, IPAs, such as the Palm Network, have proven to be an inferior business model compared to MSOs.  As of the Petition Date, the Palm Network ~~is~~was not a direct source of revenue for the Debtors.  Nonetheless, through the Palm Network, the Debtors are able to maintain and develop new relationships with third party physician practice groups with whom the Debtors contract with to provide care to HMO Enrollees.

**B.      The Debtors' Corporate Structure**

HHC was formed on August 26, 2008, as Piper Acquisition II, Inc.  On May 16, 2011, HHC changed its name to Hygea Holdings Corp.  On that same date, HHC entered into a Share Exchange Agreement with the shareholders of Hygea Health Holdings, Inc., a Florida corporation ("***Hygea Health***"), an entity founded in March of 2007 by Manuel E. Iglesias, Edward Moffly and Dr. Manuel I. Iglesias, pursuant to which HHC acquired 99.9% of the outstanding securities of Hygea Health in exchange for 135,519,339 shares of HHC common stock.

As set forth on the organizational chart attached to the First Day Declaration [Docket No. 13], HHC has myriad direct and indirect subsidiaries.  As of the Petition Date, several of these subsidiaries, some of which consist of former MSO entities, ~~are~~were inactive.  The majority of the Debtors' business operations (described above) are conducted through Hygea Health.

**C.      The Debtors' Prepetition Capital Structure**

As of the Petition Date, the Debtors had assets on a consolidated basis of approximately $77.3 million and liabilities of approximately $212.2 million, consisting of approximately $76.3 million in current liabilities and approximately $135.9 million in long-term liabilities.

The Debtors' long-term liabilities relate to approximately $162.0 million Canadian (approximately $122.0 million in U.S. Dollars) under that certain Amended and Restated Credit Agreement, dated as of January 31, 2017 (as amended, supplemented or otherwise modified from time to time, the "***Credit Agreement***"), by and among HHC, certain of the other Debtors, as obligors, Bridging Income Fund LP (formerly known as Sprott Bridging Income Fund LP) (the "***Lender***") and Bridging Finance Inc., as administrative agent (together with the Lender, "***Bridging***").  Pursuant to the related Amended and Restated Guaranty and Security Agreement, dated as of January 31, 2017, Bridging has a first priority lien and security interest in substantially all of the Debtors' assets.

As of the Petition Date, the Debtors had unsecured debt in the form of accounts payable, accrued liabilities and other liabilities.  The liabilities consist of, among other things, contingent, unliquidated and disputed litigation claims in excess of $50 million and payroll tax liabilities in excess of $10 million, including interest and penalties.

**D.      Summary of Events Leading to the Chapter 11 Filing**

Since 2017, the Debtors ~~have~~had confronted liquidity challenges and operational issues that ~~threaten~~threatened their ability to continue as a going concern.  The Debtors' financial situation ~~has~~had been deteriorating over time due to a variety of reasons.

Over the last several years, the Debtors pursued an aggressive growth strategy, expanding their acquisition of Physician Practices.  In some cases, the Debtors purchased certain Physician Practices with minimal net profit.  At the time of acquisition, the Debtors projected increased profitability for those practices as a result of performance improvements.  The Debtors, however, failed to properly integrate the underperforming acquisitions.  Consequently, the Debtors have been burdened with supporting a number of losing operations, that even with performance

11

improvements will never be profitable.  The operating losses of those practices, along with the associated acquisition costs, have caused a substantial drain on the Debtors' liquidity.

The Debtors' failed acquisition of certain MSOs similarly contributed to the current liquidity constraints.  The Debtors purchased certain MSOs that, at the time of acquisition, had sufficient infrastructure to generate profit.  The Debtors, however, were unable to maintain the investment required to support those MSOs and the MSOs performance dropped significantly and below acceptable levels for the HMOs.  As a result, the HMOs terminated their contracts with those MSOs.  Those terminations resulted in several large acquisitions becoming worthless while the Debtors remained obligated for the costs associated with such acquisitions.

The Debtors' acquisition of the Palm Network similarly proved to be unsuccessful in terms of generating direct profits.  Nonetheless, the Palm Network still provides certain value to the Debtors in terms of helping the Debtors maintain and develop new business relationships with physicians and HMOs.

In addition to failed acquisitions, the Debtors' historical financial reporting was inadequate, causing deficiencies in their financial forecasting as well as cash management.  Those inadequacies caused the Debtors to overspend in the face of an already unsustainable debt load.

Given these those operational challenges, the Debtors were never profitable on a cash basis and, therefore, were dependent on constant debt and equity fundraising activities to cover losses.  The Debtors have been unable to raise additional capital to fund those losses due to, in part, pending litigation stemming from shareholder and contractual disputes.  The Debtors do not have the liquidity to defend or settle these lawsuits.

As a result of the foregoing issues, the Debtors have been were unable to service their debt obligations to the Lender and certain events of default occurred under the Credit Agreement.  Accordingly, in or around January 2018, the Debtors hired 4Front Capital Partners Inc. ("*4Front*"), an investment banking firm, to assist the Debtors in evaluating strategic alternatives and commencing a formal marketing process for the sale and/or refinancing of Hygea.  Although Hygea and 4Front contacted almost 100 parties with respect to a potential transaction, only 15 executed an NDA.  These parties were provided access to a dataroom containing confidential information regarding the Debtors, their businesses and their assets.  Of these 15 parties who had access to the dataroom, only one expressed further interest in participating in a transaction and had further discussions with the Debtors and 4Front regarding potential transactions.  Ultimately, the last party declined to move forward with a transaction.

Following the unsuccessful sale process, in late October 2019 the Debtors engaged Alvarez & Marsal North America, LLC to assist the Debtors with, among other things, financial and operational support and strategic advice relating to a corporate reorganization.  Shortly thereafter, on or about October 31, 2019, the Debtors and Bridging entered into a Forbearance Agreement (as subsequently amended, the "*Forbearance Agreement*").  Pursuant to the Forbearance Agreement, Bridging agreed to forbear from exercising its rights and remedies under the Credit Agreement and provided in excess of $6 million of emergency funding to the Debtors.

12

Thereafter, the Debtors and Bridging engaged in significant arms'-length negotiations that led to them entering into that certain Restructuring Support Agreement, dated as of February 7, 2020, by and among the Debtors and Bridging (the "**RSA**"), pursuant to which, among other things, the Debtors agreed to commence the Chapter 11 Cases and pursue a consensual restructuring to be implemented through a chapter 11 plan, if possible, or a sale under section 363 of the Bankruptcy Code.[4] ~~As~~The proposed plan described ~~below.~~in the ~~proposed plan provides~~RSA provided for, among other things, the (i) transfer of the Debtors' equity to Bridging on account of its pre-petition secured claim, (ii) creation of a liquidating trust for the benefit of the Debtors' unsecured creditors and (iii) payment of priority tax claims pursuant to section 1129(a)(9)(c) of the Bankruptcy Code.  Pursuant to the RSA, Bridging agreed to provide the Debtors with debtor-in-possession financing to support the administrative and operational expenses of these Chapter 11 Cases.  ~~The Debtors believe the restructuring~~As discussed in greater detail below, the plan structure contemplated by the RSA ~~provides a clear path to emergence from these Chapter 11 Cases~~was modified to address, among other things, a global settlement (the "**Global Settlement**") by ~~will allow~~among the Debtors ~~to succeed as restructured companies after emergence~~, the Committee and Bridging (collectively, the "**Global Settlement Parties**").

### ARTICLE III

### <u>THE CHAPTER 11 CASES</u>

**A.      Commencement of the Chapter 11 Cases**

As set forth above, on the Petition Date the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.  No trustee or examiner has been appointed in the Chapter 11 Cases.

Since the Petition Date, the Debtors have continued to operate their businesses and manage their property as debtors and debtors-in-possession.

**B.      "First Day" Motions**

On the Petition Date, the Debtors filed ten (10) "first-day" motions designed to ease their transition into chapter 11 and to minimize the effects of the commencement of the Chapter 11 Cases.  On February 20, 2020, the Debtors filed a motion seeking entry of an order authorizing them to assume the RSA [Docket No. 41].  On February 21, 2020, the Bankruptcy Court entered orders providing certain of the requested first-day relief, including:

(i)      authorizing the Debtors' Chapter 11 Cases to be jointly administered for procedural purposes only [Docket No. 42];

(ii)      authorizing the Debtors to file a consolidated creditor matrix in lieu of submitting separate mailing matrices for each Debtor [Docket No. 44]

---

[4] In the event the Plan is withdrawn or an order denying confirmation of the Plan is entered by the Court, the Debtors have agreed to file a motion under section 363 of the Bankruptcy Code to sell substantially all of their assets to Bridging as a stalking horse bidder through a credit bid.

13

(iii)    authorizing the Debtors to retain Epiq as their claims and noticing agent [Docket No. 45]

(iv)    approving, on an interim basis, certain procedures to maintain and protect the confidentiality of patient information as required by the Health Insurance Portability and Accountability Act of 1996, while providing required disclosure in these Chapter 11 Cases [Docket No. 46] (final order entered March 19, 2020 [Docket No. 178]);

(v)    authorizing the Debtors, on an interim basis, to continue use of their existing bank accounts and business forms [Docket No. 47] (final order entered March 20, 2020 [Docket No. 198]);

(vi)    authorizing the Debtors, on an interim basis, to pay prepetition wages and continue certain employee benefit programs in the ordinary course [Docket No. 43] (final order entered March 20, 2020 [Docket No. 197]);

(vii)    authorizing the Debtors, on an interim basis, to maintain their existing insurance policies and continue their insurance premium financing arrangement with respect to such policies [Docket No. 50] (final order entered March 19, 2020 [Docket No. 182]);

(viii)    authorizing the Debtors, on an interim basis, to pay certain prepetition taxes and related obligations [Docket No. 48] (final order entered March 19, 2020 [Docket No. 181]); and

(ix)    on an interim basis, prohibiting the Debtors' utility companies from altering, refusing or discontinuing service to, or discriminating against, the Debtors and approving the form of adequate assurance of postpetition payment to such utility companies [Docket No. 49].

On February 24, 2020, the Court (final order entered an order authorizing the Debtors, on an interim basis, to enter into a post-petition financing arrangement with, permitting the use cash collateral of, and granting adequate protection to, Bridging [Docket No. 63]. The Court has scheduled a hearing for March 2420, 2020 at 2:00 p.m. (ET) (the "*Second Day Hearing*") to consider approval of certain of the first-day motions on a final basis. The Debtors also have filed additional motions to be heard at the Second Day Hearing seeking the following relief:[Docket No. 200]).

(i)    extending the Debtors' time to file their schedules of assets and liabilities and statements of financial affairs [Docket No. 83];

(ii)    establishing procedures for interim compensation and reimbursement of expenses of professionals [Docket No. 84];

(iii)    establishing bar dates for filing claims against the Debtors and approving the form and manner of notice thereof [Docket No. 87]; and

14

(iv)    finding that the appointment of a patient care ombudsman is not required in the Chapter 11 Cases [Docket No. 108].

The Debtors also intend to file one or more motions to reject certain executory contracts and unexpired leases to be heard at the Second Day Hearing

**C. Retention of Professionals and Appointment of the Committee**

**1. Retention of Debtors' Professionals**

The Debtors have sought authority were authorized to retain the following bankruptcy professionals in the Chapter 11 Cases, which retention applications are scheduled to be heard at the Second Day Hearing: (i) Cole Schotz P.C., as their bankruptcy counsel [Docket No. 179]; (ii) Alvarez & Marsal North America, LLC ("*A&M*"), as their financial advisors [Docket No. 180]; and (iii) Epiq as their administrative agent advisor [Docket No. 177].

The Debtors also have sought authority were authorized to retain certain professionals utilized by the Debtors in the ordinary course of business prior to the Petition Date pursuant to an order [Docket No. 82], which motion similarly is scheduled to be heard at the Second Day Hearing 186] entered by the Bankruptcy Court on March 19, 2020.

**2. Appointment of Committee and Retention of Committee Professionals**

On March 10, 2020, the Office of the United States Trustee for the District of Delaware appointed an official committee of unsecured creditors (the "*Committee*") pursuant to section 1102(a) of the Bankruptcy Code [Docket No. 118]. The members of the Committee are: (i) Manasota Medical Management Consultants, LLC, (ii) Claudio F. Arellano; (iii) NextGen Healthcare, Inc.; (iv) Cardiology Consultants of West Broward, P.A. ("*CCWB*"); and (iv) Adaptive Healthcare Solutions, LLC.

The Committee was authorized to retain the following bankruptcy professionals in the Chapter 11 Cases: (i) Lowenstein Sandler LLP, as its counsel [Docket No. 335]; and (ii) Morris James LLP, as its co-counsel [Docket No. 341]. The Committee's application to retain FTI Consulting, Inc. ("*FTI*"), as its financial advisor [Docket No. 219] remains pending.

**D. Significant Events During the Chapter 11 Cases**

[RESERVED]

In addition to the relief described above, the Debtors have sought and received authority with respect to various matters designed to assist in the administration of the Chapter 11 Cases and to maximize the value of the Debtors' Estates. Material events since the commencement of the Chapter 11 Cases are summarized below and include:

**1. Debtor-in-Possession Financing**

When the Debtors filed their Chapter 11 Cases, all of their cash was the cash collateral of Bridging. Moreover, even if the Debtors had been given free access to their cash, they still

15

would not have had sufficient liquidity to conduct the Chapter 11 Cases or otherwise maximize value of their assets for the benefit of creditors.  Accordingly, at the Debtors' request, Bridging extended post-petition financing in the maximum amount of $9,853,308.00 to the Debtors on very reasonable terms that did not include, among other common features, a roll-up of Bridging's prepetition debt or cross-collateralization.  The proposed financing was designed to provide the Debtors with stability and funding for the plan process that is expected to maximize value for the estates and creditors.

In connection therewith, on the Petition Date, the Debtors filed a motion seeking entry of an order authorizing the Debtors to enter into a post-petition financing arrangement with, permitting the use cash collateral of, and granting adequate protection to, Bridging [Docket No. 63] (the "*DIP Motion*").  On February 24, 2020, the Bankruptcy Court entered an order granting the DIP Motion on an interim basis [Docket No. 63].  Thereafter, Nevada 5, Inc. ("*Nevada 5*") and N5HYG, LLC ("*N5HYG*") filed an objection to the DIP Motion [Docket No. 152] and Centurion Asset Management, Inc. ("*Centurion*") filed a preliminary response thereto [Docket No. 208].  After a telephonic hearing conducted on March 25, 2020 and ensuing discussions among counsel for the Debtors, the Committee and other parties, on April 2, 2020 the Bankruptcy Court entered a second interim DIP order [Docket No. 288].

On April 10, 2020, the Committee filed a reservation of rights with respect to the DIP Motion [Docket No. 309] and informally raised with the Debtors a number of concerns regarding the proposed final DIP order (the "*Final DIP Order*").  As noted in the reservation of rights, at the time of the filing, the Global Settlement Parties were in the process of working towards the Global Settlement, as described in more detail below.  Attendant to that process, the Global Settlement Parties reached an agreement on the Final DIP Order, which reflected numerous concessions by Bridging, including (i) Bridging's agreement that various claims and causes of action would not be subject to the DIP Liens (as defined in the DIP Motion), (ii) a modification of the Committee's deadline to assert a challenge to the Debtors' stipulations with Bridging in the interim DIP orders to April 24, 2020, and (iii) clarification that the Committee had standing to challenge both the Debtors' stipulations as well as the more general Challenges (as defined in the Final DIP Order).

Thereafter, the concerns of Centurion and CCWB were resolved by the inclusion of additional language in the Final DIP Order and the agreement to clarify certain terms of the Plan.  After a contested hearing on the Final DIP Order, certain language requested by Nevada 5 and N5HYG was included in the Final DIP Order.  Pursuant to the Final DIP Order, the deadline for parties in interest (other than the Committee) to assert a Challenge is May 11, 2020.  Additionally, the Final DIP Order reserved the rights of the Committee, Nevada 5 and N5HYG to contest a credit bid of Bridging in the event of a sale of the Debtors' assets.

On April 17, 2020, the Bankruptcy Court entered the Final DIP Order [Docket No. 342].

**2.      Patient Care Ombudsman Motion**

On March 6, 2020, the Debtors filed a motion [Docket No. 108] (the "*PCO Motion*") seeking entry of an order waiving the appointment of a patient care ombudsman pursuant to

section 333 of the Bankruptcy Code.  On March 19, 2020, the Bankruptcy Court entered an order [Docket No. 184] granting the PCO Motion.

**3.      Lease Rejection Motions**

On March 10, 2020, the Debtors filed an omnibus motion [Docket No. 123] (the "***Omnibus Rejection Motion***") seeking entry of an order authorizing the rejection of (i) seven (7) executory contracts as of the Petition Date and (i) one (1) unexpired lease effective as of March 31, 2020.  On March 19, 2020, the Bankruptcy Court entered an order [Docket No. 183] granting the Omnibus Rejection Motion.

On March 10, 2020, the Debtors filed a motion [Docket No. 124] (the "***CCWB Rejection Motion***") seeking entry of an order authorizing the rejection (i) a management agreement between the Debtors and CCWB effective as of the date of entry of the order granting the motion and (ii) an unexpired lease of real property between the Debtors and Cypress Real Estate Investments, LLC effective *nunc pro tunc* to February 28, 2020.  After extensive negotiations between the Debtors and CCWB, on April 8, 2020, the Bankruptcy Court entered an order [Docket No. 296] granting the CCWB Rejection Motion.

**4.      The Claims Process**

**a.      Schedules and Statements**

On April 1, 2020, the Debtors filed their Schedules of Assets and Liabilities and Statements of Financial Affairs [Docket Nos. 221-286] (together, the "Schedules and Statements").  Among other things, the Schedules and Statements set forth the Claims of known Creditors against the Debtors as of the Petition Date, based upon the Debtors' books and records.  The Debtors retain the right to amend the Schedules and Statement during the pendency of the Chapter 11 Cases.

**b.      Bar Date Order**

On March 19, 2020, the Bankruptcy Court entered an order [Docket No. 291] (the "Bar Date Order") establishing the deadlines for filing Claims against the Debtors (collectively, the "Bar Dates"), including the following:

> General Bar Date.  Each Person or Entity, except any Governmental Unit, holding or asserting a Claim against the Debtors that arose (or is deemed to have arisen) on or before the Petition Date, including any 503(b)(9) Claims, is required to file a Proof of Claim form so that it is actually received by the Claims Agent on or before May 6, 2020 at 5:00 p.m. (Eastern Time).

> Governmental Bar Date.  Each Governmental Unit holding or asserting a Claim against the Debtors that arose (or is deemed to have arisen) on or before the Petition Date is required to file a Proof of Claim form so that it is actually received by the Claims Agent on or before August 17, 2020 at 5:00 p.m. (Eastern Time).

### c.     Claims Objections

The Debtors and their professionals are investigating each of the Claims filed against the Debtors to determine the validity of such Claims and anticipate filing objections to Claims that are filed in improper amounts or classifications, or are otherwise subject to objection under the Bankruptcy Code or other applicable law.  As of the filing of this Disclosure Statement the Debtors have not filed any objections to Claims.

### 5.     Litigation and Discovery

### a.     Committee

Since the Committee's formation, it has sought discovery from the Debtors pursuant to numerous avenues, including: (i) a detailed "lien review" request, sent on March 11, 2020; (ii) *The Official Committee of Unsecured Creditors' First Set of Request for Documents from Debtors*, dated March 19, 2020; (iii) an e-mail request for additional lien review documents, sent on Mach 25, 2020; and (iv) various  informal e-mails requesting documents related to, among other things, the Debtors' insurance policies, operations, taxes and finances.  These various requests required the Debtors and their professionals to engage in an expensive and time consuming electronically stored information ("***ESI***") production of emails and documents from the Debtors' server, using multiple search terms provided by the Committee's counsel, in addition to traditional paper discovery.  In response, the Debtors have produced a large volume of materials to the Committee, often times on an expedited and rolling basis due to the time constraints imposed by the Committee.  In addition, A&M produced directly to FTI extensive documents, answered numerous lines of inquiry and engaged in myriad conference calls with the Committee's representatives.

On April 3, 2020 and April 7, 2020, counsel for the Committee requested the production of ESI and paper discovery for additional and broader categories, and from additional custodians, including bank documents, employee personnel files, evidence of transfers to third parties and numerous other categories.  Notwithstanding that the Debtors and their advisors had been 100% responsive and cooperative with the Committee since its formation and had consensually produced massive amounts of relevant material, on April 9, 2020, the Committee filed *The Official Committee of Unsecured Creditors Motion for an Order Pursuant to Bankruptcy Rule 2004 and Local Bankruptcy Rule 2004-1 Directing the Production of Documents by Debtors* [Docket No. 302] (the "***Committee 2004 Motion***"), and a related motion to shorten the notice period and set an expedited hearing thereon [Docket No. 303].  On April 13, 2020, the Bankruptcy Court entered an order [Docket No. 316] denying the motion to shorten and scheduling a status conference on the Committee 2004 Motion for April 15, 2020 (the "***Discovery Conference***").  In advance of the Discovery Conference, the Debtors and the Committee agreed to hold the Committee 2004 Motion in abeyance until May 15, 2020.  Since that date, the Debtors have produced in excess of 65,000 pages of additional documents to the Committee, which production remains ongoing.

### b.    Nevada 5

Over the last two years, Nevada 5 and N5HYG have been pursuing litigation against certain of the Debtors, certain of their current and former directors and officers, and more recently, against Bridging, to recover on a failed investment.  Despite having never obtained any success with such efforts, and even being sanctioned by a court in Nevada for approximately $800,000, Nevada 5 and N5HYG have continued to pursue an aggressive litigation strategy in these Chapter 11 Cases and a prepetition litigation pending against, among others, HHH in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida (the "*Florida Action*").

On February 24, 2020, Nevada 5 filed an *Emergency Precautionary Motion for Relief from the Automatic Stay* [Docket No. 59] (the "*Nevada 5 Stay Relief Motion*") and a related motion [Docket No. 61] seeking to shorten the notice period and setting an expedited hearing on the Nevada 5 Stay Relief Motion.  Pursuant to the Nevada 5 Stay Relief Motion, Nevada 5 sought relief from the automatic stay to file a second amended complaint and to pursue discovery against HHH in connection with the Florida Action.  The Debtors filed an objection to the motion to shorten [Docket No. 68] and both the Debtors [Docket No. 76] and Nevada 5 [Docket No. 78] filed objections to the Nevada 5 Stay Relief Motion.  On February 28, 2020, the Bankruptcy Court held a telephonic hearing on the Nevada 5 Stay Relief Motion and ruled, in pertinent part, that Nevada 5 was not entitled to discovery from the Debtors related to the Florida Action, but that Nevada 5 could revisit such request in 90 days.  The Bankruptcy Court entered an order to that effect on March 3, 2020 (the "*Nevada 5 Stay Order*") [Docket No. 97].  That same day, Nevada 5 served on the Debtors *Nevada 5, Inc.'s Expedited Interrogatories and Requests for Production of Documents to Hygea Holdings Corp. and Hygea Health Holdings, Inc.* (the "*Nevada 5 Document Requests*"), which sought to require the Debtors to respond to 18 interrogatories and 32 document requests on an expedited basis by March 17, 2020.  Several of the Nevada 5 Document Requests sought information that related to Nevada 5's claims in the Florida Action, notwithstanding the explicit language in the Nevada 5 Stay Order.  The Debtors have produced numerous documents to Nevada 5 in response to the Nevada 5 Document Requests.

Nevada 5 also sought to obtain discovery through other mechanisms during the Chapter 11 Cases.  For example, on April 7, 2020, Nevada 5 served document requests on both the Debtors and Bridging related to the Plan and the Disclosure Statement.  *See* Docket Nos. 293 and 294.  Moreover, on April 22, 2020, Nevada 5 served a subpoena on the Committee.  *See* Docket Nos. 348 and 352.  On April 27, 2020, the Debtors served on Nevada 5 their responses and objections to the document requests.  *See* Docket No. 369.

On April 21, 2020, Nevada 5 filed a *Motion for Entry of Order Permitting Use of State Court Documents* [Docket No. 351] (the "*Document Use Motion*"), seeking to use materials in the Chapter 11 Cases that Nevada 5 covertly obtained from FTI in the Florida Action.  On that same date, Nevada 5 filed a motion to shorten the notice period and set an expedited hearing with respect to the Document Use Motion [Docket No. 305], which the Bankruptcy Court denied on April 24, 2020.  *See* Docket No. 360.  The deadline to object to the Document Use Motion is May 6, 2020, and a telephonic hearing has been scheduled for May 13, 2020.  *See* Docket No. 362.  The Debtors intend to vigorously oppose the Documents Use Motion.

On April 29, 2020, the Debtors filed an *Initial Submission in Support of Motion for Entry of an Order Enforcing the Automatic Stay and for Sanctions for a Willful Stay Violation* [Docket No. 377] (the "***Stay Violation Motion***").  As set forth in the Stay Violation Motion, the Debtors assert that Nevada 5 secretly and unlawfully obtained documents constituting property of the Debtors' estates from FTI, a pre-petition financial advisor to the Debtors.  The Debtors further assert that such actions violated the Nevada 5 Stay Order as well as the automatic stay provisions of Section 362 of the Bankruptcy Code.  By way of the Stay Violation Motion, the Debtors have requested that the Bankruptcy Court impose sanctions against Nevada 5 consisting of (i) reasonable counsel fees incurred by the Debtors as a result of Nevada 5's stay violation and (ii) punitive damages to punish Nevada 5 for its blatant disregard of the Nevada 5 Stay Order and the automatic stay.  A hearing on the Stay Violation Motion has been scheduled for May 13, 2020.

## E.    The Global Settlement

As discussed above, the Committee investigated the allowance and priority of Bridging's Secured Claim and ultimately concluded that Bridging's Secured Claim constitutes a properly perfected, valid secured claim against the Debtors.  Thus, the Committee did not pursue a Challenge of Bridging's Secured Claim in accordance with the Final DIP Order.  The Committee, however, raised several issues in connection with the RSA and the initial draft of the Plan.  In an effort to avoid further costs and delay associated with a contested confirmation hearing, the Global Settlement Parties began engaging in extensive, arm's-length and good faith negotiations that concluded in the Global Settlement, which paved the way for the proposed Plan.  The terms of the Global Settlement, which are memorialized in the term sheet attached hereto as Exhibit D (the "***Global Settlement Term Sheet***") and incorporated into the Plan, include, among other things:

(a)    The creation of a creditors' trust (the "***Creditors' Trust***"), which is responsible for the administration of Claims and Distributions to holders of Allowed General Unsecured Claims;

(b)    On the Effective Date, Bridging will fund $550,000 in the form of a non-recourse loan payable from the proceeds of causes of action assigned to the Creditors' Trust, for the benefit of holders of Allowed General Unsecured Claims;

(c)    On the Effective Date, Bridging, or the equity sponsor under the Plan, will provide for 5% of the equity in the Reorganized Debtors to be contributed to the Creditors' Trust, which equity consideration will be (i) freely assignable by the Creditors' Trust and (ii) subject to the right of the Creditors' Trust to 'put" such equity consideration to the Reorganized Debtors, subject to a formula;

(d)    On the Effective Date, the Debtors will transfer to the Creditors' Trust: (i) Avoidance Actions; (ii) commercial tort claims as defined in Article 9 of the UCC; (iii) the non-exclusive right to seek a determination by the Bankruptcy Court of any tax, fine or penalty relating to a tax, or any addition to a tax, under section 505 of the Bankruptcy Code; and (iv) all other rights, claims or causes of action not transferred to Bridging pursuant to the Plan;

20

(e)     Bridging's agreement to include in the DIP budget payment of the Committee's professionals allowed fees and expenses in an amount up to $1.325 million;

(f)     The Committee will include a letter in the Plan solicitation package encouraging general unsecured creditors to vote in favor of the Plan; and

(g)     Bridging's Deficiency Claim will be temporarily allowed and treated as a General Unsecured Claim for purposes of voting on the Plan, but will be deemed satisfied on the Effective Date and will not be allowed for Distribution purposes.

Without the Global Settlement and Bridging's significant concessions and support under the Global Settlement, the Debtors do not believe that a plan of reorganization or liquidation would be feasible in the Chapter 11 Cases.  Accordingly, the Debtors believe that that confirmation and consummation of the Plan is in the best interests of the Debtors, the Estates and their Creditors.

**F.      Formal and Informal Objections to Approval of the Disclosure Statement**

On April 23, 2020, the U.S. Trustee provided the Debtors with various comments to the initial disclosure statement that was filed on March 10, 2020 [Docket No. 120].  Thereafter, the Debtors revised this Disclosure Statement to address all of the U.S. Trustee's comments that were not related to confirmation of the Plan.  Consequently, the U.S. Trustee informed the Debtors that his informal objections to approval of the Disclosure Statement have been resolved.

On April 24, 2020, Shutlander, LLC, Jose Prida, LLC and Gabriella & Bella Castillo Trust (collectively, the "***Trusts***"), filed a preliminary objection and reservation of rights [Docket No. 361] (the "***Trust Disclosure Statement Objection***") with respect to the Debtors' solicitation procedure motion [Docket No. 121].  The Trusts assert that this Disclosure Statement provides an "inaccurate financial picture" with respect to, among other things, historical billing/invoicing and provider credentialing, and that the Debtors are more profitable than what is shown in the financial projections annexed hereto.  The Debtors disagree with the Trusts' assertions set forth in the Trust Disclosure Statement Objection.  On April 30, 2020, the Debtors filed a reply to the Trust Disclosure Statement Objection.  *See* Docket No. 381.

**ARTICLE IV**

**SUMMARY OF PLAN**

This section provides a summary of the structure and means for implementation of the Plan and the classification and treatment of Claims and Equity Interests under the Plan.  This section is qualified in its entirety by and is subject to the Plan as well as the exhibits thereto and definitions therein.  The Plan is attached to this Disclosure Statement as <u>Exhibit A</u>.

The statements contained in this Disclosure Statement include summaries of the provisions contained in the Plan and in documents referred to therein.  The statements contained in this Disclosure Statement do not purport to be precise or complete statements

of all the terms and provisions of the Plan or documents referred to therein.  Reference is made to the Plan and to such documents for the full and complete statements of such terms and provisions.

The Plan and the documents referred to therein control the actual treatment of Claims against and Equity Interests in the Debtors under the Plan.  Upon occurrence of the Effective Date, the Plan and all such documents will be binding upon all Holders of Claims against and Equity Interests in the Debtors and their Estates and all other parties in interest.  In the event of any conflict between this Disclosure Statement, on the one hand, and the Plan or any other operative document, on the other hand, the terms of the Plan or such other operative document will control.

## A.      Classification and Treatment of Claims and Equity Interests

Section 1123 of the Bankruptcy Code provides that a plan must classify the claims and equity interests of a debtor's creditors and equity interest holders.  In accordance with section 1123 of the Bankruptcy Code, the Plan divides Claims and Equity Interests into Classes and sets forth the treatment for each Class (other than the Administrative Expense Claims, Accrued Professional Compensation Claims and Priority Tax Claims, which pursuant to section 1123(a)(1) of the Bankruptcy Code need not be and have not been classified).  The Debtors also are required, under section 1122 of the Bankruptcy Code, to classify Claims against and Equity Interests in the Debtors (except for certain Claims classified for administrative convenience) into Classes that contain Claims and Equity Interests that are substantially similar to the other Claims and Equity Interests in such Class.

The Bankruptcy Code also requires that a plan provide the same treatment for each claim or equity interest of a particular class unless the claim holder or interest holder agrees to a less favorable treatment of its claim or equity interest.  The Debtors believe that they have complied with such standard.  If the Bankruptcy Court finds otherwise, however, it could deny Confirmation of the Plan if the Claimholders and Equity Interest Holders affected do not consent to the treatment afforded them under the Plan.

A Claim or Equity Interest is placed in a particular Class only to the extent that the Claim or Equity Interest falls within the description of that Class, and is classified in other Classes to the extent that any portion of the Claim or Equity Interest falls within the description of such other Classes.  A Claim also is placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released or otherwise settled prior to the Effective Date.

The Debtors believe that the Plan has classified all Claims and Equity Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law.  It is possible that a Holder of a Claim or Equity Interest may challenge the Debtors' classification of Claims and Equity Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed.  If such a situation develops, the Debtors intend, in accordance with the terms of the Plan, to make such permissible modifications to the Plan as may be necessary to permit its confirmation.  Any such reclassification could adversely affect Holders of Claims or Equity Interests by changing the composition of one or more Classes

and the vote required of such Class or Classes for approval of the Plan. **Unless such modification of classification materially adversely affects the treatment of a Holder of a Claim or Equity Interest and requires resolicitation, acceptance of the Plan by any Holder of a Claim or Equity Interest pursuant to this solicitation will be deemed to be a consent to the Plan's treatment of such Holder of a Claim or Equity Interest regardless of the Class as to which such Holder ultimately is deemed to be a member**.

The amount of any Impaired Claim that ultimately is Allowed by the Bankruptcy Court may vary from any estimated Allowed amount of such Claim and, accordingly, the total Claims that are ultimately Allowed by the Bankruptcy Court with respect to each Impaired Class of Claims also may vary from any estimates contained herein with respect to the aggregate Claims in any Impaired Class. Thus, the value of property that ultimately will be received by a particular Holder of an Allowed Claim may be adversely or favorably affected by the aggregate amount of Claims Allowed in the applicable Class.

The classification of Claims and Equity Interests and the nature of Distributions to members of each Class are summarized below. The Debtors believe that the consideration, if any, provided under the Plan to holders of Claims and Equity Interests reflects an appropriate resolution of their Claims and Equity Interests, taking into account the differing nature and priority (including applicable contractual subordination) of such Claims and Equity Interests. The Bankruptcy Court must find, however, that a number of statutory tests are met before it may confirm the Plan. Many of these tests are designed to protect the interests of Holders of Claims or Equity Interests who are not entitled to vote on the Plan, or do not vote to accept the Plan, but who will be bound by the provisions of the Plan if it is confirmed by the Bankruptcy Court.

1.     **Unclassified Claims**

a.     **Administrative Expense Claim**

An Administrative Expense Claim is a Claim for costs and expenses of administration of the Chapter 11 Cases that are Allowed under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including, without limitation: (a) any actual and necessary costs and expenses incurred on or after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Accrued Professional Compensation Claims and any other compensation for legal, financial, advisory, accounting, and other services and reimbursement of expenses Allowed by the Bankruptcy Court under sections 328, 330, 331 or 503(b) of the Bankruptcy Code to the extent incurred on or after the Petition Date and through the Effective Date; and (c) all fees and charges assessed against the Estates under section 1930, chapter 123, of title 28, United States Code.

Except to the extent that a Holder of an Allowed Administrative Expense Claim agrees to different treatment with the Debtors or Reorganized Debtors, each Holder of an Allowed Administrative Expense Claim will receive Cash in an amount equal to the unpaid amount of such Allowed Administrative Expense Claim on the later of the Effective Date or the date on which such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is reasonably practicable; *provided, however*, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of

business by the Debtors, as Debtors-in-Possession, or liabilities arising under obligations incurred by the Debtors, as Debtors-in-Possession, prior to the Effective Date, will be paid by the Debtors in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions, including, but not limited to, the Budget, DIP Orders and all other orders entered by the Bankruptcy Court related to the foregoing.  In addition, Allowed Administrative Expense Claims of the United States Trustee for statutory fees under 28 U.S.C. § 1930 incurred prior to the Effective Date will be paid on the Effective Date by the Debtors, and thereafter, as such fees may thereafter accrue and be due and payable, by the ~~Debtors or Reorganized Debtors~~Creditors' Trust in accordance with the applicable schedule for payment of such fees.

To be eligible to receive Distributions under the Plan on account of an Administrative Expense Claim that is not otherwise Allowed by the Plan, a request for payment of an Administrative Expense Claim must have been or be filed with the Bankruptcy Court on or before the Administrative Expense Claims Bar Date.  Any Administrative Expense Claim that is not asserted in accordance with the Plan will be deemed disallowed under the Plan and will be forever barred against the Debtors, the Debtors' Estates, the Reorganized Debtors, the Creditors' Trust, or any of their Assets or property, and the Holder thereof will be enjoined from commencing or continuing any action, employment of process or act to collect, offset, recoup or recover such Claim.

### b.    Accrued Professional Compensation Claims

An Accrued Professional Compensation Claim is a Claim for all accrued fees and reimbursable expenses for services rendered by a Professional in the Chapter 11 Cases through and including such date, to the extent that such fees and expenses have not been previously paid whether under a retention order with respect to such Professional or otherwise.  To the extent that there is a Final Order denying some or all of a Professional's fees or expenses, such denied amounts will no longer be considered an Accrued Professional Compensation Claim.

~~All~~Except as otherwise provide in the Plan, all Professionals seeking payment of Accrued Professional Compensation Claims will (i)  file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred in the Chapter 11 Cases by the date that is thirty (30) days after the Effective Date and (ii) be paid (a) the full unpaid amount as is Allowed by the Bankruptcy Court within five (5) Business Days after the date that such Claim is Allowed by order of the Bankruptcy Court, or (b) upon such other terms as may be mutually agreed upon between the Holder of such an Allowed Accrued Professional Compensation Claim and the Debtors or Reorganized Debtors.  Any Accrued Professional Compensation Claim that is not asserted in accordance with Section 2.2 of the Plan will be deemed disallowed under the Plan, waived, and will be forever barred against the Debtors, the Debtors' Estates, the ~~Liquidating~~Reorganized Debtors, the Creditors' Trust, or any of their Assets or property, and the Holder thereof will be enjoined from commencing or continuing any action, employment of process or act to collect, offset, recoup, or recover such Claim.

Accrued Professional Compensation Claims filed by the Committee's Professionals will be subject to the Committee Budget as described in the DIP Orders.  To the extent the Committee

24

Budget is insufficient to pay the Allowed Accrued Professional Compensation Claims of the Committee's Professionals, such Allowed Claims may be paid from the Creditors' Trust.  The Committee Budget will not be subject to the Variance.

To the extent a Professional Budget Surplus exists, such funds will be deposited into the Creditors' Trust on the Effective Date, or after payment of such Professionals' Accrued Professional Compensation Claims.

The Professional Budget Surplus will not be used to repay the Creditors' Trust Loan.

### c.    Priority Tax Claims

A Priority Tax Claim is a Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

Except as otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim or as soon as reasonably practicable thereafter), each Holder of an Allowed Priority Tax Claim will receive in full satisfaction, settlement, discharge, and release of, and in exchange for, such Allowed Priority Tax Claim pursuant to and in accordance with sections 1129(a)(9)(C) and 1129(a)(9)(D) of the Bankruptcy Code, Cash in an aggregate amount of such Allowed Priority Tax Claim payable in regular installment payments over a period ending not more than five (5) years after the Petition Date, plus simple interest at the rate required by applicable non-bankruptcy law on any outstanding balance from the Effective Date, or such lesser rate as is agreed to in writing by a particular taxing authority and the Debtors or Reorganized Debtors, as applicable, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; provided, however, that Priority Tax Claims incurred by any Debtors in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtors or Reorganized Debtors in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.  Any installment payments to be made under clause (C) or (D) above will be made in equal quarterly Cash payments beginning on the first applicable Subsequent Distribution Date, and continuing on each Subsequent Distribution Date thereafter until payment in full of the applicable Allowed Priority Tax Claim.

### 2.    Unimpaired Claims

### a.    Class 1:  Other Priority Claims

An Other Priority Claim is a Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Expense Claim.

Except to the extent that a Holder of an Allowed Other Priority Claim against the Debtors has agreed to a different treatment of such Claim, each such Holder will receive, in full satisfaction of such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date; (ii) the date the Other Priority Claim becomes an Allowed Claim; or (iii) the date for

payment provided by any agreement or arrangement between the Reorganized Debtors and the Holder of the Allowed Other Priority Claim against the Debtors.

**3.      Impaired Claims**

**b.      a. Class 2: Other Secured Claims**

An Other Secured Claim is a Secured Claim other than Bridging's Secured Claim.

In full satisfaction of an Allowed Other Secured Claim, on the later of the Effective Date and the date on which the Other Secured Claim is Allowed, each Holder of an Allowed Other Secured Claim will receive, at the sole and exclusive option of the Reorganized Debtors:  (a) Cash equal to the amount of such Claim; (b) the Collateral securing such Claim; or (c) satisfaction of such Claim pursuant to such other terms and conditions as may be agreed upon by the Reorganized Debtors and the Holder of such Other Secured Claim

**3.      Impaired Claims**

**a.      b. Class 3: Bridging's Secured Claim**

The Bridging Secured Claim means the Secured Claim of Bridging arising under or in connection with the Prepetition Loan Documents.  Bridging's Secured Claim is an Allowed Claim.

Upon the terms and subject to the conditions set forth in the Plan, in full and final satisfaction, settlement, release, and discharge of Bridging's Secured Claim, Bridging or such Entity designated by Bridging and Centurion, respectively, will receive, on the Effective Date or as soon as practicable thereafter, (i) the Debtors' Cash on hand on the Effective Date in excess of Cash necessary to operate the Reorganized Debtors' business, following funding of the LiquidatingCreditors' Trust ContributionLoan to be allocated 90.86% to Bridging and 9.14% to Centurion; (ii) the New Secured Debt in accordance with Section 6.4 of the Plan; and (iii) 10086.317% of the Reorganized DebtorsDebtor Equity will be issued to Bridging or its designee and 8.683% of the Reorganized Debtor Equity will be issued to Centurion or its designee. Bridging is a party to the RSA and, therefore, has agreed to support Confirmation of the Plan.

To the extent the Debtors' Cash on hand as of the Effective Date is not sufficient to make payments under the Plan, fund operations and fund the Creditors' Trust Loan, Bridging will advance the necessary funds to the Reorganized Debtors with such amount to be added to the Working Capital Loan.  All distributions made on account of Bridging's Secured Claim will be paid to Bridging and Centurion, as applicable.  Bridging will have the right to vote Bridging's Secured Claim.

**b.      c. Class 4: General Unsecured Claims**

A General Unsecured Claim is a Deficiency Claim and any Claim asserted against the Debtors which is not included within the other specifically defined Classes under the Plan.

Except to the extent that a Holder of an Allowed General Unsecured Claim against the Debtors agrees to a different treatment of such Claim, in full and final satisfaction of each Allowed General Unsecured Claim against the Debtors, each Holder of an Allowed General Unsecured Claim against the Debtors will receive its Pro Rata share of ~~Liquidating~~Creditors' Trust Distributable ~~Cash~~Assets as soon as practicable as determined by the ~~Liquidating~~ Trustee. Bridging will have the right to vote the Bridging Deficiency Claim but will waive any Distributions to Bridging and its participants on account of Bridging's Deficiency Claim.

> **c.      Class 5: Subordinated Claims**

A Subordinated Claim is any Claim subordinated by law or contract including pursuant to section 510(b) of the Bankruptcy Code, which will include, but not be limited to, any claim filed by Nevada 5, Inc. and N5HYG, LLC in the Chapter 11 Cases.

Holders of Subordinated Claims against the Debtors will not receive or retain any property under the Plan on account of such Subordinated Claims, and the obligations of the Debtors on account of Subordinated Claims will be discharged.

**4.      Interests**

**a.      Class ~~5~~6: Equity Interests**

Equity Interests are any Equity Security in any of the Debtors, including, without limitation, all issued, unissued, authorized or outstanding units and other ownership interests, including limited liability company interests, together with (a) any options, warrants or contractual rights to purchase or acquire any such Equity Securities at any time with respect to any Debtors, and all rights arising with respect thereto and (b) the rights of any Entity to purchase or demand the issuance of any of the foregoing and will include:  (i) conversion, exchange, voting, participation, dividend and distribution rights; (ii) liquidation preferences; (iii) options, warrants, and call and put rights; (iv) share-appreciation rights; and (v) all unexercised Equity Interests.

Holders of an Equity Interest in the Debtors will not receive or retain any property under the Plan on account of such Equity Interests, and the obligations of the Reorganized Debtors on account of the Equity Interests will be discharged.  ~~Notwithstanding the foregoing, the Equity Interests in the Debtors will be reinstated upon the Effective Date and deemed issued to and held by Bridging or such Entity designated by Bridging.~~

**5.      Special Provision Regarding Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan will affect or limit the Debtors', the Reorganized Debtors' or the ~~Liquidating~~ Trustee's rights and defenses (whether legal or equitable) in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

6.      **Discharge of Claims**

Except as otherwise provided in the Plan and effective as of the Effective Date: (i) the rights afforded in the Plan and the treatment of all Claims and Equity Interests will be in exchange for and in complete satisfaction, settlement, discharge, and release of all Claims and Equity Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors or any of their Assets, property, or Estates; (ii) the Plan will bind all Holders of Claims and Equity Interests, notwithstanding whether any such Holders abstained from voting to accept or reject the Plan or voted to reject the Plan; (iii) all Claims and Equity Interests will be satisfied, discharged, and released in full, and the Debtors' liability with respect thereto will be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (iv) all Entities will be precluded from asserting against the Debtors, the Debtors' Estates, the Reorganized Debtors, each of their successors and assigns, and each of their Assets and properties, any other Claims or Equity Interests based upon any documents, instruments or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.

7.      **Subordinated Claims**

The allowance, classification, and treatment of all Allowed Claims and Equity Interests and the respective distributions and treatments under the Plan will take into account and conform to the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Under section 510 of the Bankruptcy Code, the Debtors or the ~~Liquidating~~ Trustee, as applicable, reserve the right to re-classify any Allowed Claim or Allowed Equity Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

8.      **Elimination of Vacant Classes**

Any Class of Claims that is not occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or a ~~claim~~Claim temporarily allowed under Bankruptcy Rule 3018, or as to which no vote is cast, will be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class under section 1129(a)(8) of the Bankruptcy Code.

B.      **Acceptance or Rejection of the Plan**

1.      ~~**Acceptance by an Impaired**~~**Presumed Acceptance of Plan**

Classes 1 and 2 are Unimpaired under the Plan and, therefore, are deemed to have accepted the Plan pursuant to section 1126 of the Bankruptcy Code.

2.      **Presumed Rejection of Plan**

Classes 5 and 6 are Impaired and will receive no distribution under the Plan on account of such Subordinated Claims and Equity Interests and, therefore, are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

### 3.    Voting Class

In accordance with

Each Holder of an Allowed Claim as of the Voting Record Date in Classes 3 and 4 will be entitled to vote to accept or reject the Plan.

### 4.    Acceptance by Impaired Classes of Claims

Pursuant to section 1126(c) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims will have has accepted the Plan if the Plan is accepted by the Holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims of in such Class that actually voting have timely and properly voted to accept or reject the Plan.

### 2.    Presumed Acceptances by Unimpaired Classes

Class 1 is Unimpaired by the Plan.  Under section 1126(f) of the Bankruptcy Code, the Holders of Claims in such Class are conclusively presumed to accept the Plan, and the votes of such Holders of Claim in such Class will not be solicited.

### 3.    Classes Deemed to Reject Plan

Holders of Equity Interests in Class 9 are not entitled to receive or retain any property under the Plan.  Under section 1126(g) of the Bankruptcy Code, such Equity Interest Holders are conclusively deemed to reject the Plan, and the votes of such Equity Interest Holders will not be solicited.

### 4.    Impaired Classes of Claims Entitled to Vote

Because Claims in Classes 2, 3 and 4 are Impaired under the Plan and Holders of such Claims will receive or retain property under the Plan, Holders of Claims in Classes 2, 3, and 4 are entitled to vote and will be solicited with respect to the Plan.

### 5.    Vacant Classes Cramdown

Any Class of Claims that is not occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or a claim temporarily allowed under Bankruptcy Rule 3018, or as to which no vote is cast, will be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class under section 1129(a)(8) of the Bankruptcy Code.

### 6.    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code

If all applicable requirements for confirmation of the Plan are met as set forth in section 1129(a) of the Bankruptcy Code except subsection (8) thereof, the Debtors may request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code on the bases that the Plan is fair and equitable and does not discriminate unfairly with respect to

each Class of Claims or Equity Interests that is Impaired under, and has not accepted or is deemed to reject, the Plan.

**C.    Means for Implementation**

**1.    General Settlement of Claims**

~~Pursuant to section 1123 of~~To the extent provided for by the Bankruptcy Code ~~and Bankruptcy Rule 9019, and~~ in consideration for the classification, distributions, ~~releases,~~ and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan will constitute a good faith compromise and settlement of all Claims and Equity Interests and controversies resolved pursuant to the Plan.

**2.    ~~Substantive Consolidation for Plan Purposes Only~~Corporate Existence**

Unless otherwise provided in the Plan Supplement, ~~each Debtor will continue to maintain its separate corporate existence for all purposes other than the treatment of Claims under the Plan and distributions hereunder.  On the Effective Date, (i) all Intercompany Claims among the Debtors will be eliminated and there will be no distributions on account of such Intercompany Claims; (ii) any obligation of a Debtor and any guarantee thereof by any other Debtor will be deemed to be one obligation, and any such guarantee will be eliminated, (iii) each Claim filed or to be filed against more than one Debtor will be deemed filed only against one consolidated Debtor and will be deemed a single Claim against and a single obligation of the Debtors, and (iv) any joint or several liability of the Debtors will be deemed one obligation of the Debtors, with each of the foregoing effective retroactive to the Petition Date.  On the Effective Date, and in accordance with the terms of the Plan, all Claims based upon guarantees of collection, payment or performance made by one Debtor as to the obligations of another Debtor will be released and of no further force and effect.  Such substantive consolidation will not (other than for purposes relating to the Plan) affect the legal and corporate structures of the Reorganized Debtors.~~

~~In~~ the event the Bankruptcy Court does not approve the substantive consolidation of all of the Estates for the purposes set forth in the Plan, the Plan will be treated as a separate plan of reorganization for each Debtor not substantively consolidated.~~

~~The Plan will serve as, and will be deemed to be, a motion for entry of an order substantively consolidating the Chapter 11 Cases for the limited purposes set forth in the Plan.  If no objection to substantive consolidation is timely filed and served by any Holder of an Impaired Claim on or before the deadline to object to the confirmation of the Plan, or such other date as may be fixed by the Bankruptcy Court and the Debtors meet their burden of introducing evidence to establish that substantive consolidation is merited under the standards of applicable bankruptcy law, the Confirmation Order, which will be deemed to substantively consolidate the Debtors for the limited purposes set forth in the Plan, may be entered by the Court.  If any such objections are timely filed and served, a hearing with respect to the substantive consolidation of the Chapter 11 Cases and the objections thereto will be scheduled by the Bankruptcy Court, which hearing will coincide with the Confirmation Hearing.~~

3.        Corporate Existence

~~The~~ Debtors will continue to exist after the Effective Date as separate legal entities, with all of the powers of corporations, limited liability companies, partnerships, associations, or other business entities pursuant to the applicable law in their states of incorporation or organization. As may be set forth in the Plan Supplement, a new holding company may be created to hold the Reorganized Debtor Equity.  After the Effective Date, the Reorganized Debtors will exist with all of the powers pursuant to the New Organizational Documents.  The Plan Supplement will include appropriate corporate organizational documents governing the post-Effective Date governance of the Reorganized Debtors and the rights of the holders of the Reorganized Debtor Equity.

On the Effective Date or as soon thereafter as is reasonably practicable, and without need for any notice to or any vote, consent, authorization, approval, ratification, or other action by any Entity or any director, stockholder, security holder, manager, member, or partner (or board thereof) of any Entity, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, or necessary or appropriate to effectuate the Plan (the "*Restructuring Transactions*"), including, without limitation: (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation, or reorganization containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; (c) the filing of appropriate certificates of incorporation, merger, or consolidation with the appropriate governmental authorities under applicable law; and (d) all other actions that the Debtors or the Reorganized Debtors, as applicable, and Bridging determine are necessary or appropriate.

The Confirmation Order will be deemed to, under both section 1123 and section 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

**3.        ~~4.~~ Vesting of Assets in the Reorganized Debtors**

Except as otherwise provided in the Plan or the Confirmation Order, on or after the Effective Date, all property and Assets of the Estates and any property and Assets acquired by the Debtors pursuant to the Plan will vest in the Reorganized Debtors, free and clear of all Liens, Claims, charges or other encumbrances.  Except as may be otherwise provided in the Plan, on and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the Confirmation Order.  Without limiting the foregoing, the Reorganized Debtors will pay the charges that they incur after the Effective Date for Professionals' fees, disbursements, expenses or related support services (including reasonable fees relating to the preparation of Professional fee applications) in the ordinary course of business and without application or notice to, or order of, the Bankruptcy Court.  For the avoidance of doubt, the ~~Liquidating~~Creditors' Trust Assets

31

will not revest in the Reorganized Debtors and instead the ~~Liquidating~~Creditors' Trust Assets will vest in the ~~Liquidating~~Creditors' Trust pursuant to Section 7 of the Plan.

~~5.     New Secured Debt; Sources of Cash for Plan Distributions~~

**4.        ~~a.~~New Secured Debt**

On the Effective Date, the Reorganized Debtors will execute the New Secured Debt Documents which ~~shall~~will govern and evidence the New Secured Debt. ~~Simultaneously therewith Bridging shall make the Working Capital Loan.  The holder~~ of the Reorganized Debtors.  The New Secured Debt Documents will be at least as favorable to Bridging and Centurion as lenders as the Prepetition Loan Documents, with additional usual and customary terms for a syndicated loan (including direct ability to obtain information, access to records, regular reporting requirements and consent rights for each of the lenders).  The portion of the New Secured Debt attributable to the DIP Loan and Working Capital Loan will be issued and allocated to Bridging or its designee.  The Remaining Secured Debt will be issued to Bridging or its designee and Centurion and allocated (directly and not as a participation) as follows: (i) 90.86% of the Remaining Secured Debt will be issued to Bridging or its designee; and (ii) 9.14% of the Remaining Secured Debt will be issued to Centurion or its designee.

Payment of the New Secured Debt ~~shall~~will be ~~provided a fully perfected~~secured by a first priority lien on substantially all of the assets of the Reorganized Debtors, subject to customary exceptions to be set forth in the New Secured Debt Documents, with priority granted to Bridging or its designee with respect to the amounts attributable to the DIP Loan and Working Capital Loan.  The New Secured Debt ~~shall~~will be divided into two tranches.  The first tranche of the New Secured Debt, totaling Forty Million Dollars (\$40,000,000.00), ~~shall~~will provide for payments-in-kind of interest for the first two years following the Effective Date. ~~After the two-year anniversary of the Effective Date,~~ upon which date the Reorganized Debtors ~~shall~~will be required to make payments of principal and interest in accordance with the terms of the New Secured Debt Documents. ~~With respect to~~In the ~~second tranche, totaling \$30,000,000.00,~~event the Reorganized Debtors ~~shall only be required to make payments of principal and interest after the five-year anniversary of the Effective Date in accordance with the~~achieve certain operational milestones, Bridging and Centurion will have the right to convert a proportionate share of their equity into an additional Thirty Million Dollars (\$30,000,000.00) of New Secured Debt ~~Documents~~.

On the Effective Date, the Reorganized Debtors will be authorized to execute and deliver the New Secured Debt Documents, and any related instruments and documents, and will be authorized to execute, deliver, file, record and issue any other notes, guarantees, security agreements, documents (including UCC financing statements, intellectual property security agreements to be filed in the U.S. Patent & Trademark Office and deposit account control agreements with the Debtors' depositary banks), amendments to the foregoing, or agreements in connection therewith, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule and without need for any notice to or any vote, consent, authorization, approval, ratification or other action by any Entity or any director, stockholder, security holder, manager, member, or partner (or board thereof) of any Entity.

**5.    b. Sources of Cash for Certain Plan DistributionDistributions**

Except as otherwise provided in the Plan or the Confirmation Order, all Cash necessary for the Reorganized Debtors to make payments required pursuant to the Plan with respect to Allowed Administrative Expense Claims, Accrued Professional Compensation Claims and Priority Tax Claims will be obtained from funding advanced under the DIP Credit Agreement and, the Working Capital Loan and/or the Reorganized Debtors' Cash balances, including Cash from operations. Cash payments to be made pursuant to the Plan will be made by the Reorganized Debtors.

**6.    Issuance of Reorganized Debtor Equity and Related Documentation**

On the Effective Date, the Reorganized Debtors will be authorized to and will issue the Reorganized Debtor Equity without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule and without need for any notice to or any vote, consent, authorization, approval, ratification or other action by any Entity or any director, stockholder, security holder, manager, member, or partner (or board thereof) of any Entity from and after the Effective Date.  The Reorganized Debtor Equity will be deemed issued to and held as follows: (i) 86.317% will be issued to and held by Bridging or its designee; (ii) 8.683% will be issued to and held by Centurion; and (iii) 5% will be issued to and held by the Creditors' Trust (the "*Creditor Committee Equity*").  The Reorganized Debtor Equity will be governed by the New Equity Documents which will be in a form acceptable to Bridging, the Committee and Centurion and filed as part of the Plan Supplement.

With respect to the Creditor Committee Equity, the Creditors' Trust will receive typical minority shareholder protections (e.g., tags, drags, etc.) as more fully described in the New Equity Documents.  Further, the Creditor Committee Equity will be freely assignable by the Creditors' Trust.

The Creditor Committee Equity will entitle the Creditors' Trust to 5% of the Net Proceeds of a sale of the Reorganized Debtors.  In the event the Reorganized Debtors are not sold by the fifth anniversary of the Effective Date (the "*Put Election Date*"), the Creditors' Trust will have the right to put the Creditor Committee Equity to the Reorganized Debtors (the "*Put Election*") at an amount equal to five percent (5%) of the "*Put Amount*."  The Put Amount will be determined as follows: (EBITDA amount as of the Put Election Date multiplied by the applicable EBITDA multiple set forth in the chart below) less the total amount of secured debt as of the Put Election Date plus the total amount of unrestricted cash, cash equivalents and investments on the balance sheet as of the Put Election Date.

| LIVES MANAGED UNDER MANAGEMENT | REORGANIZED DEBTORS' EBITDA MULTIPLE FOR THE 12 MONTHS PRIOR TO EXERCISING THE PUT ELECTION |
|---|---|
| 5,000 to 7,500 | 7 |
| 7,501 to 10,000 | 7.5 |
| 10,001 to 12,500 | 8 |
| 12,501 to 15,000 | 8.5 |
| More than 15,000 | 9 |

### 7.    Section 1145 Exemption

The Reorganized Debtor Equity of the Reorganized Debtors to be issued and distributed under the Plan will be exempt from registration under (a) the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder and (b) any state or local law requiring registration for the offer, issuance, or distribution of securities pursuant to section 1145 of the Bankruptcy Code, or, if applicable, section 4(a)(2) of the Securities Act of 1933, without further act or action by any entity.  The Reorganized Debtor Equity will be freely tradable by the recipients thereof, subject to (w) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act of 1933; (x) compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments; (y) the restrictions, if any, on the transferability of such securities contained in the New Organizational Documents; and (z) applicable regulatory approval.

### 8.    Employee Matters and Retiree Benefits

Unless otherwise set forth in the schedule of ~~rejected~~assumed Executory Contracts and Unexpired Leases included in the Plan Supplement, all material employee compensation and benefit Plans, and employment, severance, retirement, indemnification, and other similar employee-related agreement or arrangements in place as of the Effective Date with the Debtors will be ~~assumed~~rejected by the ~~Reorganized Debtors and will remain in place after the Effective Date, as such agreements may be amended by agreement between the beneficiaries of such agreements and the Debtors or, after Effective Date, the Reorganized~~ Debtors.  Nothing in the Plan will limit, diminish or otherwise alter the ~~Reorganized~~ Debtors' defenses, Claims, Causes of Action, or other rights with respect to any such contracts, agreements, policies, programs, and Plans.  Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, on and after the Effective Date, all retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code), if any, will continue to be paid in accordance with applicable law.

### 9.    Release of Liens, Claims, and Equity Interests

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all Liens, Claims, Equity Interests, mortgages, deeds of trust, or other security interests against the property of the Estates will be fully released, terminated, extinguished and discharged, in each case

without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule and without need for any notice to or any vote, consent, authorization, approval, ratification or other action by any Entity or any director, stockholder, security holder, manager, member, or partner (or board thereof) of any Entity.  Any Entity holding such Liens or Equity Interests will, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Reorganized Debtors such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Reorganized Debtors.

### 10.    New Organizational Documents

The New Organizational Documents will satisfy the provisions of the Plan and the Bankruptcy Code, and will (i) include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting Equity Securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code; (ii) authorize the issuance of the Reorganized Debtor Equity; (iii) to the extent necessary or appropriate, include restrictions on the transfer of Reorganized Debtor Equity; and (iv) to the extent necessary or appropriate, include such provisions as may be needed to effectuate and consummate the Plan and the transactions contemplated in the Plan.  After the Effective Date, the Reorganized Debtors may amend and/or restate their operating agreementthe New Organizational Documents and other applicable organizational documents, as permitted by applicable law and in a manner consistent with the Plan.

### 11.    Resignation of Directors and Officers

Upon the Effective Date, the Debtors' boards of directors and officers will be deemed to have resigned and will be replaced by the New Board.

### 12.    Managers and Officers of the Reorganized Debtors

The

Except as set forth in the Plan, the existing directors and managers of the Debtors will be deemed to have resigned on and as of the Effective Date, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule and without need for any notice to or any vote, consent, authorization, approval, ratification or other action by any Entity or any other Person or any director, stockholder, security holder, manager, member, or partner (or board thereof) of any Entity.

Except as otherwise provided in the Plan, the New Board will be designated by Bridging, including a lead director who will have such authority and duties as the New Board may determine.  Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose, prior to the Confirmation Hearing, the identity and affiliations of any Person proposed to serve on the New Board or as an officer of the Reorganized Debtors and, to the extent such Person is an insider other than by virtue of being a director or officer, the nature of any compensation for such Person.  Each such manager, director, and officer will serve from and after the Effective Date pursuant to applicable law and the terms of the New Organizational Documents and the other constituent and organizational documents of the Reorganized Debtors.  Except as set forth

~~in the Plan, the existing directors and managers of the Debtors~~Centurion will be ~~deemed~~entitled ~~to have resigned on and as of the Effective Date, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule and without need for any notice to or any vote, consent, authorization, approval, ratification or other action by any Entity or any other Person or any director, stockholder, security holder, manager, member, or partner (or board thereof) of any Entity.~~ appoint one (1) director on the New Board with voting authority and one (1) director with observation rights only.  Additionally, the Creditors' Trust will be entitled to New Board observation rights.

The identity of the Reorganized Debtors' managers and officers will be disclosed in the Plan Supplement.

### 13.    Corporate Action

Upon the Effective Date, all actions contemplated by the Plan will be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Equity Interests, directors, managers, or officers of the Debtors, the Reorganized Debtors, or any other Entity, including:  (1) assumption of Executory Contracts and Unexpired Leases; (2) selection of the directors, managers, and officers for the Reorganized Debtors; (3) the execution of and entry into the New Organizational Documents; (4) the issuance and distribution of the Reorganized Debtor Equity as provided in the Plan; and (5) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan involving the company structure of the Debtors and any company action required by the Debtors in connection therewith will be deemed to have occurred on and will be in effect as of the Effective Date without any requirement of further action by the security holders, directors, managers, authorized persons, or officers of the Debtors.

### 14.    Cancellation of Agreements, Security Interests, and Other Interests

Except for the purpose of evidencing a right to a distribution under the Plan and except as otherwise set forth in the Plan, on the Effective Date, all agreements, instruments, Equity Securities and other documents evidencing any prepetition Claim against or Equity Interest in any of the Reorganized Debtors and any rights of any holder in respect thereof will be deemed cancelled, discharged, and of no force or effect.  The holders of or parties to such cancelled instruments, Equity Securities and other documentation will have no rights arising from or related to such instruments, Equity Securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to the Plan and the obligations of the Debtors thereunder or in any way related thereto will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule and without need for any notice to or any vote, consent, authorization, approval, ratification or other action by any Entity or other Person or any director, stockholder, manager, member, or partner (or board thereof) of any Entity.

### 15. Dissolved Debtors

On the Effective Date, the Dissolved Debtors will be deemed dissolved without any requirement for further action by Holders of Claims or Equity Interests, directors, managers, or officers of the Debtors, the Reorganized Debtors, or any other Entity.

## D.    ~~Liquidating~~Creditors' Trust

### 1.    Establishment of the ~~Liquidating~~Creditors' Trust

The Creditors' Trust will be governed by the Creditors' Trust Agreement.  On the Effective Date, the ~~Liquidating~~ Trustee will execute the ~~Liquidating~~Creditors' Trust Agreement and, in his capacity as ~~Liquidating~~ Trustee, accept all ~~Liquidating~~Creditors' Trust Assets on behalf of the Beneficiaries thereof, and be authorized to obtain, seek the turnover, liquidate, and collect all of the ~~Liquidating~~Creditors' Trust Assets not in his possession.  The ~~Liquidating~~Creditors' Trust will then be deemed created and effective without any further action by the Bankruptcy Court or any Person as of the Effective Date.  The ~~Liquidating~~Creditors' Trust will be established for the purposes of (i) liquidating any non-Cash ~~Liquidating~~Creditors' Trust Assets; (ii) maximizing recovery of the ~~Liquidating~~Creditors' Trust Assets for the benefit of the Beneficiaries; and (iii) distributing the proceeds of the ~~Liquidating~~Creditors' Trust Assets to the Beneficiaries in accordance with the Plan and the ~~Liquidating~~Creditors' Trust Agreement, with no objective to continue or engage in the conduct of a trade or business, except only in the event and to the extent necessary for, and consistent with, the ~~liquidating~~ purpose of the ~~Liquidating~~Creditors' Trust.

### 2.    ~~Liquidating~~Creditors' Trust ~~Reserve~~Funding

~~On the Effective Date, the Debtors will fund an amount that is sufficient to permit the Debtors and the Liquidating Trustee to satisfy all obligations under the Plan and Liquidating Trust Agreement, including:  (i) 100% of the Allowed Accrued Professional Compensation Claims that have not been previously paid; (ii) 100% of the Allowed Administrative Expenses Claims that have not been previously paid; (iii) such other amounts that need to be paid pursuant to the Plan and Liquidating Trust Agreement; and (iv) an amount the Debtors determine, with the approval of Bridging, is necessary to administer and operate the Liquidating Trust in accordance with the Plan and Liquidating Trust Agreement (the "**Liquidating Trust Reserve**").  The Liquidating Trust Reserve will be funded from any Cash on hand of the Debtors on the Effective Date.  To the extent not paid prior to the Effective Date, the Liquidating Trustee will be authorized to pay all Allowed Accrued Professional Compensation Claims, Allowed Administrative Expense Claims, and such amounts necessary to administer and operate the Liquidating Trust from the Liquidating Trust Reserve in accordance with the Plan and the Liquidating Trust Agreement.  To the extent the Liquidating Trust Reserve is not needed to fund the foregoing Claims and amounts, such excess funds will be transferred to Bridging~~

On the Effective Date, Bridging or its designee will fund Five Hundred and Fifty Thousand Dollars ($550,000.00) as a non-recourse loan to the Creditors' Trust (the "***Creditors' Trust Loan***").  The Creditors' Trust Loan will be payable only from the proceeds of the Creditors' Trust Causes of Action.  The first One Million One Hundred Thousand Dollars ($1,100,000.00)

distributed from the Creditors' Trust will be distributed evenly (50/50) between Bridging or its designee and the Creditors' Trust to repay the Creditors' Trust Loan.  Upon repayment of the Creditors' Trust Loan, Bridging will not be entitled to any additional Distributions from the Creditors' Trust.

      **3.**      **Appointment of the ~~Liquidating~~ Trustee**

The Trustee, together with his agents, representatives and professionals, will have the power to administer the Creditors' Trust Assets and make Distributions in accordance with the terms of the Plan and the Creditors' Trust Agreement.  The ~~Liquidating~~ Trustee will be appointed pursuant to the Confirmation Order and subject to removal only by the Bankruptcy Court upon application or motion by a Beneficiary of the ~~Liquidating~~Creditors' Trust, after notice and a hearing, and for cause shown, including (i) the willful and continued refusal by the ~~Liquidating~~ Trustee to perform his duties under the Plan and the ~~Liquidating~~Creditors' Trust Agreement, and (ii) gross negligence, gross misconduct, fraud, embezzlement or theft.  The ~~Liquidating~~Trustee will be chosen by the ~~Debtors, after consultation with Bridging~~Committee.  During the term of the ~~Liquidating~~Creditors' Trust, the ~~Liquidating~~ Trustee will be entitled to compensation payable from the ~~Liquidating~~Creditors' Trust Assets as set forth in the ~~Liquidating~~Creditors' Trust Agreement.

      **4.**      **Beneficiaries of ~~Liquidating~~Creditors' Trust**

The Holders of Allowed General Unsecured Claims against the Debtors that are entitled to Distributions will be the Beneficiaries of the ~~Liquidating~~Creditors' Trust.  Such Beneficiaries will be bound by the ~~Liquidating~~Creditors' Trust Agreement.  The interests of the Beneficiaries in the ~~Liquidating~~Creditors' Trust will be uncertificated and nontransferable except upon death of the interest holder or by operation of law.  Neither Bridging nor any of its participants will be entitled to any Distributions from the Creditors' Trust on account of Bridging's Deficiency Claim.

      **5.**      **Vesting and Transfer of ~~Liquidating~~Creditors' Trust Assets to the ~~Liquidating~~Creditors' Trust**

On the Effective Date, pursuant to section 1141(b) of the Bankruptcy Code, the ~~Liquidating~~Creditors' Trust Assets~~, including the Liquidating Trust Contribution,~~ will vest in the ~~Liquidating~~Creditors' Trust free and clear of all Liens, Claims and Equity Interests, except as otherwise specifically provided in the Plan or in the Confirmation Order; provided, however, that the ~~Liquidating~~ Trustee may abandon or otherwise not accept any non-Cash ~~Liquidating~~Creditors' Trust Assets that the ~~Liquidating~~ Trustee believes, in good faith, have no value to the ~~Liquidating~~Creditors' Trust.  Any non-Cash ~~Liquidating~~Creditors' Trust Assets that the ~~Liquidating~~Trustee so abandons or otherwise does not accept will not be property of the ~~Liquidating~~Creditors' Trust.

6.      **Retention of Professionals**

The ~~Liquidating~~ Trustee will have the right to retain the services of attorneys, accountants, and other professionals (collectively, the "~~*Liquidating*~~Creditors' Trust Professionals") that are necessary to assist the ~~Liquidating~~ Trustee in the performance of his duties pursuant to the Plan, the ~~Liquidating~~Creditors' Trust Agreement and the Confirmation Order.  The reasonable fees and expenses of such professionals will be paid by the ~~Liquidating~~ Trustee from the ~~Liquidating~~Creditors' Trust ~~Reserve~~Assets and, if necessary, the ~~Liquidating~~Creditors' Trust Assets upon submission of monthly statements ("~~*Liquidating*~~Creditors' Trust Monthly Fee Statements") for services rendered and costs incurred to the ~~Liquidating~~ Trustee and Bridging for review and approval.  The ~~Liquidating~~ Trustee ~~and Bridging~~ will have thirty (30) days from receipt of each ~~Liquidating~~Creditors' Trust Monthly Fee Statement to object to the ~~Liquidating~~Creditors' Trust Monthly Fee Statement.  In the event that any objection is received by the relevant ~~Liquidating~~Creditors' Trust Professional that cannot be promptly resolved by the ~~Liquidating~~Creditors' Trust Professional and the objecting party, the dispute will be submitted by the ~~Liquidating~~ Trustee to the Bankruptcy Court for adjudication. The Bankruptcy Court will retain jurisdiction to adjudicate objections to ~~Liquidating~~Creditors' Trust Monthly Fee Statements.  In the event that no objection is raised to a ~~Liquidating~~Creditors' Trust Monthly Fee Statement within the thirty (30) day period, the requested amount in the ~~Liquidating~~Creditors' Trust Monthly Fee Statement will be promptly paid by the ~~Liquidating~~ Trustee, subject to any requirements under the Plan.

7.      **~~Liquidating~~Creditors' Trust Expenses**

Subject to the provisions of the ~~Liquidating~~Creditors' Trust Agreement, all costs, expenses, and obligations incurred by the ~~Liquidating~~ Trustee in administering the Plan, the ~~Liquidating~~Creditors' Trust, or in any manner connected, incidental or related thereto, in effecting distributions from, as applicable, the ~~Liquidating~~Creditors' Trust will be a charge against the ~~Liquidating~~Creditors' Trust ~~Reserve~~Assets and, if necessary, the ~~Liquidating~~Creditors' Trust Assets remaining from time to time in the hands of the ~~Liquidating~~ Trustee.  Such expenses will be paid in accordance with the ~~Liquidating~~Creditors' Trust Agreement.

8.      **Certain Powers and Duties of the ~~Liquidating~~Creditors' Trust and ~~Liquidating~~ Trustee.**

a.      **General Powers of the ~~Liquidating~~ Trustee.**

The ~~Liquidating~~ Trustee will be the exclusive trustee of the ~~Liquidating~~Creditors' Trust and the ~~Liquidating~~Creditors' Trust Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3).  The powers, rights, and responsibilities of the ~~Liquidating~~ Trustee will be specified in the ~~Liquidating~~Creditors' Trust Agreement and will include the authority and responsibility to: (a) receive, manage, invest, supervise, and protect the ~~Liquidating~~Creditors' Trust Assets; (b) pay taxes or other obligations incurred by the ~~Liquidating~~Creditors' Trust; (c) retain and compensate, without further order of the Bankruptcy Court, the services of employees, professionals and consultants to advise and assist in the administration, prosecution and distribution of ~~Liquidating~~Creditors' Trust Assets; (d) calculate and implement Distributions of ~~Liquidating~~Creditors' Trust Assets; (e) investigate, prosecute, compromise, and settle, in

39

accordance with the specific terms of the ~~Liquidating~~Creditors' Trust Agreement, the Creditors' Trust Causes of Action ~~vested in the Liquidating Trust~~; (f) resolve issues involving Claims and Equity Interests in accordance with the Plan; and (g) undertake all administrative functions of the Chapter 11 Cases, including the payment of fees payable to the United States Trustee incurred after the Effective Date and the ultimate closing of the Chapter 11 Cases.  The ~~Liquidating~~Creditors' Trust is the successor to the Debtors and their Estates.

### b.    Investments of Cash.

The ~~Liquidating~~Creditors' Trust may invest Cash (including any earnings thereon or proceeds therefrom) as permitted by section 345 of the Bankruptcy Code or in other prudent investments, provided, however, that such investments are permitted to be made by a ~~liquidating trust~~Creditors' Trust within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings, or other controlling authorities.

### c.    Reporting.

In no event later than thirty (30) days after the end of the first full month following the Effective Date and on a quarterly basis thereafter until all Cash in the ~~Liquidating~~Creditors' Trust has been distributed in accordance with the Plan, the ~~Liquidating~~ Trustee will file with the Bankruptcy Court a report setting forth the amounts, recipients and dates of all Distributions made by the ~~Liquidating~~ Trustee under the Plan through each applicable reporting period.

### d.    Tax Reporting.

The ~~Liquidating~~ Trustee will file tax returns for the ~~Liquidating~~Creditors' Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with the Plan. The ~~Liquidating~~Creditors' Trust also will annually (for tax years in which Distributions from the ~~Liquidating~~Creditors' Trust are made) send to each Beneficiary a separate statement setting forth the Beneficiary's share of items of income, gain, loss, deduction or credit and all such holders will report such items on their federal income tax returns; provided, however, that no such statement need be sent to any Class that is not expected to receive any Distribution from the ~~Liquidating~~Creditors' Trust.  The ~~Liquidating~~Creditors' Trust's taxable income, gain, loss, deduction or credit will be allocated to the ~~Liquidating~~Creditors' Trust's Beneficiaries in accordance with their relative beneficial interests in the ~~Liquidating~~Creditors' Trust.

As soon as possible after the Effective Date, the ~~Liquidating~~Creditors' Trust will make a good faith valuation of assets of the ~~Liquidating~~Creditors' Trust, and such valuation will be used consistently by all parties for all federal income tax purposes.  The ~~Liquidating~~Creditors' Trust also will file (or cause to be filed) any other statements, returns, or disclosures relating to the ~~Liquidating~~Creditors' Trust that are required by any Governmental Unit for taxing purposes.  The ~~Liquidating~~Creditors' Trust may request an expedited determination of taxes of the Debtors or of the ~~Liquidating~~Creditors' Trust under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, the Debtors and the ~~Liquidating~~Creditors' Trust for all taxable periods through the dissolution of the ~~Liquidating~~Creditors' Trust.

The ~~Liquidating~~Creditors' Trust will be responsible for filing all federal, state, and local tax returns for the Debtors and the ~~Liquidating~~Creditors' Trust.  The ~~Liquidating~~Creditors' Trust will comply with all withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions made by the ~~Liquidating~~Creditors' Trust will be subject to any such withholding and reporting requirements; provided, however, that, if the ~~Liquidating~~ Trustee fails to withhold in respect of amounts received or distributable with respect to any Beneficiaries and the ~~Liquidating~~ Trustee is later held liable for the amount of such withholding, such Beneficiaries will reimburse the ~~Liquidating~~ Trustee for such liability.  All such amounts withheld and paid to the appropriate taxing authority will be treated as amounts distributed to such Beneficiaries for all purposes of the ~~Liquidating~~Creditors' Trust Agreement.  The ~~Liquidating~~ Trustee will be authorized to collect such tax information from the Beneficiaries (including, without limitation, social security numbers or other tax identification numbers) as it, in its sole discretion, deems necessary to effectuate the Plan, the ~~Liquidating~~Creditors' Trust Agreement and the Confirmation Order.  In order to receive distributions under the Plan, all Beneficiaries will need to identify themselves to the ~~Liquidating~~ Trustee and provide tax information and the specifics of their holdings, to the extent the ~~Liquidating~~ Trustee deems appropriate (including completing the appropriate Form W-8 or Form W-9, as applicable).  The failure to provide such tax information will result in the disallowance of such Claim without a further order from the Bankruptcy Court.

**9.    Preservation of Right to Conduct Investigations**

The preservation for the ~~Liquidating~~Creditors' Trust of any and all rights to conduct investigations pursuant to Bankruptcy Rule 2004 is necessary and relevant to the liquidation and administration of the ~~Liquidating~~Creditors' Trust Assets.  Accordingly, any and all rights to conduct investigations pursuant to Bankruptcy Rule 2004 held by the Debtors prior to the Effective Date will vest with the ~~Liquidating~~Creditors' Trust and will continue until dissolution of the ~~Liquidating~~Creditors' Trust.

**10.    Prosecution and Resolution of Causes of Action.**

**a.    The ~~Liquidating~~Creditors' Trust's Exclusive Authority to Pursue, Settle, or Abandon Causes of Action.**

From and after the Effective Date, prosecution and settlement of all Creditors' Trust Causes of Action, including Avoidance Actions, transferred to the ~~Liquidating~~Creditors' Trust will be the sole responsibility of the ~~Liquidating~~Creditors' Trust pursuant to the Plan and the Confirmation Order.  From and after the Effective Date, the ~~Liquidating~~Creditors' Trust will have exclusive rights, powers, and interests of the Debtors' Estates to pursue, settle or abandon such Causes of Action as the sole representative of the Debtors' Estates pursuant to section 1123(b)(3) of the Bankruptcy Code.  Proceeds recovered from all Causes of Action will be deposited into the ~~Liquidating~~Creditors' Trust and will be distributed by the ~~Liquidating~~ Trustee to the Beneficiaries in accordance with the provisions of the Plan and ~~Liquidating~~Creditors' Trust Agreement.  All Causes of Action, including Avoidance Actions, that are not expressly released or waived under the Plan are reserved and preserved and vest in the ~~Liquidating~~Creditors' Trust in accordance with the Plan.  No Person may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that

41

the Debtors, Reorganized Debtors or ~~Liquidating~~ Trustee will not pursue any and all available Causes of Action against such Person.  The ~~Liquidating~~ Trustee expressly reserves all Creditors' Trust Causes of Action~~, except for any Causes of Action against any Person that are expressly released or waived under the Plan~~, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, will apply to such Creditors' Trust Causes of Action upon, after, or as a consequence of confirmation or consummation of the Plan.  No claims or Causes of Action against the Released Parties expressly released or waived pursuant to the Plan will be transferred to the ~~Liquidating~~Creditors' Trust, the ~~Liquidating~~ Trustee will not have standing to pursue such claims or Causes of Action, and all such claims and Causes of Action will be waived, released and discharged pursuant to the Plan.

**b.** **Settlement of Causes of Action.**

Settlement by the ~~Liquidating~~Creditors' Trust of any Creditors' Trust Cause of Action transferred to the ~~Liquidating~~Creditors' Trust will require:  (i) approval only of the ~~Liquidating~~ Trustee if the amount claimed by the ~~Liquidating~~Creditors' Trust against a defendant is less than One Hundred Thousand Dollars ($100,000.00); and (ii) approval of the ~~Liquidating~~ Trustee and the ~~Bankruptcy Court, upon notice and a hearing~~Creditors' Trust Oversight Committee, if the amount claimed by the ~~Liquidating~~Creditors' Trust against a defendant is unliquidated or equals to or exceeds One Hundred Thousand Dollars ($100,000.00).

**11.** **Federal Income Tax Treatment of the ~~Liquidating~~Creditors' Trust ~~for the Liquidating Trust Assets~~**

For federal income tax purposes, it is intended that the ~~Liquidating~~Creditors' Trust be classified as a ~~liquidating trust~~Creditors' Trust under section 301.7701-4 of the Treasury regulations and that such trust be owned by its beneficiaries.  Accordingly, for federal income tax purposes, it is intended that the Beneficiaries be treated as if they had received a distribution from the Debtors' Estates of an undivided interest in each of the ~~Liquidating~~Creditors' Trust Assets in satisfaction of their Allowed Claims (to the extent of the value of their respective share in the applicable assets) and then contributed such interests to the ~~Liquidating~~Creditors' Trust in exchange for their interests in the ~~Liquidating~~Creditors' Trust, and the ~~Liquidating~~Creditors' Trust's Beneficiaries will be treated as the grantors and owners thereof.

**12.** **Limitation of Liability**

No recourse will ever be had, directly or indirectly, against the ~~Liquidating~~ Trustee or his or her respective employees, professionals, representatives, agents, successors, or assigns, by legal or equitable proceedings or by virtue of any statute or otherwise, or any deed of trust, mortgage, pledge or note, nor upon any promise, contract, instrument, undertaking, obligation, covenant or agreement whatsoever executed by the ~~Liquidating~~Creditors' Trust under the Plan or by reason of the creation of any indebtedness by the ~~Liquidating~~Creditors' Trust or the ~~Liquidating~~ Trustee under the Plan.  All such liabilities under the Plan will be enforceable only against, and will be satisfied only out of, the ~~Liquidating~~Creditors' Trust Assets.  The ~~Liquidating~~Creditors' Trust and the ~~Liquidating~~ Trustee and their respective officers, directors, employees, professionals, representatives, agents, successors or assigns will not be liable for any

42

act they may do, or omit to do hereunder in good faith and in the exercise of their sound judgment; *provided, however*, that ~~Section 7.12 of the Plan~~this section will not apply to any gross negligence or willful misconduct by the ~~Liquidating~~Creditors' Trust and the ~~Liquidating~~ Trustee or their respective officers, directors, employees, professionals, representatives, agents, successors, or assigns.

### 13.    Term of ~~Liquidating~~Creditors' Trust

The ~~Liquidating~~ Trustee will be discharged and the ~~Liquidating~~Creditors' Trust will be terminated, at such time as (i) all of the ~~Liquidating~~Creditors' Trust Assets have been liquidated, (ii) all duties and obligations of the ~~Liquidating~~ Trustee under the ~~Liquidating~~Creditors' Trust Agreement have been fulfilled, (iii) all Distributions required to be made by the ~~Liquidating~~Creditors' Trust under the Plan and the ~~Liquidating~~Creditors' Trust Agreement have been made, and (iv) the Chapter 11 Cases have been closed; *provided, however*, that in no event will the ~~Liquidating~~Creditors' Trust be dissolved later than five (5) years from the Effective Date unless the Bankruptcy Court, upon motion within the six-month period prior to the fifth anniversary (or the end of any extension period approved by the Bankruptcy Court), determines that a fixed period extension not to exceed one (1) year is necessary to facilitate or complete the recovery and liquidation of the ~~Liquidating~~Creditors' Trust Assets.

### 14.    Conflicts Between the ~~Liquidating~~Creditors' Trust Agreement and the Plan

In the event of any inconsistencies or conflict between the ~~Liquidating~~Creditors' Trust Agreement and the Plan, the terms and provisions of the Plan will control.

## E.    Distributions

### 1.    Distribution Record Date

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Equity Interests as maintained by the Debtors or their agents will be deemed closed, and there will be no further changes in the record Holders of any of the Claims or Equity Interests.  The Debtors will have no obligation to recognize any ownership transfer of the Claims or Equity Interests occurring after the Distribution Record Date.  The Debtors will be entitled to recognize and deal for all purposes under the Plan only with those record Holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

### 2.    Timing of Distributions

Except as otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtors will receive the full amount of the Distributions that the Plan provides for Allowed Claims in the applicable Class and in the manner provided therein.  Distributions made after the Effective Date to Holders of Allowed Claims will be deemed to have been made on the Effective Date and, except as otherwise provided in the Plan, no interest will be payable by the Debtors with respect to such Claims or

any Distribution related thereto.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but will be deemed to have been completed as of the required date.  If there are Disputed Claims, Distributions on account of any such Disputed Claims will be made pursuant to the provisions set forth in the Plan.  Except as otherwise provided in the Plan, Holders of Claims will not be entitled to interest, dividends or accruals on Distributions provided for thereunder, regardless of whether such Distributions are delivered on or at any time after the Effective Date.

### 3.    Disbursing Agent

Except as otherwise provided in the Plan, all Distributions under the Plan will be made by the Reorganized Debtors or the Liquidating Trustee, as applicable, as "Disbursing Agent" or such other Person designated by the Reorganized Debtors or the Liquidating Trustee as a Disbursing Agent on the Effective Date.

### 4.    Rights and Powers of Disbursing Agent

The Disbursing Agent will be empowered to:  (a) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan; (b) make all Distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

### 5.    Delivery of Distributions in General

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims will be made to Holders of record as of the Distribution Record Date by the Disbursing Agent. Distributions to Holders of Allowed Claims will be made at the address of each such Holder as set forth in the Debtors' books and records.  Distributions under the Plan on account of such Allowed Claims will not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim will have and receive the benefit of the distributions in the manner set forth in the Plan.  None of the Debtors, the Reorganized Debtors, and the Disbursing Agent will incur any liability whatsoever on account of any distributions under the Plan.

### 6.    Payments and Distributions on Disputed Claims

Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims will be deemed to have been made on the Effective Date.  Notwithstanding any provision otherwise in the Plan and except as may be agreed to by the Debtors or the Reorganized Debtors, on the one hand, and the Holder of a Disputed Claim, on the other hand, no partial payments and no partial Distributions will be made with respect to any Disputed Claim until all Disputed Claims held by the Holder of such Disputed Claim have become Allowed Claims or have otherwise been resolved by settlement or Final Order.

7.        **Manner of Payment**

Any Distributions to be made by or on behalf of the Debtors, Reorganized Debtors, or the Liquidating Trustee, as applicable, pursuant to the Plan will be made by checks drawn on accounts maintained by the Debtors, Reorganized Debtors, or the Liquidating Trustee, respectively, or by wire transfer if circumstances justify, at the option of the Debtors, Reorganized Debtors, or the Liquidating Trustee, as applicable; *provided, however*, any payments made to Bridging or Centurion will be made by wire transfer.

8.        **Undeliverable Distributions and Unclaimed Property**

In the event that any Distribution to any Holder is returned as undeliverable, no Distribution to such Holder will be made unless and until the Disbursing Agent has determined the then current address of such Holder, at which time such Distribution will be made as soon as practicable after such Distribution has become deliverable; *provided, however*, that such Distributions will be deemed unclaimed property under section 347(b) of the Bankruptcy Code and forfeited at the expiration of six months from the date of the Distribution.  After such date, all "unclaimed property" or interests in property will revert to the Reorganized Debtors or the Creditors' Trust, as applicable (notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary), and the Claim of any Holder to such property will be discharged and forever barred.

9.        **Withholding and Reporting Requirements**

In connection with the Plan and all instruments issued in connection therewith, the Disbursing Agent will comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all Distributions under the Plan will be subject to any such withholding or reporting requirements.

10.        **Surrender Instruments**

Pursuant to section 1143 of the Bankruptcy Code, as a condition precedent to receiving any Distribution under the Plan, each holder of a certificated instrument or note must surrender such instrument or note held by it to the Disbursing Agent or its designee.  Any such holder of such instrument or note that fails to (i) surrender the instrument or note or (ii) execute and deliver an affidavit of loss and/or indemnity reasonably satisfactory to the Disbursing Agent, as applicable, before the fifth anniversary of the Confirmation Date will be deemed to have forfeited all rights and claims and may not participate in any Distribution hereunder.  Any Distribution so forfeited will become property of the Reorganized Debtors or the Creditors' Trust, as applicable.

11.        **Setoffs**

Except for the payments to be made to Bridging or Centurion, the Debtors, and the Reorganized Debtors and/or the Trustee may, but will not be required to, set off against any Claim (for purposes of determining the Allowed amount of such Claim on which a Distribution will be made), any claims of any nature whatsoever that the Debtors and the Reorganized Debtors may have against the Holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder will constitute a waiver or release by the Debtors and, the

45

Reorganized Debtors and/or the Trustee of any such claim the Debtors and, the Reorganized Debtors and/or the Trustee may have against the Holder of such Claim.

### 12. Insurance Claims

Except for the payments to be made to Bridging or Centurion, no Distributions under the Plan will be made on account of Allowed Claims until the Holder of such Allowed Claim has exhausted all remedies with respect to the Debtors' Insurance Policies. To the extent that the Debtors' insurers agree to satisfy in full a Claim, then immediately upon such insurers' agreement, such Claim may be expunged without a Claims objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court.

### 13. Applicability of Insurance Policies

Except as otherwise provided in the Plan, Distributions to Holders of Allowed Claims will be made in accordance with the provisions of any applicable Insurance Policy. Nothing contained in the Plan will constitute or be deemed a waiver of any Cause of Action that the Debtors, Reorganized Debtors, or any Person may hold against any insurers under any of the Debtors' Insurance Policies, nor will anything contained in the Disclosure Statement or in the Plan constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

### 14. No Postpetition Interest

Unless otherwise specifically provided for in the Plan or in the Confirmation Order, or required by applicable bankruptcy law, postpetition interest will not accrue or be paid on any Claims or Equity Interests, and no Holder of a Claim or Equity Interest will be entitled to interest accruing on or after the Petition Date on such Claim or Equity Interest. Notwithstanding the foregoing, nothing in the Plan will prohibit Bridging or Centurion from allocating payments received from the Debtors to principal or interest on Bridging's Secured Claim, in itstheir sole discretion in accordance with applicable law.

### 15. Distributions Free and Clear

Except as may be otherwise provided in the Plan, all Distributions under the Plan will be free and clear of any Liens, Claims, encumbrances, and other interests.

### 16. Fractional Dollars; De Minimis Distributions

Notwithstanding any other provision of the Plan, Cash payments of fractions of dollars will not be made. Whenever any Distribution to a Holder of a Claim would otherwise call for Distribution of Cash in a fractional dollar amount, the actual Distribution of such Cash will be rounded to the nearest whole dollar (up or down), with half dollars (or less) being rounded down. Neither the Debtors nor, the Reorganized Debtors nor the Trustee will be required to make any Cash payment of less than ten dollars ($10.00) with respect to any Claim unless a request therefor is made in writing to the Debtors or, the Reorganized Debtors or the Trustee, as applicable; *provided, however*, that neither the Debtors nor, the Reorganized Debtors or the Trustee will have any obligation to make any Distribution, whether final or not, unless and until

the total amount of such Distribution to a specific Holder of an Allowed Claim is equal to or greater than ten dollars ($10.00).

## F.    Procedures for Disputed Claims

The provisions described below related to Disputed Claims will not be applicable to Bridging's Secured Claim and Bridging's Deficiency Claim which are Allowed Claims. Bridging's Deficiency Claim is Allowed for voting purposes only.  Bridging will not be entitled to any Distributions on account of Bridging's Deficiency Claim.

### 1.    Allowance of Claims and Equity Interests

Except as expressly provided in the Plan, or in any order entered in the Chapter 11 Cases prior to the Effective Date, including the Confirmation Order, no Claim or Equity Interest will be deemed Allowed unless and until such Claim or Equity Interest is deemed Allowed under the Plan or the Bankruptcy Code or Allowed by the Bankruptcy Court by entry of a Final Order allowing such Claim or Equity Interest.  On and following the Effective Date, the LiquidatingReorganized Debtors and Trustee, as applicable, will be vested with any and all rights and defenses the Debtors had with respect to any Claim or Equity Interest immediately prior to the Effective Date.

### 2.    Objections to Claims

Except as expressly provided in the Plan, the Debtors (before the Effective Date) or the LiquidatingReorganized Debtors or the Trustee (on or after the Effective Date), as applicable, will have the exclusive authority to file, settle, compromise, withdraw, or litigate to judgment any objections to Claims as permitted under the Plan.  With respect to Administrative Claims, Accrued Professional Compensation Claims, Administrative Claims and Other Priority Claims, the Debtors and Liquidatingthe Reorganized Debtors and the Trustee will obtain approval from Bridging prior to settling or payinghave standing to object to any such Claims. Any objections to Claims will be filed and served on or before the later of (i) one hundred eighty (180) days after the Effective Date or (ii) such date as may be fixed by the Bankruptcy Court.  From and after the Effective Date, the Liquidating Trustee may settle or compromise any Disputed Claim without approval of the Bankruptcy Court.  The Debtors, the Reorganized Debtors and the Liquidating Trustee reserve all rights to resolve any Disputed Claim outside the Bankruptcy Court under applicable governing law.

### 3.    Estimation of Claims

The Debtors (before the Effective Date) or the Liquidating Trustee (on or after the Effective Date) may, at any time, and from time to time, request that the Bankruptcy Court estimate any Contingent Claim or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether an objection was previously filed with the Bankruptcy Court with respect to such Claim, or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to such objection.  In the event that the Bankruptcy Court

estimates any Contingent Claim or Disputed Claim, the amount so estimated will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors or the ~~Liquidating~~ Trustee may pursue supplementary proceedings to object to the allowance of such Claim; *provided, however*, the ~~Liquidating~~ Trustee may elect not to pursue such supplementary proceedings, instead electing to treat such maximum amount as the Allowed amount of such Claim.

**4.      No Distribution Pending Allowance**

Notwithstanding any other provision of the Plan, if any portion of a Claim is Disputed, no payment or distribution provided hereunder will be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

**5.      Distributions after Allowance**

At such time as a Contingent Claim or a Disputed Claim becomes an Allowed Claim, a Distribution will be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan as soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Contingent Claim or Disputed Claim becomes a Final Order.  To the extent that all or a portion of a Contingent Claim or a Disputed Claim is disallowed, the Holder of such Claim will not receive any Distribution on account of the portion of such Claim that is disallowed.

**6.      Preservations of Rights to Settle Claims**

In accordance with section 1123(b) of the Bankruptcy Code, the ~~Liquidating~~ Trustee will have the discretion to retain and enforce, sue on, settle, or compromise all claims, rights, causes of action, suits, and proceedings, whether in law or in equity, whether known or unknown, that the Debtors or their Estates may hold against any person or entity without the approval of the Bankruptcy Court, subject to the terms of the Plan, the Confirmation Order, and any contract, instrument, release, indenture, or other agreement entered into in connection herewith.  The ~~Liquidating~~ Trustee may pursue such retained claims, rights, or causes of action, suits, or proceedings, as appropriate, in accordance with the best interests of the ~~Liquidating~~Creditors' Trust.

**7.      Disallowed Claims**

All Claims held by persons or entities against whom or which the Debtors or ~~Liquidating~~ Trustee has commenced a proceeding asserting a cause of action under sections 542, 543, 544, 545, 547, 548, 549, and/or 550 of the Bankruptcy Code will be deemed Disallowed Claims pursuant to section 502(d) of the Bankruptcy Code and Holders of such Claims will not be entitled to vote to accept or reject the Plan.  Disallowed Claims pursuant to Section 9.7 of the Plan will continue to be Disallowed Claims for all purposes until the avoidance action against such party has been settled or resolved by Final Order and any sums due to the Debtors or ~~Liquidating~~ Trustee from such party have been paid.

48

60437/0001-~~19714805~~20296303v3

### G.    Executory Contracts and Unexpired Leases

#### 1.    Assumption and Rejection of Executory Contracts and Unexpired Leases

Except with respect to the Material Contracts or as otherwise provided in the Plan or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, each of the Executory Contracts and Unexpired Leases of the Debtors will be deemed rejected as of the Effective Date, unless such Executory Contract or Unexpired Lease:  (1) was assumed or rejected previously by the Debtor; (2) expired or terminated pursuant to its own terms before the Effective Date; or (3) is the subject of a motion to assume or reject filed on or before the Effective Date.

The Debtors will assume the Material Contracts.  Entry of the Confirmation Order will constitute a Bankruptcy Court order approving assumption of such Material Contracts and such assumption will be effective as of the Effective Date.  Each Material Contract assumed pursuant to the Plan will be fully enforceable by the Reorganized Debtors in accordance with its terms, except as such terms may have been modified by any order of the Bankruptcy Court or as otherwise agreed to by the Debtors and the applicable counterparty to the Material Contract.

#### 2.    Inclusiveness

Unless otherwise specified, each Executory Contract and Unexpired Lease assumed or rejected by the Debtors will include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such Executory Contract or Unexpired Lease.

#### 3.    Rejection Claims

Except as otherwise provided in orders entered by the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the ~~Bankruptcy Court~~Claims Agent and served on the Creditors' Trust (and counsel ~~to the Debtors or the Reorganized Debtors on or before the date that is~~, if known) within thirty (30) days after ~~the date~~service of notice of entry of ~~an order of the Bankruptcy Court (including~~ the Confirmation Order~~) approving such rejection~~; *provided, that* any such Claims arising from the rejection of an Unexpired Lease will be subject to the cap on rejection damages imposed by section 502(b)(6) of the Bankruptcy Code.  Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed ~~with the Bankruptcy Court~~ within such time will be automatically disallowed, forever barred from assertion and will not be enforceable against the Debtors ~~or~~, the Reorganized Debtors, the Debtors' Estates or their property without the need for any objection by the Debtors ~~or~~, the Reorganized Debtors or the Creditors' Trust or further notice to, or action, order or approval of the Bankruptcy Court.  All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases will be classified as General Unsecured Claims against the Debtors and will be treated in accordance with the Plan.

4.        **Cure of Defaults**

Any defaults under the Materials Contracts will be satisfied, pursuant to and to the extent required by section 365(b)(1) of the Bankruptcy Code, by payment of the applicable default amount in Cash on the Effective Date or on such other terms as the Bankruptcy Court may order or the parties to such Materials Contracts may otherwise agree in writing (the "***Cure Amount***"). The Debtors will file, as part of the Plan Supplement, a schedule of the Material Contracts and associated Cure Amounts.

Any objection by a counterparty to a Material Contract to a Cure Amount must be filed, served and actually received by the Debtors on or prior to thirty (30) days after the Effective Date.  Any counterparty to a Material Contract that fails to object timely to the proposed Cure Amount will be deemed to have consented to such matters and will be deemed to have forever released and waived any objection to such Cure Amount.  The Confirmation Order will constitute an order of the Bankruptcy Court approving the assumption of the Material Contracts pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

In the event of a dispute regarding (a) the amount of any Cure Amount, (b) the ability of any Debtor or assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under any Material Contract to be assumed, or assumed and assigned or (c) any other matter pertaining to assumption, the applicable payment of the Cure  Amount required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order resolving the dispute and approving such assumption.  If such objection is sustained by Final Order of the Bankruptcy Court, the Debtors or the Reorganized Debtors may reject such Material Contract in lieu of assuming it.  The Debtors or the Reorganized Debtors, as applicable, will be authorized to effect such rejection by filing a written notice of rejection with the Bankruptcy Court and serving such notice on the applicable counterparty within thirty (30) days of the entry of such Final Order.

Subject to the payment of any Cure Amount, assumption of any Material Contract pursuant to the Plan will result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Material Contract at any time prior to the effective date of assumption, in each case as provided in section 365 of the Bankruptcy Code.  Any Proofs of Claim filed with respect to a Material Contract that has been assumed by Final Order will be deemed disallowed and expunged (subject to the payment of a Cure Amount), without further notice to or action, order, or approval of the Bankruptcy Court.

5.        **Reservation of Rights**

Nothing contained in the Plan or the Plan Supplement will constitute an admission by the Debtors or the Reorganized Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Debtors or the Reorganized Debtors have any liability thereunder.

### 6.    D&O Liability Insurance Policies

To the extent that the D&O Liability Insurance Policies are considered to be Executory Contracts, notwithstanding anything in the Plan to the contrary, effective as of the Effective Date, the Debtors will be deemed to have assumed all unexpired D&O Liability Insurance Policies with respect to the Debtors' directors, managers, officers, and employees serving on or after the Petition Date pursuant to section 365(a) of the Bankruptcy Code.  Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtors' assumption of each of the unexpired D&O Liability Insurance Policies.  Notwithstanding anything to the contrary contained in the Plan or Confirmation Order, confirmation of the Plan will not discharge, impair, or otherwise modify any indemnity obligations of the insurers under the D&O Liability Insurance Policies assumed by the foregoing assumption of the D&O Liability Insurance Policies, any agreements, documents, and instruments related thereto, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be filed.

**H.    Conditions Precedent to Consummation of the Plan**

**1.    Conditions Precedent to Confirmation**

Confirmation of the Plan will not occur, and the Confirmation Order will not be entered, until each of the following conditions precedent have been satisfied or waived pursuant to the provisions of the Plan:

a)    The Bankruptcy Court will have entered an order, which will not be subject to any stay or subject to an unresolved request for revocation under section 1144 of the Bankruptcy Code, in form and substance acceptable to the Debtors and Bridging, approving the Disclosure Statement with respect to the Plan and the solicitation of votes thereon as being in compliance with section 1125 of the Bankruptcy Code and applicable non-bankruptcy law;

b)    The proposed Confirmation Order will be in form and substance satisfactory in all respects to the Debtors, the Committee and Bridging;

c)    Unless otherwise authorized by the Confirmation Order, the Bankruptcy Court will have entered one or more orders, in form and substance acceptable to the Debtors and Bridging, authorizing the assumption of the Material Contracts; and

d)    The Plan and the Plan Supplement, including any schedules, documents, supplements, and exhibits thereto will be, in form and substance, acceptable to the Debtors, the Committee and Bridging.

**2.    Conditions Precedent to the Effective Date**

The Effective Date will not occur until each of the following conditions precedent have been satisfied or waived pursuant to the provisions of the Plan:

51

a) All documents and agreements necessary to implement the Plan, including without limitation, the Reorganized Debtor Equity and the New Organizational Documents and the New Secured Debt Documents, in each case in form and substance acceptable to the Debtors and, Bridging, the Committee and Centurion, as applicable, will have (a) been tendered for delivery and (b) been effected by, executed by, or otherwise deemed binding upon, all Entities party thereto.  All conditions precedent to such documents and agreements will have been satisfied or waived pursuant to the terms of such documents or agreements

b) All consents, actions, documents, certificates and agreements necessary to implement the Plan, including, without limitation, the New Organizational Documents, will have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws;

c) All Material Contracts will have been assumed by the Reorganized Debtors;

d) The Debtors will have implemented the Restructuring Transactions in a manner consistent with the Plan pursuant to the documentation acceptable to the Debtors and, Bridging, the Committee and Centurion, as applicable; and

e) All actions, documents, certificates, and agreements necessary to implement the Plan, including, without limitation, the LiquidatingCreditors' Trust Agreement, will have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws.

### 3.    Waiver of Conditions

The conditions to consummation of the Plan set forth in Section 11 of the Plan may be waived by the Debtors with the consent of Bridging and the Committee without notice, leave, or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.  To the extent that a condition to consummation of the Plan requires the consent of Bridging and/or the Committee, such conditions may only be waived by the Debtors with the consent of Bridging or the Committee, as applicable.  The failure to satisfy or waive a condition to confirmation or the Effective Date may be asserted by the Debtors or the Reorganized Debtors, or Bridging regardless of the circumstances giving rise to the failure of such condition to be satisfied.  The failure of the Debtors or, the Reorganized Debtors, or Bridging to exercise any of the foregoing rights will not be deemed a waiver of any other rights, and each right will be deemed an ongoing right that may be asserted at any time.

### 4.    Effect of Failure of Conditions

If the consummation of the Plan does not occur, the Plan will be null and void in all respects and nothing contained in the Plan or the Disclosure Statement will: (a) constitute a waiver or release of any claims by or Claims against or Equity Interests in the Debtors; (b) prejudice in any manner the rights of the Debtors, any Holders or any other Entity; (c) constitute an Allowance of any Claim or Equity Interest; or (d) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any Holders or any other Entity in any respect.

## I.      Effect of Confirmation

### 1.      Immediate Binding Effect

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or any other Bankruptcy Rule, upon the occurrence of the Effective Date, the terms of the Plan and the ~~Liquidating~~Creditors' Trust Agreement will be immediately effective and enforceable and deemed binding upon the Debtors, Reorganized Debtors, the ~~Liquidating~~ Trustee, the ~~Liquating~~Creditors' Trust and any and all Holders of Claims or Equity Interests (irrespective of whether such Claims or Equity Interests are deemed to have accepted the Plan), all Persons that are parties to or are subject to the settlements, compromises, releases, discharges and injunctions described in the Plan, each Person acquiring property under the Plan, and any and all non-Debtors parties to Executory Contracts and Unexpired Leases with the Debtors.

### 2.      Compromise and Settlement of Claims, Interests and Controversies

~~Pursuant to sections 363 and 1123(b) of~~To the extent provided for by the Bankruptcy Code and ~~Bankruptcy Rule 9019 and~~ in consideration for the Distributions and other benefits provided pursuant to the Plan, on the Effective Date, the provisions of the Plan will constitute a good faith compromise of all Claims, Equity Interests and controversies relating to the contractual, legal and subordination rights that a Holder of a Claim or Equity Interest may have with respect to any Allowed Claim or Equity Interest, or any Distribution to be made on account of such Allowed Claim or Equity Interest.  The entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Equity Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Equity Interests and is fair, equitable, and reasonable.

### 3.      Releases by the Debtors

Pursuant to section 1123(b) of the Bankruptcy Code and except as otherwise specifically provided in the Plan or the Plan Supplement, for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious reorganization of the Debtors and the consummation of the transactions contemplated by the Plan, on and after the Effective Date, the Released Parties are deemed released and discharged by the Debtors and their Estates from any and all claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, that the Debtors or their Estates would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, or the transactions or events giving rise to any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between the Debtors and any Released Party, the restructuring of Claims and Equity Interests before or during the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, the Disclosure Statement, any Plan Supplement or related agreements, instruments or other documents, other than Debtor Released Claims against a Released Party arising out of the gross

negligence, willful misconduct, intentional fraud, or criminal liability of any such person or entity (the "*Debtor Released Claims*").

4.      **Releases by Holders of Claims**

ON THE EFFECTIVE DATE, EXCEPT AS OTHERWISE PROVIDED IN THE PLAN AND EXCEPT FOR THE RIGHT TO ENFORCE THE PLAN, ALL PERSONS WHO (I) ~~VOTED TO ACCEPT THE PLAN OR WHO~~ ARE ~~PRESUMED OR~~ DEEMED TO HAVE VOTED TO ACCEPT THE PLAN UNDER SECTION 1126(F) OF THE BANKRUPTCY CODE; OR (II) ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN AND ~~WHO VOTE TO REJECT THE PLAN OR ABSTAIN FROM VOTING AND DO NOT~~ MARK THEIR BALLOTS AS OPTING ~~OUT OF~~ IN TO THE RELEASES GRANTED UNDER SECTION 12.4 OF THE PLAN, ~~SHALL~~ WILL, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, BE DEEMED TO FOREVER RELEASE, WAIVE AND DISCHARGE THE RELEASED PARTIES OF AND FROM ALL LIENS, CLAIMS, CAUSES OF ACTION, LIABILITIES, ENCUMBRANCES, SECURITY INTERESTS, INTERESTS OR CHARGES OF ANY NATURE OR DESCRIPTION WHATSOEVER RELATING TO THE DEBTORS, THE CHAPTER 11 CASES OR AFFECTING PROPERTY OF THE ESTATES, WHETHER KNOWN OR UNKNOWN, SUSPECTED OR UNSUSPECTED, SCHEDULED OR UNSCHEDULED, CONTINGENT OR NOT CONTINGENT, UNLIQUIDATED OR FIXED, ADMITTED OR DISPUTED, MATURED OR UNMATURED, SENIOR OR SUBORDINATED, WHETHER ASSERTABLE DIRECTLY OR DERIVATIVELY BY, THROUGH, OR RELATED TO ANY OF THE RELEASED PARTIES AND THEIR SUCCESSORS AND ASSIGNS WHETHER AT LAW, IN EQUITY OR OTHERWISE, BASED UPON ANY CONDITION, EVENT, ACT, OMISSION OCCURRENCE, TRANSACTION OR OTHER ACTIVITY, INACTIVITY, INSTRUMENT OR OTHER AGREEMENT OF ANY KIND OR NATURE OCCURRING, ARISING OR EXISTING PRIOR TO THE EFFECTIVE DATE IN ANY WAY RELATING TO OR ARISING OUT OF, IN WHOLE OR IN PART, THE DEBTORS, THE CHAPTER 11 CASES, THE PURSUIT OF CONFIRMATION OF THE PLAN, THE CONSUMMATION OF THE PLAN OR THE ADMINISTRATION OF THE PLAN, INCLUDING WITHOUT LIMITATION, THE NEGOTIATION AND SOLICITATION OF THE PLAN, ALL REGARDLESS OF WHETHER (A) A PROOF OF CLAIM OR EQUITY INTEREST HAS BEEN FILED OR IS DEEMED TO HAVE BEEN FILED, (B) SUCH CLAIM OR EQUITY INTEREST IS ALLOWED OR (C) THE HOLDER OF SUCH CLAIM OR EQUITY INTEREST HAS VOTED TO ACCEPT OR REJECT THE PLAN, EXCEPT FOR WILLFUL MISCONDUCT OR GROSS NEGLIGENCE.  FOR THE AVOIDANCE OF DOUBT, NOTHING CONTAINED IN THE PLAN WILL IMPACT THE RIGHT OF ANY HOLDER OF AN ALLOWED CLAIM TO RECEIVE A DISTRIBUTION ON ACCOUNT OF ITS ALLOWED CLAIM IN ACCORDANCE WITH SECTION 4 OF THE PLAN.

5.      **Exculpation**

None of the Exculpated Parties will have or incur any liability to any Holder of a Claim or Equity Interest, or other party in interest, or any of their respective members, officers, directors, employees, advisors, professionals, attorneys or agents, or any of their successors and

assigns, with respect to any Exculpated Claim, including, without limitation, any act or omission in connection with, related to, or arising out of, in whole or in part, the Chapter 11 Cases, except for their willful misconduct or gross negligence as determined by a Final Order of a court of competent jurisdiction, and, in all respects, the Exculpated Parties will be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

6.    **Injunction**

FROM AND AFTER THE EFFECTIVE DATE, ALL PERSONS WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS AGAINST OR EQUITY INTEREST IN THE DEBTORS ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY CAUSE OF ACTION RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER.

FROM AND AFTER THE EFFECTIVE DATE, TO THE EXTENT OF THE RELEASES AND EXCULPATION GRANTED IN THE PLAN, THE RELEASING PARTIES WILL BE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE RELEASED PARTIES AND THE EXCULPATED PARTIES AND THEIR ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, ACTION OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST, OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, THE PLAN SUPPLEMENT OR RELATED DOCUMENTS, OR FOR OBLIGATIONS PURSUANT TO THE PLAN, ALL PERSONS WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS OR EQUITY INTERESTS THAT HAVE BEEN RELEASED, DISCHARGED, OR ARE SUBJECT TO EXCULPATION, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS:  (A) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR EQUITY INTERESTS; (B) ENFORCING, ATTACHING, COLLECTING OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH PERSONS ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR EQUITY INTERESTS; (C) CREATING, PERFECTING OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH PERSONS OR THE PROPERTY OR ESTATES OF SUCH PERSONS ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR EQUITY INTERESTS; AND (D) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR EQUITY INTERESTS RELEASED, SETTLED OR DISCHARGED PURSUANT TO THE PLAN.

THE RIGHTS AFFORDED IN THE PLAN AND THE TREATMENT OF ALL CLAIMS AND EQUITY INTERESTS THEREUNDER WILL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF ALL CLAIMS AND EQUITY INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, AGAINST THE DEBTORS OR ANY OF THEIR ASSETS, PROPERTY OR ESTATES.  ON THE EFFECTIVE DATE, ALL SUCH CLAIMS AGAINST THE DEBTORS WILL BE FULLY RELEASED, AND THE INTERESTS WILL BE CANCELLED (EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN).

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR IN THE PLAN OR IN OBLIGATIONS PURSUANT THERETO FROM AND AFTER THE EFFECTIVE DATE, ALL CLAIMS AGAINST THE DEBTORS WILL BE FULLY RELEASED, AND ALL INTERESTS WILL BE CANCELLED, AND THE DEBTORS' LIABILITY WITH RESPECT THERETO WILL BE EXTINGUISHED COMPLETELY, INCLUDING ANY LIABILITY OF THE KIND SPECIFIED UNDER SECTION 502(G) OF THE BANKRUPTCY CODE.

ALL PERSONS WILL BE PRECLUDED FROM ASSERTING AGAINST THE DEBTORS, THE DEBTORS' ESTATES, THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, AND THEIR ASSETS AND PROPERTIES, ANY OTHER CLAIMS OR EQUITY INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS OR ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE.

7.    **Term of Injunctions or Stays**

Unless otherwise provided in the Plan or Confirmation Order, all injunctions or stays provided for under the Plan and ordered in the Confirmation Order or pursuant to sections 105 or 362 of the Bankruptcy Code arising under or entered during the Chapter 11 ~~Case~~Cases, or otherwise, and in existence on the Confirmation Date, will remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay and to the extent consistent with the terms and provisions of the Plan or the Confirmation Order, as applicable.

8.    **Injunction Against Interference with Plan**

Upon the Bankruptcy Court's entry of the Confirmation Order, all Holders of Claims and Equity Interests, the Debtors, and other parties in interest, along with their respective present or former employees, agents, officers, directors, or principals, will be enjoined from taking any actions to interfere with the Debtors', Reorganized Debtors', the ~~Liquidating~~Creditors' Trust's, the ~~Liquidating~~ Trustee's, and their respective affiliates', employees', advisors', officers' and directors', and agents' implementation or consummation of the Plan.

56

9.    **Effectuating Documents and Further Transactions**

The Debtors or the Reorganized Debtors, as applicable, all Holders of Claims or Equity Interests receiving distributions hereunder and all other Entities ~~shall~~will, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.  On or before the Effective Date, the Debtors will file with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

10.    **Preservation of Causes of Action of the Debtors**

In accordance with section 1123(b) of the Bankruptcy Code, and except where such Causes of Action have been expressly released (including, for the avoidance of doubt, pursuant to the releases by the Debtors and exculpation provisions provided in the Plan), the Debtors and ~~Liquidating~~ Trustee will retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action.

**J.    Modification, Revocation or Withdrawal of the Plan**

1.    **Modification and Amendments**

The Plan or any exhibits thereto may be amended, modified, or supplemented by the Debtors in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code. In addition, after the Confirmation Date, the Debtors, Reorganized Debtors, or ~~Liquidating~~ Trustee may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes and effects of the Plan.

2.    **Effect of Confirmation on Modifications**

Entry of a Confirmation Order will mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

3.    **Revocation or Withdrawal of the Plan**

The Debtors reserve the right to, consistent with their fiduciary duties, revoke or withdraw the Plan before the Effective Date.  If the Debtors revoke or withdraw the Plan, or if the Confirmation Date does not occur, then:  (a) the Plan will be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Equity Interest or Class of Claims or Equity Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, will be deemed null and void; and (c) nothing contained in the Plan ~~shall~~will:  (i) constitute a waiver or release of any Claims or Equity Interests; (ii) prejudice in any manner the rights of the Debtors or any other Person; or (iii)

constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Person.

## K.    Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court will retain jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan, including, but not limited to, jurisdiction to:

a)    allow, disallow, determine, liquidate, classify, estimate or establish the priority, secured or unsecured status or amount of any Claim or Equity Interest, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims;

b)    decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

c)    resolve any matters related to:  (i) the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which the Debtors are a party or with respect to which the Debtors may be liable in any manner and to hear, determine and, if necessary, liquidate, any Claims arising therefrom, including rejection Claims and cure Claims, pursuant to section 365 of the Bankruptcy Code or any other matter related to such Executory Contract or Unexpired Lease; (ii) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; and (iii) any dispute regarding whether a contract or lease is or was executory or expired;

d)    ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

e)    adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters and any other matters, and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

f)    adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters and any other matters, including, but not limited to, the Causes of Action, involving the ~~Liquidating~~ Trustee or the ~~Liquidating~~Creditors' Trust;

g)    adjudicate, decide, or resolve any and all matters related to any Cause of Action;

h)    adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

58

i)      enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

j)      issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person with consummation or enforcement of the Plan;

k)      resolve any cases, controversies, suits, disputes or Causes of Action with respect to the discharge, releases, injunctions, exculpations, indemnifications, and other provisions contained in the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

l)      enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

m)     resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, the ~~Liquidating~~Creditors' Trust, the ~~Liquidating~~Creditors' Trust Agreement, any transactions or payments contemplated thereby, or any contract, instrument, release, indenture, or other agreement or document relating to any of the foregoing;

n)      adjudicate any and all disputes arising from or relating to Distributions under the Plan;

o)      consider any modifications of the Plan, cure any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

p)      determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

q)      hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

r)      hear and determine all disputes involving the existence, nature or scope of the Debtors' discharge;

s)      enforce all orders previously entered by the Bankruptcy Court;

t)      hear any other matter not inconsistent with the Bankruptcy Code; and

u)      enter a final decree closing the Chapter 11 Cases.

### L.       Miscellaneous Provisions

#### 1.       Payment of Statutory Fees

All fees payable pursuant to 28 U.S.C. § 1930 will be paid on the earlier of when due or the Effective Date by the Debtors.  After the Effective Date, the ~~Liquidating~~ Trustee will be liable for payment of any such fees until entry of a final decree closing the Chapter 11 Cases.

#### 2.       Dissolution of the Committee

On the Effective Date, the Committee and any other statutory committee formed in connection with the Chapter 11 Cases will dissolve automatically and all members thereof will be released and discharged from all rights, duties, and responsibilities arising from, or related to, the Chapter 11 Cases.

#### 3.       Section 382 Limitation on Net Operating Losses and Built-In Losses

With respect to the Debtors' net operating losses, the Debtors and the Reorganized Debtors reserve the right to seek the exception set forth in 26 U.S.C. § 382(l)(5).

#### 4.       Section 1125(e) Good Faith Compliance

As of and subject to the occurrence of the Confirmation Date, the Debtors and their Related Persons will be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation.

#### 5.       Substantial Consummation

On the Effective Date, the Plan will be deemed to be substantially consummated within the meaning set forth in section 1101 and pursuant to section 1127(b) of the Bankruptcy Code.

#### 6.       Section 1146 Exemption

To the fullest extent permitted under section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of any security under or pursuant to the Plan, and the execution, delivery, or recording of any instrument of transfer under or pursuant to the Plan, and the revesting, transfer, or sale of any property of or to the ~~Liquidating~~ Creditors' Trust will not be taxed under any state or local law imposing a stamp tax, transfer tax, or similar tax or fee. Consistent with the foregoing, each recorder of deeds or similar official for any county, city or other Governmental Unit in which any instrument hereunder is to be recorded in accordance with the Plan ~~shall~~ will, pursuant to the Confirmation Order, be ordered and directed to accept such instrument, without requiring the payment of any documentary stamp tax, deed stamps, stamp tax, transfer tax, mortgage recording tax, intangible tax, or similar tax.

### 7.    Closing of the Chapter 11 Cases

~~When all Liquidating Trust Assets have been liquidated and converted into Cash and such Cash has been distributed in accordance with the Liquidating Trust Agreement and the Confirmation Order, the Liquidating Trustee~~ Upon the earlier of (i) the date upon which all payments on account of Allowed Administrative Expense Claims and Accrued Professional Compensation Claims have been paid or (ii) sixty (60) days after the Effective Date, the Reorganized Debtors will seek authority from the Bankruptcy Court to close the Chapter 11 Cases in accordance with the Bankruptcy Code and ~~the~~ Bankruptcy Rules.

### 8.    Plan Supplement

Any exhibits or schedules not filed with the Plan may be contained in the Plan Supplement, if any, and the Debtors hereby reserve the right to file such exhibits or schedules as a Plan Supplement.

### 9.    Further Assurances

The Debtors, Reorganized Debtors, or the ~~Liquidating~~ Trustee may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors, Reorganized Debtors, the ~~Liquidating~~ Trustee, and all Holders of Claims receiving Distributions pursuant to the Plan and all other parties in interest ~~shall~~will, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

### 10.    Exhibits Incorporated

All exhibits to the Plan, including the Plan Supplement, are incorporated into and are part of the Plan as if fully set forth in the Plan.

### 11.    Inconsistency

In the event of any inconsistency among the Plan, the Disclosure Statement, and any exhibit to the Disclosure Statement, the provisions of the Plan will govern.

### 12.    No Admissions

If the Effective Date does not occur, the Plan will be null and void in all respects, and nothing contained in the Plan will (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtors, (b) prejudice in any manner the rights of the Debtors or any other party in interest, or (c) constitute an admission of any sort by the Debtors or other party in interest.

### 13.    Reservation of Rights

Except as expressly set forth in the Plan, the Plan will have no force or effect unless the Bankruptcy Court will enter the Confirmation Order and the Effective Date has occurred.  None

of the Plan, any statement or provision contained in the Plan or any action taken or not taken by the Debtors with respect to the Plan, the Disclosure Statement or the Plan Supplement will be or will be deemed to be an admission or waiver of any rights of the Debtors with respect to the Holders of Claims or Equity Interests before the Effective Date.

**14.    Successors and Assigns**

The rights, benefits, and obligations of any Person named or referred to in the Plan will be binding on, and will inure to the benefit of, any heir, executor, administrator, successor or assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiaries or guardian, if any, of each Person.

**15.    Entire Agreement**

On the Effective Date, the Plan, supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

**16.    Notices**

All notices, requests, and demands to or upon the Debtors in the Chapter 11 Cases will be in writing and, unless otherwise provided in the Plan, will be deemed to have been duly given or made when actually delivered or, if by facsimile transmission, when received and telephonically confirmed to the recipients set forth in Section 15.16 of the Plan.

All notices and requests to Persons holding any Claim or Equity Interest in any Class will be sent to them at their last known address or to the last known address of their attorney of record in the Chapter 11 Cases.  Any such Holder of a Claim or Equity Interest may designate in writing any other address for purposes of Section 15.16 of the Plan, which designation will be effective upon receipt by the Debtors.

**17.    Severability**

If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision, and such term or provision will then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

18.    **Governing Law**

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of ~~New York~~Delaware, without giving effect to the principles of conflicts of laws, will govern the rights, obligations, construction, and implementation of the Plan and the transactions consummated or to be consummated in connection therewith.

19.    **Request for Confirmation**

The Debtors request entry of the Confirmation Order under section 1129(a) of the Bankruptcy Code and, to the extent necessary, section 1129(b) of the Bankruptcy Code.

**ARTICLE V**

**VOTING REQUIREMENTS;**
**<u>ACCEPTANCE AND CONFIRMATION OF THE PLAN</u>**

A.    **General**

The Bankruptcy Code requires that, in order to confirm the Plan, the Bankruptcy Court must make a series of findings concerning the Plan and the Debtors, including that (i) the Plan has classified Claims and Equity Interests in a permissible manner; (ii) the Plan complies with applicable provisions of the Bankruptcy Code; (iii) the Plan has been proposed in good faith and not by any means forbidden by law; (iv) the disclosure required by section 1125 of the Bankruptcy Code has been made; (v) the Plan has been accepted by the requisite votes of Holders of Claims (except to the extent that cramdown is available under section 1129(b) of the Bankruptcy Code) and Interests; (vi) the Plan is feasible and Confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors unless such liquidation or reorganization is proposed in the Plan; (vii) the Plan is in the 'best interests' of all Holders of Claims in an Impaired Class by providing to such Holders on account of their Claims property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holders would receive or retain in a chapter 7 liquidation, unless each Holder of a Claim in such Class has accepted the Plan; and (viii) all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of such fees on the Effective Date.

B.    **Parties in Interest Entitled to Vote**

Pursuant to the Bankruptcy Code, only Classes of Claims and Equity Interests that are 'impaired' (as defined in section 1124 of the Bankruptcy Code) under the Plan are entitled to vote to accept or reject the Plan.  A Class is Impaired if the legal, equitable or contractual rights to which the Claims or Equity Interests of that Class entitle the Holders of such Claims or Equity Interests are modified, other than by curing defaults and reinstating the Claims or Equity Interests.  Classes that are not Impaired are not entitled to vote on the Plan and are conclusively presumed to have accepted the Plan.  In addition, Classes that receive no Distributions under the Plan are not entitled to vote on the Plan and are deemed to have rejected the Plan.

C.      **Classes Impaired and Entitled to Vote under the Plan**

Holders of Claims in ~~Class~~Classes 3~~, 4~~ and 5~~4~~ are Impaired under the Plan and entitled to vote thereon. ~~Holders of Claims in Classes 6 and 7 and Interest Holders in Class 9 are deemed to reject the Plan and are not entitled to vote. Holders of Claims in Classes 1 and 2 and Interest Holders in Class 8 are deemed to accept the Plan and are not entitled to vote.~~

D.      **Voting Procedures and Requirements**

1.      **Ballots**

The Solicitation Procedures Order sets ~~————~~May 6, 2020 as the record date for voting on the Plan (the "***Record Date***"). Accordingly, only Holders of record as of the Record Date that are otherwise entitled to vote under the Plan will receive a Ballot and may vote on the Plan.

In voting for or against the Plan, please use only the Ballot sent to you with this Disclosure Statement. If you are a Holder of a Claim in Class 3~~, 4~~ or 5~~4~~ and did not receive a Ballot, your Ballot is damaged or lost or you have any questions concerning voting procedures, please contact the Voting Agent at (866) 897-6433 (U.S., and Canada, toll free), (646) 282-2500 (International) or at hygeatabulation@epiqglobal.com.

2.      **Returning Ballots**

If you are entitled to vote to accept or reject the Plan, you should read carefully, complete, sign and return your Ballot, with original signature, in the enclosed envelope.

**To be counted, your Ballot with your original signature indicating your acceptance or rejection of the Plan must be received no later than the Voting Deadline**.

3.      **Voting**

Pursuant to section 105(a) of the Bankruptcy Code, Bankruptcy Rules 2002(a)(7) and 3003(c)(2) and the Bar Date Order, any Creditors whose Claims (a) are Scheduled in the Debtors' Schedules as Disputed, Contingent or unliquidated and which are not the subject of a timely-Filed Proof of Claim, or a Proof of Claim deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any order of the Bankruptcy Court, or otherwise deemed timely Filed under applicable law; or (b) are not Scheduled and are not the subject of a timely-Filed Proof of Claim, or a Proof of Claim deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any order of the Bankruptcy Court, or otherwise deemed timely Filed under applicable law, will be denied treatment as Creditors with respect to such Claims for purposes of (a) voting on the Plan, (b) receiving Distributions under the Plan and (c) receiving notices, other than by publication, regarding the Plan.

For purposes of voting, the amount of a Claim used to calculate acceptance or rejection of the Plan under section 1126 of the Bankruptcy Code will be determined in accordance with the following hierarchy:

a.    if an order has been entered by the Bankruptcy Court determining the amount of such Claim, whether pursuant to Bankruptcy Rule 3018 or otherwise, then in the amount prescribed by the order;

b.    if no such order has been entered, then in the liquidated amount contained in a timely-Filed Proof of Claim that is not the subject of an objection as of the Claims Objection Deadline (as defined in the Solicitation Procedures Order); and

c.    if no such Proof of Claim has been timely Filed, then in the liquidated, noncontingent and undisputed amount contained in the Debtors' Schedules.

For purposes of voting, the following conditions will apply to determine the amount and/or classification of a Claim:

a.    if a Claim is partially liquidated and partially unliquidated, such Claim will be allowed for voting purposes only in the liquidated amount;

b.    if a Scheduled or Filed Claim has been paid, such Claim will be disallowed for voting purposes; and

c.    the Holder of a timely-Filed Proof of Claim that is filed in a wholly unliquidated, Contingent, Disputed and/or unknown amount, and is not the subject of an objection as of the Claims Objection Deadline (as defined in the Solicitation Procedures Order), is entitled to vote in the amount of $1.00.

Pursuant to the Solicitation Procedures Order, the deadline for filing and serving motions pursuant to Bankruptcy Rule 3018(a) seeking temporary allowance of claims for the purpose of accepting or rejecting the Plan will be ――― ――May 27, 2020 at ―4:―0―'00 a.m. (Eastern Time) (the "***Rule 3018(a) Motion Deadline***").

## E.    Acceptance of Plan

As a condition to confirmation of a plan, the Bankruptcy Code requires that each class of impaired claims vote to accept the plan, except under certain circumstances. See "Confirmation Without Necessary Acceptances; Cramdown" below.  A plan is accepted by an impaired class of claims if holders of at least two-thirds in dollar amount and more than one-half in number of claims of those that vote in such class vote to accept the plan.  A plan is accepted by an impaired class of interests if holders of at least two-thirds in amount of interests of those that vote in such class vote to accept the plan.  Only those holders of claims and equity interests who actually vote count in these tabulations.  Holders of claims and equity interests who fail to vote are not counted as either accepting or rejecting a plan.

In addition to this voting requirement, section 1129 of the Bankruptcy Code requires that a plan be accepted by each holder of a claim or equity interest in an impaired class or that the plan otherwise be found by a court to be in the best interests of each holder of a claim or equity

interest in such class.  <u>See</u> "Best Interests Test" below.  Moreover, each impaired class must accept the plan for the plan to be confirmed without application of the "fair and equitable" and "unfair discrimination" tests set forth in section 1129(b) of the Bankruptcy Code discussed below. <u>See</u> "Confirmation Without Necessary Acceptances; Cramdown" below.

## F.    Confirmation Without Necessary Acceptances; Cramdown

In the event that any impaired class of claims or equity interests does not accept a plan, a debtor nevertheless may move for confirmation of the plan.  A plan may be confirmed, even if it is not accepted by all impaired classes, if the plan has been accepted by at least one impaired class of claims, and the plan meets the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code.  Section 1129(b) of the Bankruptcy Code requires that a court find that a plan (i) "does not discriminate unfairly" and (ii) is "fair and equitable," with respect to each non-accepting impaired class of claims or equity interests.

Here, because ~~Class~~Classes 5 ~~is~~and 6 are deemed to reject the Plan, the Debtors will seek Confirmation of the Plan from the Bankruptcy Court by satisfying the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code.  The Debtors believe that such requirements are satisfied as no Claim or Equity Interest Holder junior to those in ~~Class~~Classes 5 or 6 will receive any property under the Plan.

### 1.    No Unfair Discrimination

A plan "does not discriminate unfairly" if (a) the legal rights of a nonaccepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are similar to those of the nonaccepting class, and (b) no class receives payments in excess of that which it is legally entitled to receive for its claims or equity interests.  The Debtors believe that under the Plan all Impaired Classes of Claims and Equity Interests are treated in a manner that is consistent with the treatment of other Classes of Claims and Equity Interests that are similarly situated, if any, and no Class of Claims or Equity Interests will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims or Allowed Interests in such Class.  Accordingly, the Debtors believe the Plan does not discriminate unfairly as to any Impaired Class of Claims or Equity Interests.

### 2.    Fair and Equitable Test

With respect to a dissenting class of claims or equity interests, the "fair and equitable" standard requires that a plan provide that either the claims or equity interests in each class received everything to which they are legally entitled or that classes junior in priority to the class receive nothing.  The strict requirement of the allocation of full value to dissenting classes before any junior class can receive distribution is known as the "absolute priority rule."

The Bankruptcy Code establishes different "fair and equitable" tests for holders of secured claims, unsecured claims and equity interests, which may be summarized as follows:

a.    <u>Secured Claims</u>.  Either (i) each holder of a claim in an impaired class of secured claims retains its liens securing its secured claim and it receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured

claim; (ii) each holder of a claim in an impaired class of secured claims realizes the indubitable equivalent of its allowed secured claim; or (iii) the property securing the claim is sold free and clear of liens, with such liens to attach to the proceeds and the treatment of such liens on proceeds as provided in clause (i) or (ii) of this subparagraph.

       b.    <u>Unsecured Claims</u>.  Either (i) each holder of a claim in an impaired class of unsecured claims receives or retains under the plan property of a value equal to the amount of its allowed claim; or (ii) the holders of claims and equity interests that are junior to the claims of the dissenting class will not receive any property under the chapter 11 plan, subject to the applicability of the judicial doctrine of contributing new value.

       c.    <u>Equity Interests</u>.  Either (i) each holder of an equity interest in an impaired class of interests will receive or retain under the chapter 11 plan property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such stock or (b) the value of the stock; or (ii) the holders of interests that are junior to the stock will not receive any property under the chapter 11 plan, subject to the applicability of the judicial doctrine of contributing new value.

As discussed above, the Debtors believe that the Distributions provided under the Plan satisfy the absolute priority rule.

**ARTICLE VI**

**<u>FEASIBILITY AND BEST INTERESTS OF CREDITORS</u>**

**A.**    **Best Interests Test**

Before the Plan may be confirmed, the <u>Bankruptcy</u> Court must find the Plan provides, with respect to each Impaired Class, that each Holder of a Claim in such Class either (i) has accepted the Plan or (ii) will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount such Holder would receive or retain if the Debtors liquidated under chapter 7 of the Bankruptcy Code.

Under the Plan, Classes ~~2,~~ 3, 4,<u> 5</u> and ~~5~~6 are Impaired.  ~~Class~~<u>Classes</u> 5 <u>and 6 </u>will not receive or retain any property under either the Plan or in a chapter 7 liquidation.  Classes ~~2,~~ 3 and 4 are Impaired, but are projected to receive a Distribution under the Plan.  To the extent that Class ~~2,~~ 3 or 4 does not vote in favor of the Plan, the Holders in such Classes must receive at least as much value under the Plan as they would in a chapter 7 liquidation in order for the Plan to be confirmable by the <u>Bankruptcy</u> Court.  ~~In accordance with the RSA~~<u>As a result of the Global Settlement Term Sheet</u>, the Debtors anticipate that Class 3 will vote in favor of the Plan.  Although the Debtors anticipate that most Holders of Class 4 Claims also will vote in favor of the Plan, it is doubtful that every such Holder will do so.  As such, in order to confirm the Plan, the Debtors must establish that the Claim Holders in Class 4 will receive at least as much value under the Plan as they would in a chapter 7 liquidation.

A comparison of the relative recoveries to Holders of General Unsecured Claims under the Plan and in a chapter 7 liquidation is attached hereto as <u>Exhibit B</u>.  For the reasons set forth

67

on Exhibit B hereto, the Debtors believe that Holders of Claims in Class 4 will receive or retain under the Plan property of a value, as of the Effective Date, that is greater than the amount that such Holders would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  Moreover, the failure to confirm the Plan likely would lead to material delays in Distributions to Classes 2, 3 and 4, further reducing the effective recoveries to Holders in such Classes.

**B.    Feasibility**

In connection with confirmation of the Plan, the Bankruptcy Court will be required to determine that the Plan is feasible pursuant to section 1129(a)(11) of the Bankruptcy Code, which means that the confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors.

To support their belief in the feasibility of the Plan, the Debtors have relied upon the financial projections that are annexed to this Disclosure Statement as Exhibit C (the "***Financial Projections***").

The Financial Projections indicate that the Reorganized Debtors should have sufficient cash flow to pay and service their debt obligations and to fund their operations after the Effective Date.  Accordingly, the Debtors believe that the Plan complies with the financial feasibility standard of section 1129(a)(11) of the Bankruptcy Code.

The Financial Projections are based on numerous assumptions, including Confirmation of the Plan in accordance with its terms, the occurrence of the Effective Date such that the Plan will have become fully consummated ("***Consummation***"), realization of the operating strategy of Reorganized Debtors, no material adverse changes in applicable legislation or regulations, or the administration thereof, or generally accepted accounting principles, no material adverse changes in general business and economic conditions, no material adverse changes in competition, the Reorganized Debtors' retention of certain key physicians, the absence of material contingent or unliquidated litigation, indemnity or other claims, and other matters, many of which will be beyond the control of the Reorganized Debtors and some or all of which may not materialize.

To the extent that the assumptions inherent in the Financial Projections are based upon future business decisions and objectives, they are subject to change.  In addition, although they are presented with numerical specificity and are based on assumptions considered reasonable by the Debtors, the assumptions and estimates underlying the Financial Projections are subject to significant business and economic uncertainties and contingencies, many of which will be beyond the control of the Reorganized Debtors.  Accordingly, the Financial Projections are only estimates and are necessarily speculative in nature.  It can be expected that some or all of the assumptions in the Financial Projections will not be realized and that actual results will vary from the Financial Projections, which variations may be material and are likely to increase over time.  In light of the foregoing, readers are cautioned not to place undue reliance on the Financial Projections.  The Financial Projections were not prepared in accordance with standards for projections promulgated by the American Institute of Certified Public Accountants or with a view to compliance with published guidelines of the SEC regarding projections or forecasts.  The Financial Projections have not been audited, reviewed or compiled by the Debtors' independent

public accountants.  The projected financial information contained in this Disclosure Statement should not be regarded as a representation or warranty by the Debtors, the Debtors' advisors or any other Person that the Financial Projections can or will be achieved.

The Financial Projections should be read together with the information in Article VIII of this Disclosure Statement entitled "Certain Risk Factors to be Considered," which sets forth important factors that could cause actual results to differ from those in the Financial Projections.

The Debtors do not intend to update or otherwise revise the Financial Projections, including any revisions to reflect events or circumstances existing or arising after the date of this Disclosure Statement or to reflect the occurrence of unanticipated events, even if any or all of the underlying assumptions do not come to fruition.  Further, the Debtors do not intend to update or revise the Financial Projections to reflect changes in general economic or industry conditions.

## ARTICLE VII

## EFFECT OF CONFIRMATION

### A.    Binding Effect of Confirmation

Confirmation will bind the Debtors and all Holders of Claims and Equity Interests to the provisions of the Plan, whether or not the Claim or Equity Interest of any such Holder is Impaired under the Plan and whether or not any such Holder of a Claim or Equity Interest has accepted the Plan.

### B.    Good Faith

Confirmation of the Plan will constitute a finding that: (i) the Plan has been proposed in good faith and in compliance with applicable provisions of the Bankruptcy Code; and (ii) all solicitations of acceptances or rejections of the Plan have been in good faith and in compliance with applicable provisions of the Bankruptcy Code.

## ARTICLE VIII

## CERTAIN RISK FACTORS TO BE CONSIDERED

**The Plan and its implementation are subject to certain risks, including, but not limited to, the risk factors set forth below.  Holders of Claims who are entitled to vote on the Plan should read and carefully consider the risk factors, as well as the other information set forth in this Disclosure Statement and the Plan, before deciding whether to vote to accept or reject the Plan**.

### A.    Plan May Not Be Accepted

There can be no assurance that the requisite acceptances to confirm the Plan will be obtained.  Thus, while the Debtors believe the Plan is confirmable under the standards set forth in section 1129 of the Bankruptcy Code, there is no guarantee that the Plan will be accepted by the requisite Classes entitled to vote on the Plan.

**B.      Certain Bankruptcy Law Considerations**

Even if the Holders of Claims who are entitled to vote accept the Plan, the Bankruptcy Court, which may exercise substantial discretion as a court of equity, may choose not to confirm the Plan.  Section 1129 of the Bankruptcy Code requires, among other things, a showing that confirmation of the Plan will not be followed by the liquidation or the need for further financial reorganization of the Debtors, and that the value of Distributions to dissenting Holders of Claims or Equity Interests may not be less than the value such Holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  Although the Debtors believe the Plan meets such requirements, there can be no assurance the Bankruptcy Court will reach the same conclusion.

**C.      Distributions to Holders of Allowed Claims Under the Plan**

On the Effective Date, each Holder of an Allowed General Unsecured Claim will, by operation of the Plan, receive its Pro Rata share of the ~~Liquidating~~Creditors' Trust Distributable ~~Cash~~Assets.  A substantial amount of time may elapse between the Effective Date and the receipt of Distributions because of the time required to achieve final resolution of Disputed Claims.  Moreover, although the Debtors have made a good faith estimate of projected recoveries to holders of Allowed General Unsecured Claims under the Plan, such recoveries will be less than projected if, among other things, (i) the aggregate amount of General Unsecured Claims asserted against the Debtors which ultimately are Allowed exceeds the estimated amount of such Claims or (ii) the recoveries from the litigation of Causes of Action are less than estimated by the Debtors and the Committee.

**D.      Conditions Precedent to Consummation of the Plan**

The Plan provides for certain conditions that must be satisfied (or waived) prior to Consummation of the Plan.  As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions to Consummation of the Plan will be satisfied (or waived).  Accordingly, there can be no assurance that the Plan, even if confirmed by the Bankruptcy Court, will be consummated.

**E.      Certain Tax Considerations**

There are a number of material income tax considerations, risks and uncertainties associated with Consummation of the Plan.  Holders of Claims voting on the Plan should read carefully the discussion of certain federal income tax consequences of the Plan set forth below.

# ARTICLE IX

## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion is a summary of certain United States federal income tax consequences of the Plan to the Holders of General Unsecured Claims.[5]  This discussion is based on the Internal Revenue Code of 1986, as amended (the "***Tax Code***"), Treasury Regulations promulgated and proposed thereunder, judicial decisions and published administrative rules and pronouncements of the Internal Revenue Service ("***IRS***"), all as in effect on the date hereof.

Due to the complexity of certain aspects of the Plan, the lack of applicable legal precedent, the possibility of changes in the law, the differences in the nature of the Claims, each Holder's status and method of accounting and the potential for disputes as to legal and factual matters with the IRS, the tax consequences described herein are uncertain.  No legal opinions have been requested from counsel with respect to any of the tax aspects of the Plan and no rulings have been or will be requested from the IRS with respect to the any of the issues discussed below.  Further, legislative, judicial or administrative changes may occur, perhaps with retroactive effect, which could affect the accuracy of the statements and conclusions set forth below as well as the tax consequences to the Debtors and the Holders of General Unsecured Claims.

This discussion does not purport to address all aspects of United States federal income taxation that may be relevant to the Debtors or the Holders of General Unsecured Claims in light of their personal circumstances, nor does the discussion deal with tax issues with respect to taxpayers subject to special treatment under the United States federal income tax laws (including, for example, insurance companies, financial institutions, real estate investment trusts, tax-exempt organizations, small business investment companies, regulated investment companies, a holder of a Claim that is not a "United States person," as such term is defined in the Tax Code, persons whose functional currency is not the United States dollar, persons subject to the alternative minimum tax, persons holding Claims or Equity Interests as part of a "straddle," "hedge," "constructive sale" or "conversion transaction" with other investments), and entities treated as partnerships for United States federal income tax purposes or beneficial owners of such entities.  This discussion does not address the tax consequences to Holders of General Unsecured Claims who did not acquire such Claims at the issue price on original issue.  No aspect of foreign, state, local or estate and gift taxation is addressed.

This discussion does not address the United States federal income tax consequences to Holders of General Unsecured Claims who (a) are Unimpaired or otherwise entitled to payment in full in Cash on the Effective Date under the Plan or (b) are otherwise not entitled to vote under the Plan.  Moreover, the discussion assumes that the various debt and other arrangements to which the Debtors and Reorganized Debtors are or will be parties will be respected for United States federal income tax purposes in accordance with their form.

---

[5]  Because certain of the Debtors are "pass through" entities for taxation purposes, the Plan does not have tax consequences for those Debtors themselves.  Moreover, while the Plan will have tax consequences for the Holders of Class 3 Claims, the Holders of such Claims are sophisticated commercial entities that were able to evaluate such tax consequences prior to entering into the RSA.

Each Holder of a General Unsecured Claim is urged to consult with such Holder's tax advisors concerning the United States federal, state and local, and non-United States and other tax consequences of the Plan.

**A.     Tax Consequences to Creditors**

**1.     Holders of Claims**

Generally, a Holder of a Claim should in most, but not all circumstances, recognize gain or loss equal to the difference between the "amount realized" by such Holder in exchange for its Claim and such Holder's adjusted tax basis in the Claim. The "amount realized" is equal to the sum of the cash and the fair market value of any other consideration received under a plan of reorganization in respect of a Holder's Claim. The tax basis of a Holder in a Claim will generally be equal to the Holder's cost. To the extent applicable, the character of any recognized gain or loss (*e.g.*, ordinary income, or short-term or long-term capital gain or loss) will depend upon the status of the Holder, the nature of the Claim in the Holder's hands, the purpose and circumstances of its acquisition, the Holder's holding period of the Claim, and the extent to which the Holder previously claimed a deduction for the worthlessness of all or a portion of the Claim. Generally, if the Claim is a capital asset in the Holder's hands, any gain or loss realized generally will be characterized as capital gain or loss, and will constitute long-term capital gain or loss if the Holder has held such Claim for more than one year.

A Holder who received Cash (or other consideration) in satisfaction of its Claims may recognize ordinary income or loss to the extent that any portion of such consideration is characterized as accrued interest. A Holder who did not previously include in income accrued but unpaid interest attributable to its Claim, and who receives a distribution on account of its Claim pursuant to the Plan, will be treated as having received interest income to the extent that any consideration received is characterized for United States federal income tax purposes as interest, regardless of whether such Holder realizes an overall gain or loss as a result of surrendering its Claim. A Holder who previously included in its income accrued but unpaid interest attributable to its Claim should recognize an ordinary loss to the extent that such accrued but unpaid interest is not satisfied, regardless of whether such Holder realizes an overall gain or loss as a result of the distribution it may receive under the Plan on account of its Claim.

**2.     Non-United States Persons**

A Holder of a Claim that is a non-United States Person generally will not be subject to United States federal income tax with respect to property (including money) received in exchange for such Claim pursuant to the Plan, unless (i) such Holder is (or was) engaged in a trade or business in the United States to which income, gain or loss from the exchange is (or was) "effectively connected" for United States federal income tax purposes, or (ii) if such Holder is an individual, such Holder is present in the United States for 183 days or more during the taxable year of the exchange and certain other requirements are met.

60437/0001--19714805-20296303v3

**B.** **Tax Treatment of the ~~Liquidating~~Creditors' Trust**

Upon the Effective Date, the ~~Liquidating~~Creditors' Trust will be established for the benefit of Holders of Allowed General Unsecured Claims, whether allowed on or after the Effective Date.

**1.** **Classification of the ~~Liquidating~~Creditors' Trust**

The ~~Liquidating~~Creditors' Trust is intended to qualify as a liquidating trust for federal income tax purposes. In general, a liquidating trust is not a separate taxable entity but rather is treated for federal income tax purposes as a "grantor" trust (*i.e.*, a pass-through entity). The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The ~~Liquidating~~Creditors' Trust has been structured with the intention of complying with such general criteria. Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including the ~~Liquidating~~ Trustee and the Holders of beneficial interests in the ~~Liquidating~~Creditors' Trust) are required to treat for United States federal income tax purposes the ~~Liquidating~~Creditors' Trust as a grantor trust of which the Holders of Allowed General Unsecured Claims are the owners and grantors. While the following discussion assumes that the ~~Liquidating~~Creditors' Trust would be so treated for United States federal income tax purposes, no ruling has been requested from the IRS concerning the tax status of the ~~Liquidating~~Creditors' Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the ~~Liquidating~~Creditors' Trust as a grantor trust. If the IRS were to challenge successfully such classification, the United States federal income tax consequences to the ~~Liquidating~~Creditors' Trust and the Holders of Claims could vary from those discussed herein.

**2.** **General Tax Reporting by the Trust and Beneficiaries**

For all United States federal income tax purposes, all parties (including the ~~Liquidating~~ Trustee and the Holders of beneficial interests in the ~~Liquidating~~Creditors' Trust) will be required to treat the transfer of assets to the ~~Liquidating~~Creditors' Trust, in accordance with the terms of the Plan, as a transfer of those assets directly to the Holders of Allowed General Unsecured Claims followed by the transfer of such assets by such Holders to the ~~Liquidating~~Creditors' Trust. Consistent therewith, all parties are required to treat the ~~Liquidating~~Creditors' Trust as a grantor trust of which such Holders are to be owners and grantors. Thus, such Holders (and any subsequent Holders of interests in the ~~Liquidating~~Creditors' Trust) will be treated as the direct owners of an undivided beneficial interest in the assets of the ~~Liquidating~~Creditors' Trust for all federal income tax purposes. Accordingly, each Holder of a beneficial interest in the ~~Liquidating~~Creditors' Trust will be required to report on its federal income tax return(s) the Holder's allocable share of all income, gain, loss, deduction or credit recognized or incurred by the ~~Liquidating~~Creditors' Trust.

The United States federal income tax reporting obligation of a Holder of a beneficial interest in the ~~Liquidating~~Creditors' Trust is not dependent upon the ~~Liquidating~~Creditors' Trust distributing any cash or other proceeds. Therefore, a Holder of a beneficial interest in the ~~Liquidating~~Creditors' Trust may incur a United States federal income tax liability regardless of

the fact that the ~~Liquidating~~Creditors' Trust has not made, or will not make, any concurrent or subsequent distributions to the Holder. If a Holder incurs a federal tax liability but does not receive distributions commensurate with the taxable income allocated to it in respect of its beneficial interests in the ~~Liquidating~~Creditors' Trust it holds, the Holder may be allowed a subsequent or offsetting loss.

The ~~Liquidating~~ Trustee will file tax returns with the IRS for the ~~Liquidating~~ Trust as a grantor trust pursuant to Treasury Regulations section 1.671-4(a). The ~~Liquidating~~ Trustee will also send to each Holder of a beneficial interest in the ~~Liquidating~~Creditors' Trust a separate statement setting forth the Holder's share of items of income, gain, loss, deduction or credit and will instruct the Holder to report such items on its federal income tax return.

All payments to Creditors are subject to any applicable withholding (including employment tax withholding). Under the Tax Code, interest, dividends and other reportable payments may, under certain circumstances, be subject to 'backup withholding' then in effect. Backup withholding generally applies if the Holder (a) fails to furnish his or her social security number or other taxpayer identification number ('**TIN**'), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is his correct number and that he is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax if an appropriate refund claim is filed with the IRS. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

### 3.    Allocations of Taxable Income and Loss

Allocations of taxable income of the ~~Liquidating~~Creditors' Trust among Holders of Claims will be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed Distribution, the ~~Liquidating~~Creditors' Trust had distributed all of its respective assets to the Holders of the beneficial interests in the ~~Liquidating~~Creditors' Trust, adjusted for prior taxable income and loss and taking into account all prior and concurrent Distributions from the ~~Liquidating~~Creditors' Trust. Similarly, taxable loss of the ~~Liquidating~~Creditors' Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining ~~Liquidating~~Creditors' Trust assets.

After the Effective Date, any amount a Holder receives as a Distribution from the ~~Liquidating~~Creditors' Trust in respect of its beneficial interest in the ~~Liquidating~~Creditors' Trust should not be included, for United States federal income tax purposes, in the Holder's amount realized in respect of its Allowed Claim but should be separately treated as a Distribution received in respect of such Holder's beneficial interest in the ~~Liquidating~~Creditors' Trust.

In general, a Holder's aggregate tax basis in its undivided beneficial interest in the assets transferred to the ~~Liquidating~~Creditors' Trust will equal the fair market value of such undivided beneficial interest as of the Effective Date and the Holder's holding period in such assets will begin the day following the Effective Date. Distributions to any Holder of an Allowed Claim

will be allocated first to the original principal portion of such Claim as determined for United States federal income tax purposes, and then, to the extent the consideration exceeds such amount, to the remainder of such Claim.  However, there is no assurance that the IRS will respect such allocation for United States federal income tax purposes.

The tax book value of the ~~Liquidating~~Creditors' Trust assets for this purpose will equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the Tax Code, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.  Uncertainties with regard to United States federal income tax consequences of the Plan may arise due to the inherent nature of estimates of value that will impact tax liability determinations.

As soon as practicable after the Effective Date, the ~~Liquidating~~ Trustee (to the extent that it deems it necessary or appropriate in the reasonable exercise of its discretion) will, in good faith, value the ~~Liquidating~~Creditors' Trust Assets, and, as appropriate, will apprise the Holders of beneficial interests in the ~~Liquidating~~Creditors' Trust of such valuation.  The valuation is required to be used consistently by all parties (including the Debtors, the Reorganized Debtors, the ~~Liquidating~~ Trustee and the Holders) for all United States federal income tax purposes.  The Bankruptcy Court will resolve any dispute regarding the valuation of the Assets.  No valuation will be deemed an admission or be admissible in any Cause of Action.

The ~~Liquidating~~Creditors' Trust's taxable income will be allocated to the Holders of beneficial interests in the ~~Liquidating~~Creditors' Trust in accordance with each such Holder's Pro Rata share of the ~~Liquidating~~Creditors' Trust's interests.  The character of items of income, deduction and credit to any Holder and the ability of such Holder to benefit from any deductions or losses may depend on the particular situation of such Holder.

Events subsequent to the date of this Disclosure Statement, such as the enactment of additional tax legislation, could also change the United States federal income tax consequences of the Plan and the transactions contemplated thereunder.

C.        **Importance of Obtaining Professional Tax Assistance**

**The foregoing discussion is intended only as a summary of certain United States federal income tax consequences of the Plan.  The above discussion is for informational purposes only and is not tax advice.  The tax consequences are in many cases uncertain and may vary depending on a Holder's particular circumstances.  Accordingly, Holders are urged to consult their own tax advisors about the United States federal, state and local, and applicable non-United States income and other tax consequences of the Plan**.

*[Remainder of Page Intentionally Left Blank]*

# ARTICLE X

## RECOMMENDATION AND CONCLUSION

This Disclosure Statement was approved by the Bankruptcy Court after notice and a hearing. The Bankruptcy Court has determined that this Disclosure Statement contains information adequate to permit Holders of Claims to make an informed judgment about the Plan. Such approval, however, does not mean that the Bankruptcy Court recommends either acceptance or rejection of the Plan.

The Debtors believe that ~~Confirmation~~confirmation and ~~Consummation~~consummation of the Plan is in the best interests of the Debtors, the Estates and ~~its~~their Creditors. The Plan provides for an equitable distribution to Creditors. The Debtors believe that any alternative to ~~Confirmation~~confirmation of the Plan, such as liquidation under chapter 7 of the Bankruptcy Code, could result in significant delay, litigation and additional costs, as well as a material reduction in the Distributions to Holders of Claims in Classes ~~2,~~ 3 and 4. Consequently, the Debtors urge all eligible Holders of Impaired Claims in Classes ~~2,~~ 3 and 4 to vote to ACCEPT the Plan, and to complete and return their Ballots so that they will be RECEIVED by the Voting Agent on or before the Voting Deadline.

Dated: Wilmington, Delaware
   ~~March 10~~May 1, 2020

HYGEA HOLDINGS CORP. ET AL.
Debtors and Debtors-in-Possession

By: _____
   Keith Collins, M.D.
   Authorized Signatory

COLE SCHOTZ P.C.

By:   */s/ J. Kate Stickles*_____
   J. Kate Stickles (I.D. No. 2917)
   500 Delaware Avenue, Suite 1410
   Wilmington, Delaware 19801
   Telephone: (302) 652-3131
   kstickles@coleschotz.com

   – and –

   Michael D. Sirota
   Stuart Komrower
   Felice R. Yudkin
   Jacob S. Frumkin
   Michael Trentin

76

25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000

*Proposed* *Counsel for Debtors and*
*Debtors-in-Possession*

1

EXHIBIT A TO DISCLOSURE STATEMENT

Plan of Reorganization

EXHIBIT B TO DISCLOSURE STATEMENT

Liquidation Analysis

EXHIBIT C TO DISCLOSURE STATEMENT

Financial Projections

EXHIBIT D TO DISCLOSURE STATEMENT

Global Settlement Term Sheet