## **EXHIBIT A**

Form of New Secured Debt Documents

**CREDIT AGREEMENT**

**Dated as of June [\_\_\_], 2020**

**by and among**

**NEIGHBORMD HOLDINGS CORP.,**
**NEIGHBORMD, INC.,**
as the Borrowers,

**THE OTHER PERSONS PARTY HERETO THAT ARE**
**DESIGNATED AS CREDIT PARTIES**

**BRIDGING FINANCE INC.**
as the Agent for all Lenders,

**and**

**THE OTHER PERSONS PARTY HERETO,**
as Lenders

## TABLE OF CONTENTS

ARTICLE I - THE CREDITS............................................................................................ 2
    1.1    Amounts and Terms of Commitments............................................................. 2
    1.2    Notes. ................................................................................................................ 4
    1.3    Interest.............................................................................................................. 5
    1.4    Loan Accounts. ................................................................................................ 6
    1.5    Borrowings of Revolving Loans. ..................................................................... 6
    1.6    Conversion and Continuation Elections........................................................... 7
    1.7    Optional Prepayments....................................................................................... 8
    1.8    Mandatory Prepayments of Loans. ................................................................... 9
    1.9    Fees. ................................................................................................................ 10
    1.10   Payments by the Borrowers. .......................................................................... 11
    1.11   Funding by Lenders; Non-Funding Lenders.................................................. 13
    1.12   Borrower Representative. ............................................................................... 14

ARTICLE II - CONDITIONS PRECEDENT ............................................................... 14
    2.1    Conditions to Closing Date and Initial Funding of Loans. ........................... 14
    2.2    Conditions to all Credit Extensions. ............................................................. 17

ARTICLE III - REPRESENTATIONS AND WARRANTIES .................................... 18
    3.1    Corporate Existence and Power. ................................................................... 18
    3.2    Corporate Authorization; No Contravention. ............................................... 18
    3.3    Governmental Authorization. ........................................................................ 19
    3.4    Binding Effect. ............................................................................................... 19
    3.5    Litigation........................................................................................................ 19
    3.6    No Default....................................................................................................... 20
    3.7    ERISA Compliance. ....................................................................................... 20
    3.8    Use of Proceeds; Margin Regulations........................................................... 21
    3.9    Title to Properties........................................................................................... 21
    3.10   Taxes............................................................................................................... 21
    3.11   Financial Condition........................................................................................ 22
    3.12   Environmental Matters................................................................................... 22
    3.13   Regulated Entities. ......................................................................................... 23
    3.14   Solvency......................................................................................................... 23
    3.15   Labor Relations. ............................................................................................. 23
    3.16   Intellectual Property....................................................................................... 23
    3.17   Subsidiaries.................................................................................................... 24
    3.18   Security Interests............................................................................................ 24
    3.19   Brokers' Fees; Transaction Fees. .................................................................. 24
    3.20   Insurance........................................................................................................ 24
    3.21   Full Disclosure. .............................................................................................. 24
    3.22   Foreign Assets Control Regulations and Anti-Money Laundering. .................... 25
    3.23   Material Contracts.......................................................................................... 25
    3.24   Health Care Matters. ...................................................................................... 25

ARTICLE IV - AFFIRMATIVE COVENANTS .......................................................... 29
    4.1    Financial Statements. ..................................................................................... 29
    4.2    Certificates; Other Information....................................................................... 30

4.3      Notices. ................................................................................................ 31
4.4      Preservation of Corporate Existence, Etc. ......................................... 33
4.5      Maintenance of Property. .................................................................... 34
4.6      Insurance. ............................................................................................. 34
4.7      Payment of Obligations. ...................................................................... 35
4.8      Compliance with Laws. ....................................................................... 35
4.9      Inspection of Property and Books and Records. ................................. 36
4.10     Use of Proceeds. .................................................................................. 36
4.11     Cash Management Systems. ................................................................. 36
4.12     Landlord Agreements. .......................................................................... 37
4.13     Further Assurances. ............................................................................. 37
4.14     Compliance with Material Contracts. .................................................. 39
4.15     Health Care Matters. ............................................................................ 39
4.16     Compliance Program. .......................................................................... 42
4.17     [Post-Closing Obligations.] ................................................................. 43
4.18     Monthly Lender Calls. ......................................................................... 43

ARTICLE V - NEGATIVE COVENANTS ........................................................... 43
5.1      Limitation on Liens. ............................................................................. 44
5.2      Disposition of Assets. .......................................................................... 45
5.3      Consolidations and Mergers. ............................................................... 46
5.4      Loans and Investments. ........................................................................ 46
5.5      Limitation on Indebtedness. ................................................................. 47
5.6      Transactions with Affiliates. ............................................................... 47
5.7      Management Fees and Compensation. ................................................. 48
5.8      Use of Proceeds. .................................................................................. 48
5.9      [Reserved]. ........................................................................................... 48
5.10     Compliance with ERISA. ..................................................................... 48
5.11     Restricted Payments. ............................................................................ 48
5.12     Change in Business. ............................................................................. 49
5.13     Change in Structure. ............................................................................. 49
5.14     Accounting Changes. ........................................................................... 50
5.15     Amendments to Certain Documents. ................................................... 50
5.16     No Negative Pledges. ........................................................................... 50
5.17     OFAC. ................................................................................................... 51
5.18     Sale-Leasebacks. .................................................................................. 51
5.19     Hazardous Materials. ........................................................................... 51
5.20     Stay, Extension and Usury Laws. ........................................................ 51
5.21     Regulated Entities. ............................................................................... 51

ARTICLE VI - FINANCIAL COVENANT ......................................................... 51
6.1      Minimum EBITDA. .............................................................................. 52

ARTICLE VII - EVENTS OF DEFAULT ........................................................... 52
7.1      Event of Default. .................................................................................. 52
7.2      Remedies. ............................................................................................. 54
7.3      Rights Not Exclusive. .......................................................................... 55

ARTICLE VIII - THE AGENT ...................................................................................... 55
   8.1      Appointment and Duties. ................................................................................ 55
   8.2      Binding Effect. ............................................................................................... 56
   8.3      Use of Discretion. .......................................................................................... 56
   8.4      Delegation of Rights and Duties. .................................................................. 57
   8.5      Reliance and Liability. ................................................................................... 57
   8.6      Agent Individually. ........................................................................................ 58
   8.7      Lender Credit Decision. ................................................................................. 58
   8.8      Expenses; Indemnities. .................................................................................. 59
   8.9      Resignation of Agent. .................................................................................... 60
   8.10   Release of Collateral or Guarantors. ............................................................. 61
   8.11   Additional Secured Parties............................................................................. 61

ARTICLE IX - MISCELLANEOUS ............................................................................. 62
   9.1      Amendments and Waivers. ............................................................................ 62
   9.2      Notices. .......................................................................................................... 63
   9.3      Electronic Transmissions. .............................................................................. 64
   9.4      No Waiver; Cumulative Remedies. ............................................................... 65
   9.5      Costs and Expenses........................................................................................ 65
   9.6      Indemnity. ...................................................................................................... 66
   9.7      Marshaling; Payments Set Aside. ................................................................. 67
   9.8      Successors and Assigns.................................................................................. 67
   9.9      Assignments and Participations; Binding Effect. ......................................... 67
   9.10   Confidentiality. .............................................................................................. 70
   9.11   Set-off; Sharing of Payments. ....................................................................... 71
   9.12   Counterparts................................................................................................... 72
   9.13   Severability; Facsimile Signature. ................................................................ 72
   9.14   Captions.. ....................................................................................................... 72
   9.15   Independence of Provisions.......................................................................... 72
   9.16   Interpretation.................................................................................................. 72
   9.17   No Third Parties Benefited............................................................................ 72
   9.18   Governing Law and Jurisdiction................................................................... 73
   9.19   Waiver of Jury Trial...................................................................................... 73
   9.20   Entire Agreement; Release; Survival............................................................ 73
   9.21   Patriot Act. .................................................................................................... 74
   9.22   [Reserved]. .................................................................................................... 74
   9.23   Joint and Several. .......................................................................................... 74
   9.24   Creditor-Debtor Relationship........................................................................ 74
   9.25   [Reserved]. .................................................................................................... 75
   9.26   Acknowledgement and Consent to Bail-In of EEA Financial Institutions. ........ 75

ARTICLE X - TAXES, YIELD PROTECTION AND ILLEGALITY ...................... 75
   10.1   Taxes. ............................................................................................................. 75
   10.2   Illegality. ........................................................................................................ 79
   10.3   Increased Costs and Reduction of Return. .................................................... 79
   10.4   Funding Losses. ............................................................................................. 81
   10.5   Inability to Determine Rates. ......................................................................... 82

10.6    Reserves on LIBOR Rate Loans. ........................................................................ 82
10.7    Certificates of Lenders. ..................................................................................... 82

ARTICLE XI - DEFINITIONS ......................................................................................... 82
11.1    Defined Terms. .................................................................................................. 82
11.2    Other Interpretive Provisions. ......................................................................... 106
11.3    Accounting Terms and Principles. .................................................................... 107
11.4    Payments. ......................................................................................................... 108

EAST\174048880.4

## SCHEDULES

Schedule 1.1(a)(i)      Tranche A Term Loan Commitments
Schedule 1.1(a)(ii)     Tranche B Term Loan Commitments
Schedule 1.1(b)         Revolving Loan Commitments
Schedule 3.2            Capitalization
Schedule 3.5            Litigation
Schedule 3.7            ERISA
Schedule 3.10           Taxes
Schedule 3.12           Environmental
Schedule 3.15           Labor Relations
Schedule 3.18           Brokers' and Transaction Fees
Schedule 3.23           Health Care
Schedule 4.19           Post-Closing Obligations
Schedule 5.1            Liens
Schedule 5.4            Investments
Schedule 5.5            Indebtedness
Schedule 9.2            Notice Addresses

## EXHIBITS

Exhibit 1.5             Form of Notice of Borrowing
Exhibit 1.6             Form of Notice of Conversion/Continuation
Exhibit 4.2(b)          Form of Compliance Certificate
Exhibit 11.1(a)         Form of Assignment
Exhibit 11.1(f)         Form of Term Note A
Exhibit 11.1(g)         Form of Term Note B
Exhibit 11.1(h)         Form of Revolving Note

EAST\174048880.4

# CREDIT AGREEMENT

This CREDIT AGREEMENT (including all exhibits and schedules hereto, as the same may be amended, modified and/or restated from time to time, this "Agreement") is entered into as of June [    ], 2020, by and among NeighborMD Holdings Corp., a Delaware corporation ("Holdings"), NeighborMD, Inc. (formerly known as Hygea Health Holdings, Inc.), a Florida corporation ("NMD"; NMD together with Holdings are sometimes referred to herein as the "Borrowers" and individually as a "Borrower"), Holdings, as Borrower Representative, the other Persons party hereto that are designated as a "Credit Party"[1], the several Persons from time to time party to this Agreement (collectively, the "Lenders" and individually each a "Lender"), and Bridging Finance Inc. ("Bridging"), as Agent for the Lenders.

W I T N E S S E T H:

WHEREAS, on February 19, 2020 (the "Petition Date"), Hygea Holdings Corp., a Nevada corporation ("HHC"), Hygea Health Holdings, Inc., a Florida corporation ("HHH"; HHC together with HHH are sometimes referred to herein as the "Prepetition Borrowers") and certain of its Subsidiaries and Affiliates (collectively, the "Debtors" and, each individually, a "Debtor") commenced certain Chapter 11 Cases, which are being jointly administered under Case No. 20-10361 (KBO) (each a "Chapter 11 Case" and collectively, the "Chapter 11 Cases"), by filing separate voluntary petitions for reorganization under Chapter 11 of Title 11 of the U.S. Code, 11 U.S.C. 101 et seq. (the "Bankruptcy Code"), with the United States Bankruptcy Court for the District of Delaware (together with any other court having jurisdiction over the Chapter 11 Cases or any proceeding therein from time to time, the "Bankruptcy Court").  Each Debtor continues to operate its businesses and manage its properties as a debtor and debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, prior to the Petition Date, certain lenders provided financing to the Prepetition Borrowers pursuant to that certain Amended and Restated Credit Agreement, dated as of January 31, 2017 (as amended, modified or supplemented prior to the Petition Date, the "Prepetition Credit Agreement"), among the Prepetition Borrowers, the other credit parties party thereto, Bridging (as successor to Macquarie US Trading LLC), as agent for the lenders thereunder (in such capacity, the "Prepetition Agent"), and the lenders from time to time party thereto (collectively, the "Prepetition Lenders" and together with the participants in the "Prepetition Loans" (as defined in the DIP Credit Agreement), the "Prepetition Creditors");

WHEREAS, in connection with the Chapter 11 Cases, certain Lenders provided financing to Borrowers pursuant to that certain Secured Superpriority Debtor-In-Possession Credit Agreement, dated as of February 19, 2020, among the Borrowers, the other loan parties signatory thereto, Bridging, as agent for the lenders thereunder (in such capacity, the "DIP Agent"), and the lenders from time to time signatory thereto (as amended, modified or supplemented prior to the Closing Date, the "DIP Credit Agreement");

---

[1] NTD:  To include all parties to the DIP Credit Agreement and all subsidiaries of the Borrowers.

WHEREAS, on May 1, 2020, the Debtors filed the Plan of Reorganization (as defined below), which Plan of Reorganization has been confirmed pursuant to the Confirmation Order (as defined below);

WHEREAS, pursuant to the Plan of Reorganization, the Debtors have undertaken a reorganization pursuant to which the Debtors have transferred all of their assets to the Borrowers and their Subsidiaries;

WHEREAS, Borrowers have requested that the DIP Lenders (as defined in the DIP Credit Agreement) convert the "Term Loans" and "Loans", under and as defined in the DIP Credit Agreement, into tranche A term loans in the aggregate principal amount of $[10,000,000] as set forth in this Agreement;

WHEREAS, Borrowers have requested that the Prepetition Creditors convert a portion of the Prepetition Loans into tranche B term loans in the aggregate principal amount of $[27,500,000] as set forth in this Agreement;

WHEREAS, Borrowers have requested and the Lenders have agreed to make Revolving Loans from time to time during the Availability Period in an aggregate principal amount not to exceed $[2,500,000.00] subject to the terms and conditions set forth in this Agreement;

WHEREAS, Borrowers desire all of their Obligations under the Loan Documents will be joint and several;

WHEREAS, the effective date of the Plan of Reorganization has occurred concurrently with the deemed making of the Tranche A Term Loans and the making of the other Loans hereunder; and

WHEREAS, the Lenders are willing to extend such credit to the Borrowers on the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

## ARTICLE I - THE CREDITS

1.1     <u>Amounts and Terms of Commitments</u>.

(a)     <u>The Term Credit</u>.

(i)     <u>The Tranche A Term Loans</u>.  Subject to the terms and conditions of this Agreement and in reliance upon the representations and warranties of the Credit Parties contained herein, each Borrower, each other Credit Party, each DIP Lender (as defined under the DIP Credit Agreement, a "<u>Term DIP Lender</u>") party to this Agreement as a Tranche A Term Lender on the date hereof and Bridging, as the DIP Agent and as Agent hereunder, hereby confirms and acknowledges that (i) each such Tranche A Term Lender has heretofore made Term Loans (as defined under the DIP Credit Agreement) under the DIP Credit Agreement in principal amounts set forth next to such Tranche A Term

2

Lender's name on Schedule 1.1(a)(i) hereto (collectively, the "DIP Loans"), (ii) the aggregate outstanding principal amount of all DIP Claims is $[10,000,000.00] on the Closing Date and (iii) such DIP Claims are due and owing to the Tranche A Term Lenders and are not subject to any offset, counterclaims or defenses of any kind or nature.  Subject to and upon the terms and conditions set forth herein and relying upon the representations and warranties herein set forth, after giving effect to the Plan of Reorganization and Confirmation Order, (x) each Lender holding a Tranche A Term Loan Commitment shall be deemed to have made a Tranche A Term Loan to the Borrowers on the Closing Date in an aggregate principal amount equal to its Tranche A Term Loan Commitment listed opposite its name on Schedule 1.1(a)(i) hereto and (y) the principal amount of the DIP Claims shall be deemed to be term loans outstanding hereunder as Tranche A Term Loans, such that the aggregate outstanding principal amount of all Tranche A Term Loans shall be $[10,000,000] as of the Closing Date.  Notwithstanding that no cash consideration has been exchanged, the Borrowers, the other Credit Parties, the Term DIP Lenders party to this Agreement as Tranche A Term Lenders on the date hereof and Bridging, as the DIP Agent and as Agent hereunder, hereby acknowledge and agree that the Borrowers shall owe the aggregate amount of the Tranche A Term Loans to the Tranche A Term Lenders under this Agreement and not under the DIP Credit Agreement.

(ii)    The Tranche B Term Loans.  Subject to the terms and conditions of this Agreement and in reliance upon the representations and warranties of the Credit Parties contained herein, each Borrower, each other Credit Party, each Prepetition Creditor party to this Agreement as a Tranche B Term Lender  and Bridging, as the Prepetition Agent and as Agent hereunder, hereby confirms and acknowledges that (i) each such Tranche B Term Lender has heretofore made Prepetition Loans under the Prepetition Credit Agreement, a portion of which will be converted into Tranche B Term Loans in the principal amounts set forth next to such Tranche B Term Lender's name on Schedule 1.1(a)(ii) hereto, (ii) the aggregate outstanding principal amount of the Prepetition Loans to be converted into Tranche B Term Loans hereunder is $[27,500,000.00] on the Closing Date and (iii) such Prepetition Loans are due and owing to the Tranche B Term Lenders and are not subject to any offset, counterclaims or defenses of any kind or nature.  Subject to and upon the terms and conditions set forth herein and relying upon the representations and warranties herein set forth, after giving effect to the Plan of Reorganization and Confirmation Order, (x) each Lender holding a Tranche B Term Loan Commitment shall be deemed to have made a Tranche B Term Loan to the Borrowers on the Closing Date in an aggregate principal amount equal to its Tranche B Term Loan Commitment listed opposite its name on Schedule 1.1(a)(ii) hereto and (y) the principal amount of the Prepetition Loans in an amount equal to such Tranche B Term Lender's Tranche B Term Loan Commitment as set forth on Schedule 1.1(a)(ii) hereto shall be deemed to be term loans outstanding hereunder as Tranche B Term Loans, such that the aggregate outstanding principal amount of all Tranche B Term Loans shall be $[27,500,000] as of the Closing Date.  Notwithstanding that no cash consideration has been exchanged, the Borrowers, the other Credit Parties, the Prepetition Creditors party to this Agreement as Tranche B Term Lenders on the date hereof and Bridging, as the Prepetition Agent and as Agent hereunder, hereby acknowledge and agree that the Borrowers shall owe the aggregate amount of the Tranche B Term Loans to the Tranche B Term Lenders under this Agreement and not under the Prepetition Credit Agreement.

3

(iii)    Subject to and upon the terms and conditions set forth herein, each Lender that shall be deemed to have made a Tranche A Term Loan pursuant to clause (i) of this Section 1.1(a) and each Lender that shall be deemed to have made a Tranche B Term Loan pursuant to clause (ii) of this Section 1.1(a) severally agrees that each of the Term Loans (i) shall be deemed drawn pursuant to a single deemed drawing for each such Tranche on the Closing Date, (ii) shall be denominated in Dollars, (iii) except as hereinafter provided, shall, at the option of the Borrower Representative, be incurred and maintained as, and/or converted into, LIBOR Rate Loans or, solely to the extent the LIBOR Rate is unavailable or unlawful, Base Rate Loans, comprising the same Borrowing, and (iv) shall be made by each such Lender in that aggregate principal amount which does not exceed the Tranche A Term Loan Commitment or Tranche B Term Loan Commitment, as applicable, of such Lender on the Closing Date.   Subject to the other terms and conditions hereof, the Borrowers may borrow under this Section 1.1(a), prepay under Section 1.7 and once repaid, Term Loans incurred hereunder may not be reborrowed.

(b)    The Revolving Credit.

(i)    Revolving Loans.  Subject to the terms and conditions of this Agreement and in reliance upon the representations and warranties of the Credit Parties contained herein, each Revolving Lender severally agrees to make loans (each such loan, a "Revolving Loan") to the Borrowers in Dollars from time to time on any Business Day during the Availability Period in an aggregate principal amount not to exceed at any time outstanding the amount of such Revolving Lender's Revolving Commitment; provided, however, that after giving effect to any Borrowing of Revolving Loans, (i) the Total Revolving Outstandings shall not exceed the Aggregate Revolving Commitments, and (ii) the Revolving Credit Exposure of any Revolving Lender shall not exceed such Revolving Lender's Revolving Commitment.  With the limits of each Revolving Lender's Revolving Commitment, and subject to the other terms and conditions hereof, the Borrowers may borrow under this Section 1.1(b), prepay under Section 1.7 and reborrow under this Section 1.1(b) during the Availability Period.

1.2    Notes.

(a)    The Tranche A Term Loan deemed made by each Tranche A Term Lender with a Tranche A Term Loan Commitment shall be evidenced by this Agreement and, if requested by such Lender, a Term Note A payable to such Lender in an amount equal to such Lender's Tranche A Term Loan Commitment.

(b)    The Tranche B Term Loan made by each Tranche B Term Lender with a Tranche B Term Loan Commitment shall be evidenced by this Agreement and, if requested by such Lender, a Term Note B payable to such Lender in an amount equal to such Lender's Tranche B Term Loan Commitment.

(c)    The Revolving Loans made by each Revolving Lender shall be evidenced by this Agreement and, if requested by such Lender, a Revolving Note payable to such Lender in an amount equal to such Lender's Revolving Commitment.

1.3    <u>Interest</u>.

(a)    Subject to <u>Sections 1.3(c)</u> and <u>1.3(d)</u>, (i) the Tranche A Term Loans and the Revolving Loans shall bear interest on the outstanding principal amount thereof from the date when made or deemed made at a rate per annum equal to the LIBOR or the Base Rate, as the case may be, <u>plus</u> the Applicable Margin; provided, that the Borrowers may not request, and Lenders will not be required to fund, any borrowing that is not a LIBOR borrowing or convert any Loan to a Base Rate Loan unless, subject to and as more particularly described in <u>Article X</u>, LIBOR is unavailable or unlawful, and (ii) the Tranche B Term Loan shall bear interest on the outstanding principal amount thereof from the date when made at a rate per annum equal to the Tranche B Interest Rate.  All computations of fees and interest (other than as provided in the next succeeding sentence) payable under this Agreement shall be made on the basis of a 360-day year and actual days elapsed.  All computations of interest accruing on Base Rate Loans payable under this Agreement shall be made on the basis of a 365/366-day year and actual days elapsed.  Interest and fees shall accrue during each period during which interest or such fees are computed from the first day thereof to the last day thereof.

(b)    Interest on each Loan shall be paid in cash in arrears on each Interest Payment Date and on the date of any payment or prepayment of Loans in full (including the Maturity Date); provided, that prior to the second anniversary of the Closing Date, accrued interest payable on each Loan shall be capitalized on each Interest Payment Date and added to the outstanding principal balance of (i) in the case of the Tranche A Term Loan or Revolving Loan, the Tranche A Term Loan, and (ii) in the case of the Tranche B Term Loan, the Tranche B Term Loan.

(c)    (i)  If any amount of principal of any Loan is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, such amount shall thereafter bear interest at a rate per annum equal to the Default Rate.  All such interest shall be payable on demand of the Agent (at the direction of the Required Lenders).

(ii)    At the election of the Agent (at the direction of the Required Lenders) while any Event of Default exists (or automatically while any Event of Default under <u>Section 7.1(f)</u> or <u>7.1(g)</u> exists), the Borrowers shall pay interest (after as well as before entry of judgment thereon to the extent permitted by law) on the Obligations under the Loan Documents from and after the date of occurrence of such Event of Default, at the Default Rate.  All such interest shall be payable on demand of the Agent (at the direction of the Required Lenders).

(d)    Anything herein to the contrary notwithstanding, the obligations of the Borrowers hereunder shall be subject to the limitation that payments of interest shall not be required for any period for which interest is computed hereunder, to the extent (but only to the extent) that contracting for or receiving such payment by the respective Lender would be contrary to the provisions of any law applicable to such Lender limiting the highest rate of interest which may be lawfully contracted for, charged or received by such Lender, and in such event the Borrowers shall pay such Lender interest at the highest rate permitted by applicable law ("<u>Maximum Lawful Rate</u>"); <u>provided</u>, <u>however</u>, that if at any time thereafter the rate of interest payable hereunder is less than the Maximum Lawful Rate, Borrowers shall continue to pay interest

5

hereunder at the Maximum Lawful Rate until such time as the total interest received by Agent, on behalf of Lenders, is equal to the total interest that would have been received had the interest payable hereunder been (but for the operation of this paragraph) the interest rate payable since the Closing Date as otherwise provided in this Agreement.

1.4     Loan Accounts.

(a)     The Agent, on behalf of the Lenders, shall record on its books and records the amount of each Loan made, the interest rate applicable, all payments of principal and interest thereon and the principal balance thereof from time to time outstanding.  Such record shall, absent manifest error, be conclusive evidence of the amount of the Loans made by the Lenders to the Borrowers and the interest and payments thereon.  Any failure to so record or any error in doing so, shall not, however, limit or otherwise affect the obligation of the Borrowers hereunder (and under any Note) to pay any amount owing with respect to the Loans or provide the basis for any claim against the Agent.

(b)     The Agent, acting as agent of the Borrowers solely for tax purposes and solely with respect to the actions described in this Section 1.4(b), shall establish and maintain at its address referred to in Section 9.2 (or at such other address as the Agent may notify the Borrower Representative) (A) a record of ownership (the "Register") in which the Agent agrees to register by book entry the interests (including any rights to receive payment hereunder) of the Agent and each Lender in the Term Loans, each of their obligations under this Agreement to participate in each Loan and any assignment of any such interest, obligation or right and (B) accounts in the Register in accordance with its usual practice in which it shall record (1) the names and addresses of the Lenders (and each change thereto pursuant to Sections 9.9 and 9.22), (2) the Commitments of each Lender, (3) the amount of each Loan and each funding of any participation described in clause (A) above, (4) the amount of any principal or interest due and payable or paid, and (5) any other payment received by the Agent from a Borrower and its application to the Obligations.  The entries in the Register shall be conclusive absent manifest error.

(c)     The Credit Parties, the Agent and the Lenders shall treat each Person whose name is recorded in the Register as a Lender for all purposes of this Agreement.  Information contained in the Register with respect to any Lender shall be available for access by the Borrowers, the Borrower Representative, the Agent or such Lender at any reasonable time and from time to time upon reasonable prior written notice.  No Lender shall, in such capacity, have access to or be otherwise permitted to review any information in the Register other than information with respect to such Lender unless otherwise agreed by the Agent (at the direction of the Required Lenders).

(d)     Each Lender that grants a participation shall maintain a register on which it records by book entry the name and address of each participant and the principal amount and interest of each participant's interest in the Loans granted by it (the "Participant Register").  The entries in the Participant Register shall be conclusive, absent manifest error.  Information contained in the Participant Register with respect to any Lender shall be available for access by the Borrowers, the Borrower Representative and the Agent at any reasonable time and from time to time upon reasonable prior notice.

1.5     Borrowings of Revolving Loans.

6

(a)     Borrower Representative shall give written notice (each such notice, a "Notice of Borrowing") substantially in the form of Exhibit 1.5 to the Agent of each proposed borrowing of Revolving Loans not later than 10:00 a.m. (New York time) five (5) Business Days prior to the proposed date of such borrowing.  Each borrowing of a Revolving Loan shall be in a principal amount of $500,000 and integral multiples of $100,000 in excess thereof (or, if less, the entire Revolving Loan Commitment then available).  Each notice will be effective upon receipt by the Agent, will be irrevocable and must specify the date, amount and Type of borrowing; provided that (i) the amount of each borrowing request with respect to Revolving Loans shall be in accordance with the Budget delivered to the Agent pursuant to Section 2.1(j) or 4.2(e) and (ii) notwithstanding any provision of this Agreement to the contrary, Borrowers may not request, and the Lenders will not be required to fund, any borrowing of any Loan that is not a LIBOR Rate Loan unless, subject to and as more particularly described in Article X, LIBOR is unavailable or unlawful.

(b)     Upon receipt of a Notice of Borrowing, the Agent will promptly notify each Lender thereof.  In addition, the Agent will, with reasonable promptness, notify the Borrower Representative and the Lenders of each determination of LIBOR; provided that any failure to do so shall not relieve any Borrower of any liability hereunder or provide the basis for any claim against the Agent.  On the requested borrowing date, each Lender with a Term Loan Commitment shall provide the Agent with immediately available funds to the Agent's Account not later than 3:00 p.m. on the Business Day specified in the Notice of Borrowing.  Upon satisfaction of the applicable conditions set forth in Section 2.1 and 2.2, the Agent shall make all funds so received available to the Borrowers in like funds as received by the Agent either by (i) crediting the account of the Borrowers specified on the signature pages hereto or such other account specified in the Notice of Borrowing or (ii) wire transfer of such funds, in each case in accordance with instructions provided to (and reasonably acceptable to) the Agent by the Borrower Representative.

(c)     Commitments Several.  The failure of any Revolving Lender to make a requested Revolving Loan on any date will not relieve any other Lender of its obligation (if any) to make a Revolving Loan on that date, but no DIP Lender will be responsible for the failure of any other Revolving Lender to make any Revolving Loan to be made by that other Revolving Lender.

1.6     Conversion and Continuation Elections.

(a)     Borrowers shall have the option to (i) convert at any time all or any part of outstanding Loans from Base Rate Loans to LIBOR Rate Loans, or (ii) continue all or any portion of any Loan as a LIBOR Rate Loan upon the expiration of the applicable Interest Period.  Any Loan or group of Loans having the same proposed Interest Period to be made or continued as, or converted into, a LIBOR Rate Loan must be in a minimum amount of $1,000,000 and integral multiples of $100,000 in excess of such amount.  Any such election must be made by Borrower Representative by 10:00 a.m. (New York time) three (3) Business Days prior to (1) the date of any proposed Revolving Loan, (2) the end of each Interest Period with respect to any LIBOR Rate Loans to be continued as such, or (3) the date on which Borrowers wish to convert any Base Rate Loan to a LIBOR Rate Loan for an Interest Period designated by Borrower Representative in such election.  If no election is received with respect to a LIBOR Rate Loan by 10:00 a.m. (New York time) on the 3rd Business Day prior to the end of the Interest Period with respect thereto, that

7

LIBOR Rate Loan shall be automatically continued as a LIBOR Rate Loan, subject to <u>Article X</u>, at the end of its Interest Period.  Borrower Representative must make such election by notice to Agent in writing, by fax, overnight courier, or by Electronic Transmission.  In the case of any conversion or continuation, such election must be made pursuant to a written notice (a "<u>Notice of Conversion/Continuation</u>") in the form of <u>Exhibit 1.6</u>.  No Loan shall be made, converted into or continued as a LIBOR Rate Loan, if Agent or Required Lenders have determined not to make or continue any Loan as a LIBOR Rate Loan or as provided pursuant to <u>Article X</u>.  No Loan shall be made, converted into or continued as a Base Rate Loan, unless, subject to and as more particularly described in <u>Article X</u>, LIBOR is unavailable or unlawful.

(b)    Upon receipt of a Notice of Conversion/Continuation, the Agent will promptly notify each Lender thereof.  In addition, the Agent will, with reasonable promptness, notify the Borrower Representative and the Lenders of each determination of LIBOR; <u>provided</u> that any failure to do so shall not relieve any Borrower of any liability hereunder or provide the basis for any claim against the Agent.  All conversions and continuations shall be made pro rata according to the respective outstanding principal amounts of the Loans held by each Lender with respect to which the notice was given.

(c)    Notwithstanding any other provision contained in this Agreement, after giving effect to any Borrowing, or to any continuation or conversion of any Loans, there shall not be more than five (5) different Interest Periods in effect.

1.7    <u>Optional Prepayments</u>.

(a)    The Borrowers may at any time (i) upon at least sixty (60) days' prior written notice (or such shorter period as is acceptable to Agent) by Borrower Representative to the Agent, prepay the Term Loans in whole or in part in an amount greater than or equal to $100,000 or a higher integral multiple of $50,000 (other than Revolving Loans for which no minimum shall apply) and (ii) upon at least three (3) Business Days' prior written notice by Borrower Representative to the Agent, prepay the Revolving Loans in whole or in part, in each instance, without penalty or premium except as provided in <u>Sections 1.9</u> and <u>10.4</u>.  Optional partial prepayments of Term Loans shall be applied ratably to the principal repayment installments of the Term Loans as specified by the Borrower Representative in such notice of prepayment and, in the absence of such direction or if a Default or Event of Default is then continuing, in the manner set forth in <u>subsection 1.8(g)</u>; provided that in no event shall any optional prepayment of Tranche B Term Loans be made prior to the payment in full of all outstanding Tranche A Term Loans.

(b)    The notice of any prepayment shall not thereafter be revocable by the Borrowers or Borrower Representative and the Agent will promptly notify each Lender thereof and of such Lender's Commitment Percentage of such prepayment.  The payment amount specified in such notice shall be due and payable on the date specified therein.  Together with each prepayment under this <u>Section 1.7</u>, the Borrowers shall pay any amounts required pursuant to <u>Sections 1.9</u> and <u>10.4</u>.

(c)    Borrowers may at any time upon at least thirty (30) Business Days' (or such shorter period as is acceptable to Agent) prior notice by Borrower Representative to Agent permanently reduce the Aggregate Revolving Loan Commitment; provided that such reductions

8

shall be in an amount greater than or equal to $250,000. All reductions of the Aggregate Revolving Loan Commitment shall be allocated pro rata among all Lenders with an Aggregate Loan Commitment.

      1.8      <u>Mandatory Prepayments of Loans</u>.

      (a)      <u>Revolving Loan Payments</u>.

      (i)      <u>Revolving Commitments</u>.  If for any reason (i) the Total Revolving Outstandings at any time exceed the Aggregate Revolving Commitments, or (ii) the Total Revolving Outstandings at any time exceed the amount set forth in the Budget, the Borrowers shall immediately prepay the Revolving Loans in an aggregate principal amount equal to such excess.

      (ii)      <u>Clean Down</u>.  Commencing with the fiscal quarter ending March 31, 2021, Borrowers shall repay all outstanding principal amount of Revolving Loans on or prior to the last Business Day of each fiscal quarter such that no Revolving Loans are outstanding as of the last Business Day of each fiscal quarter.  Any amounts repaid under this <u>Section 1.8(a)</u> may be reborrowed pursuant to <u>Section 1.1(b)</u> subject to the terms and conditions of this Agreement.

      (b)      <u>Scheduled Term Loan Payments</u>.

      (i)      <u>Tranche A Term Loans</u>.  Commencing with the first fiscal quarter ending after the second anniversary of the Closing Date, the Borrowers shall repay to the Agent, for the account of the Tranche A Term Lenders, the principal amount of the Tranche A Term Loans in an amount equal to $833,333 plus accrued and unpaid interest on the first Business Day of each fiscal quarter.  Borrowers shall repay the entire remaining principal amount of the Tranche A Term Loans on the Maturity Date.

      (ii)      <u>Tranche B Term Loans</u>.  The entire remaining principal amount of the Tranche B Term Loans shall be paid on the Maturity Date.

      (c)      <u>Excess Cash Flow</u>.  Concurrently with the delivery of the financial statements required to be delivered pursuant to <u>Section 4.1(a)</u> (but in any event no later than 120 days after the end of the fiscal year), the Borrowers shall prepay the Term Loans in an aggregate amount equal to the difference (to the extent positive) of (A) 75% of the Consolidated Excess Cash Flow for such fiscal year *minus* (B) the aggregate amount of all voluntary prepayments of the Term Loans and voluntary prepayments of the Revolving Loans (to the extent accompanied by a permanent reduction in the Aggregate Revolving Commitments) during such fiscal year; provided that, (i) in no event shall the amount of such prepayment required to be made be less than zero and (ii) in no event shall a particular voluntary prepayment of the Term Loans or Revolving Loans be permitted to be used to reduce the amount of the prepayment required pursuant to this <u>Section 1.8(c)</u> for more than one (1) measurement period.

      (d)      <u>Dispositions; Events of Loss; Extraordinary Receipts</u>.  If a Borrower or any Subsidiary of a Borrower shall at any time or from time to time:

(i)     make a Disposition;

(ii)    suffer an Event of Loss; or

(iii)   receive any Extraordinary Receipts;

then (A) the Borrower Representative shall promptly notify the Agent of such Disposition or Event of Loss (including the amount of the estimated Net Proceeds to be received by a Borrower and/or such Subsidiary in respect thereof) or the receipt of such Extraordinary Receipts and (B) (x) within two (2) Business Days of receipt by a Borrower and/or such Subsidiary of such Extraordinary Receipts or the Net Proceeds of such Disposition or (y) within five (5) Business Days of receipt by a Borrower and/or such Subsidiary of the Net Proceeds of such Event of Loss, in each case, the Borrowers shall deliver, or cause to be delivered, such Extraordinary Receipts or such Net Proceeds to the Agent for distribution to the Lenders as a prepayment of the Loans, which prepayment shall be applied in accordance with subsection 1.8(g) hereof.

(e)     Issuance of Indebtedness.  Immediately upon the receipt by any Credit Party or any Subsidiary of any Credit Party of the Net Issuance Proceeds of the issuance of debt securities or the incurrence of any Indebtedness (other than Net Issuance Proceeds from the issuance of debt securities and/or incurrence of any other Indebtedness, in each instance, in respect of Indebtedness permitted under Section 5.5), the Borrowers shall deliver, or cause to be delivered, to the Agent an amount equal to such Net Issuance Proceeds for application to the Loans in accordance with subsection 1.8(g).

(f)     Issuance of Equity.  Immediately upon the receipt by any Credit Party or any Subsidiary of any Credit Party of the Net Issuance Proceeds of the issuance of any equity interests or contribution of additional equity, the Borrowers shall deliver, or cause to be delivered, to the Agent an amount equal to such Net Issuance Proceeds for application to the Loans in accordance with subsection 1.8(g).

(g)     Application of Prepayments.  Any prepayments pursuant to subsection 1.8(c), 1.8(d), 1.8(e) or 1.8(f) shall be applied to prepay the Loans in the order set forth in Section 1.10(c).  To the extent permitted by the foregoing sentence, amounts prepaid shall be applied first to any Base Rate Loans then outstanding and then to outstanding LIBOR Rate Loans.  Together with each prepayment under this Section 1.8, the Borrowers shall pay any amounts required pursuant to Sections 1.9 and 10.4 hereof.

(h)     No Implied Consent.  For the avoidance of doubt and notwithstanding anything to the contrary set forth herein, provisions contained in this Section 1.8 for the application of proceeds of certain transactions shall not be deemed to constitute consent of the Lenders to transactions that are not otherwise permitted by the terms hereof.

1.9     Fees.

(a)     Commitment Fees.

(i)     Revolving Loan Commitment Fee.  Borrowers shall pay to the Agent, for the account of each Revolving Lender, a non-refundable commitment fee equal to 1.50%

of such Revolving Lender's Revolving Loan Commitment as of the date hereof as set forth on <u>Schedule 1.1(b)</u>, which fee shall be fully earned, due and payable on the Closing Date; provided that, if such fee is not paid in cash on the Closing Date, such commitment fee shall be capitalized and added to the outstanding principal balance of the Tranche A Term Loan.

(ii)    <u>Term Loan Commitment Fee</u>.  Borrowers shall pay to the Agent, for the account of each Term Lender, a non-refundable commitment fee equal to 1.50% of such Term Lender's Term Loan Commitment as of the date hereof as set forth on <u>Schedule1.1(a)(i)</u> and <u>Schedule 1.1(a)(ii)</u>, which fee shall be fully earned, due and payable on the Closing Date; provided that, if such fee is not paid in cash on the Closing Date, such commitment fee shall be capitalized and added to the outstanding principal balance of (i) in the case of such commitment fee in respect of the Tranche A Term Loan, the Tranche A Term Loan, and (ii) in the case of such commitment fee in respect of the Tranche B Term Loan, the Tranche B Term Loan.

(b)    <u>Agency Fee</u>. The Borrowers shall pay to the Agent, for the Agent's own account, an annual administrative agency fee, which fee shall be due and payable in advance on the Closing Date and on each anniversary of the Closing, in an amount equal to 1.0% of the sum of (x) the outstanding principal amount of the Term Loans as of such date plus (y) the Aggregate Revolving Loan Commitment as of such date.  Such fee shall be fully earned when paid and shall not be refundable for any reason whatsoever; provided that, prior to the second anniversary of the Closing Date, such fee shall be capitalized and added to the outstanding principal balance of the Tranche A Term Loan.

(c)    <u>Revolving Loan Unused Fee</u>.  The Borrowers shall pay to the Agent for the account of each Revolving Lender in accordance with its pro rata share of the Revolving Loan Commitment, an unused fee equal to 0.50% <u>times</u> the actual daily amount by which the Aggregate Revolving Loan Commitments exceed the sum of the outstanding amount of Revolving Loans. The Revolving Loan Facility Unused Fee shall accrue at all times during the Availability Period, and shall be due and payable quarterly in arrears on the last Business Day of each March, June, September and December, commencing with the first such date to occur after the Closing Date, and ending on the Maturity Date; provided that, prior to the second anniversary of the Closing Date, such fee shall be capitalized and added to the outstanding principal balance of the Tranche A Term Loan.  Such fee shall be fully earned when paid and shall not be refundable for any reason whatsoever.

(d)    <u>Other Fees</u>. The Borrowers shall pay to the Agent and the Lenders such fees as shall have been separately agreed upon in writing in the amounts and at the time so specified. Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever.

1.10    <u>Payments by the Borrowers</u>.

(a)    All payments (including prepayments) to be made by each Credit Party on account of principal, interest, fees and other amounts required hereunder shall be made without set-off, recoupment, counterclaim or deduction of any kind, shall, except as otherwise expressly provided herein, be made to the Agent (for the ratable account of the Persons entitled thereto) at

11

the address for payment specified in <u>Schedule 9.2</u> in relation to the Agent (or such other address as the Agent may from time to time specify in accordance with <u>Section 9.2</u>), and shall be made in Dollars and by wire transfer in immediately available funds (which shall be the exclusive means of payment hereunder), no later than 1:00 p.m. (New York time) on the date due. Any payment which is received by the Agent later than 1:00 p.m. (New York time) shall be deemed to have been received on the immediately succeeding Business Day and any applicable interest or fee shall continue to accrue. Each Borrower and each other Credit Party hereby irrevocably waives the right to direct the application during the continuance of a Default or Event of Default of any and all payments in respect of any Obligation and any proceeds of Collateral.

(b)     Subject to the provisions set forth in the definition of "Interest Period" herein, if any payment hereunder shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of interest or fees, as the case may be.

(c)     Except for payments otherwise made on account of specific Obligations in accordance with this Agreement, Agent shall apply any and all payments in respect of any Obligation, including all proceeds received by the Agent as a result of the exercise of its remedies under the Collateral Documents after the occurrence and during the continuance of an Event of Default, as follows:

<u>first</u>, to payment of costs and expenses, including Attorney Costs, of the Agent payable or reimbursable by the Credit Parties under the Loan Documents;

<u>second</u>, to payment of costs and expenses, including Attorney Costs, of the Tranche A Term Lenders and Revolving Lenders payable or reimbursable by the Borrowers under this Agreement;

<u>third</u>, to payment of all fees owed to (i) first, the Agent, (ii) second, the Tranche A Term Lenders, (iii) third, the Revolving Lenders and (iv) fourth, the Tranche B Term Lenders;

<u>fourth</u>, to payment of all accrued and unpaid interest on the Tranche A Term Loans;

<u>fifth</u>, to payment of principal of the Tranche A Term Loans;

<u>sixth</u>, to payment of all accrued and unpaid interest on the Revolving Loans;

<u>seventh</u>, to payment of principal of the Revolving Loans;

<u>eighth</u>, to payment of costs and expenses, including Attorney Costs, of the Tranche B Term Lenders payable or reimbursable by the Borrowers under this Agreement;

<u>ninth</u>, to payment of all accrued unpaid interest on the Tranche B Term Loans;

<u>tenth</u>, to payment of principal of the Tranche B Term Loans;

<u>eleventh</u>, to payment of any other amounts owing constituting Obligations; and

twelfth, any remainder shall be for the account of and paid to whoever may be lawfully entitled thereto.

In carrying out the foregoing, (i) amounts received shall be applied in the numerical order provided until exhausted prior to the application to the next succeeding category and (ii) each of the Lenders or other Persons entitled to payment shall receive an amount equal to its pro rata share of amounts available to be applied pursuant to clauses fourth through eleventh above in like funds as received by wire transfer to an account of such Lender as designated in writing to the Agent.

1.11    Funding by Lenders; Non-Funding Lenders.

(a)    Funding.  Nothing in this Agreement or the other Loan Documents shall require or be deemed to require Agent to advance funds on behalf of any Lender.

(b)    Return of Payments.

(i)    If Agent pays an amount to a Lender under this Agreement in the belief or expectation that a related payment has been or will be received by Agent from the Borrowers and such related payment is not received by Agent, then Agent will be entitled to recover such amount from such Lender on demand without setoff, counterclaim or deduction of any kind.

(ii)    If Agent determines at any time that any amount received by Agent under this Agreement must be returned to any Credit Party or paid to any other Person pursuant to any insolvency law or otherwise, then, notwithstanding any other term or condition of this Agreement or any other Loan Document, Agent will not be required to distribute any portion thereof to any Lender.  In addition, each Lender will repay to Agent on demand any portion of such amount that Agent has distributed to such Lender, together with interest at such rate, if any, as Agent is required to pay to any Borrower or such other Person, without setoff, counterclaim or deduction of any kind.

(c)    Non-Funding Lenders.  The failure of any Non-Funding Lender to make any Revolving Loans, or any other payment required by it hereunder, or to fund any purchase of any participation required to be made or funded by it on the date specified therefor shall not relieve any other Lender (each such other Revolving Lender, an "Other Lender") of its obligations to make such loan or fund the purchase of any such participation on such date, but neither Agent nor, other than as expressly set forth herein, any Other Lender shall be responsible for the failure of any Non-Funding Lender to make a loan, fund the purchase of a participation or make any other payment required hereunder.  Notwithstanding anything set forth herein to the contrary, a Non-Funding Lender shall not have any voting or consent rights under or with respect to any Loan Document or constitute a "Lender" or a "Revolving Lender" (or be, or have its Loans and Commitments, included in the determination of "Required Lenders", "Required Revolving Lenders" or "Lenders directly affected" pursuant to Section 9.1) for any voting or consent rights under or with respect to any Loan Document.  Moreover, for the purposes of determining Required Lenders and Required Revolving Lenders, the Loans and Commitments held by Non-Funding Lenders shall be excluded from the total Loans and Commitments outstanding.

(d)    Procedures.  Agent is hereby authorized by each Credit Party and each other Secured Party to establish procedures (and to amend such procedures from time to time) to facilitate administration and servicing of the Loans and other matters incidental thereto.  Without limiting the generality of the foregoing, Agent is hereby authorized to establish procedures to make available or deliver, or to accept, notices, documents and similar items on, by posting to or submitting and/or completion, on E-Systems.  The posting, completion and/or submissions by any Credit Party of any notice, certificate, demand, request, direction or other communication (each, a "Communication") shall constitute a representation and warranty by the Credit Parties that any representation, warranty, certificate or other similar statement requirement by the Loan Documents to be provided, given or made by a Credit Party in connection with any such Communication is true, correct and complete except as expressly noted in such Communication or E-System.

1.12    Borrower Representative.  Each Borrower hereby designates and appoints Holdings as its representative and agent on its behalf (the "Borrower Representative") for the purposes of issuing Notices of Borrowing, Notices of Conversion/Continuation and delivering certificates including Compliance Certificates, giving instructions with respect to the disbursement of the proceeds of the Loans, selecting interest rate options, giving and receiving all other notices and consents hereunder or under any of the other Loan Documents and taking all other actions (including in respect of compliance with covenants) on behalf of any Borrower or Borrowers under the Loan Documents.  Borrower Representative hereby accepts such appointment.  Agent and each Lender may regard any notice or other communication pursuant to any Loan Document from Borrower Representative as a notice or communication from all Borrowers.  Each warranty, covenant, agreement and undertaking made on behalf of a Borrower by Borrower Representative shall be deemed for all purposes to have been made by such Borrower and shall be binding upon and enforceable against such Borrower to the same extent as if the same had been made directly by such Borrower.

## ARTICLE II - CONDITIONS PRECEDENT

2.1    Conditions to Closing Date and Initial Funding of Loans.  The effectiveness of this Agreement and the obligation of each Lender to make (or be deemed to have made) Loans hereunder on the Closing Date is subject to satisfaction of the following conditions:

(a)    The Agent shall have received on or before the Closing Date of the following, each in form and substance reasonably satisfactory to the Agent and each Lender:

(i)    Loan Documents.  Executed counterparts of this Agreement and the other Loan Documents, each properly executed by an authorized officer of the Credit Parties and, in the case of this Agreement, by each Lender.

(ii)    Organizational Documents, Resolutions, Etc.

(A)    copies of the Organization Documents of each Credit Party certified to be true and complete as of a recent date by the appropriate governmental authority of the state or other jurisdiction of its incorporation or organization, where applicable, and certified by a secretary or other officer of such Credit Party to be true and correct as of the Closing Date;

14

(B)     such certificates of resolutions or other action, incumbency certificates and/or other certificates of authorized officers of each Credit Party as the Agent may require evidencing the identity, authority and capacity of each authorized officer thereof authorized to act as an authorized officer in connection with this Agreement and the other Loan Documents to which such Credit Party is a party; and

(C)     such documents and certifications as the Agent may reasonably require to evidence that such Credit Party is duly organized or formed, and is validly existing, in good standing and qualified to engage in business in its state of organization or formation.

(iii)     <u>Personal Property Collateral</u>

(A)     searches of UCC filings in the jurisdiction of formation of each Credit Party and each other jurisdiction reasonably deemed appropriate by the Agent;

(B)     UCC financing statements for each appropriate jurisdiction as is necessary, in the Agent's reasonable discretion, to perfect the Agent's security interest in the Collateral;

(C)     all certificates evidencing any certificated equity interests pledged to the Agent pursuant to the Collateral Documents, together with duly executed in blank, undated stock powers attached thereto;

(D)     searches of ownership of, and Liens on, United States registered intellectual property of each Credit Party in the appropriate United States governmental offices;

(E)     duly executed notices of grant of security interest in the form required by the Collateral Documents as are necessary, in the Agent's reasonable discretion, to perfect the Agent's security interest in the United States registered intellectual property of the Credit Parties; and

(F)     such other documents and instruments required by law or reasonably requested by the Agent to create or perfect the first priority Liens intended to be created under the Collateral Documents and all such documents and instruments shall have been so filed, registered or recorded to the satisfaction of eth Agent.

(iv)     <u>Evidence of Insurance</u>.  Copies of insurance policies or certificates of insurance of the Credit Parties evidencing liability and casualty insurance meeting the requirements set forth in the Loan Documents, including naming the Agent and its successors and assigns as additional insured (in the case of liability insurance) or loss payee (in the case of property insurance) on behalf of the Lenders.

(v)     <u>Management Agreements</u>.  Fully executed copies of the Management Agreements certified by the Borrower Representative to be true and correct as of the

Closing Date. The Management Agreements shall be in form and substance reasonably acceptable to the Agent.

(vi)     <u>Closing Certificate</u>.  A certificate signed by an authorized officer of the Borrower Representative certifying that the conditions specified in <u>Sections 2.1</u> and <u>2.2</u> have been satisfied.

(b)     <u>Confirmation Order</u>.  A final, nonappealable Confirmation Order shall have been entered in form and substance reasonably acceptable to the Agent and the Required Lenders and shall not have been vacated, reversed, modified, amended or stayed, and, unless waived by the Required Lenders, the time to appeal the Confirmation Order or to seek review or rehearing with respect to the Confirmation Order must have expired, no appeal or petition for review or rehearing may be pending and the Confirmation Order must otherwise be in full force and effect.

(c)     <u>Closing Date</u>.  All conditions precedent to the Effective Date under and as defined in the Plan of Reorganization (the "<u>Effective Date</u>") (other than the occurrence of the Closing Date hereunder) shall have been satisfied or duly waived.

(d)     <u>Plan of Reorganization</u>.  The Agent and the Lenders shall have received evidence reasonably satisfactory to the Agent and the Required Lenders (i) demonstrating the satisfaction of any transaction contemplated by the Plan of Reorganization to occur on the Effective Date and (ii) no motion, action or proceeding by any creditor or other party-in-interest to the Chapter 11 Cases which could materially adversely affect the Plan of Reorganization, the consummation of the Plan of Reorganization, the business or operations of the Credit Parties or the transactions contemplated by the Loan Documents, as determined by the Required Lenders in good faith, shall be pending.

(e)     <u>Existing Indebtedness</u>. All Indebtedness under the Prepetition Credit Agreement and the DIP Credit Agreement shall have been repaid, repurchased, discharged, converted or otherwise satisfied in full and all Liens related thereto shall have been released in accordance with the Plan of Reorganization.

(f)     <u>Perfection of Security Interests</u>.  The Agent shall have a perfected security interest in the Collateral.

(g)     <u>Governmental and Other Approvals</u>.  Agent shall have received copies of all authorizations, consents, approvals, licenses, qualifications or formal exemptions, filings, declarations and registrations with, any court, governmental agency, regulatory authority or any securities exchange or any other person or party (whether or not governmental) received by any Credit Party in connection with the transactions contemplated by the Loan Documents to occur on the Closing Date.

(h)     <u>No Default</u>.  No Default or Event of Default shall have occurred and be continuing or would result after giving effect to the effectiveness of this Agreement or the Borrowings or deemed Borrowings on the Closing Date

(i)     <u>Evidence of Solvency</u>.  The Agent and the Lenders shall be satisfied, based on financial statements (actual and pro forma) and projections, that the Credit Parties, taken as a

16

whole, after (i) incurring the Indebtedness contemplated by this Agreement, (ii) the disbursement of the proceeds of such Loans to or as directed by Borrower Representative, (iii) the consummation of the Transactions, and (iv) the payment and accrual of all transaction costs in connection with the foregoing, will be Solvent.

(j)        <u>Receipt of Budget, Projections and Financial Statements</u>.  The Agent and the Lenders shall have received copies of the Budget, Projections and any other financial statements requested by the Agent in form and substance satisfactory to the Agent.

(k)        <u>Patriot Act; Anti-Money Laundering; Beneficial Ownership</u>.  Agent shall have received, at least five (5) days prior to the Closing Date, all documentation and other information required by the Agent, any Lender or regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the Patriot Act.  To the extent any Credit Party qualified as a "legal entity customer" under the Beneficial Ownership Regulation, upon the reasonable request of any Lender, the Borrowers shall have provided to such Lender, and such Lender shall be reasonably satisfied with, a Beneficial Ownership Certification in relation to such Credit Party.

(l)        <u>Payment of Fees and Expenses</u>.  Payment of all fees and expenses required to be paid on the Closing Date pursuant to this Agreement, in each case, in accordance with the Plan of Reorganization.

(m)        <u>Other Documents</u>.   Agent shall have received such other assurances, certificates, documents, consents or opinions as the Agent reasonably may require.

2.2        <u>Conditions to all Credit Extensions</u>.  The obligation of each Lender to honor any request for a Borrowing, including any conversion or continuation of a Loan, is subject to the following conditions precedent:

(a)        the Agent shall have received a satisfactory Notice of Borrowing at least five (5) Business Days prior to the proposed Borrowing date in accordance with <u>Section 1.5</u>;

(b)        the representations and warranties of the Borrowers and each of the other Credit Parties contained herein or in any other Loan Document shall be true and correct as of the Closing Date, except to the extent that such representation or warranty expressly relates to an earlier date (in which event such representations and warranties shall be true and correct as of such earlier date);

(c)        no Default or Event of Default shall have occurred and be continuing or would result after giving effect to the proposed Borrowing or from the application of the proceeds thereof;

(d)        no event has occurred or circumstance exists which has or could reasonably be expected to have a Material Adverse Effect; and

(e)        with respect to any request for a Borrowing after the Closing Date, unless waived by the Agent, the Borrowers shall have paid all fees, costs and expenses, including

17

Attorney Costs, payable by the Borrowers under the Loan Documents to the extent invoiced at least two (2) Business Days prior to the proposed date of such Borrowing.

## ARTICLE III - REPRESENTATIONS AND WARRANTIES

The Credit Parties, jointly and severally, represent and warrant to the Agent and each Lender that the following are, and after giving effect to the Transactions will be, true, correct and complete:

3.1 <u>Corporate Existence and Power</u>. Each Credit Party and each of their respective Subsidiaries:

(a) is a corporation, limited liability company or limited partnership, as applicable, duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation, organization or formation, as applicable;

(b) after giving effect to the Confirmation Order and the Plan of Reorganization, has the power and authority and all governmental licenses, authorizations, Permits, consents and approvals to own its assets, carry on its business and execute, deliver, and perform its obligations under, the Loan Documents to which it is a party, and no Credit Party is in default or breach of any Permit, and no proceeding is pending, or to the best knowledge of the Credit Parties, threatened to revoke or limit any Permit;

(c) is duly qualified as a foreign corporation, limited liability company or limited partnership, as applicable, and licensed and in good standing, under the laws of each jurisdiction where its ownership, lease or operation of Property or the conduct of its business requires such qualification or license, except to the extent that the failure to do so would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.; and

(d) is in compliance with all Requirements of Law.

3.2 <u>Corporate Authorization; No Contravention</u>.

(a) The execution, delivery and performance by each of the Credit Parties of this Agreement and by each Credit Party and each of their respective Subsidiaries of any other Loan Document to which such Person is party, have been duly authorized by all necessary action, and do not and will not, after giving effect to the Confirmation Order and the Plan of Reorganization:

(i) contravene the terms of any of that Person's Organization Documents;

(ii) conflict with or result in any material breach or contravention of, or result in the creation of any Lien under, any document evidencing any material Contractual Obligation to which such Person is a party or any order, injunction, writ or decree of any Governmental Authority to which such Person or its Property is subject;

(iii)    result in or require the creation of any Lien upon any asset of any Credit Party (other than Liens in favor of the Agent under the Loan Documents); or

(iv)    violate any Requirement of Law in any material respect.

(b)    Schedule 3.2 sets forth, as of the Closing Date, the authorized Stock and Stock Equivalents of each of the Credit Parties and each of their respective Subsidiaries. All issued and outstanding Stock and Stock Equivalents of each of the Credit Parties and each of their respective Subsidiaries are duly authorized and validly issued, fully paid, non-assessable, and free and clear of all Liens other than, with respect to the Stock and Stock Equivalents of Borrowers and Subsidiaries of the Borrowers, those in favor of the Agent, for the benefit of the Secured Parties. All such securities were issued in compliance with all applicable state and federal laws concerning the issuance of securities. As of the Closing Date, all of the issued and outstanding Stock and Stock Equivalents of the Credit Parties and their respective Subsidiaries are owned by the Persons and in the amounts set forth on Schedule 3.2. Except as set forth on Schedule 3.2, there are no pre-emptive or other outstanding rights, options, warrants, conversion rights or other similar agreements for the purchase or acquisition of any Stock and Stock Equivalents of any Credit Party (other than in connection with any transaction permitted under Section 5.3).

3.3    Governmental Authorization. After giving effect to the Confirmation Order and Plan of Reorganization, no approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Credit Party or any Subsidiary of any Credit Party of this Agreement, any other Loan Document except (a) for recordings and filings in connection with the Liens granted to the Agent under the Collateral Documents, and (b) those obtained or made on or prior to the Closing Date.

3.4    Binding Effect. This Agreement and each other Loan Document to which any Credit Party or any Subsidiary of any Credit Party is a party constitute the legal, valid and binding obligations of each such Person which is a party thereto, enforceable against such Person in accordance with their respective terms, except as enforceability may be limited by applicable bankruptcy, insolvency, or similar laws affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability.

3.5    Litigation. After giving effect to the Confirmation Order and the Plan of Reorganization, there are no actions, suits, proceedings, claims or disputes pending, or to the best knowledge of each Credit Party, threatened or contemplated, at law, in equity, in arbitration or before any Governmental Authority, against any Credit Party, any Subsidiary of any Credit Party or any of their respective Properties which:

(a)    purport to affect or pertain to any Loan Document (other than any action, suit, proceeding, claim or dispute by Agent or any Lender against any Credit Party which purport to affect or pertain to any Loan Document), or any of the transactions contemplated hereby or thereby; or

19

(b)    would reasonably be expected to result in equitable relief or monetary judgment(s), individually or in the aggregate which would reasonably be expected to result in a Material Adverse Effect.

No injunction, writ, temporary restraining order or any order of any nature has been issued by any court or other Governmental Authority purporting to enjoin or restrain the execution, delivery or performance of this Agreement, any other Loan Document, or directing that the transactions provided for herein or therein not be consummated as herein or therein provided.  Except as set forth on Schedule 3.5, as of the Closing Date, no Credit Party or any Subsidiary of any Credit Party is the subject of an audit any Governmental Authority or, to each Credit Party's knowledge, any review or investigation by any Governmental Authority concerning the violation or possible violation of any Requirement of Law.

3.6    No Default.  No Default or Event of Default exists or would result from the incurring of any Obligations by any Credit Party or the grant or perfection of the Agent's Liens on the Collateral or the consummation of the Transactions.  No Credit Party and no Subsidiary of any Credit Party is in default under or with respect to any Contractual Obligation in any respect which, individually or together with all such defaults, would reasonably be expected to have a Material Adverse Effect.

3.7    ERISA Compliance.

(a)    Schedule 3.7 sets forth, as of the Closing Date, a complete and correct list of, and that separately identifies, (a) all Title IV Plans and (b) all Multiemployer Plans.  Each Benefit Plan intended to qualify under Section 401(a) of the Code has received a favorable determination letter or opinion letter from the IRS as to its qualification under such Section of the Code (or has submitted an application for a determination letter with the IRS, and is awaiting receipt of a response) and, to the knowledge of any Credit Party no act or omission has occurred which would reasonably be expected to result in the loss of any such Benefit Plan's qualified status. Except for those that would not, in the aggregate, have a Material Adverse Effect, (x) each Benefit Plan is in compliance with applicable provisions of ERISA, the Code and other Requirements of Law, (y) there are no existing or pending (or to the knowledge of any Credit Party, threatened) claims (other than routine claims for benefits in the normal course), sanctions, actions, lawsuits or other proceedings or investigation involving any Benefit Plan to which any Credit Party incurs or otherwise has or could reasonably be expected to have an obligation or any Liability and (z) no ERISA Event is reasonably expected to occur.  On the Closing Date, no ERISA Event has occurred in connection with which material obligations and liabilities (contingent or otherwise) remain outstanding.  Except as set forth in Schedule 3.7, no ERISA Affiliate would have any material Withdrawal Liability as a result of a complete withdrawal from any Multiemployer Plan on the date this representation is made.

(b)    The Unfunded Liability of all Title IV Plans does not in the aggregate exceed 20% of the Total Plan Liability for all such Title IV Plans.  Each Title IV Plan complies with all applicable requirements of law and regulations.  No contribution failure under Section 430 of the Code, Section 303 of ERISA, or the terms of any Title IV Plan has occurred with respect to any Title IV Plan sufficient to give rise to a Lien under Section 303(k) of ERISA or otherwise to have a Material Adverse Effect.  There are no pending or, to the knowledge of Borrower,

20

threatened claims, actions, investigations, or lawsuits against any Title IV Plan, any fiduciary of any Title IV Plan, or Borrower or any other member of the Controlled Group with respect to a Title IV Plan or a Multiemployer Plan.  Neither Borrower nor any other member of the Controlled Group has engaged in any prohibited transaction (as defined in Section 4975 of the Code or Section 406 of ERISA) in connection with any Title IV Plan or Multiemployer Plan which would subject that Person to any material liability.  Within the past five (5) years, neither Borrower nor any other member of the Controlled Group has engaged in a transaction that resulted in a Title IV Plan with an Unfunded Liability being transferred out of the Controlled Group.

(c)    (i) All contributions (if any) have been made to any Multiemployer Plan that are required to be made by Borrowers or any other member of the Controlled Group under the terms of the plan or of any collective bargaining agreement or by applicable law; (ii) none of the Borrowers nor any other member of the Controlled Group has withdrawn or partially withdrawn from any Multiemployer Plan, incurred any withdrawal liability with respect to any such plan, or received notice of any claim or demand for withdrawal liability or partial withdrawal liability from any such plan, and no condition has occurred which, if continued, would reasonably be expected to result in a withdrawal or partial withdrawal from any such plan; and (iii) neither Borrower nor any other member of the Controlled Group has received any notice that any Multiemployer Pension Plan is in reorganization, that increased contributions may be required to avoid a reduction in plan benefits or the imposition of any excise tax, that any such plan is or has been funded at a rate less than that required under Section 412 of the Code, that any such plan is or may be terminated, or that any such plan is or may become insolvent.

3.8    <u>Use of Proceeds; Margin Regulations</u>.  The proceeds of the Loans are intended to be and shall be used solely for the purposes set forth in and permitted by <u>Section 4.10</u>, and are intended to be and shall be used in compliance with <u>Section 5.8</u>.  No Credit Party and no Subsidiary of any Credit Party is engaged in the business of purchasing or selling Margin Stock or extending credit for the purpose of purchasing or carrying Margin Stock.  Proceeds of the Loans shall not be used for the purpose of purchasing or carrying Margin Stock.

3.9    <u>Title to Properties</u>.  After giving effect to the Confirmation Order and the Plan of Reorganization, each of the Credit Parties and each of their respective Subsidiaries has good record and marketable title in fee simple to, or valid leasehold interests in, all real Property, and good and valid title to all owned personal property and valid leasehold interests in all leased personal property, in each instance, (i) necessary or material in the ordinary conduct of their respective businesses and (ii) except for defects in title that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.  The Property of the Credit Parties and its Subsidiaries is subject to no Liens, other than Permitted Liens.

3.10    <u>Taxes</u>.  Except as set forth on <u>Schedule 3.10</u>:  (i) all federal and material state, local and foreign income and franchise and other material tax returns, reports and statements (collectively, the "<u>Tax Returns</u>") required to be filed by any Tax Affiliate have been filed with the appropriate Governmental Authorities in all jurisdictions in which such Tax Returns are required to be filed, all such Tax Returns are true and correct in all material respects, and all income, franchise and other material taxes, charges and other impositions reflected therein or otherwise due and payable have been paid or, as applicable withheld, prior to the date on which any Liability may be added thereto for non-payment thereof except for those contested in good faith by

appropriate proceedings diligently conducted and for which adequate reserves are maintained on the books of the appropriate Tax Affiliate in accordance with GAAP; (ii) as of the Closing Date, no Tax Return is under audit or examination by any Governmental Authority and no written notice of such an audit or examination or any written assertion of any claim for Taxes has been given or made by any Governmental Authority; and (iii) no Tax Affiliate has participated in a "reportable transaction" within the meaning of Treasury Regulation Section 1.6011-4(b).

3.11    <u>Financial Condition</u>.

(a)    The financial statements delivered pursuant to <u>Section 4.1</u> (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; (ii) fairly present in all material respects the financial condition of Holdings and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein (subject, in the case of unaudited financial statements, to the absence of footnotes and to normal year-end audit adjustments); and (iii) show all material indebtedness and other material liabilities, direct or contingent, of Holdings and its Subsidiaries as of the date thereof, including liabilities for taxes, material commitments and Indebtedness.

(b)    Since the Petition Date there has been no Material Adverse Effect.

(c)    The Credit Parties and their Subsidiaries have no Indebtedness other than Indebtedness permitted pursuant to <u>Section 5.5</u>.

(d)    All financial performance projections delivered to the Agent represent the Borrowers' good faith estimate of future financial performance and are based on assumptions believed by the Borrowers to be fair and reasonable in light of current market conditions at the time such projections were delivered, it being acknowledged and agreed by the Agent and Lenders that projections as to future events are not to be viewed as facts and that actual results during the period or periods covered by such projections may differ materially from the projected results and failure to achieve such projected results shall not, in and of itself, constitute a Default or an Event of Default.

3.12    <u>Environmental Matters</u>.    Except as set forth on <u>Schedule 3.12</u>, (a) the operations of each Credit Party and each Subsidiary of each Credit Party are and have been in compliance with all applicable Environmental Laws, including obtaining, maintaining and complying with all Permits required by any applicable Environmental Law, other than non-compliances that, in the aggregate, would not have a reasonable likelihood of resulting in Material Environmental Liabilities to any Credit Party or any Subsidiary of any Credit Party, (b) no Credit Party and no Subsidiary of any Credit Party is party to, and no Credit Party and no Subsidiary of any Credit Party and no real property currently (or to the knowledge of any Credit Party previously) owned, leased, subleased, operated or otherwise occupied by or for any such Person is subject to or the subject of, any Contractual Obligation or any pending (or, to the knowledge of any Credit Party, threatened) order, action, investigation, suit, proceeding, audit, claim, demand, dispute or notice of violation or of potential liability or similar notice relating in any manner to any Environmental Law other than those that, in the aggregate, are not reasonably likely to result in

22

Material Environmental Liabilities to any Credit Party or any Subsidiary of any Credit Party, (c) no Lien in favor of any Governmental Authority securing, in whole or in part, Environmental Liabilities has attached to any property of any Credit Party or any Subsidiary of any Credit Party and, to the knowledge of any Credit Party, no facts, circumstances or conditions exist that could reasonably be expected to result in any such Lien attaching to any such property, (d) no Credit Party and no Subsidiary of any Credit Party has caused or suffered to occur a Release of Hazardous Materials at, to or from any real property of any such Person and each such real property is free of contamination by any Hazardous Materials except for such Release or contamination that could not reasonably be expected to result, in the aggregate, in Material Environmental Liabilities to any Credit Party or any Subsidiary of any Credit Party, (e) no Credit Party and no Subsidiary of any Credit Party (i) is or has been engaged in, or has permitted any current or former tenant to engage in, operations or (ii) knows of any facts, circumstances or conditions, including receipt of any information request or notice of potential responsibility under the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. §§ 9601 et seq.) or similar Environmental Laws, that, in the aggregate, would have a reasonable likelihood of resulting in Material Environmental Liabilities to any Credit Party or any Subsidiary of any Credit Party and (f) each Credit Party has made available to Agent copies of all material existing environmental reports, reviews and audits and all material documents pertaining to actual or potential Environmental Liabilities, in each case to the extent such reports, reviews, audits and documents are in their possession, custody or control.

3.13    Regulated Entities.  None of any Credit Party, any Person controlling any Credit Party, or any Subsidiary of any Credit Party, is (a) an "investment company" within the meaning of the Investment Company Act of 1940 or (b) subject to regulation under the Federal Power Act, the Interstate Commerce Act, any state public utilities code, or any other Federal or state statute, rule or regulation limiting its ability to incur Indebtedness, pledge its assets or perform its Obligations under the Loan Documents.

3.14    Solvency.  After giving effect to (a) the Loans made on or prior to the date this representation and warranty is made or remade, (b) the disbursement of the proceeds of such Loans, (c) the consummation of the Transactions and (d) the payment and accrual of all transaction costs in connection with the foregoing, the Credit Parties taken as a whole are Solvent.

3.15    Labor Relations.  There are no strikes, work stoppages, slowdowns or lockouts existing, pending (or, to the knowledge of any Credit Party, threatened) against or involving any Credit Party or any Subsidiary of any Credit Party, except for those that would not, in the aggregate, reasonably be expected to have a Material Adverse Effect.  Except as set forth on Schedule 3.15, as of the Closing Date, (a) there is no collective bargaining or similar agreement with any union, labor organization, works council or similar representative covering any employee of any Credit Party or any Subsidiary of any Credit Party, (b) no petition for certification or election of any such representative is existing or pending with respect to any employee of any Credit Party or any Subsidiary of any Credit Party and (c) no such representative has sought certification or recognition with respect to any employee of any Credit Party or any Subsidiary of any Credit Party.

3.16    Intellectual Property.  Each Credit Party and each Subsidiary of each Credit Party owns, or is licensed to use, all Intellectual Property necessary to conduct its business as currently conducted except for such Intellectual Property the failure of which to own or license

would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect. To the knowledge of each Credit Party, (a) the conduct and operations of the businesses of each Credit Party and each Subsidiary of each Credit Party does not infringe, misappropriate, dilute, violate or otherwise impair any Intellectual Property owned by any other Person and (b) no other Person has contested any right, title or interest of any Credit Party or any Subsidiary of any Credit Party in, or relating to, any Intellectual Property.

3.17    Subsidiaries.  As of the Closing Date, no Credit Party has any Subsidiaries or equity investments in any other corporation or entity other than those specifically disclosed in Schedule 3.2.

3.18    Security Interests.  The Collateral Documents create in favor of the Agent, for the benefit of the Secured Parties, a legal, valid, and enforceable security interest in the Collateral purported to be covered thereby, which security interests and Liens are currently perfected security interests and Liens, prior to all other Liens.

3.19    Brokers' Fees; Transaction Fees.  Except as disclosed on Schedule 3.18 and except for fees payable to the Agent and Lenders, none of the Credit Parties or any of their respective Subsidiaries has any obligation to any Person in respect of any finder's, broker's or investment banker's fee in connection with the transactions contemplated hereby.

3.20    Insurance.    Each  of  the  Credit  Parties  and  each  of  their  respective Subsidiaries and their respective Properties are insured with financially sound and reputable insurance companies which are not Affiliates of the Borrowers, in such amounts, with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar Properties in localities where such Person operates.  As of the Closing Date, a true and complete listing of such insurance, including issuers, coverages and deductibles, has been provided to the Agent.

3.21    Full Disclosure.  Each Credit Party has disclosed to the Agent and the Lenders all agreements, instruments and corporate or other restrictions to which it or any of its Subsidiaries is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect. Each written report, financial statement, certificate or other information furnished by or on behalf of any Credit Party to the Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or under any other Loan Document (in each case, taken as a whole with all such other information provided) is, after giving effect to all modifications, supplements and updates, correct in all material respects and does not and will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein, in light of the circumstances under which they were made, not misleading (after giving effect to all supplements and updates); provided, that, with respect to projected financial information, the Credit Parties represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time of preparation thereof (it being understood that projections are not to be viewed as facts and that the actual results during the period or periods covered by such projections may vary from such projections and such differences may be significant). To the knowledge of the Borrowers, the information included in the Beneficial Ownership Certification, if applicable, is true and correct in all respects.

3.22    <u>Foreign Assets Control Regulations and Anti-Money Laundering</u>.

(a)    <u>OFAC</u>.  Neither any Credit Party nor any Subsidiary of any Credit Party (i) is a person whose property or interest in property is blocked or subject to blocking pursuant to Section 1 of Executive Order 13224 of September 23, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)), (ii) engages in any dealings or transactions prohibited by Section 2 of such executive order, or is otherwise associated with any such person in any manner violative of Section 2, or (iii) is a person on the list of Specially Designated Nationals and Blocked Persons or subject to the limitations or prohibitions under any other U.S. Department of Treasury's Office of Foreign Assets Control regulation or executive order.

(b)    <u>Patriot Act</u>.  Each of the Credit Parties and each of their respective Subsidiaries are in compliance, in all material respects, with the Patriot Act.  No part of the proceeds of the Loans will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended, or in violation of sanctions administered by the U.S. Department of Treasury's Office of Foreign Assets Control regulation.

3.23    <u>Material Contracts</u>.  Set forth on <u>Schedule 3.22</u> is a complete and accurate list as of the Closing Date of all Material Contracts of each of the Credit Parties, their Subsidiaries and the Managed Practices, showing the parties and amendments and modifications thereto.  Each such Material Contract (a) is in full force and effect and is binding upon and enforceable against each of the Loan Parties and their Subsidiaries that is a party thereto and, to each Credit Party's knowledge, all other parties thereto in accordance with its terms; and (b) has not been otherwise amended or modified in any way that would reasonably be expected to adversely affect the interests of the Agent or the Lenders.

3.24    <u>Health Care Matters</u>.

(a)    Other than as set forth on <u>Schedule 3.24</u> or except to the extent that failure to do so would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect, (i) each Credit Party is and has been in compliance with all Health Care Laws applicable to it, its products and its properties or other assets or its business or operation and (ii) each Credit Party, and, any Person acting on their behalf, has in effect all Permits, including, without limitation, all Permits necessary for it to own, lease or operate its properties and other assets and to carry on its business and operations as presently conducted and all such Permits are in full force and effect and there exists no default under, or violation of, any such Permit and (iii) no Credit Party has received notice or has knowledge that any Governmental Authority is considering limiting, suspending, terminating, adversely amending or revoking any such Permit. No action, demand, requirement or investigation by any Governmental Authority and no suit, action or proceeding by any other person, in each case with respect to any Credit Party or, to the knowledge of each Credit Party, any Person acting on their behalf, is pending or, to the knowledge of any Credit Party, threatened, except to the extent such action, demand, requirement,

investigation, suit, or proceeding would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

(b)     Except as set forth on <u>Schedule 3.24</u> or except as would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, all reports, documents, claims, notices or approvals required to be filed, obtained, maintained or furnished pursuant to any Health Care Law to any Governmental Authority have been so filed, obtained, maintained or furnished, and all such reports, documents, claims and notices were complete and correct on the date filed (or were corrected in or supplemented by a subsequent filing).

(c)     No Credit Party has made an untrue statement of a material fact or fraudulent statement to any Governmental Authority, failed to disclose a material fact required to any Governmental Authority, or committed an act, made a statement, or failed to make a statement that, at the time such disclosure was made, would reasonably be expected to constitute a violation of any Health Care Law.  No Credit Party, no employee or officer of a Credit Party, nor to such Credit Party's knowledge, any affiliate or agent of any Credit Party, has made any untrue statement of fact regarding material claims incurred but not reported.

(d)     Each Credit Party has the requisite provider number or other Permit to bill under Medicare, the respective Medicaid program in the state or states in which such entity operates, Private Third Party Payor Programs, or any Capitated Contracts with managed care organizations to the extent such Credit Party, or contracting physician on behalf of such Credit Party, bills such programs and/or payors.  Except as set forth on <u>Schedule 3.24</u> and the Known Events, there is no investigation, audit, claim review, or other action pending, or to the knowledge of any Credit Party, threatened which would reasonably be expected to result in a revocation, suspension, termination, probation, restriction, limitation, or non-renewal of any Governmental Third Party Payor or Private Third Party Payor (as defined below) provider or supplier number or Permit or result in any Credit Party's exclusion from any Governmental Third Party Payor Program or Private Third Party Payor Program.  For purposes of this Agreement, a "<u>Private Third Party Payor</u>" means private insurers and any other person or entity which presently or in the future maintains Private Third Party Payor Programs.  In addition, for purposes of this Agreement, "<u>Private Third Party Payor Programs</u>" means all third party payor programs in which any Credit Party participates or is enrolled which is not operated by or financed, in whole or in part, by any foreign or domestic Governmental Authority.

(e)     Each Credit Party has received and maintains accreditation in good standing and without limitation or impairment by all applicable accrediting organizations, to the extent required by law (including any foreign law or equivalent regulation), except where the failure to have or maintain such accreditation in good standing or imposition of limitation or impairment would not have a Material Adverse Effect.

(f)     There are no facts, circumstances or conditions that would reasonably be expected to form the basis for any investigation, suit, claim, audit, action (legal or regulatory) or proceeding (legal or regulatory) by a Governmental Authority against or affecting any Credit Party relating to any of the Health Care Laws except to the extent such investigation, suit, claim, audit, action or proceeding would not reasonably be expected to have, individually or in the aggregate, a

Material Adverse Effect.  No Credit Party (1) is a party to a corporate integrity agreement or deferred prosecution agreement, or (2) has any reporting obligations pursuant to a settlement agreement, plan of correction, or other remedial measure entered into with any Governmental Authority.

(g)     Except for such noncompliance as would not reasonably be expected to result in any material liability to a Credit Party, no Credit Party is a party to any contract, lease agreement or other arrangement (including any joint venture or consulting agreement) with any physician, health care facility, hospital, nursing facility, home health agency or other person who is in a position to make or influence referrals to or otherwise generate business for or to provide items or services to or lease space or equipment from, or engage in any other venture or activity, other than agreements which are in compliance with all applicable Health Care Laws.  No Credit Party, directly or indirectly, has:  (1) offered or paid any remuneration, in cash or in kind, to, or made any financial arrangements with, any past, present or potential patient, supplier, medical staff member, contractor, Private Third Party Payor or Governmental Third Party Payor of any Credit Party in order to illegally obtain business or payments from such person in violation of any Health Care Law; (2) given or agreed to give, or is aware that there has been made or that there is any illegal agreement to make, any illegal gift or gratuitous payment of any kind, nature or description (whether in money, property or services) to any past, present or potential customer, patient, supplier, contractor, Private Third Party Payor, Governmental Third Party Payor or any other person in violation of any Health Care Law; (3) made or agreed to make, or is aware that there has been made or that there is any agreement to make, any contribution, payment or gift of funds or property to, or for the private use of, any governmental official, employee or agent where either the contribution, payment or gift or the purpose of such contribution, payment or gift is or was illegal under the laws of any Governmental Authority having jurisdiction over such payment, contribution or gift; (4) established or maintained any unrecorded fund or asset for any purpose or made any misleading, false or artificial entries on any of its books or records for any reason; or (5) made, or agreed to make, or is aware that there has been made or that there is any agreement to make, any payment to any person with the intention or understanding that any part of such payment would be in violation of any Health Care Law or used or was given for any purpose other than that described in the documents supporting such payment.  For purposes of this Agreement, a "Governmental Third Party Payor" means Medicare, Medicaid, TRICARE, state government insurers and any other Person or entity which presently or in the future maintains Governmental Third Party Payor Programs.  In addition, for purposes of this Agreement, "Governmental Third Party Payor Programs" means all "Federal Health Care Programs" (as that term is defined in 42 U.S.C. § 1320a-7b) and all other federal, state or other third party payor programs operated by or financed, in whole or in part, by any foreign or domestic Governmental Authority. in which any Credit Party, or a customer of a Credit Party, participates or is enrolled (including, without limitation, Medicare, Medicaid, TRICARE or any other federal or state health care programs).

(h)     None of the Credit Parties is, has been, or has been threatened to be, (i) excluded from any Governmental Third Party Payor Program pursuant to 42 U.S.C. § 1320a-7 and related regulations, (ii) "suspended" or "debarred" from selling products to the U.S. government or its agencies pursuant to the Federal Acquisition Regulation, relating to debarment and suspension applicable to federal government agencies generally (48 C.F.R. Subpart 9.4), or other applicable laws or regulations, or (iii) made a party to any other action by any Governmental Authority that may prohibit it from selling products to any governmental or other purchaser

27

pursuant to any federal, state or local laws or regulations, except where the same could not reasonably be expected to have a Material Adverse Effect.

(i)     To the extent applicable to any Credit Party and for so long as (1) any Credit Party is a "covered entity" as defined in 45 C.F.R. § 160.103, (2) any Credit Party is a "business associate" as defined in 45 C.F.R. § 160.103, (3) any Credit Party is subject to or covered by the HIPAA Administrative Requirements codified at 45 C.F.R. Parts 160 & 162 and/or the HIPAA Security and Privacy Requirements codified at 45 C.F.R. Parts 160 & 164, and/or (4) any Credit Party sponsors any "group health plans" as defined in 45 C.F.R. § 160.103, such Credit Party is in compliance with the applicable privacy, security, transaction standards, breach notification, and other provisions and requirements of HIPAA and any comparable state laws, except for such non-compliance as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(j)     As of the Closing Date, none of the Credit Parties (i) have been (or to their knowledge will be) a party to or are currently a party to any consent decree or settlement with the FDA or any comparable state Governmental Authority related to such Credit Parties' products, (ii) have been (or to their knowledge will be) subject or are currently subject to any material product recall required by the FDA or any comparable state Governmental Authority or (iii) have received (or to their knowledge will be receiving) any notice from the FDA regarding product safety that could reasonably be expected to have a Material Adverse Effect.

(k)     No Credit Party or Subsidiary of any Credit Party, or owner, officer, manager or Person with a "direct or indirect ownership interest" (as that phrase is defined in 42 C.F.R. § 420.201) in any Credit Party or any Subsidiary of any Credit Party has been (or, to the best knowledge of any Credit Party, has been threatened to be): (i) excluded from participation in a Governmental Third Party Payor Program pursuant to 42 U.S.C. § 1320a-7 and related regulations or (ii) "suspended" or "debarred" from selling products to the U.S. government or its agencies pursuant to the Federal Acquisition Regulation relating to debarment and suspension applicable to federal government agencies generally (48 C.F.R. Subpart 9.4), or other applicable laws or regulations.

(l)     Each Credit Party has established a compliance plan, the purpose of which is to reasonably assure that such Credit Party and any of its Subsidiaries is in compliance in all material respects with all Health Care Laws applicable to them, their assets, business or operations, respectively.

(m)     No Credit Party or Subsidiary nor any Collateral is subject to any liability in respect of amounts received by any Credit Party or Subsidiary for the purchase or improvement of any Collateral or any part thereof under restricted or conditioned grants or donations, including monies received under the Public Health Service Act, 42 U.S.C. Section 291 et seq.

(n)     No Credit Party and no Managed Practice is the subject of a pending investigation or audit by the DOJ, the OIG, a state attorney general, Medicaid fraud unit or Medicaid agency that would reasonably be expected to identify any violation of any Health Care Law by any Credit Party or Managed Practice.

(o)     All Credit Party Personnel and all Managed Practice Personnel who provide services to patients that require a license hold valid and unrestricted licenses to practice their profession, and if applicable or if required by the state in which such Credit Party Personnel or Managed Practice Personnel provides services, a valid and unrestricted DEA registration and/or a valid and unrestricted state equivalent of DEA registration

## ARTICLE IV - AFFIRMATIVE COVENANTS

Each Credit Party covenants and agrees that, so long as any Lender shall have any Commitment hereunder, or any Loan or other Obligation (other than contingent indemnification Obligations to the extent no claim giving rise thereto has been asserted) shall remain unpaid or unsatisfied:

4.1     _Financial Statements_.  Each Credit Party shall maintain, and shall cause each of its Subsidiaries to maintain, a system of accounting established and administered in accordance with sound business practices to permit the preparation of financial statements in conformity with GAAP (provided that monthly financial statements shall not be required to have footnote disclosures and are subject to normal year-end adjustments).  The Borrowers shall deliver to the Agent and each Lender in electronic form and in detail reasonably satisfactory to the Agent and the Required Lenders:

(a)     not later than one hundred twenty (120) days after the end of each fiscal year, a copy of the audited consolidated balance sheets of Holdings and each of its Subsidiaries as at the end of such year and the related consolidated statements of income or operations, shareholders' equity and cash flows for such fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year, and accompanied by the unqualified opinion (except that such opinion may be qualified solely due to the scheduled termination of Revolving Commitments under this Agreement, or the final scheduled installment of the Term Loans or the maturity of the Term Loans) of an Acceptable Auditing Firm or other nationally recognized independent public accounting firm reasonably acceptable to the Agent (at the direction of the Required Lenders) which report shall state that such consolidated financial statements present fairly in all material respects the financial position for the periods indicated in conformity with GAAP applied on a basis consistent with prior years; and

(b)     not later than forty-five (45) days after the end of each fiscal quarter of each year, a copy of the unaudited consolidated balance sheets of Holdings and each of its Subsidiaries, and the related consolidated statements of income and cash flows as of the end of such fiscal quarter and for the portion of the fiscal year then ended, in each case in such detail (including, without limitation, details of all non-recurring charges or costs to achieve the synergies underwritten by the Lenders) and otherwise in form and detail reasonably satisfactory to the Agent (at the direction of the Required Lenders), all certified on behalf of the Borrowers by an appropriate Responsible Officer of the Borrower Representative as being complete and correct and fairly presenting, in all material respects, in accordance with GAAP, the financial position and the results of operations of Borrowers and their Subsidiaries, subject to normal year-end adjustments and absence of footnote disclosures.

4.2    <u>Certificates; Other Information</u>.  The Borrowers shall furnish in electronic form, to the Agent and each Lender (provided if there are more than two unaffiliated Lenders, then Borrowers shall deliver to the Agent, who shall promptly deliver to the Lenders) in detail reasonably satisfactory to Agent at the direction of the Required Lenders:

(a)    together with each delivery of financial statements pursuant to <u>subsections 4.1(a)</u> and <u>4.1(b)</u>, (i) a management report, in reasonable detail, signed by the chief financial officer of the Borrower Representative, describing the operations and financial condition of the Credit Parties and their Subsidiaries for the fiscal quarter and the portion of the fiscal year then ended (or for the fiscal year then ended in the case of annual financial statements), and (ii) a report setting forth in comparative form the corresponding figures for the corresponding periods of the previous fiscal year and the corresponding figures from the most recent projections for the current fiscal year delivered pursuant to <u>subsection 4.2(f)</u> and discussing the reasons for any significant variations;

(b)    concurrently with the delivery of the financial statements referred to in <u>subsections 4.1(a)</u> and <u>4.1(b)</u> above, commencing with the fiscal quarter ending December 31, 2020, a fully and properly completed compliance certificate in the form of <u>Exhibit 4.2(b)</u> (a "<u>Compliance Certificate</u>"), including a calculation of Consolidated Excess Cash Flow, certified on behalf of the Borrowers by a Responsible Officer of the Borrower Representative;

(c)    promptly after the same are filed, copies of all financial statements and regular, periodic or special reports which such Person may make to, or file with, the Securities and Exchange Commission or any successor or similar Governmental Authority;

(d)    no later than the third (3rd) Business Day of each calendar week, commencing with the week immediately following the Closing Date, a comparison of the Credit Parties' actual receipts and disbursements for the immediately preceding one-week period to the projected receipts and disbursements for such period as set forth in the Budget for such period in form and substance, and with such detail, as is reasonably acceptable to Agent (at the direction of the Required Lenders), certified by the chief executive officer or chief financial officer of the Borrower Representative;

(e)    no later than five (5) Business Days after the end of each fiscal month, a roll-forward of the Budget, which shall (i) show receipts and disbursements of the Credit Parties projected through such period and (ii) otherwise be in form and substance, and with such detail, as is reasonably acceptable to Agent (at the direction of the Required Lenders).  The Borrowers represent, warrant and covenant that each Budget shall be, and when delivered has been, prepared in good faith based upon assumptions believed by the Borrowers to be reasonable in light of current market conditions, it being acknowledged and agreed by the Lenders that projections as to future events are inherently uncertain and are not a guarantee of financial performance and that actual results may differ from projected results;

(f)    no later than the fifth (5th) Business Day of each fiscal month, a comparison of the Credit Parties' actual operating results for the immediately preceding one month period to the projected results in the Projections in form and substance and with such detail as is reasonably

acceptable to the Agent (at the direction of the Required Lenders), certified by the chief executive officer or chief financial officer of Borrower Representative;

(g)  no later than ten (10) Business Days after the end of each fiscal quarter, a roll-forward of the Projections in form and substance, and with such detail, as is reasonably acceptable to the Agent (at the direction of the Required Lenders), certified by the chief executive officer or chief financial officer of Borrower Representative;

(h)  upon the request of the Agent, at any time if an Event of Default shall have occurred and be continuing, the Borrowers will, at the Borrowers' expense, obtain and deliver to the Agent a report of an independent collateral auditor satisfactory to the Agent (at the direction of the Required Lenders) with respect to the Accounts and Inventory of the Credit Parties;

(i)  as soon as available and in any event no later than forty-five (45) days following the last day of each fiscal year of the Borrowers, commencing with the fiscal year ending December 31, 2020, an annual business plan and budget of Holdings and its Subsidiaries containing pro forma statements of income or operations for each month of the forthcoming fiscal year and supporting detail as reasonably requested by the Agent;

(j)  promptly upon receipt thereof, copies of any reports submitted by the certified public accountants in connection with each annual, interim or special audit or review of any type of the financial statements or internal control systems of any Credit Party made by such accountants, including any comment letters submitted by such accountants to management of any Credit Party in connection with their services;

(k)  promptly following receipt, copies of any notices (including notices of default) received in connection with any Material Contract and copies of any default or acceleration notices received with respect to any Indebtedness with a principal amount in excess of $100,000; and

(l)  promptly, such additional business, financial, corporate affairs, perfection certificates and other information as the Agent may from time to time reasonably request on behalf of the Lenders.

4.3  <u>Notices</u>.  The Borrowers shall notify promptly the Agent and each Lender (provided if there are more than two unaffiliated Lenders, then Borrowers shall notify the Agent, who shall promptly notify the Lenders) (and upon receiving such notice, Agent agrees to promptly notify each Lender) of each of the following (and in no event later than three (3) Business Days after a Responsible Officer becoming aware thereof):

(a)  the occurrence or existence of any Default or Event of Default hereunder;

(b)  any breach or non-performance of, or any default under, any Contractual Obligation of any Credit Party or any Subsidiary of any Credit Party, or any violation of, or non-compliance with, any Requirement of Law, which would reasonably be expected to result, either individually or in the aggregate, in a Material Adverse Effect, including a description of such breach, non-performance, default, violation or non-compliance and the steps, if any, such Person has taken, is taking or proposes to take in respect thereof;

31

(c)     any dispute, litigation, investigation, proceeding or suspension which may exist at any time between any Credit Party or any Subsidiary of any Credit Party and any Governmental Authority which would reasonably be expected to result, either individually or in the aggregate, in a Material Adverse Effect;

(d)     the commencement of, or any material development in, any litigation or proceeding affecting any Credit Party or any Subsidiary of any Credit Party (i) in which the amount of damages claimed is $50,000 or more (or its equivalent in another currency or currencies) net of insurance, (ii) in which injunctive or similar relief is sought and which, if adversely determined, would reasonably be expected to have a Material Adverse Effect, or (iii) in which the relief sought is an injunction or other stay of the performance of this Agreement, or any Loan Document;

(e)     (i) the receipt by any Credit Party of any notice of violation of or potential liability or similar notice under Environmental Law which would reasonably be expected to result in Material Environmental Liabilities, (ii)(A) unpermitted Releases, (B) the existence of any condition that could reasonably be expected to result in violations of or liabilities under, any Environmental Law or (C) the commencement of, or any material change to, any action, investigation, suit, proceeding, audit, claim, demand, dispute alleging a violation of or liability under any Environmental Law, that, for each of clauses (A), (B) and (C) above (and, in the case of clause (C), if adversely determined), in the aggregate for each such clause, could reasonably be expected to result in Environmental Liabilities in excess of $50,000, (iii) the receipt by any Credit Party of notification that any material property of any Credit Party is subject to any Lien in favor of any Governmental Authority securing, in whole or in part, Environmental Liabilities and any proposed acquisition or lease of real property, if such acquisition or lease would have a reasonable likelihood of resulting in aggregate Environmental Liabilities in excess of $50,000;

(f)     (i) on or prior to any filing by any Credit Party of any notice of intent to terminate any Title IV Plan, a copy of such notice, (ii) promptly, and in any event within ten (10) days after, any officer of any Credit Party knows or has reason to know that an ERISA Affiliate has filed a notice of intent to terminate any Title IV Plan, a copy of such notice, and (iii) promptly, and in any event within 10 days, after any officer of any ERISA Affiliate knows that a request for a minimum funding waiver under Section 412 of the Code has been filed with respect to any Title IV Plan, a written notice describing such waiver request and any action that any ERISA Affiliate proposes to take with respect thereto, together with a copy of any notice filed with the PBGC or the IRS pertaining thereto;

(g)     any Material Adverse Effect subsequent to the date of the most recent audited financial statements delivered to the Agent and Lenders pursuant to this Agreement;

(h)     any material change in accounting policies or financial reporting practices by any Credit Party or any Subsidiary of any Credit Party;

(i)     any labor controversy resulting in or threatening to result in any strike, work stoppage, boycott, shutdown or other labor disruption against or involving any Credit Party or any Subsidiary of any Credit Party if the same would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect;

(j)       the creation, establishment or acquisition of any Subsidiary or the issuance by or to any Credit Party of any Stock or Stock Equivalent;

(k)       (i) the creation, or filing with the IRS or any other Governmental Authority by a Tax Affiliate of any Contractual Obligation or other document extending, or having the effect of extending, the period for assessment or collection of any taxes of any Tax Affiliate (other than an extension to file a Tax Return made in the Ordinary Course of Business) and (ii) the creation by a Tax Affiliate of any Contractual Obligation of any Tax Affiliate, or the receipt of any request directed to any Tax Affiliate, to make any adjustment under Section 481(a) of the Code, by reason of a change in accounting method or otherwise, in the case of each of clauses (i) and (ii) above, which would have a Material Adverse Effect;

(l)       the resignation or termination of the chief executive officer or chief financial officer of any Borrower;

(m)       any material amendment, waiver or modification to, or material consent granted under any Material Contract or any Indebtedness in excess of $100,000;

(n)       any cancellation or material change in any insurance maintained by any Credit Party;

(o)       any violation of, or non-compliance with, any material requirement of applicable law, including any Health Care Laws, by any Credit Party or Subsidiary;

(p)       any changes to the strategy of any Credit Party; or

(q)       any non-compliance with any Permit or Health Care Permit or other authorization of any Credit Party or Subsidiary required to conduct its business as currently conducted, or any termination, restriction or threatened termination or restriction thereof or receipt of any notices received in connection with any Health Care Permit or other Permit.

Each notice pursuant to this Section shall be in electronic form accompanied by a statement by a Responsible Officer of the Borrower Representative, on behalf of the Borrowers, setting forth details of the occurrence referred to therein, and stating what action the Borrowers or other Person proposes to take with respect thereto and at what time.  Each notice under subsection 4.3(a) shall describe with particularity any and all clauses or provisions of this Agreement or other Loan Document that have been breached or violated.

4.4       Preservation of Corporate Existence, Etc.  Each Credit Party shall, and shall cause each of its Subsidiaries to:

(a)       preserve and maintain in full force and effect its organizational existence and good standing under the laws of its jurisdiction of incorporation, organization or formation, as applicable, except as permitted by Section 5.3;

(b)       preserve and maintain in full force and effect all rights, privileges, qualifications, permits, licenses and franchises necessary in the normal conduct of its business except in connection with transactions permitted by Section 5.3 and sales of assets permitted by

33

<u>Section 5.2</u> and except as would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect; and

(c)    preserve or renew all of its registered trademarks, trade names and service marks, the non-preservation of which would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

4.5    <u>Maintenance of Property</u>.  Each Credit Party shall maintain, and shall cause each of its Subsidiaries to maintain, and preserve all its Property which is used or useful in its business in good working order and condition, ordinary wear and tear excepted and shall make all necessary repairs thereto and renewals and replacements thereof.

4.6    <u>Insurance</u>.

(a)    Each Credit Party shall, and shall cause each of its Subsidiaries to, (i) maintain or cause to be maintained in full force and effect all policies of insurance of any kind with respect to the property and businesses of the Credit Parties and such Subsidiaries (including policies of life, fire, theft, product liability, public liability, Flood Insurance, property damage, other casualty, employee fidelity, workers' compensation, business interruption and employee health and welfare insurance) with financially sound and reputable insurance companies or associations (in each case that are not Affiliates of Borrowers) of a nature and providing such coverage as is sufficient and as is customarily carried by businesses of the size and character of the business of the Credit Parties and (ii) cause all such insurance relating to any property or business of any Credit Party to name Agent as additional insured or loss payee, as appropriate.  All policies of insurance on real and personal property of the Credit Parties will contain an endorsement, in form and substance acceptable to Agent (at the direction of the Required Lenders), showing loss payable to Agent and extra expense and business interruption endorsements.  Such endorsement, or an independent instrument furnished to Agent, will provide that the insurance companies will give Agent at least thirty (30) days' prior written notice before any such policy or policies of insurance shall be altered or canceled and that no act or default of Borrowers or any other Person shall affect the right of Agent to recover under such policy or policies of insurance in case of loss or damage.  Each Credit Party shall direct all present and future insurers under its "All Risk" policies of property insurance to pay all proceeds payable thereunder directly to Agent.  If any insurance proceeds are paid by check, draft or other instrument payable to any Credit Party and Agent jointly, Agent may endorse such Credit Party's name thereon and do such other things as Agent may deem advisable to reduce the same to cash.  Agent reserves the right at any time, upon review of each Credit Party's risk profile, to reasonably require additional forms and limits of insurance.  Notwithstanding the requirement in subsection (i) above, Federal Flood Insurance shall not be required for (x) real property owned, leased, subleased or otherwise operated or occupied by any Credit Party or any Subsidiary of any Credit Party not located in a Special Flood Hazard Area, or (y) such real property located in a Special Flood Hazard Area in a community that does not participate in the National Flood Insurance Program (but Flood Insurance may be required if applicable).  Notwithstanding anything herein to the contrary, if any improved real property is at any time subject to a Mortgage, Borrower will maintain Flood Insurance and/or Federal Flood Insurance with respect to such property in compliance with all requirements of applicable laws and regulations.

34

(b)     Unless the Borrowers provide the Agent with evidence of the insurance coverage required by this Agreement, the Agent may, upon five (5) Business Days written notice to Borrower Representative, purchase such insurance at the Credit Parties' expense to protect the Agent's and Lenders' interests in the Credit Parties' and their Subsidiaries' properties.  This insurance may, but need not, protect the Credit Parties' and their Subsidiaries' interests.  The coverage that the Agent purchases may not pay any claim that any Credit Party or any Subsidiary of any Credit Party makes or any claim that is made against such Credit Party or any Subsidiary in connection with said Property.  The Borrowers may later cancel any insurance purchased by the Agent, but only after providing the Agent with evidence that there has been obtained insurance as required by this Agreement.  If the Agent purchases insurance, the Credit Parties will be responsible for the costs of that insurance, including interest and any other charges the Agent may impose in connection with the placement of insurance, until the effective date of the cancellation or expiration of the insurance.  The costs of the insurance shall be added to the Obligations.  The costs of the insurance may be more than the cost of insurance the Borrowers may be able to obtain on their own.

4.7     <u>Payment of Obligations</u>.  Such Credit Party shall, and shall cause each of its Subsidiaries to, pay, discharge and perform as the same shall become due and payable or required to be performed, all their respective obligations and liabilities set forth below:

(a)     all federal, state and local tax liabilities, assessments and governmental charges or levies upon it or its properties or assets unless the same are being contested in good faith by appropriate proceedings diligently prosecuted for which adequate reserves in accordance with GAAP are being maintained by such Person;

(b)     the performance of all obligations under any material Contractual Obligation to which such Credit Party or any of its Subsidiaries is bound (other than obligations with respect to Indebtedness), or to which it or any of its properties is subject; and

(c)     payments to the extent necessary to avoid the imposition of a Lien with respect to, or the involuntary termination of any underfunded Benefit Plan.

4.8     <u>Compliance with Laws</u>.

(a)     Each Credit Party shall, and shall cause each of its Subsidiaries to, comply with all Requirements of Law of any Governmental Authority having jurisdiction over it or its business, except where the failure to comply would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

(b)     Without limiting the generality of the foregoing, each Credit Party shall, and shall cause each of its Subsidiaries to, comply with, and maintain its real property, whether owned, leased, subleased or otherwise operated or occupied, in compliance with, all applicable Environmental Laws (including by implementing any Remedial Action necessary to achieve such compliance or that is required by orders and directives of any Governmental Authority) except for failures to comply that would not, reasonably be expected to have, in the aggregate, a Material Adverse Effect.  Without limiting the foregoing, if an Event of Default is continuing or if Agent, at the direction of Required Lenders, at any time has a reasonable basis to believe that there exist

violations of Environmental Laws by any Credit Party or any Subsidiary of any Credit Party or that there exist any Environmental Liabilities, in each case, that would reasonably be expected to have, in the aggregate, a Material Adverse Effect, then each Credit Party shall, promptly upon receipt of request from Agent, cause the performance of, and allow Agent and its Related Persons access to such real property for the purpose of conducting, such environmental audits and assessments, including subsurface sampling of soil and groundwater, and cause the preparation of such reports, in each case as Agent may from time to time reasonably request. Such audits, assessments and reports, to the extent not conducted by Agent or any of its Related Persons, shall be conducted and prepared by reputable environmental consulting firms reasonably acceptable to Agent and shall be in form and substance reasonably acceptable to Agent, in each case, at the direction of the Required Lenders.

4.9     <u>Inspection of Property and Books and Records</u>.  Each Credit Party shall maintain and shall cause each of its Subsidiaries to maintain its books and records in accordance with sound business practices sufficient to allow the preparation of financial statements in accordance with GAAP; permit, and cause each other Credit Party and each Subsidiary of each Credit Party to permit, at any reasonable time on a Business Day and with reasonable notice, the Agent, any Lender or any representative, agent, or advisor thereof to inspect the properties and operations of the Credit Parties and their Subsidiaries; and permit, and cause each other Credit Party and each Subsidiary of each Credit Party to permit, at any reasonable time on a Business Day and with reasonable notice, the Agent, any Lender or any representative, agent, or advisor thereof to visit any or all of its offices, to discuss its financial matters with its officers and its independent auditors (and Borrowers and each of their Subsidiaries hereby authorizes all such independent auditors to discuss those financial matters with the Agent, the Lenders or any representative, agent, or advisor thereof), and to examine (and photocopy extracts from) any of its books or other records; and permit, and cause each other Credit Party and each Subsidiary of each Credit Party to permit, at any reasonable time on a Business Day and with reasonable notice, the Agent, the Lenders and their representatives, agents, and advisors and any Lender that may accompany the Agent) to inspect the inventory and other tangible assets of the Credit Parties and their Subsidiaries, to perform appraisals of the equipment of the Credit Parties and their Subsidiaries, and to inspect, audit, conduct physical counts and perform valuations thereof, and to audit, check and make copies of and extracts from the books, records, computer data, computer programs, journals, orders, receipts, correspondence and other data relating to inventory, accounts, and any other Collateral.  All such visits, inspections, appraisals or audits by the Agent and its representatives, agents, and advisors will be at Borrower's expense. Any Lender may accompany Agent in connection with any inspection at such Lender's expense.

4.10    <u>Use of Proceeds</u>.  The proceeds of the Tranche A Term Loans shall be used to fund the DIP Claims as necessary for the consummation of the transactions contemplated by the Plan of Reorganization.  The proceeds of the Tranche B Term Loans shall be used (i) to fund the balance of the Secured Claim under the Prepetition Loan Documents (as defined in the Plan of Reorganization) as necessary for the consummation of the transactions contemplated by the Plan of Reorganization and (ii) for working capital and other general corporate purposes.  The proceeds of the Revolving Loans shall be used for working capital and other general corporate purposes in accordance with the Budget.

4.11    <u>Cash Management Systems</u>.

36

(a)     Subject to <u>Section 4.17</u>, each Credit Party shall, and shall cause each Subsidiary of each Credit Party to, enter into, and cause each depository, securities intermediary or commodities intermediary to enter into, Control Agreements with respect to each deposit, securities, commodity or similar account maintained by such Person (other than Excluded Accounts and any Segregated Governmental Account) as of or after the Closing Date.

(b)     In addition, in order to segregate and to facilitate perfection of the Agent's security interest in funds received from Governmental Third Party Payors making payments under Medicare or Medicaid, if any, the Credit Parties agree that the Credit Parties shall, subject to <u>Section 4.17</u>, (a) segregate collections made from Governmental Third Party Payors making payments under Medicare or Medicaid, from collections made from all other Account Debtors and customers of the applicable Credit Parties, including, without limitation, by (i) notifying all payors (other than Governmental Third Party Payors making payments under Medicare or Medicaid) then instructed to make payments to such Credit Parties' deposit accounts to make payments to a deposit account subject to a Control Agreement, and (ii) notifying all Governmental Third Party Payors making payments under Medicare or Medicaid to make payments to a Segregated Governmental Account, and (b) enter into, and cause each applicable depository to enter into, a "sweep" agreement (a "<u>Sweep Agreement</u>") with respect to each Segregated Governmental Account pursuant to which such depository will agree to sweep amounts deposited therein on daily basis to a deposit account of the Credit Parties subject to a Control Agreement in favor of the Agent as and when funds clear and become available in accordance with such depository's customary procedures, each with such financial institution and each in form and substance reasonably acceptable to the Agent. No Credit Party may change any sweep instruction set forth in such Sweep Agreement without the prior written consent of the Agent. To the extent any Person, whether a Governmental Third Party Payor or otherwise, remits payments to an incorrect deposit account or otherwise makes payments not in accordance with the provisions of this <u>Section 4.11</u> or an applicable Credit Party's payment direction, such Credit Party shall contact such Person and use its commercially reasonable efforts to redirect payment from such Person in accordance with the terms hereof.  The Agent agrees and confirms that Credit Parties will have sole dominion and "control" (within the meaning of Section 9-104 of the UCC and the common law) over each Segregated Governmental Account and all funds therein and the Agent disclaims any right of any nature whatsoever to control or otherwise direct or make any claim against the funds held in any Segregated Governmental Account from time to time.

4.12     <u>Landlord Agreements</u>.  Each Credit Party shall, and shall cause each of its Subsidiaries to, use commercially reasonable efforts (for a period of sixty (60) days following (a) the Closing Date, to the extent applicable on the Closing Date, or (b) the date such Person enters into a lease or agreement with respect to such leased property or bailee location (or acquires such leased location)) to obtain a landlord agreement or bailee or mortgagee waivers, as applicable, from the lessor of each material leased property, bailee in possession of any Collateral or mortgagee of any owned property with respect to each location where any Collateral is stored or located, which agreement shall be reasonably satisfactory in form and substance to Agent (at the direction of the Required Lenders).

4.13     <u>Further Assurances</u>.

(a)     Each Credit Party shall ensure that all written information, exhibits and reports furnished to the Agent or the Lenders with respect to the Credit Parties and their Subsidiaries (other than projections, budgets, financial estimates, forecasts and other forward-looking information and general economic or specific industry information), when taken as a whole, do not and will not contain any untrue statement of a material fact and do not and will not omit to state any material fact or any fact necessary to make the statements contained therein not misleading in light of the circumstances in which made, and will promptly disclose to the Agent and the Lenders and correct any defect or error that may be discovered therein or in any Loan Document or in the execution, acknowledgement or recordation thereof.

(b)     Promptly upon request by the Agent (at the direction of Required Lenders), the Credit Parties shall (and, subject to the limitations hereinafter set forth, shall cause each of their Subsidiaries to) take such additional actions as the Agent may reasonably require (at the direction of Required Lenders) from time to time in order (i) to subject to the Liens created by any of the Collateral Documents any of the Properties, rights or interests covered by any of the Collateral Documents, (ii) to perfect and maintain the validity, effectiveness and priority of any of the Collateral Documents and the Liens intended to be created thereby, and (iii) to better assure, convey, grant, assign, transfer, preserve, protect and confirm to the Secured Parties the rights granted or now or hereafter intended to be granted to the Secured Parties under any Loan Document or under any other document executed in connection therewith.  Without limiting the generality of the foregoing and except as otherwise approved in writing by Required Lenders, the Credit Parties shall cause each of their Subsidiaries to guaranty the Obligations and to cause each such Subsidiary to grant to the Agent, for the benefit of the Secured Parties, a security interest in, subject to the limitations hereinafter set forth, all of such Subsidiary's Property to secure such guaranty. Furthermore and except as otherwise approved in writing by Required Lenders, each Credit Party shall, and shall cause each of its Subsidiaries to, pledge all of the Stock and Stock Equivalents of each of its Subsidiaries, in each instance, to the Agent, for the benefit of the Secured Parties, to secure the Obligations.  In connection with each pledge of Stock and Stock Equivalents, the Credit Parties shall deliver, or cause to be delivered, to the Agent, irrevocable proxies and stock powers and/or assignments, as applicable, duly executed in blank.  In the event any Credit Party or any Subsidiary of any Credit Party acquires fee title in any real Property located inside the United States with a fair market value in excess of $100,000 for any one location or, if as a result of such acquisition, the Credit Parties own, in the aggregate, real Property located inside the United States with a fair market value in the aggregate in excess of $100,000 which is not encumbered by a Mortgage, or enters into and assumes any material lease, such Person shall execute and/or deliver, or cause to be executed and/or delivered, to the Agent unless the same is otherwise waived by the Agent, (v) within five (5) days (or such longer period, not to exceed an additional five (5) days, as the Agent may agree) of such acquisition, a fully executed Mortgage with respect to such real Property, in form and substance reasonably satisfactory to the Agent (at the direction of the Required Lenders), (w) within thirty (30) days (or such longer period, not to exceed an additional thirty (30) days, as the Agent, at the direction of the Required Lenders, may agree) of such acquisition, an A.L.T.A. lender's title insurance policy issued by a title insurer reasonably satisfactory to the Agent (at the direction of the Required Lenders), in form and substance and in an amount reasonably satisfactory to the Agent (at the direction of the Required Lenders) insuring that the Mortgage is a valid and enforceable first priority Lien on the respective property, free and clear of all defects, encumbrances and Liens (other than Permitted Liens), (x) if reasonably requested by Agent (at the direction of Required Lenders), then current A.L.T.A. surveys, certified

38

to the Agent by a licensed surveyor sufficient to allow the issuer of the lender's title insurance policy to issue such policy without a survey exception, (y) if reasonably requested by Agent an environmental site assessment prepared by a qualified firm reasonably acceptable to the Agent, in form and substance satisfactory to the Agent, in each case, at the direction of the Required Lenders and (z) prior to execution of any Mortgage, life of loan flood zone determinations and, as applicable, notices to such Person of flood zone and availability of Flood Insurance and Flood Insurance.  Notwithstanding anything contained in this Agreement to the contrary, no Mortgage shall be executed and delivered with respect to any real property unless and until each Lender has received a life of loan flood zone determination and such other documents as it may reasonably request to complete its flood insurance due diligence (at least twenty days in advance of execution and delivery of any such Mortgage) and has confirmed to the Agent that flood insurance due diligence and flood insurance compliance has been completed to its satisfaction.

4.14    Compliance with Material Contracts.  Each Credit Party shall and shall cause its Subsidiaries to perform and observe all the terms and provisions of each Material Contract to be performed or observed by it, maintain each such Material Contract in full force and effect, enforce each such Material Contract in accordance with its terms, take all such action to such end as may be from time to time reasonably requested by the Agent and, upon request of the Agent, make to each other party to each such Material Contract such demands and requests for information and reports or for action as any Credit Party or any of its Subsidiaries is entitled to make under such Material Contract, and cause each of its Subsidiaries to do so.

4.15    Health Care Matters.

(a)    Each Credit Party and any Subsidiary thereof shall: (i) comply in all material respects with all Health Care Laws applicable to them, their assets, business or operations, respectively; and (ii) comply, maintain and renew all required Health Care Permits. All Health Care Permits of the Credit Parties and their Subsidiaries are in full force and effect and there exists no material default under, or material violation of, any such Health Care Permit. To the knowledge of the Credit Parties, no circumstance or event exists which would reasonably be anticipated to result in the suspension, revocation, termination, material restriction, limitation, modification or non-renewal of any material Health Care Permit.

(b)    Each Credit Party and any Subsidiary thereof shall: (i) timely file, or caused to be filed, all required Health Care Filings in accordance with Health Care Laws; (ii) pay in a timely fashion all undisputed amounts, taxes, fees and assessments due and payable in connection with the required Health Care Filings; and (iii) keep and maintain all records required to be maintained under applicable Health Care Laws for the period of time in which they are required to be maintained; in each case, except where failure to do so could not reasonably be expected to result individually or in the aggregate in a Material Adverse Effect.

(c)    To the extent that and for so long as any Credit Party is deemed to be a "covered entity" or "business associate" within the meaning of HIPAA, such Credit Party currently has in place, or within a reasonable period of time from the Effective Date hereof, shall have in place, each of the following: (i) necessary surveys, audits, inventories, reviews, analyses and/or assessments (including any necessary risk assessments) of such areas of such Credit Party's business and operations as required by HIPAA; (ii) policies and procedures and training for being

39

HIPAA Compliant (a "HIPAA Compliance Plan"); and (iii) has implemented those provisions of such HIPAA Compliance Plan necessary to ensure that such Loan Party is HIPAA Compliant. For purposes hereof, "HIPAA Compliant" means that a Credit Party is in compliance in all material respects with each of the applicable requirements of HIPAA as of the Effective Date or within a reasonable period of time thereafter, or thereafter, any final rule or regulation under HIPAA becomes effective in accordance with its or their terms, as the case may be (each such date, a "HIPAA Compliance Date"). None of the Credit Parties or their respective Subsidiaries has, to their knowledge, within the past three (3) years, suffered any breach (as defined under HIPAA) of unsecured protected health information (as defined under HIPAA), received any written notice from the Office for Civil Rights for the U.S. Department of Health and Human Services or any other Governmental Authority regarding any allegation regarding its failure to comply with Privacy Laws, nor made any notification of such a breach or failure to the media or the Secretary of the U.S. Department of Health and Human Services pursuant to Privacy Laws; in each case, except where failure to do so could not reasonably be expected to result individually or in the aggregate in a Material Adverse Effect.

(d)       Each Credit Party and its Subsidiaries and, to the knowledge of the Credit Parties, all Licensed Personnel who perform medical services or similar professional services for or on behalf of the Credit Parties and their Subsidiaries have complied in all material respects and currently are in material compliance with applicable Healthcare Laws, and, as of the Effective Date and throughout the term of this Agreement, are and shall be: (i) duly licensed and/or registered, certificated or permitted as required to practice his or her profession (or provide the applicable services to or on behalf of the Credit Parties or their Subsidiaries); and (ii) where required, validly registered (to the extent required) with the DEA and any corresponding state Laws. Each such Permit is in full force and effect and, to the knowledge of the Credit Parties, no Licensed Personnel has received written notification of a pending or threatened suspension, revocation, termination or nonrenewal of any such Permit.

(e)       No individual hired or engaged by any Credit Party or its Subsidiaries has been or is excluded, debarred or otherwise ineligible pursuant to the OIG's List of Excluded Individuals/Entities. None of the Credit Parties has received written notice that (i) any Person providing healthcare services to such Credit Party and its Subsidiaries, or (ii) any employee or individual contractor of any Credit Party and its Subsidiaries, has been charged with or convicted of a criminal offense related to the provision of health care items or services.

(f)       The billing and collection practices of the Credit Parties and their Subsidiaries shall comply in all material respects with applicable Laws and written reimbursement policies of Governmental Third Party Payor Programs, including Medicare, Medicaid, TRICARE and government contracting agencies, Private Third Party Payor Programs, health maintenance organizations, preferred provider organizations and managed care systems.

(g)       No Credit Party or Subsidiary thereof has: (i) knowingly submitted to any Governmental Third Party Payor Program or Private Third Party Payor Program any materially false, fraudulent, abusive or improper claim for payment, or (ii) received and knowingly retained any payment or reimbursement from any Governmental Third Party Payor Program or Private Third Party Payor Program in excess of the proper amount allowed by applicable Law and applicable contracts or agreements with such Governmental Third Party Payor Program or Private

40

Third Party Payor Program.  There are no material claims, actions, proceedings or appeals pending before any Governmental Authority with respect to any Medicare reports or claims filed by the Credit Party or any Subsidiary, or with respect to any material adjustments, denials, recoupments or disallowances by any intermediary, carrier, other insurer, commission, board or agency in connection with any cost reports or claims.  Except for routine reviews, surveys, inspections, audits, investigations or program integrity reviews for which no material violations or non-compliance have been found or reported, that have been conducted by CMS or another applicable Government Authority, no validation review, survey, inspection, audit, investigation or program integrity review related to any Credit Party is currently pending or, to the knowledge of the Credit Party, threatened (in writing) by any Governmental Authority or government contractor in connection with Governmental Third Party Payor Programs; in each case, except where such Governmental Third Party Payor Program review could not reasonably be expected to result individually or in the aggregate in a Material Adverse Effect.

(h)     Each Credit Party shall notify Agent within ten (10) Business Days following the occurrence of any of the following facts, events, notices, or circumstances, whether threatened, existing or pending, together with such supporting data and information as shall be reasonably necessary to fully explain to Agent the scope and nature of the fact, event, notice or circumstance, and shall provide to Agent within two (2) Business Days of Agent's request, such additional information as Agent shall request (at the direction of Required Lenders) regarding such disclosure:

(i)     Notice of any material inquiry, civil or criminal investigation or audit, or pending or threatened proceedings by any federal, state, local governmental or Governmental Third Party Payor or Private Third Party Payor relating to any material violation by any Credit Party of any Health Care Laws;

(ii)     Any Credit Party, an owner, officer, manager or Person with a "direct or indirect ownership interest" (as that phrase is defined in 42 C.F.R. § 420.201) in any Credit Party:  (i) has had a civil monetary penalty assessed against him, her or it pursuant to 42 U.S.C. § 1320a-7a or is the subject of a proceeding seeking to assess such penalty; (ii) has been excluded from participation in a Governmental Third Party Payor or is the subject of a proceeding seeking to assess such penalty; (iii) has been convicted (as that term is defined in 42 C.F.R. § 1001.2) of any of those offenses described in 42 U.S.C. § 1320a-7b or 18 U.S.C. §§ 669, 1035, 1347, 1518 or is the subject of a proceeding seeking to assess such penalty; or (iv) has been involved or named in a U.S. Attorney complaint made or any other action taken pursuant to the False Claims Act under 31 U.S.C. §§ 3729-3731 or qui tam action brought pursuant to 31 U.S.C. §§ 3729 et seq.;

(iii)     any validation review or program integrity review related to any Credit Party by any commission, board or agency in connection with the business of Credit Parties;

(iv)     copies of any written recommendation from any Governmental Authority or other regulatory body that any Credit Party should have any of its Permits, provider or supplier number, or accreditation suspended, revoked, or limited in any way, or any penalties or sanctions imposed;

(v)  notice of any claim to recover any alleged material overpayments to a Credit Party with respect to any Receivables in excess of $50,000;

(vi)  voluntary disclosure by Credit Party to the OIG, CMS, a Medicare fiscal intermediary or any state Medicaid program of a potential overpayment matter involving the submission of claims to such payor in any amount greater than $50,000;

(vii)  notice of termination of eligibility of any Credit Party to participate in any reimbursement program of any private insurance carrier, managed care or similar organization, or other obligor applicable to it;

(viii)  notice of any material reduction in the level of reimbursement expected to be received with respect to Receivables due to any Credit Party;

(ix)  notice of any reimbursement payment contract or process that results or is reasonably expected to result in any claim against a Credit Party (including on account of overpayments, settlement payments, appeals, repayment plan requests);

(x)  the determination of a Borrower, any Credit Loan Party or any Subsidiary of a Credit Party after an initial investigation that a material breach of confidentiality, privacy or security (as defined by applicable Privacy Laws) affecting any Credit Party or Subsidiary occurred; or  the determination of a Borrower, Credit Party or any Subsidiary after an initial investigation that a Breach of Unsecured Protected Health Information (as such capitalized terms are defined in HIPAA) affecting a Borrower, Credit Party or any Subsidiary occurred which affects more than 500 individuals or for which media notification will be required or which is otherwise material;

(xi)  Any allegations by any Governmental Authority (or any agent thereof) or any Governmental Third Party Payor or Private Third Party Payor of fraudulent activities of any Credit Party or any Subsidiary thereof in relation to the provision of healthcare services; and

(xii)  Without duplication, any failure of any Borrower, any Credit Party or any Subsidiary of a Credit Party to comply with the covenants and conditions of this Section 4.15.

4.16  Compliance Program.  Each Credit Party shall regularly (i) review and revise its policies and procedures to ensure continuing compliance by such Credit Party, its officers, directors, employees and all Licensed Personnel employed by or under contract with such Credit Party, with all applicable Health Care Laws, (ii) maintain appropriate programs and procedures for communicating such policies and procedures to all officers, directors, employees and Licensed Personnel of each Credit Party, (iii) ensure that all officers, directors, employees and Licensed Personnel of such Credit Party are able to report violations of any Health Care Laws, and (iv) ensure that such reported violations are adequately addressed and corrected in a reasonable and timely manner.  Additionally, each Credit Party and each of their respective Subsidiaries shall maintain, as applicable, a corporate and health care regulatory compliance program (hereinafter, an "RCP") addressing the applicable requirements of Health Care Laws and including the following components: (i) standards of conduct and procedures that describe compliance policies

regarding laws with an emphasis on prevention of fraud and abuse; (ii) a specific officer within high-level personnel identified as having overall responsibility for compliance with such standards and procedures; (iii) training and education programs which effectively communicate the compliance standards and procedures to employees and agents, including fraud and abuse laws and illegal billing practices; (iv) auditing and monitoring systems and reasonable steps for achieving compliance with such standards and procedures including publicizing a reporting system to allow employees and other agents to anonymously report potential compliance problems; (v) disciplinary guidelines and consistent enforcement of compliance policies; and (vi) mechanisms to promptly respond to detected violations of the RCP.  The Borrowers shall modify such RCPs from time to time, as they or their respective advisors deem necessary and appropriate to ensure continuing material compliance with applicable Health Care Laws.  Upon reasonable advance notice and request, the Agent (and/or its consultants) shall be permitted to conduct a review of such RCPs at its expense during normal operating hours of the business of each Credit Party and each of their respective Subsidiaries.  With respect to Health Care Laws, none of the Credit Parties or their Subsidiaries shall knowingly commit any violation of such laws.

4.17    [Post-Closing Obligations.  Notwithstanding the conditions precedent set forth in Article II above, the Borrowers have informed Agent and the Lenders that certain of such items required to be delivered to Agent or otherwise satisfied as conditions precedent to the effectiveness of this Agreement will not be delivered to Agent as of the Closing Date.  Therefore, with respect to the items set forth on Schedule 4.19 (collectively, the "**Outstanding Items**"), and notwithstanding anything to the contrary contained herein or in any other Loan Document, the Borrowers shall deliver or otherwise satisfy each Outstanding Item to Agent in the form, manner and time set forth thereon for such Outstanding Item or within such other time as Agent may reasonably agree.][2]

4.18    Monthly Lender Calls.  No later than the fifth (5) Business Day after the end of each fiscal month, the Credit Parties shall cause their senior management to make themselves available during normal business hours for a telephonic meeting with Agent and Lenders to provide the Agent and Lenders with summary information regarding the Credit Parties' business results, and the opportunity for the Agent, its advisors, as well as the Lenders to ask any questions regarding same.  Senior management may present such information orally to the Agent and Lenders and shall be accompanied by a written presentation of the information to be presented on such quarterly call by senior management (in a form reasonably acceptable to the Agent, at the direction of the Required Lenders), which written presentation shall be delivered to Agent not less than one (1) Business Days in advance of such call.

## ARTICLE V - NEGATIVE COVENANTS

Each Credit Party covenants and agrees that, so long as any Lender shall have any Commitment hereunder, or any Loan or other Obligation (other than contingent indemnification Obligations to the extent no claim giving rise thereto has been asserted) shall remain unpaid or unsatisfied:

---

[2] To include covenants to (i) transfer assets of Managed Practices to new Wholly Owned Subsidiaries of Borrowers and join such Subsidiaries as Credit Parties within 60 days of Closing Date and (ii) establish accounts in accordance with Section 4.11.

5.1    <u>Limitation on Liens</u>.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, directly or indirectly, make, create, incur, assume or suffer to exist any Lien upon or with respect to any part of its Property, whether now owned or hereafter acquired, other than the following ("Permitted Liens"):

(a)    any Lien existing on the Property of a Credit Party or a Subsidiary of a Credit Party on the Closing Date and set forth in <u>Schedule 5.1</u> securing Indebtedness outstanding on such date and permitted by <u>Section 5.5(c)</u>, including replacement Liens on the Property currently subject to such Liens securing Indebtedness permitted by <u>Section 5.5(c)</u>;

(b)    any Lien created under any Loan Document;

(c)    Liens for taxes, fees, assessments or other governmental charges which are not yet due, not delinquent, remain payable without penalty, or which are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves are maintained on the books of the appropriate Person in accordance with GAAP;

(d)    carriers', warehousemen's, mechanics', landlords', materialmen's, repairmen's, custom brokers' or other similar Liens arising in the Ordinary Course of Business which are not delinquent or which are being contested in good faith and by appropriate proceedings diligently prosecuted, which proceedings have the effect of preventing the forfeiture or sale of the Property subject thereto and for which adequate reserves in accordance with GAAP are being maintained;

(e)    Liens (other than any Lien imposed by ERISA) consisting of pledges or deposits required in the Ordinary Course of Business in connection with workers' compensation, employment insurance, unemployment insurance and other social security legislation or to secure the performance of tenders, statutory obligations, surety, stay, customs and appeals bonds, bids, leases, utilities, governmental contract, trade contracts, performance and return of money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money) or to secure liability to insurance carriers;

(f)    Liens consisting of judgment liens, appeal bonds, judicial attachment liens or other similar Liens arising in connection with court proceedings, provided that the enforcement of such Liens is effectively stayed and all such Liens secure judgments the existence of which do not constitute an Event of Default under <u>Section 7.1(h)</u>;

(g)    easements, rights-of-way, zoning and other restrictions, minor defects or other irregularities in title, and other similar encumbrances incurred in the Ordinary Course of Business which, either individually or in the aggregate, are not substantial in amount, and which do not in any case materially detract from the value of the Property subject thereto or interfere in any material respect with the ordinary conduct of the businesses of any Credit Party or any Subsidiary of any Credit Party;

(h)    any interest or title of a lessor or sublessor under any lease not prohibited by this Agreement;

(i)     Liens arising from precautionary uniform commercial code financing statements filed under any lease not prohibited by this Agreement;

(j)     licenses, sublicenses, leases or subleases granted to third parties in the Ordinary Course of Business not interfering with the business of the Credit Parties or any of their Subsidiaries;

(k)     Liens in favor of collecting banks arising under Section 4-210 of the UCC; and

(l)     Liens (including the right of set-off) in favor of a bank or other depository institution arising as a matter of law encumbering deposits.

5.2     <u>Disposition of Assets</u>.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, directly or indirectly, sell, assign, lease, convey, transfer or otherwise dispose of (whether in one or a series of transactions) any Property (including accounts and notes receivable, with or without recourse), except:

(a)     dispositions of inventory, rental assets, or used, worn-out or surplus equipment, all in the Ordinary Course of Business;

(b)     dispositions not otherwise permitted hereunder which are made for fair market value and the mandatory prepayment in the amount of the Net Proceeds of such disposition is made if and to the extent required by <u>Section 1.8</u>; <u>provided</u>, that (i) not less than 75% of the aggregate sales price from such disposition shall be paid in cash, (ii) the aggregate fair market value of all assets so sold (as determined in good faith by the board of directors or a similar governing body of Borrowers) by the Credit Parties and their Subsidiaries, together, shall not exceed in any fiscal year $100,000 without the prior written consent of the Agent and (iii) no Default or Event of Default is continuing or would result therefrom;

(c)     dispositions of Cash Equivalents;

(d)     licenses, sublicenses, leases or subleases granted to third parties in the Ordinary Course of Business or not interfering with the business of the Credit Parties or any of their Subsidiaries in any material respect;

(e)     transfers of property subject to casualty or condemnation proceeding (including in lieu thereof) upon receipt of the Net Proceeds therefore; <u>provided</u>, that the Net Proceeds thereof are applied in accordance with <u>Section 1.8</u>;

(f)     the abandonment of intellectual property rights in the Ordinary Course of Business which, in the reasonable good faith determination of the Borrowers, are no longer used or useful to the business of the Borrowers and their Subsidiaries;

(g)     sales, transfers and other dispositions of delinquent account receivables in the Ordinary Course of Business in connection with the collection thereof;

(h)      (x) transfers among the Credit Parties, (y) transfers among non-Credit Party Subsidiaries and (z) transfers from non-Credit Party Subsidiaries to Credit Parties; and

(i)      to the extent constituting sales, transfers or dispositions (i) Investments to the extent permitted pursuant to Section 5.4, (ii) Restricted Payments to the extent permitted pursuant to Section 5.11, and (iii) such sale, transfer or disposition effected pursuant to a merger, consolidation, liquidation or dissolution permitted pursuant to Section 5.3, in each case made in accordance with the terms and conditions applicable thereto.

5.3      Consolidations and Mergers.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, merge, consolidate with or into, or convey, transfer, lease or otherwise dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person, except (a) that any Credit Party or Wholly-Owned Subsidiary of a Credit Party may merge with, or dissolve or liquidate into, a Wholly-Owned Subsidiary of a Credit Party or a Credit Party, provided that (i) with respect to any such transaction to which a Credit Party is a party, such Credit Party shall be the continuing or surviving entity and (ii) with respect to any such transaction to which a Borrower is a party, such Borrower shall be the continuing or surviving entity and (b) Investments permitted under Section 5.4.

5.4      Loans and Investments.  No Credit Party shall and no Credit Party shall suffer or permit any of its Subsidiaries to (i) purchase or acquire, or make any commitment to purchase or acquire any Stock or Stock Equivalents, or any obligations or other securities of, or any interest in, any Person, including the establishment or creation of a Subsidiary, or (ii) make or commit to make any Acquisitions, or any other acquisition of all or substantially all of the assets of another Person, or of any business or division of any Person, including without limitation, by way of merger, consolidation or other combination or (iii) make or commit to make any advance, loan, extension of credit or capital contribution to or any other investment in, any Person including any Affiliate of a Borrower or any Subsidiary of a Borrower (the items described in clauses (i), (ii) and (iii) are referred to as "Investments", except for:

(a)      Investments in cash and Cash Equivalents;

(b)      extensions of credit and capital contributions by (i) any Credit Party to any other Credit Party, (ii) a Subsidiary of a Credit Party to a Credit Party; and (iii) Investments consisting of transfers of Inventory and Equipment among a Borrower and Subsidiaries of a Borrower in the Ordinary Course of Business;

(c)      Investments received as the non-cash portion of consideration received in connection with transactions permitted pursuant to Section 5.2(b);

(d)      Investments acquired in connection with the settlement of delinquent Accounts in the Ordinary Course of Business or in connection with the bankruptcy or reorganization of suppliers or customers;

(e)      Investments existing on the Closing Date and set forth on Schedule 5.4; and

(f)        (i) Investments comprised of Contingent Obligations permitted by <u>Section 5.5</u>, (ii) Investments consisting of extensions of credit in the nature of Accounts or notes receivable arising from the grant of trade credit in the Ordinary Course of Business, (iii) bank deposits in the ordinary course of business so long as the provisions of <u>Section 4.11</u> have been complied with, (iv) to the extent constituting an Investment, endorsement of negotiable instruments held for collection in the Ordinary Course of Business and (v) pledges, bonds and deposits permitted as Liens under <u>Section 5.1</u>.

5.5        <u>Limitation on Indebtedness</u>.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, create, incur, assume, permit to exist, or otherwise become or remain directly or indirectly liable with respect to, any Indebtedness, except:

(a)        Indebtedness incurred pursuant to this Agreement;

(b)        Indebtedness existing on the Closing Date and set forth in <u>Schedule 5.5</u> including extensions and refinancings thereof which do not increase the principal amount of such Indebtedness as of the date of such extension or refinancing;

(c)        Indebtedness consisting of unpaid insurance premiums owing to insurance companies and insurance brokers incurred in connection with the financing of insurance premiums in the ordinary course of business;

(d)        Indebtedness consisting of loans and advances made (i) by a Credit Party to any other Credit Party or (ii) by a Subsidiary of a Credit Party to a Credit Party, provided, that such Indebtedness shall be subordinated to the Obligations on terms acceptable to the Agent;

(e)        Indebtedness incurred in the ordinary course of business in respect of overdraft facilities, netting services, automatic clearinghouse arrangements and other ordinary course cash management arrangements; and

(f)        secured Indebtedness of the Borrowers issued to a Preferred Stock Securityholder (as defined in the Stockholders' Agreement) upon exercise of the Preferred Stock Put Right (as defined in the Stockholders' Agreement) on terms and conditions acceptable to the Agent.

5.6        <u>Transactions with Affiliates</u>.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, enter into any transaction with any Affiliate of a Borrower or of any such Subsidiary, except:

(a)        payment of any management, consulting or similar fees permitted pursuant to <u>Section 5.7</u> and payment of any Restricted Payment pursuant to <u>Section 5.11</u>;

(b)        in the Ordinary Course of Business and pursuant to the reasonable requirements of the business of such Credit Party or such Subsidiary provided that, in the case of this clause (b), upon fair and reasonable terms no less favorable to such Credit Party or such Subsidiary than would be obtained in a comparable arm's length transaction with a Person not an Affiliate of a Borrower or such Subsidiary and which are disclosed in writing to the Agent; <u>provided</u>, <u>further</u>, that in no event shall a Credit Party or any Subsidiary of a Credit Party perform

47

or provide any management, consulting, administrative or similar services to or for any Person other than another Credit Party, a Subsidiary of a Credit Party or a customer in the Ordinary Course of Business;

(c)    reasonable director, officer, consultant and employee compensation (including bonuses) and other benefits (including retirement, health, stock option and other benefit plans) in the Ordinary Course of Business and reasonable indemnification and reimbursement arrangements with respect to such Persons; or

(d)    transactions among Credit Parties and their Subsidiaries to the extent permitted hereunder.

5.7    <u>Management Fees and Compensation</u>.  No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, pay any management, consulting or similar fees to any Affiliate of any Credit Party or to any officer, director or employee of any Credit Party or any Affiliate of any Credit Party, except:

(a)    payment of reasonable compensation to officers and employees for actual services rendered to the Credit Parties and their Subsidiaries in the Ordinary Course of Business;

(b)    payment of directors' fees and reimbursement of actual out-of-pocket expenses incurred in connection with attending board of director meetings as approved by the Agent; and

(c)    payment of fees under the Management Agreements as currently in effect.

5.8    <u>Use of Proceeds</u>.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, use any portion of the Loan proceeds, directly or indirectly, to purchase or carry Margin Stock or repay or otherwise refinance Indebtedness of any Credit Party or others incurred to purchase or carry Margin Stock, or otherwise in any manner which is in contravention of any Requirement of Law or in violation of this Agreement.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, engage principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulations T, U, or X of the Board of Governors of the Federal Reserve System).

5.9    [Reserved].

5.10    <u>Compliance with ERISA</u>.  No Credit Party shall cause or suffer to exist (a) any event that would reasonably be expected to result in the imposition of a material Lien on any asset of a Credit Party or a Subsidiary of a Credit Party with respect to any Title IV Plan or Multiemployer Plan or (b) any other ERISA Event, that would, in the aggregate, have a Material Adverse Effect.  No Credit Party shall cause or suffer to exist any event that would reasonably be expected to result in the imposition of a Lien with respect to any Benefit Plan.

5.11    <u>Restricted Payments</u>.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, (i) declare or make any dividend payment or other distribution of assets, properties, cash, rights, obligations or securities on account of any Stock or Stock

48

Equivalent of Borrowers or any of their Subsidiaries, (ii) purchase, redeem or otherwise acquire for value any Stock or Stock Equivalent of Borrowers or any of their Subsidiaries now or hereafter outstanding or (iii) make any payment or prepayment of principal of, premium, if any, interest, fees, redemption, exchange, purchase, retirement, defeasance, sinking fund or similar payment with respect to, any Indebtedness (the items described in clauses (i), (ii) and (iii) above are referred to as "Restricted Payments"); and except that, (i) any Wholly-Owned Subsidiary of a Borrower or a Credit Party may declare and pay dividends to a Borrower or a Credit Party, and (ii) solely for purposes of clarification, the Transactions may be consummated and any Credit Party (or a Subsidiary) may make payments contemplated hereunder in connection therewith, both as of and after the Closing Date with respect to the aggregate consideration and any purchase price adjustments in accordance with the terms applicable thereto:

(a)     if Holdings files a consolidated federal income tax return with a Credit Party (or, if the Credit Party is a disregarded entity for federal income tax purposes, with the Credit Party's owner), then such Credit Party may make distributions to Holdings (and, if applicable, Holdings may make distributions to its direct or indirect parent company) to pay federal and state income taxes then due and owing by Holdings (or a direct or indirect parent company thereof); provided that the amount of such distributions shall not be greater than, nor the receipt by such Credit Party of tax benefits less than, they would have been had such Credit Party not filed consolidated income tax returns with Holdings or such direct or indirect parent company thereof (and, if such Credit Party is a disregarded entity, if such Credit Party were treated as a corporation for federal and state income tax purposes);

(b)     the Borrowers may make payments under the Indebtedness permitted pursuant to Section 5.5(g) to the extent permitted under the intercreditor arrangements applicable thereto;

(c)     the Subsidiaries of Borrowers may declare and make dividend payments to Borrowers (and, if applicable, Borrowers may declare and make dividend payments to its direct or indirect parent) in amounts approved by the Agent, the proceeds of which are used to fund actual, reasonable, out-of-pocket overhead and administrative expenses (including those related to directors and board observance) payable by Borrowers (or its direct or indirect parent company) in the Ordinary Course of Business; and

(d)     the Borrowers may make payments permitted by Sections 5.7(b) or 5.7(c).

5.12     Change in Business.  No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, engage in any material line of business substantially different from those lines of business carried on by the Credit Parties on the Closing Date or otherwise reasonably related thereto or reasonable extensions thereof.

5.13     Change in Structure.  No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to (i) amend any of its Organization Documents in any respect materially adverse to the Agent or Lenders, or (ii) change its state of formation or its organizational form, except upon 30 days' prior notice to the Agent; provided that such Credit Party shall take all actions requested by the Agent or the Lenders in their sole discretion to maintain a first-priority perfected

Lien in favor of the Agent (subject to Permitted Liens) on the Collateral of such Credit Party prior to any such change.

5.14    <u>Accounting Changes</u>.  No Credit Party, and no Credit Party shall suffer or permit any of its Subsidiaries to change the fiscal year or method for determining fiscal quarters of any Credit Party without the consent of the Agent (the direction of Required Lenders).

5.15    <u>Amendments to Certain Documents</u>.  No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries directly or indirectly to, change or amend the terms of any Material Contract,  any Management Agreement or any Indebtedness permitted pursuant to <u>Section 5.5(g)</u> in any respect materially adverse to the Agent or Lenders.  Each Credit Party shall, prior to entering into any amendment or modification at of any Material Contract, Management Agreement or documents relating to the Indebtedness permitted pursuant to <u>Section 5.5(g)</u>, deliver to Agent reasonably in advance of the execution thereof, any final or execution form copy thereof.

5.16    <u>No Negative Pledges</u>.  No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, directly or indirectly, to:  (A) create or otherwise cause or suffer to exist or become effective any consensual restriction or encumbrance of any kind on the ability of any such Subsidiary to pay dividends or make any other distribution on any of such Subsidiary's Stock or Stock Equivalents or to pay fees, including management fees, or make other payments and distributions to a Borrower or any of its Subsidiaries or (B) enter into, assume or become subject to any Contractual Obligation prohibiting or otherwise restricting the existence of any Lien upon any of its assets in favor of the Agent, whether now owned or hereafter acquired except in connection with any document or instrument governing Liens permitted pursuant to Section 5.1 provided that any such restriction contained therein relates only to the asset or assets subject to such permitted Liens; <u>provided</u>, that the following agreements, restrictions, encumbrances or Contractual Obligations shall be permitted:

      (i)    the Loan Documents;

      (ii)    customary provisions in leases restricting the subletting or assignment thereof (and restricting liens on the leasehold assets subject thereto);

      (iii)    customary provisions in agreements or licenses entered into in the Ordinary Course of Business restricting assignment of such agreement or license to the extent not materially interfering with the use of such licenses or agreements;

      (iv)    customary restrictions and conditions contained in any agreement relating to the sale of any property pending the consummation of such sale, provided that (1) such restrictions and conditions apply only to the property to be sold, and (2) such sale is permitted hereunder; and

      (v)    negative pledges and restrictions in favor of the holder of deposits constituting Permitted Liens so long as such negative pledges and restrictions extend solely to the amounts on deposit with such holders and not any other assets of the Credit Parties or their Subsidiaries.

5.17    OFAC.  No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to (i) become a person whose property or interests in property are blocked or subject to blocking pursuant to Section 1 of Executive Order 13224 of September 23, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit or Support Terrorism (66 Fed. Reg. 49079(2001)), (ii) engage in any dealings or transactions prohibited by Section 2 of such executive order, or be otherwise associated with any such person in any manner violative of Section 2, or (iii) otherwise become a person on the list of Specially Designated Nationals and Blocked Persons or subject to the limitations or prohibitions under any other OFAC regulation or executive order.

5.18    Sale-Leasebacks.  No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, enter into any arrangement, directly or indirectly, enter into any arrangement with any Person whereby, in a substantially contemporaneous transaction, any Borrower or any Subsidiaries sells or transfers all or substantially all of its right, title and interest in an asset and, in connection therewith, acquires or leases back the right to use such asset.

5.19    Hazardous Materials.  No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, cause or suffer to exist any Release of any Hazardous Material at, to or from any real property owned, leased, subleased or otherwise operated or occupied by any Credit Party or any Subsidiary of any Credit Party that would violate any Environmental Law, form the basis for any Environmental Liabilities or otherwise adversely affect the value or marketability of any real property (whether or not owned by any Credit Party or any Subsidiary of any Credit Party), other than such violations, Environmental Liabilities and effects that would not, in the aggregate, have a Material Adverse Effect.

5.20    Stay, Extension and Usury Laws.  Each Credit Party covenants (to the extent that it may lawfully do so) that it shall not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law or other law wherever enacted, now or at any time hereafter in force, that may affect the covenants or the performance of its Obligations under the Loan Documents, and each Credit Party hereby expressly waives all benefit or advantage of any such law, and covenants that it shall not, by resort to any such law, hinder, delay or impede the execution of any power herein granted to the Agent or Lenders, but shall suffer and permit the execution of every such power as though no such law has been enacted.

5.21    Regulated Entities.  The Borrowers shall not, and shall not permit any of their Subsidiaries to, become (a) an "investment company" within the meaning of the Investment Company Act of 1940 or (b) subject to regulation under any other federal or state statute, rule or regulation limiting its ability to incur Indebtedness, pledge its assets or perform its obligations under the Loan Documents with which such Borrower or such Subsidiary is not in compliance.

## ARTICLE VI - FINANCIAL COVENANT

Each Credit Party covenants and agrees that, so long as any Lender shall have any Commitment hereunder, or any Loan or other Obligation (other than contingent indemnification Obligations to the extent no claim giving rise thereto has been asserted in a manner reasonably acceptable to Agent (at the direction of the Required Lenders)) shall remain unpaid or unsatisfied:

6.1    Minimum EBITDA.  The Credit Parties shall not permit EBITDA as of the last day of any fiscal year to be less than the following:

| Fiscal Year Ending | Minimum EBITDA |
|---|---|
| December 31, 2020 | $4,500,000 |
| December 31, 2021 | $8,000,000 |
| December 31, 2022 | [$15,000,000] |

## ARTICLE VII - EVENTS OF DEFAULT

7.1    Event of Default.  Any of the following shall constitute an "Event of Default":

(a)    Non-Payment.  Any Credit Party fails (i) to pay when and as required to be paid herein, any amount of principal of or interest on any Loan, including after maturity of the Loans or (ii) to pay within three (3) Business Days after the same shall become due, any fee or any other amount payable hereunder or pursuant to any other Loan Document; or

(b)    Representation or Warranty.  Any representation, warranty or certification by or on behalf of any Credit Party or any of its Subsidiaries made or deemed made herein, in any other Loan Document, or which is contained in any certificate, document or financial or other statement by any such Person, or their respective Responsible Officers, furnished at any time under this Agreement, or in or under any other Loan Document, shall prove to have been incorrect in any material respect (without duplication of other materiality qualifiers contained therein) on or as of the date made or deemed made; or

(c)    Specific Defaults.  Any Credit Party fails to perform or observe any term, covenant or agreement contained in Article IV, Article V or Article VI hereof; or

(d)    Other Defaults.  Any Credit Party or any Subsidiary of any Credit Party fails to perform or observe any other term, covenant or agreement contained in this Agreement or any other Loan Document, and such default shall continue unremedied for a period of ten (10) days after the earlier of (i) the date a Responsible Officer of a Credit Party becomes aware of such failure or (ii) the date upon which written notice thereof is given to the Borrower Representative by the Agent or Required Lenders; or

(e)    Cross-Default.  Any Credit Party or any Subsidiary of any Credit Party (i) fails to make any payment in respect of any Indebtedness (other than the Obligations and any intercompany Indebtedness) or Contingent Obligation (other than the Obligations and any intercompany Contingent Obligations) having an aggregate principal amount (including undrawn committed or available amounts and including amounts owing to all creditors under any combined or syndicated credit arrangement) of more than $100,000 when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) and such failure continues

after the applicable grace or notice period, if any, specified in the document relating thereto on the date of such failure; or (ii) fails to perform or observe any other condition or covenant, or any other event shall occur or condition exist, under any agreement or instrument relating to any such Indebtedness or Contingent Obligation, if the effect of such failure, event or condition is to cause, or to permit the holder or holders of such Indebtedness or beneficiary or beneficiaries of such Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause such Indebtedness to be declared to be due and payable prior to its stated maturity (without regard to any subordination terms with respect thereto), or such Contingent Obligation to become payable or cash collateral in respect thereof to be demanded; or

(f)　　Insolvency; Voluntary Proceedings.　Any Credit Party or any Subsidiary of any Credit Party:  (i) generally fails to pay, or admits in writing its inability to pay, its debts as they become due, subject to applicable grace periods, if any, whether at stated maturity or otherwise; (ii) voluntarily ceases to conduct its business in the ordinary course other than pursuant to a transaction expressly permitted hereunder; (iii) commences any Insolvency Proceeding with respect to itself; or (iv) takes any action to effectuate or authorize any of the foregoing; or

(g)　　Involuntary Proceedings.　(i) Any involuntary Insolvency Proceeding is commenced or filed against any Credit Party or any Subsidiary of any Credit Party, or any writ, judgment, warrant of attachment, execution or similar process, is issued or levied against a substantial part of any such Person's Properties, and any such proceeding or petition shall not be dismissed, or such writ, judgment, warrant of attachment, execution or similar process shall not be released, vacated or fully bonded within sixty (60) days after commencement, filing or levy; (ii) any Credit Party or any Subsidiary of any Credit Party admits the material allegations of a petition against it in any Insolvency Proceeding, or an order for relief (or similar order under non-U.S. law) is ordered in any Insolvency Proceeding; or (iii) any Credit Party or any Subsidiary of any Credit Party acquiesces in the appointment of a receiver, trustee, custodian, conservator, liquidator, mortgagee in possession (or agent therefor), or other similar Person for itself or a substantial portion of its Property or business; or

(h)　　Monetary Judgments.　One or more judgments, non-interlocutory orders, decrees, appeal bonds or arbitration awards shall be entered against any one or more of the Credit Parties or any of their respective Subsidiaries involving in the aggregate a liability (to the extent not covered by independent third-party insurance) as to any single or related series of transactions, incidents or conditions, of $100,000 or more, and the same shall remain unsatisfied, unvacated and unstayed pending appeal for a period of thirty (30) days after the entry thereof; or

(i)　　Non-Monetary Judgments.　One or more non-monetary judgments, orders or decrees shall be rendered against any one or more of the Credit Parties or any of their respective Subsidiaries which has or would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect, and there shall be any period of ten (10) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect; or

(j)　　Collateral.　Any material provision of any Loan Document shall for any reason cease to be valid and binding on or enforceable against any Credit Party or any Subsidiary of any Credit Party thereto, or any Credit Party or any Subsidiary of any Credit Party shall so state

in writing or bring an action to limit its obligations or liabilities thereunder; or any Collateral Document shall for any reason (other than pursuant to the terms thereof) cease to create a valid security interest in the Collateral purported to be covered thereby or such security interest shall for any reason (other than the failure of the Agent to take any action within its control based upon accurate and timely disclosure of relevant information by the Credit Parties as required herein) cease to be a perfected and first priority security interest subject only to Permitted Liens; or

(k)    _Material Adverse Effect_.  Any event or circumstance occurs which has or, in the reasonable judgment of the Agent, is reasonably likely to have, a Material Adverse Effect.

(l)    _Change of Control_.  The occurrence of a Change of Control.

(m)    _Material Contracts_.  Any termination or loss of a Material Contract, which has not been replaced or supplemented with one or more other contracts within thirty (30) days following the date of termination or loss.

(n)    _Change in Key Management_.  Any termination, resignation, replacement or other change in the chief executive officer or chief financial officer of any Borrower or any of its Subsidiaries that have not been approved by the Agent.

(o)    _Plan of Reorganization_.

(i)    Reversal, vacation or stay of the effectiveness of the Plan of Reorganization or the Credit Parties shall attempt to vacate or modify the Confirmation Order.

(ii)    Entry of an order amending, supplementing, staying, vacating or otherwise modifying the Confirmation Order or the Plan of Reorganization without the prior written consent of the Agent and the Lenders or the filing of a motion for reconsideration with respect thereto.

7.2    _Remedies_.  Upon the occurrence and during the continuance of any Event of Default, the Agent may (with the consent of the Required Lenders) and shall at the request of the Required Lenders:

(a)    declare all or any portion of the Commitment of each Lender to make Loans to be terminated, whereupon such Commitments shall forthwith be terminated;

(b)    declare all or any portion of the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable; without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by each Credit Party; and/or

(c)    exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or applicable law;

provided, however, that upon the occurrence of any event specified in Sections 7.1(f) or 7.1(g) above (in the case of clause (i) of Section 7.1(g) upon the expiration of the sixty (60) day period

54

mentioned therein), the obligation of each Lender to make Loans shall automatically terminate and the unpaid principal amount of all outstanding Loans and all interest and other amounts as aforesaid shall automatically become due and payable without further act of the Agent or any Lender.

7.3    <u>Rights Not Exclusive</u>.  The rights provided for in this Agreement and the other Loan Documents are cumulative and are not exclusive of any other rights, powers, privileges or remedies provided by law or in equity, or under any other instrument, document or agreement now existing or hereafter arising.

ARTICLE VIII - THE AGENT

8.1    <u>Appointment and Duties</u>.

(a)    <u>Appointment of Agent</u>.  Subject to the terms hereof, each Lender hereby appoints Bridging (together with any successor Agent pursuant to <u>Section 8.9</u>) as the Agent hereunder and authorizes the Agent to (i) execute and deliver the Loan Documents and accept delivery thereof on its behalf from any Credit Party, (ii) take such action on its behalf and to exercise all rights, powers and remedies and perform the duties as are expressly delegated to the Agent under such Loan Documents and (iii) exercise such powers as are reasonably incidental thereto.

(b)    <u>Duties as Collateral and Disbursing Agent</u>.  Subject to the terms hereof, without limiting the generality of clause (a) above, the Agent shall have the sole and exclusive right and authority (to the exclusion of the Lenders), and is hereby authorized, to (i) act as the disbursing and collecting agent for the Lenders with respect to all payments and collections arising in connection with the Loan Documents (including in any proceeding described in <u>Section 7.1(g)</u> or any other bankruptcy, insolvency or similar proceeding), and each Person making any payment in connection with any Loan Document to any Secured Party is hereby authorized to make such payment to the Agent, (ii) file and prove claims and file other documents necessary or desirable to allow the claims of the Secured Parties with respect to any Obligation in any proceeding described in subsection 7.1(g) or any other bankruptcy, insolvency or similar proceeding (but not to vote, consent or otherwise act on behalf of such Person), (iii) act as collateral agent for each Secured Party for purposes of the perfection of all Liens created by such agreements and all other purposes stated therein, (iv) manage, supervise and otherwise deal with the Collateral, (v) take such other action as is necessary or desirable to maintain the perfection and priority of the Liens created or purported to be created by the Loan Documents, (vi) except as may be otherwise specified in any Loan Document, exercise all remedies given to the Agent and the other Secured Parties with respect to the Collateral, whether under the Loan Documents, applicable Requirements of Law or otherwise and (vii) execute any amendment, consent or waiver under the Loan Documents on behalf of any Lender that has consented in writing to such amendment, consent or waiver; <u>provided</u>, <u>however</u>, that the Agent hereby appoints, authorizes and directs each Lender to act as collateral sub-agent for the Agent, the Lenders for purposes of the perfection of all Liens with respect to the Collateral, including any deposit account maintained by a Credit Party with, and cash and Cash Equivalents held by, such Lender, and may further authorize and direct the Lenders to take further actions as collateral sub-agents for purposes of enforcing such Liens or otherwise

55

to transfer the Collateral subject thereto to the Agent, and each Lender hereby agrees to take such further actions to the extent, and only to the extent, so authorized and directed.

(c)     Limited Duties.  Under the Loan Documents, the Agent (i) is acting solely on behalf of the Lenders (except to the limited extent provided in Section 1.4(b) with respect to the Register), with duties that are entirely administrative in nature, notwithstanding the use of the defined term "Agent", the terms "agent", "Agent" and "collateral agent" and similar terms in any Loan Document to refer to the Agent, which terms are used for title purposes only, (ii) is not assuming any obligation under any Loan Document other than as expressly set forth therein or any role as agent, fiduciary or trustee of or for any Lender or any other Person and (iii) shall have no implied functions, responsibilities, duties, obligations or other liabilities under any Loan Document, and each Lender hereby waives and agrees not to assert any claim against the Agent based on the roles, duties and legal relationships expressly disclaimed in clauses (i) through (iii) above.

8.2     Binding Effect.  Each Lender agrees that (i) any action taken by the Agent or the Required Lenders (or, if expressly required hereby, a greater proportion of the Lenders) in accordance with the provisions of the Loan Documents, (ii) any action taken by the Agent in reliance upon the instructions of Required Lenders (or, where so required, such greater proportion) and (iii) the exercise by the Agent or the Required Lenders (or, where so required, such greater proportion) of the powers set forth herein or in accordance with the other Loan Documents, together with such other powers as are reasonably incidental thereto, shall be authorized and binding upon all of the Secured Parties.

8.3     Use of Discretion.

(a)     No Action without Instructions.  The Agent shall not be required to exercise any discretion or take, or to omit to take, any action, including with respect to enforcement or collection, except any action it is required to take or omit to take (i) under any Loan Document or (ii) pursuant to instructions from the Required Lenders (or, where expressly required by the terms of this Agreement, a greater proportion of the Lenders).

(b)     Right Not to Follow Certain Instructions.  Notwithstanding clause (a) above, the Agent shall not be required to take, or to omit to take, any action (i) unless, upon demand, the Agent receives an indemnification satisfactory to it from the Lenders (or, to the extent applicable and acceptable to the Agent, any other Person) against all Liabilities that, by reason of such action or omission, may be imposed on, incurred by or asserted against the Agent or any Related Person thereof or (ii) that is, in the opinion of the Agent or its counsel, contrary to any Loan Document or applicable Requirement of Law.

(c)     Exclusive Right to Enforce Rights and Remedies.  Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Credit Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Agent in accordance with the Loan Documents for the benefit of all the Lenders; provided that the foregoing shall not prohibit (i) the Agent from exercising on its own behalf the rights and remedies that inure to its

benefit (solely in its capacity as Agent) hereunder and under the other Loan Documents, (ii) [reserved], (iii) any Lender from exercising setoff rights in accordance with Section 9.11 or (iv) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Credit Party under any bankruptcy or other debtor relief law; and provided further that if at any time there is no Person acting as the Agent hereunder and under the other Loan Documents, then (A) the Required Lenders shall have the rights otherwise ascribed to the Agent pursuant to Section 7.2 and (B) in addition to the matters set forth in clauses (ii), (iii) and (iv) of the preceding proviso and subject to Section 9.11, any Lender may, with the consent of the Required Lenders, enforce any rights and remedies available to it and as authorized by the Required Lenders.

8.4    <u>Delegation of Rights and Duties</u>.  The Agent may, upon any term or condition it specifies, delegate or exercise any of its rights, powers and remedies under, and delegate or perform any of its duties or any other action with respect to, any Loan Document by or through any trustee, co-agent, employee, attorney-in-fact and any other Person (including any Secured Party).  Any such Person shall benefit from this Article VIII to the extent provided by the Agent.

8.5    <u>Reliance and Liability</u>.

(a)    The Agent may, without incurring any liability hereunder, (i) treat the payee of any Note as its holder until such Note has been assigned in accordance with <u>Section 9.9</u>, (ii) rely on the Register to the extent set forth in <u>Section 1.4</u>, (iii) consult with any of its Related Persons and, whether or not selected by it, any other advisors, accountants and other experts (including advisors to, and accountants and experts engaged by, any Credit Party) and (iv) rely and act upon any document and information (including those transmitted by Electronic Transmission) and any telephone message or conversation, in each case believed by it to be genuine and transmitted, signed or otherwise authenticated by the appropriate parties.

(b)    None of the Agent and its Related Persons shall be liable for any action taken or omitted to be taken by any of them under or in connection with any Loan Document, and each Lender, each Borrower and each other Credit Party hereby waive and shall not assert (and the Borrowers shall cause each other Credit Party to waive and agree not to assert) any right, claim or cause of action based thereon, except to the extent of liabilities resulting primarily from the gross negligence or willful misconduct of the Agent or, as the case may be, such Related Person (each as determined in a final, non-appealable judgment by a court of competent jurisdiction) in connection with the duties expressly set forth herein.  Without limiting the foregoing, the Agent:

(i)    shall not be responsible or otherwise incur liability for any action or omission taken in reliance upon the instructions of the Required Lenders (or, where expressly required by the terms of this Agreement, a greater proportion of the Lenders) or for the actions or omissions of any of its Related Persons selected with reasonable care (other than employees, officers and directors of the Agent, when acting on behalf of the Agent);

(ii)    shall not be responsible to any Lender or other Person for the due execution, legality, validity, enforceability, effectiveness, genuineness, sufficiency or value of, or the

57

attachment, perfection or priority of any Lien created or purported to be created under or in connection with, any Loan Document;

(iii)    makes no warranty or representation, and shall not be responsible, to any Lender or other Person for any statement, document, information, representation or warranty made or furnished by or on behalf of any Credit Party or any Related Person of any Credit Party in connection with any Loan Document or any transaction contemplated therein or any other document or information with respect to any Credit Party, whether or not transmitted or (except for documents expressly required under any Loan Document to be transmitted to the Lenders) omitted to be transmitted by the Agent, including as to completeness, accuracy, scope or adequacy thereof, or for the scope, nature or results of any due diligence performed by the Agent in connection with the Loan Documents; and

(iv)    shall not have any duty to ascertain or to inquire as to the performance or observance of any provision of any Loan Document, whether any condition set forth in any Loan Document is satisfied or waived, as to the financial condition of any Credit Party or as to the existence or continuation or possible occurrence or continuation of any Default or Event of Default and shall not be deemed to have notice or knowledge of such occurrence or continuation unless it has received a notice from the Borrower Representative, any Lender describing such Default or Event of Default clearly labeled "notice of default" (in which case the Agent shall promptly give notice of such receipt to all Lenders);

and, for each of the items set forth in clauses (i) through (iv) above, each Lender, each Borrower hereby waives and agrees not to assert (and each Borrower shall cause each other Credit Party to waive and agree not to assert) any right, claim or cause of action it might have against the Agent based thereon.

8.6    <u>Agent Individually</u>.  The Agent and its Affiliates may make loans and other extensions of credit to, acquire Stock and Stock Equivalents of, engage in any kind of business with, any Credit Party or Affiliate thereof as though it were not acting as Agent and may receive separate fees and other payments therefor.  To the extent the Agent or any of its Affiliates makes any Loan or otherwise becomes a Lender hereunder, it shall have and may exercise the same rights and powers hereunder and shall be subject to the same obligations and liabilities as any other Lender and the terms "Lender", "Revolving Lender", "Required Lender", "Required Revolving Lender" and any similar terms shall, except where otherwise expressly provided in any Loan Document, include, without limitation, the Agent or such Affiliate, as the case may be, in its individual capacity as Lender, Revolving Lender or as one of the Required Lenders or Required Revolving Lenders, respectively.

8.7    <u>Lender Credit Decision</u>.

(a)    Each Lender acknowledges that it shall, independently and without reliance upon the Agent, any Lender or any of their Related Persons or upon any document (including any offering and disclosure materials in connection with the syndication of the Loans) solely or in part because such document was transmitted by the Agent or any of its Related Persons, conduct its own independent investigation of the financial condition and affairs of each Credit Party and make and continue to make its own credit decisions in connection with entering into, and taking or not

taking any action under, any Loan Document or with respect to any transaction contemplated in any Loan Document, in each case based on such documents and information as it shall deem appropriate.  Except for documents expressly required by any Loan Document to be transmitted by the Agent to the Lenders, the Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of any Credit Party or any Affiliate of any Credit Party that may come in to the possession of the Agent or any of its Related Persons.

(b)    If any Lender has elected to abstain from receiving material non-public information ("MNPI") concerning the Credit Parties or their Affiliates, such Lender acknowledges that, notwithstanding such election, Agent and/or the Credit Parties will, from time to time, make available syndicate-information (which may contain MNPI) as required by the terms of, or in the course of administering the Loans to the credit contact(s) identified for receipt of such information on the Lender's administrative questionnaire who are able to receive and use all syndicate-level information (which may contain MNPI) in accordance with such Lender's compliance policies and contractual obligations and applicable law, including federal and state securities laws; provided, that if such contact is not so identified in such questionnaire, the relevant Lender hereby agrees to promptly (and in any event within one (1) Business Day) provide such a contact to Agent and the Credit Parties upon request therefor by Agent or the Credit Parties.  Notwithstanding such Lender's election to abstain from receiving MNPI, such Lender acknowledges that if such Lender chooses to communicate with Agent, it assumes the risk of receiving MNPI concerning the Credit Parties or their Affiliates.

8.8    Expenses; Indemnities.

(a)    Each Lender agrees to reimburse the Agent and each of its Related Persons (to the extent not reimbursed by any Credit Party promptly after demand therefor) promptly upon demand, severally and ratably, of any out-of-pocket costs and expenses (including fees, charges and disbursements of financial, legal and other advisors and Other Taxes paid in the name of, or on behalf of, any Credit Party) that may be incurred by the Agent or any of its Related Persons in connection with the preparation, syndication, execution, delivery, administration, modification, consent, waiver or enforcement (whether through negotiations, through any work-out, bankruptcy, restructuring or other legal or other proceeding or otherwise) of, or legal advice in respect of its rights or responsibilities under, any Loan Document.

(b)    Each Lender further agrees to indemnify the Agent and each of its Related Persons (to the extent not reimbursed by any Credit Party promptly after demand therefor), severally and ratably, from and against Liabilities (including taxes, interests and penalties imposed for not properly withholding or backup withholding on payments made to on or for the account of any Lender) that may be imposed on, incurred by or asserted against the Agent or any of its Related Persons in any matter relating to or arising out of, in connection with or as a result of any Loan Document or any other act, event or transaction related, contemplated in or attendant to any such document, or, in each case, any action taken or omitted to be taken by the Agent or any of its Related Persons under or with respect to any of the foregoing; provided, however, that no Lender shall be liable to the Agent or any of its Related Persons to the extent such liability has resulted primarily from the gross negligence or willful misconduct of the Agent or, as the case may be,

such Related Person, as determined by a court of competent jurisdiction in a final non-appealable judgment or order.

(c)     To the extent required by any applicable law, Agent may withhold from any payment to any Lender under a Loan Document an amount equal to any applicable withholding tax.  If the Internal Revenue Service or any other Governmental Authority asserts a claim that Agent did not properly withhold tax from amounts paid to or for the account of any Lender (because the appropriate certification form was not delivered, was not properly executed, or fails to establish an exemption from, or reduction of, withholding tax with respect to a particular type of payment, or because such Lender failed to notify Agent or any other Person of a change in circumstances which rendered the exemption from, or reduction of, withholding tax ineffective, or for any other reason), or Agent reasonably determines that it was required to withhold taxes from a prior payment but failed to do so, such Lender shall promptly indemnify Agent fully for all amounts paid, directly or indirectly, by Agent as tax or otherwise, including penalties and interest, and together with all expenses incurred by Agent, including legal expenses, allocated internal costs and out-of-pocket expenses.  Agent may offset against any payment to any Lender under a Loan Document, any applicable withholding tax that was required to be withheld from any prior payment to such Lender but which was not so withheld, as well as any other amounts for which Agent is entitled to indemnification from such Lender under this Section 8.8(c).

8.9     Resignation of Agent.

(a)     (i) The Agent may resign at any time by delivering notice of such resignation to the Lenders and the Borrower Representative, effective on the date set forth in such notice or, if no such date is set forth therein, upon the date such notice shall be effective.  If the Agent delivers any such notice or if the Agent is removed pursuant to clause (ii) below, the Required Lenders shall have the right to appoint a successor Agent.  If, within 30 days after the retiring Agent having given notice of resignation, no successor Agent has been appointed by the Required Lenders that has accepted such appointment, then the retiring Agent may, on behalf of the Lenders, appoint a successor Agent from among the Lenders.  (ii) At any time when the Person acting as Agent is also a Non-Funding Lender of the type described in clause (a) of the definition thereof, Required Lenders may remove Agent in its capacity as such upon thirty (30) days' prior written notice to Agent and Borrower Representative, unless such Person ceases to be such a Non-Funding Lender on or prior to the expiration of such thirty (30) day period.  (iii) The Required Lenders may, to the extent permitted by applicable law, by notice in writing to the Borrower Representative and the Agent, remove Agent in its capacity as such and as provided in the manner above, appoint a successor Agent.

(b)     Effective immediately upon its resignation or removal, (i) the retiring Agent or removed Agent shall be discharged from its duties and obligations under the Loan Documents, (ii) the Lenders shall assume and perform all of the duties of the Agent until a successor Agent shall have accepted a valid appointment hereunder, (iii) the retiring Agent or removed Agent and its Related Persons shall no longer have the benefit of any provision of any Loan Document other than with respect to any actions taken or omitted to be taken while such retiring Agent or removed Agent was, or because such Agent had been, validly acting as Agent under the Loan Documents and (iv) subject to its rights under Section 8.3, the retiring Agent or removed Agent shall take such action as may be reasonably necessary to assign to the successor Agent its rights as Agent under

60

the Loan Documents; provided that (i) the retiring Agent or removed Agent shall not be required to take any acts or execute any documents. Effective immediately upon its acceptance of a valid appointment as Agent, a successor Agent shall succeed to, and become vested with, all the rights, powers, privileges and duties of the retiring Agent or removed Agent under the Loan Documents.

8.10    <u>Release of Collateral or Guarantors</u>.  Each Lender hereby consents to the release and hereby directs the Agent to release (or, in the case of clause (b)(ii) below, release or subordinate) the following:

(a)    any Subsidiary of a Borrower from its guaranty of any Obligation if all of the Stock and Stock Equivalents of such Subsidiary owned by any Credit Party are sold or transferred in a transaction permitted under the Loan Documents (including pursuant to a waiver or consent), to the extent that, after giving effect to such transaction, such Subsidiary would not be required to guaranty any Obligations pursuant to <u>Section 4.13</u>; and

(b)    any Lien held by the Agent for the benefit of the Secured Parties against (i) any Collateral that is sold, transferred, conveyed or otherwise disposed of by a Credit Party in a transaction permitted by the Loan Documents (including pursuant to a valid waiver or consent), to the extent all Liens required to be granted in such Collateral pursuant to <u>Section 4.13</u> after giving effect to such transaction have been granted, (ii) any property subject to a Lien permitted hereunder in reliance upon <u>Section 5.1(h)</u> or <u>(i)</u> and (iii) all of the Collateral and all Credit Parties, upon (A) termination of the Revolving Loan Commitments, (B) payment and satisfaction in full of all Loans and all other Obligations under the Loan Documents (other than contingent indemnification obligations in respect of which no claim has been made) that the Agent has theretofore been notified in writing by the holder of such Obligation are then due and payable, (C) deposit of cash collateral with respect to all contingent Obligations in amounts and on terms and conditions and with parties satisfactory to the Agent and each Indemnitee that is, or may be, owed such Obligations and (D) to the extent requested by the Agent, receipt by Agent and the Secured Parties of liability releases from the Credit Parties each in form and substance acceptable to the Agent.

Each Lender hereby directs the Agent, and the Agent hereby agrees, upon receipt of reasonable advance notice from the Borrower Representative, when and as directed in this Section 8.10, to (i) promptly to execute and deliver or file such documents and to perform other actions reasonably necessary to release the guaranties and Liens and (ii) deliver to the Credit Parties any portion of such Collateral so released in the possession of the Agent.

8.11    <u>Additional Secured Parties</u>.  The benefit of the provisions of the Loan Documents directly relating to the Collateral or any Lien granted thereunder shall extend to and be available to any Secured Party that is not a Lender party hereto as long as, by accepting such benefits, such Secured Party agrees, as among the Agent and all other Secured Parties, that such Secured Party is bound by (and, if requested by the Agent, shall confirm such agreement in a writing in form and substance acceptable to the Agent) this <u>Article VIII</u>, <u>Section 9.3</u>, <u>Section 9.9</u>, <u>Section 9.10</u>, <u>Section 9.11</u>, <u>Section 9.17</u>, <u>Section 9.24</u> and <u>Section 10.1</u> and the decisions and actions of the Agent and the Required Lenders (or, where expressly required by the terms of this Agreement, a greater proportion of the Lenders or other parties hereto as required herein) to the same extent a Lender is bound; <u>provided</u>, <u>however</u>, that, notwithstanding the foregoing, (a) such Secured Party shall be bound by Section 8.8 only to the extent of Liabilities, costs and expenses

with respect to or otherwise relating to the Collateral held for the benefit of such Secured Party, in which case the obligations of such Secured Party thereunder shall not be limited by any concept of pro rata share or similar concept, (b) subject to the express provisions of <u>Sections 1.10(c)</u> and <u>9.1(b)</u>, each of the Agent and the Lenders party hereto shall be entitled to act at its sole discretion, without regard to the interest of such Secured Party, regardless of whether any Obligation to such Secured Party thereafter remains outstanding, is deprived of the benefit of the Collateral, becomes unsecured or is otherwise affected or put in jeopardy thereby, and without any duty or liability to such Secured Party or any such Obligation and (c) except as otherwise set forth herein, such Secured Party shall not have any right to be notified of, consent to, direct, require or be heard with respect to, any action taken or omitted in respect of the Collateral or under any Loan Document.

## ARTICLE IX - MISCELLANEOUS

9.1     <u>Amendments and Waivers</u>.

(a)     No amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent with respect to any departure by any Credit Party therefrom, shall be effective unless the same shall be in writing and signed by the Required Lenders (or by the Agent with the consent of the Required Lenders given in writing or by Electronic Transmission), the Borrower Representative and acknowledged by the Agent (which such acknowledgement shall be provided by the Agent upon written direction of the Required Lenders), and then such waiver shall be effective only in the specific instance and for the specific purpose for which given; <u>provided</u>, <u>however</u>, that no such waiver, amendment, or consent shall, unless in writing and signed by all the Lenders directly affected thereby (or by the Agent with the consent of all the Lenders directly affected thereby given in writing or by Electronic Transmission), in addition to the Required Lenders (or by the Agent with the consent of the Required Lenders given in writing or by Electronic Transmission), the Borrowers and acknowledged by the Agent (which such acknowledgement shall be provided by the Agent upon written direction of all Lenders directly affected thereby), do any of the following:

(i)     increase or extend the Commitment of any Lender (or reinstate any Commitment terminated pursuant to <u>Section 7.2(a)</u>);

(ii)     postpone or delay any date fixed for, or waive, any scheduled installment of principal or any payment of interest, fees or other amounts due to the Lenders (or any of them) hereunder or under any other Loan Document (other than prepayments pursuant to <u>Sections 1.8(c)</u> through <u>(f)</u>);

(iii)     reduce the principal of, or the rate of interest specified herein (it being agreed that waiver of the default interest margin shall only require the consent of Required Lenders) or the amount of interest payable in cash specified herein on any Loan, or of any fees or other amounts payable hereunder or under any other Loan Document;

(iv)     change the percentage of the Commitments or of the aggregate unpaid principal amount of the Loans which shall be required for the Lenders or any of them to take any action hereunder;

62

(v)    amend Section 1.10(c) (or any other provision of the Loan Documents that would alter the pro rata sharing of payments or proceeds of the Collateral), or amend this Section 9.1 or the definitions of Required Lenders, Required Tranche A Term Lenders, Required Tranche B Term Lenders, Required Revolving Lenders or any provision providing for consent or other action by all Lenders;

(vi)    discharge any Credit Party from its respective payment Obligations under the Loan Documents, or release all or substantially all of the Collateral, except as otherwise may be provided in this Agreement or the other Loan Documents;

(vii)    affect the rights or duties of Tranche A Term Lenders (but not those of Tranche B Term Lender or Revolving Lender or in a manner disproportionate thereto), without the written consent of the Required Tranche A Term Lenders;

(viii)    affect the rights or duties of Tranche B Term Lenders (but not those of Tranche A Term Lender or Revolving Lender or in a manner disproportionate thereto), without the written consent of the Required Tranche B Term Lenders; or

(ix)    affect the rights or duties of the Revolving Lenders (but not those of the Term Lenders or in a manner disproportionate thereto), without the written consent of the Required Revolving Lenders; or

it being agreed that all Lenders shall be deemed to be directly affected by an amendment or waiver of the type described in the preceding clauses (iv), (v) and (vi).

(b)    No amendment, waiver or consent shall, unless in writing and signed by the Agent, in addition to the Required Lenders or all Lenders directly affected thereby, as the case may be (or by the Agent with the consent of the Required Lenders or all the Lenders directly affected thereby, as the case may be) and the Borrower Representative, affect the rights or duties of the Agent under this Agreement or any other Loan Document.

(c)    Notwithstanding anything to the contrary contained in this Section 9.1, (y) Agent may amend Schedule 1.1(a) to reflect Sales entered into pursuant to Section 9.9, and (z) Agent and Borrowers may amend or modify this Agreement and any other Loan Document to (1) cure any clerical defect or omission, or (2) grant a new Lien for the benefit of the Secured Parties, extend an existing Lien over additional property for the benefit of the Secured Parties or join additional Persons as Credit Parties.

9.2    Notices.

(a)    Addresses.    All notices, demands, requests, directions and other communications required or expressly authorized to be made by this Agreement shall, whether or not specified to be in writing but unless otherwise expressly specified to be given by any other means, be given in writing and (i) addressed to the address set forth on Schedule 9.2, (ii) posted to Intralinks® or SyndTrak®, Debt Domain (to the extent such system is available and set up by or at the direction of the Agent prior to posting) in an appropriate location by uploading such notice, demand, request, direction or other communication, (iii) posted to any other E-System set up by or at the direction of Agent or (iv) addressed to such other address as shall be notified in writing

(A) in the case of the Borrowers, and the Agent, to the other parties hereto and (B) in the case of all other parties, to the Borrower Representative and the Agent.  Transmission by electronic mail (including E-Fax) shall be sufficient or effective to transmit any such notice under this <u>clause (a)</u>, subject to <u>Section 9.3</u> below.

(b)     <u>Effectiveness</u>.  All communications described in <u>clause (a)</u> above and all other notices, demands, requests and other communications made in connection with this Agreement shall be effective and be deemed to have been received (i) if delivered by hand, upon personal delivery, (ii) if delivered by overnight courier service or by mail, upon receipt, (iii) if delivered by facsimile or other electronic transmission (including via e-mail but other than to post to an E-System pursuant to clause (a)(ii) or (a)(iii) above), upon sender's receipt of confirmation of proper transmission, and (iv) if delivered by posting to any E-System, on the later of the Business Day of such posting and the Business Day access to such posting is given to the recipient thereof in accordance with the standard procedures applicable to such E-System; <u>provided</u>, <u>however</u>, that no communications to Agent pursuant to Article I shall be effective until received by Agent.

(c)     Each Lender shall notify the Agent in writing of any changes in the address to which notices to such Lender should be directed, of addresses of its Lending Office, of payment instructions in respect of all payments to be made to it hereunder and of such other administrative information as the Agent shall reasonably request.

(d)     With respect to all references to written notice or written consent in this Agreement, such written notice or written consent may, in each case, be delivered by e-mail (or other electronic means), to the e-mail address set forth on <u>Schedule 9.2</u>, or as otherwise provided by the parties hereto from time to time.

9.3     <u>Electronic Transmissions</u>.

(a)     <u>Authorization</u>.  Subject to the provisions of <u>Section 9.2(a)</u>, each of Agent, Lenders, each Credit Party and each of their Related Persons, is authorized (but not required) to transmit, post or otherwise make or communicate, in its sole discretion, Electronic Transmissions in connection with any Loan Document and the transactions contemplated therein.  Each Credit Party and each Secured Party hereto acknowledges and agrees that the use of Electronic Transmissions is not necessarily secure and that there are risks associated with such use, including risks of interception, disclosure and abuse and each indicates it assumes and accepts such risks by hereby authorizing the transmission of Electronic Transmissions.

(b)     <u>Signatures</u>.  Subject to the provisions of <u>Section 9.2(a)</u>, (i)(A) no posting to any E-System shall be denied legal effect merely because it is made electronically, (B) each E-Signature on any such posting shall be deemed sufficient to satisfy any requirement for a "signature" and (C) each such posting shall be deemed sufficient to satisfy any requirement for a "writing", in each case including pursuant to any Loan Document, any applicable provision of any UCC, the federal Uniform Electronic Transactions Act, the Electronic Signatures in Global and National Commerce Act and any substantive or procedural Requirement of Law governing such subject matter, (ii) each such posting that is not readily capable of bearing either a signature or a reproduction of a signature may be signed, and shall be deemed signed, by attaching to, or logically

associating with such posting, an E-Signature, upon which each Secured Party and each Credit Party may rely and assume the authenticity thereof, (iii) each such posting containing a signature, a reproduction of a signature or an E-Signature shall, for all intents and purposes, have the same effect and weight as a signed paper original and (iv) each party hereto or beneficiary hereto agrees not to contest the validity or enforceability of any posting on any E-System or E-Signature on any such posting under the provisions of any applicable Requirement of Law requiring certain documents to be in writing or signed; provided, however, that nothing herein shall limit such party's or beneficiary's right to contest whether any posting to any E-System or E-Signature has been altered after transmission.

(c)     Separate Agreements.  All uses of an E-System shall be governed by and subject to, in addition to Section 9.2 and this Section 9.3, the separate terms, conditions and privacy policy posted or referenced in such E-System (or such terms, conditions and privacy policy as may be updated from time to time, including on such E-System) and related Contractual Obligations executed by Agent and Credit Parties in connection with the use of such E-System.

(d)     LIMITATION OF LIABILITY.  ALL E-SYSTEMS AND ELECTRONIC TRANSMISSIONS SHALL BE PROVIDED "AS IS" AND "AS AVAILABLE".  NONE OF AGENT, ANY LENDER OR ANY OF THEIR RELATED PERSONS WARRANTS THE ACCURACY, ADEQUACY OR COMPLETENESS OF ANY E-SYSTEMS OR ELECTRONIC TRANSMISSION AND DISCLAIMS ALL LIABILITY FOR ERRORS OR OMISSIONS THEREIN.  NO WARRANTY OF ANY KIND IS MADE BY AGENT, ANY LENDER OR ANY OF THEIR RELATED PERSONS IN CONNECTION WITH ANY E-SYSTEMS OR ELECTRONIC COMMUNICATION, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD-PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS. Each of each Borrower, each other Credit Party executing this Agreement and each Secured Party agrees that Agent has no responsibility for maintaining or providing any equipment, software, services or any testing required in connection with any Electronic Transmission or otherwise required for any E-System.

9.4     No Waiver; Cumulative Remedies.  No failure to exercise and no delay in exercising, on the part of the Agent or any Lender, any right, remedy, power or privilege hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  No course of dealing between any Credit Party, any Affiliate of any Credit Party, the Agent or any Lender shall be effective to amend, modify or discharge any provision of this Agreement or any of the other Loan Documents.

9.5     Costs and Expenses.  Any action taken by any Credit Party under or with respect to any Loan Document, even if required under any Loan Document or at the request of Agent or Required Lenders, shall be at the expense of such Credit Party, and neither Agent nor any other Secured Party shall be required under any Loan Document to reimburse any Credit Party or any Subsidiary of any Credit Party therefor except as expressly provided therein.  In addition, the Borrowers agree to pay or reimburse within ten (10) days after receipt of a summary invoice (in reasonable detail) therefor, (a) reasonable and documented (in summary form) out-of-pocket fees, costs, disbursements and expenses of (i) the Agent (including Attorney Costs of counsel to

the Agent) and (ii) the Lenders (including Attorney Costs of counsel to the Lenders), in the case of each of the foregoing clauses (i) and (ii), in connection with the negotiations, preparation, execution and delivery of the Loan Documents and the deemed funding of all Loans under this Agreement, including, without limitation, all due diligence, transportation, computer, duplication, messenger, audit, insurance, appraisal, valuation and consultant costs and expenses, and all search, filing and recording fees, incurred or sustained by the Agent and the Lenders, and their counsel and professional advisors in connection with this Agreement, the other Loan Documents or the transactions contemplated thereby, the administration of this Agreement and any amendment or waiver of any provision of the other Loan Documents, (b) the Agent for all reasonable costs and expenses incurred by it or any of its Related Persons in connection with internal audit reviews, field examinations and Collateral examinations (which shall be reimbursed, in addition to the out-of-pocket costs and expenses of such examiners, at the per diem rate per individual charged by the Agent for its examiners), and (c) fees, costs, disbursements and expenses of (i) the Agent and (ii) the Lenders (including all Attorney Costs of counsel to the Agent and Lenders) in connection with (x) any refinancing or restructuring of the credit arrangements provided hereunder in the nature of a "work-out", (y) the enforcement or preservation of any right or remedy under any Loan Document, any Obligation, with respect to the Collateral or any other related right or remedy or (z) the commencement, defense, conduct of, intervention in, or the taking of any other action with respect to, any proceeding (including any bankruptcy or insolvency proceeding) related to any Credit Party, any Subsidiary of any Credit Party, Loan Document, Obligation or Transaction (or the response to and preparation for any subpoena or request for document production relating thereto), including Attorney Costs, including, to the extent required, specialist counsel, in each case, incurred in connection with any of the matters referred to in clause (c) above.

9.6    <u>Indemnity</u>.

(a)    Each Credit Party agrees, jointly and severally, to indemnify, hold harmless and defend Agent, each Lender and each of their respective Related Persons (each such Person being an "<u>Indemnitee</u>") from and against all Liabilities (including (x) brokerage commissions, fees and other compensation and (y) reasonable and documented out-of-pocket fees and disbursements of one counsel, one local counsel in each relevant jurisdiction, and any successor counsel to primary or local counsel, for the Agent and one counsel for the other Indemnitees) that may be imposed on, incurred by or asserted or awarded against any such Indemnitee in any matter relating to or arising out of, in connection with or as a result of (i) any Loan Document, any Obligation (or the repayment thereof), the use or intended use of the proceeds of any Loan or the use of any securities filing of, or with respect to, any Credit Party, (ii) any commitment letter, proposal letter or term sheet with any Person or any Contractual Obligation, arrangement or understanding with any broker, finder or consultant, in each case entered into by or on behalf of any Credit Party or any Affiliate of any of them in connection with any of the foregoing and any Contractual Obligation entered into in connection with any E-Systems or other Electronic Transmissions, (iii) any actual or prospective investigation, litigation or other proceeding, whether or not brought by any such Indemnitee or any of its Related Persons, any holders of securities or creditors, whether or not any such Indemnitee, Related Person, holder or creditor is a party thereto, and whether or not based on any securities or commercial law or regulation or any other Requirement of Law or theory thereof, including common law, equity, contract, tort or otherwise, in each case, arising out of matters described in clauses (i) or (ii) above, or (iv) any other act, event or transaction related, contemplated in or attendant to any of the foregoing (collectively, the "<u>Indemnified Matters</u>");

provided, however, that no Credit Party shall have any liability under this Section 9.6 to any Indemnitee with respect to any Indemnified Matter, and no Indemnitee shall have any liability with respect to any Indemnified Matter other than (to the extent otherwise liable), to the extent such liability is found in a final non appealable judgment by a court of competent jurisdiction to have resulted solely from the gross negligence, or willful misconduct of such Indemnitee or its Related Persons. Furthermore, each Borrower and each other Credit Party executing this Agreement waives and agrees not to assert against any Indemnitee, and shall cause each other Credit Party to waive and not assert against any Indemnitee, any right of contribution with respect to any Liabilities that may be imposed on, incurred by or asserted against any Related Person. This Section 9.6(a) shall not apply with respect to Taxes other than Taxes that represent Liabilities arising from any non-Tax claim.

(b)     Without limiting the foregoing, "Indemnified Matters" includes all Environmental Liabilities, including those arising from, or otherwise involving, any property of any Credit Party or any Related Person of any Credit Party or any actual, alleged or prospective damage to property or natural resources or harm or injury alleged to have resulted from any Release of Hazardous Materials on, upon or into such property or natural resource or any property on or contiguous to any real property of any Credit Party or any Related Person or any Credit Party, whether or not, with respect to any such Environmental Liabilities, any Indemnitee is a mortgagee pursuant to any leasehold mortgage, a mortgagee in possession, the successor-in-interest to any Credit Party or any Related Person of any Credit Party or the owner, lessee or operator of any property of any Related Person through any foreclosure action, in each case except to the extent such Environmental Liabilities (i) are incurred solely following foreclosure by Agent or following Agent or any Lender having become the successor-in-interest to any Credit Party or any Related Person of any Credit Party and (ii) are attributable solely to acts of such Indemnitee.

9.7     Marshaling; Payments Set Aside. No Secured Party shall be under any obligation to marshal any property in favor of any Credit Party or any other Person or against or in payment of any Obligation. To the extent that any Secured Party receives a payment from a Borrower, from any other Credit Party, from the proceeds of the Collateral, from the exercise of its rights of setoff, any enforcement action or otherwise, and such payment is subsequently, in whole or in part, invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party, then to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor, shall be revived and continued in full force and effect as if such payment had not occurred.

9.8     Successors and Assigns. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; provided that any assignment by any Lender shall be subject to the provisions of Section 9.9 hereof, and provided further that no Credit Party may assign or transfer any of its rights or obligations under this Agreement without the prior written consent of the Agent and each Lender.

9.9     Assignments and Participations; Binding Effect.

(a)     This Agreement shall become effective when it shall have been executed by the Borrowers, the other Credit Parties signatory hereto and the Agent and when the Agent shall have been notified by each Lender that such Lender has executed it. Thereafter, it shall be binding

67

upon and inure to the benefit of, but only to the benefit of, the Borrowers, the other Credit Parties hereto (in each case except for Article VIII), the Agent and each Lender party hereto and, to the extent provided in Section 8.11, each other Secured Party and, in each case, their respective successors and permitted assigns.  Except as expressly provided in any Loan Document (including in Section 8.9), none of any Borrower, any other Credit Party or the Agent shall have the right to assign any rights or obligations hereunder or any interest herein.

(b)     Each Lender may sell, transfer, negotiate or assign (a "Sale") all or a portion of its rights and obligations hereunder (including all or a portion of its Commitments and its rights and obligations with respect to Loans) to (i) any existing Lender (other than a Non-Funding Lender or Impacted Lender), (ii) any Affiliate or Approved Fund of any existing Lender (other than a Non-Funding Lender or Impacted Lender) or (iii) any other Person acceptable (which acceptance shall not be unreasonably withheld or delayed) to the Agent; provided, however, that (x) such Sales do not have to be ratable between the Revolving Loan, the Tranche A Term Loan and the Tranche B Term Loan but must be ratable among the obligations owing to and owed by such Lender with respect to the Revolving Loans, Tranche A Term Loan or Tranche B Term Loan, (y) for each Loan, the aggregate outstanding principal amount (determined as of the effective date of the applicable Assignment) of the Loans and Commitments subject to any such Sale shall be in a minimum amount of $1,000,000, unless such Sale is made to an existing Lender or an Affiliate or Approved Fund of any existing Lender, is of the assignor's (together with its Affiliates and Approved Funds) entire interest in such facility or is made with the prior consent of the Borrower Representative and the Agent and (z) such Sales by Non-Funding Lenders shall be subject to Agent's prior written consent in all instances.

(c)     The parties to each Sale made in reliance on clause (b) above (other than those described in clause (e) or (f) below) shall execute and deliver to the Agent an Assignment via an electronic settlement system designated by the Agent (or, if previously agreed with the Agent, via a manual execution and delivery of the Assignment) evidencing such Sale, together with any existing Note subject to such Sale (or any affidavit of loss therefor acceptable to the Agent, at the direction of the Required Lenders), any tax forms required to be delivered pursuant to Section 10.1 and payment of an assignment fee in the amount of $3,500 provided that (1) if a Sale by a Lender is made to an Affiliate or an Approved Fund of such assigning Lender, then no assignment fee shall be due in connection with such Sale, and (2) if a Sale by a Lender is made to an assignee that is not an Affiliate or Approved Fund of such assignor Lender, and concurrently to one or more Affiliates or Approved Funds of such assignee, then only one assignment fee of $3,500 shall be due in connection with such Sale.  Upon receipt of all the foregoing, and conditioned upon such receipt and, if such Assignment is made in accordance with Section 9.9(b)(iii), upon the Agent (and the Borrower, if applicable) consenting to such Assignment (if required), from and after the effective date specified in such Assignment, the Agent shall record or cause to be recorded in the Register the information contained in such Assignment.

(d)     Subject to the recording of an Assignment by the Agent in the Register pursuant to Section 1.4(b), (i) the assignee thereunder shall become a party hereto and, to the extent that rights and obligations under the Loan Documents have been assigned to such assignee pursuant to such Assignment, shall have the rights and obligations of a Lender, (ii) any applicable Note shall be transferred to such assignee through such entry and (iii) the assignor thereunder shall, to the extent that rights and obligations under this Agreement have been assigned by it pursuant to

68

such Assignment, relinquish its rights (except for those surviving the termination of the Commitments and the payment in full of the Obligations) and be released from its obligations under the Loan Documents, other than those relating to events or circumstances occurring prior to such assignment (and, in the case of an Assignment covering all or the remaining portion of an assigning Lender's rights and obligations under the Loan Documents, such Lender shall cease to be a party hereto).

(e)      In addition to the other rights provided in this Section 9.9, each Lender may grant a security interest in, or otherwise assign as collateral, any of its rights under this Agreement, whether now owned or hereafter acquired (including rights to payments of principal or interest on the Loans), to (A) any federal reserve bank (pursuant to Regulation A of the Federal Reserve Board), by notice to the Agent or (B) any holder of, or trustee for the benefit of the holders of, such Lender's Indebtedness or equity securities, without notice to the Agent; provided, however, that no such holder or trustee, whether because of such grant or assignment or any foreclosure thereon (unless such foreclosure is made through an assignment in accordance with clause (b) above), shall be entitled to any rights of such Lender hereunder and no such Lender shall be relieved of any of its obligations hereunder.

(f)      In addition to the other rights provided in this Section 9.9, each Lender may, (x) with notice to the Agent, grant to an SPV the option to make all or any part of any Loan that such Lender would otherwise be required to make hereunder (and the exercise of such option by such SPV and the making of Loans pursuant thereto shall satisfy the obligation of such Lender to make such Loans hereunder) and such SPV may assign to such Lender the right to receive payment with respect to any Obligation and (y) without notice to or consent from the Agent or the Borrowers, sell participations to one or more Persons in or to all or a portion of its rights and obligations under the Loan Documents (including all its rights and obligations with respect to the Revolving Loans, Tranche A Term Loan and Tranche B Term Loan); provided, however, that, whether as a result of any term of any Loan Document or of such grant or participation, (i) no such SPV or participant shall have a commitment, or be deemed to have made an offer to commit, to make Loans hereunder, and, except as provided in the applicable option agreement, none shall be liable for any obligation of such Lender hereunder, (ii) such Lender's rights and obligations, and the rights and obligations of the Credit Parties and the Secured Parties towards such Lender, under any Loan Document shall remain unchanged and each other party hereto shall continue to deal solely with such Lender, which shall remain the holder of the Obligations in the Register, except that (A) each such participant and SPV shall be entitled to the benefit of Article X, but, with respect to Section 10.1, only to the extent such participant or SPV delivers the tax forms such Lender is required to collect pursuant to Section 10.1(f) and then only to the extent of any amount to which such Lender would be entitled in the absence of any such grant or participation and (B) each such SPV may receive other payments that would otherwise be made to such Lender with respect to Loans funded by such SPV to the extent provided in the applicable option agreement and set forth in a notice provided to the Agent by such SPV and such Lender, provided, however, that in no case (including pursuant to clause (A) or (B) above) shall an SPV or participant have the right to enforce any of the terms of any Loan Document, and (iii) the consent of such SPV or participant shall not be required (either directly, as a restraint on such Lender's ability to consent hereunder or otherwise) for any amendments, waivers or consents with respect to any Loan Document or to exercise or refrain from exercising any powers or rights such Lender may have under or in respect of the Loan Documents (including the right to enforce or direct enforcement of the Obligations),

except for those described in clauses (ii) and (iii) of <u>Section 9.1(a)</u> with respect to amounts, or dates fixed for payment of amounts, to which such participant or SPV would otherwise be entitled and, in the case of participants, except for those described in clause (vi) of <u>Section 9.1(a)</u>.  Each Lender that grants an option to a SPV or sells a participation, acting solely for this purpose as an agent of the Borrower, shall maintain a register on which it enters the name and address of each SPV and participant and the principal amounts (and stated interest) of each SPV and participant's interest in the Loans or other obligations under the Loan Documents (the "<u>SPV/Participant Register</u>"); provided that no Lender shall have any obligation to disclose all or any portion of the SPV/Participant Register (including the identity of any SPV or participant or any information relating to any SPV or participant's interest in any Loans or other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such Loan or other obligation is in registered form under Section 5f.103-1(c) or Section 1.871¬14(c) of the United States Treasury Regulations.  The entries in the SPV/Participant Register shall be conclusive absent manifest error, and the parties hereto shall treat each Person whose name is recorded in the SPV/Participant Register as the owner of such portion of the Loan or participation for all purposes of this Agreement notwithstanding any notice to the contrary.  No party hereto shall institute (and each Borrower shall cause each other Credit Party not to institute) against any SPV grantee of an option pursuant to this clause (f) any bankruptcy, reorganization, insolvency, liquidation or similar proceeding, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper of such SPV; <u>provided</u>, <u>however</u>, that each Lender having designated an SPV as such agrees to indemnify each Indemnitee against any Liability that may be incurred by, or asserted against, such Indemnitee as a result of failing to institute such proceeding (including a failure to get reimbursed by such SPV for any such Liability).  The agreement in the preceding sentence shall survive the termination of the Commitments and the payment in full of the Obligations.

    9.10    <u>Confidentiality</u>.  (a) Each Lender and the Agent agrees to use all reasonable efforts to maintain, in accordance with its customary practices, the confidentiality of information obtained by it pursuant to any Loan Document and designated in writing by any Credit Party as confidential for a period of two (2) years following the date on which this Agreement terminates in accordance with the terms hereof, except that such information may be disclosed (i) with the Borrower Representative's consent, (ii) to Related Persons of such Lender or the Agent, as the case may be, that are advised of the confidential nature of such information and are instructed to keep such information confidential, (iii) to the extent such information presently is or hereafter becomes available to such Lender or the Agent, as the case may be, on a non-confidential basis from a source other than any Credit Party, (iv) to the extent disclosure is required by applicable Requirements of Law or other legal process or requested or demanded by any Governmental Authority, (v) to the extent necessary or customary for inclusion in league table measurements or in any tombstone or other advertising materials (and the Credit Parties consent to the publication of such tombstone or other advertising materials by the Agent, any Lender or any of their Related Persons), (vi) (A) to the National Association of Insurance Commissioners or any similar organization, any examiner or any nationally recognized rating agency or (B) otherwise to the extent consisting of general portfolio information that does not identify borrowers, (vii) to current or prospective assignees, a Lender's current or prospective investors and funding source, SPVs (including the investors therein) or participants and to their respective Related Persons, in each case to the extent such assignees, investors, participants, counterparties or Related Persons agree to be bound by provisions substantially similar to the provisions of this <u>Section 9.10</u> and (viii) in

connection with the exercise of any remedy under any Loan Document.  In the event of any conflict between the terms of this <u>Section 9.10</u> and those of any other Contractual Obligation entered into with any Credit Party (whether or not a Loan Document), the terms of this <u>Section 9.10</u> shall govern.

(b)     Each Credit Party consents to the publication by Agent or any Lender of advertising material relating to the financing transactions contemplated by this Agreement; provided that under no circumstance shall Agent use a Borrower's or any other Credit Party's name, product photographs, logo or trademark without Borrower Representative's prior consent. Agent or such Lender shall provide a draft of any advertising material to Borrower Representative for review and comment prior to the publication thereof.

9.11    <u>Set-off; Sharing of Payments</u>.

(a)     <u>Right of Setoff</u>.    Each of the Agent, each Lender and each Affiliate (including each branch office thereof) of any of them is hereby authorized, without notice or demand (each of which is hereby waived by each Credit Party), at any time and from time to time during the continuance of any Event of Default and to the fullest extent permitted by applicable Requirements of Law, to set off and apply any and all deposits (whether general or special, time or demand, provisional or final but excluding deposits in any withholding tax or fiduciary account referred to in <u>Section 4.11</u>) at any time held and other Indebtedness, claims or other obligations at any time owing by the Agent, such Lender or any of their respective Affiliates to or for the credit or the account of the Borrowers or any other Credit Party against any Obligation of any Credit Party now or hereafter existing, whether or not any demand was made under any Loan Document with respect to such Obligation and even though such Obligation may be unmatured.  No Lender shall exercise any such right of set off without the prior consent of Agent or Required Lenders. Each of the Agent and each Lender agrees promptly to notify the Borrower Representative and the Agent after any such setoff and application made by such Lender or its Affiliates; <u>provided</u>, <u>however</u>, that the failure to give such notice shall not affect the validity of such setoff and application.  The rights under this <u>Section 9.11</u> are in addition to any other rights and remedies (including other rights of setoff) that the Agent, the Lenders, their Affiliates and the other Secured Parties, may have.

(b)     <u>Sharing of Payments, Etc</u>.  If any Lender, directly or through an Affiliate or branch office thereof, obtains any payment of any Obligation of any Credit Party (whether voluntary, involuntary or through the exercise of any right of setoff or the receipt of any Collateral or "proceeds" (as defined under the applicable UCC) of Collateral) other than pursuant to <u>Article X</u> or customary set off rights set forth in deposit account control agreements with a Lender and such payment exceeds the amount such Lender would have been entitled to receive if all payments had gone to, and been distributed by, the Agent in accordance with the provisions of the Loan Documents, such Lender shall purchase for cash from other Lenders such participations in their Obligations as necessary for such Lender to share such excess payment with such Lenders to ensure such payment is applied as though it had been received by the Agent and applied in accordance with this Agreement (or, if such application would then be at the discretion of the Borrowers, applied to repay the Obligations in accordance herewith); <u>provided</u>, <u>however</u>, that (a) if such payment is rescinded or otherwise recovered from such Lender in whole or in part, such purchase shall be rescinded and the purchase price therefor shall be returned to such Lender

71

without interest and (b) such Lender shall, to the fullest extent permitted by applicable Requirements of Law, be able to exercise all its rights of payment (including the right of setoff) with respect to such participation as fully as if such Lender were the direct creditor of the applicable Credit Party in the amount of such participation.  If a Non-Funding Lender or Impacted Lender receives any such payment as described in the previous sentence, such Lender shall turn over such payments to Agent in an amount that would satisfy the cash collateral requirements set forth in <u>Section 1.11(b)</u>.

9.12    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts and by different parties in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.  Signature pages may be detached from multiple separate counterparts and attached to a single counterpart.  Delivery of an executed signature page of this Agreement by facsimile transmission or Electronic Transmission shall be as effective as delivery of a manually executed counterpart hereof.

9.13    <u>Severability; Facsimile Signature</u>.  The illegality or unenforceability of any provision of this Agreement or any instrument or agreement required hereunder shall not in any way affect or impair the legality or enforceability of the remaining provisions of this Agreement or any instrument or agreement required hereunder.  Any Loan Document, or other agreement, document or instrument, delivered by facsimile transmission or, subject to the provisions hereof, Electronic Transmission, shall have the same force and effect as if the original thereof had been delivered.

9.14    <u>Captions</u>.  The captions and headings of this Agreement are for convenience of reference only and shall not affect the interpretation of this Agreement.

9.15    <u>Independence of Provisions</u>.  The parties hereto acknowledge that this Agreement and other Loan Documents may use several different limitations, tests or measurements to regulate the same or similar matters, and that such limitations, tests and measurements are cumulative and must each be performed, except as expressly stated to the contrary in this Agreement.

9.16    <u>Interpretation</u>.  This Agreement is the result of negotiations among and has been reviewed by counsel to the Agent, each Lender and other parties hereto, and is the product of all parties hereto.  Accordingly, this Agreement and the other Loan Documents shall not be construed against the Lenders or the Agent merely because of the Agent's or Lenders' involvement in the preparation of such documents and agreements.

9.17    <u>No Third Parties Benefited</u>.  This Agreement is made and entered into for the sole protection and legal benefit of the Borrowers, the Lenders, the Agent, and, subject to the provisions of <u>Section 8.11</u> hereof, each other Secured Party, and their permitted successors and assigns, and no other Person shall be a direct or indirect legal beneficiary of, or have any direct or indirect cause of action or claim in connection with, this Agreement or any of the other Loan Documents.  Neither the Agent nor any Lender shall have any obligation to any Person not a party to this Agreement or the other Loan Documents.

9.18    Governing Law and Jurisdiction.

(a)    Governing Law.  The laws of the State of New York shall govern all matters arising out of, in connection with or relating to this Agreement, including, without limitation, its validity, interpretation, construction, performance and enforcement.

(b)    Submission to Jurisdiction.  Any legal action or proceeding with respect to any Loan Document brought against Agent or any Lender may exclusively be brought in the courts of the United States of America sitting in the Southern District of New York, and if such courts do not have or abstain from exercising jurisdiction, in the courts of the State of New York located in the City of New York, Borough of Manhattan, and, by execution and delivery of this Agreement, each Borrower and each other Credit Party executing this Agreement hereby accepts for itself and in respect of its property, generally and unconditionally, the exclusive jurisdiction of the aforesaid courts.  The parties hereto (and, to the extent set forth in any other Loan Document, each other Credit Party) hereby irrevocably waive any objection, including any objection to the laying of venue or based on the grounds of forum non conveniens, that any of them may now or hereafter have to the bringing of any such action or proceeding in such jurisdictions.

(c)    Service of Process.  Each Credit Party hereby irrevocably waives personal service of any and all legal process, summons, notices and other documents and other service of process of any kind and consents to such service in any suit, action or proceeding brought in the United States of America with respect to or otherwise arising out of or in connection with any Loan Document by any means permitted by applicable Requirements of Law, including by the mailing thereof (by registered or certified mail, postage prepaid) to the address of Borrowers specified herein (and shall be effective when such mailing shall be effective, as provided therein). Each Credit Party agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(d)    Non-Exclusive Jurisdiction.  Nothing contained in this Section 9.18 shall affect the right of Agent or any Lender to serve process in any other manner permitted by applicable Requirements of Law or commence legal proceedings or otherwise proceed against any Credit Party in any other jurisdiction.

9.19    Waiver of Jury Trial.  THE PARTIES HERETO, TO THE EXTENT PERMITTED BY LAW, WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING ARISING OUT OF, IN CONNECTION WITH OR RELATING TO, THIS AGREEMENT, THE OTHER LOAN DOCUMENTS AND ANY OTHER TRANSACTION CONTEMPLATED HEREBY AND THEREBY.  THIS WAIVER APPLIES TO ANY ACTION, SUIT OR PROCEEDING WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE.

9.20    Entire Agreement; Release; Survival.

(a)    THE LOAN DOCUMENTS EMBODY THE ENTIRE AGREEMENT OF THE PARTIES AND SUPERSEDE ALL PRIOR AGREEMENTS AND UNDERSTANDINGS RELATING TO THE SUBJECT MATTER THEREOF AND ANY PRIOR LETTER OF INTEREST, CONFIDENTIALITY AND SIMILAR AGREEMENTS INVOLVING ANY

CREDIT PARTY AND ANY LENDER OR ANY OF THEIR RESPECTIVE AFFILIATES RELATING TO A FINANCING OF SUBSTANTIALLY SIMILAR FORM, PURPOSE OR EFFECT, THE TERMS OF THIS AGREEMENT SHALL GOVERN (UNLESS SUCH TERMS OF SUCH OTHER LOAN DOCUMENTS ARE NECESSARY TO COMPLY WITH APPLICABLE REQUIREMENTS OF LAW, IN WHICH CASE SUCH TERMS SHALL GOVERN TO THE EXTENT NECESSARY TO COMPLY THEREWITH).

(b)     Execution of this Agreement by the Credit Parties constitutes a full, complete and irrevocable release of any and all claims which each Credit Party may have at law or in equity in respect of all prior discussions and understandings, oral or written, relating to the subject matter of this Agreement and the other Loan Documents.  In no event shall any Indemnitee be liable on any theory of liability for any special, indirect, consequential or punitive damages (including any loss of profits, business or anticipated savings).  Each Borrower and each other Credit Party signatory hereto hereby waives, releases and agrees (and shall cause each other Credit Party to waive, release and agree) not to sue upon any such claim for any special, indirect, consequential or punitive damages, whether or not accrued and whether or not known or suspected to exist in its favor.

(c)     (i) Any indemnification or other protection provided to any Indemnitee pursuant to Article VIII (The Agent), Section 9.5 (Costs and Expenses), Section 9.6 (Indemnity), this Section 9.20, and Article X (Taxes, Yield Protection and Illegality) of this Agreement, (ii) solely for the two (2) year time period specified therein, the provisions of Section 9.10 of this Agreement and (iii) the provisions of Section 8.1 of the Guaranty and Security Agreement, in each case, shall (x) survive the termination of the Commitments and the payment in full of all other Obligations and (y) with respect to clause (i) hereof, inure to the benefit of any Person that at any time held a right thereunder (as an Indemnitee or otherwise) and, thereafter, its successors and permitted assigns.

9.21    Patriot Act.  Each Lender that is subject to the Patriot Act hereby notifies the Borrowers that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies each Borrower, which information includes the name and address of each Borrower and other information that will allow such Lender to identify each Borrower in accordance with the Patriot Act.

9.22    [Reserved].

9.23    Joint and Several.  The obligations of the Credit Parties hereunder and under the other Loan Documents are joint and several.  Without limiting the generality of the foregoing, reference is hereby made to Article II of the Guaranty and Security Agreement, to which the obligations of Borrower and the other Credit Parties are subject.

9.24    Creditor-Debtor Relationship.  The relationship between Agent and each Lender, on the one hand, and the Credit Parties, on the other hand, is solely that of creditor and debtor.  No Secured Party has any fiduciary relationship or duty to any Credit Party arising out of or in connection with, and there is no agency, tenancy or joint venture relationship between the Secured Parties and the Credit Parties by virtue of, any Loan Document or any transaction contemplated therein.

9.25    [Reserved].

9.26    Acknowledgement and Consent to Bail-In of EEA Financial Institutions. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)    the effects of any Bail-in Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

ARTICLE X - TAXES, YIELD PROTECTION AND ILLEGALITY

10.1    Taxes.

(a)    Except as otherwise provided in this Section 10.1 or by a Requirement of Law, each payment by any Credit Party under any Loan Document shall be made free and clear of all present or future taxes, levies, imposts, deductions, charges or withholdings and all interest, penalties or similar liabilities with respect thereto (and without deduction for any of them) (collectively, but excluding the taxes set forth in clauses (i), (ii) and (iii) below, the "Taxes") other than for (i) taxes measured by net income (including branch profits taxes) and franchise taxes imposed in lieu of net income taxes, in each case imposed on any Secured Party as a result of (x) a present or former connection between such Person and the jurisdiction of the Governmental Authority imposing such tax or any political subdivision or taxing authority thereof or therein (other than such connection arising solely from any Secured Party having executed, delivered or performed its obligations or received a payment under, or enforced, any Loan Document) or (y) such Secured Party being organized under the laws of, or having its principal office, or in the case of any Lender, its applicable lending office located in the jurisdiction imposing the tax (or any political subdivision thereof); (ii) taxes that are attributable to the failure by Agent or any Lender to comply with clause (f) below; or (iii) any withholding tax that is imposed under Sections 1471 through 1474 of the Code as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), including any

75

current or future United States Treasury Regulations promulgated thereunder, any official interpretation or other guidance issued in connection therewith, any agreement entered into under Section 1471(b)(1) of the Code, and any applicable intergovernmental agreements or any non-U.S. implementing legislation with respect thereto ("<u>FATCA</u>").

(b)    If any Taxes shall be required by a Requirement of Law to be deducted from or in respect of any amount payable under any Loan Document by a Credit Party to any Secured Party (i) such amount shall be increased as necessary to ensure that, after all required deductions for Taxes are made (including deductions applicable to any increases to any amount under this <u>Section 10.1</u>), such Secured Party receives the amount it would have received had no such deductions been made, (ii) the relevant Credit Party shall be entitled to make such deductions, (iii) the relevant Credit Party shall timely pay the full amount deducted to the relevant taxing authority or other authority in accordance with applicable Requirements of Law and (iv) within thirty (30) days after such payment is made, the relevant Credit Party, if the applicable withholding agent, shall deliver to the Agent an original or certified copy of a receipt evidencing such payment; <u>provided</u>, <u>however</u>, that no such increase shall be made with respect to, and no Credit Party shall be required to indemnify any Secured Party pursuant to clause (d) below for, Taxes to the extent that the obligation to pay or withhold such Taxes existed on the date that such Person became a "Secured Party" under this Agreement or arose due to a change in circumstances of such Secured Party after the Closing Date (including, but not limited to, a Lender changing its lending office, but other than a change in any statute, treaty, regulation or other applicable law with respect to taxes), except in each case to the extent (other than with respect to a change in any statute, treaty, regulation or other applicable law with respect to taxes) (x) such Person is a direct or indirect assignee (other than pursuant to <u>Section 9.22</u>) of any other Secured Party that was entitled, at the time the assignment to such Person became effective, to receive additional amounts under this clause (b), or (y) such Lender was entitled, at the time it changed its lending office, to receive additional amounts under this clause (b) in such amounts.

(c)    In addition, the Borrowers agree to pay, and authorize the Agent to pay in their name, any stamp, documentary, excise or property tax, charges or similar levies imposed by any applicable Requirement of Law or Governmental Authority and all interest, penalties or similar liabilities with respect thereto (including by reason of any delay in payment thereof), in each case arising from the execution, delivery or registration of, or otherwise with respect to, any Loan Document or any transaction contemplated therein (collectively, "<u>Other Taxes</u>").  Within ten (10) days after the date of any payment of Taxes or Other Taxes by any Credit Party, the Borrowers shall furnish to the Agent, at its address referred to in <u>Section 9.2</u>, the original or a certified copy of a receipt evidencing payment thereof.

(d)    The Borrowers shall reimburse and indemnify, within ten (10) days after receipt of demand therefor (with copy to the Agent), each Secured Party for all Taxes and Other Taxes (including any Taxes and Other Taxes imposed by any jurisdiction on amounts payable under this <u>Section 10.1</u>) paid by such Secured Party, whether or not such Taxes or Other Taxes were correctly or legally asserted.  A certificate of the Secured Party (or of the Agent on behalf of such Secured Party) claiming any compensation under this clause (d), setting forth the amounts to be paid thereunder together with an original or certified copy of a receipt, if any, evidencing payment of Taxes or other Taxes for which the compensation is claimed and delivered to the

EAST\174048880.4

Borrower Representative with copy to the Agent, shall be conclusive, binding and final for all purposes, absent manifest error.

(e)    [Reserved].

(f)

(i)    Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrowers and the Agent, at the time or times reasonably requested by the Borrowers or the Agent, such properly completed and executed documentation reasonably requested by the Borrowers or the Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrower or the Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Agent as will enable the Borrower or the Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in <u>Section 10.1(f)(ii)(A)</u> or <u>(B), (iii), (iv)</u> and <u>(v)</u> below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)    Each Non-U.S. Lender Party shall (w) on or prior to the date such Non-U.S. Lender Party becomes a "Non-U.S. Lender Party" hereunder, (x) on or prior to the date on which any such form or certification expires or becomes obsolete, (y) after the occurrence of any event requiring a change in the most recent form or certification previously delivered by it pursuant to this clause (i) and (z) from time to time if requested by the Borrower Representative or the Agent (or, in the case of a participant or SPV, the relevant Lender), provide the Agent and the Borrower Representative (or, in the case of a participant or SPV, the relevant Lender) with two completed originals of each of the following, as applicable: (A) Forms W-8ECI (claiming exemption from U.S. withholding tax because the income is effectively connected with a U.S. trade or business), W-8BEN or W-8BEN-E (claiming exemption from, or a reduction of, U.S. withholding tax under an income tax treaty, if any) and/or W-8IMY (accompanied by Forms W-8BEN or W-8BEN-E, Form W-8ECI, Form W-9 or other certification documents from each beneficial owner, as applicable) or any successor forms, (B) in the case of a Non-U.S. Lender Party claiming exemption under Sections 871(h) or 881(c) of the Code, Form W-8BEN or W-8BEN-E (claiming exemption from U.S. withholding tax under the portfolio interest exemption) or any successor form and a certificate in form and substance acceptable to the Agent that such Non-U.S. Lender Party is not (1) a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (2) a "10 percent shareholder" of the Borrowers within the meaning of Section 881(c)(3)(B) of the Code or (3) a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code or (C) any other applicable document prescribed by the IRS or applicable law certifying as to the entitlement of such Non-U.S. Lender Party to such exemption from United States withholding tax or reduced rate with respect to all payments to be made to

77

such Non-U.S. Lender Party under the Loan Documents, or otherwise as prescribed by applicable law as a basis for claiming exemption from or a reduction in United States withholding tax, in each case, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrowers or the Agent to determine the withholding or deduction required to be made.  Unless the Borrower Representative and the Agent have received forms or other documents satisfactory to them indicating that payments under any Loan Document to or for a Non-U.S. Lender Party are not subject to United States withholding tax or are subject to such tax at a rate reduced by an applicable tax treaty, the Credit Parties and the Agent shall be entitled to withhold amounts required to be withheld by applicable Requirements of Law from such payments at the applicable statutory rate.

(iii)    Each U.S. Lender Party shall (A) on or prior to the date such U.S. Lender Party becomes a "U.S. Lender Party" hereunder, (B) on or prior to the date on which any such form or certification expires or becomes obsolete, (C) after the occurrence of any event requiring a change in the most recent form or certification previously delivered by it pursuant to this clause (f) and (D) from time to time if requested by the Borrower Representative or the Agent (or, in the case of a participant or SPV, the relevant Lender), provide the Agent and the Borrower Representative (or, in the case of a participant or SPV, the relevant Lender) with two completed originals of Form W-9 (certifying that such U.S. Lender Party is not subject to U.S. backup withholding tax) or any successor form.

(iv)    Each Non-U.S. Lender Party shall deliver to the Borrower Representative and the Agent (or, in the case of a participant or SPV, the relevant Lender), on or prior to the date on which such Non-U.S. Lender Party becomes a Lender hereunder (or a participant or SPV hereunder), and from time to time thereafter upon the reasonable request of the Borrower Representative or the Agent, in such number of copies as shall be requested by the Borrower Representative or the Agent, any documentation that is required under FATCA, and such additional documentation reasonably requested by the Borrower Representative or the Agent, to enable the Borrower Representative and the Agent to determine and execute their obligations, duties and liabilities with respect to FATCA, including but not limited to any Taxes they may be required to withhold in respect of FATCA.  Solely for purposes of this Section 10.1(f)(iii), "FATCA" shall include any amendments made to Sections 1471 through 1474 of the Code after the date of this Agreement.

(v)    Each Lender having sold a participation in any of its Obligations or identified an SPV as such to the Agent shall collect from such participant or SPV the documents described in this clause (f) and provide them to the Agent.

(vi)    Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower Representative and the Agent in writing of its legal inability to do so.

(g)    If the Borrowers pay any amounts pursuant to the provisions of this Section 10.1, and if thereafter any Secured Party becomes aware that it has received or been granted a

credit against, a refund of, or other relief for Taxes payable by such Secured Party in respect of the amounts so paid by the Borrowers (including by the payment of additional amounts pursuant to Section 10.1(b)), such Secured Party shall to the extent that it can do so without prejudice to the retention of the amount of such credit or other relief and provided no Event of Default then exists, pay to the Borrowers within thirty (30) days after the date on which such Secured Party became aware that it effectively obtained the benefit of such credit or other relief an amount equal to such credit, refund, or other relief less any sum which it is required by law to deduct therefrom and less any fees and out-of-pocket expenses (including Taxes) incurred by such Secured Party in connection therewith.  Such Secured Party may, in its reasonable discretion, determine the order of utilization of all charges, deductions, credits and expenses which reduce taxes imposed on its net income.  Nothing in this Section 10.1(g) shall be construed as requiring any Secured Party to (A) conduct its business or to arrange or alter in any respect its tax or financial affairs so that it is entitled to receive such refund, credit or other relief, other than performing any ministerial acts necessary to be entitled to receive such credit or other relief or (B) disclose any tax return or any other information that it deems confidential.

10.2     Illegality.  If after the date hereof any Lender shall determine that the introduction of any Requirement of Law, or any change in any Requirement of Law or in the interpretation or administration thereof, has made it unlawful, or that any central bank or other Governmental Authority has asserted that it is unlawful, for any Lender or its Lending Office to make LIBOR Rate Loans, then, on notice thereof by such Lender to the Borrowers through the Agent, the obligation of that Lender to make LIBOR Rate Loans shall be suspended until such Lender shall have notified the Agent and the Borrower Representative that the circumstances giving rise to such determination no longer exists.

(a)     Subject to clause (c) below, if any Lender shall determine that it is unlawful to maintain any LIBOR Rate Loan, the Borrowers shall prepay in full all LIBOR Rate Loans of such Lender then outstanding, together with interest accrued thereon, either on the last day of the Interest Period thereof if such Lender may lawfully continue to maintain such LIBOR Rate Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such LIBOR Rate Loans, together with any amounts required to be paid in connection therewith pursuant to Section 10.4.

(b)     If the obligation of any Lender to make or maintain LIBOR Rate Loans has been terminated, the Borrower Representative may elect, by giving notice to such Lender through the Agent that all Loans which would otherwise be made by any such Lender as LIBOR Rate Loans shall be instead Base Rate Loans.

(c)     Before giving any notice to the Agent pursuant to this Section 10.2, the affected Lender shall designate a different Lending Office with respect to its LIBOR Rate Loans if such designation will avoid the need for giving such notice or making such demand and will not, in the judgment of the Lender, be illegal or otherwise disadvantageous to the Lender.

10.3     Increased Costs and Reduction of Return.

(a)     If any Lender shall determine that, due to either (i) the introduction of, or any change in, or in the interpretation of, any law or regulation or (ii) the compliance with any

guideline or request from any central bank or other Governmental Authority (whether or not having the force of law), in the case of either clause (i) or (ii) subsequent to the date hereof, there shall be any increase in the cost to such Lender of agreeing to make or making, funding or maintaining any LIBOR Rate Loans, then the Borrowers shall be liable for, and shall from time to time, within ten (10) days of demand therefor by such Lender (with a copy of such demand to the Agent), pay to the Agent for the account of such Lender, additional amounts as are sufficient to compensate such Lender for such increased costs; provided, that the Borrowers shall not be required to compensate any Lender pursuant to this Section for any increased costs incurred more than 270 days prior to the date that such Lender notifies the Borrower Representative, in writing of the increased costs and of such Lender's intention to claim compensation thereof; provided, further, that if the circumstance giving rise to such increased costs is retroactive, then the 270-day period referred to above shall be extended to include the period of retroactive effect thereof; provided, further, that notwithstanding anything to the contrary in this Section 10.3, it shall be a condition to a Lender's exercise of its rights, if any, under this Section 10.3 that such Lender shall generally be exercising similar rights with respect to borrowers under similar agreements where available.

(b)     If any Lender shall have determined that:

(i)     the introduction of any Capital Adequacy Regulation;

(ii)     any change in any Capital Adequacy Regulation;

(iii)     any change in the interpretation or administration of any Capital Adequacy Regulation by any central bank or other Governmental Authority charged with the interpretation or administration thereof; or

(iv)     compliance by such Lender (or its Lending Office) or any entity controlling the Lender, with any Capital Adequacy Regulation;

affects the amount of capital required or expected to be maintained by such Lender or any entity controlling such Lender and (taking into consideration such Lender's or such entities' policies with respect to capital adequacy and such Lender's desired return on capital) determines that the amount of such capital is increased as a consequence of its Commitment(s), loans, credits or obligations under this Agreement, then, within ten (10) days of demand of such Lender (with a copy to the Agent), the Borrowers shall pay to such Lender, from time to time as specified by such Lender, additional amounts sufficient to compensate such Lender (or the entity controlling the Lender) for such increase; provided, that the Borrowers shall not be required to compensate any Lender pursuant to this Section for any amounts incurred more than 270 days prior to the date that such Lender notifies the Borrower Representative, in writing of the amounts and of such Lender's intention to claim compensation thereof; provided, further, that if the event giving rise to such increase is retroactive, then the 270-day period referred to above shall be extended to include the period of retroactive effect thereof; provided, further, that notwithstanding anything to the contrary in this Section 10.3, it shall be a condition to a Lender's exercise of its rights, if any, under this Section 10.3 that such Lender shall generally be exercising similar rights with respect to borrowers under similar agreements where available.

(c)    This <u>Section 10.3</u> shall not apply to increased costs with respect to any Taxes (which for purposes of this <u>Section 10.3</u> shall include the items set forth in clauses (i), (ii) and (iii) of <u>Section 10.1(a)</u>), levels, imposts, deductions, charges or withholdings and liabilities with respect thereto, which shall be governed solely by <u>Section 10.1</u>, other than financial transaction Taxes, core capital Taxes or similar Taxes.

(d)    Notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States of America or foreign regulatory authorities, in each case in respect of this clause (ii) pursuant to Basel III, shall, in each case, be deemed to be a change in a Requirement of Law under subsection (a) above and/or a change in Capital Adequacy Regulation under subsection (b) above, as applicable, regardless of the date enacted, adopted or issued.

10.4    <u>Funding Losses</u>.  The Borrowers agree to reimburse each Lender and to hold each Lender harmless from any loss or expense which such Lender may sustain or incur as a consequence of:

(a)    the failure of the Borrowers to make any payment or mandatory prepayment of principal of any LIBOR Rate Loan (including payments made after any acceleration thereof);

(b)    the failure of the Borrowers to continue or convert a Loan after the Borrower Representative has given (or is deemed to have given) a Notice of Conversion/Continuation;

(c)    the failure of the Borrowers to make any prepayment after the Borrowers have given a notice in accordance with <u>Section 1.7</u>;

(d)    the prepayment (including pursuant to <u>Section 1.8</u>) of a LIBOR Rate Loan on a day which is not the last day of the Interest Period with respect thereto including pursuant to an assignment in accordance with <u>Section 9.22</u>; or

(e)    to the extent permitted hereunder, the conversion pursuant to <u>Section 1.6</u> of any LIBOR Rate Loan to a Base Rate Loan on a day that is not the last day of the applicable Interest Period;

including any such loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain its LIBOR Rate Loans hereunder or from fees payable to terminate the deposits from which such funds were obtained (but excluding loss of anticipated profits); provided that, with respect to the expenses described in clauses (d) and (e) above, such Lender shall have notified Agent of any such expense within two (2) Business Days of the date on which such expense was incurred.  Solely for purposes of calculating amounts payable by the Borrowers to the Lenders under this <u>Section 10.4</u> and under <u>Section 10.3(a)</u>:  each LIBOR Rate Loan made by a Lender (and each related reserve, special deposit or similar requirement) shall be conclusively deemed to have been funded at the LIBOR used in determining the interest rate for such LIBOR Rate Loan by a matching deposit or other borrowing in the interbank eurodollar market for a comparable amount and for a comparable period, whether or not such LIBOR Rate Loan is in fact so funded.

10.5    <u>Inability to Determine Rates</u>.  If the Agent shall have determined in good faith that for any reason adequate and reasonable means do not exist for ascertaining the LIBOR for any requested Interest Period with respect to a proposed LIBOR Rate Loan or that the LIBOR applicable pursuant to <u>Section 1.3(a)</u> for any requested Interest Period with respect to a proposed LIBOR Rate Loan does not adequately and fairly reflect the cost to the Lenders of funding (or deemed funding) such Loan, the Agent will forthwith give notice of such determination to the Borrower Representative and each Lender.  Thereafter, the obligation of the Lenders to make or maintain LIBOR Rate Loans hereunder shall be suspended until the Agent revokes such notice in writing.  Upon receipt of such notice, the Borrower Representative may revoke any Notice of Borrowing or Notice of Conversion/Continuation then submitted by it.  If the Borrower Representative does not revoke such notice, the Lenders shall make, convert or continue the Loans, as proposed by the Borrower Representative, in the amount specified in the applicable notice submitted by the Borrower Representative, but such Loans shall be made, converted or continued as Base Rate Loans.

10.6    <u>Reserves on LIBOR Rate Loans</u>.  The Borrowers shall pay to each Lender, as long as such Lender shall be required under regulations of the Federal Reserve Board to maintain reserves with respect to liabilities or assets consisting of or including Eurocurrency funds or deposits (currently known as "<u>Eurocurrency liabilities</u>"), additional costs on the unpaid principal amount of each LIBOR Rate Loan equal to actual costs of such reserves allocated to such Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive absent demonstrable error), payable on each date on which interest is payable on such Loan provided the Borrower Representative shall have received at least ten (10) days' prior written notice (with a copy to the Agent) of such additional interest from the Lender.  If a Lender fails to give notice ten (10) days prior to the relevant Interest Payment Date, such additional interest shall be payable ten (10) days from receipt of such notice.

10.7    <u>Certificates of Lenders</u>.    Any Lender claiming reimbursement or compensation pursuant to this <u>Article X</u> shall deliver to the Borrower Representative (with a copy to the Agent) a certificate setting forth in reasonable detail the amount payable to such Lender hereunder and such certificate shall be conclusive and binding on the Borrowers in the absence of manifest error.

ARTICLE XI - DEFINITIONS

11.1    <u>Defined Terms</u>.    The following terms are defined in the Sections or subsections referenced opposite such terms:

| | |
|---|---|
| "Affected Lender" | 9.22 |
| "Agreement" | Preamble |
| "Assessments" | 3.23(i) |
| "Bankruptcy Court" | Recitals |
| "Borrower" and "Borrowers" | Preamble |
| "Borrower Representative" | 1.12 |
| "Chapter 11 Cases" | Recitals |
| "Communication" | 1.11(f) |
| "Compliance Certificate" | Exhibit 4.2(b) |

| | |
|---|---|
| "DIP Agent" | Recitals |
| "Effective Date" | 2.1(d) |
| "Event of Default" | 7.1 |
| "FATCA" | 10.1(a) |
| "Governmental Third Party Payor" | 3.23(e) |
| "Governmental Third Party Payor Programs" | 3.23(e) |
| "HIPAA Compliance Date" | 4.15(c) |
| "HIPAA Compliance Plan" | 4.15(c) |
| "HIPAA Compliant" | 4.15(c) |
| "Indemnified Matters" | 9.6 |
| "Indemnitee" | 9.6 |
| "Investments" | 5.4 |
| "Lender" | Preamble |
| "MNPI" | 8.1(b) |
| "Notice of Conversion/Continuation" | Exhibit 1.6 |
| "Other Taxes" | 10.1(c) |
| "Participant Register" | 1.4(e) |
| "Permitted Liens" | 5.1 |
| "Petition Date" | Recitals |
| "Private Third Party Payor" | 3.23(d) |
| "Private Third Party Payor Programs" | 3.23(d) |
| "Register" | 1.4(b) |
| "Restricted Payments" | 5.11 |
| "Sale" | 9.9(b) |
| "Segregated Governmental Account" | 4.11 |
| "SPV/Participant Register" | 9.9(f) |
| "Taxes" | 10.1(a) |
| "Tax Returns" | 3.10 |

In addition to the terms defined elsewhere in this Agreement, the following terms have the following meanings:

"Acceptable Auditing Firm" means any top ranked accounting firm that is acceptable to the Agent, at the direction of the Required Lenders.

"Account" means, as at any date of determination, all "accounts" (as such term is defined in the UCC) of the Borrowers and their Subsidiaries, including, without limitation, the unpaid portion of the obligation of a customer of a Borrower or any of its Subsidiaries in respect of Inventory purchased by and shipped to such customer and/or the rendition of services by a Borrower or such Subsidiary, as stated on the respective invoice of a Borrower or such Subsidiary, net of any credits, rebates or offsets owed to such customer.

"Account Debtor" means any Person who is or may become obligated with respect to, or on account of, an Account, chattel paper or general intangible, including a payment intangible (as such terms are defined in the Uniform Commercial Code)).

"Acquisition" means any transaction or series of related transactions for the purpose of or resulting, directly or indirectly, in (a) the acquisition of all or substantially all of the assets of a Person, or of any business or division of a Person, (b) the acquisition of in excess of fifty percent (50%) of the Stock and Stock Equivalents of any Person or otherwise causing any Person to become a Subsidiary of a Borrower, or (c) a merger or consolidation or any other combination with another Person.

"Affiliate" means, as to any Person, any other Person which, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person. A Person shall be deemed to control another Person if the controlling Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of the other Person, whether through the ownership of voting securities, by contract or otherwise. Without limitation, any director, executive officer or beneficial owner of ten percent (10%) or more of the Stock (either directly or through ownership of Stock Equivalents) of a Person shall for the purposes of this Agreement, be deemed to control the other Person. Notwithstanding the foregoing, neither the Agent nor any Lender shall be deemed an "Affiliate" of any Credit Party or of any Subsidiary of any Credit Party.

"Agent" means Bridging Finance Inc. in its capacity as administrative agent for the Lenders hereunder, and any successor administrative agent.

"Aggregate Revolving Loan Commitment" means the combined Revolving Loan Commitments of the Lenders, which shall be in the amount of $[2,500,000] on the Closing Date, as such amount may be reduced from time to time pursuant to this Agreement.

"Aggregate Tranche A Term Loan Commitment" means the combined Tranche A Term Loan Commitments of the Lenders, which shall be in the amount of $[10,000,000] on the Closing Date, as such amount may be reduced from time to time pursuant to this Agreement.

"Aggregate Tranche B Term Loan Commitment" means the combined Tranche B Term Loan Commitments of the Lenders, which shall be in the amount of $[27,500,000] on the Closing Date, as such amount may be reduced from time to time pursuant to this Agreement.

"Applicable Margin" means, (i) with respect to the Revolving Loans, (x) if a Base Rate Loan, five percent (5.00%) per annum and (y) if a LIBOR Rate Loan, six percent (6.00%) per annum, and (ii) with respect to the Tranche A Term Loans, (x) if a Base Rate Loan, 7.50% per annum and (y) if a LIBOR Rate Loan, 8.50% per annum.

"Approved Fund" means, with respect to any Lender, any Person (other than a natural Person) that (a) (i) is or will be engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the Ordinary Course of Business or (ii) temporarily warehouses loans for any Lender or any Person described in clause (i) above and (b) is advised or managed by (i) such Lender, (ii) any Affiliate of such Lender or (iii) any Person (other than an individual) or any Affiliate of any Person (other than an individual) that administers or manages such Lender.

"Assignment" means an assignment agreement entered into by a Lender, as assignor, and any Person, as assignee, pursuant to the terms and provisions of Section 9.9 (with the consent of

84

any party whose consent is required by Section 9.9), accepted by the Agent, in substantially the form of Exhibit 11.1(a) or any other form approved by the Agent with the consent of the Required Lenders.

"Attorney Costs" means and includes all reasonable fees and disbursements of any law firm or other external counsel.

"Availability Period" means the period from but not including the Closing Date to the earliest of (i) the Maturity Date, (ii) the date of termination of the Aggregate Revolving Loan Commitments pursuant to Section 1.7 and (iii) the date of termination of the commitment of each Revolving Lender to make Revolving Loans pursuant to Section 7.2.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"Bankruptcy Code" means the Federal Bankruptcy Reform Act of 1978 (11 U.S.C. §101, et seq.), as amended and in effect from time to time and the regulations issued from time to time thereunder.

"Base Rate" means, for any day, a rate per annum equal to the highest of (a) the rate last quoted by The Wall Street Journal as the "Prime Rate" in the United States or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by Agent) or any similar release by the Federal Reserve Board (as determined by Agent), (b) the sum of 0.50% per annum and the Federal Funds Rate, and (c) the sum of (x) LIBOR, as defined herein, calculated for each such day based on an Interest Period of one month determined two (2) Business Days prior to such day (but for the avoidance of doubt, not less than one percent (1.00%) per annum), plus (y) the excess of the Applicable Margin for LIBOR Rate Loans over the Applicable Margin for Base Rate Loans, in each instance, as of such day. Any change in the Base Rate due to a change in any of the foregoing shall be effective on the effective date of such change in the "bank prime loan" rate, the Federal Funds Rate, or LIBOR for an Interest Period of three months.

"Base Rate Loan" means a Loan that bears interest based on the Base Rate.

"Beneficial Ownership Certification" means a certification regarding beneficial ownership required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" means 31 C.F.R. § 1010.230.

"Benefit Plan" means any employee benefit plan as defined in Section 3(3) of ERISA (whether governed by the laws of the United States or otherwise) to which any Credit Party incurs or otherwise has any obligation or liability, contingent or otherwise.

"Borrowing" means a borrowing hereunder consisting of Loans made to or for the benefit of the Borrowers on the same day by the Lenders pursuant to Article I.

"Budget" means the rolling 13-week cash flow forecast for the Credit Parties' collections and disbursements that is consistent with the Projections, as updated on a monthly basis pursuant to Section 4.2(e).

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the laws of, or are in fact closed in, the State of New York or Florida or the Province of Ontario, Canada, and, in the case of a Business Day that relates to a LIBOR Rate Loan, on which dealings are carried on in the London interbank eurodollar market.

"Capital Adequacy Regulation" means any guideline, request or directive of any central bank or other Governmental Authority, or any other law, rule or regulation, whether or not having the force of law, in each case, regarding capital adequacy or liquidity of any Lender or of any corporation controlling a Lender.

"Capital Expenditures" means, for any period, an amount equal to the aggregate of all expenditures and other obligations for the period of measurement which should be capitalized under GAAP, less, in each case, to the extent otherwise included, capital expenditures included above reimbursed in cash during the applicable period of measurement from any Person that is not a Credit Party or any Subsidiary thereof and for which no Credit Party or Subsidiary thereof has any corresponding obligation or liability to such Person with respect to such expenditure.

"Capital Lease" means any leasing or similar arrangement which, in accordance with GAAP, is classified as a capital lease.

"Capital Lease Obligations" means all monetary obligations of any Credit Party or any Subsidiary of any Credit Party under any Capital Leases.

"Capitated Contracts" means any of Credit Parties' contracts whether presently existing or hereafter executed between a Credit Party and various health maintenance organizations and all proceeds therefrom.

"Cash Equivalents" means:  (a) securities issued or fully guaranteed or insured by the United States Government or any agency thereof having maturities of not more than six (6) months from the date of acquisition; (b) certificates of deposit, time deposits, repurchase agreements, reverse repurchase agreements, or bankers' acceptances, having in each case a tenor of not more than six (6) months, issued by any U.S. commercial bank or any branch or agency of a non-U.S. bank licensed to conduct business in the U.S. having combined capital and surplus of not less than $250,000,000; (c) commercial paper of an issuer rated at least A-1 by Standard & Poor's Corporation or P-1 by Moody's Investors Service Inc. and in either case having a tenor of not more than three (3) months; (d) money market funds provided that substantially all of the assets of such

fund are comprised of securities of the type described in clauses (a) through (c); and (e) other short term liquid investments approved in writing by Agent (at the direction of the Required Lenders).

"Change of Control" means (a) Bridging or its Affiliates shall cease to (i) directly or indirectly, own and control at least fifty and one-tenth percent (50.1%) of the outstanding equity interests of Holdings (after giving effect to the Transactions) or (ii) possess the right to elect (through contract, ownership of voting securities or otherwise) at all times a majority of the board of directors (or similar governing body) of Holdings or any Borrower, or (b) Holdings shall cease to, directly or indirectly, own and control one hundred percent (100%) of each class of the outstanding equity interests of any Credit Party.

"Closing Date" means June [___], 2020.

"CMS" means the Centers for Medicare and Medical Services of the United States Department of Health and Human Services.

"Code" means the Internal Revenue Code of 1986, and regulations promulgated thereunder.

"Collateral" means all Property and interests in Property and proceeds thereof now owned or hereafter acquired by any Credit Party, any of their respective Subsidiaries or any other Person who has granted a Lien to the Agent, in or upon which a Lien now or hereafter exists in favor of any Lender or the Agent for the benefit of the Agent, Lenders and other Secured Parties, whether under this Agreement or under any other documents executed by any such Persons and delivered to the Agent, in each case securing the Obligations or any guaranty in respect thereof.

"Collateral Documents" means, collectively, the Guaranty and Security Agreement, each Control Agreement, any Mortgage and all other security agreements, pledge agreements, patent and trademark security agreements, lease assignments, guarantees and other similar agreements, and all amendments, restatements, modifications or supplements thereof or thereto, by or between any one or more of any Credit Party, any of their respective Subsidiaries or any other Person pledging or granting a lien on Collateral to secure the Obligations or any guaranty in respect thereof or guaranteeing the payment and performance of the Obligations, and any Lender or the Agent for the benefit of the Agent, the Lenders and other Secured Parties now or hereafter delivered to the Lenders or the Agent pursuant to or in connection with the transactions contemplated hereby, and all financing statements (or comparable documents now or hereafter filed in accordance with the UCC or comparable law) against any such Person as debtor in favor of any Lender or the Agent for the benefit of the Agent, the Lenders and the other Secured Parties, as secured party, as any of the foregoing may be amended, restated and/or modified from time to time.

"Commitment" means, for each Lender, the sum of its Revolving Loan Commitment, Tranche A Term Loan Commitment, and Tranche B Term Loan Commitment.

"Commitment Percentage" means, as to any Lender, the percentage equivalent of such Lender's Revolving Loan Commitment, Tranche A Term Loan Commitment or Tranche B Term Loan Commitment divided by the Aggregate Revolving Loan Commitment, Aggregate Tranche A Term Loan Commitment or Aggregate Tranche B Term Loan Commitment, as applicable.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.).

"Confirmation Order" means a final order of the Bankruptcy Court under the Chapter 11 Cases that confirms the Plan of Reorganization.

"Consolidated Excess Cash Flow" means, for any fiscal year of Holdings and its subsidiaries on a consolidated basis, the excess, if any, of (a) EBITDA for such fiscal year, minus (B) the sum, without duplication, of (i) the amount of any taxes paid in cash by Holdings and its Subsidiaries with respect to such fiscal year, (ii) the cash portion of Consolidated Interest Charges for such period, and (iii) Capital Expenditures for such period (other than those financed with non-revolving Indebtedness or the proceeds of any equity issuance).

"Consolidated Interest Charges" means, for any period, for Holdings and its subsidiaries on a consolidated basis, the sum of (a) all interest, premium payments, debt discount, fees, charges and related expenses in connection with borrowed money (including capitalized interest) or in connection with the deferred purchase price of assets, in each case to the extent treated as interest in accordance with GAAP, plus (B) the portion of rent expense with respect to such period under Capital Leases that is treated as interest in accordance with GAAP.

"Contingent Obligation" means, as to any Person, any direct or indirect liability, contingent or otherwise, of that Person:  (i) with respect to any Indebtedness, lease, dividend or other obligation of another Person if the primary purpose or intent of the Person incurring such liability, or the primary effect thereof, is to provide assurance to the obligee of such liability that such liability will be paid or discharged, or that any agreements relating thereto will be complied with, or that the holders of such liability will be protected (in whole or in part) against loss with respect thereto; (ii) with respect to any letter of credit issued for the account of that Person or as to which that Person is otherwise liable for reimbursement of drawings; (iii) [reserved]; (iv) to make take-or-pay or similar payments if required regardless of nonperformance by any other party or parties to an agreement; or (v) for the obligations of another Person through any agreement to purchase, repurchase or otherwise acquire such obligation or any Property constituting security therefor, to provide funds for the payment or discharge of such obligation or to maintain the solvency, financial condition or any balance sheet item or level of income of another Person.  The amount of any Contingent Obligation shall be equal to the amount of the obligation so guaranteed or otherwise supported or, if not a fixed and determined amount, the maximum amount so guaranteed or supported.

"Contractual Obligations" means, as to any Person, any provision of any security issued by such Person or of any agreement, undertaking, contract, indenture, mortgage, deed of trust or other instrument, document or agreement to which such Person is a party or by which it or any of its Property is bound.

"Control Agreement" means a deposit account, securities account or commodities account control agreement by and among the applicable Credit Party, Agent, and the depository, securities intermediary or commodities intermediary, and each in form and substance reasonably satisfactory in all respects to Agent (acting at the direction of the Required Lenders) and in any event providing to Agent "control" of such deposit account, securities or commodities account within the meaning of Articles 8 and 9 of the UCC.

"Controlled Group" means all members of a controlled group of corporations, all members of a controlled group of trades or businesses (whether or not incorporated) under common control and all members of an affiliated service group which, together with Borrowers or any Subsidiary of Borrowers, are treated as a single employer under Section 414 of the Code or Section 4001 of ERISA.

"Conversion Date" means any date on which the Borrowers convert a Base Rate Loan to a LIBOR Rate Loan or, to the extent permitted hereunder, a LIBOR Rate Loan to a Base Rate Loan.

"Copyrights" means all rights, title and interests (and all related IP Ancillary Rights) arising under any Requirement of Law in or relating to copyrights and all mask work, database and design rights, whether or not registered or published, all registrations and recordations thereof and all applications in connection therewith.

"Credit Parties" means each Borrower and each other Person (i) which executes this Agreement as a "Credit Party," (ii) which executes a guaranty of the Obligations, (iii) which grants a Lien on all or substantially all of its assets to secure payment of the Obligations and (iv) all of the Stock of which is pledged to Agent for the benefit of the Secured Parties.

"Credit Party Personnel" means all employees, independent contractors or leased personnel of each Credit Party.

"DEA" means the United States Drug Enforcement Administration under the DOJ.

"Default" means any event or circumstance which, with the giving of notice, the lapse of time, or both, would (if not cured or otherwise remedied during such time) constitute an Event of Default.

"Default Rate" means 22% per annum.

"DIP Claims" means each Lender's claims under the DIP Credit Agreement.

"Disposition" means (a) the sale, lease, conveyance or other disposition of Property, other than sales or other dispositions expressly permitted under Section 5.2 (other than Sections 5.2(h) and 5.2(i)) and (b) the sale or transfer by a Borrower or any Subsidiary of a Borrower of any Stock or Stock Equivalent issued by any Subsidiary of a Borrower and held by such transferor Person. For the avoidance of doubt, the issuance by any Person of its own Stock or Stock Equivalent shall not be deemed to be a Disposition.

"DOJ" means the United States Department of Justice, including any office of a United States Attorney.

"Dollars", "dollars" and "$" each mean lawful money of the United States of America.

"Domestic Subsidiary" means, with respect to any Person, a Subsidiary of such Person, which Subsidiary is incorporated or otherwise organized under the laws of the United States of America, the District of Columbia or a state of the United States of America.

"EBITDA" means, for any period, the sum of the following determined on a consolidated basis, without duplication, for Holdings and its subsidiaries in accordance with GAAP, (a) consolidated net income for the most recently completed period plus (b) the following to the extent deducted in calculating such consolidated net income (without duplication): (i) interest expense, (ii) the provision for federal, state, local and foreign income taxes payable, (iii) depreciation and amortization expense, and (iv) any non-recurring costs, fees or charges paid in cash during the period and approved by the Agent in its sole and absolute discretion.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Electronic Transmission" means each document, instruction, authorization, file, information and any other communication transmitted, posted or otherwise made or communicated by e-mail or E-Fax, or otherwise to or from an E-System or other equivalent service.

"Environmental Laws" means all present and future Requirements of Law and Permits imposing liability or standards of conduct for or relating to the regulation and protection of human health, safety, the environment and natural resources, and including public notification requirements and environmental transfer of ownership, notification or approval statutes.

"Environmental Liabilities" means all Liabilities (including costs of Remedial Actions, natural resource damages and costs and expenses of investigation and feasibility studies) that may be imposed on, incurred by or asserted against any Credit Party or any Subsidiary of any Credit Party as a result of, or related to, any claim, suit, action, investigation, proceeding or demand by any Person, whether based in contract, tort, implied or express warranty, strict liability, criminal or civil statute or common law or otherwise, arising under any Environmental Law or in connection with any environmental, health or safety condition or with any Release and resulting from the ownership, lease, sublease or other operation or occupation of property by any Credit Party or any Subsidiary of any Credit Party, whether on, prior or after the Closing Date.

"ERISA" means the Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" means, collectively, any Credit Party and any Person under common control or treated as a single employer with, any Credit Party, within the meaning of Section 414(b), (c), (m) or (o) of the Code.

"ERISA Event" means any of the following:  (a) a reportable event described in Section 4043(b) or (c) of ERISA (unless the applicable notice requirement has been duly waived under the applicable regulations) with respect to a Title IV Plan; (b) the withdrawal of any ERISA Affiliate from a Title IV Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer, as defined in Section 4001(a)(2) of ERISA; (c) the complete or partial withdrawal of any ERISA Affiliate from any Multiemployer Plan; (d) with respect to any Multiemployer Plan, the filing of a notice of insolvency or termination (or treatment of a plan amendment as termination) under Section 4041A of ERISA; (e) the filing of a notice of intent to terminate a Title IV Plan (or treatment of a plan amendment as termination) under Section 4041 of ERISA; (f) the institution of proceedings to terminate a Title IV Plan or Multiemployer Plan by the PBGC; (g) the failure to make any required contribution to any Title IV Plan or Multiemployer Plan when due; (h) the imposition of a lien under Section 430 of the Code or Section 302 or 4068 of ERISA on any property (or rights to property, whether real or personal) of any ERISA Affiliate; the failure of a Benefit Plan or any trust thereunder intended to qualify for tax exempt status under Section 401 or 501 of the Code; and (j) any other event or condition that is reasonably expected to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Title IV Plan.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Event of Loss" means, with respect to any Property, any of the following:  (a) any loss, destruction or damage of such Property; or (b) any actual condemnation, seizure or taking, by exercise of the power of eminent domain or otherwise, of such Property, or confiscation of such Property or the requisition of the use of such Property.

"Excluded Account" means (i) any payroll account so long as such payroll account is a zero balance account, (ii) any withholding tax account and (iii) any fiduciary account.

"E-Fax" means any system used to receive or transmit faxes electronically.

"E-Signature" means the process of attaching to or logically associating with an Electronic Transmission an electronic symbol, encryption, digital signature or process (including the name or an abbreviation of the name of the party transmitting the Electronic Transmission) with the intent to sign, authenticate or accept such Electronic Transmission.

"E-System" means any electronic system, including Intralinks®, SyndTrak®, Debt Domain and ClearPar® and any other Internet or extranet-based site, whether such electronic system is owned, operated or hosted by the Agent, any of its Related Persons or any other Person, providing for access to data protected by passcodes or other security system.

"Extraordinary Receipts" means Net Proceeds received by any Credit Party or any of its Subsidiaries not in the ordinary course of business (and not consisting of Net Proceeds of any Disposition or Event of Loss described in <u>Section 1.8(d)(i)</u> and <u>(ii))</u>, including, without limitation, (i) foreign, federal, state or local tax refunds, (ii) pension plan reversions, (iii) proceeds of insurance, (iv) judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action, (v) indemnity payments and (vi) any purchase price adjustment, net

working capital or similar adjustment received in connection with any purchase agreement, merger agreement, contribution agreement or similar agreement.

"FDA" means the United States Food and Drug Administration.

"Federal Flood Insurance" means Federally backed Flood Insurance available under the National Flood Insurance Program to owners of real property improvements located in Special Flood Hazard Areas in a community participating in the National Flood Insurance Program.

"Federal Funds Rate" means, for any day, the rate per annum (rounded upward to the nearest 1/100th of 1%) equal to the weighted average of the rates on overnight Federal Funds transactions with members of the Federal Reserve System arranged by Federal Funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day, provided that if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate quoted to the Agent on such day on such transactions as determined by the Agent in a commercially reasonable manner.

"Federal Reserve Board" means the Board of Governors of the Federal Reserve System, or any entity succeeding to any of its principal functions.

"FEMA" means the Federal Emergency Management Agency, a component of the U.S. Department of Homeland Security that administers the National Flood Insurance Program.

"Flood Insurance" means, for any real property located in a Special Flood Hazard Area, Federal Flood Insurance or private insurance that meets the requirements set forth by FEMA in its Mandatory Purchase of Flood Insurance Guidelines. Flood Insurance shall be in an amount equal to the full, unpaid balance of the Loans and any prior liens on the real property up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Agent, with deductibles not to exceed $50,000.

"GAAP" means generally accepted accounting principles set forth from time to time in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the accounting profession), which are applicable to the circumstances as of the date of determination.

"Governmental Authority" means any nation or government, any state or other political subdivision thereof, any central bank (or similar monetary or regulatory authority) thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, and any corporation or other entity owned or controlled, through stock or capital ownership or otherwise, by any of the foregoing. Governmental Authority shall include any agency, branch or other governmental body charged with the responsibility and/or vested with the authority to administer and/or enforce any Health Care Laws. Payments from Governmental Authorities will be deemed to include payments governed under the Social Security Act (42 U.S.C. §§ 1395 et seq.), including payments under Medicare, Medicaid and TRICARE/CHAMPUS, and payments administered or regulated by CMS.

"Guarantor" means any Person that has guaranteed any Obligations.

"Guaranty and Security Agreement" means that certain Guaranty and Security Agreement, dated as of the Closing Date, made by the Credit Parties in favor of the Agent, for the benefit of the Secured Parties, as the same may be amended, restated and/or modified from time to time.

"Hazardous Materials" means any substance, material or waste that is classified, regulated or otherwise characterized under any Environmental Law as hazardous, toxic, a contaminant or a pollutant or by other words of similar meaning or regulatory effect, including petroleum or any fraction thereof, asbestos, polychlorinated biphenyls and radioactive substances.

"Health Care Laws" means all applicable federal, state and local statutes, laws, ordinances, rules, and regulations of any Governmental Authority pertaining to any of the following: (a) fraud and abuse laws, including, without limitation, 42 U.S.C. § 1320a-7b(b) (Criminal Penalties Involving Medicare or State Health Care Programs), commonly referred to as the federal Anti-Kickback Statute; Section 1877 of the Social Security Act, codified at 42 U.S.C. § 1395nn (Prohibition Against Certain Referrals), commonly referred to as the Stark Law; 31 U.S.C. §§ 3729-3722, commonly referred to as the federal False Claims Act; 31 U.S.C. §§ 3801-3812, commonly referred to as the Program Fraud Civil Remedies Act; 42 U.S.C. §§ 1320a-7a and 1320a-7b, commonly referred to as the Civil Monetary Penalties Law; 42 U.S.C. § 1320a-7, commonly referred to as the Exclusion Laws; 42 U.S.C. § 1320a-7b(a), commonly referred to as the administrative False Claims Law; and 1320a-7a(a)(5), commonly referred to as the Anti-Inducement Law; and the regulations promulgated pursuant to such statutes and any comparable state laws; (b) HIPAA and the regulations promulgated thereunder and any comparable state laws; (c) the Federal Food Drug and Cosmetic Act (21 U.S.C. *et seq.*) and all regulations promulgated thereunder by the FDA including, without limitation, all laws relating to the preparation, procurement, development, manufacture, production, analysis, labeling, distribution, dispensing, importation, exportation, use, handling, quality, sale, or promotion of any medical device, or other Product (including, without limitation, any ingredient or component) subject to regulation under the Federal Food Drug and Cosmetic Act and similar state laws, or consumer product safety laws; (d) the Controlled Substances Act (21 U.S.C. §§ 801 *et seq.*) and all applicable requirements, regulations and guidances issued thereunder by the DEA; (e) Requirements of Law relating to the licensure, ownership or operation of a health care facility or business, or assets used in connection therewith; (f) Requirements of Law relating to the billing or submission of claims, collection of accounts receivable, reimbursement for, administration of, underwriting the cost of, and payment for services which are reimbursed with federal, state or local governmental funds through or on behalf of any Governmental Authority, including Medicare (Title XVIII of the Social Security Act) and the regulations promulgated thereunder, Medicaid (Title XIX of the Social Security Act) and the regulations promulgated thereunder, and TRICARE/CHAMPUS, as well as the provision of management or administrative services in connection with any and all of the foregoing by any Credit Party; (g) all applicable professional standards regulating healthcare providers, healthcare professionals, healthcare facilities, clinical research facilities or healthcare payors, including, but not limited to, laws and regulations relating to the practice of medicine and other health care professions, patient or program charges, recordkeeping, referrals and professional fee splitting; and (h) any and all other applicable health care laws, rules, codes, statutes, orders and ordinances, regulations, manual provisions, policies and administrative guidance, each of (a) through (h) as may be amended from time to time.

"Health Care Filing" means any regulatory report, schedules, statements, documents, filings, submissions, forms, registrations and cost reports together with any amendments required to be made with respect thereto which are material and necessary under any applicable Health Care Laws.

"Health Care Permit" means any Permit, license, certificate, accreditation or other approval or authorization, as applicable, of any Governmental Authority which is necessary under Health Care Laws for a Credit Party to conduct its business and operations as presently conducted.

"HIPAA" means the following, as the same may be amended, modified or supplemented from time to time, and any successor statute thereto, and together with any and all rules or regulations promulgated from time to time thereunder: (a) the Health Insurance Portability and Accountability Act of 1996 (42 U.S.C. § 1302d et seq.); (b) the Health Information Technology for Economic and Clinical Health Act (Title XIII of the American Recovery and Reinvestment Act of 2009; and (c) applicable state and local privacy, security and/or data breach laws, regulations, rules, statutes and ordinances (collectively "Privacy Laws").

"Impacted Lender" means any Revolving Lender that fails to promptly provide Agent, upon Agent's reasonable request, reasonably satisfactory assurance that such Lender will not become a Non-Funding Lender.

"Indebtedness" of any Person means, without duplication:  (a) all indebtedness for borrowed money; (b) all obligations issued, undertaken or assumed as the deferred purchase price of Property or services (other than trade payables entered into in the Ordinary Course of Business); (c) without duplication, all drafts drawn under letters of credit issued for the account of such Person and all drawn and unreimbursed letters of credit, surety bonds and other similar instruments issued by such Person; (d) all obligations evidenced by notes, bonds, debentures or similar instruments, including obligations so evidenced incurred in connection with the acquisition of Property, assets or businesses; (e) all indebtedness created or arising under any conditional sale or other title retention agreement, or incurred as financing, in either case with respect to Property acquired by the Person (even though the rights and remedies of the seller or bank under such agreement in the event of default are limited to repossession or sale of such Property); (f) all Capital Lease Obligations; (g) the principal balance outstanding under any synthetic lease, off-balance sheet loan or similar off balance sheet financing product; (h) all obligations, whether or not contingent, to purchase, redeem, retire, defease or otherwise acquire for value any of its own Stock or Stock Equivalents (or any Stock or Stock Equivalent of a direct or indirect parent entity thereof) prior to the date that is 180 days after the Maturity Date of the Term Loans, valued at, in the case of redeemable preferred Stock, the greater of the voluntary liquidation preference and the involuntary liquidation preference of such Stock plus accrued and unpaid dividends; (i) all indebtedness referred to in clauses (a) through (h) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien upon or in Property (including accounts and contracts rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such indebtedness; and (j) all Contingent Obligations described in clause (i) of the definition thereof in respect of indebtedness or obligations of others of the kinds referred to in clauses (a) through (i) above.  For the avoidance of doubt, any post-closing purchase price adjustment, indemnity payment, deferred or contingent purchase price owing to a seller which is not required to be included as a liability on the balance

94

sheet of the buyer thereof in accordance with GAAP, or cash-collateralized or escrowed obligation (included in the purchase price) shall not be Indebtedness for purposes hereof.

"Insolvency Proceeding" means (a) any case, action or proceeding before any court or other Governmental Authority relating to bankruptcy, reorganization, insolvency, liquidation, receivership, dissolution, winding-up or relief of debtors, or (b) any general assignment for the benefit of creditors, composition, marshaling of assets for creditors, or other, similar arrangement in respect of its creditors generally or any substantial portion of its creditors; in each case in (a) and (b) above, undertaken under U.S. Federal, state or foreign law, including the Bankruptcy Code.

"Intellectual Property" means all rights, title and interests in or relating to intellectual property and industrial property arising under any Requirement of Law and all IP Ancillary Rights relating thereto, including all Copyrights, Patents, Trademarks, Internet domain names, Trade Secrets and IP Licenses.

"Interest Payment Date" means, (a) with respect to any LIBOR Rate Loan, the last day of each Interest Period applicable to such Loan, and (b) with respect to Base Rate Loans, the first Business Day of each fiscal month.

"Interest Period" means, with respect to any LIBOR Rate Loan, the period commencing on the Business Day such Loan is disbursed or continued or on the Conversion Date on which a Base Rate Loan is converted to a LIBOR Rate Loan, and ending on the date one month thereafter; provided that:

(a)    if any Interest Period pertaining to a LIBOR Rate Loan would otherwise end on a day which is not a Business Day, that Interest Period shall be extended to the next succeeding Business Day unless the result of such extension would be to carry such Interest Period into another calendar month, in which event such Interest Period shall end on the immediately preceding Business Day;

(b)    any Interest Period pertaining to a LIBOR Rate Loan that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period;

(c)    no Interest Period for any Term Loan shall extend beyond the last scheduled payment date therefor and no Interest Period for any Revolving Loan shall extend beyond the Revolving Termination Date; and

(d)    no Interest Period applicable to any Term Loan or portion thereof shall extend beyond any date upon which is due any scheduled principal payment in respect of such Term Loan unless the aggregate principal amount of such Term Loan represented by Base Rate Loans or by LIBOR Rate Loans having Interest Periods that will expire on or before such date is equal to or in excess of the amount of such principal payment.

"Inventory" means all of the "inventory" (as such term is defined in the UCC) of the Borrowers and their Subsidiaries, including, but not limited to, all merchandise, raw materials, parts, supplies, work-in-process and finished goods intended for sale, together with all the

containers, packing, packaging, shipping and similar materials related thereto, and including such inventory as is temporarily out of a Borrower's or such Subsidiary's custody or possession, including inventory on the premises of others and items in transit.

"IP Ancillary Rights" means, with respect to any other Intellectual Property, as applicable, all foreign counterparts to, and all divisionals, reversions, continuations, continuations-in-part, reissues, reexaminations, renewals and extensions of, such Intellectual Property and all income, royalties, proceeds and Liabilities at any time due or payable or asserted under or with respect to any of the foregoing or otherwise with respect to such Intellectual Property, including all rights to sue or recover at law or in equity for any past, present or future infringement, misappropriation, dilution, violation or other impairment thereof, and, in each case, all rights to obtain any other IP Ancillary Right.

"IP License" means all Contractual Obligations (and all related IP Ancillary Rights), whether written or oral, granting any right, title and interest in or relating to any Intellectual Property.

"IRS" means the Internal Revenue Service of the United States and any successor thereto.

"Known Events" means, the commencement and continuation of the Chapter 11 Cases, the events leading up to the Chapter 11 Cases, the effect of the bankruptcy, the consummation of transactions contemplated by the Credit Parties' "first day" pleadings reviewed by the DIP Agent and "Required Lenders" (as defined in the DIP Credit Agreement), or as disclosed to the Agent prior to the Petition Date.

"Lender-Related Distress Event" means, with respect to any Lender or any Person that directly or indirectly controls such Lender (each a "<u>Distressed Person</u>"), (a) a voluntary or involuntary case with respect to such Distressed Person under the Bankruptcy Code or any similar bankruptcy laws of its jurisdiction of formation, (b) a custodian, conservator, receiver or similar official is appointed for such Distressed Person or any substantial part of such Distressed Persons' assets, (c) such Distressed Person or any Person that directly or indirectly controls such Distressed Person is subject to a forced liquidation, merger, sale or other change of majority control supported in whole or in part by guaranties or other support (including, without limitation, the nationalization or assumption of majority ownership or operating control by) the U.S. government or other Governmental Authority, or (d) such Distressed Person makes a general assignment for the benefit of creditors or is otherwise adjudicated as, or determined by any Governmental Authority having regulatory authority over such Distressed Person or its assets to be, insolvent or bankruptcy.  For purposes of this definition, control of a Person shall have the same meaning as in the second sentence of the definition of "Affiliate".

"Lending Office" means, with respect to any Lender, the office or offices of such Lender specified as its "Lending Office" beneath its name on <u>Schedule 9.2</u>, or such other office or offices of such Lender as it may from time to time notify the Borrower Representative and the Agent.

"Liabilities" means all claims, actions, suits, judgments, damages, losses, liability, obligations, responsibilities, fines, penalties, sanctions, costs, fees, taxes, commissions, charges, disbursements and expenses, in each case of any kind or nature (including interest accrued thereon

96

or as a result thereto and fees, charges and disbursements of financial, legal and other advisors and consultants), whether joint or several, whether or not indirect, contingent, consequential, actual, punitive, treble or otherwise.

"LIBOR" means, for each Interest Period, the highest of (a) the offered rate per annum for deposits of Dollars for the applicable Interest Period that appears on Reuters Screen LIBOR01 Page as of 11:00 A.M. (London, England time) two (2) Business Days prior to the first day in such Interest Period and (b) one percent (1.00%).  If no such offered rate exists, such rate will be the rate of interest per annum, as determined by the Agent (rounded upwards, if necessary, to the nearest 1/100 of 1%) at which deposits of Dollars in immediately available funds are offered at 11:00 A.M. (London, England time) two (2) Business Days prior to the first day in such Interest Period by major financial institutions reasonably satisfactory to the Agent (at the direction of the Required Lenders) in the London interbank market for such Interest Period for the applicable principal amount on such date of determination.

Notwithstanding anything to the contrary in this Agreement or any other Loan Documents, but without limiting Article X hereof, if the Agent determines (which determination shall be conclusive and binding upon all parties hereto absent manifest error), or the Required Lenders notify the Agent (with, in the case of the Required Lenders, a copy to Borrower) that the Required Lenders (as applicable) have determined, that:

> (i)      adequate and reasonable means do not exist for ascertaining LIBOR for any requested Interest Period; or

> (ii)      a Governmental Authority having or purporting to have jurisdiction over the Agent has made a public statement identifying a specific after which LIBOR shall no longer be made available, or used for determining the interest rate of loans, provided that, at the time of such statement, there is no successor administrator that is satisfactory to the Agent, that will continue to provide LIBOR after such specific date (such specific date, the "Scheduled Unavailability Date"), or

> (iii)      syndicated loans currently being executed, or that include language similar to that contained in this definition, are being executed or amended (as applicable) to incorporate or adopt a new benchmark interest rate to replace LIBOR,

then, reasonably promptly after such determination by the Agent or receipt by the Agent of such notice from the Required Lenders, as applicable, the Agent may amend this Agreement to replace LIBOR with another alternate benchmark rate, giving due consideration to any evolving or then existing convention for similar U.S. dollar denominated syndicated credit facilities for such alternative benchmarks and, in each case, including any mathematical or other adjustments to such benchmark giving due consideration to any evolving or then existing convention for similar U.S. dollar denominated syndicated credit facilities for such benchmarks, which adjustment or method for calculating such adjustment shall be published on an information service as selected by the Agent from time to time in its reasonable discretion and may be periodically updated (the "Adjustment;" and any such proposed rate, a "LIBOR Successor Rate"), and any such amendment shall become effective at 5:00 p.m. (New York time) on the fifth (5th) Business Day after the Agent shall have posted such proposed amendment to all Lenders and the Borrower unless, prior

to such time, Lenders comprising the Required Lenders have delivered to the Agent written notice that such Required Lenders (A) in the case of an amendment to replace LIBOR with a rate described in clause (x), object to the Adjustment; or (B) in the case of an amendment to replace LIBOR with a rate described in clause (y), object to such amendment. Such LIBOR Successor Rate shall be applied in a manner consistent with market practice; provided that, to the extent such market practice is not administratively feasible for the Agent, such LIBOR Successor Rate shall be applied in a manner as otherwise reasonably determined by the Agent; provided further that, the Agent shall provide written notice to the Borrower of any such change in application.

If no LIBOR Successor Rate has been determined and the circumstances under clause (i) above exist or the Scheduled Unavailability Date has occurred (as applicable), the Agent will promptly so notify the Borrower and each Lender. Thereafter, the obligation of the Lenders to make or maintain LIBOR Rate Loans shall be suspended, (to the extent of the affected LIBOR Rate Loans or Interest Periods).

Notwithstanding anything else herein, any definition of LIBOR Successor Rate shall provide that in no event shall such LIBOR Successor Rate be less than zero for purposes of this Agreement.

In connection with the implementation of a LIBOR Successor Rate, the Agent will have the right to make LIBOR Successor Rate Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such LIBOR Successor Rate Conforming Changes will become effective without any further action or consent of any other party to this Agreement; *provided*, *however*, the Agent will promptly notify the Borrower and each Lender of such LIBOR Successor Rate Conforming Changes.

"LIBOR Rate Loan" means a Loan that bears interest based on LIBOR.

"LIBOR Successor Rate Conforming Changes" means, with respect to any proposed LIBOR Successor Rate, any conforming changes to the definition of Base Rate, Interest Period, timing and frequency of determining rates and making payments of interest and other technical, administrative or operational matters as may be appropriate, in the discretion of the Agent, to reflect the adoption and implementation of such LIBOR Successor Rate and to permit the administration thereof by the Agent in a manner substantially consistent with market practice (or, if the Agent determines that adoption of any portion of such market practice is not administratively feasible or that no market practice for the administration of such LIBOR Successor Rate exists, in such other manner of administration as the Agent determines is reasonably necessary in connection with the administration of this Agreement).

"Licensed Personnel" means any physician or other professional personnel employed or retained by a Credit Party or any or its Subsidiaries.

"Lien" means any mortgage, deed of trust, pledge, hypothecation, assignment, charge or deposit arrangement, encumbrance, lien (statutory or otherwise) or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including those created by, arising under or evidenced by any conditional sale or other title retention agreement, the interest of a lessor under a Capital Lease, any financing lease having substantially the same economic effect as any of the foregoing, or the filing of any financing statement naming the owner

of the asset to which such lien relates as debtor, under the UCC or any comparable law) and any contingent or other agreement to provide any of the foregoing, but not including the interest of a lessor under a lease which is not a Capital Lease.

"Loan" means an extension of credit by a Lender to the Borrowers pursuant to Article I hereof, including the Term Loans and Revolving Loans, and may be a Base Rate Loan or a LIBOR Rate Loan.

"Loan Documents" means this Agreement, the Notes, the Collateral Documents and all documents delivered to the Agent and/or any Lender in connection with any of the foregoing.

"Managed Practice" means any medical practice that is party to an administrative services agreement, management services agreement or similar arrangement with a Credit Party or any of its Subsidiaries, whether written or oral, pursuant to which such Credit Party or Subsidiary provides administrative or management services to such medical practice.

"Managed Practice Personnel" means all employees, independent contractors or leased personnel of each Managed Practice.

"Management Agreements" means, collectively, that certain Strategic Advisory Services Agreement, dated as of May 1, 2020, by and between Holdings and Healthcare Advisory Solutions, L.L.C., and that certain Client Agreement, dated as of May 1, 2020, by and between Holdings and Care Optimize, LLC, in each case as amended in accordance with Section 5.15.

"Margin Stock" means "margin stock" as such term is defined in Regulation T, U or X of the Federal Reserve Board.

"Material Adverse Effect" means:  (a) a material adverse change in, or a material adverse effect upon, the operations, business, Properties or condition (financial or otherwise) of any Credit Party or the Credit Parties and the Subsidiaries taken as a whole; (b) a material impairment of the ability of any Credit Party, any Subsidiary of any Credit Party or any other Person (other than the Agent or Lenders) to perform in any material respect its obligations under any Loan Document; or (c) a material adverse effect upon (i) the legality, validity, binding effect or enforceability of any Loan Document, (ii) the perfection or priority of any Lien granted to the Lenders or to the Agent for the benefit of the Secured Parties under any of the Collateral Documents or (iii) the rights and remedies of the Secured Parties under the Loan Documents or applicable law (it being understood that none of the Known Events shall constitute or result in a Material Adverse Effect).

"Material Contract" means, with respect to any Person, (a) any Management Agreement or other management agreement in respect of a Managed Practice; (b) any contract or agreement to which that Person or any of its Subsidiaries is a party involving aggregate consideration payable to or by that Person or that Subsidiary of more than 5% of the revenue of such Person and its Subsidiaries in any Fiscal Year; and (c) all other contracts or agreements as to which the breach, nonperformance, cancellation, or failure to renew by any party would reasonably be expected to have a Material Adverse Effect.

"Material Environmental Liabilities" means Environmental Liabilities exceeding $100,000 in the aggregate.

"Maturity Date" means June [____], 2023.

"Mortgage" means any deed of trust, leasehold deed of trust, mortgage, leasehold mortgage, deed to secure debt, leasehold deed to secure debt or other document creating a Lien on real Property or any interest in real Property, in each case securing the Obligations.

"Multiemployer Plan" means any multiemployer plan, as defined in Section 4001(a)(3) of ERISA, as to which any ERISA Affiliate incurs or otherwise has any obligation or liability, contingent or otherwise.

"National Flood Insurance Program" means the program created by the U.S. Congress pursuant to the National Flood Insurance Act of 1968 and the Flood Disaster Protection Act of 1973, as revised by the National Flood Insurance Reform Act of 1994, that mandates the purchase of flood insurance to cover real property improvements located in Special Flood Hazard Areas in participating communities and provides protection to property owners through a Federal insurance program.

"Net Issuance Proceeds" means, in respect of any issuance of debt or equity securities, or incurrence of other Indebtedness, cash proceeds (including cash proceeds as and when received in respect of non-cash proceeds received or receivable in connection with such issuance or incurrence), net of underwriting discounts, upfront fees and reasonable out-of-pocket costs and expenses paid or incurred in connection therewith in favor of any Person not an Affiliate of a Credit Party.

"Net Proceeds" means proceeds in cash, checks or other cash equivalent financial instruments (including Cash Equivalents) as and when received by the Person making a Disposition and insurance proceeds received on account of an Event of Loss, net of:  (a) in the event of a Disposition (i) the direct costs relating to such Disposition excluding amounts payable to a Borrower or any Affiliate of a Borrower, (ii) sale, use or other transaction taxes paid or payable as a result thereof and other taxes payable by a Credit Party or its Subsidiary in connection therewith, (i) amounts required to be applied to repay principal, interest and prepayment premiums and penalties on Indebtedness secured by a Lien on the asset which is the subject of such Disposition, (ii) any portion of such proceeds required to be deposited in an escrow account pursuant to the documentation relating to such Disposition (provided that such amounts, if any, shall be treated as Net Proceeds upon their release from such escrow account to the applicable Credit Party) and (v) reasonable reserves established by any Credit Party or Subsidiary thereof for indemnification obligations attributable to its indemnities and representations and warranties as a seller to the purchaser in any such Disposition (provided that such amounts, if any, shall be treated as Net Proceeds upon their release from such reserve) and (b) in the event of an Event of Loss, (i) all of the costs and expenses reasonably incurred in connection with the collection of such proceeds, award or other payments, and (ii) any amounts retained by or paid to parties having superior rights to such proceeds, awards or other payments.

"Non-Funding Lender" means any Lender (a) that has failed to fund any payments required to be made by it under the Loan Document within two (2) Business Days after any such payment is due, unless such failure to fund is the subject of a good faith dispute by such Lender that the conditions in <u>Section 2.2</u> have not been satisfied, (b) that has given written notice to a Borrower,

100

Agent or any Lender and has otherwise publicly announced that such Lender believes it will fail to fund all payments required to be made by it or fund all purchases of participations required to be funded by it under this Agreement and the other Loan Documents, unless such failure to fund is the subject of a good faith dispute by such Lender that the conditions in <u>Section 2.2</u> have not been satisfied, (c) as to which Agent has a good faith belief that such Lender has defaulted in fulfilling its obligations (as a lender or agent) under one or more other syndicated credit facilities or (d) with respect to which one or more Lender-Related Distress Events has occurred with respect to such Person or any Person that directly or indirectly controls such Lender and Agent has determined that such Lender may become a Non-Funding Lender pursuant to clause (a) or (b) of the definition hereof.  For purposes of this definition, control of a Person shall have the same meaning as in the second sentence of the definition of Affiliate.

"Non-U.S. Lender Party" means each of the Agent, each Lender, each SPV and each participant, in each case that is not a United States person under and as defined in Section 7701(a)(30) of the Code.

"Note" means any Term Note A, Term Note B, or Revolving Note and "Notes" means all such Notes.

"Obligations" means all Loans, and other Indebtedness, advances, debts, liabilities, obligations, covenants and duties owing by any Credit Party to any Lender, the Agent, or any other Person required to be indemnified, that arises under any Loan Document, in each case, whether or not for the payment of money, whether arising by reason of an extension of credit, loan, guaranty, indemnification or in any other manner, whether direct or indirect (including those acquired by assignment), absolute or contingent, due or to become due, now existing or hereafter arising and however acquired.

"OIG" means the Office of the Inspector General under the DOJ.

"Ordinary Course of Business" means, in respect of any transaction involving any Credit Party or any Subsidiary of any Credit Party, the ordinary course of such Person's business, as conducted by any such Person in accordance with past practice and undertaken by such Person in good faith and not for purposes of evading any covenant or restriction in any Loan Document.

"Organization Documents" means, (a) for any corporation, the certificate or articles of incorporation, the bylaws, any shareholder or stockholder agreement (including, for the avoidance of doubt, the Stockholders' Agreement), any certificate of determination or instrument relating to the rights of preferred shareholders of such corporation, any shareholder rights agreement, (b) for any partnership, the partnership agreement and, if applicable, certificate of limited partnership, (c) for any limited liability company, the operating agreement and articles or certificate of formation or (d) any other document setting forth the manner of election or duties of the officers, directors, managers or other similar persons, or the designation, amount or relative rights, limitations and preference of the Stock of a Person.

"Patents" means all rights, title and interests (and all related IP Ancillary Rights) arising under any Requirement of Law in or relating to letters patent and applications therefor.

"Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, P.L. 107-56, as amended.

"PBGC" means the United States Pension Benefit Guaranty Corporation any successor thereto.

"Permits" means, with respect to any Person, any permit, approval, authorization, license, registration, accreditation, certificate, qualification, provider number, right, privilege, consent, concession, grant, franchise, variance or permission from, and any other Contractual Obligations with, any Governmental Authority, together with any amendments, supplements and other modifications thereto; in each case, whether or not having the force of law and applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Person" means an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Authority or other entity of whatever nature.

"Plan of Reorganization" means that certain First Amended Joint Chapter 11 Plan of Reorganization of Hygea Holdings Corp. and its Affiliated Debtors pursuant to Chapter 11 of the Bankruptcy Code, dated May 1, 2020.

"Projections" means financial statements of the Credit Parties showing the projected monthly cash flow and income for the 2-year period following the Closing Date, as updated on a quarterly basis as required pursuant to Section 4.2(g).

"Property" means any interest in any kind of property or asset, whether real, personal or mixed, and whether tangible or intangible.

"Related Persons" means, with respect to any Person, each Affiliate of such Person and each director, officer, employee, agent, trustee, representative, attorney, accountant and each insurance, environmental, legal, financial and other advisor (including those retained in connection with the satisfaction or attempted satisfaction of any condition set forth in Article II) and other consultants and agents of or to such Person or any of its Affiliates.

"Releases" means any release, threatened release, spill, emission, leaking, pumping, pouring, emitting, emptying, escape, injection, deposit, disposal, discharge, dispersal, dumping, leaching or migration of Hazardous Material into or through the environment.

"Remedial Action" means all actions required to (a) clean up, remove, treat or in any other way address any Hazardous Material in the indoor or outdoor environment, (b) prevent or minimize any Release so that a Hazardous Material does not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment or (c) perform pre remedial studies and investigations and post-remedial monitoring and care with respect to any Hazardous Material.

"Required Lenders" means at any time (a) Lenders then holding more than fifty percent (50%) of the sum of (i) the Aggregate Revolving Loan Commitment then in effect and (ii) the

unpaid principal balance of the Term Loans then outstanding, or (b) if the Revolving Loan Commitments have been terminated, Lenders then having more than fifty percent (50%) of the sum of (i) the aggregate unpaid principal amount of Revolving Loans then outstanding and (ii) the aggregate unpaid principal amount of the Term Loans then outstanding.

"Required Revolving Lenders" means Lenders having (a) more than fifty percent (50%) of the Aggregate Revolving Loan Commitments of all Lenders, or (b) if the Aggregate Revolving Loan Commitments have been terminated, more than fifty percent (50%) of the sum of the aggregate outstanding amount of Revolving Loans.

"Required Tranche A Term Lenders" means the Lenders having more than fifty percent (50%) of the aggregate unpaid principal amount of the Tranche A Term Loans then outstanding.

"Required Tranche B Term Lenders" means the Lenders having more than fifty percent (50%) of the aggregate unpaid principal amount of the Tranche B Term Loans then outstanding.

"Requirement of Law" or "Law" means, as to any Person, any law (statutory or common), ordinance, treaty, rule, regulation, order, policy, other legal requirement or determination of an arbitrator or of a Governmental Authority, in each case applicable to or binding upon such Person or any of its Property or to which such Person or any of its Property is subject. This term includes any Health Care Law.

"Responsible Officer" means the chief executive officer, chief financial officer, corporate controller, or the president of a Borrower or Borrower Representative, as applicable, or any other officer having substantially the same authority and responsibility; or, with respect to compliance with the financial covenant or delivery of financial information, the chief financial officer or the treasurer of a Borrower or Borrower Representative, as applicable, or any other officer having substantially the same authority and responsibility.

"Revolving Lender" means each Lender with a Revolving Loan Commitment (or if the Revolving Loan Commitments have terminated, who holds Revolving Loans).

"Revolving Loan Commitment" means, with respect to each Revolving Lender, the commitment of such Lender to make Revolving Loans hereunder pursuant to Section 1.1(b).

"Revolving Note" means a promissory note of the Borrowers payable to a Lender, in substantially the form of Exhibit 11.1(h) hereto, evidencing the Indebtedness of the Borrowers to such Lender resulting from Revolving Loans made to the Borrowers by such Lender.

"Secured Party" means the Agent, each Lender, each other Indemnitee and each other holder of any Obligation of a Credit Party.

"Segregated Governmental Account" means a deposit account of a Credit Party maintained in accordance with the requirements of Section 4.11, the only funds on deposit in which constitute the direct proceeds of Medicare and Medicaid payments made by Governmental Third Party Payors.

"Solvent" means, with respect to any Person as of any date of determination, that, as of such date, (a) the value of the assets of such Person (both at fair value and present fair saleable value) is greater than the total amount of liabilities (including contingent and unliquidated liabilities) of such Person, (b) such Person is able to pay all liabilities of such Person as such liabilities mature and (c) such Person does not have unreasonably small capital.  In computing the amount of contingent or unliquidated liabilities at any time, such liabilities shall be computed at the amount that, in light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

"Special Flood Hazard Area" means an area that FEMA's current flood maps indicate has at least a one percent (1%) chance of a flood equal to or exceeding the base flood elevation (a 100-year flood) in any given year.

"SPV" means any special purpose funding vehicle identified as such in a writing by any Lender to the Agent.

"Stock" means all shares of capital stock (whether denominated as common stock or preferred stock), equity interests, beneficial, partnership or membership interests, joint venture interests, participations or other ownership or profit interests in or equivalents (regardless of how designated) of or in a Person (other than an individual), whether voting or non-voting.

"Stock Equivalents" means all securities convertible into or exchangeable for Stock or any other Stock Equivalent and all warrants, options or other rights to purchase, subscribe for or otherwise acquire any Stock or any other Stock Equivalent, whether or not presently convertible, exchangeable or exercisable.

"Stockholders' Agreement" means the Stockholders Agreement, dated as of June [__], 2020, by and among Holdings and its Stockholders, as amended, restated, supplemented or otherwise modified from time to time in accordance with Section 5.13.

"Subsidiary" of a Person means any corporation, association, limited liability company, partnership, joint venture or other business entity of which more than fifty percent (50%) of the voting Stock, is owned or controlled directly or indirectly by the Person, or one or more of the Subsidiaries of the Person, or a combination thereof.

"Tax Affiliate" means, (a) each Borrower and its Subsidiaries and (b) any Affiliate of a Borrower with which such Borrower files or is eligible to file consolidated, combined or unitary tax returns.

"Term Lender" means collectively, the Tranche A Term Lenders and the Tranche B Term Lenders.

"Term Loan" means collectively, the Tranche A Term Loans and the Tranche B Term Loans.

"Term Loan Commitment" means collectively, the Tranche A Term Loan Commitment and the Tranche B Term Loan Commitment.

"Term Note A" means a promissory note of the Borrowers payable to a Lender, in substantially the form of Exhibit 11.1(f) hereto, evidencing the Indebtedness of the Borrowers to such Lender resulting from the Tranche A Term Loan made to the Borrowers by such Lender.

"Term Note B" means a promissory note of the Borrowers payable to a Lender, in substantially the form of Exhibit 11.1(g) hereto, evidencing the Indebtedness of the Borrowers to such Lender resulting from the Tranche B Term Loan made to the Borrowers by such Lender.

"Title IV Plan" means a pension plan subject to Title IV of ERISA, other than a Multiemployer Plan, to which any ERISA Affiliate incurs or otherwise has any obligation or liability, contingent or otherwise.

"Total Plan Liability" means at any time, the present value of all vested and unvested accrued benefits under all Title IV Plans, determined as of the then most recent valuation date of each Title IV Plan, using PBGC actuarial assumptions for single employer plan terminations.

"Trade Secrets" means all right, title and interest (and all related IP Ancillary Rights) arising under any Requirement of Law in or relating to trade secrets.

"Trademark" means all rights, title and interests (and all related IP Ancillary Rights) arising under any Requirement of Law in or relating to trademarks, trade names, corporate names, company names, business names, fictitious business names, trade styles, service marks, logos and other source or business identifiers and, in each case, all goodwill associated therewith, all registrations and recordations thereof and all applications in connection therewith.

"Tranche" means the respective facility and commitments utilized in making Loans hereunder.

"Tranche A Term Lenders" means any Lenders or other Secured Parties holding any Tranche A Term Loans or any Tranche A Term Loan Commitment.

"Tranche A Term Loan" means the term loans made (or deemed made) by the Tranche A Term Lenders to the Borrowers pursuant to Section 1.1(a)(i).

"Tranche A Term Loan Commitment" means, with respect to each Lender, the commitment of such Lender to deem to make Tranche A Term Loans hereunder as set forth on Schedule 1.1(a), or in the Assignment pursuant to which such Lender assumed its Tranche A Term Loan Commitment, as applicable, as the same may reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to Section 9.9. The aggregate amount of the Tranche A Term Loan Commitments as of the Closing Date is $[10,000,000.00].

"Tranche B Interest Rate" means fifteen percent (15%) per annum.

"Tranche B Term Lenders" means any Lenders or other Secured Parties holding any Tranche B Term Loans or any Tranche B Term Loan Commitment.

"Tranche B Term Loan" means the term loans made (or deemed made) by the Tranche B Term Lenders to the Borrowers pursuant to Section 1.1(a)(ii).

"Tranche B Term Loan Commitment" means, with respect to each Lender, the commitment of such Lender to deem to make Tranche B Term Loans hereunder as set forth on Schedule 1.1(b), or in the Assignment pursuant to which such Lender assumed its Tranche B Term Loan Commitment, as applicable, as the same may reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to Section 9.9. The aggregate amount of the Tranche B Term Loan Commitments as of the Closing Date is $[27,500,000.00].

"Transactions" means, collectively, (a) the entry into the Loan Documents, (b) the consummation of the other transactions contemplated by the Plan of Reorganization, and (c) the payment of all fees, costs and expenses associated with the foregoing.

"Type" means the type of Loan determined with regard to the interest option applicable thereto, i.e., whether a Base Rate Loan or a LIBOR Rate Loan.

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of New York.

"Unfunded Liability" means the amount (if any) by which the present value of all vested and unvested accrued benefits under all Title IV Plans exceeds the fair market value of all assets allocable to those benefits, all determined as of the then most recent valuation date for each Title IV Plan, using PBGC actuarial assumptions for single employer plan terminations.

"United States" and "U.S." each means the United States of America.

"U.S. Lender Party" means each of the Agent, each Lender, each SPV and each participant, in each case that is a United States person under and as defined in Section 7701(a)(30) of the Code.

"Wholly-Owned Subsidiary" means any Subsidiary in which (other than directors' qualifying shares required by law) one hundred percent (100%) of the Stock and Stock Equivalents, at the time as of which any determination is being made, is owned, beneficially and of record, by any Credit Party, or by one or more of the other Wholly-Owned Subsidiaries, or both.

"Withdrawal Liabilities" means, at any time, any liability incurred (whether or not assessed) by any ERISA Affiliate and not yet satisfied or paid in full at such time with respect to any Multiemployer Plan pursuant to Section 4201 of ERISA.

"Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

11.2    Other Interpretive Provisions.

(a)    Defined Terms. Unless otherwise specified herein or therein, all terms defined in this Agreement or in any other Loan Document shall have the defined meanings when used in any certificate or other document made or delivered pursuant hereto. The meanings of defined terms shall be equally applicable to the singular and plural forms of the defined terms.

Terms (including uncapitalized terms) not otherwise defined herein and that are defined in the UCC shall have the meanings therein described.

(b)    <u>The Agreement</u>.  The words "hereof", "herein", "hereunder" and words of similar import used in this Agreement or any other Loan Document shall refer to this Agreement or such other Loan Document as a whole and not to any particular provision of this Agreement or such other Loan Document; and subsection, section, schedule and exhibit references are to this Agreement or such other Loan Documents unless otherwise specified.

(c)    <u>Certain Common Terms</u>.  The term "documents" includes any and all instruments, documents, agreements, certificates, indentures, notices and other writings, however evidenced.  The term "including" is not limiting and means "including without limitation."

(d)    <u>Performance; Time</u>.  Whenever any performance obligation hereunder or under any other Loan Document (other than a payment obligation) shall be stated to be due or required to be satisfied on a day other than a Business Day, such performance shall be made or satisfied on the next succeeding Business Day.  In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding", and the word "through" means "to and including." If any provision of this Agreement or any other Loan Document refers to any action taken or to be taken by any Person, or which such Person is prohibited from taking, such provision shall be interpreted to encompass any and all means, direct or indirect, of taking, or not taking, such action.

(e)    <u>Contracts</u>.  Unless otherwise expressly provided herein or in any other Loan Document, references to agreements and other contractual instruments, including this Agreement and the other Loan Documents, shall be deemed to include all subsequent amendments, thereto, restatements and substitutions thereof and other modifications and supplements thereto which are in effect from time to time, but only to the extent such amendments and other modifications are not prohibited by the terms of any Loan Document.

(f)    <u>Laws</u>.  Except as otherwise provided, references to any statute or regulation are to be construed as including all statutory and regulatory provisions related thereto or consolidating, amending, replacing, supplementing or interpreting the statute or regulation.

(g)    All references to the "knowledge" of any Credit Party or any Subsidiary of any Credit Party or facts "known" by any such Person or any Person becoming "aware" of facts shall mean actual knowledge of any Responsible Officer of such Person.

11.3    <u>Accounting Terms and Principles</u>.  All accounting determinations required to be made pursuant hereto shall, unless expressly otherwise provided herein, be made in accordance with GAAP.  No change in the accounting principles used in the preparation of any financial statement hereafter adopted by Credit Parties shall be given effect for purposes of measuring compliance with any provision of Article V or VI unless the Borrowers, the Agent and the Required Lenders agree to modify such provisions to reflect such changes in GAAP and, unless such provisions are modified, all financial statements, Compliance Certificates and similar documents provided hereunder shall be provided together with a reconciliation between the calculations and amounts set forth therein before and after giving effect to such change in GAAP.

Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to in <u>Article V</u> and <u>Article VI</u> shall be made, without giving effect to any election under Statement of Financial Accounting Standards 159 (or any other Financing Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of any Credit Party or any Subsidiary of any Credit Party at "fair value."

   11.4 <u>Payments</u>.  The Agent may set up standards and procedures to determine or redetermine the equivalent in Dollars of any amount expressed in any currency other than Dollars and otherwise may, but shall not be obligated to, rely on any determination made by any Credit Party.  Any such determination or redetermination by the Agent shall be conclusive and binding for all purposes, absent manifest error.  No determination or redetermination by any Secured Party or any Credit Party and no other currency conversion shall change or release any obligation of any Credit Party or of any Secured Party (other than the Agent and its Related Persons) under any Loan Document, each of which agrees to pay separately for any shortfall remaining after any conversion and payment of the amount as converted.  The Agent may round up or down, and may set up appropriate mechanisms to round up or down, any amount hereunder to nearest higher or lower amounts and may determine reasonable de minimis payment thresholds.

**[Balance of page intentionally left blank; signature page follows.]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized officers as of the day and year first above written.

<u>BORROWERS</u>:

**NEIGHBORMD HOLDINGS CORP.**, a Delaware corporation

By: _____
Name: _____
Title: _____


**NEIGHBORMD, INC.**, a Florida corporation

By: _____
Name: _____
Title: _____


<u>BORROWER REPRESENTATIVE</u>:

**NEIGHBORMD HOLDINGS CORP.**, a Nevada corporation

By: _____
Name: _____
Title: _____

Address for notices:

[___]
Attn:  [___]
Email:  [___]

Address for Wire Transfers:

Bank Name:  [___]

Address:  [___]
ABA:  [___]
Account#:  [___]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized officers as of the day and year first above written.

ADDITIONAL CREDIT PARTIES:

[___], a [___]

By: _____
Name: _____
Title: _____


Address for notices:

[_____]
Attn: [_____]
Email: [_____]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized officers as of the day and year first above written.

**BRIDGING FINANCE INC.**, as the Agent

By: _____

Name: _____

Title: _____

Address for Notices:

[____]

Attention:  [____]

Email:  [____]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized officers as of the day and year first above written.

[_____], as a Lender

By: _____
Name: _____
Title: _____

GUARANTY AND SECURITY AGREEMENT

Dated as of June [____], 2020

by and among

NEIGHBORMD HOLDINGS CORP.,
NEIGHBORMD, INC.,
together with their successors and assigns,

and

Each Other Grantor
From Time to Time Party Hereto

and

BRIDGING FINANCE INC.,
as Agent

# TABLE OF CONTENTS

Page

ARTICLE I DEFINED TERMS ................................................................................... 1

    Section 1.1    Definitions.................................................................................. 1

    Section 1.2    Certain Other Terms ................................................................. 4

ARTICLE II GUARANTY............................................................................................ 5

    Section 2.1    Guaranty.................................................................................... 5

    Section 2.2    Limitation of Guaranty ............................................................ 5

    Section 2.3    Contribution ............................................................................. 5

    Section 2.4    Authorization; Other Agreements ............................................ 6

    Section 2.5    Guaranty Absolute and Unconditional..................................... 6

    Section 2.6    Waivers .................................................................................... 7

    Section 2.7    Reliance ................................................................................... 8

ARTICLE III GRANT OF SECURITY INTEREST ................................................... 8

    Section 3.1    Collateral.................................................................................. 8

    Section 3.2    Grant of Security Interest in Collateral ................................... 9

ARTICLE IV REPRESENTATIONS AND WARRANTIES ....................................... 9

    Section 4.1    Title; No Other Liens ............................................................... 9

    Section 4.2    Perfection and Priority ............................................................. 9

    Section 4.3    Jurisdiction of Organization; Chief Executive Office ............................. 10

    Section 4.4    Locations of Inventory, Equipment and Books and Records ................... 10

    Section 4.5    Pledged Collateral................................................................... 10

    Section 4.6    Instruments and Tangible Chattel Paper Formerly Accounts .................. 11

    Section 4.7    Intellectual Property................................................................ 11

    Section 4.8    Commercial Tort Claims.......................................................... 11

    Section 4.9    Specific Collateral................................................................... 12

    Section 4.10    Enforcement............................................................................ 12

ARTICLE V COVENANTS.......................................................................................... 12

    Section 5.1    Maintenance of Perfected Security Interest; Further Documentation and Consents ................................................. 12

    Section 5.2    Changes in Locations, Name, Etc ........................................... 13

    Section 5.3    Pledged Collateral................................................................... 13

Section 5.4    Accounts ........................................................................ 14

Section 5.5    [Reserved] ..................................................................... 14

Section 5.6    Delivery of Instruments and Tangible Chattel Paper and Control of Investment Property, Letter-of-Credit Rights and Electronic Chattel Paper ................................................................ 14

Section 5.7    Intellectual Property ...................................................... 15

Section 5.8    Notices ........................................................................... 16

Section 5.9    Notice of Commercial Tort Claims.............................. 16

ARTICLE VI REMEDIAL PROVISIONS ..................................................... 16

Section 6.1    Code and Other Remedies ........................................... 16

Section 6.2    Accounts and Payments in Respect of General Intangibles..................... 20

Section 6.3    Pledged Collateral ........................................................ 20

Section 6.4    Proceeds to be Turned over to and Held by Agent ................................. 21

Section 6.5    Sale of Pledged Collateral ............................................ 22

Section 6.6    Deficiency ..................................................................... 22

ARTICLE VII THE AGENT .......................................................................... 22

Section 7.1    Agent's Appointment as Attorney-in-Fact.................... 22

Section 7.2    Authorization to File Financing Statements ................ 24

Section 7.3    Authority of Agent........................................................ 24

Section 7.4    Duty; Obligations and Liabilities................................. 25

ARTICLE VIII MISCELLANEOUS ............................................................... 25

Section 8.1    Reinstatement................................................................ 25

Section 8.2    Release of Collateral or Grantor .................................. 26

Section 8.3    Independent Obligations ............................................... 26

Section 8.4    No Waiver by Course of Conduct.................................. 26

Section 8.5    Amendments in Writing................................................. 27

Section 8.6    Additional Grantors; Additional Pledged Collateral; Joinder Agreements ............................................................. 27

Section 8.7    Notices ........................................................................... 27

Section 8.8    Successors and Assigns.................................................. 27

Section 8.9    Counterparts .................................................................. 27

Section 8.10   Severability ................................................................... 27

Section 8.11   Governing Law ............................................................. 28

Section 8.12   Intercreditor Agreement............................................... 28

Section 8.13    Waiver of Jury Trial .................................................................................... 28

ANNEXES AND SCHEDULES

Annex 1        Form of Pledge Amendment
Annex 2        Form of Joinder Agreement
Annex 3        Form of Intellectual Property Security Agreement

Schedule 1     Commercial Tort Claims
Schedule 2     Filings
Schedule 3     Jurisdiction of Organization; Chief Executive Office
Schedule 4     Location of Inventory and Equipment
Schedule 5     Pledged Collateral
Schedule 6     Intellectual Property

GUARANTY AND SECURITY AGREEMENT, dated as of June [___], 2020 (as amended, restated, amended and restated, supplemented and/or otherwise modified from time to time, this "Agreement"), by and among NeighborMD Holdings Corp., a Delaware corporation ("Holdings"), NeighborMD, Inc. (formerly known as Hygea Health Holdings, Inc.), a Florida corporation ("NMD"; NMD together with Holdings are sometimes referred to herein together as the "Borrowers" and individually as a "Borrower"), and each of the other entities listed on the signature pages hereof or that becomes a party hereto pursuant to Section 8.6 (together with the Borrowers, the "Grantors"), in favor of Bridging Finance Inc. ("Bridging"), as administrative agent (in such capacity, together with its successors and permitted assigns, the "Agent") for the Lenders and the other Secured Parties.

W I T N E S E T H :

WHEREAS, the Borrowers, the Credit Parties from time to time party thereto, the Lenders and Bridging, as Agent for the Lenders, entered into that certain Credit Agreement, dated as of June [___], 2020 (as amended, restated, amended and restated, supplemented or modified from time to time, the "Credit Agreement");

WHEREAS, pursuant to the Credit Agreement, the Lenders have agreed severally but not jointly to make extensions of credit to the Borrowers upon the terms and subject to the conditions set forth therein;

WHEREAS, each Grantor (other than any Borrower in respect of the Obligations owed by such Borrower) has agreed to guaranty the Obligations;

WHEREAS, each Grantor will derive substantial direct and indirect benefits from the making of the extensions of credit under the Credit Agreement; and

WHEREAS, it is a condition precedent to the obligation of the Lenders to make their respective extensions of credit to the Borrowers under the Credit Agreement that the Grantors shall have executed and delivered this Agreement to the Agent.

NOW, THEREFORE, in consideration of these premises and to induce the Lenders and the Agent to enter into the Credit Agreement and to induce the Lenders to make their respective extensions of credit to the Borrowers thereunder, each Grantor hereby agrees with the Agent for the benefit of the Secured Parties as follows:

ARTICLE I

DEFINED TERMS

Section 1.1    Definitions.  (a)  Capitalized terms used herein without definition are used as defined in the Credit Agreement.

(b)    The following terms have the meanings given to them in the UCC and terms used herein without definition that are defined in the UCC have the meanings given to them in the UCC (such meanings to be equally applicable to both the singular and plural forms of the terms defined): "account", "account debtor", "as-extracted collateral", "certificated

security", "chattel paper", "commercial tort claim", "commodity contract", "deposit account", "electronic chattel paper", "equipment", "farm products", "fixture", "general intangible", "goods", "health-care-insurance receivable", "instruments", "inventory", "investment property", "letter-of-credit right", "proceeds", "record", "securities account", "security", "supporting obligation" and "tangible chattel paper".

(c)     The following terms shall have the following meanings:

"Agent" has the meaning specified in the preamble hereof.

"Agreement" has the meaning specified in the preamble hereof.

"Applicable IP Office" means the United States Patent and Trademark Office, the United States Copyright Office or any successor office or agency.

"Bridging" has the meaning specified in the preamble hereof.

"Collateral" has the meaning specified in Section 3.1.

"Credit Agreement" has the meaning set forth in the recitals.

"Excluded Account" has the meaning set forth in the Credit Agreement.

"Excluded Property" means, collectively, (i) pledges and security interests prohibited by applicable law, rule or regulation (to the extent such law, rule or regulation is effective under applicable anti-assignment provisions of the UCC or contractual restrictions), other than proceeds and receivables thereof, (ii) any lease (including any Capital Lease), license or other agreement or any property subject to a purchase money security interest or similar arrangement to the extent that a grant of a security interest therein would violate or invalidate such lease, license or agreement or purchase money arrangement or create a right of termination in favor of any other party thereto (other than a Credit Party) after giving effect to the applicable anti-assignment provisions of the UCC, the assignment of which is expressly deemed effective under the UCC notwithstanding such prohibition, and other than proceeds and receivables thereof, (iii) any "intent to use" Trademark applications for which a "statement of use" or "amendment to allege use" has not been filed (but only until such statement or amendment is filed), and (iv) Excluded Accounts; provided that, "Excluded Property" shall not include any proceeds, products, substitutions or replacements of Excluded Property (unless such proceeds, products, substitutions or replacements would otherwise constitute Excluded Property).

"Fraudulent Transfer Laws" has the meaning set forth in Section 2.2.

"Grantors" has the meaning specified in the preamble hereof.

"Guaranteed Obligations" has the meaning set forth in Section 2.1.

"Guarantor" means each Grantor (other than any Borrower in respect of the Obligations owed by such Borrower).

"<u>Guaranty</u>" means the guaranty of the Guaranteed Obligations made by the Guarantors as set forth in this Agreement.

"<u>Intellectual Property Security Agreement</u>" means a short-form intellectual property security agreement substantially in the form attached hereto as Annex 3.

"<u>Joinder Agreement</u>" has the meaning set forth in Section 8.6(a).

"<u>Material Intellectual Property</u>" means Intellectual Property that is owned by or licensed to a Grantor and material to the conduct of any Grantor's business.

"<u>Pledge Amendment</u>" has the meaning set forth in Section 8.6(b).

"<u>Pledged Certificated Stock</u>" means all certificated securities and any other Stock or Stock Equivalent of any Person evidenced by a certificate, instrument or other similar document (as defined in the UCC), in each case owned by any Grantor, and any distribution of property made on, in respect of or in exchange for the foregoing from time to time, including all Stock and Stock Equivalents listed on <u>Schedule 5</u>.

"<u>Pledged Collateral</u>" means, collectively, the Pledged Stock and the Pledged Debt Instruments.

"<u>Pledged Debt Instruments</u>" means all right, title and interest of any Grantor in instruments evidencing any Indebtedness or other obligations owed to such Grantor, and any distribution of property made on, in respect of or in exchange for the foregoing from time to time, including all Indebtedness described on <u>Schedule 5</u>, issued by the obligors named therein.

"<u>Pledged Investment Property</u>" means any investment property of any Grantor, and any distribution of property made on, in respect of or in exchange for the foregoing from time to time, other than any Pledged Stock or Pledged Debt Instruments.

"<u>Pledged Stock</u>" means all Pledged Certificated Stock and all Pledged Uncertificated Stock.

"<u>Pledged Uncertificated Stock</u>" means any Stock or Stock Equivalent of any Person that is not Pledged Certificated Stock, including all right, title and interest of any Grantor as a limited or general partner in any partnership not constituting Pledged Certificated Stock or as a member of any limited liability company, all right, title and interest of any Grantor in, to and under any Organization Document of any partnership or limited liability company to which it is a party, and any distribution of property made on, in respect of or in exchange for the foregoing from time to time, including in each case those interests set forth on <u>Schedule 5</u>, to the extent such interests are not certificated.

"<u>Secured Obligations</u>" has the meaning set forth in <u>Section 3.2</u>.

"<u>Secured Parties</u>" has the meaning assigned to such term in the Credit Agreement.

"Software" means (a) all computer programs, including source code and object code versions, (b) all data, databases and compilations of data, whether machine readable or otherwise, and (c) all documentation, training materials and configurations related to any of the foregoing.

"UCC" means the Uniform Commercial Code as from time to time in effect in the State of New York; provided, however, that, in the event that, by reason of mandatory provisions of any applicable Requirement of Law, any of the attachment, perfection or priority of the Agent's or any other Secured Party's security interest in any Collateral is governed by the Uniform Commercial Code of a jurisdiction other than the State of New York, "UCC" shall mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such attachment, perfection or priority and for purposes of the definitions related to or otherwise used in such provisions.

Section 1.2    Certain Other Terms.

(a)    The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms. References herein to an Annex, Schedule, Article, Section or clause refer to the appropriate Annex or Schedule to, or Article, Section or clause in this Agreement. Where the context requires, provisions relating to any Collateral when used in relation to a Grantor shall refer to such Grantor's Collateral or any relevant part thereof.

(b)    Other Interpretive Provisions.

(i)    Defined Terms. Unless otherwise specified herein or therein, all terms defined in this Agreement shall have the defined meanings when used in any certificate or other document made or delivered pursuant hereto.

(ii)    The Agreement. The words "hereof", "herein", "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.

(iii)    Certain Common Terms. The term "including" is not limiting and means "including without limitation."

(iv)    Performance; Time. Whenever any performance obligation hereunder (other than a payment obligation) shall be stated to be due or required to be satisfied on a day other than a Business Day, such performance shall be made or satisfied on the next succeeding Business Day. In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding", and the word "through" means "to and including." If any provision of this Agreement refers to any action taken or to be taken by any Person, or which such Person is prohibited from taking, such provision shall be interpreted to encompass any and all means, direct or indirect, of taking, or not taking, such action.

4

(v)     Contracts.    Unless otherwise expressly provided herein, references to agreements and other contractual instruments, including this Agreement and the other Loan Documents, shall be deemed to include all subsequent amendments, thereto, restatements and substitutions thereof and other modifications and supplements thereto which are in effect from time to time, but only to the extent such amendments and other modifications are not prohibited by the terms of any Loan Document.

(vi)     Laws.    References to any statute or regulation may be made by using either the common or public name thereof or a specific cite reference and, except as otherwise provided with respect to FATCA, are to be construed as including all statutory and regulatory provisions related thereto or consolidating, amending, replacing, supplementing or interpreting the statute or regulation.

ARTICLE II

GUARANTY

Section 2.1     Guaranty.     To induce the Lenders to make the Loans and each other Secured Party to make credit available to or for the benefit of one or more Grantors, each Guarantor hereby, jointly and severally, absolutely, unconditionally and irrevocably guarantees, as primary obligor and not merely as surety, the full and punctual payment when due, whether at stated maturity or earlier, by reason of acceleration, mandatory prepayment or otherwise in accordance with any Loan Document, of all the Obligations of the Borrowers whether existing on the date hereof or hereinafter incurred or created (the "Guaranteed Obligations").    This Guaranty by each Guarantor hereunder constitutes a guaranty of payment and not of collection.

Section 2.2     Limitation of Guaranty.    Any term or provision of this Guaranty or any other Loan Document to the contrary notwithstanding, the maximum aggregate amount for which any Guarantor shall be liable hereunder shall not exceed the maximum amount for which such Guarantor can be liable without rendering this Guaranty or any other Loan Document, as it relates to such Guarantor, subject to avoidance under applicable Requirements of Law relating to fraudulent conveyance or fraudulent transfer (including the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act and Section 548 of title 11 of the United States Code or any applicable provisions of comparable Requirements of Law) (collectively, "Fraudulent Transfer Laws").    Any analysis of the provisions of this Guaranty for purposes of Fraudulent Transfer Laws shall take into account the right of contribution established in Section 2.3 and, for purposes of such analysis, give effect to any discharge of intercompany debt as a result of any payment made under the Guaranty.

Section 2.3     Contribution.    Without limiting any right under applicable law for contribution, to the extent that any Guarantor shall be required hereunder to pay any portion of any Guaranteed Obligation exceeding the greater of (a) the amount of the value actually received by such Guarantor and its Subsidiaries from the Loans and other Obligations and (b) the amount such Guarantor would otherwise have paid if such Guarantor had paid the aggregate amount of the Guaranteed Obligations (excluding the amount thereof repaid by the Borrowers) in the same proportion as such Guarantor's net worth on the date enforcement is sought hereunder bears to the aggregate net worth of all the Guarantors on such date, then such Guarantor shall be

5

reimbursed by such other Guarantors for the amount of such excess, pro rata, based on the respective net worth of such other Guarantors on such date. Such contribution rights shall be subordinate and subject in right of payment to obligations of such Guarantors under the Loan Documents and no Guarantor shall exercise such rights of contribution until all Obligations have been paid in full.

Section 2.4    Authorization; Other Agreements. The Secured Parties are hereby authorized, without notice to or demand upon any Guarantor and without discharging or otherwise affecting the obligations of any Guarantor hereunder and without incurring any liability hereunder, from time to time, to do each of the following:

(a)    (i) modify, amend, supplement or otherwise change, (ii) accelerate or otherwise change the time of payment or (iii) waive or otherwise consent to noncompliance with, any Guaranteed Obligation or any Loan Document;

(b)    apply to the Guaranteed Obligations any sums by whomever paid or however realized in such order as provided in the Loan Documents;

(c)    refund at any time any payment received by any Secured Party in respect of any Guaranteed Obligation;

(d)    (i) sell, exchange, enforce, waive, substitute, liquidate, terminate, release, abandon, fail to perfect, subordinate, accept, substitute, surrender, exchange, affect, impair or otherwise alter or release any Collateral for any Guaranteed Obligation or any other guaranty therefor in any manner, (ii) receive, take and hold additional Collateral to secure any Guaranteed Obligation, (iii) add, release or substitute any one or more other Guarantors, makers or endorsers of any Guaranteed Obligation or any part thereof and (iv) otherwise deal in any manner with each Borrower and any other Guarantor, maker or endorser of any Guaranteed Obligation or any part thereof; and

(e)    settle, release, compromise, collect or otherwise liquidate the Guaranteed Obligations.

Section 2.5    Guaranty Absolute and Unconditional. Each Guarantor hereby waives and agrees not to assert any defense (other than the performance in full and indefeasible payment in full of the Guaranteed Obligations), whether arising in connection with or in respect of any of the following or otherwise, and hereby agrees that its obligations under this Guaranty are irrevocable, absolute and unconditional and shall not be discharged as a result of or otherwise affected by any of the following (which may not be pleaded and evidence of which may not be introduced in any proceeding with respect to this Guaranty, in each case except as otherwise agreed in writing by the Agent):

(a)    the invalidity or unenforceability of any obligation of any Borrower or any other Guarantor under any Loan Document or any other agreement or instrument relating thereto (including any amendment, consent or waiver thereto), or any security for, or other guaranty of, any Guaranteed Obligation or any part thereof, or the lack of perfection or continuing perfection or failure of priority of any security for the Guaranteed Obligations or any part thereof;

(b)      the absence of (i) any attempt to collect any Guaranteed Obligation or any part thereof from any Borrower or any other Guarantor or other action to enforce the same or (ii) any action to enforce any Loan Document or any Lien thereunder;

(c)      the failure by any Person to take any steps to perfect and maintain any Lien on, or to preserve any rights with respect to, any Collateral;

(d)      any workout, insolvency, bankruptcy proceeding, reorganization, arrangement, liquidation or dissolution by or against any Borrower, any other Guarantor or any of the Borrower's other Subsidiaries or any procedure, agreement, order, stipulation, election, action or omission thereunder, including any discharge or disallowance of, or bar or stay against collecting, any Guaranteed Obligation (or any interest thereon) in or as a result of any such proceeding;

(e)      any foreclosure, whether or not through judicial sale, and any other sale or other disposition of any Collateral or any election following the occurrence of an Event of Default by any Secured Party to proceed separately against any Collateral in accordance with such Secured Party's rights under any applicable Requirement of Law; or

(f)      any other defense, setoff, counterclaim or any other circumstance that might otherwise constitute a legal or equitable discharge of any Borrower, any other Guarantor or any of the Borrower's other Subsidiaries, in each case other than the performance in full and indefeasible payment in full of the Guaranteed Obligations.

Section 2.6      Waivers.  To the fullest extent permitted by applicable law, each Guarantor hereby unconditionally and irrevocably waives and agrees not to assert any claim, defense (other than performance in full and the indefeasible payment in full of the Guaranteed Obligations), setoff or counterclaim based on diligence, promptness, presentment, requirements for any demand or notice hereunder including any of the following: (a) any demand for payment or performance and protest and notice of protest; (b) any notice of acceptance; (c) any presentment, demand, protest or further notice or other requirements of any kind with respect to any Guaranteed Obligation (including any accrued but unpaid interest thereon) becoming immediately due and payable; and (d) any other notice in respect of any Guaranteed Obligation or any part thereof, and any defense arising by reason of any disability or other defense of the Borrowers or any other Guarantor.  To the fullest extent permitted by applicable law, each Guarantor further unconditionally and irrevocably agrees not to (x) enforce or otherwise exercise any right of subrogation or any right of reimbursement or contribution or similar right against the Borrowers or any other Guarantor by reason of any Loan Document or any payment made thereunder, except as specifically set forth herein or (y) assert any claim, defense, setoff or counterclaim it may have against any other Credit Party or set off any of its obligations to such other Credit Party against obligations of such Credit Party to such Guarantor, until the Guaranteed Obligations have been indefeasibly paid in full.  Except as expressly provided in this Agreement or the Credit Agreement, no obligation of any Guarantor hereunder shall be discharged other than by complete performance.  To the fullest extent permitted by applicable law, each Guarantor further waives any right such Guarantor may have under any applicable Requirement of Law to require any Secured Party to seek recourse first against the Borrowers or

any other Person, or to realize upon any Collateral for any of the Obligations, as a condition precedent to enforcing such Guarantor's liability and obligations under this Guaranty.

Section 2.7    Reliance.    Each Guarantor hereby assumes responsibility for keeping itself informed of the financial condition of each Borrower, each other Guarantor and any other guarantor, maker or endorser of any Guaranteed Obligation or any part thereof, and of all other circumstances bearing upon the risk of nonpayment of any Guaranteed Obligation or any part thereof that diligent inquiry would reveal, and each Guarantor hereby agrees that no Secured Party shall have any duty to advise any Guarantor of information known to it regarding such condition or any such circumstances.  In the event any Secured Party, in its sole discretion, undertakes at any time or from time to time to provide any such information to any Guarantor, such Secured Party shall be under no obligation to (a) undertake any investigation not a part of its regular business routine, (b) disclose any information that such Secured Party, pursuant to accepted or reasonable commercial finance or banking practices, wishes to maintain confidential or (c) make any future disclosures of such information or any other information to any Guarantor.

## ARTICLE III

## GRANT OF SECURITY INTEREST

Section 3.1    Collateral.    For the purposes of this Agreement, all of the following property now owned or at any time hereafter acquired by a Grantor or in which a Grantor now has or at any time in the future may acquire any right, title or interests is collectively referred to as the "Collateral":

(a)    all accounts, chattel paper, deposit accounts, documents (as defined in the UCC), equipment, general intangibles, instruments, inventory, investment property, letter of credit rights and any supporting obligations related to any of the foregoing;

(b)    the commercial tort claims, including those described on Schedule 1 and on any supplement thereto received by the Agent pursuant to Section 5.9;

(c)    all books and records pertaining to the other property described in this Section 3.1;

(d)    all property of such Grantor held by any Secured Party, including all property of every description, in the custody of or in transit to such Secured Party for any purpose, including safekeeping, collection or pledge, for the account of such Grantor or as to which such Grantor may have any right or power, including but not limited to cash;

(e)    all other goods (including but not limited to fixtures) and personal property of such Grantor, whether tangible or intangible and wherever located; and

(f)    to the extent not otherwise included, all proceeds of the foregoing;

provided, however, that the term "Collateral" shall not include the Excluded Property.

8

Section 3.2    Grant of Security Interest in Collateral.    Each Grantor, as collateral security for the prompt and complete payment and performance when due (whether at stated maturity, by acceleration or otherwise) of the Obligations (the "Secured Obligations"), hereby grants to the Agent for the benefit of the Secured Parties a Lien on and security interest in, all of its right, title and interest in, to and under the Collateral of such Grantor; provided, however, that notwithstanding the foregoing, no Lien or security interest is hereby granted on any Excluded Property; provided, further, that if and when any property shall cease to be Excluded Property, a Lien on and security interest in such property shall be deemed granted therein.

ARTICLE IV

REPRESENTATIONS AND WARRANTIES

To induce the Lenders and the Agent to enter into the Loan Documents, each Grantor hereby represents and warrants each of the following to the Agent, the Lenders and the other Secured Parties:

Section 4.1    Title; No Other Liens.    Except for the Lien granted to the Agent pursuant to this Agreement and other Permitted Liens (except for those Permitted Liens that do not comply with the priority conditions of Section 4.2) under any Loan Document (including Section 4.2), such Grantor owns each item of the Collateral free and clear of any and all Liens or claims of others.   Such Grantor (a) is the record and beneficial owner of the Collateral pledged by it hereunder constituting instruments or certificates and (b) has rights in or the power to transfer each other item of Collateral in which a Lien is granted by it hereunder, free and clear of any other Lien other than Permitted Liens.

Section 4.2    Perfection and Priority.    The security interest granted pursuant to this Agreement constitutes a valid and continuing perfected security interest in favor of the Agent for the benefit of the Secured Parties in all Collateral subject, for the following Collateral, to the occurrence of the following: (a) in the case of all Collateral in which a security interest may be perfected by filing a financing statement under the UCC, the completion of the filings and other actions specified on Schedule 2 (which, in the case of all filings and other documents referred to on such schedule, have been delivered to the Agent in completed and duly authorized form), (b) in the case of all U.S. registered and pending Copyrights, Trademarks and Patents for which UCC filings are insufficient, all appropriate filings having been made with the United States Copyright Office or the United States Patent and Trademark Office, as applicable, (c) in the case of letter-of-credit rights, the execution of a Contractual Obligation granting control to the Agent over such letter-of-credit rights and (d) in the case of electronic chattel paper, the completion of all steps necessary to grant control to the Agent over such electronic chattel paper. Such security interest shall be prior to all other Liens on the Collateral except for Permitted Liens having priority over the Agent's Lien by operation of law or permitted pursuant to Section 5.1 of the Credit Agreement upon (i) in the case of all Pledged Certificated Stock, Pledged Debt Instruments and Pledged Investment Property, the delivery thereof to the Agent of such Pledged Certificated Stock, Pledged Debt Instruments and Pledged Investment Property, consisting of instruments and certificates, in each case properly endorsed for transfer to the Agent or in blank, and (ii) in the case of all other instruments and tangible chattel paper that are not Pledged

9

Certificated Stock, Pledged Debt Instruments or Pledged Investment Property, the delivery thereof to the Agent of such instruments and tangible chattel paper. Except as set forth in this Section 4.2, all actions by each Grantor necessary to protect and perfect the Lien granted hereunder on the Collateral have been duly taken. Notwithstanding anything to the contrary contained in this Agreement or any other Loan Document, no Grantor shall be required to make any filings or take any actions to record or perfect the Agent's security interest in any intellectual property (including any Patents, Copyrights or Trademarks) other than (i) the filing of financing statements under the UCC in the applicable jurisdictions and (ii) the recording of Intellectual Property Security Agreements substantially in the form attached hereto as Annex 3 with the U.S. Patent and Trademark Office and U.S. Copyright Office, as applicable.

Section 4.3    Jurisdiction of Organization; Chief Executive Office. Such Grantor's jurisdiction of organization, legal name and organizational identification number, if any, and the location of such Grantor's sole place of business or, if such Grantor has more than one place of business, such Grantor's chief executive office, in each case as of the date hereof, is specified on Schedule 3 and such Schedule 3 also lists all jurisdictions of incorporation, legal names and locations of such Grantor's chief executive office or sole place of business for the five years preceding the date hereof.

Section 4.4    Locations of Inventory, Equipment and Books and Records. On the date hereof, such Grantor's (i) inventory and equipment (other than inventory or equipment in transit, out for repair or refurbishment or in the possession of employees in the Ordinary Course of Business) and (ii) books and records concerning the Collateral are, in each case, kept at the locations listed on Schedule 4.

Section 4.5    Pledged Collateral. (a) The Pledged Stock pledged by such Grantor hereunder (i) is listed on Schedule 5 and constitutes that percentage of the issued and outstanding equity of all classes of each issuer thereof as set forth on Schedule 5, (ii) in the case of Pledged Stock issued by Affiliates of such Grantor, or, in the case of those issued by Persons that are not Affiliates of such Grantor, to the knowledge of such Grantor, has been duly authorized, validly issued and is fully paid and nonassessable (other than Pledged Stock in limited liability companies and partnerships) and (iii) in the case of Pledged Stock issued by Affiliates of such Grantor, or, in the case of those issued by Persons that are not Affiliates of such Grantor, to the knowledge of such Grantor, constitutes the legal, valid and binding obligation of the obligor with respect thereto, enforceable in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability.

(b)    As of the Closing Date, all Pledged Collateral (other than Pledged Uncertificated Stock) and all Pledged Investment Property consisting of instruments and certificates have been delivered to the Agent in accordance with Section 5.3(a).

(c)    Upon the occurrence and during the continuance of an Event of Default, the Agent shall be entitled to exercise all of the rights of the Grantor granting the security interest in any Pledged Stock, and a transferee or assignee of such Pledged Stock shall become a holder of such Pledged Stock to the same extent as such Grantor and be entitled to participate in the management of the issuer of such Pledged Stock and, upon the transfer of the entire interest of

such Grantor, such Grantor shall, by operation of law, cease to be a holder of such Pledged Stock.

(d)    Except (solely as to the following <u>clause (iii)</u>) for the Pledged Stock of each of the limited liability companies for which there is a certificate number listed on <u>Schedule 5</u>, no Pledged Stock held by such Grantor (i) is dealt in or traded on securities exchanges or in securities markets, (ii) is "investment company securities" (as defined in Section 8-103(b) of the UCC) or (iii) provides, in the related membership agreement, certificates, if any, representing such the Pledged Stock or otherwise, that they are securities governed by the Uniform Commercial Code of any jurisdiction.

Section 4.6    <u>Instruments and Tangible Chattel Paper Formerly Accounts</u>.  No amount in excess of $10,000 payable to such Grantor under or in connection with any account is evidenced by any instrument or tangible chattel paper that has not been delivered to the Agent, properly endorsed for transfer, to the extent delivery is required by Section 5.6(a).

Section 4.7    <u>Intellectual Property</u>.  (a) <u>Schedule 6</u> sets forth a true and complete list of the Intellectual Property such Grantor owns that is registered or subject to applications for registration with the United States Patent and Trademark Office or the United States Copyright Office, as applicable, including for such Intellectual Property that is owned or licensed by such Grantor (1) the owner, (2) the title, and (3) as applicable, the registration or application number and registration or application date.

(b)    On the Closing Date, to such Grantor's knowledge, all Intellectual Property owned by such Grantor is in full force and effect, subsisting, unexpired, enforceable and, valid, and no Intellectual Property owned by such Grantor has been abandoned, except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  No breach or default of any IP License shall be caused by any of the following, and none of the following shall limit or impair the ownership, use, validity or enforceability of, or any rights of such Grantor in, any Intellectual Property, except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect: (i) the consummation of the transactions contemplated by any Loan Document or (ii) any holding, decision, judgment or order rendered by any Governmental Authority against such Grantor as of the date hereof and known by such Grantor.  There are no pending (or, to the knowledge of such Grantor, threatened) actions, investigations, suits, proceedings, audits, claims, demands, orders or disputes that, if adversely determined, would reasonably be expected to have a Material Adverse Effect, except for non-final office actions issued in the ordinary course, challenging the ownership, use, validity, enforceability of, or such Grantor's rights in, any Intellectual Property owned by such Grantor.  To such Grantor's knowledge, no Person has been or is infringing, misappropriating, diluting, violating or otherwise impairing any Intellectual Property owned by such Grantor.  Such Grantor, and to such Grantor's knowledge, each other party thereto, is not in breach or default of any IP License, except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 4.8    <u>Commercial Tort Claims</u>.  The only commercial tort claims in amounts in excess of $10,000 of any Grantor existing on the date hereof (regardless of whether the amount, defendant or other material facts can be determined and regardless of whether such

commercial tort claim has been asserted, threatened or has otherwise been made known to the obligee thereof or whether litigation has been commenced for such claims) are those listed on Schedule 1, which sets forth such information separately for each Grantor.

Section 4.9    Specific Collateral. None of the Collateral is or is proceeds or products of farm products, as-extracted collateral or timber to be cut.

Section 4.10    Enforcement.    No Permit, notice to or filing with any Governmental Authority or any other Person or any consent from any Person that has not been obtained is required for the exercise by the Agent of its rights (including voting rights) provided for in this Agreement or the enforcement of remedies in respect of the Collateral pursuant to this Agreement, including the transfer of any Collateral, except as may be required in connection with the perfection of the security interests created hereby and the assignment or disposition of any portion of the Pledged Collateral by laws affecting the offering and sale of securities generally or any approvals that may be required to be obtained from any bailees or landlords to collect the Collateral.

ARTICLE V

COVENANTS

Each Grantor agrees with the Agent for the benefit of the Secured Parties to the following, as long as any Obligation or Commitment remains outstanding (other than contingent indemnification Obligations to the extent no claim giving rise thereto has been asserted):

Section 5.1    Maintenance of Perfected Security Interest; Further Documentation and Consents.  (a) Such Grantor shall (i) not use or permit any Collateral to be used unlawfully or in violation of any provision of any Loan Document, any Requirement of Law or any policy of insurance covering the Collateral if such use would reasonably be expected to result in a Material Adverse Effect and (ii) not enter into any Contractual Obligation or undertaking restricting the right or ability of such Grantor or the Agent to sell, assign, convey or transfer any Collateral if such restriction would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect, or would otherwise be prohibited under the Credit Agreement.

(b)    Unless otherwise expressly permitted by this Agreement or the Credit Agreement, such Grantor shall maintain the security interest created by this Agreement as a perfected security interest having at least the priority described in Section 4.2 and shall defend such security interest and such priority against the claims and demands of all Persons.

(c)    Such Grantor shall furnish to the Agent from time to time statements and schedules further identifying and describing the Collateral and such other documents in connection with the Collateral as the Agent may reasonably request, all in reasonable detail and in form and substance reasonably satisfactory to the Agent.

(d)    At any time and from time to time, upon the reasonable written request of the Agent, such Grantor shall, for the purpose of obtaining or preserving the full benefits of this Agreement and of the rights and powers herein granted, (i) promptly and duly execute and

12

deliver, and have recorded, such further documents, including an authorization to file (or, as applicable, the filing) of any financing statement or amendment under the UCC (or other filings under similar Requirements of Law) in effect in any jurisdiction with respect to the security interest created hereby and (ii) take such further action as Agent may reasonably request that is not prohibited by this Agreement or the Credit Agreement, subject to the limitations in Section 3.2.

Section 5.2    Changes in Locations, Name, Etc.  Such Grantor recognizes that financing statements pertaining to the Collateral have been or may be filed where such Grantor is organized.  Without limitation of any other covenant herein, such Grantor will not cause or permit (i) any change in such Grantor's legal name or corporate, limited liability company, or limited partnership structure or (ii) any change to such Grantor's jurisdiction of organization, unless such Grantor shall have (1) notified the Agent of such change in writing at least 30 days prior to such change, and (2) taken all action reasonably requested by the Agent or any other Secured Party for the purpose of reaffirming the grant of security interests and maintaining the perfection and priority of the Agent's security interests under this Agreement.  In any notice furnished pursuant to this Section 5.2, such Grantor will expressly state in a conspicuous manner that the notice is required by this Agreement and contains facts that may require additional filings of financing statements or other notices for the purposes of continuing perfection of the Agent's security interest in the Collateral.

Section 5.3    Pledged Collateral.  (a) Delivery of Pledged Collateral.  Such Grantor shall deliver to the Agent, in suitable form for transfer and in form and substance reasonably satisfactory to the Agent, (A) all Pledged Certificated Stock, (B) all Pledged Debt Instruments, having a stated value in excess of $10,000 individually or in the aggregate and (C) all certificates and instruments evidencing Pledged Investment Property, with a stated value in excess of $10,000 individually or in the aggregate.

(b)    Event of Default.  During the continuance of an Event of Default, the Agent shall have the right, at any time in its discretion and upon notice to the Grantor, to (i) transfer to or to register in its name or in the name of its nominees any Pledged Collateral or any Pledged Investment Property and (ii) exchange any certificate or instrument representing or evidencing any Pledged Collateral or any Pledged Investment Property for certificates or instruments of smaller or larger denominations.

(c)    Pledged Uncertificated Stock. Each Grantor hereby covenants and agrees that, without the prior express written consent of the Agent (which consent is deemed made with respect to the Pledged Stock of each of the limited liability companies for which there is a certificate number listed on Schedule 5), it will not agree to any election by any limited liability company to treat the Pledged Stock as securities governed by the Uniform Commercial Code of any jurisdiction and in any event will promptly notify the Agent in writing if the representation set forth in Section 4.5(d) hereof becomes untrue in any material respect for any reason and, in such event, take such action as the Agent make request in order to establish the Agent's "control" (within the meaning of Section 8-106 of the UCC) over such Pledged Stock.

13

(d)    <u>Cash Distributions with respect to Pledged Collateral</u>.  Except as provided in Article VI and subject to the limitations set forth in the Credit Agreement, such Grantor shall be entitled to receive all distributions and dividends paid in respect of the Pledged Collateral.

Section 5.4    <u>Accounts</u>.

(a)    So long as an Event of Default is continuing, such Grantor shall not, other than in the Ordinary Course of Business, (i) grant any extension of the time of payment of any account, (ii) compromise or settle any account for less than the full amount thereof, (iii) release, wholly or partially, any Person liable for the payment of any account, (iv) allow any credit or discount on any account or (v) amend, supplement or modify any account in any manner that could materially adversely affect the value thereof.

(b)    So long as an Event of Default is continuing, the Agent shall have the right to make test verifications of the Accounts in any manner and through any medium that it reasonably considers advisable, and such Grantor shall furnish all such assistance and information as the Agent may reasonably require in connection therewith.  So long as an Event of Default is continuing, upon the Agent's reasonable request, such Grantor shall cause independent public accountants or others satisfactory to the Agent to furnish to the Agent reports showing reconciliations, aging and test verifications of, and trial balances for, the accounts.

Section 5.5    [Reserved].

Section 5.6    <u>Delivery of Instruments and Tangible Chattel Paper and Control of Investment Property, Letter-of-Credit Rights and Electronic Chattel Paper</u>.  (a) If any amount in excess of $10,000 individually or in the aggregate payable under or in connection with any Collateral owned by such Grantor shall be or become evidenced by an instrument or tangible chattel paper other than such instrument delivered in accordance with Section 5.3(a) and in the possession of the Agent, such Grantor shall mark all such instruments and tangible chattel paper with the following legend: "This writing and the obligations evidenced or secured hereby are subject to the security interest of Bridging Finance Inc., as Agent" and, at the request of the Agent, shall promptly deliver such instrument or tangible chattel paper to the Agent, duly indorsed in a manner reasonably satisfactory to the Agent.

(b)    Such Grantor shall not grant "<u>control</u>" (within the meaning of such term under Article 9-106 of the UCC) over any investment property constituting Collateral to any Person other than the Agent or any agent under any Indebtedness permitted to be incurred pursuant to Section 5.5(f) of the Credit Agreement (such Indebtedness, the "<u>Subordinated Indebtedness</u>" and any agent under such Subordinated Indebtedness, a "<u>Subordinated Agent</u>").

(c)    If such Grantor is or becomes the beneficiary of a letter of credit, such Grantor shall promptly, and in any event within 7 Business Days after becoming a beneficiary, notify the Agent thereof and, following such notice, enter into a Contractual Obligation with the Agent, the issuer of such letter of credit or any nominated person with respect to the letter-of-credit rights under such letter of credit.  Such Contractual Obligation shall assign such letter-of-credit rights to the Agent and such assignment shall be sufficient to grant control for the purposes of Section 9-107 of the UCC (or any similar section under any equivalent UCC).  The provisions

14

of the Contractual Obligation shall be in form and substance reasonably satisfactory to the Agent.

(d)    If any amount in excess of $10,000 payable under or in connection with any Collateral owned by such Grantor shall be or become evidenced by electronic chattel paper, such Grantor shall take all steps necessary to grant the Agent control of all such electronic chattel paper for the purposes of Section 9-105 of the UCC (or any similar section under any equivalent UCC) and all "transferable records" as defined in each of the Uniform Electronic Transactions Act and the Electronic Signatures in Global and National Commerce Act.

Section 5.7    Intellectual Property.  (a) Each Grantor shall (i) together with the delivery of each Compliance Certificate to be furnished in connection with the financial statements under Section 4.2(b) of the Credit Agreement provide the Agent notification of any change to Schedule 6 for such Grantor, and (ii) execute and deliver the short-form intellectual property agreements and assignments as described in Section 5.7(e) below and any other documents that the Agent reasonably requests with respect thereto.

(b)    Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, such Grantor shall (and shall, subject to such Grantor's reasonable business judgment and consistent with past practice, cause all its licensees to), except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect (i) (1) continue to use each Trademark in order to maintain such Trademark in full force and effect with respect to each class of goods for which such Trademark is currently used, free from any claim of abandonment for non-use (except to the extent such Grantor determines in the Ordinary Course of Business and consistent with reasonable business judgment to cease use of a Trademark in connection with particular good), (2) maintain at least the same standards of quality of products and services offered under such Trademark as are currently maintained, (3) use such Trademark with the appropriate notice of registration and all other notices and legends required by applicable Requirements of Law, (4) not adopt or use any other Trademark that is confusingly similar or a colorable imitation of such Trademark unless the Agent shall obtain for the benefit of the Secured Parties a perfected security interest in such other Trademark pursuant to this Agreement and (ii) not do any act or omit to do any act whereby (w) such Trademark (or any goodwill associated therewith) may become destroyed, invalidated, impaired or harmed in any material way (other than as permitted by Section 5.2 of the Credit Agreement), (x) any Patent may become forfeited, misused, unenforceable, abandoned or dedicated to the public (other than as permitted by Section 5.2 of the Credit Agreement), (y) any portion of the Copyrights may become invalidated, otherwise impaired or fall into the public domain (other than by expiration and other than as permitted by Section 5.2 of the Credit Agreement) or (z) any Trade Secret may become publicly available or otherwise unprotectable (other than as permitted by Section 5.2 of the Credit Agreement).

(c)    Such Grantor shall notify the Agent promptly if it knows that any application or registration relating to any Intellectual Property may become forfeited, misused, unenforceable, abandoned or dedicated to the public, or of any adverse determination or development regarding the validity or enforceability or such Grantor's ownership of, interest in, right to use, register, own or maintain any Intellectual Property (including any determination in any proceeding relating to the foregoing in any Applicable IP Office but excluding any non-final

15

office actions). Such Grantor shall take all reasonable actions that are necessary or reasonably requested by the Agent to maintain and pursue each application (and to obtain the relevant registration or recordation) and to maintain each registration and recordation included in the Intellectual Property (except as otherwise permitted by Section 5.2 of the Credit Agreement).

(d)     Such Grantor shall not knowingly do any act or omit to do any act to infringe, misappropriate, dilute, violate or otherwise impair the Intellectual Property of any other Person, except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. In the event that any Material Intellectual Property of such Grantor is or has been infringed, misappropriated, violated, diluted or otherwise impaired by a third party, such Grantor shall take such action as it reasonably deems appropriate under the circumstances in response thereto, including promptly bringing suit as it reasonably deems appropriate and recovering all damages therefor.

(e)     Such Grantor shall execute and deliver to the Agent in form and substance reasonably acceptable to the Agent and suitable for filing in the Applicable IP Office the short-form intellectual property security agreements in the form attached hereto as Annex 3 for all U.S. registered and pending Copyrights, Trademarks and Patents of such Grantor.

Section 5.8     Notices. Subject to the agreed carveouts in this Agreement, such Grantor shall promptly notify the Agent in writing of its acquisition of any interest hereafter in property that is of a type where a security interest or lien must be or may be registered, recorded or filed under, or notice thereof given under, any federal statute or regulation.

Section 5.9     Notice of Commercial Tort Claims. Such Grantor agrees that, if it shall acquire any interest in commercial tort claims in excess of $10,000 individually or in the aggregate (whether from another Person or because such commercial tort claim shall have come into existence), (i) such Grantor shall, at the time of the delivery of a Compliance Certificate pursuant to Section 4.2(b) of the Credit Agreement, deliver to the Agent, in each case in form and substance reasonably satisfactory to the Agent, a notice of the existence and nature of such commercial tort claim and a supplement to Schedule 1 containing a specific description of such commercial tort claim, (ii) Section 3.1 shall apply to such commercial tort claim and (iii) such Grantor shall execute and deliver to the Agent, in each case in form and substance reasonably satisfactory to the Agent, any document, and take all other action, deemed by the Agent to be reasonably necessary or appropriate for the Agent to obtain, for the benefit of the Secured Parties, a perfected security interest having at least the priority set forth in Section 4.2 in all such commercial tort claims. Any supplement to Schedule 1 delivered pursuant to this Section 5.9 shall, after the receipt thereof by the Agent, become part of Schedule 1 for all purposes hereunder other than in respect of representations and warranties made prior to the date of such receipt.

ARTICLE VI

REMEDIAL PROVISIONS

Section 6.1     Code and Other Remedies. (a) UCC Remedies. During the continuance of an Event of Default, the Agent may exercise, in addition to all other rights and

16

remedies granted to it in this Agreement and in any other instrument or agreement securing, evidencing or relating to any Secured Obligation, all rights and remedies of a secured party under the UCC or any other applicable law.

(b)      Disposition of Collateral.  Without limiting the generality of the foregoing, the Agent may, without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except any notice required by law referred to below) to or upon any Grantor or any other Person (all and each of which demands, defenses, advertisements and notices are hereby waived), during the continuance of any Event of Default (personally or through its agents or attorneys) (i) enter upon the premises where any Collateral is located, without any obligation to pay rent, through self-help, without judicial process, without first obtaining a final judgment or giving any Grantor or any other Person notice or opportunity for a hearing on the Agent's claim or action, (ii) collect, receive, appropriate and realize upon any Collateral and (iii) sell, assign, convey, transfer, grant option or options to purchase and deliver any Collateral (enter into Contractual Obligations to do any of the foregoing), in one or more parcels at public or private sale or sales, at any exchange, broker's board or office of any Secured Party or elsewhere upon such terms and conditions as it may deem advisable and at such prices as it may deem best, for cash or on credit or for future delivery without assumption of any credit risk.  The Agent shall have the right, upon any such public sale or sales and, to the extent permitted by the UCC and other applicable Requirements of Law, upon any such private sale, to purchase the whole or any part of the Collateral so sold, free of any right or equity of redemption of any Grantor, which right or equity is hereby waived and released.

(c)      Management of the Collateral.  Each Grantor further agrees, that, during the continuance of any Event of Default, (i) at the Agent's request, it shall assemble the Collateral and make it available to the Agent at places that the Agent shall reasonably select, whether at such Grantor's premises or elsewhere, (ii) without limiting the foregoing, the Agent also has the right to require that each Grantor store and keep any Collateral pending further action by the Agent and, while any such Collateral is so stored or kept, provide such guards and maintenance services as shall be necessary to protect the same and to preserve and maintain such Collateral in good condition, (iii) until the Agent is able to sell, assign, convey or transfer any Collateral, the Agent shall have the right to hold or use such Collateral to the extent that it deems appropriate for the purpose of preserving the Collateral or its value or for any other purpose deemed appropriate by the Agent and (iv) the Agent may, if it so elects, seek the appointment of a receiver or keeper to take possession of any Collateral and to enforce any of the Agent's remedies (for the benefit of the Secured Parties), with respect to such appointment without prior notice or hearing as to such appointment.  The Agent shall not have any obligation to any Grantor to maintain or preserve the rights of any Grantor as against third parties with respect to any Collateral while such Collateral is in the possession of the Agent.

(d)      Application of Proceeds.  The Agent shall apply the cash proceeds of any action taken by it pursuant to this Section 6.1, after deducting all reasonable and documented costs and expenses of every kind incurred in connection therewith or incidental to the care or safekeeping of any Collateral or in any way relating to the Collateral or the rights of the Agent and any other Secured Party hereunder, including reasonable and documented attorneys' fees and out-of-pocket disbursements, to the payment in whole or in part of the Secured Obligations, as set forth in the Credit Agreement, and only after such application and after the payment by the

Agent of any other amount required by any Requirement of Law, need the Agent account for the surplus, if any, to any Grantor.

(e)     Direct Obligation.  Neither the Agent nor any other Secured Party shall be required to make any demand upon, or pursue or exhaust any right or remedy against, any Grantor, any other Credit Party or any other Person with respect to the payment of the Obligations or to pursue or exhaust any right or remedy with respect to any Collateral therefor or any direct or indirect guaranty thereof.  All of the rights and remedies of the Agent and any other Secured Party under any Loan Document shall be cumulative, may be exercised individually or concurrently and not exclusive of any other rights or remedies provided by any Requirement of Law.  To the extent it may lawfully do so, each Grantor absolutely and irrevocably waives and relinquishes the benefit and advantage of, and covenants not to assert against the Agent or any other Secured Party, any valuation, stay, appraisement, extension, redemption or similar laws and any and all rights or defenses it may have as a surety, now or hereafter existing, arising out of the exercise by them of any rights hereunder.  If any notice of a proposed sale or other disposition of any Collateral shall be required by law, such notice shall be deemed reasonable and proper if given at least 10 days before such sale or other disposition.

(f)     Commercially Reasonable.  To the extent that applicable Requirements of Law impose duties on the Agent to exercise remedies in a commercially reasonable manner, each Grantor acknowledges and agrees that it is not commercially unreasonable for the Agent to do any of the following:

(i)     fail to incur significant costs, expenses or other Liabilities reasonably deemed as such by the Agent to prepare any Collateral for disposition or otherwise to complete raw material or work in process into finished goods or other finished products for disposition;

(ii)     fail to obtain Permits, or other consents, for access to any Collateral to sell or for the collection or sale of any Collateral, or, if not required by other Requirements of Law, fail to obtain Permits or other consents for the collection or disposition of any Collateral;

(iii)     fail to exercise remedies against account debtors or other Persons obligated on any Collateral or to remove Liens on any Collateral or to remove any adverse claims against any Collateral;

(iv)     advertise dispositions of any Collateral through publications or media of general circulation, whether or not such Collateral is of a specialized nature, or to contact other Persons, whether or not in the same business as any Grantor, for expressions of interest in acquiring any such Collateral;

(v)     exercise collection remedies against account debtors and other Persons obligated on any Collateral, directly or through the use of collection agencies or other collection specialists, hire one or more professional auctioneers to assist in the disposition of any Collateral, whether or not such Collateral is of a specialized nature, or, to the extent deemed appropriate by the Agent, obtain the services of other brokers, investment

bankers, consultants and other professionals to assist the Agent in the collection or disposition of any Collateral, or utilize Internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capacity of doing so, or that match buyers and sellers of assets to dispose of any Collateral;

(vi)    dispose of assets in wholesale rather than retail markets;

(vii)    disclaim disposition warranties, such as title, possession or quiet enjoyment; or

(viii)    purchase insurance or credit enhancements to insure the Agent against risks of loss, collection or disposition of any Collateral or to provide to the Agent a guaranteed return from the collection or disposition of any Collateral.

Each Grantor acknowledges that the purpose of this Section 6.1 is to provide a non-exhaustive list of actions or omissions that are commercially reasonable when exercising remedies against any Collateral and that other actions or omissions by any Secured Party shall not be deemed commercially unreasonable solely on account of not being indicated in this Section 6.1. Without limitation upon the foregoing, nothing contained in this Section 6.1 shall be construed to grant any rights to any Grantor or to impose any duties on the Agent that would not have been granted or imposed by this Agreement or by applicable Requirements of Law in the absence of this Section 6.1.

(g)    IP Licenses.  For the purpose of enabling the Agent to exercise rights and remedies under this Section 6.1 (including in order to take possession of, collect, receive, assemble, process, appropriate, remove, realize upon, sell, assign, convey, transfer or grant options to purchase any Collateral) at such time as the Agent shall be lawfully entitled to exercise such rights and remedies, each Grantor hereby grants to the Agent, for the benefit of the Secured Parties, (i) an irrevocable, nonexclusive, worldwide license (exercisable for the purpose of enabling the Agent to exercise rights and remedies under this Section 6.1 without payment of royalty or other compensation to such Grantor), including in such license the right to sublicense, use and practice any Intellectual Property now owned or hereafter acquired by such Grantor and access to all media in which any of the licensed items may be recorded or stored and to all Software and programs used for the compilation or printout thereof; provided that this license (A) shall not violate the express terms of any agreement between a Grantor and a third party governing the applicable Grantor's use of such Intellectual Property in effect on the date hereof and those granted by any Grantor hereafter, as permitted under the Loan Documents, to the extent conflicting, (B) may be exercised, at the option of the Agent, only upon the occurrence and during the continuation of an Event of Default, provided, that any license, sublicense or other transaction entered into by the Agent in accordance herewith shall be binding upon the Grantors notwithstanding any subsequent cure of an Event of Default, and (C) apply to the use of the Trademarks in connection with goods and services of similar type and quality to those heretofore sold by such Grantor under such Trademark, and (ii) an irrevocable license (without payment of rent or other compensation to such Grantor) to use, operate and occupy all real Property owned, operated, leased, subleased or otherwise occupied by such Grantor.

19

Section 6.2    Accounts and Payments in Respect of General Intangibles. (a) In addition to, and not in substitution for, any similar requirement in the Credit Agreement, if required by the Agent at any time during the continuance of an Event of Default, any payment of accounts or payment in respect of general intangibles, when collected by any Grantor, shall be promptly (and, in any event, within 2 Business Days) deposited by such Grantor in the exact form received, subject to the Agent's rights as provided in Section 6.4. Until so turned over, such payment shall be held by such Grantor in trust for the Agent and the other Secured Parties, segregated from other funds of such Grantor. Each such deposit of proceeds of accounts and payments in respect of general intangibles shall be accompanied by a report identifying in reasonable detail the nature and source of the payments included in the deposit.

(b)    At any time during the continuance of an Event of Default:

(i)    each Grantor shall, upon the Agent's request, deliver to the Agent all original and other documents evidencing, and relating to, the Contractual Obligations and transactions that gave rise to any account or any payment in respect of general intangibles, including all original orders, invoices and shipping receipts and notify account debtors that the accounts or general intangibles have been collaterally assigned to the Agent and that payments in respect thereof shall be made directly to the Agent; and

(ii)    the Agent may, without notice, at any time during the continuance of an Event of Default, limit or terminate the authority of a Grantor to collect its accounts or amounts due under general intangibles or any thereof and, in its own name or in the name of others, communicate with account debtors to verify with them to the Agent's satisfaction the existence, amount and terms of any account or amounts due under any general intangible. In addition, the Agent may at any time enforce such Grantor's rights against such account debtors and obligors of general intangibles.

(c)    Anything herein to the contrary notwithstanding, each Grantor shall remain liable under each account and each payment in respect of general intangibles to observe and perform all the conditions and obligations to be observed and performed by it thereunder, all in accordance with the terms of any agreement giving rise thereto. No Secured Party shall have any obligation or liability under any agreement giving rise to an account or a payment in respect of a general intangible by reason of or arising out of any Loan Document or the receipt by any Secured Party of any payment relating thereto, nor shall any Secured Party be obligated in any manner to perform any obligation of any Grantor under or pursuant to any agreement giving rise to an account or a payment in respect of a general intangible, to make any payment, to make any inquiry as to the nature or the sufficiency of any payment received by it or as to the sufficiency of any performance by any party thereunder, to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts that may have been assigned to it or to which it may be entitled at any time or times.

Section 6.3    Pledged Collateral. (a) Voting Rights. During the continuance of an Event of Default, upon notice by the Agent to the relevant Grantor or Grantors, the Agent or its nominee may exercise (A) any voting, consent, corporate and other right pertaining to the Pledged Collateral at any meeting of shareholders, partners or members, as the case may be, of the relevant issuer or issuers of Pledged Collateral or otherwise and (B) any right of conversion,

exchange and subscription and any other right, privilege or option pertaining to the Pledged Collateral as if it were the absolute owner thereof (including the right to exchange at its discretion any Pledged Collateral upon the merger, amalgamation, consolidation, reorganization, recapitalization or other fundamental change in the corporate or equivalent structure of any issuer of Pledged Stock, the right to deposit and deliver any Pledged Collateral with any committee, depositary, transfer agent, registrar or other designated agency upon such terms and conditions as the Agent may determine), all without liability except to account for property actually received by it; provided, however, that the Agent shall have no duty to any Grantor to exercise any such right, privilege or option and shall not be responsible for any failure to do so or delay in so doing.

(b)    Proxies.  In order to permit the Agent to exercise the voting and other consensual rights that it may be entitled to exercise pursuant hereto and to receive all dividends and other distributions that it may be entitled to receive hereunder, (i) each Grantor shall promptly execute and deliver (or cause to be executed and delivered) to the Agent all such proxies, dividend payment orders and other instruments as the Agent may from time to time reasonably request and (ii) without limiting the effect of clause (i) above, such Grantor hereby grants to the Agent (subject to the terms of Section 6.3(a)) an irrevocable proxy to vote all or any part of the Pledged Collateral and to exercise all other rights, powers, privileges and remedies to which a holder of the Pledged Collateral would be entitled (including giving or withholding written consents of shareholders, partners or members, as the case may be, calling special meetings of shareholders, partners or members, as the case may be, and voting at such meetings), which proxy shall be effective, automatically and without the necessity of any action (including any transfer of any Pledged Collateral on the record books of the issuer thereof) by any other person (including the issuer of such Pledged Collateral or any officer or agent thereof) during the continuance of an Event of Default and which proxy shall only terminate upon the indefeasible payment in full of the Secured Obligations (other than contingent indemnification obligations to the extent no claim giving rise thereto has been asserted).

(c)    Authorization of Issuers.  Each Grantor hereby expressly and irrevocably authorizes and instructs, without any further instructions from such Grantor, each issuer of any Pledged Collateral pledged hereunder by such Grantor to (i) comply with any instruction received by it from the Agent in writing that states that an Event of Default is continuing and is otherwise in accordance with the terms of this Agreement and each Grantor agrees that such issuer shall be fully protected from Liabilities to such Grantor in so complying and (ii) unless otherwise expressly permitted hereby or pursuant to the Credit Agreement, pay any dividend or make any other payment with respect to the Pledged Collateral directly to the Agent.

Section 6.4    Proceeds to be Turned over to and Held by Agent.  Unless otherwise expressly provided in the Credit Agreement or this Agreement, during the continuation of an Event of Default all proceeds of any Collateral received by any Grantor hereunder in cash or Cash Equivalents shall be held by such Grantor in trust for the Agent and the other Secured Parties, segregated from other funds of such Grantor, and shall, promptly upon receipt by any Grantor, be turned over to the Agent in the exact form received (with any necessary endorsement).  All proceeds being held by the Agent (or by such Grantor in trust for the Agent) shall continue to be held as collateral security for the Secured Obligations and shall not constitute payment thereof until applied as provided in the Credit Agreement.

21

Section 6.5    Sale of Pledged Collateral.  (a) Each Grantor recognizes that the Agent may be unable to effect a public sale of any Pledged Collateral by reason of certain prohibitions contained in applicable state or foreign securities laws or otherwise or may determine that a public sale is impracticable, not desirable or not commercially reasonable and, accordingly, may resort to one or more private sales thereof to a restricted group of purchasers that shall be obliged to agree, among other things, to acquire such securities for their own account for investment and not with a view to the distribution or resale thereof.  Each Grantor acknowledges and agrees that any such private sale may result in prices and other terms less favorable than if such sale were a public sale and, notwithstanding such circumstances, agrees that any such private sale shall be deemed to have been made in a commercially reasonable manner.  The Agent shall be under no obligation to delay a sale of any Pledged Collateral for the period of time necessary to permit the issuer thereof to register such securities for public sale under the Securities Act of 1933 or under applicable state securities laws even if such issuer would agree to do so.

(b)    Each Grantor agrees to use its commercially reasonable efforts to do or cause to be done all such other acts (other than registering securities for public sale under the Securities Act of 1933 or under applicable state securities laws) as may be necessary to make such sale or sales of any portion of the Pledged Collateral pursuant to Section 6.1 and this Section 6.5 valid and binding and in compliance with all applicable Requirements of Law.  Each Grantor further agrees that a breach of any covenant contained herein will cause irreparable injury to the Agent and other Secured Parties, that the Agent and the other Secured Parties have no adequate remedy at law in respect of such breach and, as a consequence, that each and every covenant contained herein shall be specifically enforceable against such Grantor, and such Grantor hereby waives and agrees not to assert any defense against an action for specific performance of such covenants except for a defense that no Event of Default has occurred under the Credit Agreement.  Each Grantor waives any and all rights of contribution or subrogation upon the sale or disposition of all or any portion of the Pledged Collateral by Agent.

Section 6.6    Deficiency.  Each Grantor shall remain liable for any deficiency if the proceeds of any sale or other disposition of any Collateral are insufficient to pay the Secured Obligations and the fees and disbursements of any attorney employed by the Agent or any other Secured Party to collect such deficiency.

## ARTICLE VII

## THE AGENT

Section 7.1    Agent's Appointment as Attorney-in-Fact.    (a) Each Grantor hereby irrevocably constitutes and appoints the Agent and any Related Person thereof, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of such Grantor and in the name of such Grantor or in its own name, for the purpose of carrying out the terms of the Loan Documents, to take any appropriate action and to execute any document or instrument that may be necessary or desirable to accomplish the purposes of the Loan Documents, and, without limiting the generality of the foregoing, each Grantor hereby gives the Agent and its Related Persons the power and right, on

22

behalf of such Grantor, without notice to or assent by such Grantor, to do any of the following when an Event of Default shall be continuing:

(i)　　in the name of such Grantor, in its own name or otherwise, take possession of and indorse and collect any check, draft, note, acceptance or other instrument for the payment of moneys due under any account or general intangible or with respect to any other Collateral and file any claim or take any other action or proceeding in any court of law or equity or otherwise deemed appropriate by the Agent for the purpose of collecting any such moneys due under any account or general intangible or with respect to any other Collateral whenever payable;

(ii)　　in the case of any Intellectual Property owned by or licensed to such Grantor, execute, deliver and have recorded any document that the Agent may reasonably request to evidence, effect, publicize or record the Agent's security interest in such Intellectual Property and the goodwill and general intangibles of such Grantor relating thereto or represented thereby;

(iii)　　pay or discharge taxes and Liens levied or placed on or threatened against any Collateral, effect any repair or pay any insurance called for by the terms of the Credit Agreement (including all or any part of the premiums therefor and the costs thereof);

(iv)　　execute, in connection with any sale provided for in Section 6.1 or Section 6.5, any document to effect or otherwise necessary or appropriate in relation to evidence the sale of any Collateral; or

(v)　　(A) direct any party liable for any payment under any Collateral to make payment of any moneys due or to become due thereunder directly to the Agent or as the Agent shall direct, (B) ask or demand for, and collect and receive payment of and receipt for, any moneys, claims and other amounts due or to become due at any time in respect of or arising out of any Collateral, (C) sign and indorse any invoice, freight or express bill, bill of lading, storage or warehouse receipt, draft against debtors, assignment, verification, notice and other document in connection with any Collateral, (D) commence and prosecute any suit, action or proceeding at law or in equity in any court of competent jurisdiction to collect any Collateral and to enforce any other right in respect of any Collateral, (E) defend any actions, suits, proceedings, audits, claims, demands, orders or disputes brought against such Grantor with respect to any Collateral, (F) settle, compromise or adjust any such actions, suits, proceedings, audits, claims, demands, orders or disputes and, in connection therewith, give such discharges or releases as the Agent may deem appropriate, (G) assign any Intellectual Property owned by such Grantor or any IP Licenses of such Grantor throughout the world on such terms and conditions and in such manner as the Agent shall in its sole discretion determine, including the execution and filing of any document necessary to effectuate or record such assignment and (H) generally, sell, assign, convey, transfer or grant a Lien on, make any Contractual Obligation with respect to and otherwise deal with, any Collateral as fully and completely as though the Agent were the absolute owner thereof for all purposes and do, at the Agent's option, at any time or from time to time, all acts and things that the Agent deems necessary to protect, preserve or realize upon any Collateral and the

23

Secured Parties' security interests therein and to effect the intent of the Loan Documents, all as fully and effectively as such Grantor might do.

If any Grantor fails to perform or comply with any Contractual Obligation contained herein, the Agent, at its option, but without any obligation so to do, may perform or comply, or otherwise cause performance or compliance, with such Contractual Obligation.

(b)     The reasonable and documented expenses of the Agent incurred in connection with actions undertaken as provided in this Section 7.1, from the date of payment by the Agent to the date reimbursed by the relevant Grantor, shall be payable by such Grantor to the Agent on demand.

(c)     Each Grantor hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue of this Section 7.1.  All powers, authorizations and agencies contained in this Agreement are coupled with an interest and are irrevocable until this Agreement is terminated and the security interests created hereby are released.

Section 7.2     Authorization to File Financing Statements.     Each Grantor authorizes Agent and its Related Persons, at any time and from time to time, to file or record financing statements, amendments thereto, and other filing or recording documents or instruments with respect to any Collateral in such form and in such offices as Agent reasonably determines appropriate to perfect, or continue or maintain perfection of, the security interests of the Agent under this Agreement, and such financing statements and amendments may describe the Collateral covered thereby as "all assets of the debtor" or words of similar import.  A copy of this Agreement shall be sufficient as a financing statement or other filing or recording document or instrument for filing or recording in any jurisdiction.  Such Grantor also hereby ratifies its authorization for Agent to have filed any initial financing statement or amendment thereto under the UCC (or other similar laws) in effect in any jurisdiction if filed prior to the date hereof.  Each Grantor hereby (i) waives any right under the UCC or any other Requirement of Law to receive notice and/or copies of any filed or recorded financing statements, amendments thereto, continuations thereof or termination statements filed or recorded pursuant to this Section 7.2 and (ii) releases and excuses the Agent from any obligation under the UCC or any other Requirement of Law to provide notice or a copy of any such filed or recorded documents that are filed or recorded in accordance with the terms of this Agreement.

Section 7.3     Authority of Agent.  Each Grantor acknowledges that the rights and responsibilities of the Agent under this Agreement with respect to any action taken by the Agent or the exercise or non-exercise by the Agent of any option, voting right, request, judgment or other right or remedy provided for herein or resulting or arising out of this Agreement shall, as between the Agent and the other Secured Parties, be governed by the Credit Agreement and by such other agreements with respect thereto as may exist from time to time among them, but, as between the Agent and any Grantor, the Agent shall be conclusively presumed to be acting as agent for the Secured Parties with full and valid authority so to act or refrain from acting, and no Grantor shall be under any obligation or entitlement to make any inquiry respecting such authority.

Section 7.4    Duty; Obligations and Liabilities.  (a) Duty of Agent.  The Agent's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession shall be to deal with it in substantially the same manner as the Agent deals with similar property for its own account.  The powers conferred on the Agent hereunder are solely to protect the Agent's interest in the Collateral and shall not impose any duty upon the Agent to exercise any such powers.  The Agent shall be accountable only for amounts that it receives as a result of the exercise of such powers, and neither it nor any of its Related Persons shall be responsible to any Grantor for any act or failure to act hereunder, except for their own gross negligence or willful misconduct as determined in a final, non-appealable judgment by a court of competent jurisdiction.  In addition, the Agent shall not be liable or responsible for any loss or damage to any Collateral, or for any diminution in the value thereof, by reason of the act or omission of any warehousemen, carrier, forwarding agency, consignee or other bailee if such Person has been selected by the Agent in good faith.

(b)    Obligations and Liabilities with respect to Collateral.  No Secured Party and no Related Person thereof shall be liable for failure to demand, collect or realize upon any Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of any Grantor or any other Person or to take any other action whatsoever with regard to any Collateral.  The powers conferred on the Agent hereunder shall not impose any duty upon any other Secured Party to exercise any such powers. The other Secured Parties shall be accountable only for amounts that they actually receive as a result of the exercise of such powers, and neither they nor any of their respective officers, directors, employees or agents shall be responsible to any Grantor for any act or failure to act hereunder, except for their own gross negligence or willful misconduct as determined in a final, non-appealable judgment by a court of competent jurisdiction.

## ARTICLE VIII

## MISCELLANEOUS

Section 8.1    Reinstatement.  Each Grantor agrees that, if any payment made by any Credit Party or other Person and applied to the Secured Obligations is at any time annulled, avoided, set aside, rescinded, invalidated, declared to be fraudulent or preferential or otherwise required to be refunded or repaid, or the proceeds of any Collateral are required to be returned by any Secured Party to such Credit Party, its estate, trustee, receiver or any other party, including any Grantor, under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or repayment, any Lien or other Collateral securing such liability shall be and remain in full force and effect, as fully as if such payment had never been made.  If, prior to any of the foregoing, (a) any Lien or other Collateral securing such Grantor's liability hereunder shall have been released or terminated by virtue of the foregoing or (b) any provision of the Guaranty hereunder shall have been terminated, cancelled or surrendered, such Lien, other Collateral or provision shall be reinstated in full force and effect and such prior release, termination, cancellation or surrender shall not diminish, release, discharge, impair or otherwise affect the obligations of any such Grantor in respect of any Lien or other Collateral securing such obligation or the amount of such payment.

Section 8.2    Release of Collateral or Grantor.    (a) At the time provided in Section 8.10 of the Credit Agreement, the Collateral shall be released from the Lien created hereby and this Agreement and all obligations (other than those expressly stated to survive such termination) of the Agent and each Grantor hereunder shall terminate, all without delivery of any instrument or performance of any act by any party, and all rights to the Collateral shall revert to the Grantors.  Agent will, upon request of (and at the sole expense of) any Grantor file UCC amendments at such time evidencing the termination of the Liens so released.  At the request of any Grantor following any such termination, the Agent shall deliver to such Grantor any Collateral of such Grantor held by the Agent hereunder and execute and deliver to such Grantor such documents and take such actions as such Grantor shall reasonably request to evidence or effect such termination at the sole cost and expense of the Grantors.

(b)    If the Agent shall be directed or permitted pursuant to Section 8.10 of the Credit Agreement to release any Lien or any Collateral, such Collateral shall be released from the Lien created hereby to the extent provided under, and subject to the terms and conditions set forth in, such Section.  In connection therewith, the Agent, at the request of (and at the sole expense of) any Grantor, shall execute and deliver to such Grantor such documents and take such actions as such Grantor shall reasonably request to evidence or effect such release at the sole cost and expense of Grantors.

(c)    At the time provided in Section 8.10(a) of the Credit Agreement and at the request of such Borrower, a Grantor shall be released from its obligations hereunder in the event that all the Stock and Stock Equivalents of such Grantor shall be sold or transferred in a transaction permitted by the Loan Documents (including the conversion of any Restricted Subsidiary into an Unrestricted Subsidiary in accordance with the terms of the Credit Agreement (including pursuant to a waiver or consent)) to the extent that, after giving effect to such transaction, such Subsidiary would not be required to guaranty any Obligations pursuant to Section 4.13 of the Credit Agreement.

Section 8.3    Independent Obligations.    The obligations of each Grantor hereunder are independent of and separate from the Secured Obligations and the Guaranteed Obligations.  If any Secured Obligation or Guaranteed Obligation is not paid when due, or upon the occurrence and during the continuance of any Event of Default, the Agent may, at its sole election, proceed directly and at once, without notice, against any Grantor and any Collateral to collect and recover the full amount of any Secured Obligation or Guaranteed Obligation then due, without first proceeding against any other Grantor, any other Credit Party or any other Collateral and without first joining any other Grantor or any other Credit Party in any proceeding.

Section 8.4    No Waiver by Course of Conduct.  No Secured Party shall by any act (except by a written instrument pursuant to Section 8.5), delay, indulgence, omission or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any Default or Event of Default.  No failure to exercise, nor any delay in exercising, on the part of any Secured Party, any right, power or privilege hereunder shall operate as a waiver thereof.  No single or partial exercise of any right, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  A waiver by any

26

Secured Party of any right or remedy hereunder on any one occasion shall not be construed as a bar to any right or remedy that such Secured Party would otherwise have on any future occasion.

Section 8.5    Amendments in Writing.  None of the terms or provisions of this Agreement may be waived, amended, supplemented or otherwise modified except in accordance with Section 9.1 of the Credit Agreement; provided, however, that (i) annexes to this Agreement may be supplemented (but no existing provisions may be modified and no Collateral may be released) through Pledge Amendments and Joinder Agreements, in substantially the form of Annex 1 and Annex 2, respectively, in each case duly executed by the Agent and each Grantor directly affected thereby and (ii) the Schedules hereto may be supplemented by the Grantors as provided herein.

Section 8.6    Additional Grantors; Additional Pledged Collateral; Joinder Agreements.  (a)  If, at the option of any Borrower or as required pursuant to Section 4.13 of the Credit Agreement, such Borrower shall cause any Subsidiary that is not a Grantor to become a Grantor hereunder, such Restricted Subsidiary shall execute and deliver to the Agent a Joinder Agreement substantially in the form of Annex 2 (each, a "Joinder Agreement") and shall thereafter for all purposes be a party hereto and have the same rights, benefits and obligations as a Grantor party hereto on the Closing Date.

(b)    Pledge Amendments.  To the extent any Pledged Collateral has not been delivered as of the Closing Date, such Grantor shall deliver a pledge amendment duly executed by the Grantor in substantially the form of Annex 1 (each, a "Pledge Amendment").  Such Grantor authorizes the Agent to attach each Pledge Amendment to this Agreement.

Section 8.7    Notices.  All notices, requests and demands to or upon the Agent or any Grantor hereunder shall be effected in the manner provided for in Section 9.2 of the Credit Agreement; provided, however, that any such notice, request or demand to or upon any Grantor shall be addressed to the Borrower's notice address set forth in such Section 9.2 of the Credit Agreement.

Section 8.8    Successors and Assigns.  This Agreement shall be binding upon the successors and assigns of each Grantor and shall inure to the benefit of each Secured Party and their successors and assigns; provided, however, that no Grantor may assign, transfer or delegate any of its rights or obligations under this Agreement without the prior written consent of the Agent.

Section 8.9    Counterparts.  This Agreement may be executed in any number of counterparts and by different parties in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.  Signature pages may be detached from multiple separate counterparts and attached to a single counterpart.  Delivery of an executed signature page of this Agreement by facsimile transmission or by Electronic Transmission shall be as effective as delivery of a manually executed counterpart hereof.

Section 8.10    Severability.  Any provision of this Agreement being held illegal, invalid or unenforceable in any jurisdiction shall not affect any part of such provision not held

illegal, invalid or unenforceable, any other provision of this Agreement or any part of such provision in any other jurisdiction.

Section 8.11    Governing Law.    The laws of the State of New York shall govern all matters arising out of, in connection with or relating to this Agreement, including, without limitation, its validity, interpretation, construction, performance and enforcement (including, without limitation, any claims sounding in contract or tort law arising out of the subject matter hereof and any determinations with respect to post-judgment interest).

Section 8.12    Intercreditor Agreement.    In the event Agent, Subordinated Agent and Grantors enter into an intercreditor agreement, substantially in the form attached as Section 5.3-B(3) of the Stockholders Agreement, dated as of June [___], 2020, by and among Holdings and its stockholders (as the same may be amended, restated, supplemented or otherwise modified from time to time pursuant to the terms thereof, the "Intercreditor Agreement"), to the extent any provision of this Agreement conflicts with the Intercreditor Agreement, the Intercreditor Agreement shall control.    If and to the extent the Agent is in possession or control of any Collateral, in addition to holding such Collateral as the representative of and for the benefit of the Secured Parties, the Agent shall be deemed for all purposes to be holding such Collateral as the representative of and for the benefit of the Subordinated Agent, on behalf of the holders of the Subordinated Indebtedness in accordance with the terms of the Intercreditor Agreement.

Section 8.13    Waiver of Jury Trial.    THE PARTIES HERETO, TO THE EXTENT PERMITTED BY LAW, WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING ARISING OUT OF, IN CONNECTION WITH OR RELATING TO, THIS AGREEMENT, THE OTHER LOAN DOCUMENTS AND ANY OTHER TRANSACTION CONTEMPLATED HEREBY AND THEREBY.    THIS WAIVER APPLIES TO ANY ACTION, SUIT OR PROCEEDING WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE.

EACH GRANTOR AGREES TO BE BOUND BY THE PROVISIONS OF SECTIONS 9.18(b) AND (c) OF THE CREDIT AGREEMENT.

[SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, each of the undersigned has caused this Guaranty and Security Agreement to be duly executed and delivered as of the date first above written.

**<u>GRANTORS</u>**:

**NEIGHBORMD HOLDINGS CORP.**, as a Grantor

By:  _____
Name:  Michael Muchnicki
Title:    President, Chief Executive Officer and Secretary

By:  _____
Name:  Lee Clark
Title:    Chief Financial Officer and Treasurer

**NEIGHBORMD, INC.**, as a Grantor

By:  _____
Name:  Michael Muchnicki
Title:    President, Chief Executive Officer and Secretary

By:  _____
Name:  Lee Clark
Title:    Chief Financial Officer and Treasurer

**NEIGHBORMD INTERMEDIARY HOLDINGS, LLC**, as a Grantor

By:  _____
Name:  Michael Muchnicki
Title:    President, Chief Executive Officer and Secretary

By: _____
Name:  Lee Clark
Title:    Chief Financial Officer and Treasurer

**NEIGHBORMD HOLDINGS OF FLORIDA, LLC,**
as a Grantor

By: _____
Name:  Michael Muchnicki
Title:    President, Chief Executive Officer and
Secretary

By: _____
Name:  Lee Clark
Title:    Chief Financial Officer and Treasurer

**NEIGHBORMD MANAGEMENT, LLC**, as a
Grantor

By: _____
Name:  Michael Muchnicki
Title:    President, Chief Executive Officer and
Secretary

By: _____
Name:  Lee Clark
Title:    Chief Financial Officer and Treasurer

**NEIGHBORMD OF AVENTURA, LLC**, as a
Grantor

By: _____
Name:  Michael Muchnicki
Title:    President, Chief Executive Officer and
Secretary

By: _____
Name:  Lee Clark
Title:    Chief Financial Officer and Treasurer


**NEIGHBORMD OF MIAMI, LLC**, as a Grantor


By: _____
Name:  Michael Muchnicki
Title:    President, Chief Executive Officer and
Secretary


By: _____
Name:  Lee Clark
Title:    Chief Financial Officer and Treasurer


**NEIGHBORMD OF PALM BEACH GARDENS,
LLC**, as a Grantor


By: _____
Name:  Michael Muchnicki
Title:    President, Chief Executive Officer and
Secretary


By: _____
Name:  Lee Clark
Title:    Chief Financial Officer and Treasurer


**NEIGHBORMD OF KISSIMMEE, LLC**, as a
Grantor


By: _____
Name:  Michael Muchnicki
Title:    President, Chief Executive Officer and
Secretary


By: _____
Name:  Lee Clark

Title:    Chief Financial Officer and Treasurer

**NEIGHBORMD OF LAKE UNDERHILL, LLC**, as a Grantor

By:  _____
Name:  Michael Muchnicki
Title:    President, Chief Executive Officer and Secretary

By:  _____
Name:  Lee Clark
Title:    Chief Financial Officer and Treasurer

**NEIGHBORMD OF LONGWOOD, LLC**, as a Grantor

By:  _____
Name:  Michael Muchnicki
Title:    President, Chief Executive Officer and Secretary

By:  _____
Name:  Lee Clark
Title:    Chief Financial Officer and Treasurer

**NEIGHBORMD OF PEMBROKE PINES, LLC**, as a Grantor

By:  _____
Name:  Michael Muchnicki
Title:    President, Chief Executive Officer and Secretary

By:  _____
Name:  Lee Clark
Title:    Chief Financial Officer and Treasurer

**NEIGHBORMD OF SUNRISE, LLC**, as a Grantor

By: _____
Name: Michael Muchnicki
Title:  President, Chief Executive Officer and
Secretary

By: _____
Name: Lee Clark
Title:  Chief Financial Officer and Treasurer

**NEIGHBORMD OF NORTH MIAMI BEACH,
LLC**, as a Grantor

By: _____
Name: Michael Muchnicki
Title:  President, Chief Executive Officer and
Secretary

By: _____
Name: Lee Clark
Title:  Chief Financial Officer and Treasurer

**NEIGHBORMD OF TAMARAC, LLC**, as a Grantor

By: _____
Name: Michael Muchnicki
Title:  President, Chief Executive Officer and
Secretary

By: _____
Name: Lee Clark
Title:  Chief Financial Officer and Treasurer

**NEIGHBORMD OF BRADENTON, LLC**, as a
Grantor

By: _____
Name:  Michael Muchnicki
Title:   President, Chief Executive Officer and
Secretary


By: _____
Name:  Lee Clark
Title:   Chief Financial Officer and Treasurer


**NEIGHBORMD MANAGEMENT OF FLORIDA,
LLC**, as a Grantor


By: _____
Name:  Michael Muchnicki
Title:   President, Chief Executive Officer and
Secretary
By: _____
Name:  Lee Clark
Title:   Chief Financial Officer and Treasurer


**NEIGHBORMD MANAGEMENT OF GEORGIA,
LLC**, as a Grantor


By: _____
Name:  Michael Muchnicki
Title:   President, Chief Executive Officer and
Secretary


By: _____
Name:  Lee Clark
Title:   Chief Financial Officer and Treasurer


**NEIGHBORMD PARTNERS OF SOUTH
FLORIDA, LLC**, as a Grantor


By: _____
Name:  Michael Muchnicki
Title:   President, Chief Executive Officer and

Secretary


By: _____
Name:  Lee Clark
Title:    Chief Financial Officer and Treasurer


**NEIGHBORMD PARTNERS OF CENTRAL FLORIDA, LLC**, as a Grantor


By: _____
Name:  Michael Muchnicki
Title:    President, Chief Executive Officer and Secretary


By: _____
Name:  Lee Clark
Title:    Chief Financial Officer and Treasurer


**NEIGHBORMD PARTNERS OF GULF COAST, LLC**, as a Grantor


By: _____
Name:  Michael Muchnicki
Title:    President, Chief Executive Officer and Secretary


By: _____
Name:  Lee Clark
Title:    Chief Financial Officer and Treasurer


**NEIGHBORMD PARTNERS OF TAMPA, LLC**, as a Grantor


By: _____
Name:  Michael Muchnicki
Title:    President, Chief Executive Officer and

Secretary

By: _____
Name:  Lee Clark
Title:   Chief Financial Officer and Treasurer

**NEIGHBORMD PARTNERS OF PANHANDLE, LLC**, as a Grantor

By: _____
Name:  Michael Muchnicki
Title:   President, Chief Executive Officer and Secretary

By: _____
Name:  Lee Clark
Title:   Chief Financial Officer and Treasurer

**NEIGHBORMD PARTNERS OF GEORGIA, LLC**, as a Grantor

By: _____
Name:  Michael Muchnicki
Title:   President, Chief Executive Officer and Secretary

By: _____
Name:  Lee Clark
Title:   Chief Financial Officer and Treasurer

**[OTHER GRANTORS]**

By: _____
Name:
Title:

ACCEPTED AND AGREED
as of the date first above written:

**BRIDGING FINANCE INC.,**
    as Agent

By: _____
    Name:
    Title:

**ANNEX 1**
**TO**
**GUARANTY AND SECURITY AGREEMENT**

**FORM OF PLEDGE AMENDMENT**

This Pledge Amendment, dated as of _____, 20_, is delivered pursuant to <u>Section 8.6</u> of the Guaranty and Security Agreement, dated as of June [___], 2020, by and among NeighborMD Holdings Corp., a Delaware corporation ("<u>Holdings</u>"), NeighborMD, Inc. (formerly known as Hygea Health Holdings, Inc.), a Florida corporation ("<u>NMD</u>"; NMD together with Holdings are sometimes referred to herein together as the "<u>Borrowers</u>" and individually as a "<u>Borrower</u>"), and each of the other entities listed on the signature pages thereof or that becomes a party thereto pursuant to <u>Section 8.6</u> of the Guaranty and Security Agreement (as defined below) (together with the Borrowers, the "<u>Grantors</u>"), in favor of Bridging Finance Inc. ("<u>Bridging</u>"), as administrative agent (in such capacity, together with its successors and permitted assigns, the "<u>Agent</u>") for the Lenders and each other Secured Party (as such agreement may be amended, restated, amended and restated, supplemented and/or otherwise modified from time to time, the "<u>Guaranty and Security Agreement</u>").  Capitalized terms used herein without definition are used as defined in the Guaranty and Security Agreement.

The undersigned hereby agrees that this Pledge Amendment may be attached to the Guaranty and Security Agreement and that the Pledged Collateral listed on <u>Annex 1-A</u> to this Pledge Amendment shall be and become part of the Collateral referred to in the Guaranty and Security Agreement and shall secure all Obligations of the undersigned.

The undersigned hereby represents and warrants that each of the representations and warranties contained in <u>Sections 4.1</u>, <u>4.2</u>, <u>4.5</u> and <u>4.10</u> of the Guaranty and Security Agreement applicable to it is true and correct in all material respects on and as of the date hereof as if made on and as of such date.

The laws of the State of New York shall govern all matters arising out of, in connection with or relating to this Pledge Amendment, including, without limitation, its validity, interpretation, construction, performance and enforcement (including, without limitation, any claims sounding in contract or tort law arising out of the subject matter hereof and any determinations with respect to post-judgment interest).

A1-1

[GRANTOR]

By:_____
Name:_____
Title:_____

Annex 1-A

## PLEDGED STOCK

| ISSUER | CLASS | CERTIFICATE NO(S). | PAR VALUE | NUMBER OF SHARES, UNITS OR INTEREST $ |
|--------|-------|--------------------|-----------|----------------------------------------|
|        |       |                    |           |                                        |

## PLEDGED DEBT INSTRUMENTS

| ISSUER | DESCRIPTION OF DEBT | CERTIFICATE NO(S). | FINAL MATURITY | PRINCIPAL AMOUNT |
|--------|---------------------|--------------------|----------------|------------------|
|        |                     |                    |                |                  |

ACKNOWLEDGED AND AGREED
as of the date first above written:

**BRIDGING FINANCE INC.,**
    as Agent

By: _____
    Name:
    Title:

**ANNEX 2**
**TO**

**GUARANTY AND SECURITY AGREEMENT**

**FORM OF JOINDER AGREEMENT**

This JOINDER AGREEMENT, dated as of _____, 20__, is delivered pursuant to Section 8.6 of the Guaranty and Security Agreement, dated as of June [___], 2020, by and among NeighborMD Holdings Corp., a Delaware corporation ("Holdings"), NeighborMD, Inc. (formerly known as Hygea Health Holdings, Inc.), a Florida corporation ("NMD"; NMD together with Holdings are sometimes referred to herein together as the "Borrowers" and individually as a "Borrower"), and each of the other entities listed on the signature pages hereof or that becomes a party thereto pursuant to Section 8.6 of the Guaranty and Security Agreement (as defined below) (together with the Borrowers, the "Grantors"), in favor of Bridging Finance Inc. ("Bridging"), as administrative agent (in such capacity, together with its successors and permitted assigns, the "Agent") for the Lenders and each other Secured Party (as such agreement may be amended, restated, amended and restated, supplemented and/or otherwise modified from time to time, the "Guaranty and Security Agreement")  Capitalized terms used herein without definition are used as defined in the Guaranty and Security Agreement.

By executing and delivering this Joinder Agreement, the undersigned, as provided in Section 8.6 of the Guaranty and Security Agreement, hereby becomes a party to the Guaranty and Security Agreement as a Grantor thereunder with the same force and effect as if originally named as a Grantor therein and, without limiting the generality of the foregoing, as collateral security for the prompt and complete payment and performance when due (whether at stated maturity, by acceleration or otherwise) of the Secured Obligations, hereby grants to the Agent for the benefit of the Secured Parties a Lien on and security interest in, all of its right, title and interest in, to and under the Collateral of the undersigned and expressly assumes all obligations and liabilities of a Grantor thereunder.  The undersigned hereby agrees to be bound as a Grantor for the purposes of the Guaranty and Security Agreement.

The information set forth in Annex 1-A is hereby added to the information set forth in Schedules 1 through 6 to the Guaranty and Security Agreement and Schedule 3.20 of the Credit Agreement.  By acknowledging and agreeing to this Joinder Agreement, the undersigned hereby agree that this Joinder Agreement may be attached to the Guaranty and Security Agreement and that the Collateral listed on Annex 1-A to this Joinder Amendment shall be and become part of the Collateral referred to in the Guaranty and Security Agreement and shall secure all Secured Obligations of the undersigned.

The undersigned hereby represents and warrants that each of the representations and warranties contained in Article IV of the Guaranty and Security Agreement applicable to it is true and correct in all material respects on and as the date hereof as if made on and as of such date.

The laws of the State of New York shall govern all matters arising out of, in connection with or relating to this Joinder Agreement, including, without limitation, its validity,

interpretation, construction, performance and enforcement (including, without limitation, any claims sounding in contract or tort law arising out of the subject matter hereof and any determinations with respect to post-judgment interest).

IN WITNESS WHEREOF, THE UNDERSIGNED HAS CAUSED THIS JOINDER AGREEMENT TO BE DULY EXECUTED AND DELIVERED AS OF THE DATE FIRST ABOVE WRITTEN.

A2-2

[Additional Grantor]

By:_____

Name: _____

Title: _____

ACKNOWLEDGED AND AGREED
as of the date first above written:

[EACH GRANTOR PLEDGING
ADDITIONAL COLLATERAL]

By: _____
    Name:
    Title:

**BRIDGING FINANCE INC.,**
    as Agent

By: _____
    Name:
    Title:

**ANNEX 3**
**TO**
**GUARANTY AND SECURITY AGREEMENT**

**FORM OF INTELLECTUAL PROPERTY SECURITY AGREEMENT[1]**

THIS [COPYRIGHT] [PATENT] [TRADEMARK] SECURITY AGREEMENT, dated as of _____, 20__, is made by [_____], a [_____] ("Grantor"), in favor of Bridging Finance Inc. ("Bridging"), as administrative agent (in such capacity, together with its successors and permitted assigns, the "Agent") for the Secured Parties (as defined in the Credit Agreement referred to below).

W I T N E S E T H :

WHEREAS, pursuant to the Credit Agreement, dated as of June [___], 2020 (as the same may be amended, restated, amended and restated, supplemented and/or otherwise modified from time to time (the "Credit Agreement"), by and among NeighborMD Holdings Corp., a Delaware corporation ("Holdings"), NeighborMD, Inc. (formerly known as Hygea Health Holdings, Inc.), a Florida corporation ("NMD"; NMD together with Holdings are sometimes referred to herein together as the "Borrowers" and individually as a "Borrower"), the other Persons party thereto that are designated as a "Credit Party", Bridging Finance Inc., as Agent for the several financial institutions from time to time party to the Credit Agreement (collectively, the "Lenders" and individually each a "Lender"), and the Lenders from time to time party thereto, the Lenders have severally agreed to make extensions of credit to the Borrowers upon the terms and subject to the conditions set forth therein;

WHEREAS, Grantor has agreed, pursuant to the Guaranty and Security Agreement of June [___], 2020 in favor of Agent (as such agreement may be amended, restated, amended and restated, supplemented and/or otherwise modified from time to time, the "Guaranty and Security Agreement"), to guarantee the Obligations (as defined in the Credit Agreement) of the Borrowers; and

WHEREAS, Grantor is party to the Guaranty and Security Agreement pursuant to which Grantor is required to execute and deliver this [Copyright] [Patent] [Trademark] Security Agreement;

NOW, THEREFORE, in consideration of the premises and to induce the Lenders and Agent to enter into the Credit Agreement and to induce the Lenders to make their respective extensions of credit to the Borrowers thereunder, Grantor hereby agrees with Agent for the benefit of the Secured Parties as follows:

Section 1.    Defined Terms.  Capitalized terms used herein without definition are used as defined in the Guaranty and Security Agreement.

---

[1] Separate agreements should be executed relating to each Grantor's respective Copyrights, Patents, and Trademarks.

Section 2.    Grant of Security Interest in [Copyright] [Trademark] [Patent] Collateral.  Grantor, as collateral security for the prompt and complete payment and performance when due (whether at stated maturity, by acceleration or otherwise) of the Secured Obligations of Grantor, hereby grants to Agent for the benefit of the Secured Parties a Lien on and security interest in, all of its right, title and interest in, to and under the following Collateral of Grantor (the "[Copyright] [Patent] [Trademark] Collateral"):

(a)    [all of its Copyrights, including, without limitation, those referred to on Schedule 1 hereto;

(b)    all renewals, reversions and extensions of the foregoing; and

(c)    all income, royalties, proceeds and Liabilities at any time due or payable or asserted under and with respect to any of the foregoing, including, without limitation, all rights to sue and recover at law or in equity for any past, present and future infringement, misappropriation, dilution, violation or other impairment thereof.]

or

(a)    [all of its Patents, including, without limitation, those referred to on Schedule 1 hereto;

(b)    all reissues, reexaminations, continuations, continuations-in-part, divisionals, renewals and extensions of the foregoing; and

(c)    all income, royalties, proceeds and Liabilities at any time due or payable or asserted under and with respect to any of the foregoing, including, without limitation, all rights to sue and recover at law or in equity for any past, present and future infringement, misappropriation, dilution, violation or other impairment thereof.]

or

(a)    [all of its Trademarks, including, without limitation, those referred to on Schedule 1 hereto; provided, that no Lien and security interest is granted on any "intent to use" Trademark applications for which a "statement of use" or "amendment to allege use" has not been filed (but only until such statement or amendment is filed);

(b)    all renewals and extensions of the foregoing;

(c)    all goodwill of the business connected with the use of, and symbolized by, each such Trademark; and

(d)    all income, royalties, proceeds and Liabilities at any time due or payable or asserted under and with respect to any of the foregoing, including, without limitation, all rights to sue and recover at law or in equity for any past, present and future infringement, misappropriation, dilution, violation or other impairment thereof.]

Section 3.    <u>Guaranty and Security Agreement</u>.  The security interest granted pursuant to this [Copyright] [Patent] [Trademark] Security Agreement is granted in conjunction with the security interest granted to the Agent pursuant to the Guaranty and Security Agreement and Grantor hereby acknowledges and agrees that the rights and remedies of the Agent with respect to the security interest in the [Copyright] [Patent] [Trademark] Collateral made and granted hereby are more fully set forth in the Guaranty and Security Agreement, the terms and provisions of which are incorporated by reference herein as if fully set forth herein.

Section 4.    <u>Grantor Remains Liable</u>.  Grantor hereby agrees that, subject to the terms and conditions of the Credit Agreement and the Guaranty and Security Agreement, anything herein to the contrary notwithstanding, Grantor shall assume full and complete responsibility for the prosecution, defense, enforcement or any other necessary or desirable actions in connection with their [Copyrights] [Patents] [Trademarks] subject to a security interest hereunder.

Section 5.    <u>Counterparts</u>.  This [Copyright] [Patent] [Trademark] Security Agreement may be executed in any number of counterparts and by different parties in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.  Signature pages may be detached from multiple separate counterparts and attached to a single counterpart.  Delivery of an executed signature page of this [Patent][Trademark] Security Agreement by facsimile transmission or by Electronic Transmission shall be as effective as delivery of a manually executed counterpart hereof.

Section 6.    <u>Governing Law</u>.  The laws of the State of New York shall govern all matters arising out of, in connection with or relating to this [Copyright] [Patent] [Trademark] Security Agreement, including, without limitation, its validity, interpretation, construction, performance and enforcement (including, without limitation, any claims sounding in contract or tort law arising out of the subject matter hereof and any determinations with respect to post-judgment interest).

[SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, each Grantor has caused this [Copyright] [Patent] [Trademark] Security Agreement to be executed and delivered by its duly authorized officer as of the date first set forth above.

Very truly yours,

[GRANTOR]
    as Grantor


By: _____
Name: _____
Title: _____

ACCEPTED AND AGREED
as of the date first above written:

**BRIDGING FINANCE INC.,**
          as Agent

By: _____
          Name:
          Title:

SCHEDULE I
TO
[COPYRIGHT] [PATENT] [TRADEMARK] SECURITY AGREEMENT

[Copyright] [Patent] [Trademark] Registrations

1.      REGISTERED [COPYRIGHTS] [PATENTS] [TRADEMARKS]

[Include Registration Number and Date]

2.      [COPYRIGHT] [PATENT] [TRADEMARK] APPLICATIONS

[Include Application Number and Date]

**Guaranty and Security Agreement Schedules**

**Schedule 1**

**Commercial Tort Claims**

| Grantor | Tort Claims |
|---------|-------------|
|         |             |

**Schedule 2**

**Filings**

| Type of Filing | Grantor | Jurisdiction for UCC filing |
|---|---|---|
|  |  |  |

## Schedule 3
## Jurisdiction of Organization; Chief Executive Office

| Legal Name of Grantor | Jurisdiction of Organization | Organizational Identification Number | Location of Chief Executive Office or Sole Place of Business | Prior Legal Names, Jurisdictions of Organization and Location of Chief Executive Office or Sole Place of Business (Past Five Years) |
|---|---|---|---|---|
|  |  |  |  |  |

**Schedule 4**

**Location of Inventory and Equipment**

| Grantor | Location of Inventory and Equipment |
|---|---|
|  |  |

**Schedule 5**

**Pledged Collateral**

Pledged Equity Interests

| Grantor | Issuer | Percentage of Issued and Outstanding Equity Interest | Certificate No. |
|---|---|---|---|
|  |  |  |  |

Pledged Debt Instruments

| Grantor | Debt Instrument |
|---|---|
|  |  |

## Schedule 6

## Intellectual Property

Patents

| Owner | Patent | Jurisdiction | Application Number/Filing Date | Patent Number/Issue Date |
|-------|--------|--------------|-------------------------------|--------------------------|
|       |        |              |                               |                          |

Trademarks

| Owner | Mark | Country | Serial No./Filing Date | Reg. No./Reg Date |
|-------|------|---------|------------------------|-------------------|
|       |      |         |                        |                   |

Copyrights

| Owner | Copyright | Registration Number | Registration Date |
|-------|-----------|---------------------|-------------------|
|       |           |                     |                   |

## EXHIBIT B

Form of Stockholders Agreement

**STOCKHOLDERS AGREEMENT**

**by and among**

**NEIGHBORMD HOLDINGS CORP.**

**and**

**ITS STOCKHOLDERS**

**Dated as of June [●], 2020**

## TABLE OF CONTENTS

**ARTICLE I Certain Defined Terms**...........................................................................2

**ARTICLE II Formation and Organizational Matters**.............................................15

    2.1   Corporate Existence ...............................................................................15
    2.2   Purpose ....................................................................................................15
    2.3   Powers of the Company .........................................................................15
    2.4   Fiscal Year ...............................................................................................16

**ARTICLE III Securityholders and Shares of Stock** ...............................................16

    3.1   Shares of Stock .......................................................................................16
    3.2   Share Certificates ...................................................................................16
    3.3   Legends ....................................................................................................16
    3.4   Lost, Stolen or Destroyed Certificates ................................................17
    3.5   Classes .....................................................................................................17

**ARTICLE IV Transfer of Stock** .................................................................................17

    4.1   Transfer of Stock Restricted .................................................................17
    4.2   Transfer Criteria ....................................................................................18
    4.3   No Pledge or Encumbrance ..................................................................18
    4.4   Third Party Bona Fide Offers to Additional Stockholders...............19
    4.5   Purchase Terms by Third Party Offeror .............................................20
    4.6   Stock Splits, Etc......................................................................................20
    4.7   Failure to Deliver Securities ................................................................20

**ARTICLE V Drag Along Obligations; Certain Tag Along and Other Rights**.....................21

    5.1   Drag Along Obligations for Sale of the Company. ............................21
    5.2   Common Stock Tag Along Rights. .......................................................23
    5.3   Preferred Stock Put Rights. ..................................................................25
    5.4   Creditors' Trust Put Right. ...................................................................28
    5.5   Rights to Participate in Certain Offerings. .........................................29
    5.6   Forfeiture; Repurchase Rights. ............................................................31

**ARTICLE VI Registration Rights**..............................................................................32

    6.1   Demand Registration.............................................................................32
    6.2   Piggyback Registration .........................................................................33
    6.3   Obligations of the Company .................................................................33
    6.4   Registration Expenses ...........................................................................34
    6.5   Underwriting Requirements and Cutbacks.........................................34
    6.6   Furnish Information ...............................................................................35
    6.7   Indemnification and Contribution.......................................................36
    6.8   Holdback Agreements ...........................................................................39

i

6.9    Third Party Registration Rights .............................................................39

**ARTICLE VII Board of Directors; Governance** ..............................................**39**

7.1    General .................................................................................................39
7.2    Board Size ............................................................................................39
7.3    Director Appointment, Removal, Resignation and Replacement.............39
7.4    Initial Directors ....................................................................................40

**ARTICLE VIII Distributions and Dividends**...................................................**40**

8.1    General .................................................................................................40
8.2    Priority of Distributions Among Stockholders .......................................40

**ARTICLE IX Confidentiality and Business Opportunities**...............................**41**

9.1    Confidentiality. ....................................................................................41
9.2    Business Opportunities .........................................................................42
9.3    Reasonableness of Restrictions; Enforcement........................................43
9.4    Remedies for Breach ............................................................................43
9.5    Survival ...............................................................................................43

**ARTICLE X Termination**..............................................................................**43**

10.1   Termination of this Agreement...............................................................43
10.2   Termination of the Company..................................................................43
10.3   Distribution of Assets............................................................................44
10.4   Certificate of Dissolution......................................................................44
10.5   Return of Contribution Nonrecourse to Other Stockholders ...................44

**ARTICLE XI Investment Representations** .....................................................**45**

11.1   Representations of Stockholders............................................................45

**ARTICLE XII Miscellaneous** ........................................................................**46**

12.1   Notices.................................................................................................46
12.2   Entire Agreement and Amendments. .....................................................46
12.3   Interpretation .......................................................................................47
12.4   Governing Law .....................................................................................47
12.5   Waivers................................................................................................47
12.6   Severability..........................................................................................47
12.7   Facsimile or Electronic Signatures ........................................................47
12.8   Counterparts.........................................................................................47
12.9   Dispute Resolution................................................................................48
12.10      Parties Benefited ............................................................................48
12.11      Successors and Assigns ...................................................................48
12.12      Legal Counsel ................................................................................49

ii

12.13    Release. ...........................................................................................................49

iii

## STOCKHOLDERS AGREEMENT

This **STOCKHOLDERS AGREEMENT** (this "**Agreement**") is made and entered into as of [June ___], 2020 (the "**Effective Date**"), by and among (i) NeighborMD Holdings Corp., a Delaware corporation (the "**Company**"), (ii) Bridging Finance Inc., a corporation incorporated under the laws of the Province of Ontario, as administrative agent on behalf of Bridging Income Fund L.P. f/k/a Sprott Bridging Income Fund LP, a limited partnership organized under the laws of the Province of Ontario (the "**Bridging Lender**", (iii) Centurion Asset Management Inc., a corporation incorporated under the laws of the Province of Ontario ("**Centurion**"), on behalf of itself, the funds or other Persons managed or advised by Centurion, and 220901 Ontario Inc., a corporation incorporated under the laws of the Province of Ontario, in its capacity as sub-participant of Centurion's interest in the obligations under the Prepetition Loan Documents (together with Centurion, the "**Centurion Lender**"), (iv) the Creditors' Trust (as defined below) (together with the Bridging Lender and the Centurion Lender, the "**Original Stockholders**"), and (v) each other Person who acquires shares of Stock of the Company and agrees to become a party to, and bound by, this Agreement after the date hereof by executing a Joinder (each, an "**Additional Stockholder**" and collectively, "**Additional Stockholders**").  Each of the Bridging Lender, the Centurion Lender, the Creditors' Trust and the Additional Stockholders may be referred to herein individually, as a "**Stockholder**" and collectively, as the "**Stockholders**".  Any capitalized terms used and not otherwise defined herein shall have the respective meanings ascribed to such terms in Article I hereof.

## RECITALS

**A.**    On January 31, 2017, Hygea Holdings Corp., a Nevada corporation ("**Hygea Holdings**") and certain of its Subsidiaries (together with Hygea Holdings, the "**Borrowers**") entered into the following agreements with the Bridging Lender (as amended, modified or supplemented from time to time, the "**Prepetition Bridging Agreement**"): (i) that certain Amended and Restated Credit Agreement (the "**Credit Agreement**"); and (ii) that certain Amended and Restated Guaranty and Security Agreement, pursuant to which the Bridging Lender fully advanced a loan in the principal amount of CAD $70,000,000.00 (the "**Original Loan**") on the terms and conditions set forth therein.

**B.**    The Bridging Lender and Centurion entered into that certain Participation Agreement, dated January 31, 2017 (the "**Participation Agreement**"), whereby Centurion purchased an undivided participation interest in the Original Loan of CAD $10,000,000.00, representing a participation percentage of 14.28% in the then-outstanding Original Loan (the "**Original Participation Percentage**").

**C.**    The Bridging Lender provided an incremental advance of CAD $8,500,000.00 to the Borrowers pursuant to an amendment to the Credit Agreement, dated June 9, 2017, without further contribution by Centurion, reducing Centurion's Original Participation Percentage to 12.74%.

**D.**    Centurion and 220 are parties to a sub-participation agreement[, dated [●]] (the "**Sub-Participation Agreement**").

**E.**     In April 2018, the Bridging Lender began to make further advances to the Borrowers in U.S. Dollars (the "**USD Advances**").

**F.**     On February 19, 2020 (the "**Petition Date**"), Hygea Holdings and certain of its Subsidiaries and Affiliates (collectively, the "**Debtors**") each commenced Chapter 11 cases, which are jointly administered for procedural purposes as Chapter 11 case number 20-10361 (KBO) (each, a "**Case**" and collectively, the "**Cases**"), by filing with the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") voluntary petitions for relief under the Bankruptcy Code and have continued to operate their business as debtor-in-possession ("**DIP**") pursuant to Section 1107 and 1108 thereof.

**G.**     On May 1, 2020, the Debtors filed the Plan in the Cases, which Plan was confirmed by the Bankruptcy Court on _____, 2020, and effective as of _____, 2020.

**H.**     Pursuant to the Plan, the Debtors have undertaken a reorganization pursuant to which (i) the Debtors have transferred all Assets to the Company and its Subsidiaries (the "**Reorganized Debtors**") in accordance with the Plan; and (ii) the Original Stockholders have become the one hundred percent (100%) beneficial owners of the Company in the respective Equity Percentages set forth below.  For the avoidance of doubt, except as otherwise provided in the Plan, on or after the effective date thereof, all Assets of the Debtors shall vest in the Company and the Reorganized Debtors (as defined in the Plan) for the benefit of the Original Stockholders.

**I.**     On April 13, 2020, the Bridging Lender and the Centurion Lender entered into a Memorandum of Understanding (the "**MOU**") which requires that the Original Stockholders enter into this Agreement.

**J.**     The Company and the Stockholders desire to provide for certain restrictions with respect to the ownership and transfer of shares of Stock owned by them and certain rights incident to the ownership of shares of Stock.

**NOW, THEREFORE**, in consideration of the foregoing and of the respective covenants and undertakings of the parties set forth below, the parties hereto, intending to be legally bound hereby, agree as follows:

**ARTICLE I**
**CERTAIN DEFINED TERMS**

Capitalized terms used in this Agreement have the meanings set forth in this <u>Article I</u> or are defined in the provisions of this Agreement identified in this <u>Article I</u>.  Any other capitalized terms used and not otherwise defined in this Agreement shall have the respective meanings ascribed to such terms in the Plan.

"**AAA**" has the meaning set forth in <u>Section 12.9(a)(i)</u> hereof.

"**Act**" means the Delaware General Corporation Law, Del. Code tit. 8, § 101 *et seq.*, as amended from time to time.

2

"**Additional Stockholders**" has the meaning set forth in the Preamble hereof.

"**Affiliate**" of a Person means any Person which, directly or indirectly, controls, is controlled by, or is under common control with such Person. The term "**control**" (including, with correlative meaning, the terms "**controlled by**" and "**under common control with**"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to elect a majority of the board of directors (or other governing body) or to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise and, in any event and without limiting the generality of the foregoing, any Person owning a majority of the voting securities of another Person shall be deemed to control that Person. With respect to the Bridging Lender and the Creditors' Trust, the term "Affiliate" also means any entity in which such Bridging Lender, or an Affiliate thereof, is a general partner, or for which it acts as administrative agent. With respect to the Centurion Lender, the term "Affiliate" also means any entity in which Centurion Asset Management Inc., or an Affiliate thereof, acts as manager or administrator.

"**Agreement**" means this Stockholders Agreement, as the same may be amended or amended and restated from time to time in accordance herewith.

"**Applicable Laws**" means any U.S., Canadian, or other foreign federal, state, local, or municipal statute, law, order, constitution, principle of common law, code, ordinance, rule, regulation, treaty, or other guidance issued by a Governmental Authority including, without limitation, any Applicable Laws related to the healthcare or insurance industries as well as securities laws and the application and interpretation thereof.

"**Assets**" means all assets of the Debtors of any nature whatsoever, including, without limitation, all property of the Estates pursuant to section 541 of the Bankruptcy Code, Cash (including proceeds from the sale of Assets), Causes of Action, accounts receivable, tax refunds, claims of right, interests and property, real and personal, tangible and intangible, and proceeds from all of the foregoing, which are accepted and assumed as assets of the Reorganized Debtors pursuant to the Plan and the Confirmation Order.

"**Bankruptcy Court**" has the meaning set forth in the Recitals hereof.

"**Beneficiaries**" means the Holders of Allowed General Unsecured Claims and Deficiency Claims against the Debtors' Estates, as beneficiaries of the Creditors' Trust, as defined in the Creditors' Trust Agreement.

"**Board**" or "**Board of Directors**" means the board of directors of the Company.

"**Bona Fide Offer**" means a bona fide written offer from any Person (other than a Permitted Transferee) to purchase any Securities owned by a Stockholder.

"**Borrowers**" has the meaning set forth in the Recitals hereof.

"**Breaching Stockholder**" has the meaning set forth in Section 5.6(b)(i) hereof.

"**Bridging Lender**" has the meaning set forth in the Recitals hereof and any other Person, whether acting in an individual, fiduciary or other capacity party thereto, including those Persons identified as the "Bridging Lender" on the signature pages hereto and each Person that becomes a Bridging Lender without violation of the terms of this Agreement and that executes a Joinder as a Bridging Lender.

"**Business**" means any business conducted by the Company Group during the Restricted Period, or which the Company Group is actively pursuing or has taken concrete steps to develop as of the Effective Date or otherwise during the Restricted Period.

"**Bylaws**" has the meaning set forth in Section 7.2 hereof.

"**Case**" and "**Cases**" have the respective meanings set forth in the Recitals hereof.

"**Causes of Action**" has the meaning set forth in Section 12.13(a) hereof.

"**Centurion Lender**" has the meaning set forth in the Recitals hereof.

"**Certificate**" means the Certificate of Incorporation of the Company filed with the Secretary of State of the State of Delaware pursuant to the Act.

"**Class**" has the meaning set forth in Section 3.5 hereof.

"**Class A Common Stock**" means the Company's voting class A Common Stock, par value $0.0001 per share, and any securities issued in respect thereof, or in substitution therefor, in connection with any stock split, dividend or combination, or any reclassification, recapitalization, merger, consolidation, exchange or similar reorganization.

"**Class B Common Stock**" means the Company's non-voting class B Common Stock, par value $0.0001 per share, and any securities issued in respect thereof, or in substitution therefor, in connection with any stock split, dividend or combination, or any reclassification, recapitalization, merger, consolidation, exchange or similar reorganization.

"**Commission**" means the U.S. Securities and Exchange Commission, or any successor thereto.

"**Committee**" means the Official Committee of Unsecured Creditors appointed by the United States Trustee for the District of Delaware in the Cases pursuant to section 1102 of the Bankruptcy Code.

"**Common Stock Separation**" has the meaning set forth in Section 5.6(b)(i) hereof.

"**Common Stock**" means, collectively, (a) the Class A Common Stock, (b) the Class B Common Stock, and (c) any other class of common stock of the Company and any securities issued in respect thereof, or in substitution therefor, in connection with any stock split, dividend or combination, or any reclassification, recapitalization, merger, consolidation, exchange or similar reorganization.

4

"**Company**" has the meaning set forth in the Preamble hereof.

"**Company Designee**" has the meaning set forth in Section 4.4(a) hereof.

"**Company Group**" means the Company, its Subsidiaries and Managed Practices.

"**Company Offered Shares**" has the meaning set forth in Section 5.5(a) hereof.

"**Company Option**" has the meaning set forth in Section 4.4(b) hereof.

"**Competitor**" means any Person or an Affiliate of such Person that, directly or indirectly, in any manner (whether on his, her or its own account, or as an owner, operator, manager, consultant, officer, director, employee, investor, lender, agent or otherwise), engages directly or indirectly in any business that competes with the Business then conducted by the Company Group.

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan under section 1129 of the Bankruptcy Code, including all exhibits, appendices, supplements, and related documents.

"**Counsel**" has the meaning set forth in Section 12.12 hereof.

"**Credit Agreement**" has the meaning set forth in the Recitals hereof.

"**Creditors' Trust**" means the grantor trust created as of the Effective Date for the benefit of the Beneficiaries pursuant to the Plan and that certain Global Settlement Term Sheet by and among the Debtors, the DIP Secured Parties (as defined therein) and the Committee. Such Creditors' Trust shall be responsible for the administration of claims and distributions to general unsecured creditors under the Plan, as set forth in the Creditor Trust Agreement.

"**Creditors' Trust Agreement**" means the agreement, substantially in the form included in the Plan Supplement, governing the operations of the Creditors' Trust, as it may be subsequently amended from time to time. Such Creditors' Trust Agreement shall be materially consistent with this Plan and acceptable to the Debtors, the Bridging Lender and the Committee.

"**CT Put Closing**" has the meaning set forth in Section 5.4(d) hereof.

"**CT Put Election Date**" has the meaning set forth in Section 5.4(b) hereof.

"**CT Put Notice**" has the meaning set forth in Section 5.4(b) hereof.

"**CT Put Price**" has the meaning set forth in Section 5.4(c) hereof.

"**CT Put Right**" has the meaning set forth in Section 5.4(a) hereof.

"**CT Put Right Percentage**" means the lesser of the Creditors' Trust's Equity Percentage as of the CT Put Election Date or the Creditors' Trust's Original Equity Percentage.

"**CT Put Shares**" has the meaning set forth in Section 5.4(a) hereof.

"**Debtors**" has the meaning set forth in the Recitals hereof.

"**Demand Registration**" has the meaning set forth in Section 6.1 hereof.

"**Derivative Securities**" means all options, warrants, rights to purchase capital stock of the Company, or any securities (other than Preferred Stock) which are exercisable, convertible or exchangeable for capital stock of the Company.

"**DIP**" has the meaning set forth in the Recitals hereof.

"**DIP Credit Agreement**" means that certain Secured Superpriority Debtor-in-Possession Credit Agreement, by and among Hygea Holdings Corp., as borrower, the other guarantors party thereto, and the DIP Lender, as lender, as amended, modified, or supplemented from time to time, which DIP Credit Agreement shall be refinanced in whole as of the effective date of the Plan pursuant to the Exit Credit Agreement.

"**DIP Lender**" means Bridging Income Fund L.P. f/k/a Sprott Bridging Income Fund LP, and the other lending parties that may from time to time become parties to the DIP Credit Agreement.

"**DIP Loan**" means the total unpaid amount under the DIP Credit Agreement as of the effective date of the Plan.

"**Disputing Party**" and "**Disputing Parties**" have the respective meanings set forth in Section 12.9(a) hereof.

"**Drag-Along Notice**" has the meaning set forth in Section 5.1(a) hereof.

"**Drag-Along Shares**" has the meaning set forth in Section 5.1(a) hereof.

"**Equity Percentage**" means, as to any Stockholder, the percentage that (a) the outstanding shares of Preferred Stock or Common Stock then owned by such Stockholder or a portion thereof that is the subject of a transaction expressly contemplated by this Agreement, is of (b) the aggregate outstanding number of shares of Preferred Stock or Common Stock then owned by all of the holders of the Preferred Stock or Common Stock, respectively or a portion of such aggregate that is the subject of a transaction expressly contemplated by this Agreement, in each case determined for the Preferred Stock and Common Stock independently of one another. Each Stockholder's total Equity Percentage of the Preferred Stock and Common Stock as of the Effective Date is set forth on **Schedule I** attached hereto and incorporated herein by reference, as many be amended from time to time in accordance with this Agreement.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**Exit Credit Agreement**" means that certain [Credit Agreement], dated as of June [●], 2020, by and among the Company (as borrower), the other guarantors party thereto, and the Bridging Lender and the Centurion Lender (as lender), as amended, modified, or supplemented from time to time.

6

"**Fair Market Value**" means, for purposes of <u>Section 5.6(b)</u> hereof, with respect to any Common Stock, the Board's good faith consistently applied determination of the fair market value of one Share as of the applicable reference date, inclusive of any applicable discounts (including discounts for lack of control, lack of marketability, lack of liquidity or minority ownership); <u>provided</u>, <u>however</u>, that the Board shall notify the Breaching Stockholder in writing of the Fair Market Value of such Common Stock Share as determined by the Board, and such Fair Market Value shall be final and binding on the parties unless such Breaching Stockholder objects in writing within thirty (30) days of such notification, in which case the fair market value shall be determined by an independent appraiser who is a member of the American Society of Appraisers and is experienced in making appraisals of closely held businesses as mutually agreed upon by the Company and such Breaching Stockholder (the "**Appraiser**"). If, for any reason, the Company and such Breaching Stockholder are unable or unwilling to mutually select the Appraiser, then the Company and such Breaching Stockholder will each designate an appraiser in writing. The appraisers designated by them must be independent, must be members of the American Society of Appraisers and must be experienced in making appraisals of closely held businesses. The Appraiser will then be chosen by lot from the two (2) appraisers designated by the Company and such Breaching Stockholder, unless either the Company or such Breaching Stockholder fails to timely designate a qualified appraiser, then the Fair Market Value will be determined by taking the average of the appraisal issued by the initial appraiser and the Appraiser. A single appraisal determined in accordance with this Agreement shall be valid and applicable to multiple Repurchase Rights occurring within a twelve (12) month period of such appraisal unless otherwise determined by the Board that a new appraisal is necessary. The Company and the Breaching Stockholder shall each bear one-half (1/2) of all appraisal fees incurred by the Company hereunder.

"**Family Member**" means, with respect to any individual, such individual's parents, spouse, and descendants (whether natural or adopted) and any trust or other vehicle formed for the benefit of any one or more of them.

"**First Refusal Notice**" has the meaning set forth in <u>Section 4.4(a)</u> hereof.

"**Fiscal Year**" has the meaning set forth in <u>Section 2.4</u> hereof.

"**Free Writing Prospectus**" means any "issuer free writing prospectus", as defined in Rule 433 of the Securities Act Regulations ("**Rule 433**") (or that would otherwise constitute a "free writing prospectus", as defined in Rule 405 of the Securities Act Regulations), relating to the Securities that (a) is required to be filed with the Commission by the Company, (b) is a "road show that is a written communication" within the meaning of Rule 433(d)(8)(i), whether or not required to be filed with the Commission, (c) is exempt from filing pursuant to Rule 433(d)(5)(i) because it contains a description of the Securities or of the offering that does not reflect the final terms, in each case in the form filed or required to be filed with the Commission or, if not required to be filed, in the form retained in the Company's records pursuant to Rule 433(g), and (d) to which the Company has given its prior consent.

"**Fully Diluted Stock**" means all Stock then issued and outstanding together with all Stock issuable upon exercise, conversion or exchange of all options, warrants or convertible or exchangeable securities that are then exercisable or convertible as if such options, warrants or

convertible or exchangeable securities had been exercised, converted or exchanged in full at the then applicable exercise price or conversion or exchange rate.

"**Governmental Authority**" means any federal, state, provincial or local governmental or regulatory commission, board, bureau, agency, court or regulatory or administrative body.

"**Government Program**" means (i) Medicare, Medicaid, TRICARE or any other "Federal Health Care Program," as defined in 42 U.S.C. § 1320a-7b(f), as amended, or (ii) any other program, fund, scheme, or benefit administered by or on behalf of any Governmental Authority, and in which program, fund, scheme, or benefit the Company or any Subsidiary or Affiliate participates.

"**Hygea Holdings**" has the meaning set forth in the Recitals hereof.

"**Indebtedness**" means with respect to the Company and its Subsidiaries, in the aggregate, at any date, without duplication, any direct indebtedness or obligations:  (a) for borrowed money including, without limitation, the debt evidenced by the Refinancing Documents; (b) once exercised by the Bridging Lender, the debt associated with the Preferred Stock Put Right pursuant to <u>Section 5.3</u>; (c) evidenced by notes (including promissory notes), debentures, bonds or other similar instruments for the payment of which the Company or any of its Subsidiaries is responsible or liable; (c) in respect of acceptance credit, letters of credit or similar facilities (to the extent drawn); (d) as lessee under any leases that are recorded as capital leases; (e) to pay the deferred purchase price or earn-out in connection with the purchase of any asset (including any equity security), property, equipment or services; (f) any outstanding judgments or settlement amounts against or in respect of the Company or any of its Subsidiaries; (g) any unpaid taxes; (h) any accounts payable not paid in a timely manner in the ordinary course of business or that is otherwise aged 45 days or older; (i) any unpaid credit card balances; (j) in respect of any overpayment, setoff, recoupment or adjustment amount owed to any Payor Program; and (k) for any accrued interest, premiums (including prepayment premiums), penalties, charges, assessments and other fees and expenses that are required to be paid by such Persons in respect of any of the foregoing.

"**Intellectual Property**" means (a) all inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, and all patents, (b) all trademarks, service marks, trade dress, logos, trade names, fictitious names, brand names, brand marks and corporate names, together with all translations, adaptations, derivations, and combinations thereof and including all goodwill associated therewith, and all applications, registrations, and renewals in connection therewith, (c) all copyrightable works, all copyrights, and all applications, registrations, and renewals in connection therewith, (d) all mask works and all applications, registrations, and renewals in connection therewith, (e) all trade secrets and confidential business information, (f) all computer software (including data, source codes and related documentation), (g) all other proprietary rights, (h) all copies and tangible embodiments thereof (in whatever form or medium), or similar intangible personal property which have been or are developed or created in whole or in part by an Additional Stockholder: (i) at any time and at any place while such Additional Stockholder is employed or retained by the Company (or any of its Subsidiaries, if any), or (ii) as a result of tasks assigned to such Additional Stockholder by the Company (or any of its Subsidiaries, if any).

"**Interest Rate**" has the meaning set forth in Section 5.6(b)(iii) hereof.

"**Joinder**" means a joinder to this Agreement in the form of **Exhibit 4.2** attached hereto, pursuant to the execution of which a Person shall become bound by all of the terms and conditions of this Agreement.

"**Lender Related Party**" means, as applicable, each of the Bridging Lender and the Centurion Lender, and their respective Affiliates and affiliated funds, partners, managers, directors and employees, excluding any Company Group employee, advisor, Board member, consultant or other Person with stock options, incentive shares, warrants, grants or similar types of incentive equity (in his, her or its capacity as an incentive equityholder).

"**Lives Managed Under Management**" means [the aggregate number of patients (without duplication) during the applicable twelve (12) month period used to calculate the CT Put Price pursuant to Section 5.4(c) that are managed by the Company Group (i) pursuant to a Medicare Advantage Plan under contract with the Centers for Medicare & Medicaid Services; (ii) for which the Company Group's sharing of revenue is based on a percentage greater than 80% of the premium used by the applicable payer to adjudicate claims for such patients; and (ii) for which any downstream payments to or revenue sharing with affiliated providers do not exceed 25% of the amount payable and actually received by the Company Group for such patients.[1]]

"**Managed Practice**" means any medical practice or other form of clinical entity that is managed by the Company or any of its Subsidiaries or Affiliates.

"**Management Agreements**" means, collectively, that certain Strategic Advisory Services Agreement, dated as of May 1, 2020, by and between the Company and Healthcare Advisory Solutions, L.L.C., and that certain Client Agreement, dated as of May 1, 2020, by and between the Company and Care Optimize, LLC.

"**Management Fees**" means, collectively, any Success Fee, Break Up Fee and other management fees payable pursuant to the Management Agreements.  The terms, "Success Fee" and "Break Up Fee" have the respective meanings set forth in the Management Agreement.

"**Milestone**" means the operational milestone set forth on **Exhibit 5.3-A** hereof.

"**Minimum Terms**" has the meaning set forth in Section 4.5 hereof.

"**MOU**" has the meaning set forth in the Recitals hereof.

"**Nevada 5**" means N5HYG, LLC and its direct and indirect shareholders, members, investors, partners, principals, managers, directors, officers and employees and each of their Affiliates.

---

[1] **DLA Note:** Remains subject to review and comment by the Bridging Lender.

"**Note**" means a promissory note, in the form of **Exhibit 5.3-B**, issued to the Bridging Lender or the Centurion Lender upon exercise of the Preferred Stock Put Right pursuant to Section 5.3 hereof.

"**Offered Shares**" has the meaning set forth in Section 4.4(a) hereof.

"**Option Agreement**" means an agreement pursuant to which the Company grants Options for shares of Common Stock pursuant to an incentive compensation plan of the Company (if any).

"**Option Notice**" has the meaning set forth in Section 4.4(b) hereof.

"**Option Period**" has the meaning set forth in Section 4.4(b) hereof.

"**Options**" means the options issued pursuant to any Option Agreement.

"**Original Equity Percentage**" means the Equity Percentage owned by each Original Stockholder as of the Effective Date hereof, as set forth on **Schedule I**, attached hereto and incorporated herein.

"**Original Participation Percentage**" has the meaning set forth in the Recitals hereof.

"**Original Loan**" has the meaning set forth in the Recitals hereof.

"**Original Stockholder**" has the meaning set forth in the Preamble hereof.

"**Participating Stockholders**" has the meaning set forth in Section 5.5(a) hereof.

"**Participation Agreement**" has the meaning set forth in the Recitals hereof.

"**Participation Amount**" means, as to any Participating Stockholder, the percentage that (a) the outstanding shares of Stock then owned by such Participating Stockholder is of (b) the Fully Diluted Stock.

"**Payor Program**" means any Government Program or any other health maintenance organization, preferred provider organization, health care service plan, health benefit plan, health insurance plan or other third-party reimbursement and payment program in which the Company or any of its Subsidiaries, Affiliates or Managed Practices is participating.

"**Petition Date**" has the meaning set forth in the Recitals hereof.

"**Permitted Transferee**" means with respect to any Stockholder, (i) any Affiliate; (ii) the direct or indirect shareholders, partners, principals, members, managers, directors, and officers of the Stockholder and its Affiliates, or (iii) the estates and Family Members of any such Persons and of their spouses, and any trust, limited liability company or other entity intended to act as an estate planning vehicle solely for the benefit of any of the foregoing Persons. It being understood that with respect to each of the foregoing Persons described in clauses (a) and (b) of this definition, the "Permitted Transferee" must have become a Stockholder of the Company

after full compliance with the terms and conditions of this Agreement, including execution of a Joinder, delivery thereof to the Company and compliance with the criteria set forth in <u>Section 4.1</u> hereof.

"**Person**" means an individual, a sole proprietorship, a corporation, a partnership, limited liability company, a limited partnership, a joint venture, an association, a trust, or any other entity or organization, including a government or a political subdivision, agency or instrumentality thereof.

"**Piggyback Registration**" has the meaning set forth in <u>Section 6.2</u> hereof.

"**Piggyback Registration Notice**" has the meaning set forth in <u>Section 6.2</u> hereof.

"**Plan**" means that certain First Amended Joint Chapter 11 Plan of Reorganization of Hygea Holdings Corp. and its Affiliated Debtors filed with the Bankruptcy Court, including, without limitation, the exhibits, appendices and schedules thereto to be filed with the Plan Supplement, as may be altered, amended or modified from time to time.

"**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, to be filed fourteen (14) days prior to the Confirmation Hearing, as amended, supplemented, or modified from time to time in accordance with the terms hereof, the Bankruptcy Code and the Bankruptcy Rules.

"**Preferred Stock**" means the Company's preferred stock, $0.0001 par value per share, which stock shall be valued in the aggregate of Thirty Million and 00/100 Dollars ($30,000,000.00) as of the Effective Date and accrue interest at a rate of 15% per annum, compounded annually on the last day of each December from the date of issuance of such Preferred Stock (*provided, however,* that such amount shall be pro-rated for any partial year). Each of the Bridging Lender and the Centurion Lender shall hold Preferred Stock in their respective Equity Percentage as set forth on **<u>Schedule I</u>**.

"**Preferred Stock Drag-Along Right**" has the meaning set forth in <u>Section 5.3(d)</u> hereof.

"**Preferred Stock Put Notice**" has the meaning set forth in <u>Section 5.3(b)</u> hereof.

"**Preferred Stock Put Price**" has the meaning set forth in <u>Section 5.3(c)</u> hereof.

"**Preferred Stock Put Right**" has the meaning set forth in <u>Section 5.3(a)</u> hereof.

"**Preferred Stock Tag Notice**" has the meaning set forth in <u>Section 5.3(g)</u> hereof.

"**Preferred Stock Tag Right**" has the meaning set forth in <u>Section 5.3(g)</u> hereof.

"**Preferred Stock Yield**" means, as of any date of determination, with respect to any Preferred Stock, the amount accruing from and after the date of issuance of such Preferred Stock until and including the date of determination at a rate of 15.0% per annum, compounded annually on the last day of each December (*provided, however,* that such amount shall be pro-rated for any partial year).

"**Prepetition Bridging Agreement**" has the meaning set forth in the Recitals hereof.

"**Prepetition Loan Documents**" means, collectively, the Prepetition Bridging Agreement, the Participation Agreement and the Sub-Participation Agreement, each as amended, modified or supplemented from time to time prior to the date hereof.

"**Proposed Purchaser**" has the meaning set forth in Section 5.2(a) hereof.

"**Proposed Sale**" has the meaning set forth in Section 5.2(a) hereof.

"**Proprietary Information**" has the meaning set forth in Section 9.1(a) hereof.

"**Pro-Rata Share**" means the Equity Percentage held by each of the Preferred Stock Securityholders or Common Stock Securityholders, respectively, as set forth on **Schedule I**, attached hereto and incorporated herein, as may be amended from time to time in accordance with this Agreement.

"**Public Offering**" shall mean the sale of shares of Common Stock in a public offering registered with the Commission.

"**Purchase Amount**" has the meaning set forth in Section 5.5(a) hereof.

"**Qualified Public Offering**" means an underwritten Public Offering involving the sale of Common Stock with net cash proceeds to the Company of at least $[**70**]000,000, after the consummation of which the Common Stock is listed or admitted for trading on a national securities exchange.

"**Refinancing Documents**" means any financing documents relating to the Exit Credit Agreement, the DIP Loan and DIP Credit Agreement, the Remaining Secured Debt, and the Working Capital Loan, and any and all other documents ancillary or otherwise relating thereto.

"**register**", "**registered**" and "**registration**" means a registration effected by preparing and filing a registration statement with the Commission ("**Registration Statement**") in compliance with the Securities Act, and the declaration or ordering of effectiveness of such Registration Statement by the Commission.

"**Registered Securities**" means the Registrable Securities included in a particular Registration Statement which has been declared effective by the Commission and which has remained effective for the minimum period required under and pursuant to the terms and conditions of this Agreement.

"**Registered Stockholder**" means, with respect to a particular Registration Statement, each Stockholder which has included Registrable Securities in such Registration Statement.

"**Registrable Securities**" means (a) any shares of Common Stock beneficially owned (which, for purposes of this Agreement, shall be determined in accordance with Rule 13d-3 of the Exchange Act) by any Stockholder, (b) shares of Common Stock issued or issuable upon the exercise, exchange or conversion, as applicable, of options, warrants, rights to purchase,

exchangeable securities or convertible securities owned by any Stockholder (excluding any shares of Common Stock issued pursuant to an incentive compensation plan of the Company that have not vested), and (c) any shares of Common Stock which were issued or received in respect of, or in exchange or in substitution for any of the foregoing, including, but not limited to, those arising from a stock dividend, distribution, stock split, reclassification, reorganization, merger, consolidation, sale or transfer of assets or other exchange of securities.  As to any particular Registrable Securities, once issued, such securities shall cease to be Registrable Securities when (a) a Registration Statement with respect to the sale of such securities shall have become effective under the Securities Act and such securities shall have been disposed of in accordance with such Registration Statement, (b) such securities shall have ceased to be outstanding, or (c) such securities shall have been transferred as permitted by, and in compliance with, Rule 144 (or any successor provision) promulgated under the Securities Act.

"**Released Parties**" has the meaning set forth in Section 12.13(a) hereof.

"**Releasing Parties**" has the meaning set forth in Section 12.13(a) hereof.

"**Remaining Secured Debt**" means senior secured debt in the amount of the Effective Date Debt Limit, less the amount of the DIP Loan and the Working Capital Loan, as memorialized in the Exit Credit Agreement.

"**Reorganized Debtors**" has the meaning set forth in the Recitals hereof.

"**Repurchase Closing**" has the meaning set forth in Section 5.6(b)(iii) hereof.

"**Repurchase Notice**" has the meaning set forth in Section 5.6(b)(ii) hereof.

"**Repurchase Price**" has the meaning set forth in Section 5.6(b)(i) hereof.

"**Repurchase Right**" has the meaning set forth in Section 5.6(b)(i) hereof.

"**Restricted Period**" means for as long as a Lender Related Party is a Stockholder of the Company plus two (2) years thereafter.

"**Restricted Territory**" means anywhere within the States of Florida and Georgia, and any state in which the Company Group operates or has taken concrete steps to develop or commence operations at any time during which the Lender Related Party is a Stockholder.

"**Rights Offer Notice**" has the meaning set forth in Section 5.5(a) hereof.

"**Sale of the Company**" means any of the following to the extent not constituting a dissolution or liquidation of the Company: (a) any sale or series of related sales of the Common Stock of the Company or the ownership of the Company Group following which the holders of the Common Stock and their Affiliates or the ownership of the Company Group immediately prior to such sale own, directly or indirectly (including through an Affiliate), less than fifty percent (50%) of the Common Stock or voting power of the Company or the ownership or voting power of the Company Group after such sale or series of related sales; (b) a consolidation or merger of the Company or the Company Group with or into any other Person, or any other

13

corporate reorganization in which the Securityholders or owners immediately prior to such consolidation, merger or reorganization own less than fifty percent of the Common Stock or voting power of the Company or ownership or voting power of the Company Group immediately after such consolidation, merger; or (c) any sale of all or substantially all of the assets of the Company or the Company Group.

"**Securities**" means all Shares, options, warrants, notes, bonds or other equity or debt securities of the Company which are offered or issued by the Company from time to time on or after the date hereof.

"**Securities Act**" has the meaning set forth in Section 3.3 hereof.

"**Securityholder**" means any Stockholder or any other Person who owns or otherwise has any Stock, stock option, investment, profit, beneficial or other financial interest in the Company or any of the Reorganized Debtors, from time to time, and who or which is or becomes a party to this Agreement pursuant to the terms hereof.

"**Sellers' Representative**" has the meaning set forth in Section 5.1(c) hereof.

"**Selling Stockholder**" has the meaning set forth in Section 4.4(a) hereof.

"**Shares**" and "**Stock**" each mean and include (a) all shares of Common Stock and Preferred Stock, (b) all shares of other capital stock of the Company, (c) Derivative Securities, and (d) all other capital stock or Derivative Securities which may be issued in exchange for or in respect of shares of capital stock (whether by way of stock split, stock dividend, combination, reclassification, reorganization, or by any other means). For avoidance of doubt, "Shares" and "Stock" may be used interchangeably in this Agreement in accordance with this definition and Section 3.1 hereof.

"**Stockholder**" has the meaning set forth in the Preamble hereof.

"**Subject Shares**" has the meaning set forth in Section 5.6(b)(i) hereof.

"**Sub-Participation Agreement**" has the meaning set forth in the Recitals hereof.

"**Subsidiary**" means any Person that is, directly or indirectly, owned in whole or in part or otherwise controlled by the Company including any Subsidiary that is owned in whole or in part or otherwise controlled by another Company Subsidiary.

"**Tag Along Notice**" has the meaning set forth in Section 5.2(b) hereof.

"**Tag Along Shares**" has the meaning set forth in Section 5.2(a) hereof.

"**Tag Along Stockholders**" has the meaning set forth in Section 5.2(a) hereof.

"**Third Party Offer Terms**" has the meaning set forth in Section 4.4(a) hereof.

"**Third Party Offeror**" has the meaning set forth in Section 4.4(a) hereof.

14

"**Transaction Expenses**" means in each case, without duplication, the sum of (a) any and all Management Fees, (b) any and all costs and expenses incurred by the Company Group or the Bridging Lender in connection with the CT Put Right Closing, (c) all change in control, bonuses, severance and/or other transaction related compensation payments, if any, payable to current or former officers, directors, employees and independent contractors of the Company in connection with the consummation of the transactions contemplated by this Agreement and the Related Agreements, including any employer portion of any Taxes imposed in connection with such payments.

"**Transfer**" means any transfer of all or a portion of or any interest in, Stock, whether directly or indirectly, by sale, assignment, gift, will, devise, bequest, operation of the laws of descent and distribution, or in trust, pledge, hypothecation, mortgage, encumbrance or other disposition.

"**Transferee**" has the meaning set forth in <u>Section 4.2</u> hereof.

"**Transferring Stockholder**" has the meaning set forth in <u>Section 4.7</u> hereof.

"**USD Advances**" has the meaning set forth in the Recitals hereof.

"**Working Capital Loan**" means a revolving working capital facility in the maximum principal amount of [$2,500,000] as of the effective date of the Plan.

## <u>ARTICLE II</u>
### FORMATION AND ORGANIZATIONAL MATTERS

2.1    <u>Corporate Existence</u>.  The Company was formed on May 21, 2020 as a Delaware corporation by the execution and filing of the Certificate with the Secretary of State of the State of Delaware pursuant to the Act.  The Board of Directors shall cause to be executed all necessary certificates and documents, shall make all such filings and recordings, and shall cause to be done all other acts as may be necessary or appropriate from time to time to comply with all requirements for the continued existence and operation of the Company in the State of Delaware. The rights, powers, duties, obligations and liabilities of the Stockholders (in their respective capacities as such) shall be determined pursuant to the Act and this Agreement.  To the extent that the rights, powers, duties, obligations and liabilities of any Stockholder (in its capacity as such) differ by virtue of any provision in this Agreement than they would be in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control.

2.2    <u>Purpose</u>.  The Company was incorporated to carry on any lawful business, purpose or activity as the Board of Directors may determine.

2.3    <u>Powers of the Company</u>.  Subject to the provisions of this Agreement:

(a)    The Company shall possess and may exercise all of the powers and privileges granted by the Act and any other Applicable Laws, together with any powers incidental thereto, which are necessary or convenient for the conduct, promotion or attainment of the business, purposes or activities of the Company;

15

(b)    The Company may execute, deliver and perform any and all contracts and engage in all activities and transactions necessary or advisable to carry out its business, purposes or activities, all without any further act, vote or approval of any Stockholder; and

(c)    The Board of Directors may authorize any Person to execute, deliver and perform any contract and engage in all activities and transactions necessary or advisable to carry out the business, purposes or activities of the Company on behalf of the Company.

2.4    <u>Fiscal Year</u>.  The fiscal year of the Company (the "**Fiscal Year**") shall be the calendar year.

**<u>ARTICLE III</u>**
**<u>SECURITYHOLDERS AND SHARES OF STOCK</u>**

3.1    <u>Shares of Stock</u>.  Stock in the Company shall be represented solely by Shares. The rights, preferences, powers, qualifications, limitations and restrictions of the Shares shall be as set forth in this Agreement (as may be amended from time to time).  Without limiting the generality of any definition, the terms "**Shares**" and "**Stock**" as used for any and all purposes in this Agreement shall mean the entire ownership interest of each Stockholder in the Company, whether in the form of Common Stock, Preferred Stock or any combination thereof, and shall include all rights, powers, preferences, benefits, remedies, duties and obligations of each Original Stockholder, and any Additional Stockholder admitted to the Company, as the owner and holder of the Stock, whether arising under (i) this Agreement, (ii) the Certificate, and/or (iii) the Act or other Applicable Laws.

3.2    <u>Share Certificates</u>.  All Shares shall be represented by certificates in the form approved by the Board; provided that the Board may provide by resolution or resolutions that some or all of any class of Shares shall be uncertificated shares and may be evidenced by a book-entry system maintained by the Company.  The certificates representing Shares of each class shall be signed by, or in the name of, the Company by an authorized officer of the Company. Any or all such signatures may be facsimiles, electronic .pdf, Docusign, or other electronic signature copy approved by the Board.

3.3    <u>Legends</u>.  Each certificate evidencing any of the Shares shall bear a legend substantially as follows:

THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO RESTRICTIONS ON TRANSFER AND MAY NOT BE SOLD, EXCHANGED, TRANSFERRED, PLEDGED, HYPOTHECATED OR OTHERWISE DISPOSED OF EXCEPT IN ACCORDANCE WITH AND SUBJECT TO THE TERMS AND CONDITIONS OF THAT CERTAIN STOCKHOLDERS AGREEMENT DATED AS OF [JUNE] [●], 2020 (AS THE SAME MAY BE AMENDED OR MODIFIED FROM TIME TO TIME), BY AND AMONG THE COMPANY AND ITS STOCKHOLDERS, A COPY OF WHICH THE COMPANY WILL FURNISH TO THE HOLDER OF THIS CERTIFICATE UPON REQUEST AND WITHOUT CHARGE.

16

THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**") OR ANY APPLICABLE STATE SECURITIES LAW.  THE SHARES HAVE BEEN ACQUIRED BY THE HOLDER NOT WITH A VIEW TO, OR FOR RESALE IN CONNECTION WITH, ANY DISTRIBUTION THEREOF WITHIN THE MEANING OF THE SECURITIES ACT AND MAY NOT BE SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT AFTER SUCH SHARES HAVE BEEN REGISTERED OR QUALIFIED UNDER THE SECURITIES ACT AND ALL APPLICABLE STATE SECURITIES LAWS OR IN THE OPINION OF COUNSEL ACCEPTABLE TO THE COMPANY, AN EXEMPTION FROM SUCH REGISTRATION AND QUALIFICATION REQUIREMENTS IS AVAILABLE.

3.4     Lost, Stolen or Destroyed Certificates.  The Board may direct a new certificate or uncertificated shares to be issued in place of any certificate previously issued by the Company alleged to have been lost, stolen, or destroyed upon the making of an affidavit of such fact by the Securityholder of the allegedly lost, stolen or destroyed certificate, in form and substance acceptable to the Board.  When authorizing such issuance of a new certificate or uncertificated shares, the Board may, in its discretion and as a condition precedent to the issuance thereof, require the Securityholder of the lost, stolen or destroyed certificate to indemnify it against any claim that may be made against the Company or its Stockholders, directors, officers, employees or agents with respect to (i) the allegedly lost, stolen or destroyed certificate or (ii) the issuance of such new certificate or uncertificated shares.

3.5     Classes.  The Stock may be divided into separate and distinct classes of Shares in the Company (each, a "**Class**" of Shares), each of which shall have the rights, preferences and privileges set forth in this Agreement.  Except as otherwise determined by the Board, (a) the Preferred Stock shall initially be issued solely to the Bridging Lender and the Centurion Lender, (b) the Class A Common Stock shall initially be issued solely to the Bridging Lender and the Centurion Lender, and (c) the Class B Common Stock shall initially be issued solely to the Creditors' Trust.  The Board may also establish and issue Shares, options, warrants, equity pursuant to an incentive plan, or other forms of equity to be issued to employees, managers, administrators, members of the Board, advisors, physicians, and such other Persons furnishing services to the Company or any member of the Company Group in exchange for such services.

## ARTICLE IV
### TRANSFER OF STOCK

4.1     Transfer of Stock Restricted.  Each Securityholder shall not Transfer all or any portion of or any interest in such Securityholder's Stock to any Person unless: (a) such Transfer complies with the criteria set forth in Section 4.2 below; and (b) such Transfer is to (i) a Permitted Transferee; (ii) a Person pursuant to terms and conditions approved by the Board pursuant to Article VII hereof; or (iii) solely in the case of the Creditors' Trust Stock, a Person to whom the Creditors' Trust, in its reasonable discretion, determines in good faith to Transfer all or any part of its Shares in each case, in accordance with this Agreement and the Creditors' Trust Agreement; *provided, however,* that in no event shall the Creditors' Trust have the right to

17

Transfer all or any portion of its Stock or any interest therein to Nevada 5 or any of its Affiliates or as of the date of such Transfer, the then-current or former, direct or indirect, shareholders, partners, principals, members, managers, directors and officers of Nevada 5 or any of its Affiliates or the estates and Family Members of any such Persons and of their spouses, and any trust, limited liability company or other entity intended to act as an estate planning vehicle solely for the benefit of any of the foregoing Persons. No Transfer prohibited by this Agreement or otherwise made in contravention of this Agreement shall be effective and the Company shall not, and shall not be compelled to, recognize any such Transfer or record any Transfer on its books, or issue any certificate representing any Stock to any Person who has received such Stock in a Transfer prohibited by this Agreement or otherwise made in contravention of this Agreement.

4.2     Transfer Criteria. Each Securityholder shall be permitted to Transfer all or any portion of or any interest in such Securityholder's Stock pursuant to Section 4.1 provided that the transferring Securityholder and the recipient of such Stock, including any Permitted Transferee (the "**Transferee**") comply with the following criteria unless otherwise expressly waived  writing by the Board:

(a)     The transferring Securityholder delivers written notice to the Board at least three (3) business days prior to such Transfer;

(b)     The Transferee executes a joinder in the form attached hereto as **Exhibit 4.2** (the "**Joinder**") as an Additional Stockholder prior to the effective time of such Transfer, and thereafter the Transferee shall be treated as an Additional Stockholder for all purposes under this Agreement;

(c)     The transferring Securityholder is not otherwise in breach of this Agreement;

(d)     The Transferee is not in breach or violation of any non-competition or other restrictive covenants by virtue of his, her or its ownership of the Stock;

(e)     Any and all notices and/or approvals from a Governmental Authority relating to the Transfer with respect to the Company Group, if any, have been obtained or otherwise waived by the Board of Directors;

(f)     The Transferee or its Affiliates have not been convicted of the commission of a crime involving the healthcare or insurance industries or any other felony;

(g)     The Transferee's ownership of Stock does not, and would not be reasonably expected by the Board, to jeopardize any member of the Company Group's participation in a Government Program or Payor Program; and

(h)     The Transferee is not a Competitor or an Affiliate of a Competitor to the Company Group unless otherwise approved by the Board of Directors.

4.3     No Pledge or Encumbrance. Notwithstanding the above or any other provision in this Agreement (including the definition of Transfer or Permitted Transferee), each of the Securityholders shall not, directly or indirectly, pledge, hypothecate or otherwise encumber all or

any portion of or interest in his, her or its Shares to any Person as collateral for any loan, financing, or other Indebtedness other than a loan, financing or other Indebtedness for the sole and exclusive benefit of the Company and/or any of its Subsidiaries or that is otherwise approved by the Board of Directors.

4.4     Third Party Bona Fide Offers to Additional Stockholders.

(a)     Third Party Bona Fide Offer.    If a Securityholder (a "**Selling Stockholder**") other than the Bridging Lender receives a Bona Fide Offer to purchase all or any part of the Selling Stockholder's Stock (the "**Offered Shares**") which the Selling Stockholder desires to accept, it must give written notice (the "**First Refusal Notice**") to the Company and comply with Sections 4.1, Section 4.2, and this Section 4.4 before accepting such Bona Fide Offer.  The First Refusal Notice shall state the name of the third party purchaser (the "**Third Party Offeror**") and the material terms of the Bona Fide Offer (including the purchase price and the form of consideration offered) to purchase such Offered Shares and shall be accompanied by a true and complete copy any and all documents constituting the Bona Fide Offer (the "**Third Party Offer Terms**").  The Company may delegate or assign all or any part of its rights and obligations with respect to such Bona Fide Offer to any Person, including any Affiliate, the Bridging Lender or any other Permitted Transferee (a "**Company Designee**").

(b)     Company Option.    For a period of thirty (30) days after receipt of the First Refusal Notice (the "**Option Period**"), the Company (and/or a Company Designee) shall have the right, but not the obligation (the "**Company Option**") to purchase all of the Offered Shares.  The purchase price per Offered Share shall be the same as set forth in the Third Party Offer Terms; provided, however, if the Third Party Offer Terms call for any portion of the purchase price to be paid in property consisting of non-cash consideration, the Board of Directors shall determine in good faith the fair market value of such non-cash property for purposes of determining the purchase price.  If, however, the Selling Stockholder disputes the value assigned by the Board of Directors to the non-cash portion of the Third Party Offer Terms, the Selling Stockholder may agree to revoke its First Refusal Notice pursuant to this Section 4.4 and continue to hold the Offered Shares.  The purchase price for the Offered Shares shall be paid either (a) all in cash at the closing, or (b) on the same terms as the Third Party Offer Terms, as determined by the Company or the Company Designee.  The Company or the Company Designee shall deliver a written notice (the "**Option Notice**") to the Selling Stockholder prior to the expiration of the Option Period whether it will exercise the Company Option, such notice specifying the amount of Offered Shares to be purchased by the Company and/or the Company Designee.

(c)     Company Option Closing.

(i)     Timing.    If the Company or the Company Designee timely exercises the Company Option by delivering the Option Notice to the Selling Stockholder prior to the expiration of the Option Period as to its or their purchase of all of the Offered Shares, a closing shall be held at the Company or the Company Designee's discretion as of (A) the closing date set forth in the First Refusal Notice and Bona Fide Offer; (B) such earlier period as determined by the Company or the Company Designee, provided it is at least forty five (45) days after the expiration of the Option Period; or (C) such other time as mutually agreed upon by the

19

Selling Stockholder and the Company or the Company Designee; provided, however, that any closing shall be subject to and reasonably extended to take into account any and all notices and/or approvals required from any Governmental Authority or other third party.  The closing shall be held at the then-principal office of the Company or at such other place or remotely as the Selling Stockholder and the Company or the Company Designee shall agree in writing.

(ii)     Company Option Closing Deliverables.  Prior to or at the closing of the Company Option, each Selling Stockholder shall deliver (A) a purchase agreement duly executed by such Selling Stockholder in a form reasonably satisfactory to the Company containing usual and customary representations, warranties and indemnities in favor of the Company and the Company Designee and consistent with the Third Party Offer Terms; (B) a certificate or certificates (to the extent certificated) for all of such Selling Stockholder's Stock to be Transferred to the Company or the Company Designee, duly endorsed for transfer with signatures guaranteed and all endorsements necessary for Transfer or a customary lost certificate affidavit (with customary indemnification provisions) in lieu thereof attesting to the loss or destruction of such certificate(s); (C) a stock power duly executed by such Selling Stockholder in a form reasonably acceptable to the Company; (D) resignations of any and all officers, directors, managers or committee roles, titles or functions, if any, of the Company Group appointed by or otherwise affiliated with such Selling Stockholder; and (E) such other documents reasonably requested by the Company.  At the closing of the Company Option, the Company or the Company Designee shall deliver the Company Option purchase price to the Selling Stockholder via wire transfer to a bank account designated by the Selling Stockholder in a written notice to the Company and/or the Company Designee at least three (3) business days prior to such closing.

4.5     Purchase Terms by Third Party Offeror.  If the Company and/or the Company Designee do not agree to purchase all of the Offered Shares or the parties fail to consummate the Company Option closing pursuant to Section 4.4(b), then, for a period of ninety (90) days after the termination of the Option Period, the Selling Stockholder may sell the Offered Shares to the Third Party Offeror; provided, however, that (i) such Third Party Offeror is approved by the Board; (ii) the Offered Shares are sold to the Third Party Offeror at a price per share not less than the per Share offer price contained in the Third Party Offer Terms and otherwise upon terms no less favorable to the Selling Stockholder than the Third Party Offer Terms (the "**Minimum Terms**"), (iii) such Third Party Offeror executes a Joinder agreeing to be bound as an Additional Stockholder; (iv) the Selling Stockholder and Third Party Offeror are in compliance with the criteria set forth in Section 4.5.  If the Selling Stockholder wishes to sell all or any part of the Offered Shares on terms less favorable to the Selling Stockholder than the Minimum Terms or does not sell such Offered Shares on the Minimum Terms within the aforementioned ninety (90) day period, the Selling Stockholder shall be obligated to make new offers and re-offers to the Company in accordance with this Section 4.5, before it shall be permitted to Transfer its Shares, or any part thereof, to any Person who is not a Permitted Transferee.

4.6     Stock Splits, Etc.  If there shall be any change in the Stock of the Company as a result of any merger, consolidation, reorganization, recapitalization, stock dividend, split-up, combination or exchange of Shares, or otherwise, the provisions of this Agreement shall apply with equal force to additional and/or substitute Shares, if any, received by each Stockholder in exchange for or by virtue of its ownership of Stock.

4.7     <u>Failure to Deliver Securities</u>.  If any Additional Stockholder (the "**Transferring Stockholder**") becomes obligated to Transfer any Securities to the Company or to another Securityholder pursuant to this Agreement (including a Transfer to another Securityholder for purposes of Transfer to another purchaser pursuant to <u>Section 5.1</u> or <u>5.2</u> hereof), and fails to deliver such Securities in accordance with the terms of this Agreement, the Company or the other transferee Stockholder, as the case may be, may, at its, his or her option, in addition to all other remedies it may have, either (a) send to the Transferring Stockholder the purchase price for such Securities as is herein specified, or (b) deposit such amount with a trustee or escrow agent for the benefit of the Transferring Stockholder for release upon delivery of such Securities to the trustee or escrow agent in accordance with the terms of this Agreement.  Thereupon, the Company, upon written notice to the Transferring Stockholder, shall (i) cancel on its books the certificate or certificates representing the Securities so required to be transferred by the Transferring Stockholder, and (ii) issue, in lieu thereof, in the name of the Company, to such other Stockholder or purchaser, as the case may be, a new certificate or certificates representing such Securities.  All of the Transferring Stockholder's rights in and to such Securities shall terminate as of the date of the Company's written notice to the Transferring Stockholder.  Notwithstanding the foregoing, neither the Company nor the other transferee Stockholder shall have the rights and powers provided by this <u>Section 4.7</u> if it has failed to fulfill any covenant in this Agreement.

**ARTICLE V**
**D<small>RAG</small> A<small>LONG</small> O<small>BLIGATIONS</small>; C<small>ERTAIN</small> T<small>AG</small> A<small>LONG AND</small> O<small>THER</small> R<small>IGHTS</small>**

5.1     <u>Drag Along Obligations for Sale of the Company</u>.

(a)     <u>Drag-Along Notice</u>.  Upon the approval of the Board of Directors and the Bridging Lender to consummate a Sale of the Company, each Securityholder shall be obligated, as applicable, to (i) vote all of such Securityholder's Shares in favor of, and not object to, the Sale of the Company, (ii) reasonably cooperate with the Company, the Bridging Lender and the purchaser in any such Sale of the Company, and (iii) waive any dissenters' rights, appraisal rights or similar rights to which such Securityholder may be entitled under Applicable Laws. The Company shall provide each of the Securityholders with notice of the terms and conditions of the proposed Sale of the Company (the "**Drag-Along Notice**") not later than fifteen (15) days prior to the closing of the Sale of the Company.  The Drag-Along Notice shall state the name of the third party purchaser and the material terms of the Sale of the Company (including the purchase price and the form of consideration offered).  If the Sale of the Company is structured (x) as a sale of Stock, each Securityholder will agree to Transfer all of such Securityholder's Stock (the "**Drag-Along Shares**") on the same terms as the Bridging Lender with respect to the Stock, or (y) as a sale of assets, each Securityholder will vote in favor of and otherwise not object to any subsequent liquidation or other distribution of the proceeds therefrom, as approved by the Board of Directors, so long as such subsequent liquidation or other distribution of the proceeds is in accordance with <u>Section 8.2</u> of this Agreement.

(b)     <u>Equity Percentage of Drag-Along Shares</u>.  If the Sale of the Company is structured as a (i) sale of the Common Stock or Preferred Stock, then each of the Securityholders shall be required to sell its Equity Percentage of the Common Stock and the Preferred Stock comprising the Drag-Along Shares, such Equity Percentage to be determined separately for the Common Stock and the Preferred Stock (and shall not sell more than their Equity Percentage of

21

the Drag-Along Shares to the purchaser or group of purchasers on the same terms and conditions as those offered to the Bridging Lender for the Common Stock or Preferred Stock, respectively). Any net proceeds from the Sale of the Company shall be allocated to each Securityholder in accordance with <u>Section 8.2</u>.For avoidance of doubt, after giving effect to any portion of the purchase price payable to Securityholders of Preferred Stock in accordance with the foregoing sentence, each Securityholder of Common Stock shall be entitled to a Pro-Rata Share of the remainder of the net purchase price proceeds equal to such Securityholder's Equity Percentage of the Common Stock comprising the Drag-Along Shares.

(c) <u>Drag-Along Closing</u>. Prior to or at the closing of the Sale of the Company, each Securityholder shall deliver (i) a purchase agreement duly executed by such Securityholder in a form reasonably satisfactory to the Company and the Bridging Lender containing usual and customary representations, warranties and indemnities; (ii) a certificate or certificates (to the extent certificated) for all of such Securityholder's Drag-Along Shares to be Transferred to the purchaser, duly endorsed for transfer with signatures guaranteed and all endorsements necessary for Transfer to the purchaser or group of purchasers or a customary lost certificate affidavit (with customary indemnification provisions) in lieu thereof attesting to the loss or destruction of such certificate(s); (iii) a stock power duly executed by such Securityholder in a form reasonably acceptable to the Company; (iv) resignations of any and all officer, director, manager or committee roles, titles or functions, if any, of the Company Group appointed by or otherwise affiliated with such Securityholder; and (v) such other agreements, documents, certificates, resolutions, or instruments reasonably requested by the Company and the Bridging Lender. In furtherance of the foregoing, each Securityholder participating in such Sale of the Company will be obligated to join all other Securityholders in any purchase price adjustments, indemnification, escrow arrangement, or similar financial or economic obligations that the sellers of Drag-Along Shares are required to provide in connection with such Sale of the Company. Each Securityholder agrees to appoint the Bridging Lender or its designee as the "**Sellers' Representative**" in connection with a Sale of the Company on standard and customary terms and conditions. Each Securityholder of Drag-Along Shares will bear such Securityholder's pro rata share of the fees, costs and expenses incurred by the Company Group, or by the Bridging Lender and its Affiliates on behalf of the Securityholders or the Company Group in connection with of a Sale of the Company. No Securityholder, however, will be required to provide representations or warranties with respect to the Company Group other than that such Securityholder is the sole beneficial owner of its Drag-Along Shares and is transferring them free and clear of any and all claims and encumbrances.

(d) <u>Failure to Comply</u>. If a Securityholder refuses or otherwise fails to execute agreements, documents, certificates, resolutions, or other instruments as required hereby or otherwise comply with this <u>Section 5.1</u>, such Securityholder (i) will not be entitled to the consideration that such Securityholder would otherwise receive in the Sale of the Company until such holder cures such failure; *provided*, *however*, that, after curing such failure, such Securityholder will be so entitled to such consideration without interest, (ii) will be deemed, for all purposes, as of the closing of the Sale of the Company, no longer to be a Securityholder of the Company with respect to any of the Drag-Along Shares and will have no voting rights with respect to such Drag-Along Shares, (iii) will not be entitled to any dividends or other distributions declared after the Sale of the Company with respect to the Drag-Along Shares held by such Securityholder, (iv) will have no other rights or privileges granted to Securityholders

22

under this or any future agreement with respect to the Drag-Along Shares, and (v) in the event of liquidation of the Company, until such Securityholder cures such failure, such Securityholder will have no right to receive any of the consideration that such Securityholder would have received if such Securityholder had complied with this <u>Section 5.1</u>. Any payments due to such Securityholder pursuant to this <u>Section 5.1</u> shall be net of any reasonable costs and expenses incurred by the Company Group, the Bridging Lender, and their Affiliates in connection with such Securityholder's failure to comply with this <u>Section 5.1</u>.

(e)    <u>Proxy and Power of Attorney</u>. Each Securityholder hereby appoints the Bridging Lender and any designee thereof, each of them individually, its limited proxy and attorney-in-fact, with full power of substitution and resubstitution to vote or act by written consent with respect to all of such Securityholder's Drag-Along Shares in accordance with this <u>Section 5.1</u>, and to sign its name (as a stockholder) to any agreement, consent, certificate, instrument, or other document relating to the Company Group that the laws of the State of Delaware may permit or require in connection with any matter referred to in this <u>Section 5.1</u>. This proxy is given to secure the performance of the duties and obligations of such Securityholder under this Agreement. Each Securityholder affirms that the proxy granted hereunder is coupled with an interest and is irrevocable until termination of this Agreement, whereupon such proxy and power of attorney will automatically terminate. Each Securityholder will take such further action and execute such other instruments as may be necessary to effectuate the intent of this proxy. For Shares as to which such Securityholder is the beneficial owner but not the record owner, such Securityholder will cause any record owner of such Shares of Stock to grant the Bridging Lender and any designee thereof a proxy to the same effect as that contained herein.

(f)    <u>Qualified Public Offering Exception</u>. Notwithstanding anything herein to the contrary, the provisions of this <u>Section 5.1</u> shall not apply to a Qualified Public Offering and shall be terminated effective immediately prior to a Qualified Public Offering.

(g)    <u>Sections 4.1 and 4.2 Inapplicable</u>. Any sale of Stock pursuant to this <u>Section 5.1</u> shall not be subject to the provisions of <u>Sections 4.1</u> and <u>4.2</u> of this Agreement.

5.2    <u>Common Stock Tag Along Rights</u>.

(a)    <u>Tag Along Stockholders</u>. Except as otherwise provided in <u>Section 5.1</u> above, and subject to the exceptions in <u>Section 5.2(e)</u> hereof, if at any time the Bridging Lender desires to sell a majority of its Common Stock in a single transaction or series of related transactions to a prospective purchaser or group of purchasers (such Person or Persons hereinafter referred to as the "**Proposed Purchaser**"; and such proposed transaction, the "**Proposed Sale**") that is not a Permitted Transferee, then each of the other Stockholders (hereinafter referred to collectively as the "**Tag Along Stockholders**") shall have the right to require the Proposed Purchaser to purchase from each of them up to the number of whole shares of Common Stock owned by each such Tag Along Stockholder, equal to the number derived by multiplying the total number of shares of Common Stock that the Bridging Lender proposes to sell by a fraction, the numerator of which is the total number of Shares of Common Stock owned by such Tag Along Stockholder, and the denominator of which is the total number of Shares of Common Stock owned by the Bridging Lender and all such Tag Along Stockholders (the "**Tag**

Along Shares"). Any Tag Along Shares purchased from Tag Along Stockholders pursuant to this Section 5.2 shall be at the same price per share and otherwise at the same time and upon the same terms and conditions as the proposed Transfer by the Bridging Lender. The Bridging Lender shall notify, or cause to be notified, each Tag Along Stockholder and the Board of Directors in writing of each such proposed Transfer subject to the provisions of this Section 5.2. Such notice shall set forth: (i) the name of the proposed purchaser; (ii) the number of shares of Common Stock proposed to be purchased, and (iii) contain a true and complete copy of any and all available documents constituting the agreement to Transfer and, to the extent not set forth in the accompanying documents, the price offered.

      (b)     Tag Along Notice. Any Tag Along Stockholder may exercise his, her or its tag along right hereunder by delivery of a written notice to the Bridging Lender (the "**Tag Along Notice**") and to the Board of Directors within ten (10) days following the receipt of the notice specified in Section 5.2(a) hereof. The Tag Along Notice shall state the number of Shares of Common Stock that such Tag Along Stockholder proposes to include in such Proposed Sale, determined in accordance with Section 5.2(a) hereof. Once delivered, the Tag Along Notice may not be revoked by any Tag Along Stockholder without the consent of the Company's Board of Directors and the Bridging Lender. No Tag Along Stockholder shall have oversubscription or over allotment rights with respect to the Tag Along Shares without the Board of Director's prior written approval. In the event that the Proposed Purchaser refuses to purchase such Tag Along Shares from the Tag Along Stockholders on the same terms and conditions as it purchases Shares of Common Stock from the Bridging Lender in the Proposed Sale, then the Bridging Lender shall have the right to either reduce the total number of Shares of Common Stock to be Transferred in the Proposed Sale in order to otherwise comply with this Section 5.2 or otherwise not sell any Shares of Common Stock to the Proposed Purchaser in the Proposed Sale. If no Tag Along Notice is received during the fifteen (15) day period referred to in this Section 5.2(b), the Bridging Lender shall have the right to Transfer its Shares of Common Stock on terms and conditions no more favorable than those stated in the notice under Section 5.2(a) hereof and in accordance with the provisions of this Article V.

      (c)     Tag-Along Closing. Prior to or at the closing of the Proposed Sale of the Tag Along Shares, each Tag Along Stockholder shall deliver (i) a purchase agreement duly executed by such Tag Along Stockholder in a form reasonably satisfactory to the Company and the Bridging Lender containing usual and customary representations, warranties and indemnities; (ii) a certificate or certificates (to the extent certificated) for all of such Tag Along Stockholder's Tag Along Shares to be Transferred to the Proposed Purchaser, duly endorsed for Transfer with signatures guaranteed and all endorsements necessary for Transfer to the Proposed Purchaser or a customary lost certificate affidavit (with customary indemnification provisions) in lieu thereof attesting to the loss or destruction of such certificate(s); (iii) a stock power duly executed by such Tag Along Stockholder in a form reasonably acceptable to the Company; (iv) resignations of any and all officers, directors, managers or committee roles, titles or functions, if any, of the Company Group appointed by or otherwise affiliated with such Tag Along Stockholder; and (v) such other agreements, documents, certificates, resolutions, or instruments reasonably requested by the Company and the Bridging Lender. In furtherance of the foregoing, each Tag Along Stockholder will be obligated to join all other Securityholders in any purchase price adjustments, indemnification, escrow arrangement, or similar financial or economic obligations that the sellers of Tag Along Shares are required to provide in connection with such Proposed Sale. Each Tag

Along Stockholder agrees to appoint the Bridging Lender or its designee as the Sellers' Representative in connection with such Proposed Sale on standard and customary terms and conditions. Each Tag Along Stockholder will bear such Tag Along Stockholder's pro rata share of the fees, costs and expenses incurred by the Company Group, or by the Bridging Lender and its Affiliates on behalf of the Securityholders or the Company Group in connection with such Proposed Sale.

(d)     <u>Failure to Comply</u>.  If a Tag Along Stockholder refuses or otherwise fails to execute agreements, documents, certificates, resolutions, or other instruments as required hereby or otherwise comply with this <u>Section 5.2</u>, such Tag Along Stockholder (i) will not be entitled to the consideration that such Securityholder would otherwise receive in the Proposed Sale until such holder cures such failure; *provided*, *however*, that, after curing such failure, such Tag Along Stockholder will be so entitled to such consideration without interest, (ii) will be deemed, for all purposes, as of the closing of the Proposed Sale, no longer to be a Securityholder of the Company with respect to any of the Tag Along Shares and will have no voting rights with respect to such Tag Along Shares, (iii) will not be entitled to any dividends or other distributions declared after the Proposed Sale with respect to the Tag Along Shares held by such Securityholder, (iv) will have no other rights or privileges granted to Securityholders under this or any future agreement with respect to the Tag Along Shares, and (v) in the event of liquidation of the Company, until such Tag Along Stockholder cures such failure, such Tag Along Stockholder will have no right to receive any of the consideration that such Securityholder would have received if such Tag Along Stockholder had complied with this <u>Section 5.2</u>.  Any payments due to such Tag Along Stockholder pursuant to this <u>Section 5.2</u> shall be net of any reasonable costs and expenses incurred by the Company Group, the Bridging Lender, and their Affiliates in connection with such Securityholder's failure to comply with this <u>Section 5.2.</u>  Any provision herein to the contrary notwithstanding, the exercise of the tag along right shall be conditioned upon the agreement by such Tag Along Stockholder to comply with this <u>Section 5.2</u>.  Failure of any Tag Along Stockholder to comply with the provisions of this <u>Section 5.2</u> shall constitute a breach of this Agreement and waiver of its tag along right.

(e)     <u>Tag-Along Right Exceptions</u>.  Notwithstanding anything herein to the contrary, the provisions of this <u>Section 5.2</u> shall not apply to any Transfer of Stock that is (i) made to a Permitted Transferee, (ii) made to either the Bridging Lender or the Company pursuant to the exercise of their respective rights set forth in <u>Section 4.4</u>, (iii) proposed to be made by the Bridging Lender or required to be made by any other Securityholder pursuant to <u>Section 4.1</u>; or (iv) made pursuant to a Qualified Public Offering and shall be terminated effective immediately prior to a Qualified Public Offering.

(f)     <u>Qualified Public Offering Exception</u>.  Notwithstanding anything herein to the contrary, the provisions of this <u>Section 5.2</u> shall not apply to a Qualified Public Offering and shall be terminated effective immediately prior to a Qualified Public Offering.

(g)     <u>Sections 4.1 and 4.2 Inapplicable</u>.  Any sale of Stock pursuant to this <u>Section 5.2</u> shall not be subject to the provisions of <u>Sections 4.1</u> and <u>4.2</u> of this Agreement.

5.3     <u>Preferred Stock Put Rights</u>.

(a)     Preferred Stock Put Right.  At any time on or after the achievement of the Milestone set forth on **Exhibit 5.3-A**, the Bridging Lender shall have the option, but not the obligation (the "**Preferred Stock Put Right**") to Transfer all or any portion of its Preferred Stock to the Company, along with the Preferred Stock of each other Preferred Stock Securityholder pursuant to Sections 5.3(c) and 5.3(d) below, and the Company shall have the obligation to repurchase such Preferred Stock, for an amount equal to the Preferred Stock Put Price payable to such Preferred Stock Securityholder pursuant to a promissory note in substantially the same form as **Exhibit 5.3-B**, attached hereto and incorporated herein by reference and which Note shall be subject to the Refinancing Documents.

(b)     Preferred Stock Put Notice.  The Bridging Lender may exercise the Preferred Stock Put Right hereunder by delivering written notice thereof to the Company and the Centurion Lender (the "**Preferred Stock Put Notice**").  The Preferred Stock Put Notice shall state the number of Shares of Preferred Stock that the Bridging Lender proposes to include in connection with the exercise of its Preferred Stock Put Right.

(c)     Preferred Stock Put Price.  As used herein, the "**Preferred Stock Put Price**" means (i) $30,000,000.00 plus the Preferred Stock Yield, multiplied by (ii) a fraction, the numerator of which is the total number of Shares of Preferred Stock being Transferred to the Company for repurchase, and the denominator of which is the total number of outstanding shares of Preferred Stock; multiplied by (iii) such Preferred Stock Securityholder's Pro-Rata Share of the Preferred Stock.

(d)     Preferred Stock Drag-Along Right.  If the Bridging Lender exercises the Preferred Stock Put Right, in whole or in part, pursuant to Section 5.3(a) hereof, then the Bridging Lender shall have the right (the "**Preferred Stock Drag-Along Right**") to require the Centurion Lender to Transfer all or otherwise such Preferred Stock Securityholder's Pro-Rata Share of the Preferred Stock that is to be Transferred to the Company pursuant to the Preferred Stock Put Notice.  Such Bridging Drag-Along Right shall be on the same terms and conditions as those offered to the Bridging Lender.  The Bridging Lender may exercise the Preferred Stock Drag-Along Right by delivering written notice thereof to the Company and the Centurion Lender as part of, simultaneous with, or at any time after delivery of, the Preferred Stock Put Notice. The closing of the Preferred Stock Drag-Along Right shall be contingent upon and contemporaneous with the closing of the Company's repurchase of the Preferred Stock pursuant to the Preferred Stock Put Right pursuant to Section 5.3(a).

(e)     Failure to Comply.  If the Centurion Lender refuses or otherwise fails to execute agreements, documents, certificates, resolutions, or other instruments as required hereby or otherwise comply with this Section 5.3, such Securityholder (i) will not be entitled to the consideration that such Securityholder would otherwise receive in the Preferred Stock Put Right until such holder cures such failure; *provided*, *however*, that, after curing such failure, such Securityholder will be so entitled to such consideration without interest, (ii) will be deemed, for all purposes, as of the closing of the Company's repurchase of the Preferred Stock pursuant to the Preferred Stock Put Right, no longer to be a Securityholder of the Company with respect to any of the Preferred Stock Put Right Shares and will have no voting rights with respect to such Shares, (iii) will not be entitled to any dividends or other distributions declared after the closing of the Company's repurchase of such Preferred Stock held by such Securityholder, (iv) will have

26

no other rights or privileges granted to Securityholders under this or any future agreement with respect to such Shares, and (v) in the event of liquidation of the Company, until such Securityholder cures such failure, such Securityholder will have no right to receive any of the consideration that such Securityholder would have received if such Securityholder had complied with this <u>Section 5.3</u>.  Any payments due to such Securityholder pursuant to this <u>Section 5.3</u> shall be net of any reasonable costs and expenses incurred by the Company Group, the Bridging Lender, and their Affiliates in connection with such Securityholder's failure to comply with this <u>Section 5.3</u>.

(f)    <u>Proxy and Power of Attorney</u>.  The Centurion Lender hereby appoints the Bridging Lender and any designee thereof, each of them individually, its limited proxy and attorney-in-fact, with full power of substitution and resubstitution to vote or act by written consent with respect to all of such Securityholder's Preferred Stock that is the subject of the Preferred Stock Put Right and Preferred Stock Drag-Along Right in accordance with this <u>Section 5.3</u>, and to sign its name (as a stockholder) to any agreement, consent, certificate, instrument, or other document relating to the Company Group that the laws of the State of Delaware may permit or require in connection with any matter referred to in this <u>Section 5.3</u>.  This proxy is given to secure the performance of the duties and obligations of the Centurion Lender under this Agreement.  The Centurion Lender affirms that the proxy granted hereunder is coupled with an interest and is irrevocable until termination of this Agreement, whereupon such proxy and power of attorney will automatically terminate.  The Centurion Lender will take such further action and execute such other instruments as may be necessary to effectuate the intent of this proxy.  For Shares of Preferred Stock as to which the Centurion Lender is the beneficial owner but not the record owner, such Securityholder will cause any record owner of such Shares of Preferred Stock to grant the Bridging Lender and any designee thereof a proxy to the same effect as that contained herein.

(g)    <u>Preferred Stock Tag Right</u>.  Except as otherwise provided in <u>Section 5.3(d)</u> above, if the Bridging Lender exercise its Preferred Stock Put Right, in whole or in part, pursuant to <u>Section 5.3(a)</u> hereof, then the Centurion Lender shall have the right (the "**Preferred Stock Tag Right**") to require the Company to repurchase from the Centurion Lender its Pro-Rata Share of the Preferred Stock that is the subject of the Preferred Stock Put Notice.  The Centurion Lender may exercise the Preferred Stock Tag Right by delivering written notice thereof to the Company and the Bridging Lender (the "**Preferred Stock Tag Notice**") within ten (10) days of the Bridging Lender's delivery of the Preferred Stock Put Notice to the Company the Centurion Lender pursuant to <u>Section 5.3(a)</u>.  Once delivered, the Preferred Stock Tag Notice may not be revoked by the Centurion Lender without the consent of the Company's Board of Directors and the Bridging Lender.  Any Preferred Stock repurchased by the Company pursuant to this <u>Section 5.3(g)</u> shall be at the same price per share and otherwise at the same time and upon the same terms and conditions as the closing of the Preferred Stock Put Right.  If no Preferred Stock Tag Notice is received during the ten (10) day period referred to in this <u>Section 5.3(g)</u>, such Preferred Stock Securityholder waives the Preferred Stock Tag Right in full, unless and until the Bridging Lender exercises a Preferred Stock Put Right with respect to the Bridging Lender's remaining shares of Preferred Stock, if any.

(h)    <u>Preferred Stock Repurchase Closing</u>.  Prior to or at the closing of the Company's repurchase of any Preferred Stock pursuant to this <u>Section 5.3</u>, each Preferred Stock

Securityholder shall deliver (i) a redemption agreement duly executed by such Securityholder in a form reasonably satisfactory to the Company and the Bridging Lender containing usual and customary representations, warranties and indemnities; (ii) a certificate or certificates (to the extent certificated) for all of such Securityholder's Preferred Stock to be Transferred to the Company, duly endorsed for Transfer with signatures guaranteed and all endorsements necessary for Transfer to the Company or a customary lost certificate affidavit (with customary indemnification provisions) in lieu thereof attesting to the loss or destruction of such certificate(s); (iii) a stock power duly executed by such Securityholder in a form reasonably acceptable to the Company; and (iv) such other agreements, documents, certificates, resolutions, or instruments reasonably requested by the Company and the Bridging Lender.  The Bridging Lender and the Centurion Lender will each bear its respective Pro-Rata Share of the fees, costs and expenses incurred by the Company Group, or by the Bridging Lender and its Affiliates, in connection with the Company's repurchase of the Preferred Stock pursuant to this <u>Section 5.3</u>. Neither the Bridging Lender nor the Centurion Lender will be required to make any representations other than sole beneficial ownership and conveyance free and clear of claims and encumbrances.

(i)     <u>Sections 4.1 and 4.2 Inapplicable</u>.  Any sale of Stock pursuant to this <u>Section 5.3</u> shall not be subject to the provisions of <u>Sections 4.1</u> and <u>4.2</u> of this Agreement.

5.4     <u>Creditors' Trust Put Right</u>.

(a)     <u>CT Put Right</u>.  If the Sale of the Company has not occurred on or prior to the fifth year anniversary of the Effective Date, then the Creditors' Trust shall have the right (the "**CT Put Right**") to Transfer all, but not less than all, of its Common Stock, up to its Original Equity Percentage (the "**CT Put Shares**"), and the Company shall have the obligation to repurchase the CT Put Shares in exchange for the CT Put Price (as defined below), all subject to the Refinancing Documents.

(b)     <u>CT Put Notice</u>.  The Creditors' Trust may exercise the CT Put Right hereunder by delivering written notice thereof to the Company (the "**CT Put Notice**").  The CT Put Notice shall state the number of Shares of Common Stock that the Creditors' Trust proposes to include in connection with the exercise of its CT Put Right.  As of the date (the "**CT Put Election Date**") that the CT Put Notice is delivered to the Company, the CT Put Notice may not be revoked by the Creditors' Trust without the written consent of the Company and the Bridging Lender.

(c)     <u>CT Put Price</u>.  As used herein, the "**CT Put Price**" means the (i) the earnings before interest, taxes, depreciation and amortization (EBITDA) of the Company Group for the twelve (12) month period ending on the CT Put Election Date, multiplied by (ii) the applicable multiple set forth in the chart below based upon the Lives Managed Under Management as of the CT Put Election Date, less (iii) the total amount of Indebtedness of the Company as of the CT Put Closing, less (iv) any Transaction Expenses, plus (v) the total amount of unrestricted cash, cash equivalents and investments on the balance sheet as of the CT Put Closing, multiplied by (vi) the CT Put Right Percentage.

| Lives Managed Under Management | EBITDA Multiple |
|---|---|
| 5,000 to 7,500 | 7 |
| 7,501 to 10,000 | 7.5 |
| 10,001 to 12,500 | 8 |
| 12,501 to 15,000 | 8.5 |
| More than 15,000 | 9 |

(d)    <u>CT Put Right Closing</u>.  The closing (the "**CT Put Closing**") of the CT Put Right shall occur on a date determined by the Company on no less than ten (10) days' prior notice to the Creditors' Trust, which date shall be no later than one hundred eighty (180) days after the date on which the Company receives the CT Put Notice.  Prior to or at the CT Put Closing, the Creditors' Trust shall deliver to the Company: (i) a redemption agreement duly executed by the Creditors' Trust in a form reasonably satisfactory to the Company and the Bridging Lender containing usual and customary representations, warranties and indemnities; (ii) a certificate or certificates (to the extent certificated) for all of the CT Put Shares to be Transferred to the Company, duly endorsed for Transfer with signatures guaranteed and all endorsements necessary for Transfer to the Company or a customary lost certificate affidavit (with customary indemnification provisions) in lieu thereof attesting to the loss or destruction of such certificate(s); (iii) a stock power duly executed by the Creditors' Trust in a form reasonably acceptable to the Company; and (iv) such other agreements, documents, certificates, resolutions, or instruments reasonably requested by the Company and the Bridging Lender.  The Creditors' Trust shall bear all of the fees, costs and expenses incurred by the Company Group, or by the Bridging Lender and its Affiliates, in connection with the Company's repurchase of the CT Put Shares pursuant to this <u>Section 5.4</u>.  At the CT Put Closing, the Company shall deliver or cause to be delivered to the Creditors' Trust the CT Put Price to the Creditors' Trust via wire transfer to a bank account designated by the Creditors' Trust in a written notice to the Company at least three (3) business days prior to such CT Put Closing.

(e)    <u>Sections 4.1 and 4.2 Inapplicable</u>.  Any sale of Stock pursuant to this <u>Section 5.4</u> shall not be subject to the provisions of <u>Sections 4.1</u> and <u>4.2</u> of this Agreement.

5.5    <u>Rights to Participate in Certain Offerings</u>.

(a)    <u>Participation Rights by Participating Stockholders</u>.    Subject to the exceptions in <u>Section 5.5</u> hereof, in the event the Company makes any future offering of Stock (including Common Stock, Preferred Stock or Derivative Securities) or any units consisting of Stock (the "**Company Offered Shares**"), the Company shall offer (which offer may be made contemporaneously with such offering of the Company Offered Shares or thereafter but not later than thirty (30) days after the completion of such offering of Company Offered Shares) to the Bridging Lender and each Stockholder (if any) (collectively, the "**Participating Stockholders**") the right to participate in such offering, at the same price, on the same payment terms and for the same securities as offered to each other Participating Stockholder or other proposed purchaser in such issuance, by delivering to each Participating Stockholder a notice (a "**Rights Offer Notice**"), which shall (a) identify and describe the Company Offered Shares, (b) describe the price and other terms upon which the Company Offered Shares are to be or were issued or sold, (c) identify the Persons (if known) to which the Company Offered Shares are to be offered or to which such Company Offered Shares have been sold, and (d) offer to issue and sell to such

Participating Stockholder (i) an amount elected by such Participating Stockholder up to its pro rata share of the Company Offered Shares (calculated based upon such Stockholder's Equity Percentage of the Common Stock or Pro-Rata Share of the Preferred Stock, respectively), or (ii) if such Company Offered Shares have already been offered and sold, an amount elected by such Participating Stockholder up to such number of shares of Stock so that such Participating Stockholder's Participation Amount immediately after any such offering and sale of Company Offered Shares and offerings to Participating Stockholders pursuant to this Section 5.5, would be equivalent to such Participating Stockholder's Participation Amount had such Participating Stockholder participated fully in such offering of Company Offered Shares when sold to the other purchasers of such Company Offered Shares (the amount so elected by such Participating Stockholder (up to the limit described in this Section 5.5), the "**Purchase Amount**").  For the avoidance of doubt, no Securityholder of Class B Common Stock shall have the right to participate in any additional issuance of Preferred Stock.

(b)    Exercise of Participation Rights.  To accept a participation rights offer in whole or in part, a Participating Stockholder must deliver to the Company, on or prior to the date that is thirty (30) days after the date of delivery of the Rights Offer Notice, a notice of acceptance indicating that such Participating Stockholder elects to purchase its Purchase Amount (and specifying the amount of the Purchase Amount).

(c)    No Oversubscription.    No Participating Stockholder shall have oversubscription or overallotment rights with respect to the Purchase Amount to be acquired by another Participating Stockholder pursuant to such other Participating Stockholder's notice of acceptance and which such other Participating Stockholder fails to acquire.  For the avoidance of doubt, a Securityholder of Common Stock shall have no right to participate in the issuance of any Preferred Stock.

(d)    Closing of Sale or Issuance to Participating Stockholders.    Upon the closing of the issuance or sale of the shares of Stock offered to Participating Stockholders pursuant to this Article V, each Participating Stockholder shall acquire from the Company and the Company shall issue to each Participating Stockholder, such Participating Stockholder's Purchase Amount specified in the notice of acceptance upon the terms and conditions specified in the participation Rights Offer Notice.

(e)    Exceptions.    The rights of the Participating Stockholders under this Section 5.5 shall not apply to:

(i)    the issuance of any shares of Stock upon conversion, exercise or exchange of (A) any shares of Preferred Stock, (B) any outstanding Derivative Securities in accordance with the terms thereof in effect on the date hereof, or (C) any Derivative Securities issued after the date hereof in accordance with the terms thereof on the date of issuance, provided such Derivative Securities were offered in compliance with Section 5.5(a) hereof;

(ii)    the issuance of any shares of Stock, including Common Stock or Preferred Stock, in connection with a split or subdivision or similar transaction with respect to shares of Stock;

(iii)    any shares of Common Stock or related Derivative Securities issued to employees, officers and directors of and consultants, customers and vendors to, the Company, pursuant to any arrangement approved by the Board of Directors;

(iv)    shares of Stock, including Common Stock, Preferred Stock, or related Derivative Securities, issued after the date hereof to any debt financing source in connection with any debt financing or refinancing approved by the Board of Directors;

(v)    any issuances in a Qualified Public Offering;

(vi)    a Sale of the Company; and

(vii)    securities issued as consideration in connection with the acquisition of another Person by the Company by merger, purchase of all or substantially all of the assets or shares or other reorganization or in connection with the formation of any joint venture with another Person (other than the Bridging Lender or a Permitted Transferee thereof), provided such transaction is approved by the Board of Directors.

(f)    <u>Anti-Dilution</u>.  Notwithstanding the foregoing, no Securityholder of Common Stock shall be diluted below its Original Equity Percentage of Common Stock without such Securityholder's prior written approval.

5.6    <u>Forfeiture; Repurchase Rights</u>.

(a)    <u>Forfeiture of Units</u>.  Shares may be forfeited for no consideration in accordance with the provisions of agreements between the holders of such Shares and the Company, including rollover and contribution agreements, unit award agreements and Joinders to this Agreement.  In addition to the provisions of this <u>Section 5.6</u>, Shares may be subject to call options and purchase rights in accordance with the provisions of agreements between the holders of such Shares and the Company.

(b)    <u>Common Stock Repurchase Rights</u>.

(i)    Upon a Common Stock Securityholder's (A) breach of any restrictive covenants or other representations set forth in <u>Article IX</u> and <u>Article XI</u> hereof; (B) other material breach of this Agreement which remains uncured for a period of thirty (30) days after written notice thereof from the Board (or, if incapable of cure within such third (30) day period, within a reasonable period of time not to exceed ninety (90) days, provided the breaching Stockholder continues to faithfully and diligently pursue such cure); or (C) failure to satisfy the criteria set forth in <u>Section 4.2</u> (each of the foregoing clauses (A) through (C), a "**Common Stock Separation**"; and such Stockholder, the "**Breaching Stockholder**"), the Company will, at the Board's sole discretion, have the right, but not the obligation (the "**Repurchase Right**"), to repurchase all Common Stock held by such Common Stock Securityholder (whether held directly by such Common Stock Securityholder, or indirectly by one or more of its Permitted Transferees (to the extent applicable)) (such shares, "**Subject Shares**") for the Repurchase Price (defined herein), pursuant to the terms and conditions set forth in this <u>Section 5.6</u>.  The "**Repurchase Price**" means, as of the redemption date reasonably determined by the Company, the lesser of the Fair Market Value of all of the Subject Shares held by such Breaching

31

Stockholder as of the date of the Repurchase Closing or the original issuance date of such Subject Shares.

(ii)    The Company may elect, in its sole discretion, to purchase all or any portion of the Subject Shares by giving written notice to the Breaching Stockholder (the "**Repurchase Notice**"), within one hundred twenty (120) days following the Company's actual knowledge of the occurrence of a Common Stock Separation.  Such Repurchase Notice will set forth the number of Subject Shares to be acquired by the Company, the aggregate consideration to be paid for such Subject Shares as determined pursuant to this Section 5.6, and the time and place for the closing of such purchase.

(iii)    If the Company has elected to purchase any of the Subject Shares, then closing of such Repurchase Right pursuant to this Section 5.6 (the "**Repurchase Closing**") shall occur at the Company's principal office, at 10:00 a.m., on the thirtieth (30th) day following the date on which the Company delivers the Repurchase Notice to the Breaching Stockholder, that the Company is purchasing any of the Subject Shares, or on such earlier date as designated by the Company, in its sole discretion, upon not less than ten (10) days' prior notice to the Breaching Stockholder.  If such date is not a business day, then the Repurchase Closing will occur at the same time and place on the next succeeding business day.  The Company will pay for the Subject Shares, at its sole option, by (i) delivery of a cashier's check or wire transfer of immediately available funds, (ii) setoff against any and all obligations (to the extent of such obligations) owed to the Company and/or its Subsidiaries or Affiliates by the Breaching Stockholder, (iii) delivery of a promissory note in form and substance reasonably satisfactory to the Company and the Breaching Stockholder, which shall be payable as to principal in sixty (60) equal monthly installments (such installments to commence on the first month following the Repurchase Closing), together with interest at the Interest Rate (defined herein), payable monthly in arrears on the principal payment dates as described above, and/or (iv) any combination thereof.  The Company may rescind any exercise of its Repurchase Right under this Section 5.6 at any time prior to the Repurchase Closing.  At the Repurchase Closing, the Breaching Stockholder and any of its Permitted Transferees (to the extent applicable) shall deliver a certificate or certificates representing the Subject Shares to be purchased duly endorsed, or with other assignment documents duly endorsed, for transfer, and such other documents as the Company may reasonably request.  The Company will be entitled to receive customary representations and warranties as to ownership, title, authority to sell and the like from the Breaching Stockholder and any of its Permitted Transferees (to the extent applicable) regarding such sale, and to receive such other evidence, including applicable inheritance and estate tax waivers, as may be reasonable and appropriate to effectuate the purchase of the Subject Shares. For purposes of this Section 5.6, "**Interest Rate**" means a fluctuating rate of interest per annum equal to the rate of interest announced by Citibank, N.A. from time to time as its "prime rate."

## ARTICLE VI
### REGISTRATION RIGHTS

6.1    Demand Registration.  Upon the receipt of a written request from the Bridging Lender that the Company file a Registration Statement under the Securities Act covering the registration for the offer and sale of all or part of the Bridging Lender's Registrable Securities (a "**Demand Registration**"), as soon as practicable, the Company shall give written notice to all

other Stockholders of such Demand Registration and shall cause all Registrable Securities that the Bridging Lender has requested be registered to be registered under the Securities Act, subject to and in accordance with the terms, conditions, procedures and limitations contained in this Agreement. The Bridging Lender is entitled to effect three (3) such Demand Registrations pursuant to this Article VI and a registration requested pursuant to this Article VI shall not be deemed to have been effected unless a Registration Statement with respect thereto has become effective, remained continuously effective without interruption in accordance with the provisions of Section 6.3(a) hereof, and the Registered Securities shall have been disposed of in accordance with the plan of distribution set forth therein. The Bridging Lender may terminate a Demand Registration prior to the filing of a Registration Statement relating thereto, or require the Company to withdraw promptly any Registration Statement which has been filed pursuant to this Article VI but which has not become effective under the Securities Act, and such registration shall not be deemed to be a Demand Registration if either (i) it agrees to pay the costs and expenses of such registration as set forth in Section 6.4 hereof, or (ii) such withdrawal is accompanied by notice from the Bridging Lender that, in the good faith exercise of its reasonable judgment, (A) such withdrawal is warranted based on a change in the business or prospects of the Company or a change in the condition of the United States financial markets, or (B) there has occurred a misstatement or omission in any preliminary prospectus which makes it inadvisable to proceed with the registration.

6.2    Piggyback Registration.  Subject to Section 6.5 hereof, except in connection with an initial underwritten Public Offering, if at any time the Company proposes to register its Common Stock under the Securities Act, either for its own account or for the account of others (including and to the extent any such registrations are effected pursuant to Section 6.1 hereof), in connection with the Public Offering of such Common Stock solely for cash, on a registration form that would also permit the registration of Registrable Securities (other than a registration statement on Form S-8 or any successor form, or a registration statement on Form S-4 for the purpose of offering such securities to another business entity or the stockholders of such entity in connection with the acquisition of assets or shares of capital stock, respectively, of such entity), the Company shall, each such time, give the Bridging Lender and each other Stockholder written notice of such proposal no later than fifteen (15) days prior to the filing of the Registration Statement relating thereto (a "**Piggyback Registration Notice**").  Within ten (10) days after the Piggyback Registration Notice is given, the Bridging Lender and each of the other Stockholders shall give notice as to the number of shares of Registrable Securities, if any, which such Stockholders request to be registered simultaneously with such registration by the Company ("**Piggyback Registration**").  The Company shall include such Registrable Securities in such Registration Statement (or in a separate Registration Statement concurrently filed) which the Stockholders thereof request to be registered under the Securities Act, subject to and in accordance with the terms, conditions, procedures and limitations contained in this Agreement. Notwithstanding the foregoing, if such Piggyback Registration was initiated by the Company to effect a primary public offering of its securities and, if at any time after giving written notice of its intention to so register securities and before the effectiveness of the Registration Statement filed in connection with such registration, the Company determines for any reason either not to effect such registration or to delay such registration, the Company may, at its election, by prior written notice to each Stockholder, (i) in the case of a determination not to effect registration, relieve itself of its obligation to register the Registrable Securities in connection with such registration, or (ii) in the case of a determination to delay registration, delay the registration of

such Registrable Securities for the same period as the delay in the registration of such other securities. Each Stockholder requesting inclusion in a registration pursuant to this Section 6.2 may, at any time before the effective date of the Registration Statement relating to such registration, revoke such request by written notice of such revocation to the Company, in which case the Company shall cause such Stockholder's Registrable Securities to be withdrawn from such Registration Statement.

6.3     Obligations of the Company.  Whenever required under this Agreement to effect the registration of any Registrable Securities, the Company shall, as expeditiously as reasonably possible:

(a)     Prepare and file with the Commission a Registration Statement covering such Registrable Securities and use its best efforts to cause such Registration Statement to be declared effective by the Commission and to keep such registration effective until the date when all Registrable Securities covered by the Registration Statement have been sold; provided, however, in the case of registration under Section 6.1 hereof, not longer than 180 days after the effective date of the Registration Statement or prospectus or any amendments or supplements thereto.

(b)     Prepare and file with the Commission such amendments and post-effective amendments to such Registration Statement as may be necessary to keep such Registration Statement effective until the applicable date referred to in Section 6.3(a) hereof and to comply with the provisions of the Securities Act with respect to the disposition of all securities covered by such Registration Statement, and cause the prospectus to be supplemented by any required prospectus supplement, and as so supplemented to be filed with the Commission pursuant to Rule 424 under the Securities Act.

(c)     Comply with all of its obligations under the Securities Act and the Exchange Act, and the rules and regulations thereunder, use commercially reasonable efforts to qualify the Common Stock under the blue sky laws of such states as the underwriters in such registration shall reasonably request, and use its best efforts to list the Common Stock on, and remain continuously listed on, such national securities exchange or trading medium as the underwriters in such registration shall reasonably request.

6.4     Registration Expenses.  Except as set forth below, in connection with any registration of Registrable Securities hereunder, the Company will pay all of the expenses relating to such registration; provided, however, that (i) the Company will only pay the fees and disbursements charged by one counsel chosen by (A) the Bridging Lender, in the case of a Demand Registration, and (B) the holders of a majority of the Registrable Securities sought to be included in the Registration Statement under Section 6.2, in the case a Piggyback Registration which is not also a Demand Registration, and (ii) each Stockholder participating in the sale of Registrable Securities will pay any underwriting discounts, commissions and fees attributable to the sale of its Registrable Securities and any out-of-pocket expenses of such Stockholder (or the agents who manage its accounts) or the fees and disbursements of its counsel (other than the legal counsel referred to in Section 6.4(i)(A) or (B) above).

6.5    <u>Underwriting Requirements and Cutbacks</u>.

(a)    With respect to a Demand Registration pursuant to <u>Section 6.1</u> hereof, the Bridging Lender shall have the right to select the investment banker(s) and manager(s) to administer such registration, subject to the approval of the Company, which approval will not be unreasonably withheld, delayed or conditioned.

(b)    With respect to a Piggyback Registration pursuant to <u>Section 6.2</u> hereof, the Company shall have the right to select the investment banker(s) and manager(s) to administer such registration, except in a case where a demand right has been exercised pursuant to <u>Section 6.1</u> and subject to the conditions of <u>Section 6.5(a)</u>.

(c)    No Stockholder may participate in any underwritten registration hereunder unless such Stockholder (i) agrees to sell such Stockholder's Registrable Securities on the basis provided in any underwriting arrangements reasonably approved by the persons entitled hereunder to approve such arrangements, and (ii) completes and executes all questionnaires, powers of attorney, indemnities, underwriting agreements and other documents that are customary for similarly situated Persons and are reasonably required under the terms of such underwriting arrangements.

(d)    If a registration under <u>Section 6.1</u> hereof is an underwritten offering and the managing underwriters advise the Company that in their opinion the number of shares of Common Stock requested to be registered exceeds the number of shares which can be sold in such offering without materially and adversely affecting the marketability of the offering, then the Company will include in such registration (i) first, Registrable Securities owned by the Stockholders with the right to include their Registrable Securities in such registration pursuant to <u>Section 6.1</u>, Registrable Securities owned by the Stockholders that requested the inclusion of any Registrable Securities pursuant to <u>Section 6.2</u>, and Common Stock owned by other stockholders of the Company who hold contractual demand registration rights (pro rata among all such stockholders (including such Stockholders) on the basis of the number of Registrable Securities and other shares of Common Stock such stockholders (including the Stockholders) have requested to be registered), and (ii) second, Common Stock owned by the other stockholders of the Company who hold contractual piggyback registration rights (pro rata among all such stockholders on the basis of the number of shares of Common Stock such stockholders have requested to be registered).

(i)    If a registration under <u>Section 6.2</u> hereof is an underwritten primary offering initiated by the Company and the managing underwriters advise the Company that in their opinion the number of securities requested to be included in such registration exceeds the number which can be sold in such offering without materially and adversely affecting the marketability of the offering, the Company will include in such registration (A) first, the securities the Company proposes to sell, and (B) second, (x) Registrable Securities owned by the Stockholders that have requested the inclusion of any Registrable Securities in such registration pursuant to <u>Section 6.2</u>, and (y) Common Stock held by other stockholders of the Company requesting such registration pursuant to contractual registration rights, in each case, pro rata among all such stockholders (including the Stockholders) on the basis of the number of

Registrable Securities and other shares of Common Stock such stockholders (including the Stockholders) have so requested to be registered.

(ii)    If a registration under <u>Section 6.2</u> hereof is an underwritten registration initiated by any of the stockholders of the Company (other than any Stockholder) and the managing underwriters advise the Company that in their opinion the number of securities requested to be included in such registration exceeds the number which can be sold in such offering without materially and adversely affecting the marketability of the offering, the Company will include in such registration (A) first, Common Stock owned by other stockholders of the Company (and not any Stockholder) who hold contractual demand registration rights (pro rata among all such other stockholders on the basis of the number of shares of Common Stock such stockholders have requested to be registered), and (B) second, Common Stock owned by the Stockholders with the right to include their Common Stock in such registration pursuant to <u>Section 6.2</u> and Common Stock owned by other Stockholders of the Company who hold contractual piggyback registration rights (pro rata among all such stockholders (including such Stockholders) on the basis of the number of shares of Common Stock such stockholders (including the Stockholders) have requested to be registered).

6.6    <u>Furnish Information</u>.    The Stockholders shall furnish to the Company such information regarding them, the Registrable Securities held by them, and the intended method of disposition by them of such Registrable Securities as is customarily provided by selling securityholders and as the Company or any underwriters shall reasonably request.

6.7    <u>Indemnification and Contribution</u>.    In the event any Registrable Securities are included in a Registration Statement under this Agreement:

(a)    To the full extent permitted by law, the Company will and hereby does (i) indemnify and hold harmless each Stockholder, each director, officer, partner, member, manager, employee, Affiliate, or agent of or for such Stockholder, any underwriter (as defined in the Securities Act) for such Stockholder, and each Person, if any, who controls such Stockholder or underwriter within the meaning of the Securities Act, against any losses, claims, damages, costs or liabilities, joint or several, to which they may become subject insofar as such losses, claims, damages, costs or liabilities (or actions in respect thereof) (A) arise out of, are caused by, or are based on any untrue or alleged untrue statement of any material fact contained in such Registration Statement, including any amendments or supplements thereto, or arise out of or are based upon the omission or alleged omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading, (B) arise out of, are caused by, or are based on any untrue or alleged untrue statement of any material fact contained in any preliminary prospectus, Free Writing Prospectus or final prospectus contained in such Registration Statement, including any amendments or supplements thereto, or arise out of or are based upon the omission or alleged omission to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading, or (C) arise out of, or are caused by, any violation by the Company of any securities law, rule or regulation applicable to the Company and relating to action or inaction required of the Company in connection with any such registration, and (ii) reimburse each such Person or entity for any legal or other expenses reasonably incurred by them in connection with investigating or defending any such loss, claim, damage, costs, liability, or action as such

expenses are incurred; provided, however, that the indemnity agreement contained in this Section 6.7(a) shall not apply to amounts paid in settlement of any such loss, claim, damage, liability, or action if such settlement is effected without the consent of the Company (which consent shall not be unreasonably withheld, delayed or conditioned) nor shall the Company be liable to a Stockholder, underwriter or controlling Person in any such case for any such loss, claim, damage, liability or action to the extent that it arises out of or is based upon an untrue statement or an alleged untrue statement or omission or alleged omission made in connection with such Registration Statement, preliminary prospectus, Free Writing Prospectus, final prospectus, or amendments or supplements thereto in reliance upon and in conformity with written information furnished expressly for use in connection with such registration by or on behalf of any such Stockholder, underwriter or controlling Person. This indemnity shall be in addition to other indemnification arrangements to which the Company and any Stockholders may otherwise be party.

(b) To the full extent permitted by law, each Stockholder requesting or joining in a registration under this Agreement, severally and not jointly, will and hereby does (i) indemnify and hold harmless the Company, each of its directors, each of its officers who have signed the Registration Statement, each Person, if any, who controls the Company within the meaning of the Securities Act, and any underwriter (as defined in the Securities Act) for the Company, each other Stockholder and each Person, if any, who controls such other Stockholder within the meaning of Section 15 of the Securities Act, against any losses, claims, damages or liabilities, joint or several, to which the Company or any such director, officer, controlling Person, other Stockholder or underwriter may become subject, under the Securities Act and applicable state securities laws, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) (A) arise out of, are caused by, or are based on any untrue or alleged untrue statement of any material fact contained in such Registration Statement, including any amendments or supplements thereto, or arise out of or are based upon the omission or alleged omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading, or (B) arise out of, are caused by, or are based on any untrue or alleged untrue statement of any material fact contained in any preliminary prospectus, Free Writing Prospectus or final prospectus contained in such Registration Statement, including any amendments or supplements thereto, or arise out of or are based upon the omission or alleged omission to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading, in each case to the extent, but only to the extent, that such untrue statement or alleged untrue statement or omission or alleged omission was made in such Registration Statement, preliminary prospectus, Free Writing Prospectus or final prospectus, or amendments or supplements thereto, in reliance upon and in conformity with written information furnished by such Stockholder expressly for use in such Registration Statement, preliminary prospectus, Free Writing Prospectus or final prospectus, or amendments or supplements thereto, and (ii) reimburse any legal or other expenses reasonably incurred by the Company or any such director, officer, other Stockholder, controlling Person or underwriter attributable to investigating or defending any loss, claim, damage, liability or action indemnified by such Stockholder pursuant to clause (i) above; provided, however, that the indemnity agreement contained in this Section 6.7(b) shall not apply to amounts paid in settlement of any such loss, claim, damage, liability or action if such settlement is effected without the consent of such Stockholder (which consent shall not be unreasonably withheld, delayed or conditioned). In no event shall the liability of any Registered Stockholder be greater

than the dollar amount of the proceeds (net of payment of all expenses) received by such Registered Stockholder upon the sale of the Registrable Securities giving rise to such indemnification obligation.

(c)     Promptly after receipt by an indemnified party under this <u>Section 6.7</u> of notice of the commencement of any action (including any governmental action) or knowledge of a claim that would, if asserted, give rise to a claim for indemnity hereunder, such indemnified party will, if a claim in respect thereof is to be made against any indemnifying party under this <u>Section 6.7</u>, notify the indemnifying party in writing of the commencement thereof or knowledge thereof and the indemnifying party shall have the right to participate in, and, to the extent the indemnifying party so desires, jointly with any other indemnifying party similarly noticed, to assume the defense thereof with counsel mutually satisfactory to the parties.  If prejudicial to any material extent to his, her or its ability to defend such action, the failure to notify an indemnifying party promptly of the commencement of any such action or of the knowledge of any such claim, shall relieve such indemnifying party of any liability to the indemnified party under this <u>Section 6.7</u> to the extent so prejudiced, but the omission so to notify the indemnifying party will not relieve him, her or it of any liability that he may have to any indemnified party otherwise than under this <u>Section 6.7</u>.  Each indemnified party shall have the right to employ separate counsel in such action, claim or proceeding and participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of each indemnified party unless: (i) such indemnifying party has agreed to pay such expenses, (ii) such indemnifying party has failed promptly to assume the defense and employ counsel reasonably satisfactory to such indemnified party, or (iii) such indemnified party shall have been advised in writing by counsel that either there may be one or more legal defenses available to it which are different from or in addition to those available to such indemnifying party or such Affiliate or controlling Person or a conflict of interest may exist if such counsel represents such indemnified party and such indemnifying party or its Affiliate or controlling Person; provided, however, that such indemnifying party shall not, in connection with any one such action or proceeding or separate but substantially similar or related actions or proceedings in the same jurisdiction arising out of the same general allegations or circumstances, be responsible hereunder for the fees and expenses of more than one separate firm of attorneys (in addition to any local counsel), which counsel shall be designated by such indemnified party.

(d)     The indemnifying party's liability to any such indemnified party hereunder shall not be extinguished solely because any other indemnified party is not entitled to indemnity hereunder.  The indemnification provided for under this Agreement will remain in full force and effect regardless of any investigation made by or on behalf of the indemnified party or any officer, director or controlling Person of such indemnified party, and will survive the transfer of Securities.  No Person guilty of fraudulent misrepresentation within the meaning of Section 11(f) of the Securities Act shall be entitled to indemnification from any Person who was not guilty of such fraudulent misrepresentation.

(e)     If the indemnification provided for in this <u>Section 6.7</u> is for any reason, other than pursuant to the terms thereof, held to be unavailable or insufficient to an indemnified party in respect of any losses, claims, damages or liabilities (or actions in respect thereof) referred to therein, then each indemnifying party shall, in lieu of indemnifying such indemnified party, contribute to the amount paid or payable by such indemnified party as a result of such

38

losses, claims, damages or liabilities (or actions in respect thereof) in such proportion as is appropriate to reflect the relative fault of the indemnifying and indemnified parties in connection with the statements or omissions which resulted in such losses, claims, damages, liabilities (or actions in respect thereof), as well as any other relevant equitable considerations. If, however, the allocation provided by the immediately preceding sentence is not permitted by Applicable Law, then each indemnifying party shall contribute to such amount paid or payable by such indemnified party in such proportion as is appropriate to reflect not only such relative fault but also the relative benefits received by the indemnifying and indemnified parties from the offering of Registrable Securities. The relative benefits received by a party shall be deemed to be in the same proportion as the total net proceeds from the offering (before deducting expenses) received by such party bears to the total net proceeds from the offering received by all parties. The relative fault shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact relates to information supplied by the Company or a Stockholder and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission. The Company and the Stockholders agree that it would not be just and equitable if contribution pursuant to this subsection (e) were determined by pro rata allocation or by any other method of allocation not taking into account the equitable considerations referred to above in this subsection (e). The amount paid or payable by an indemnified party as a result of the losses, claims, damages or liabilities (or actions in respect thereof) referred to above in this subsection (e) shall be deemed to include any legal or other expenses reasonably incurred by such indemnified party in connection with investigating or defending any such action or claim. No Person guilty of fraudulent misrepresentation within the meaning of Section 11(f) of the Securities Act shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.

(f)     Notwithstanding the foregoing, to the extent that the provisions on indemnification and contribution contained in the underwriting agreement entered into in connection with the underwritten public offering are in conflict with the foregoing provisions, the provisions in the underwriting agreement shall control.

(g)     Unless otherwise superseded by an underwriting agreement entered into in connection with the underwritten public offering, the obligations of the Company and Stockholders under this <u>Section 6.7</u> shall survive the completion of any offering of Registrable Securities in a registration statement under this <u>Article VI</u>, and otherwise and shall survive the termination of this Agreement.

6.8     <u>Holdback Agreements</u>.  Each Stockholder agrees not to effect any sale or distribution (including hedging transactions) of Common Stock or any securities convertible into or exchangeable or exercisable for Common Stock, including a sale pursuant to Rule 144 under the Securities Act, during such period as requested by the managing underwriter of the offering; provided, however, with respect to any particular registration, such period shall not extend beyond one hundred eighty (180) days after the effective date of the registration relating thereto or such other number of days as required by law or by the managing underwriters so long as such number of days does not exceed two hundred twenty five (225). Each Stockholder agrees to enter into such form of agreement between it and the managing underwriter as the managing underwriter shall reasonably request to more fully set forth and to further effect the provisions of this <u>Section 6.8</u>.

6.9     Third Party Registration Rights.  Nothing in this Agreement shall be deemed to prevent the Company from providing registration rights to any other Person on such terms as the Company deems desirable in its sole discretion.

## ARTICLE VII
### BOARD OF DIRECTORS; GOVERNANCE

7.1     General.  The business of the Company will be managed by the Board of Directors, and the Persons constituting the Board of Directors will be the "directors" of the Company for all purposes under the Act; *provided* that, except as otherwise provided herein, no single director of the Board of Directors may bind the Company, and the Board of Directors will have the power to act only collectively in accordance with the provisions and in the manner specified herein.  For avoidance of doubt, the Company shall not (i) enter into any arrangement with any Person involving an aggregate commitment of $100,000 or more, or (ii) agree to pay any employee or contractor aggregate annual compensation of $75,000 or more, without first obtaining the approval of the Board of Directors; and no officer or other Person shall have the authority to bind the Company with respect to either of the foregoing absent express Board approval.  Board meetings, quorum and other matters not otherwise expressly addressed herein shall be conducted and determined in accordance with the Company bylaws attached hereto as **Exhibit 7.1** and incorporated herein by reference (the "**Bylaws**").

7.2     Board Size.  The Board of Directors shall, as of the date hereof, be comprised of four (4) directors appointed in accordance with Section 7.3.  In addition, there shall be two (2) individuals designated as Board observers in accordance with Section 7.3.  The number of directors on the Board may be increased or decreased by the Bridging Lender from time to time; provided that no such change to the size of the Board shall affect the designation rights set forth in Section 7.3.

7.3     Director Appointment, Removal, Resignation and Replacement.

(a)     The Bridging Lender shall have the right to appoint three (3) voting directors to the Board, one (1) of whom shall function as the Chairman of the Board.

(b)     For so long as the Centurion Lender holds no less than 5% of the Common Stock (as adjusted for any stock dividend, stock split or stock combination), the Centurion Lender shall have the right to appoint one (1) voting director to the Board as well as one (1) individual with Board observation rights to attend and observe Board meetings.

(c)     For so long as the Creditors' Trust holds no less than its Original Equity Percentage (as adjusted for any stock dividend, stock split or stock combination), the Creditors' Trust shall have the right to designate one (1) individual with Board observation rights to attend and observe Board meetings and who shall be provided with all documents provided to other members of the Board, on a confidential basis, which documents may be shared with the Trustee of the Creditors' Trust and the Creditors' Trust Oversight Committee Members on a confidential basis.

(d)     Each director shall serve at the discretion of the appointing Stockholder, and may be removed at any time, with or without cause, by such appointing Stockholder.  A

director may also resign at any time; provided that such resignation shall be contingent upon receipt by the Company and the Board of written resignation notice. Upon a director's death, removal or replacement, the Stockholder appointing such director shall promptly designate a suitable replacement to fill the vacancy.

7.4    Initial Directors.    As of the Effective Date, the Board shall consist of the following individuals: (i) on behalf of the Bridging Lender, [NAME], who shall serve as Chairman of the Board, [Robb Cacovic] and [Kevin Moreau]; and (ii) on behalf of the Centurion Lender, Daryl Boyce, as its designated voting director. As of the Effective Date, the Centurion Lender has also appointed Sergei Tchetvertnykh with Board observer rights; and the Creditors' Trust has appointed the Trustee with Board observer rights. No director or observer shall be affiliated or associated with a Competitor or Nevada 5 without the Bridging Lender's prior written approval.

## ARTICLE VIII
### DISTRIBUTIONS AND DIVIDENDS

8.1    General.    Distributions in respect of a Share in the Company shall be made only to the Stockholders who, according to the books and records of the Company, are the holders of record of the Shares in respect of which such distributions are made on the actual date of distribution. Neither the Company nor any Stockholder shall incur any liability for making distributions in accordance with the provisions of the preceding sentence, whether or not the Company or the Stockholder has knowledge or notice of any Transfer or purported Transfer of ownership of Shares in the Company which is not permitted under this Agreement. Subject to the Act, distributions shall be made to the Stockholders at such times and in such amounts as determined by the Board of Directors.

8.2    Priority of Distributions Among Stockholders.    In the event of any proceed allocation, distribution or dividend in connection with the Sale of the Company, liquidation, dissolution or winding up of the Company, either voluntary or involuntary (including, without limitation, upon any bankruptcy), such allocations, distributions or dividends shall be made in the following priority:

(a)    First, to pay the outstanding balance under (i) the Exit Credit Agreement (including the DIP, Working Capital, and Remaining Secured Debt), and, (ii) solely to the extent applicable, any Note(s) issued to a Preferred Stock Securityholder upon exercise of the Preferred Stock Put Right in accordance with any inter-creditor agreement between the lender(s) under the Exit Credit Agreement and the Preferred Stock Securityholder;

(b)    Second, solely to the extent the Milestone has been satisfied and there remains any outstanding Preferred Stock, to the holders of such Preferred Stock in an amount equal to their Pro-Rata Share of the unreturned value of the outstanding Preferred Stock and Preferred Stock Yield;

(c)    Third, to pay any Company Group employee, advisor, Board member, consultant or other Person in accordance with the terms and conditions of such Person's stock options, incentive shares, warrants, grants or similar types of incentive equity, in each case solely

to the extent vested, issued by the Company Group in exchange for such Person's services to the Company or the Company Group; and

(d)     *Fourth*, on a pari-passu basis, the balance of such proceeds to the holders of Common Stock, equal to each such holder's Equity Percentage at the time of such distribution.

## ARTICLE IX
### CONFIDENTIALITY AND BUSINESS OPPORTUNITIES

9.1     Confidentiality.

(a)     Proprietary Information.  Except as otherwise set forth in this Section 9.1, each Securityholder recognizes and acknowledges that the Proprietary Information is a valuable, special and unique asset of the business of the Company.  As a result, each Securityholder shall not, and shall cause its shareholders, members, investors, owners, principals, managers, directors, officers and agents to not, without the prior written consent of the Company, for any reason either directly or indirectly divulge to any third-party or use for his or her own benefit, or for any purpose other than the exclusive benefit of the Company Group, any Proprietary Information revealed, obtained from the Company Group by virtue of his or her status as a Securityholder.  As used herein, "**Proprietary Information**" shall include, but shall not be limited to, in each case for each member of the Company Group, the Intellectual Property and other intangible personal property, any information relating to methods of research, computer codes or instructions (including source and object code listings, program logic algorithms, subroutines, modules or other subparts of computer programs and related documentation, including program notation), computer processing systems and techniques, concepts, layouts, flowcharts, specifications, know-how, any associated user or service manuals or other like textual materials (including any other data and materials used in performing each Securityholder's duties), all computer inputs and outputs (regardless of the media on which stored or located), hardware and software configurations, designs, architecture, interfaces, plans, sketches, blueprints, and any other materials prepared by any other employee or contractor of the Company Group, business studies, business procedures, finances, marketing data, methods, plans and efforts, the identities of patients, referral sources, payors, customers, contractors and suppliers and prospective patients, referral sources, payors, customers, contractors and suppliers, the terms of contracts and agreements with patients, referral sources, payors, customers, contractors and suppliers, the relationship of the Company Group with actual and prospective patients, referral sources, payors, customers, contractors and suppliers and the needs and requirements of, and the course of dealing of the Company Group with, any such actual or prospective patients, referral sources, payors, customers, contractors and suppliers, personnel information, customer and vendor credit information, any other materials that have not been made available to the general public and any other confidential information relating to the business of the Company Group.  Failure by the Company or any of the Company Group to mark any of the Proprietary Information as confidential or proprietary shall not affect its status as Proprietary Information under the terms of this Agreement.  Proprietary Information shall not include information that (i) was or becomes generally available to the public other than as a result of a disclosure by a Securityholder in violation of this Agreement, or (ii) was or becomes available to the Securityholder on a non-confidential basis from a source other than the provider

of the Proprietary Information provided that such source and such information is not, to the Securityholder's knowledge, in contravention of any Applicable Law or agreement, or (iii) was within the Securityholder's possession prior to such being furnished to the recipient by the provider of the Proprietary Information; subject, in either case, to applicable legal requirements under privacy and security laws.

(b)     Permitted Disclosures.  Each Securityholder shall be permitted to disclose Proprietary Information (i) to such Securityholder's agents, representatives, employees and Affiliates who need to be familiar with such information in connection with the operations of the Company Group and who are informed of the confidential nature thereof and agree to keep such information confidential on the terms set forth therein and such Securityholder shall be responsible for any breach hereof by such Person, (ii) to such Securityholder's current and prospective partners and equity holders in connection with such Securityholder's or its Affiliates' normal fund raising, marketing, informational or reporting activities so long as they are informed of the confidential nature thereof and agree to keep such information confidential on the terms set forth herein and such Securityholder shall be responsible for any breach hereof by such Person, (iii) to the extent requested by any government agency or self-regulatory body having jurisdiction over such Securityholder, (iv) to the extent required by Applicable Law (so long as such Securityholder shall have, to the extent legally permissible, first provided the Company a reasonable opportunity to contest the necessity of disclosing such information) or the rules of any securities exchange, (v) to the extent necessary for the enforcement of any right arising under this Agreement, (vi) to a potential Permitted Transferee who is informed of, and agrees to keep such information confidential on the terms set forth therein and such Securityholder shall be responsible for any breach hereof by such Permitted Transferee, (vii) in the case of the Bridging Lender and the Centurion Lender, (A) to its limited partners, co-investors, Affiliates, representatives, potential transferees (as well as their respective representatives) and its managed accounts or its Affiliates' managed accounts and (B) to applicable regulators, and (viii) if such information is known or becomes generally available to the public other than as a result of the unauthorized disclosure of such information by such Securityholder or such Securityholder's respective agents, representative, employees or Affiliates.   Each Securityholder will be responsible for any breaches or violations by its respective agents, representatives, employees and Affiliates of the obligations contained in this Section 9.1.

9.2     Business Opportunities.  Each Lender Related Party agrees and covenants that, during the Restricted Period, such Lender Related Party will not, without the prior written approval of the Board, directly or indirectly, individually or on behalf of or in coordination with or relating to any Affiliate or other Person: own, manage, operate, join, control, finance, participate or engage in, or be connected as an owner, investor, partner, joint venturer, lender, member, director, manager, officer, consultant or other agent of, or otherwise have a financial relationship in or with, a Competitor, anywhere within the Restricted Territory.

9.3     Reasonableness of Restrictions; Enforcement.  Each Securityholder acknowledges and agrees that the restrictions contained in this Article IX are reasonable and do not impose a greater restraint than is necessary to protect the goodwill, trade secrets and other legitimate business interests of the Company and the Company Group and that each such Securityholder has had the opportunity to review the provisions of this Agreement with his, her or its legal counsel.  However, if the final judgment of a court of competent jurisdiction declares that any

term or provision of this Article IX is invalid or unenforceable, the Securityholders agree that the court making the determination of invalidity or unenforceability shall have the power to reduce the scope, duration, or area of the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closer to expressing the intention of the invalid or unenforceable term or provision, and this Agreement shall be enforceable as so modified after the expiration of the time within which the judgment may be appealed.  Any period of non-compliance shall toll the running of the restricted period until such non-compliance is remedied.  The existence of any claim or cause of action by any Securityholder against another Securityholder, the Company or the Company Group or any of their respective Affiliates, whether predicated on this Agreement or otherwise, will not constitute a defense to the enforcement by the Company of the provisions of this Article IX, which Article will be enforceable notwithstanding the existence of any breach by the Company Group or any Securityholder.

9.4    Remedies for Breach.  In the event of the breach or a threatened breach by any Securityholder of any of the provisions of this Article IX, the Company, in addition and supplementary to any other rights and remedies existing in its favor, will be entitled to specific performance and/or injunctive or other equitable relief from a court of competent jurisdiction, after presenting evidence to such court's satisfaction that there is a breach or threatened breach, in order to enforce or prevent any violations of the provisions hereof (without posting a bond or other security).

9.5    Survival.  The provisions of this Article IX shall survive the termination of this Agreement, irrespective of the reason therefor.

## ARTICLE X
### TERMINATION

10.1    Termination of this Agreement.  This Agreement shall terminate upon (a) the consummation of a Qualified Public Offering or Sale of the Company, or (b) the agreement to terminate this Agreement by the Board and the unanimous approval of the Stockholders; provided, however, that any Article or Section hereof which, by its terms, survives the expiration or termination of this Agreement, including (without limitation) Section 5.4, Article VI, Article IX, and this Article X, shall survive any expiration or termination of this Agreement.

10.2    Termination of the Company.

(a)    The Company shall be dissolved, its assets disposed of and its affairs wound up on the first to occur of the following:

(i)    upon the written consent of the Board of Directors and the Bridging Lender; or

(ii)    upon the Sale of the Company if the dissolution of the Company is contemplated in connection with such transaction.

(b)    The withdrawal, resignation, expulsion, bankruptcy or dissolution of a Stockholder or the occurrence of any other event which terminates a Stockholder's continued ownership of Stock in the Company shall not result in the dissolution of the Company.

10.3    <u>Distribution of Assets</u>.

(a)    If the Company is dissolved and its affairs are to be wound up, the Board shall sell or otherwise liquidate all of the Company's assets as promptly as practicable (except to the extent the Board may determine to distribute any assets to the Stockholders in kind), discharge all liabilities of the Company (other than liabilities to Stockholders), including all costs relating to the dissolution, winding up, and liquidation and distribution of assets, establish such reserves as may be reasonably necessary to provide for contingent liabilities of the Company, discharge any liabilities of the Company to the Stockholders other than on account of their interests in the Company capital or profits and distribute the remaining assets to the Stockholders in accordance with <u>Section 8.2</u>.  If any assets of the Company are to be distributed in kind, the net fair market value of such assets as of the date of dissolution shall be determined by independent appraisal or by agreement of the Board acting in good faith.

(b)    Upon completion of the winding up, liquidation and distribution of the assets, the Company shall be deemed terminated.

(c)    The Board shall comply with any requirements of Applicable Law pertaining to the winding up of the affairs of the Company and the final distribution of its assets.

10.4    <u>Certificate of Dissolution</u>.  When all debts, liabilities and obligations have been paid and discharged or adequate provisions have been made therefor and all of the remaining property and assets have been distributed to the Stockholders in accordance with <u>Section 10.2</u>, the Company shall be terminated and the liquidator shall cause the dissolution of the Company by the filing of a Certificate of Dissolution with the Secretary of State of the State of Delaware, and shall cause the cancellation of all qualifications and registrations of the Company as a foreign corporation in jurisdictions other than the State of Delaware and shall take such other actions as may be necessary to terminate the Company's existence.

10.5    <u>Return of Contribution Nonrecourse to Other Stockholders</u>.  Except as provided by the Act or other Applicable Law, upon dissolution, each Stockholder shall look solely to the assets of the Company for the return of his, her or its capital contributions.  If the Company property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the capital contributions of one or more Stockholders, such Stockholder or Stockholders shall have no recourse against any other Stockholder.

## ARTICLE XI
### INVESTMENT REPRESENTATIONS

11.1    <u>Representations of Stockholders</u>.  Each Stockholder hereby represents, warrants, covenants, agrees and acknowledges, as to himself, herself, or itself, as follows:

(a)    The Securities are intended to be and are being acquired solely for his, her or its account without a view to the current distribution or resale thereof, and he, she or it does

not have any contract, undertaking, agreement or arrangement to sell or otherwise transfer or dispose of any of such Securities in any manner to any Person.

(b)    He, she or it will not Transfer or otherwise dispose of any of his, her or its Securities, in any manner, unless at the time of any such Transfer: (i) a registration is in effect with respect to the Securities to be sold, transferred or disposed of, and he, she or it complies with all of the requirements of the Securities Act and the Applicable Laws (as hereinafter defined) with respect to the proposed transaction, or (ii) he, she or it has obtained and has provided to the Company an opinion from counsel satisfactory to the Company (as to both the counsel rendering such opinion and the substance of the opinion) that the proposed Transfer or disposition does not require registration under the Securities Act or other Applicable Laws.

(c)    The Securities have not been issued to him, her or it by the Company pursuant to a registration, and he, she or it must therefore hold the Securities indefinitely unless a subsequent registration or exemption therefrom is available and is obtained.  No federal or state agency has approved or disapproved the Securities for investment or any other purpose.  All of his, her or its Securities have been issued and sold to him, her or it in reliance upon a specific exemption from the registration requirements of the Securities Act which depends, in part, upon the accuracy of his, her or its representations, warranties and agreements set forth in this Agreement.

(d)    Legend(s) will be placed on the certificates evidencing the Shares as described in Section 3.3 hereof, and stop-transfer instructions will be issued to any transfer agent of such Securities, to ensure compliance with the provisions of this Agreement and of the Securities Act and the Applicable Laws.

(e)    Prior to the execution of this Agreement, such Stockholder and his, her or its advisers, if any, have made such investigation, review, examination and inquiry concerning the Company and its business as they have deemed appropriate; and such Stockholder and his, her or its advisers, if any, have been offered the opportunity to ask such questions and obtain such additional information concerning the Company and its business as they have requested so as to understand the nature of the investment in the Securities and to verify the accuracy of the information obtained as a result of their investigation.

(f)    He, she or it can bear the economic risk of the purchase of the Securities, including the total loss of his, her or its investment, has no need for liquidity in this investment and, either alone or with his, her or its advisors, has such knowledge and experience in financial and business matters that he, she or it is capable of evaluating the merits and risks of the Company and the investment in the Securities.

(g)    All of the representations, warranties, agreements, acknowledgments and understandings made by him, her or it in this Agreement shall survive the delivery of this Agreement and the purchase by the undersigned of the Securities.

46

## ARTICLE XII
### MISCELLANEOUS

12.1    Notices.  All notices and other communications given in connection with this Agreement shall be in writing and shall be given by personal delivery, by facsimile or e-mail, by registered or certified first-class U.S. mail, return receipt requested and postage prepaid, or by express courier or recognized overnight delivery service, charges prepaid, to such party's address, facsimile number or e-mail address set forth on **Schedule I** hereto.  Notice shall be deemed given: (a) when delivered personally to the recipient, (b) when received, if sent by facsimile or e-mail (confirmation of such receipt by confirmed facsimile transmission or e-mail being deemed receipt of communications sent by facsimile or e-mail), (c) on the date five (5) days after the date mailed, if sent by registered or certified first-class U.S. mail, return receipt requested and postage prepaid, and (d) when delivered (or upon the date of attempted delivery where delivery is refused), if sent by express courier or recognized overnight delivery service, charges prepaid.  Notice of any change in any such address, facsimile number or e-mail address shall also be given in the manner set forth above.  Whenever the giving of notice is required, the giving of such notice may be waived by the party entitled to receive such notice.

12.2    Entire Agreement and Amendments.

(a)    This Agreement constitutes the complete and exclusive statement of agreement among the Stockholders with respect to the subject matter hereof.  This Agreement replaces and supersedes all prior written agreements and oral statements by and among the Stockholders or any of them, and no representation, statement, condition or warranty not contained in this Agreement will be binding on the Stockholders or have any force or effect whatsoever.

(b)    **Schedule I** shall be prepared to reflect the Equity Percentages of the Original Stockholders as of the Effective Date and shall thereafter be updated in writing by the Company to reflect changes in the composition of the Stockholders and changes in their addresses that may occur from time to time as a result of Transfers consummated in accordance with this Agreement or any new issuance of Shares by the Company.  Any amendment or revision to **Schedule I** made in accordance with this Agreement shall not require the prior approval of any Stockholder.  Any reference to **Schedule I** in this Agreement shall be deemed to be a reference to **Schedule I** as updated and in effect from time to time.

(c)    Any other amendment, whether directly or indirectly to this Agreement shall be in writing and shall require the written consent of the Securityholders of a majority of the Common Stock and the Bridging Lender, and, if such amendment adversely affects the rights or obligations of any Securityholder or group of Securityholders under this Agreement in a disproportionate and material manner (determined without regard to individual tax consequences of such amendment), then the consent of such Securityholder or a majority-in-interest of such Securityholders, as the case may be.

12.3    Interpretation.  Titles to articles and headings to sections herein are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement.  When a reference is made in this Agreement to an Article,

47

Section, Schedule or Exhibit, such reference shall be to an Article, Section, Schedule or Exhibit of this Agreement unless otherwise indicated. All words used in this Agreement will be construed to be of such gender or number as the circumstances require. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall have the meaning as defined in this Agreement. All Schedules and Exhibits annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth herein. The word "including" and words of similar import when used in this Agreement will mean "including, without limitation", unless otherwise specified.

12.4    Governing Law. This Agreement shall be governed by the laws of the State of Delaware, without regard to any conflicts of laws principles thereof that would call for the application of the laws of any other jurisdiction. Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement may be brought against any of the parties in the courts of the State of Delaware, or if it has or can acquire jurisdiction, in the United States District Court for the District of Delaware, and each of the parties hereby consents to the jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding and waives any objection to venue laid therein.

12.5    Waivers. No failure or delay of any party in exercising any right or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such right or power, or any course of conduct, preclude any other or further exercise thereof or the exercise of any other right or power.

12.6    Severability. Whenever possible, each provision or portion of any provision of this Agreement shall be interpreted in such manner as to be effective and valid under Applicable Law, but if any provision or portion of any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any Applicable Law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or portion of any provision in such jurisdiction, and this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision or portion of any provision had never been contained herein.

12.7    Facsimile or Electronic Signatures. This Agreement may be executed by facsimile, electronic .pdf, Docusign, or other electronic signature approved by the Board and shall constitute an original for all purposes. At the request of any party hereto, the other parties shall confirm facsimile or other electronic transmissions by executing duplicate original documents and delivering the same to the requesting party or parties.

12.8    Counterparts. This Agreement may be executed in two or more counterparts, including by a Joinder, all of which shall be considered one and the same instrument and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other party.

12.9    Dispute Resolution. Except as otherwise set forth in this Agreement (including, without limitation, Section 9.4 hereof), any and all claims, disputes, controversies and other

matters between or among the parties to this Agreement, arising out of or relating to this Agreement, or the breach hereof, shall be settled in the manner set forth in this Section 12.9.

(a)    Binding Arbitration.  All claims, disputes, controversies and other matters in question between or among the parties in dispute (each, a "**Disputing Party**" and, together, the "**Disputing Parties**") arising out of or relating to this Agreement, or the breach hereof, and which cannot be resolved by the Disputing Parties shall be settled by final and binding arbitration in accordance with this Agreement and the following procedures:

(i)    Any arbitration shall be conducted in accordance with the Commercial Rules of the American Arbitration Association (the "**AAA**") then in effect.  Said rules shall apply to the conduct of such arbitration and, in addition, each Disputing Party shall have the right to take reasonable discovery of the other party by any or all methods provided in the Federal Rules of Civil Procedure, subject to the reasonable discretion of the arbitrator(s). The arbitrators may upon request exclude any evidence not made available to the other party pursuant to a proper discovery request from being used in the arbitration proceeding.

(ii)    Within thirty (30) days after service of a demand for arbitration, the Disputing Parties shall attempt to agree upon a single arbitrator.  In the event the Disputing Parties cannot agree upon a single arbitrator, any party may request the AAA to appoint an arbitrator in accordance with its rules, subject to the qualifications specified herein; except that if the Disputing Parties fail to agree upon an arbitrator from the persons named by the AAA or if for any reason the appointment cannot be made from the lists submitted by the AAA, then a board of three arbitrators shall preside over the arbitration where each such party shall be entitled to appoint an arbitrator and the third arbitrator shall be appointed by the other two arbitrators.

(iii)    The arbitration proceeding shall be held in [New York City, New York].

(b)    Payment Dispute.  In case of any dispute as to the amount of any payment, the part not in dispute shall be promptly paid.

(c)    Expenses of Arbitration.  Each Disputing Party shall be responsible for all costs and expenses such Disputing Party may have incurred in connection with an arbitration. The expenses of the arbitrator(s) shall be borne equally by the Disputing Parties unless the arbitrators determine that one of the Disputing Parties has not proceeded in good faith with respect to the matters submitted for arbitration, in which case such party shall bear fully the expenses of arbitration.

12.10    Parties Benefited.    Subject to compliance with the Plan and the Bankruptcy Court's Confirmation Order thereof, nothing in this Agreement, express or implied, is intended to confer upon any third party any rights, remedies, obligations or liabilities.

12.11    Successors and Assigns.    This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective heirs, personal representatives, successors and assigns including, without limitation, Additional Stockholders agreeing to be bound by all of the terms and conditions of this Agreement.

12.12  <u>Legal Counsel</u>. DLA Piper LLP (US) ("**Counsel**") has been retained on behalf of the Bridging Lender in connection with the Plan and the legal affairs of the Company Group, including (without limitation) the preparation of certain agreements related thereto, and the Bridging Lender may retain Counsel in connection with the management and operation of the Company Group.  Counsel to the Bridging Lender and its Affiliates may also be counsel to the Company Group.  Each Securityholder acknowledges and agrees that, whether or not Counsel has in the past represented or is currently representing such Securityholder with respect to other matters, Counsel does not represent, or owe any duty to, any Securityholder or the Securityholders as a group in connection with (a) the preparation or negotiation of this Agreement, or (b) the formation, organization, management or operation of, or offering of Shares or other equity interests in, the Company Group.  In the event any dispute or controversy arises (i) between or among any Securityholders, on the one hand, and the Company Group or the Bridging Lender or its Affiliates, on the other hand, or (ii) between or among any Securityholders or the Company, on the one hand, and the Bridging Lender or its Affiliates, on the other hand, then Counsel may represent (A) in the case of clause (i), the Company Group or the Bridging Lender or its Affiliates, or each of them, and (B) in the case of clause (ii), the Bridging Lender or its Affiliates, or each of them, in any such dispute or controversy, and each Securityholder hereby consents to such representation. Each Securityholder acknowledges and agrees that he, she or it has been given the opportunity to retain independent counsel for advice regarding such Securityholder's rights and obligations under this Agreement.

12.13  <u>Release</u>.

(a)  For and in consideration of the issuance of shares of Stock, and the additional covenants and promises set forth in this Agreement, each of the Stockholders, on behalf of itself, himself or herself and its assigns, heirs, beneficiaries, creditors, representatives, agents and Affiliates (the "**Releasing Parties**"), hereby fully, finally and irrevocably releases, acquits and forever discharges each of the other Stockholders, their respective subsidiaries, officers, directors, managers, managing member, partners, general partners, limited partners, managing directors, members, trustees, shareholders, representatives, employees, principals, agents, Affiliates, parents, subsidiaries, joint ventures, predecessors, successors, assigns, beneficiaries, heirs, executors, personal or legal representatives, insurers and attorneys of any of them (collectively, the "**Released Parties**") from any and all commitments, actions, debts, claims, counterclaims, suits, causes of action, damages, demands, liabilities, obligations, costs, expenses and compensation of every kind and nature whatsoever, past, present or future, at law or in equity, whether known or unknown, contingent or otherwise, which such Releasing Parties, or any of them, had, has or may have had at any time in the past until and including the date of this Agreement against the Released Parties, or any of them, including but not limited to any claims which relate to or arise out of such Releasing Party's prior relationship with any Released Party (including their present and former subsidiaries, parent entities or any predecessors-in-interest) (collectively, for the purposes of this <u>Section 12.13</u>, "**Causes of Action**"); provided, that this release shall not affect or impair any of the rights of the Releasing Parties or any obligations of the Released Parties to the Releasing Parties arising under this Agreement.

(b)  The Releasing Parties hereby represent to the Released Parties that the Releasing Parties: (i) have not assigned any Causes of Action or possible Causes of Action against any Released Party, (ii) fully intend to release all Causes of Action against the Released

Parties including without limitation, unknown and contingent Causes of Action (other than those specifically reserved above) and (iii) have consulted with counsel with respect to the execution and delivery of this general release and has been fully apprised of the consequences hereof.

(c)　　　The Releasing Parties hereby irrevocably covenant to refrain from, directly or indirectly:  (i) asserting any Causes of Action, or commencing, instituting or causing to be commenced, or continuing with any claim, action or proceeding for a Cause of Action, and this Agreement may be raised by any Released Party as an estoppel to any such claims, actions or proceedings and (ii) making any claim or commencing any action or proceeding against any Person (or assisting or encouraging any other Person in connection therewith) in which any claim, action or proceeding would arise against any Released Party for contribution or indemnity or other relief from, over and against any Released Party or which otherwise results in a Released Party suffering or incurring any losses, whether under common law, equity, statute, contract or otherwise, with respect a Cause of Action.  Without in any way limiting any of the rights and remedies otherwise available to any Released Party, the Releasing Parties shall indemnify and hold harmless each Released Party from and against all claims whether or not involving third-party claims, actions or proceedings, arising directly or indirectly from or in connection with the assertion by or on behalf of each Releasing Party or any of its Affiliates of any claim, action or proceeding or other matter which is, or is purported to be, a Cause of Action. It is the intention of the Releasing Parties that the release described in this Section 12.13 be effective as a bar to each Cause of Action hereinabove specified.  In furtherance of this intention, the Releasing Parties hereby expressly waive any and all rights and benefits conferred upon it by the provisions of Applicable Law with respect to any Cause of Action and expressly consents that the release described in this Section 12.13 shall be given full force and effect according to each and all of its express terms and provisions.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties have executed this Stockholders Agreement on the day and year first indicated above.

**THE COMPANY:**

NeighborMD Holdings Corp.

By: _____
Name: _____
Title: _____

**BRIDGING LENDER:**

Bridging Income Fund L.P.

By:      Bridging Finance Inc.,
         its administrative agent

By: _____
Name: _____
Title: _____

**CENTURION LENDER:**

By:  Centurion Asset Management Inc.

By: _____
Name: _____
Title: _____

**CREDITORS' TRUST:**

By:      [●],
         its Trustee

By: _____
Name: _____
Title: _____

[Signature Page to Stockholders Agreement]

## SCHEDULE I
## STOCKHOLDERS, EQUITY PERCENTAGE AND NOTICE ADDRESSES

**A.    STOCKHOLDERS AND EQUITY PERCENTAGE OF COMMON STOCK**

| Stockholder | Equity Percentage | Class |
|---|---|---|
| Bridging Lender | 86.317% | A |
| Centurion Lender | 8.683% | A |
| Creditors' Trust | 5% | B |
| TOTAL | 100% | |

**B.    STOCKHOLDERS AND EQUITY PERCENTAGE OF PREFERRED STOCK**

| Stockholder | Equity Percentage |
|---|---|
| Bridging Lender | 90.86% |
| Centurion Lender | 9.14% |
| TOTAL | 100% |

**C.    ADDRESS FOR NOTICE PURPOSES**

If to the Company:  [●]

with a copy (which shall not constitute notice) to:

DLA Piper LLP (US)
200 South Biscayne Boulevard, Suite 2500
Miami, FL 33131-5341
Attention: Joshua M. Kaye, P.A.

If to the Bridging Lender:

Bridging Finance Inc.
77 King St. W., Suite 2925
Toronto, Ontario M5K 1K7
Attention: Kevin Moreau, General Counsel

with a copy (which shall not constitute notice) to:

DLA Piper LLP (US)
200 South Biscayne Boulevard, Suite 2500
Miami, FL 33131-5341
Attention: Joshua M. Kaye, P.A.

If to the Centurion Lender:  [●]

with a copy (which shall not constitute notice) to:  [●]

If to the Creditors' Trust:  [●]

with a copy (which shall not constitute notice) to:  [●]

If to the other Stockholders of the Company, to their respective addresses on record with the Company.

### EXHIBIT 4.2
### JOINDER

This Joinder forms part of the Stockholders Agreement (the "**Agreement**") made as of [●] [●], 2020 by and among NEIGHBHORMD HOLDINGS CORP., a Delaware corporation (the "**Company**"), and the Stockholders (as defined in the Agreement) signatory thereto from time to time, which Agreement permits execution (including by facsimile or other electronic signature) by counterpart and this joinder.  The undersigned hereby acknowledges having received a copy of the said Agreement and having read the said Agreement in its entirety, and for good and valuable consideration, receipt and sufficiency of which is hereby acknowledged, hereby agrees that the terms and conditions of the said Agreement shall be binding upon the undersigned as a Stockholder, and such terms and conditions shall inure to the benefit of and be binding upon the undersigned and its successors and permitted assigns.  The undersigned shall be bound by and comply with the provisions of the Agreement in the same manner as if the undersigned were an original signatory to such agreement as a Stockholder.  In connection therewith, effective as of the date hereof the undersigned hereby makes the representations and warranties contained in the Agreement.

IN WITNESS WHEREOF, the undersigned has executed this instrument as of _____, ____.

_____
(Signature of Stockholder)

_____
(Name in block letters)

**<u>EXHIBIT 5.3-A</u>**
**MILESTONE**

For purposes of this Agreement and the Preferred Stock Put Right, the "**Milestone**" means the Company Group's consolidated earnings before interest, taxes, depreciation and amortization during any twelve (12) month period equals or exceeds $15,000,000.

**<u>EXHIBIT 5.3B(1)</u>**
**FORM OF NOTE**

See attached.

**Exhibit 5.3-B**
**[FORM OF] PROMISSORY NOTE**

NOTWITHSTANDING ANYTHING TO THE CONTRARY SET FORTH HEREIN, THIS PROMISSORY NOTE (this "**Note**") AND THE SECURITY INTERESTS SECURING THE OBLIGATIONS EVIDENCED BY THIS NOTE, THE EXERCIXE OF ANY RIGHT OR REMEDY WITH RESPECT THERETO, AND CERTAIN OF THE RIGHTS OF THE PARTIES HERETO ARE SUBJECT TO THE PROVISIONS OF THE INTERCREDITOR AGREEMENT, DATED AS OF [___], 20[___] (AS AMENDED, RESTATED, SUPPLEMENTED OR OTHERWISE MODIFIED FROM TIME TO TIME, the "**Intercreditor Agreement**"), BY AND BETWEEN BRIDGING FINANCE INC., AS SENIOR AGENT, [BRIDGING FINANCE INC.], AS SUBORDINATED AGENT, AND THE OTHER PARTIES THERETO.  IN THE EVENT OF ANY CONFLICT BETWEEN THE TERMS OF THE INTERCREDITOR AGREEMENT AND THIS NOTE, THE TERMS OF THE INTERCREDITOR AGREEMENT SHALL GOVERN AND CONTROL.

$_____                                                      _____, 20____

     **FOR VALUE RECEIVED**, each of **NEIGHBORMD HOLDINGS CORP.**, a Delaware corporation, and **NEIGHBORMD, INC.** (formerly known as Hygea Health Holdings, Inc.), a Florida corporation (collectively, the "**Maker**"), unconditionally promises to pay to the order of _____, a _____ (the "**Payee**," which term shall also include any subsequent holder of this Note), the principal sum of _____ DOLLARS ($_____), together with interest until paid, as set forth herein.

    1.   <u>Principal Payments</u>.  Unless sooner paid in full, the entire unpaid principal balance of this Note, together with all outstanding and unpaid accrued interest, late charges, fees and Collection Costs shall be due and payable by the Maker to the Payee on _____, 20_____ (the "**Maturity Date**").[1]

    2.   <u>Interest Payments</u>.

        (a)   Interest shall accrue and be payable on the outstanding and unpaid principal balance of this Note at the fixed interest rate of fifteen percent (15%) per annum. Interest shall accrue based on a 360-day year for the actual number of days the principal is outstanding.

---

[1] NTD:  To be 5 years from date of exercise of Preferred Stock Put Right.

(b)    The Maker shall make payments of the accrued and unpaid interest on the unpaid principal balance of this Note to the Payee in arrears as follows:

(i)    monthly in arrears on the first (1st) Business Day of each month (each such date, an "**Interest Payment Date**"), beginning on the first such date after the date hereof, and on the first (1st) day of each consecutive month thereafter until this Note has been paid in full; provided, that prior to June [___], 2022, accrued and unpaid interest on the principal amount of this Note shall be capitalized and added to the outstanding principal balance of this Note on each Interest Payment Date; and

(ii)    on the Maturity Date.

As used herein, "**Business Day**" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the laws of, or are in fact closed in, the State of New York or Florida or the Province of Ontario, Canada.

(c)    If a prepayment is made on this Note, the Maker shall pay to the Payee, on the date of the prepayment, all accrued and unpaid interest on the principal amount prepaid.

3.    <u>Default Interest</u>.  Upon and after the occurrence of an Event of Default, interest shall accrue and be payable on the unpaid principal balance of this Note at the interest rate per annum of twenty two percent (22.0%) (the "**Default Interest Rate**").  Interest shall continue to accrue and be payable on the unpaid principal balance of this Note after the commencement, and during the pendency, of any case, whether voluntary or involuntary, with respect to the Maker under the United States Bankruptcy Code or under similar law or any other law of any jurisdiction regarding bankruptcy, insolvency, assignment for the benefit of creditors, receivership, conservatorship, moratorium, rearrangement, reorganization, liquidation or similar debtor relief.

4.    <u>Manner of Payment</u>.

(a)    All payments shall be made in United States of America ("**United States**") dollars in immediately available funds without defense, set-off, counterclaim or deduction of any kind on the due dates of such payments.  Payments shall be made to the Subordinated Agent's address set forth in this Note (or such other payment address as may be designated by the Subordinated Agent upon written notice to the Maker) by 1:00 p.m. (time at the payment address) on the due date for such payments. If any payment on this Note shall be due and payable on any day that is not a Business Day, such payment shall be deemed due on the next following Business Day, and interest shall be payable at the interest rate on this Note (including the Default Interest Rate, as applicable) through such Business Day.  Payment received by the Subordinated Agent at the payment address after 1:00 p.m. (time at the payment address) shall be deemed to have been made on the next Business Day after such receipt in the Subordinated Agent's discretion.  Payments shall be applied to interest, principal, fees and Collection Costs in such order as the Subordinated Agent may determine in the Subordinated Agent's discretion and shall be promptly distributed by the Subordinated Agent

- 2 -

to the Payee and the other holders of the Preferred Stock Notes in accordance with Section 4(b) below in like funds as received by wire transfer to an account of the Payee or such holder of the Preferred Stock Notes as designated in writing to the Subordinated Agent. If at any time any payment made by the Maker under this Note is rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy or reorganization of the Maker or for any other reason, the Maker's obligation to make such payment under this Note shall be reinstated as though such payment had not been made.

(b)    All payments received in respect of this Note or any other note issued pursuant to the exercise of the Preferred Stock Put Right (as defined in the Stockholders Agreement, dated as of June [___], 2020, by and among NeighborMD Holdings Corp. and its stockholders, as amended, restated, supplemented or otherwise modified from time to time) (this Note and any such other notes, the "**Preferred Stock Notes**") shall be divided pro rata among the Payee and the holder of any other Preferred Stock Note in proportion to the principal amount of each such Preferred Stock Note. Any sums obtained from any Maker or other Credit Party by reason of the exercise of its rights of set-off or in collection shall be shared (net of costs) pro rata among the holders of the Preferred Stock Notes on the basis of the principal amount of loans outstanding under such Preferred Stock Notes.

5.    <u>Voluntary Prepayments</u>. Subject to the terms and conditions of the Intercreditor Agreement, the Maker shall have the right to prepay this Note in whole or in part in accordance with the provisions of this Section. The Maker shall give the Payee at least sixty (60) days' (or such shorter period as is acceptable to the Payee) prior written notice of any prepayment, which notice shall be irrevocable and shall state the amount of the prepayment and the date on which the prepayment shall be made. Partial prepayments must be in amounts not less than One Hundred Thousand Dollars ($100,000) or integral multiples of Fifty Thousand Dollars ($50,000) in excess thereof. When the Maker has notified the Payee that a prepayment will be made, the prepayment amount stated in the prepayment notice shall then become due and payable on the date set forth in the prepayment notice. When a prepayment is made, the Maker shall also pay to the Payee the accrued and unpaid interest on the principal amount prepaid.

6.    <u>Mandatory Prepayments</u>. Subject, in each case, to the terms and conditions of the Intercreditor Agreement, in the event the Maker is required to make any mandatory prepayment pursuant to Section 1.8(c), (d), (e) or (f) of the Senior Credit Agreement, the Maker shall prepay the Note in an amount equal to 100% of any remainder of the Net Proceeds (as defined in the Senior Credit Agreement) after payment of the obligations under the Senior Credit Documents as required under the Senior Credit Agreement.

7.    <u>Collection Costs</u>. Within ten (10) days after the Payee's written request from time to time, the Maker shall pay, or provide the Payee with sufficient funds for the payment of, or reimburse the Payee for the payment of, the Payee's Collection Costs. As used in this Note, "**Collection Costs**" means the Payee's costs and expenses (including, without limitation, attorneys' fees and expenses, and the fees and expenses of other professionals, including experts, consultants, accountants, appraisers, surveyors, engineers, receivers, trustees, warehousemen and auctioneers) incurred by the Payee in connection with (a) collecting or

- 3 -

attempting to collect the principal, interest and other amounts owed to the Payee under this Note (the "**Obligations**"), (b) enforcing or defending the Payee's rights under this Note or under any other agreement, instrument or document that guarantees or secures this Note or any of the Obligations, or that otherwise evidences any of the Obligations, at any time (such other agreements, instruments or documents, including any amendments thereto, the "**Related Documents**"), or (c) enforcing the Payee's rights, and exercising any remedies, with respect to any personal property, real property or fixtures in which the Payee has been granted a security interest or lien to secure this Note or the Obligations or to secure any guarantee thereof (such personal property, real property or fixtures, the "**Collateral**"). The Related Documents include, without limitation, (i) that certain Guaranty and Security Agreement, dated [___], 20[___], by and among the Makers, the subsidiaries and affiliates of the Makers party thereto (together with the Makers, the "**Credit Parties**") and [Bridging Finance Inc.], as agent for the Payee (the "**Subordinated Agent**"), as it may be amended from time to time (the "**Guaranty and Security Agreement**"), (ii) the Intercreditor Agreement and (iii) any other documents, instruments and certificates executed in connection therewith. If the Maker shall fail to pay or reimburse the Payee for Collection Costs as herein provided, and the Payee shall pay, or shall have paid or advanced, such Collection Costs (the Payee being hereby authorized, but not obligated, to pay or advance such Collection Costs), the Payee shall be entitled to add the amount of such Collection Costs to the amount of principal outstanding under this Note and thereafter charge interest thereon at the interest rate applicable (including the Default Interest Rate as applicable) to the outstanding principal balance of this Note. If the Payee shall add the amount of Collection Costs that are not paid or reimbursed by the Maker to the amount of principal outstanding under this Note as provided in this Section, neither the addition of such unpaid amount to the principal outstanding under this Note, nor the charging of interest thereon, shall relieve the Maker of any Event of Default for failure to pay Collection Costs when due, and the Payee shall be entitled to exercise all of the Payee's rights and remedies upon the occurrence of any such Event of Default.

8.    <u>Representations and Warranties</u>. The Maker makes the following representations and warranties to the Payee on and as of the date of this Note:

(a)    each Maker is a corporation duly formed, validly existing, and in good standing, under the laws of the jurisdiction of its incorporation, and has the corporate power and authority to execute, deliver and perform this Note and each Related Document to which such Maker is or will be a party;

(b)    the Maker's execution, delivery and performance of this Note, and each Related Document to which the Maker is or will be a party, have been duly authorized by all requisite corporate action on the part of the Maker;

(c)    this Note has been duly and validly executed and delivered by the Maker and constitutes the Maker's legal, valid and binding obligation, enforceable in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, or similar laws affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability;

- 4 -

(d)     the execution, delivery and performance of this Note by the Maker do not and will not (i) contravene the terms of such Maker's organizational documents, (ii) contravene, be in conflict with, result in a breach of, or constitute (with due notice or lapse of time or both, as applicable) a default under, any indenture, agreement or other instrument binding upon the Maker or any of the Maker's properties or assets, (iii) result in the creation or imposition of any security interest, lien or encumbrance upon any of the Maker's properties or assets for the benefit or security of any obligation or Person (as used in this Note, the term "**Person**" includes any natural person and any corporation, limited liability company, partnership, trust, association, government, governmental authority or other entity), excepting any security interests, liens or encumbrances created or imposed solely for the benefit and security of the Payee, or (iv) contravene any provision of law or any order of any court or other agency of government;

(e)     the Maker's incurrence of the indebtedness and other Obligations evidenced by this Note do not and will not (i) contravene, be in conflict with, result in a breach of, or constitute (with due notice or lapse of time or both, as applicable) a default under, any indenture, agreement or other instrument binding upon the Maker or any of the Maker's properties or assets, (ii) result in the creation or imposition of any security interest, lien or encumbrance upon any of the Maker's properties or assets for the benefit or security of any obligation or Person, excepting any security interests, liens or encumbrances created or imposed solely for the benefit and security of the Payee, or (iii) contravene any provision of law or any order of any court or other agency of government;

(f)     giving effect to the incurrence of the principal amount of the indebtedness,  and the other Obligations, evidenced by this Note, (i) the value of the Maker's assets is greater than the total amount of the Maker's liabilities, including contingent and unliquidated liabilities (computed, in the case of contingent and unliquidated liabilities, at the amount that, in light of all of the currently existing facts and circumstances can reasonably be expected to become actual or matured liabilities), (ii) the Maker is able to pay all of its liabilities as such liabilities mature, and (iii) the Maker does not have unreasonably small capital;

(g)     the Maker does not have any Subsidiaries (as used in this Note, "**Subsidiary**" means, with respect to any Person, any corporation, limited liability company, partnership, statutory trust or other entity with respect to which such Person holds, directly or indirectly, a majority of the shares, membership interests, partnership interests, beneficial interests, or other equity interests having ordinary voting power for the election of the board of directors or other equivalent governing body thereof, or as to which such Person controls, directly or indirectly, the management thereof), other than as set forth on Schedule 3.2 to the Senior Credit Documents (as defined in the Intercreditor Agreement);

(h)     the Maker is not engaged in the business of extending credit for the purpose, whether immediate, incidental or ultimate, of buying or carrying Margin Stock, and no amount of the proceeds of the indebtedness evidenced by this Note has been used, and no

- 5 -

amount thereof will be used, to purchase or carry any Margin Stock or to extend credit to others for the purpose of purchasing or carrying any Margin Stock.  As used in this Note, "**Margin Stock**" means margin stock within the meanings of Regulations T, U and X, of the Board of Governors of the Federal Reserve System of the United States (and any successor thereto), as the same may be modified and supplemented and in effect from time to time;

(i)     the Maker is not an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended;

(j)     no default or Event of Default (as defined in Section 10) exists or would result from the incurrence of the Obligations by the Maker or the grant or perfection of the liens on the Collateral or the consummation of the transactions contemplated by this Note and the Related Documents;

(k)     the Maker is not in default (i) under the Senior Credit Documents or (ii) with respect to any contractual obligation to which the Maker is a party or by which any of the Maker's properties or assets are bound which, in the case of this subclause (ii), individually or together with all such defaults, would reasonably be expected to have a Material Adverse Effect.  As used herein, "**Material Adverse Effect**" shall mean (x) a material adverse change in, or a material adverse effect upon, the operations, business, properties or condition (financial or otherwise) of Maker and its Subsidiaries taken as a whole, (y) a material impairment of the ability of the Maker, any Subsidiary of the Maker or any other Person (other than the Subordinated Agent or Payee) to perform in any material respect its obligations under this Note or any Related Document, or (z) a material adverse effect upon (1) the legality, validity, binding effect or enforceability of this Note or any Related Document, (2) the perfection or priority of any lien granted to the Subordinated Agent for the benefit of the Payee or any other parties under the Related Document or (iii) the rights and remedies of the Subordinated Agent, the Payee or any other party under this Note or the Related Documents or Applicable Law; and

(l)     the financial statements delivered pursuant to Section 9(e) (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; (ii) fairly present in all material respects the financial condition of Holdings and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein (subject, in the case of unaudited financial statements, to the absence of footnotes and to normal year-end audit adjustments); and (iii) show all material indebtedness and other material liabilities, direct or contingent, of Holdings and its Subsidiaries as of the date thereof, including liabilities for taxes, material commitments and Indebtedness. As used herein, "**GAAP**" means generally accepted accounting principles set forth from time to time in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the accounting profession), which are applicable to the circumstances as of the date of determination.

- 6 -

9.        Covenants.  The Maker further covenants and agrees, for the benefit and security of the Payee, as follows:

(a)        Existence.  The Maker shall, and shall cause each of its Subsidiaries to, do all things necessary to preserve, renew and keep in full force and effect the Maker's legal existence and the legal existence of each of the Maker's Subsidiaries, except as permitted under the Senior Credit Documents.  The Maker and its Subsidiaries shall do all things necessary to preserve, renew and keep in full force and effect all rights, permits, licenses, franchises, patents, trademarks, copyrights, privileges, authorizations, permissions, consents, easements, agreements or approvals of or issued by any governmental authority or any other Person that may be required by any law or are otherwise necessary or advisable for the ownership or operation of the business, property or assets of the Maker and its Subsidiaries, except as permitted under the Senior Credit Documents.  Neither the Maker nor any Subsidiary of the Maker shall dissolve or liquidate, except as permitted under the Senior Credit Documents.

(b)        Compliance with Law.  The Maker and each of its Subsidiaries shall comply with all Applicable Laws.  As used in this Note, "**Applicable Laws**" means, as to any Person, all laws (whether federal, state, local or foreign) applicable to or binding upon (i) such Person, (ii) any property of such Person, or (iii) any business or activity of such Person.

(c)        Taxes.  The Maker and each of its Subsidiaries shall (i) file, or cause to be filed, when due, all tax returns and reports which are required to be filed by them, (ii) pay and discharge promptly, on or before the due date, all taxes, assessments, charges, and other impositions imposed by any government or governmental authority on any of them or on any of their properties or assets unless the same are being contested in good faith by appropriate proceedings diligently prosecuted for which adequate reserves in accordance with GAAP are being maintained by such Person, and (iii) pay when due all lawful claims which, if unpaid, would by law become a lien upon any of their properties or assets.  Promptly upon the Payee's request from time to time, the Maker and its Subsidiaries shall provide to the Payee receipts and other evidences of compliance with the provisions of this Section.

(d)        Books and Records.  The Maker and each of its Subsidiaries shall maintain their financial books and records in accordance with GAAP.  The Payee shall be permitted access to all financial books and records of the Maker and its Subsidiaries at any of the Maker's locations, or at any location of any Subsidiary of the Maker, during normal business hours and shall be permitted to make and keep copies, at the Maker's expense, of such records as the Payee may request, at the Maker's cost and expense.

(e)        Financial Reports.  The Maker shall deliver to the Payee or cause to be delivered to the Payee the following:  (i) as soon as available, but in no event more than one hundred and twenty (120) days after the close of the Maker's fiscal year, a copy of the audited consolidated balance sheets of the Maker and its Subsidiaries as of the end of such fiscal year, together with related consolidated statements of income or operations, shareholders' equity and cash flows for such fiscal year, and setting forth in comparative form consolidated figures for the preceding fiscal year, all in reasonable detail and prepared after audit by a certified public

- 7 -

accountant reasonably acceptable to the Payee whose opinion shall be unqualified and shall be to the effect that such consolidated financial statements have been prepared in accordance with GAAP applied on a consistent basis; (ii) as soon as available, but in no event more than forty-five (45) days after the end of each fiscal quarter of each fiscal year, a copy of the unaudited consolidated balance sheets of the Maker and its Subsidiaries and related consolidated statements of income and cash flows for the Maker and its Subsidiaries for such quarterly period and for the applicable portion of the fiscal year ending with such period, in each case setting forth in comparative form consolidated figures for the corresponding period of the preceding fiscal year, all in reasonable form and detail acceptable to the Payee, and accompanied by a certificate of the chief financial officer or other authorized officer of the Maker stating that such financial statements are complete and correct and fairly present, in all material respects, in accordance with GAAP applied on a consistent basis, subject to normal year-end adjustments and absence of footnote disclosure; and (iii) promptly, such additional business, financial, corporate affairs, perfection certificates and other information as the Maker may from time to time reasonably request.

(f)    Other Information.  Promptly upon the Maker's filing, registration or other transmission thereof, the Maker shall give the Payee (i) copies of any filings and registrations with, and reports to, the Securities and Exchange Commission, or any successor agency, by the Maker or any Subsidiary of the Maker, (ii) copies of any tax returns filed with the Internal Revenue Service or with the tax authorities of any state by the Maker or any Subsidiary of the Maker, and (iii) copies of all financial statements, proxy statements, notices and reports that the Maker or any Subsidiary of the Maker sends to its shareholders, members, partners, beneficiaries or other equity holders, or to the holders of any indebtedness of the Maker or any Subsidiary the Maker in their capacities as holders of such indebtedness, including, without limitation, the Senior Agent and the holders of the indebtedness under the Senior Credit Documents.

(g)    Notice of Default.  The Maker shall give the Payee written notice of any breach, default or Event of Default under this Note or under any Related Document or under the Senior Credit Documents promptly and in any event within three (3) Business Days an officer of the Maker becomes aware thereof.

(h)    Investments.  Without the Payee's prior written consent, neither the Maker nor any Subsidiary of the Maker shall (i) purchase, acquire or otherwise invest in any equity interest in any Person, (ii) purchase, acquire or otherwise invest in any indebtedness of any Person, (iii) make any loan to or for any Person, or (iv) provide any other financial or credit support to or for any Person, other than Investments (as defined in the Senior Credit Agreement) permitted under the Senior Credit Agreement.

(i)    Acquisitions.  Without the Payee's prior written consent, which consent may be withheld or conditioned in the Payee's sole and absolute discretion, neither the Maker nor any Subsidiary of the Maker shall (i) acquire all or substantially all of assets of any Person, (ii) acquire any line of business of any Person, (iii) merge with any Person, (iv) enter into any

- 8 -

partnership or joint venture, or (v) form or acquire any Subsidiary, other than as permitted under the Senior Credit Agreement.

(j)     Indebtedness.  Without the Payee's prior written consent, which consent may be withheld or conditioned in the Payee's sole and absolute discretion, neither the Maker nor any Subsidiary of the Maker shall incur, assume, or otherwise be or become liable for any Indebtedness, or permit any Indebtedness to be secured by a security interest, lien or other encumbrance on any property or assets of the Maker or of any Subsidiary of the Maker, other than any Indebtedness permitted to be incurred under the Senior Credit Agreement.  As used in this Note, "**Indebtedness**" means any of the following: (a) all indebtedness for borrowed money; (b) all obligations issued, undertaken or assumed as the deferred purchase price of property or services (other than trade payables entered into in the ordinary course of business); (c) without duplication, all drafts drawn under letters of credit issued for the account of such Person and all drawn and unreimbursed letters of credit, surety bonds and other similar instruments issued by such Person; (d) all obligations evidenced by notes, bonds, debentures or similar instruments, including obligations so evidenced incurred in connection with the acquisition of property, assets or businesses; (e) all indebtedness created or arising under any conditional sale or other title retention agreement, or incurred as financing, in either case with respect to property acquired by the Person (even though the rights and remedies of the seller or bank under such agreement in the event of default are limited to repossession or sale of such Property); (f) all capital lease obligations; (g) the principal balance outstanding under any synthetic lease, off-balance sheet loan or similar off balance sheet financing product; (h) all obligations, whether or not contingent, to purchase, redeem, retire, defease or otherwise acquire for value any of its own stock or stock equivalents (or any stock or stock equivalent of a direct or indirect parent entity thereof) prior to the date that is 180 days after the Maturity Date, valued at, in the case of redeemable preferred stock, the greater of the voluntary liquidation preference and the involuntary liquidation preference of such stock plus accrued and unpaid dividends; (i) all indebtedness referred to in clauses (a) through (h) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any lien upon or in property (including accounts and contracts rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such indebtedness; and (j) all contingent obligations described in clause (i) of the definition thereof in respect of indebtedness or obligations of others of the kinds referred to in clauses (a) through (i) above.  For the avoidance of doubt, any post-closing purchase price adjustment, indemnity payment, deferred or contingent purchase price owing to a seller which is not required to be included as a liability on the balance sheet of the buyer thereof in accordance with GAAP, or cash-collateralized or escrowed obligation (included in the purchase price) shall not be Indebtedness for purposes hereof.

(k)     Guarantees.  Without the Payee's prior written consent, which consent may be withheld or conditioned in the Payee's sole and absolute discretion, neither the Maker nor any Subsidiary of the Maker shall guarantee the payment of any Indebtedness or any other obligations of any Person, other than Indebtedness permitted under the Senior Credit Agreement.

(l)    Liens.  Without the Payee's prior written consent, which consent may be withheld or conditioned in the Payee's sole and absolute discretion, neither the Maker nor any Subsidiary of the Maker shall grant, create or suffer to exist any security interest, lien or encumbrance on any of the Maker's or such Subsidiary's properties or assets, other than Permitted Liens (as defined in the Senior Credit Agreement).

(m)    Dispositions.  Without the Payee's prior written consent, which consent may be withheld or conditioned in the Payee's sole and absolute discretion, neither the Maker nor any Subsidiary of the Maker shall sell, assign, transfer, convey, lease, license or otherwise dispose of any of the Maker's or any such Subsidiary's property or assets, other than sales or other dispositions permitted under the Senior Credit Agreement.

(n)    Dividends and Distributions.  Without the Payee's prior written consent, which consent may be withheld or conditioned in the Payee's sole and absolute discretion, neither the Maker nor any Subsidiary of the Maker shall (i) pay any dividend, or make any other distribution, payment or advance, to any holder of, or otherwise in respect of, any shares, membership interests, partnership interests, beneficial interests, warrants or other equity interests in the Maker or any Subsidiary of the Maker, (ii) redeem, repurchase or purchase any shares, membership interests, partnership interests, beneficial interests, warrants, or other equity interests in the Maker or any Subsidiary of the Maker, or (iii) prepay, redeem, repurchase, purchase, or maintain any sinking fund or other fund for the payment of, any indebtedness of the Maker or of any Subsidiary of the Maker that is or may be convertible into any equity interest in the Maker or in any Subsidiary of the Maker, other than Restricted Payments (as defined in the Senior Credit Agreement) permitted under the Senior Credit Agreement.

(o)    Affiliate Transactions.  Without the Payee's prior written consent, which consent may be withheld or conditioned in the Payee's sole and absolute discretion, neither the Maker nor any Subsidiary of the Maker shall engage in any transaction, or enter into any agreement, with any Affiliate, except as permitted under the Senior Credit Agreement.  As used in this Note, "**Affiliate**" means, as to any specified Person, any other Person which, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person.  A Person shall be deemed to control another Person if the controlling Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of the other Person, whether through the ownership of voting securities, by contract or otherwise.  Without limitation, any director, executive officer or beneficial owner of ten percent (10%) or more of the stock (either directly or through ownership of stock equivalents) of a Person shall for the purposes of this Note, be deemed to control the other Person.  Notwithstanding the foregoing, neither the Subordinated Agent nor the Payee shall be deemed an "Affiliate" of any Maker or of any Subsidiary of any Maker.

(p)    Guaranty and Security Interests.

(i)    The full and complete payment and performance of this Note and the Obligations when due, and all other obligations of the Maker or any other Person to the

- 10 -

Payee under this Note or under any Related Document are guaranteed and secured by the Guaranty and Security Agreement, subject to the terms and conditions of the Intercreditor Agreement.

(ii)    Without limiting the generality of the foregoing and except as otherwise approved in writing by the Payee, the Maker shall cause each of their Subsidiaries to guaranty the Obligations and to cause each such Subsidiary to grant to the Subordinated Agent a security interest in, subject to the limitations hereinafter set forth, all of such Subsidiary's property to secure such guaranty. Furthermore and except as otherwise approved in writing by the Payee, the Maker shall, and shall cause each of its Subsidiaries to, pledge all of the stock and stock equivalents of each of its Subsidiaries, in each instance, to the Subordinated Agent, for the benefit of the Payee, to secure the Obligations. In connection with each pledge of stock and stock equivalents, the Maker shall deliver, or cause to be delivered, to the Subordinated Agent, irrevocable proxies and stock powers and/or assignments, as applicable, duly executed in blank.

(r)    <u>Replacement Notes</u>. If this Note is lost or destroyed, the Maker shall, within ten (10) days after the Payee's written request, execute and deliver to the Payee a replacement promissory note identical to this Note, provided the Payee shall execute and deliver to the Maker a certificate (i) stating that the original of this Note has been lost or destroyed and (ii) confirming that the Payee shall indemnify the Maker from and against the Maker's actual damages suffered as a result of the existence of this Note and the replacement promissory note requested by the Payee, both evidencing the same obligation. No replacement of this Note under this Section shall result in a novation of the Maker's obligations under this Note. If this Note is guaranteed or secured, such guarantees and security shall continue in full force and effect and shall apply to any such replacement promissory note.

10.    <u>Default; Acceleration</u>.    The occurrence of any of the following events or circumstances shall be an "**Event of Default**":

(a)    the failure of the Maker to make any payment of principal or interest on this Note when due;

(b)    the failure of the Maker to pay, provide the Payee with sufficient funds for the payment of, or reimburse the Payee for, Collection Costs, within ten (10) days after the Payee gives the Maker a written request for such payment, sufficient funds, or reimbursement;

(c)    the failure of the Maker to pay or perform its obligations under any term, provision, covenant or agreement in this Note, which failure is not within the scope of preceding clauses (a) or (b);

(d)    if any representation or warranty made by the Maker or any other Obligor in this Note or in any Related Document is breached in any material respect or is false or misleading (as used in this Note, the term "**Obligor**" refers, individually and collectively, to the Maker, any indorser or guarantor of this Note, and any other party that provides collateral

- 11 -

security for this Note or for any amount owed to the Payee under this Note or under any Related Document);

(e)     the occurrence of (x) a breach or default under any Related Document by (i) any Obligor or (ii) any other party thereto (other than the Payee); provided that (A) if such Related Document expressly provides for the Payee to give a notice of such breach or default to an Obligor or other party thereto, such notice of breach or default shall have been given to such Obligor or other party, and (B) if such Related Document expressly provides for a grace or cure period for such breach or default, such breach or default under the Related Document shall not constitute an Event of Default under this Note until such breach or default under the Related Document continues uncured beyond the grace or cure period expressly provided in the Related Document or (y) an Event of Default, as defined in the Senior Credit Agreement;

(f)     if the Maker, or any Subsidiary of the Maker, or any other Obligor, or any Subsidiary thereof, (i) shall breach or default in any payment of any indebtedness (other than the indebtedness evidenced by this Note) owed by it to any Person of more than $100,000 when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) and such failure continues after the applicable grace or notice period, or (ii) shall breach, or default under, any other terms, representations, warranties, covenants, conditions, or other provisions applicable to such indebtedness and the occurrence of any such breach or default would accelerate such indebtedness, or would entitle the holder of such indebtedness to accelerate such indebtedness or exercise any other remedies with respect thereto;

(g)     unless otherwise agreed by the Subordinated Agent, if the chief executive officer or chief financial officer of any Maker or any of its Subsidiaries as of the date hereof ceases (by reason of resignation, termination, death, retirement or otherwise) to be employed by such Maker or Subsidiary;

(h)     if one or more judgments, non-interlocutory orders, decrees, appeal bonds or arbitration awards shall be entered against any one or more of the Makers, Obligors or any of their respective Subsidiaries involving in the aggregate a liability (to the extent not covered by independent third-party insurance) as to any single or related series of transactions, incidents or conditions, of $100,000 or more, and the same shall remain unsatisfied, unvacated and unstayed pending appeal for a period of thirty (30) days after the entry thereof;

(i)     if one or more non-monetary judgments, orders or decrees shall be rendered against any one or more of the Makers, Obligors or any of their respective Subsidiaries which has or would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect, and there shall be any period of ten (10) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect;

(j)     the occurrence, directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, of any Change of Control (as used in this Note, "**Change of Control**" has the meaning assigned to such term in the Senior Credit Agreement);

(k)      the occurrence of any event or circumstance occurs which has or, in the reasonable judgment of the Maker, is reasonably likely to have, a Material Adverse Effect;

(l)      if the Maker or any other Obligor shall allege any invalidity or unenforceability of (i) this Note, (ii) any of the Obligations, (iii) any Related Document, or (iv) any security interest, lien or encumbrance created in favor of the Payee under any Related Document;

(m)      the termination or loss of a Material Contract, which has not been replaced or supplemented with one or more other contracts within thirty (30) days following the date of termination or loss. As used herein, "**Material Contract**" means, with respect to any Person, (a) that certain Strategic Advisory Services Agreement, dated as of May 1, 2020, by and between Holdings and Healthcare Advisory Solutions, L.L.C., as amended, and that certain Client Agreement, dated as of May 1, 2020, by and between Holdings and Care Optimize, LLC, as amended, (b) any contract or agreement to which that Person or any of its Subsidiaries is a party involving aggregate consideration payable to or by that Person or that Subsidiary of more than 5% of the revenue of such Person and its Subsidiaries in any Fiscal Year, and (c) all other contracts or agreements as to which the breach, nonperformance, cancellation, or failure to renew by any party would reasonably be expected to have a Material Adverse Effect;

(n)      if the Maker or any other Obligor shall commence a voluntary case or other proceeding seeking liquidation, reorganization, or other relief with respect to itself or its debts under any bankruptcy, insolvency, or similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian, or similar official of it or any substantial part of its assets, or shall consent to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it, or shall make a general assignment for the benefit of creditors, or shall fail generally to pay its debts as they become due, or shall take any action to authorize any of the foregoing (the "**Voluntary Events**"); or

(o)      if an involuntary case or other proceeding shall be commenced against the Maker or any other Obligor seeking liquidation, reorganization or other relief with respect to it or its debts under any bankruptcy, insolvency or similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its assets, and such involuntary case or other proceeding shall remain undismissed and unstayed for a period of sixty (60) days, or an order for relief shall be entered against the Maker under the federal bankruptcy laws as now or hereafter in effect (the "**Involuntary Events**," and together with the Voluntary Events, the "**Bankruptcy Events of Default**").

Upon the occurrence of an Event of Default, the unpaid principal balance of this Note with accrued and unpaid interest thereon and all fees, Collection Costs and other sums evidenced by this Note shall, at the option of the Payee, and in the Payee's sole and absolute discretion, be accelerated and become immediately due and payable. Notwithstanding the foregoing, upon

- 13 -

any Bankruptcy Event of Default, and without notice to or demand upon the Maker or any other Obligor or any action by the Payee, the unpaid principal balance of this Note together with all accrued and unpaid interest thereon, and all late charges, fees, Collection Costs and other sums evidenced by this Note, shall be accelerated automatically and become immediately due and payable.  The Payee's rights and remedies with respect to the acceleration of this Note upon the occurrence of an Event of Default are in addition to the Payee's rights and remedies under common and statutory law and under any Related Documents.

11.    <u>Notices</u>.    Any notice, request or demand required or permitted by or in connection with this Note shall be in writing and shall be made by facsimile, or by electronic transmission ("**e-mail**"), or by hand delivery, or by a nationally recognized overnight delivery service, or by certified mail, return receipt requested, postage prepaid, addressed to the Payee or to the Maker at the appropriate address set forth below or to such other address as may be hereafter specified by written notice by the Payee or the Maker.  Notice, request or demand shall be considered given as of the earlier of the date of actual receipt, or the date of the facsimile transmission without error, if receipt of the facsimile has been confirmed by telephone, or the date the e-mail is delivered, or the date of hand delivery, or one (1) Business Day after delivery to a nationally recognized overnight delivery service, or three (3) Business Days after the date of mailing by certified mail, return receipt requested, postage prepaid, independent of the date of actual delivery or whether delivery is ever in fact made, as the case may be, provided the giver of the notice, request or demand can establish that the notice, request or demand was given as provided herein.  Notwithstanding the aforesaid procedures, any notice, request or demand upon the Maker, in fact received by the Maker, shall be sufficient notice, request or demand.

| | |
|---|---|
| If to the Payee: | _____ |
| | _____ |
| | _____ |
| | Attn: _____ |
| | E-mail: _____ |
| With a copy to: | _____ |
| | _____ |
| | _____ |
| | Attn: _____ |
| | E-mail: _____ |
| If to the Subordinated Agent: | _____ |
| | _____ |
| | _____ |
| | Attn: _____ |
| | E-mail: _____ |
| With a copy to: | _____ |
| | _____ |

```
                                    _____
                            Attn: _____
                            E-mail: _____

If to the Maker:            _____
                            _____
                            _____
                            Attn: _____
                            E-mail: _____

With a copy to:             _____
                            _____
                            _____
                            Attn: _____
                            E-mail: _____
```

12.     <u>Certain Waivers</u>.  The Maker and each indorser, guarantor or other Obligor waives demand, presentment, protest, notice of dishonor, notice of protest, notice of nonpayment, notice of acceleration, and diligence.  Presentment is not necessary to enforce the obligation of indorsers of this Note.  Notice of dishonor is not necessary to enforce the obligation of any party to pay this Note. The Maker, and each indorser, guarantor or other Obligor agrees that if the Payee or any other Person entitled to enforce this Note agrees at any time, with or without consideration, to an extension of the due date of the obligation of any party to pay this Note, such extension (whether of the maturity of this Note or any payment under this Note) will not discharge any obligation of the Maker or any obligation of any indorser, guarantor or other Obligor. The Maker and each indorser, guarantor or other Obligor waives valuation and appraisement and all applicable exemption rights, whether under any state constitution, homestead laws or otherwise. The Maker and each indorser, guarantor or other Obligor waives all defenses based on suretyship or impairment of collateral.

13.     <u>Preservation of Payee Rights</u>.  No failure on the part of the Payee to exercise any right or remedy hereunder, whether before or after the happening of an Event of Default, shall constitute a waiver thereof, and no waiver of any past Event of Default shall constitute waiver of any future default or of any other Event of Default.  No failure to accelerate the indebtedness evidenced hereby by reason of any Event of Default hereunder, or acceptance of a past due payment, or indulgence granted from time to time, shall be construed to be a waiver of the right to insist upon prompt payment thereafter or to impose late charges retroactively or prospectively, or shall be deemed to be a novation of this Note or as a reinstatement of the indebtedness evidenced hereby or as a waiver of such right of acceleration or any other right, or be construed so as to preclude the exercise of any right that the Payee may have, whether by the laws of the Governing Jurisdiction, by agreement, or otherwise; and the Maker and each indorser, guarantor or other Obligor hereby expressly waives the benefit of any statute or rule of law or equity that would produce a result contrary to or in conflict with the foregoing.

14.   <u>Joint and Several Liability</u>.  If there is more than one Person executing this Note as Maker, or if any Person is an indorser, guarantor or other Obligor, the liability of each such Person shall be joint and several, and without limiting the operation or effect of any other provision of this Note each such Person waives: (a) any right to require the Payee to: (i) proceed against any other Maker, indorser, guarantor or other Obligor, (ii) proceed against any particular property or Collateral given by any Person to secure this Note or the Obligations, or (iii) notify any Person of any default by any other Person in the payment of any amounts due under this Note or in the performance of any other agreement of any Maker, indorser, guarantor or other Obligor; and (b) any defense arising by reason of any of the following: (i) any disability or any counterclaim or right of set-off or other defense of any Maker, indorser, guarantor or other Obligor, (ii) the invalidity, illegality or lack of enforceability of this Note or any Related Document, or any provision hereof or thereof from any cause whatsoever, including any action or inaction by the Payee, (iii) the failure of the Payee to perfect or maintain perfection of any security interest in any property or Collateral securing this Note, (iv) the cessation from any cause whatsoever of the liability of any Maker, indorser, guarantor or other Obligor, including the release by the Payee of such Maker's, indorser's, guarantor's or other Obligor's liability hereunder, (v) that this Note shall be void or voidable as against any Maker, indorser, guarantor or other Obligor or any Maker's, indorser's, guarantor's or Obligor's creditors, including a trustee in bankruptcy of any Maker, indorser, guarantor or other Obligor, by reason of any fact or circumstance, (vi) any event or circumstance which might otherwise constitute a legal or equitable discharge of any Maker's, indorser's, guarantor's or other Obligor's obligations hereunder, or (vii) any act or omission of the Payee which changes the scope of such Person's risk under this Note or under any Related Document.

15.   <u>Commercial Obligations</u>. The Maker acknowledges and agrees that all of the Obligations under this Note are commercial obligations. The Maker represents and warrants to the Payee that no amount of the proceeds of the indebtedness evidenced by this Note has been used, and no amount thereof will be used, for consumer, personal, family or household purposes.

16.   <u>Maximum Rate of Interest</u>.  Notwithstanding anything herein to the contrary, the obligations of the Maker under this Note shall be subject to the limitation that payments of interest (including any amounts properly be characterized as interest under the law applicable to the indebtedness evidenced hereby) shall not be required to the extent that receipt of any such payment of interest by the Payee would be contrary to provisions of law applicable to the indebtedness evidenced hereby (or applicable to the Maker or the Payee) limiting the maximum lawful rate of interest that may be charged or collected by the Payee on this Note or on the indebtedness evidenced hereby. Without limiting the generality of the foregoing, all calculations of the rate of interest contracted for, charged or received under this Note which are made for the purposes of determining whether such rate of interest exceeds the maximum lawful rate of interest shall be made, to the extent permitted by Applicable Law, by amortizing, prorating, allocating and spreading in equal parts during the period of the full stated term of this Note, all interest at any time contracted for, charged or received in connection with the indebtedness evidenced by this Note, and then to the extent that any excess remains, all such excess shall be automatically credited against and in reduction of the principal balance, and any

portion of said excess so paid which exceeds that principal balance shall be paid by the Payee to the Maker, it being the intent of the parties hereto that under no circumstances shall the Maker be required to pay any interest in excess of the highest interest rate permissible under Applicable Law. This Section applies only if there are such provisions of law applicable to this Note or the indebtedness evidenced hereby that limit the maximum lawful rate of interest that may be charged or collected by the Payee on the indebtedness evidenced hereby.

17.    Appointment and Duties of Subordinated Agent.

(a)    Appointment of Subordinated Agent. The Payee (and by its acceptance hereof, each other holder of this Note) hereby irrevocably appoints [Bridging Finance Inc.] (together with any successor thereof) as the Subordinated Agent hereunder to act on behalf of the Payee  and authorizes the Subordinated Agent take such action on its behalf and to exercise all rights, powers and remedies and perform the duties as are expressly delegated to the Subordinated Agent under this Note and the other Related Documents and to exercise such powers as are reasonably incidental thereto.

(b)    Duties as Collateral and Disbursing Agent.  Without limiting the generality of clause (a) above, the Subordinated Agent shall have the sole and exclusive right and authority (to the exclusion of the Payee), and is hereby authorized, to (i) act as the disbursing and collecting agent for the Payee with respect to all payments and collections arising in connection with this Note and any Related Document (including in any bankruptcy, insolvency or similar proceeding), and each Person making any payment in connection with this Note or any Related Document to the Payee is hereby authorized to make such payment to the Subordinated Agent, which payments shall be disbursed by the Subordinated Agent in accordance with Section 4 hereof, (ii) file and prove claims and file other documents necessary or desirable to allow the claims of the Payee with respect to any Obligation in any bankruptcy, insolvency or similar proceeding (but not to vote, consent or otherwise act on behalf of such Person), (iii) act as collateral agent for the Payee for purposes of the perfection of all liens created by such agreements and all other purposes stated therein, (iv) manage, supervise and otherwise deal with the Collateral, (v) take such other action as is necessary or desirable to maintain the perfection and priority of the liens created or purported to be created by this Note or the Related Documents, (vi) except as may be otherwise specified in this Note or the Related Documents, exercise all remedies given to the Subordinated Agent and the Payee with respect to the Collateral, whether under this Note, the Related Documents, Applicable Law or otherwise and (vii) execute any amendment, consent or waiver under this Note or Related Documents on behalf of the Payee that has consented in writing to such amendment, consent or waiver; provided, however, that the Subordinated Agent hereby appoints, authorizes and directs the Payee to act as collateral sub-agent for the Subordinated Agent for purposes of the perfection of all liens with respect to the Collateral, including any deposit account maintained by a Credit Party with, and cash and cash equivalents held by, the Payee, and may further authorize and direct the Payee to take further actions as collateral sub-agents for purposes of enforcing such liens or otherwise to transfer the Collateral subject thereto to the Subordinated Agent, and the Payee hereby agrees to take such further actions to the extent, and only to the extent, so authorized and directed.

- 17 -

(c)    <u>Limited Duties</u>.  Under this Note and the Related Documents, the Subordinated Agent (i) is acting solely on behalf of the Payee, with duties that are entirely administrative in nature, notwithstanding the use of the defined term "Subordinated Agent", the terms "agent", "Subordinated Agent" and "collateral agent" and similar terms in this Note or any Related Document to refer to the Subordinated Agent, which terms are used for title purposes only, (ii) is not assuming any obligation under this Note or any Related Document other than as expressly set forth therein or any role as agent, fiduciary or trustee of or for the Payee or any other Person and (iii) shall have no implied functions, responsibilities, duties, obligations or other liabilities under this Note or any Related Document, and the Payee hereby waives and agrees not to assert any claim against the Subordinated Agent based on the roles, duties and legal relationships expressly disclaimed in clauses (i) through (iii) above.

(d)    <u>Binding Effect</u>.  The Payee agrees that (i) any action taken by the Subordinated Agent in accordance with the provisions of this Note or the Related Documents, (ii) any action taken by the Subordinated Agent in reliance upon the instruction of Payee and (iii) the exercise by the Subordinated Agent of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized and binding upon the Payee.

(e)    <u>Right Not to Follow Certain Instructions</u>.  The Subordinated Agent shall not be required to take, or to omit to take, any action (i) unless, upon demand, the Subordinated Agent receives an indemnification satisfactory to it from the Payee (or, to the extent applicable and acceptable to the Subordinated Agent, any other Person) against all liabilities that, by reason of such action or omission, may be imposed on, incurred by or asserted against the Subordinate Agent or any agent, employee or representative thereof or (ii) that is, in the opinion of the Subordinated Agent or its counsel, contrary to the Note or any Related Document or Applicable Law.

(f)    <u>Exclusive Right to Enforce Rights and Remedies</u>.  Notwithstanding anything to the contrary contained herein or in any other Related Document, the authority to enforce rights and remedies hereunder and under the other Related Documents against the Borrowers and the other Credit Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Subordinated Agent in accordance with the Note and the other Related Documents for the benefit of the Payee.  Any proceeds received by the Subordinated Agent in respect of the exercise of any such rights and remedies shall be distributed by the Subordinated Agent to the Payee and the other holders of the Preferred Stock Notes in accordance with Section 4 hereof.

18.    <u>Incorporation of Senior Covenants by Reference</u>.  Should the Senior Credit Agreement no longer be effective for any reason, all of the covenants (both positive and negative, including the financial covenants) and events of default set out in the Senior Credit Agreement that are applicable to Borrowers and/or the other Credit Parties will automatically be deemed to have been adopted and incorporated by reference in this Note, with such

variations as the Subordinated Agent may approve.  The Maker and the Payee will enter into such amendments to this Note as the Subordinated Agent may require to reflect the same.

19.  <u>Amendments and Waivers</u>.  This Note may not be modified, amended, restated, changed or terminated orally, but only by an agreement in writing executed by the Maker and the Payee.  No waiver of any term, covenant, representation, warranty or other provision of this Note, and no waiver of any Event of Default or any breach or default that with the giving of notice or the passage of time could become an Event of Default, shall be effective unless such waiver is given in writing and executed by the Payee.  If any such waiver is given by the Payee, such waiver shall be effective only with respect to the specific circumstances set forth in such writing. No security interest or lien shall be terminated or released, and no Collateral shall be released from any security interest or lien, except by an agreement in writing executed by the Payee. The Payee shall not be obligated to agree to any modification, amendment, restatement, change, termination, waiver, or release, and any such agreement may be withheld or conditioned in the Payee's sole and absolute discretion.

20.  <u>Severability</u>.  In case any provision or any part of any provision contained in this Note shall for any reason be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision or remaining part of the affected provision of this Note, but this Note shall be construed as if such invalid, illegal, or unenforceable provision or part thereof had never been contained herein but only to the extent such provision or part thereof is invalid, illegal, or unenforceable.

21.  <u>Successors and Assigns</u>.  This Note shall be binding upon the Maker and the Maker's successors and assigns, and shall inure to the benefit of the Payee and the Payee's successors and assigns.  This Note may be assigned in whole or in part by the Payee with the prior written consent of the Maker and the Subordinated Agent, and any such purported assignment by the Payee without such prior written consent of the Maker and the Subordinated Agent shall be null and void; provided, that no such consent shall be required for any assignment to an Affiliate of Payee.  The Maker may not assign any of its obligations under this Note without the prior written consent of the Subordinated Agent, which consent may be withheld or conditioned in the Subordinated Agent's sole and absolute discretion, and any such purported assignment by the Maker without such prior written consent of the Subordinated Agent shall be null and void.

22.  <u>Captions</u>.  Section headings and captions in this Note are for convenience only and shall not affect the construction or interpretation of this Note.  Unless otherwise expressly stated in this Note, references in this Note to Sections shall be read as Sections of this Note.

23.  <u>Time of the Essence</u>.  Time is of the essence of this Note.

24.  <u>Further Assurances</u>.  The Maker shall execute and deliver to the Payee such further assurances of this Note and take such other further actions as the Payee may from time to time request to further the intent and purposes of this Note and to maintain the rights and remedies intended to be created in favor the Payee under this Note.

25.     Holder in Due Course Status.  If the Payee transfers or assigns this Note to another holder who takes this Note for value and without actual knowledge of a defense, set-off or claim of the Maker against any prior holder of this Note, such transferee or assignee shall not be subject to any defenses, set-offs, or claims that the Maker may have against any holder of this Note prior to such transfer or assignment, and such transferee or assignee shall have all of the rights of a holder in due course against the Maker even if, absent this provision, such transferee or assignee would not qualify as, or would not be, a holder in due course under Applicable Law.  This Section is intended to apply, and is intended to give such transferee or assignee the rights of a holder in due course against the Maker, regardless of whether this Note is or is not a negotiable instrument.

26.     Representation by Counsel.  The Maker acknowledges that the Maker is and has been represented by counsel of the Maker's choice in connection with the negotiation, preparation, review, authorization, execution and delivery of this Note and any other instruments, agreements or matters relating to this Note.

27.     Choice of Law, Venue and Jury Trial Waiver.

(a)     Governing Law. (a)  This Note and the rights and obligations of the Maker and the Payee hereunder shall, in all respects, be governed by, and construed in accordance with, the laws (excluding the principles of conflict of laws) of the State of New York (the "**Governing Jurisdiction**") (including Section 5-1401 and Section 5-1402 of the General Obligations Law of the State of New York), including all matters of construction, validity and performance.

(b)     JURISDICTION; VENUE; SERVICE.

(i)     THE MAKER HEREBY IRREVOCABLY CONSENTS TO THE NON-EXCLUSIVE PERSONAL JURISDICTION OF THE STATE COURTS OF THE GOVERNING JURISDICTION AND, IF A BASIS FOR FEDERAL JURISDICTION EXISTS, THE NON-EXCLUSIVE PERSONAL JURISDICTION OF ANY UNITED STATES DISTRICT COURT FOR THE GOVERNING JURISDICTION.

(ii)     THE MAKER AGREES THAT VENUE SHALL BE PROPER IN ANY COURT OF THE GOVERNING JURISDICTION SELECTED BY THE PAYEE OR, IF A BASIS FOR FEDERAL JURISDICTION EXISTS, IN ANY UNITED STATES DISTRICT COURT IN THE GOVERNING JURISDICTION. THE MAKER WAIVES ANY RIGHT TO OBJECT TO THE MAINTENANCE OF ANY SUIT, CLAIM, ACTION, LITIGATION OR PROCEEDING OF ANY KIND OR DESCRIPTION, WHETHER IN LAW OR EQUITY, WHETHER IN CONTRACT OR IN TORT OR OTHERWISE, IN ANY OF THE STATE OR FEDERAL COURTS OF THE GOVERNING JURISDICTION ON THE BASIS OF IMPROPER VENUE OR INCONVENIENCE OF FORUM.

- 20 -

(iii)   ANY SUIT, CLAIM, ACTION, LITIGATION OR PROCEEDING OF ANY KIND OR DESCRIPTION, WHETHER IN LAW OR EQUITY, WHETHER IN CONTRACT OR TORT OR OTHERWISE, BROUGHT BY THE MAKER AGAINST THE PAYEE THAT IS BASED, IN WHOLE OR IN PART, DIRECTLY OR INDIRECTLY, ON THIS NOTE OR ANY MATTERS RELATING TO THIS NOTE OR ANY RELATED DOCUMENT OR ANY OBLIGATIONS, SHALL BE BROUGHT IN A COURT ONLY IN THE GOVERNING JURISDICTION. THE MAKER SHALL NOT FILE ANY COUNTERCLAIM AGAINST THE PAYEE IN ANY SUIT, CLAIM, ACTION, LITIGATION OR PROCEEDING BROUGHT BY THE PAYEE AGAINST THE MAKER IN A JURISDICTION OUTSIDE OF THE GOVERNING JURISDICTION UNLESS UNDER THE RULES OF THE COURT IN WHICH THE PAYEE BROUGHT SUCH SUIT, CLAIM, ACTION, LITIGATION OR PROCEEDING THE COUNTERCLAIM IS MANDATORY, AND NOT PERMISSIVE, AND WOULD BE CONSIDERED WAIVED UNLESS FILED AS A COUNTERCLAIM IN THE SUIT, CLAIM, ACTION, LITIGATION OR PROCEEDING INSTITUTED BY THE PAYEE AGAINST THE MAKER.  THE MAKER AGREES THAT ANY FORUM OUTSIDE THE GOVERNING JURISDICTION IS AN INCONVENIENT FORUM AND THAT ANY SUIT, CLAIM, ACTION, LITIGATION OR PROCEEDING BROUGHT BY THE MAKER AGAINST THE PAYEE IN ANY COURT OUTSIDE THE GOVERNING JURISDICTION SHOULD BE DISMISSED OR TRANSFERRED TO A COURT LOCATED IN THE GOVERNING JURISDICTION. FURTHERMORE, THE MAKER IRREVOCABLY AND UNCONDITIONALLY AGREES THAT IT WILL NOT BRING OR COMMENCE ANY SUIT, CLAIM, ACTION, LITIGATION OR PROCEEDING OF ANY KIND OR DESCRIPTION, WHETHER IN LAW OR EQUITY, WHETHER IN CONTRACT OR IN TORT OR OTHERWISE, AGAINST THE PAYEE IN ANY WAY RELATING TO THIS NOTE OR ANY RELATED DOCUMENT, OR ANY OBLIGATIONS HEREUNDER OR THEREUNDER, OR ANY TRANSACTIONS RELATING HERETO OR THERETO, IN ANY FORUM OTHER THAN THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY, AND THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE JURISDICTION OF SUCH COURTS AND AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH SUIT, CLAIM, ACTION, LITIGATION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT.  EACH OF THE MAKER AND THE PAYEE AGREES THAT A FINAL JUDGMENT IN ANY SUCH SUIT, CLAIM, ACTION, LITIGATION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.

(iv)   EACH OF THE MAKER AND THE PAYEE IRREVOCABLY CONSENT TO THE SERVICE OF PROCESS OUT OF ANY OF THE AFOREMENTIONED COURTS IN ANY SUCH SUIT, CLAIM, ACTION, LITIGATION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL POSTAGE PREPAID, TO IT AT THE ADDRESS SET FORTH FOR NOTICES IN THIS

NOTE (OR AT SUCH OTHER ADDRESS FOR NOTICE AS THE MAKER OR THE PAYEE SHALL HAVE SPECIFIED BY WRITTEN NOTICE TO THE OTHER), SUCH SERVICE TO BECOME EFFECTIVE THIRTY (30) DAYS AFTER THE DATE OF MAILING.

(v)    NOTHING HEREIN SHALL AFFECT THE RIGHT OF THE PAYEE TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR TO OTHERWISE PROCEED AGAINST THE MAKER OR ANY OTHER PERSON IN THE GOVERNING JURISDICTION OR IN ANY OTHER JURISDICTION.

(c)    WAIVER OF JURY TRIAL. THE MAKER AND THE PAYEE MUTUALLY WAIVE ALL RIGHT TO TRIAL BY JURY OF ALL CLAIMS OF ANY KIND ARISING UNDER THIS NOTE OR THE RELATED DOCUMENTS. THE MAKER AND THE PAYEE ACKNOWLEDGE THAT THIS IS A WAIVER OF A LEGAL RIGHT AND THAT THE MAKER AND THE PAYEE EACH MAKE THIS WAIVER VOLUNTARILY AND KNOWINGLY AFTER CONSULTATION WITH COUNSEL OF ITS CHOICE. THE MAKER AND THE PAYEE AGREE THAT ALL SUCH CLAIMS SHALL BE TRIED BEFORE A JUDGE OF A COURT HAVING JURISDICTION, WITHOUT A JURY.

[The signature page follows.  The remainder of this page is blank.]

- 22 -

IN WITNESS WHEREOF, and intending to be legally bound hereby, the Maker executes this Promissory Note as of the date first written above.

**MAKER**:

**NEIGHBORMD   HOLDINGS   CORP.**, a Delaware corporation

By: _____
    Name: _____
    Title: _____

**NEIGHBORMD, INC.**, a Florida corporation

By: _____
    Name: _____
    Title: _____

[Signature Page to Promissory Note]

The Payee hereby confirms its acceptance of the foregoing Promissory Note and its agreement with the terms, provisions, covenants and agreements set forth therein.

**PAYEE:**

_____, a
_____

By: _____
Name: _____
Title: _____

[Signature Page to Promissory Note]

ACCEPTED AND AGREED:

**<u>SUBORDINATED AGENT</u>**:

_____, solely in
its capacity as the Subordinated Agent hereunder


By: _____
Name: _____
Title: _____

[Signature Page to Promissory Note]

**<u>EXHIBIT 5.3B(2)</u>**
**FORM OF INTERCREDITOR AGREEMENT**

See attached.

## [FORM OF] INTERCREDITOR AGREEMENT

THIS INTERCREDITOR AGREEMENT (this "Agreement") is entered into as of [___], 20[___], by and among [BRIDGING FINANCE INC.], in its capacity as administrative agent under the Senior Credit Documents (as defined herein), and its successors and assigns from time to time (the "Senior Agent"), [BRIDGING FINANCE INC.], in its capacity as administrative agent under the Subordinated Credit Documents (as defined herein), and its successors and assigns from time to time (the "Subordinated Agent"), NEIGHBORMD HOLDINGS CORP., a Delaware corporation ("Holdings") NEIGHBORMD, INC. (formerly known as Hygea Health Holdings, Inc.), a Florida corporation ("NMD" and together with Holdings, the "Borrowers"), and each of the other entities listed on the signature page hereof as a "Credit Party".

## RECITALS

A.    Borrowers, Senior Agent and the lenders party thereto from time to time (the "Senior Lenders" and together with the Senior Agent, the "Senior Creditors") have entered into that certain Credit Agreement, dated June [___], 2020 (as amended, restated, supplemented or otherwise modified from time to time, the "Senior Credit Agreement"), pursuant to which, among other things, Senior Lenders have agreed, subject to the terms and conditions set forth in the Senior Credit Agreement, to make certain loans and financial accommodations to Borrowers. All of the Credit Parties' obligations to the Senior Creditors under the Senior Credit Documents (as hereinafter defined) are guaranteed by the Credit Parties and secured by a first priority Lien (as hereinafter defined) on all assets of the Borrowers and the other Credit Parties (including, without limitation, the Collateral (as such term is defined in the Senior Credit Agreement)).

B.    Borrowers have issued (i) that certain Promissory Note, dated as of [___], 20[___] (as amended, restated, supplemented or otherwise modified from time to time, the "Bridging Note"), in favor of [Bridging Income Fund L.P. f/k/a Sprott Bridging Income Fund LP, a limited partnership organized under the laws of the Province of Ontario] ("Bridging Lender"), and (ii) that certain Promissory Note, dated as of [___], 20[___] (as amended, restated, supplemented or otherwise modified from time to time, the "Centurion Note" and together with the Bridging Note, the "Notes"), in favor of [Centurion Asset Management Inc., a corporation incorporated under the laws of the Province of Ontario] ("Centurion Lender" and together with the Bridging Lender and including their successors and assigns, the "Subordinated Lenders" and together with the Subordinated Agent, the "Subordinated Creditors"). All of Credit Parties' obligations to the Subordinated Creditors under the Notes and the other Related Documents (as defined in the Notes) are guaranteed by the Credit Parties and are secured by a Lien on all assets of the Borrowers and the other Credit Parties (including, without limitation, the Collateral (as such term is defined in the Notes)) that are pari passu with the Liens in favor of the Senior Agent.

C.    As one of the conditions precedent to the incurrence of the Subordinated Debt, Senior Creditors have required the execution and delivery of this Agreement by Subordinated Agent and Credit Parties, in order to set forth the relative rights and priorities of Senior Agent, on behalf of the Senior Creditors, and Subordinated Agent, on behalf of the Subordinated Creditors, under the Senior Credit Documents (as hereinafter defined) and the Subordinated Credit Documents (as hereinafter defined).

NOW, THEREFORE, in order to comply with the Senior Credit Documents and to induce Subordinated Creditors to consummate the transactions contemplated by the Subordinated Credit Documents, and for other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the parties hereto hereby agree as follows:

1.    <u>Definitions</u>.  The following terms shall have the following meanings in this Agreement:

"<u>Affiliate</u>" shall mean, as to any specified Person, any other Person which, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person.  A Person shall be deemed to control another Person if the controlling Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of the other Person, whether through the ownership of voting securities, by contract or otherwise.  Without limitation, any director, executive officer or beneficial owner of ten percent (10%) or more of the stock (either directly or through ownership of stock equivalents) of a Person shall for the purposes of this Agreement, be deemed to control the other Person.

"<u>Bankruptcy Code</u>" shall mean Chapter 11 of Title 11 of the United States Code, as amended from time to time and any successor statute and all rules and regulations promulgated thereunder.

"<u>Distribution</u>" means, with respect to any indebtedness or other obligation, (a) any payment or distribution by any Person of cash, securities or other property, by set-off or otherwise, on account of such indebtedness or obligation, (b) any redemption, purchase or other acquisition of such indebtedness or obligation by any Person or (c) the granting of any lien or security interest to or for the benefit of the holders of such indebtedness or obligation in or upon any property of any Person that would constitute Collateral under the terms of this Agreement.

 "<u>Lien</u>" shall mean any security interest, chattel mortgage, charge, lien or encumbrance, or any other legal device, howsoever denominated, the intent of which is for property of any kind to be security for payment or performance of an obligation.

"<u>paid in full</u>" or "<u>payment in full</u>" shall mean with respect to the Senior Debt, the time at which all of the Obligations (as defined in the Senior Credit Agreement) with respect to the Senior Credit Documents, other than unasserted contingent indemnity obligations, have been fully paid, performed and satisfied.

"<u>Person</u>" means any natural person, corporation, general or limited partnership, limited liability company, firm, trust, association, government, governmental agency or other entity, whether acting in an individual, fiduciary or other capacity.

"<u>Proceeding</u>" shall mean any voluntary or involuntary insolvency, bankruptcy, receivership, custodianship, liquidation, dissolution, reorganization, assignment for the benefit of creditors, appointment of a custodian, receiver, trustee or other officer with similar powers or any other proceeding for the liquidation, dissolution or other winding up of a Person.

"<u>Senior Credit Documents</u>" shall mean the Senior Credit Agreement, the other Loan Documents (as defined in the Senior Credit Agreement) and all other agreements, documents and instruments executed from time to time in connection therewith, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"<u>Senior Debt</u>" shall mean all obligations (including, without limitation, the Obligations, as defined in the Senior Credit Agreement), liabilities and indebtedness of every nature of Borrowers and the other Credit Parties from time to time owed to Senior Creditors under the Senior Credit Documents, including, without limitation, the principal amount of all debts, claims and indebtedness, accrued and unpaid interest and all fees, costs and expenses, whether primary, secondary, direct, contingent, fixed or otherwise, heretofore, now and from time to time hereafter owing, due or payable, whether before or after the filing of a Proceeding under the Bankruptcy Code together with (a) any amendments, modifications, renewals or extensions thereof to the extent not prohibited by the terms of this Agreement and (b) any interest accruing thereon after the commencement of a Proceeding, without regard to whether or not such interest is an allowed claim.

"<u>Senior Priority Collateral</u>" shall mean the Collateral (as defined in the Senior Credit Agreement).

"<u>Subordinated Credit Documents</u>" shall mean the Notes and the other Related Documents (as defined in the Notes), and all other documents, agreements and instruments now existing or hereinafter entered into evidencing or pertaining to all or any portion of the Subordinated Debt.

"<u>Subordinated Debt</u>" shall mean all obligations (including, without limitation, the Obligations, as defined in the Subordinated Credit Documents), liabilities and indebtedness of every nature of Borrowers and the other Credit Parties from time to time owed to Subordinated Creditors under the Subordinated Credit Documents, including, without limitation, the principal amount of all debts, claims and indebtedness, accrued and unpaid interest and all fees, costs and expenses, whether primary, secondary, direct, contingent, fixed or otherwise, heretofore, now and from time to time hereafter owing, due or payable, whether before or after the filing of a Proceeding under the Bankruptcy Code together with (a) any amendments, modifications, renewals or extensions thereof and (b) any interest accruing thereon after the commencement of a Proceeding, without regard to whether or not such interest is an allowed claim. For the avoidance of doubt, Subordinated Debt shall exclude any equity investment by Subordinated Creditors or its Affiliates in any Borrower, including rights to receive dividends and Distributions that are payable to equity interest holders of any Borrower.

2.    <u>Subordination</u>.

2.1    <u>Subordination of Payment of Subordinated Debt to Senior Debt</u>. The Subordinated Debt hereby is expressly subordinated in right of payment to the prior performance and irrevocable and indefeasible payment in full in cash of the Senior Debt and termination of the Senior Credit Documents. In furtherance of the foregoing and notwithstanding any other

3

provisions of this Agreement, the Senior Credit Documents or the Subordinated Credit Documents, the Credit Parties shall not at any time make, and shall not permit or cause to be made, and Subordinated Creditors shall not at any time receive or collect or permit to be received or collected, directly or indirectly, any payment on or with respect to any of the Subordinated Debt, and any such payment received by the Subordinated Creditors or any of its Affiliates shall be held by Subordinated Creditors or such Affiliate in trust for the Senior Creditors and shall be turned over to the Senior Agent immediately for application to the Senior Debt; provided, that Borrowers may make scheduled payments of interest and reimburse fees and expenses as required under the Notes so long as no Default or Event of Default (each as defined in the Senior Credit Agreement) has occurred, is continuing or would result by or from any such payment.

2.2    <u>Subordination of Liens and Security</u>.  Until the Senior Debt has been paid in full, the Liens of Subordinated Agent in the Senior Priority Collateral shall be and hereby are subordinated for all purposes and in all respects to the Liens of Senior Creditor in the Senior Priority Collateral, regardless of the time, manner or order of perfection of any such Liens. Subordinated Agent, on behalf of the Subordinated Creditors, agrees that it will not at any time contest the validity, perfection, priority or enforceability of the Senior Debt, the Senior Credit Documents, or the Liens of Senior Agent in the Senior Priority Collateral or other collateral securing the Senior Debt.  Senior Agent, on behalf of the Senior Creditors, agrees that it will not at any time contest the validity, perfection, priority or enforceability of the Subordinated Debt, the Subordinated Credit Documents, or the Liens of Subordinated Agent in the Senior Priority Collateral or other collateral securing the Subordinated Debt.

2.3    <u>Sale, Transfer or other Disposition of Subordinated Debt</u>.

(a) Subordinated Creditors shall not sell, assign, pledge, dispose of or otherwise transfer all or any portion of the Subordinated Debt or any Subordinated Credit Document unless, prior to the consummation of any such action, the transferee thereof shall execute and deliver to Senior Agent an agreement substantially identical to this Agreement, providing for the continued subordination of the Subordinated Debt to the Senior Debt as provided herein and for the continued effectiveness of all of the rights of Senior Creditors arising under this Agreement.

(b) Notwithstanding the failure of any transferee to execute or deliver an agreement substantially identical to this Agreement, the subordination effected hereby shall survive any sale, assignment, pledge, disposition or other transfer of all or any portion of the Subordinated Debt, and the terms of this Agreement shall be binding upon the successors and assigns of the Subordinated Creditors, as provided in <u>Section 8</u> hereof.

3.    <u>Modifications to Credit Documents</u>.

3.1    <u>Modifications to Senior Credit Documents</u>.  Senior Creditors may at any time and from time to time without the consent of or notice to Subordinated Creditors, without incurring liability to any Subordinated Creditor and without impairing or releasing the obligations of any Subordinated Creditor under this Agreement, change the manner or place of payment or extend the time of payment of or renew or alter any of the terms of the Senior Debt, or amend in any manner any agreement, note, guaranty or other instrument evidencing or

4

securing or otherwise relating to the Senior Debt. Senior Creditors shall promptly, after the execution and delivery of such amendments and or modifications, deliver conformed copies thereof to Subordinated Agent.

3.2    <u>Modifications to Subordinated Credit Documents</u>. Subordinated Creditors may at any time and from time to time without the consent of or notice to Senior Creditors, without incurring liability to any Senior Creditor and without impairing or releasing the obligations of any Senior Creditor under this Agreement, change the manner or place of payment or extend the time of payment of or renew or alter any of the terms of the Subordinated Debt, or amend in any manner any agreement, note, guaranty or other instrument evidencing or securing or otherwise relating to the Senior Debt; <u>provided,</u> that Subordinated Creditors shall not (a) accelerate the final maturity of the Subordinated Debt (as set forth in the Subordinated Credit Documents in effect on the date hereof) or (b) change any scheduled payments required under the Subordinated Credit Documents in effect on the date hereof in a manner adverse to the Senior Creditors. Subordinated Creditors shall promptly, after the execution and delivery of such amendments and or modifications, deliver conformed copies thereof to Senior Agent.

4.    <u>Representations and Warranties</u>.

4.1    <u>Representations and Warranties of Subordinated Agent</u>. Subordinated Agent hereby represents and warrants to Senior Agent that as of the date hereof: (a) Subordinated Agent has the power and authority to enter into, execute, deliver and carry out the terms of this Agreement, all of which have been duly authorized by all proper and necessary action; and (b) this Agreement is the legal, valid and binding obligation of the Subordinated Agent, enforceable against the Subordinated Agent in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by equitable principles.

4.2    <u>Representations and Warranties of Senior Agent</u>. Senior Agent hereby represents and warrants to Subordinated Agent that as of the date hereof: (a) Senior Agent has the power and authority to enter into, execute, deliver and carry out the terms of this Agreement, all of which have been duly authorized by all proper and necessary action; and (b) this Agreement is the legal, valid and binding obligation of Senior Agent, enforceable against Senior Agent in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally or by equitable principles.

5.    <u>Modification</u>. Any modification or waiver of any provision of this Agreement, or any consent to any departure by any party from the terms hereof, shall not be effective in any event unless the same is in writing and signed by Senior Agent and Subordinated Agent, and then such modification, waiver or consent shall be effective only in the specific instance and for the specific purpose given. Any notice to or demand on any party hereto in any event not specifically required hereunder shall not entitle the party receiving such notice or demand to any other or further notice or demand in the same, similar or other circumstances unless specifically required hereunder.

6.      Further Assurances.  Each party to this Agreement promptly will execute and deliver such further instruments and agreements and do such further acts and things as may be reasonably requested in writing by any other party hereto that may be necessary or desirable in order to effect fully the purposes of this Agreement.

7.      Notices.  Unless otherwise specifically provided herein, any notice delivered under this Agreement shall be in writing addressed to the respective party as set forth below and may be personally served, telecopied or sent by overnight courier service or certified or registered United States mail and shall be deemed to have been given (a) if delivered in person, when delivered; (b) if delivered by telecopy, on the date of transmission if transmitted on a business day before 4:00 p.m. (Eastern time) or, if not, on the next succeeding business day; (c) if delivered by overnight courier, one business day after delivery to such courier properly addressed; or (d) if by United States mail, four business days after deposit in the United States mail, postage prepaid and properly addressed. Notices shall be addressed and delivered in the case of Senior Agent, to [TBD], with a copy to [TBD], and in the case of Subordinated Agent, to [TBD], with a copy to [TBD], or in any case, to such other address as the party addressed shall have previously designated by written notice to the serving party, given in accordance with this Section 7.

8.      Successors and Assigns.  This Agreement shall inure to the benefit of, and shall be binding upon, the respective successors and assigns of Senior Agent, Subordinated Agent and the Credit Parties.

9.      Relative Rights.  This Agreement defines the relative rights of Senior Agent, on behalf of the Senior Creditors, and Subordinated Agent, on behalf of the Subordinated Creditors. Nothing in this Agreement shall (a) impair, as between the Credit Parties and Senior Creditors and as between Credit Parties and Subordinated Creditors, the obligation of Credit Parties with respect to the payment of the Senior Debt and the Subordinated Debt in accordance with their respective terms or (b) affect the relative rights of Senior Creditors or Subordinated Creditors with respect to any other creditors of any Credit Party.

10.     Headings.  The paragraph headings used in this Agreement are for convenience only and shall not affect the interpretation of any of the provisions hereof.

11.     Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Signature by facsimile or electronic transmission shall bind the parties hereto.

12.     Severability.  In the event that any provision of this Agreement is deemed to be invalid, illegal or unenforceable by reason of the operation of any law or by reason of the interpretation placed thereon by any court or governmental authority, the validity, legality and enforceability of the remaining provisions of this Agreement shall not in any way be affected or impaired thereby, and the affected provision shall be modified to the minimum extent permitted by law so as most fully to achieve the intention of this Agreement.

6

13.   <u>Continuation of Subordination; Termination of Agreement</u>.  This Agreement shall remain in full force and effect until the payment in full of the Senior Debt and the termination of all lending commitments under the Senior Credit Documents after which this Agreement shall terminate without further action on the part of the parties hereto.

14.   <u>Applicable Law</u>.  This Agreement shall be governed by and shall be construed and enforced in accordance with the internal laws of the State of New York, without regard to conflicts of law principles.

15.   <u>CONSENT TO JURISDICTION</u>.  EACH OF SENIOR AGENT, SUBORDINATED AGENT AND THE CREDIT PARTIES HEREBY CONSENTS TO THE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED WITHIN THE CITY OR COUNTY OF THE STATE OF NEW YORK.  EACH OF SENIOR AGENT, SUBORDINATED AGENT AND THE CREDIT PARTIES EXPRESSLY SUBMITS AND CONSENTS TO THE JURISDICTION OF THE AFORESAID COURTS AND WAIVES ANY DEFENSE OF FORUM NON CONVENIENS.  EACH OF SENIOR AGENT, SUBORDINATED AGENT AND THE CREDIT PARTIES IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF ANY OF THE AFOREMENTIONED COURTS IN ANY SUCH SUIT, CLAIM, ACTION, LITIGATION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL POSTAGE PREPAID, TO IT AT THE ADDRESS SET FORTH FOR NOTICES IN THIS NOTE (OR AT SUCH OTHER ADDRESS FOR NOTICE AS THE MAKER OR THE PAYEE SHALL HAVE SPECIFIED BY WRITTEN NOTICE TO THE OTHER), SUCH SERVICE TO BECOME EFFECTIVE THIRTY (30) DAYS AFTER THE DATE OF MAILING.

16.   <u>WAIVER OF JURY TRIAL</u>.  SUBORDINATED AGENT, BORROWERS AND SENIOR AGENT HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, ANY OF THE SUBORDINATED CREDIT DOCUMENTS OR ANY OF THE SENIOR CREDIT DOCUMENTS. EACH OF SUBORDINATED AGENT, CREDIT PARTIES AND SENIOR AGENT ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS RELIED ON THE WAIVER IN ENTERING INTO THIS AGREEMENT, THE SUBORDINATED CREDIT DOCUMENTS AND THE SENIOR CREDIT DOCUMENTS (AS APPLICABLE) AND THAT EACH WILL CONTINUE TO RELY ON THE WAIVER IN THEIR RELATED FUTURE DEALINGS.  EACH OF SUBORDINATED AGENT, CREDIT PARTIES AND SENIOR AGENT WARRANTS AND REPRESENTS THAT EACH HAS HAD THE OPPORTUNITY OF REVIEWING THIS JURY WAIVER WITH LEGAL COUNSEL, AND THAT EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS.

17.   <u>Separation of Rights of Subordinated Creditors</u>.  Notwithstanding any provision herein to the contrary, the parties acknowledge and agree that Subordinated Agent is entering into this Agreement solely in its capacity as Subordinated Agent, on behalf of the Subordinated Creditors, and that this Agreement shall not apply to (a) any obligations of

Borrowers to Subordinated Creditors or its Affiliates arising from or related to equity interests of Subordinated Creditor or its Affiliates in Borrowers, or (b) any rights or remedies of Subordinated Creditors or its Affiliates in respect of any of the obligations referenced in clause (a) above.

[BALANCE OF PAGE INTENTIONALLY LEFT BLANK]

8

IN WITNESS WHEREOF, Subordinated Agent, Credit Parties and Senior Agent have caused this Agreement to be executed as of the date first above written.

SUBORDINATED AGENT:

[BRIDGING FINANCE INC.]

By: _____
Name:
Title:


SENIOR AGENT:

[BRIDGING FINANCE INC.]

By: _____
Name:
Title:

**[SIGNATURE PAGE TO SUBORDINATION AND INTERCREDITOR AGREEMENT]**

BORROWERS:

NEIGHBORMD HOLDINGS CORP.

By: _____
Name:
Title:

NEIGHBORMD, INC.

By: _____
Name:
Title:

CREDIT PARTIES:

[____]

By: _____
Name:
Title:

**[SIGNATURE PAGE TO SUBORDINATION AND INTERCREDITOR AGREEMENT]**

## **EXHIBIT 7.1**
## **BYLAWS**

See attached.

# NEIGHBORMD HOLDINGS CORP.

# BY-LAWS

## Effective As of June _____, 2020

### ARTICLE I
### FORMATION AND OFFICES

**Section 1.01    Formation.**    These bylaws (the "**Bylaws**") of NeighborMD Holdings Corp., a Delaware corporation, are established pursuant to that certain Stockholders Agreement, dated of even date herewith, of the Corporation and its Stockholders (the "**Stockholders Agreement**").  Any capitalized term not defined herein and that is not otherwise capitalized for grammatical purposes shall have the meaning ascribed to such term in the Stockholders Agreement.  These Bylaws are intended to supplement the Stockholders Agreement and to address certain matters not otherwise expressly addressed in detail in the Stockholders Agreement. To the extent, however, that there is any conflict between these Bylaws and the Stockholders Agreement, the Stockholders Agreement shall supersede, preempt, and control.

**Section 1.02    Offices.** The address of the registered office of the Corporation in the State of Delaware shall be at 251 Little Falls Drive, Wilmington, Delaware 19808. The Corporation may have other offices, both within and without the State of Delaware, as the board of directors of the Corporation (the "**Board of Directors**") from time to time shall determine or the business of the Corporation may require.

**Section 1.03    Books and Records.** Any records administered by or on behalf of the Corporation in the regular course of its business, including its stock ledger, books of account, and minute books, may be maintained on any information storage device, method, or one or more electronic networks or databases (including one or more distributed electronic networks or databases); *provided that* the records so kept can be converted into clearly legible paper form within a reasonable time, and, with respect to the stock ledger, the records so kept comply with Section 224 of the Delaware General Corporation Law. The Corporation shall so convert any records so kept upon the request of any person entitled to inspect such records pursuant to applicable law.

# ARTICLE II
## MEETINGS OF THE STOCKHOLDERS

**Section 2.01   Place of Meetings.** All meetings of the Stockholders shall be held at such place, if any, either within or without the State of Delaware, or by means of remote communication, as shall be designated from time to time by resolution of the Board of Directors and stated in the notice of meeting. Meetings shall be held separately by Class of Stock unless otherwise designated by the Board of Directors.

**Section 2.02   Annual Meeting.** The annual meeting of the Stockholders for the election of directors and for the transaction of such other business as may properly come before the meeting shall be held at such date, time and place, if any, as shall be determined by the Board of Directors and stated in the notice of the meeting.

**Section 2.03   Special Meetings.** Special meetings of Stockholders for any purpose or purposes shall be called pursuant to (i) a resolution approved by the Board of Directors, (ii) upon those holders of a majority of the Preferred Stock for the purpose of calling a special meeting of the Preferred Stock Securityholders, or (iii) upon those holders of a majority of the Common Stock for the purpose of calling a special meeting of the Common Stock Securityholders, and may not be called by any other person or persons. The only business which may be conducted at a special meeting shall be the matter or matters set forth in the notice of such meeting.

**Section 2.04   Adjournments.** Any meeting of the Stockholders, annual or special, may be adjourned from time to time to reconvene at the same or some other place, if any, and notice need not be given of any such adjourned meeting if the time, place, if any, thereof, and the means of remote communication, if any, are announced at the meeting at which the adjournment is taken. At the adjourned meeting, the Corporation may transact any business which might have been transacted at the original meeting. If the adjournment is for more than 30 days, a notice of the adjourned meeting shall be given to each Stockholder of record entitled to vote at the meeting. If after the adjournment a new record date is fixed for Stockholders entitled to vote at the adjourned meeting, the Board of Directors shall fix a new record date for notice of the adjourned meeting and shall give notice of the adjourned meeting to each Stockholder of record entitled to vote at the adjourned meeting as of the record date fixed for notice of the adjourned meeting.

**Section 2.05   Notice of Meetings.** Notice of the place, if any, date, hour, the record date for determining the Stockholders entitled to vote at the meeting (if such date is different from the record date for Stockholders entitled to notice of the meeting) and means of remote communication, if any, of every meeting of Stockholders shall be given by the Corporation not less than 10 days nor more than 60 days before the meeting

(unless a different time is specified by law) to every Stockholder entitled to vote at the meeting as of the record date for determining the Stockholders entitled to notice of the meeting. Notices of special meetings shall also specify the purpose or purposes for which the meeting has been called. Notices of meetings to Stockholders may be given by mailing the same, addressed to the Stockholder entitled thereto, at such Stockholder's mailing address as it appears on the records of the corporation and such notice shall be deemed to be given when deposited in the U.S. mail, postage prepaid. Without limiting the manner by which notices of meetings otherwise may be given effectively to Stockholders, any such notice may be given by electronic transmission in accordance with the Stockholders Agreement or Applicable Law. Notice of any meeting need not be given to any Stockholder who shall, either before or after the meeting, submit a waiver of notice or who shall attend such meeting, except when the Stockholder attends for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Any Stockholder so waiving notice of the meeting shall be bound by the proceedings of the meeting in all respects as if due notice thereof had been given.

**Section 2.06  Quorum.** Unless otherwise required by law, the Stockholders Agreement, the Corporation's Certificate of Incorporation (the "**Certificate of Incorporation**") or these By-laws, at each meeting of the Stockholders, a majority in voting power of the Shares of the Corporation entitled to vote at such meeting, present in person or represented by proxy, shall constitute a quorum. If, however, such quorum shall not be present or represented at any meeting of the Stockholders, the Stockholders entitled to vote thereat, present in person or represented by proxy, shall have power, by the affirmative vote of a majority in voting power thereof, to adjourn the meeting from time to time, in the manner provided in Section 2.04, until a quorum shall be present or represented. A quorum, once established, shall not be broken by the subsequent withdrawal of enough votes to leave less than a quorum. At any such adjourned meeting at which there is a quorum, any business may be transacted that might have been transacted at the meeting originally called.

**Section 2.07  Conduct of Meetings.** The Board of Directors may adopt by resolution such rules and regulations for the conduct of the meeting of the Stockholders as it shall deem appropriate. At every meeting of the Stockholders, a majority in voting power of the Shares of the Corporation entitled to vote at such meeting shall appoint a Chairperson of such meeting who shall preside at, the meeting. The secretary or, in his or her absence or inability to act, the person whom the chairperson of the meeting shall appoint secretary of the meeting, shall act as secretary of the meeting and keep the minutes thereof. Except to the extent inconsistent with such rules and regulations as adopted by the Board of Directors, the chairperson of any meeting of the Stockholders shall have the right and authority to prescribe such rules, regulations, and procedures and to do all such acts as, in the judgment of such chairperson, are appropriate for the proper conduct of the meeting. Such rules, regulations, or procedures, whether adopted by the

Board of Directors or prescribed by the chairperson of the meeting, may include, without limitation, the following: (a) the establishment of an agenda or order of business for the meeting; (b) the determination of when voting shall occur at such meeting; (c) rules and procedures for maintaining order at the meeting and the safety of those present; (d) limitations on attendance at or participation in the meeting to Stockholders of record of the corporation, their duly authorized and constituted proxies or such other persons as the Chairperson of the meeting shall determine; (e) restrictions on entry to the meeting after the time fixed for the commencement thereof; and (f) limitations on the time allotted to questions or comments by participants.

**Section 2.08    Voting; Proxies.**    If so provided in the Stockholders Agreement, the election of the Board of Directors shall be determined in accordance with the Stockholders Agreement.    Unless otherwise required by Applicable Law, the Certificate of Incorporation, the Stockholders Agreement or these By-laws, any matter, other than the election of directors, brought before any meeting of Stockholders shall be decided by the affirmative vote of the majority of Shares present in person or represented by proxy at the meeting and entitled to vote on the matter. Each Stockholder entitled to vote at a meeting of Stockholders or to express consent to corporate action in writing without a meeting may authorize another person or persons to act for such Stockholder by proxy, but no such proxy shall be voted or acted upon after three years from its date, unless the proxy provides for a longer period. A proxy shall be irrevocable if it states that it is irrevocable and if, and only as long as, it is coupled with an interest sufficient in law to support an irrevocable power. A Stockholder may revoke any proxy which is not irrevocable by attending the meeting and voting in person or by delivering to the secretary of the Corporation a revocation of the proxy or a new proxy bearing a later date. Voting at meetings of Stockholders need not be by written ballot.

**Section 2.09    Written Consent of Stockholders Without a Meeting.**    Any action to be taken at any annual or special meeting of Stockholders may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action to be so taken, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all Shares entitled to vote thereon were present and voted and shall be delivered to the Corporation by delivery to the Chairperson of the Board of Directors.    Every written consent shall bear the date of signature of each Stockholder who signs the consent, and no written consent shall be effective to take the corporate action referred to therein unless, within 60 days of the earliest dated consent delivered in the manner required by this Section 2.09, written consents signed by a sufficient number of Stockholders to take action are delivered to the Corporation as aforesaid. Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall, to the extent required by Applicable Law, be given to those Stockholders who have not consented in writing, and who, if the action had been taken at a meeting, would have been entitled to notice of the meeting if the record date

for notice of such meeting had been the date that written consents signed by a sufficient number of holders to take the action were delivered to the Corporation.

**Section 2.10   Telephone Meetings.** Stockholder meetings may be held by means of telephone conference or other communications equipment by means of which all persons participating in the meeting can hear each other and be heard. Participation by a Stockholder in a meeting pursuant to this Section 2.10 shall constitute presence in person at such meeting.

# ARTICLE III
# BOARD OF DIRECTORS

**Section 3.01   General Powers.** The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors. The Board of Directors may adopt such rules and procedures, not inconsistent with the Certificate of Incorporation, the Stockholders Agreement, these By-laws, or Applicable Law, as it may deem proper for the conduct of its meetings and the management of the Corporation.

**Section 3.02   Number; Term of Office.** The number and appointment of the Board of Directors shall be determined in accordance with the Stockholders Agreement.

**Section 3.03   Fees and Expenses.** Directors shall receive such fees and expenses as the Board of Directors shall from time to time prescribe.

**Section 3.04   Regular Meetings.** Regular meetings of the Board of Directors may be held without notice at such times and at such places as may be determined from time to time by a majority of the Board of Directors or its Chairperson.

**Section 3.05   Special Meetings.** Special meetings of the Board of Directors may be held at such times and at such places as may be determined by the Chairperson on at least 24 hours' notice to each director given by one of the means specified in Section 3.08 hereof other than by mail or on at least three days' notice if given by mail.

**Section 3.06   Telephone Meetings.** Board of Directors or Board of Directors committee meetings may be held by means of telephone conference or other communications equipment by means of which all persons participating in the meeting can hear each other and be heard. Participation by a director in a meeting pursuant to this Section 3.06 shall constitute presence in person at such meeting.

**Section 3.07   Adjourned Meetings.** A majority of the directors present at any meeting of the Board of Directors, including an adjourned meeting, whether or not a quorum is present, may adjourn and reconvene such meeting to another time and place. At least 24 hours' notice of any adjourned meeting of the Board of Directors shall be given to each director whether or not present at the time of the adjournment, if such notice shall be given by one of the means specified in Section 3.08 hereof other than by mail, or at least three days' notice if by mail. Any business may be transacted at an adjourned meeting that might have been transacted at the meeting as originally called.

**Section 3.08   Notices.** Subject to Section 3.07, Section 3.09, and Section 3.13 hereof, whenever notice is required to be given to any director by applicable law, the Certificate of Incorporation, or these By-laws, such notice shall be deemed given effectively if given in person or by telephone, mail addressed to such director at such director's address as it appears on the records of the Corporation, facsimile, email, or by other means of electronic transmission permissible pursuant to the Stockholders Agreement.

**Section 3.09   Waiver of Notice.** Whenever notice to directors is required by applicable law, the Certificate of Incorporation, or these by-laws, a waiver thereof, in writing signed by, or by electronic transmission by, the director entitled to the notice, whether before or after such notice is required, shall be deemed equivalent to notice. Attendance by a director at a meeting shall constitute a waiver of notice of such meeting except when the director attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business on the ground that the meeting was not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any regular or special Board of Directors or committee meeting need be specified in any waiver of notice.

**Section 3.10   Organization.** At each meeting of the Board of Directors, the chairperson or, in his or her absence, another director selected by a majority of the Board of Directors shall preside. The secretary shall act as secretary at each meeting of the Board of Directors. If the secretary is absent from any meeting of the Board of Directors, an assistant secretary shall perform the duties of secretary at such meeting; and in the absence from any such meeting of the secretary and all assistant secretaries, the person presiding at the meeting may appoint any person to act as secretary of the meeting.

**Section 3.11   Quorum of Directors.** A quorum of directors shall be determined in accordance with the Stockholders Agreement and shall be necessary and sufficient for the transaction of business at any meeting of the Board of Directors.

**Section 3.12   Action by Majority Vote.** Except as otherwise expressly required by these By-laws, the Certificate of Incorporation, the Stockholders Agreement or by

Applicable Law, the vote of a majority of the directors entitled to vote and present at a meeting at which a quorum is present shall be the act of the Board of Directors.

**Section 3.13   Action Without Meeting.** Unless otherwise restricted by the Certificate of Incorporation, the Stockholders Agreement, or these By-laws, any action required or permitted to be taken at any meeting of the Board of Directors or of any committee thereof may be taken without a meeting if all directors or members of such committee, as the case may be, consent thereto in writing or by electronic transmission, and the writings or electronic transmissions are filed with the minutes of proceedings of the Board of Directors or committee in accordance with Applicable Law.

**Section 3.14   Committees of the Board of Directors.** The Board of Directors may designate one or more committees, each committee to consist of one or more of the directors of the Corporation. Any such committee shall report to the Board of Directors and any action taken by such committee shall be subject to the review and approval of the Board of Directors. Unless the Board of Directors provides otherwise, at all meetings of such committee, a majority of the then authorized members of the committee shall constitute a quorum for the transaction of business, and the vote of a majority of the members of the committee present at any meeting at which there is a quorum shall be the act of the committee. Each committee shall keep regular minutes of its meetings.

## ARTICLE IV
## OFFICERS

**Section 4.01   Positions and Election.** The officers of the Corporation shall be determined by the Board of Directors and may include a president and/or Chief Executive Officer, a treasurer and/or Chief Financial Officer, a secretary, and such other officer positions and titles as determined by the Board of Directors.

**Section 4.02   Term.** Each officer of the Corporation shall hold office until such officer's successor is appointed and qualified or until such officer's earlier death, resignation, or removal. Any officer appointed by the Board of Directors may be removed by the Board of Directors at any time, with or without cause, by the majority vote of the members of the Board of Directors then in office subject to the terms and conditions of any agreement between the Company and such officer. The removal of an officer shall be without prejudice to his or her contract rights, if any. The election or appointment of an officer shall not of itself create contract rights. Any officer of the Corporation may resign at any time by giving written notice of his or her resignation to the president or the secretary subject to the terms and conditions of any agreement between the Company and such officer. Any such resignation shall take effect at the time specified therein or, if the time when it shall become effective shall not be specified

therein, immediately upon its receipt. Unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective. Should any vacancy occur among the officers, the position shall be filled for the unexpired portion of the term by appointment made by the Board of Directors.

**Section 4.03  Duties of Officers May Be Delegated.** In case any officer is absent, or for any other reason that the Board of Directors may deem sufficient, the president or the Board of Directors may delegate for the time being the powers or duties of such officer to any other officer or to any director; provided that any such delegation shall at all times comply with the financial controls and other requirements prescribed by the Board and the Stockholders Agreement, including (without limitation) Section 7.1 thereof.

**Section 4.04  Management Agreements.**  The Corporation has entered into the Management Agreements (as defined in the Stockholders Agreement).  These Bylaws hereby acknowledge that the Person(s) identified in the Management Agreements have been delegated the duty and obligation to carry out such functions in accordance with the terms and conditions set forth in the Management Agreements.

## ARTICLE V
## GENERAL PROVISIONS

**Section 5.01   Seal.** The seal of the Corporation shall be in such form as shall be approved by the Board of Directors. The seal may be used by causing it or a facsimile thereof to be impressed or affixed or reproduced or otherwise, as may be prescribed by law or custom or by the Board of Directors.

**Section 5.02  Agreements, Checks, Notes, Drafts, Etc.** All (i) agreements, instruments, and other undertakings (collectively, "**Agreements**"), and (ii) checks, notes, drafts, or other orders for the payment of money of the Corporation (collectively, "**Money Orders**") shall be signed, endorsed, or accepted in the name of the Corporation by such officer, officers, person, or persons as from time to time may be designated by the Board of Directors or by an officer or officers authorized by the Board of Directors to make such designation; provided that all Agreements and Money Orders shall require the signatures of at least two (2) officers in order to bind the Corporation.

**Section 5.03  Conflict with Stockholders Agreement, Applicable Law or Certificate of Incorporation.** These By-laws are adopted subject to any Applicable Law, the Stockholders Agreement and the Certificate of Incorporation. Whenever these By-laws may conflict with any Applicable Law, the Stockholders Agreement or the

Certificate of Incorporation, such conflict shall be resolved in favor of such law, the Stockholders Agreement or the Certificate of Incorporation.

## ARTICLE VI
## AMENDMENTS

**Section 6.01   Amendments.** These By-laws may be adopted, amended, repealed or replaced with new by-laws adopted by the Board of Directors and approved by the Stockholders in accordance with and in the same manner as amendments or modifications permissible pursuant to the Stockholders Agreement.

**<u>EXHIBIT C</u>**

Corporate Organizational Chart for Reorganized Debtors

**POST-CONFIRMATION ORGANIZATIONAL STRUCTURE**



**[Continued on next slide]**

**POST-CONFIRMATION ORGANIZATIONAL STRUCTURE**



## **EXHIBIT D**

List of Directors of New Board and Officers of Reorganized Debtors

List of Directors of New Board:

1. Robb Cacovic of Bridging Finance Inc.
2. Kevin Moreau of Bridging Finance Inc.
3. Daryl Boyce of Centurion Asset Management, Inc.

Board Observers:

1. Sergei Tchetvertnykh (Centurion Board Observer)
2. Committee Board Observer – To be determined

Officers of Reorganized Debtors:

1. Michael Muchnicki – Chief Executive Officer
2. Lee Clark – Chief Financial Officer

# **EXHIBIT E**

List of Material Contracts to be Assumed and Assigned

**LIST OF MATERIAL CONTRACTS - EXECUTORY CONTRACTS TO BE ASSUMED AND ASSIGNED**

| | DEBTOR ENTITY | CONTRACT COUNTER-PARTY(IES) | CONTRACT NAME / DESCRIPTION | CURE AMOUNT | ASSIGNEE |
|---|---|---|---|---|---|
| **A.  PAYOR AGREEMENTS** | | | | | |
| 1. | First Harbour Health Management, LLC | Humana Insurance Company, Humana Health Insurance Company of Florida, Inc., Humana Medical Plan, Inc. and their affiliates that underwrite or administer health plans | Independent Practice Association Participation Agreement, as amended by, (i) First Amendment to IPA Physician Group Agreement, (ii) Second Amendment to IPA Physician Group Agreement, (iii) Third Amendment to IPA Physician Group Agreement, (iv) Fourth Amendment to IPA Physician Group Agreement, and (v) Fifth Amendment to IPA Physician Group Agreement. | $0.00 | NeighborMD Partners of Gulf Coast, LLC; NeighborMD Partners of Central Florida, LLC; NeighborMD Partners of Tampa, LLC; and NeighborMD Partners of Panhandle, LLC |
| 2. | First Harbour Health Management, LLC and First Harbour Medical Centers, LLC | Humana Insurance Company, Humana Health Insurance Company of Florida, Inc., Humana Medical Plan, Inc. and their affiliates that underwrite or administer health plans | Humana Affiliate Contract, with respect to services rendered at the following location(s), and any and all successor location(s): 712 53rd Ave. E., Bradenton, FL. | $0.00 | NeighborMD Partners of Tampa, LLC |
| 3. | First Harbour Health Management, LLC | Collier Boulevard HMA Physician Management, LLC and CHS/Community Health Systems, Inc. | IPA Physician Group Agreement, as amended by (i) First Amendment to IPA Physician Group Agreement, and (ii) Second Amendment to IPA Physician Group Agreement. | $0.00 | NeighborMD Partners of Gulf Coast, LLC |
| 4. | First Harbour Health Management, LLC | Collier Boulevard HMA Physician Management, LLC and CHS/Community Health Systems, Inc. | Humana Affiliate Contract, with respect to services rendered at the following locations, and any and all successor location(s):<br>• 8340 Collier Blvd., Ste. 200, Naples, FL<br>• 1839 San Marco Rd., Marco Island, FL | $0.00 | NeighborMD Partners of Gulf Coast, LLC |
| 5. | First Harbour Health Management, LLC | Collier HMA Physician Management, LLC and CHS/Community Health Systems, Inc. | IPA Physician Group Agreement, as amended by, (i) First Amendment to IPA Physician Group Agreement, and (ii) Second Amendment to IPA Physician Group Agreement. | $0.00 | NeighborMD Partners of Gulf Coast, LLC |

EAST\174535686.2

**LIST OF MATERIAL CONTRACTS - EXECUTORY CONTRACTS TO BE ASSUMED AND ASSIGNED**

| | DEBTOR ENTITY | CONTRACT COUNTER-PARTY(IES) | CONTRACT NAME / DESCRIPTION | CURE AMOUNT | ASSIGNEE |
|---|---|---|---|---|---|
| 6. | First Harbour Health Management, LLC | Collier HMA Physician Management, LLC and CHS/Community Health Systems, Inc. | Humana Affiliate Contract, with respect to services rendered at the following locations, and any and all successor location(s): <br>• 6101 Pine Ridge Rd., Naples, FL <br>• 15215 Collier Blvd., #320, Naples, FL <br>• 24231 Walden Center Drive, Bonita Springs, FL | $0.00 | NeighborMD Partners of Gulf Coast, LLC |
| 7. | First Harbour Health Management, LLC | Gulf Coast HMA Physician Management, LLC and CHS/Community Health Systems, Inc. | IPA Physician Group Agreement, as amended by, First Amendment to IPA Physician Group Agreement. | $0.00 | NeighborMD Partners of Gulf Coast, LLC |
| 8. | First Harbour Health Management, LLC | Gulf Coast HMA Physician Management, LLC and CHS/Community Health Systems, Inc. | Humana Affiliate Contract, with respect to services rendered at the following locations, and any and all successor location(s): <br>• 8383 Tamiami Trl., Ste. 115, Sarasota, FL <br>• 2446 Laurel Rd., Venice, FL <br>• 900 East Pine St., Ste. 222, Englewood, FL <br>• 901 Venetia Bay Blvd. Ste. 110, Venice, FL <br>• 1720 E. Venice Ave., Fl. 1, Venice, FL <br>• 1720 E. Venice Ave., Fl. 2, Venice, FL <br>• 14876 S. Tamiami Trl., North Port, F <br>• 18659 Tamiami Trl., Ste. A, North Port, FL <br>• 1370 E Venice Ave., Ste. 202, Venice, FL | $0.00 | NeighborMD Partners of Gulf Coast, LLC |
| 9. | First Harbour Health Management, LLC | S. Reddy Kosanam, M.D. | IPA Physician Agreement | $0.00 | NeighborMD Partners of Central Florida, LLC |
| 10. | First Harbour Health Management, LLC | Meadowcrest Family Physicians, P.A. | IPA Physician Agreement | $0.00 | NeighborMD Partners of Central Florida, LLC |
| 11. | First Harbour Health Management, LLC | Meadowcrest Family Physicians, P.A. | Humana Affiliate Contract, with respect to services rendered at the following location, and any and all successor location(s): 1250 N. Vantage Point Dr., Crystal River, FL 34429. | $0.00 | NeighborMD Partners of Central Florida, LLC |

2

**LIST OF MATERIAL CONTRACTS - EXECUTORY CONTRACTS TO BE ASSUMED AND ASSIGNED**

| | DEBTOR ENTITY | CONTRACT COUNTER-PARTY(IES) | CONTRACT NAME / DESCRIPTION | CURE AMOUNT | ASSIGNEE |
|---|---|---|---|---|---|
| 12. | First Harbour Health Management, LLC | Millennium Physician Group, LLC | IPA Physician Agreement, as amended by, First Amendment to IPA Physician Group Agreement. | $0.00 | NeighborMD Partners of Gulf Coast, LLC |
| 13. | First Harbour Health Management, LLC | Millennium Physician Group, LLC | Humana Affiliate Contract, with respect to services rendered at the following locations, and any and all successor location(s):<br>• 13774 Plantation Rd., Ste. 101, Fort Myers, FL<br>• 2315 Aaron St., Port Charlotte, FL<br>• 315 E. Olympia Ave., Ste. 223, Punta Gorda, FL<br>• 315 E. Olympia Ave., Ste. 111, Punta Gorda, FL<br>• 19531 Cochran Blvd., Port Charlotte, FL<br>• 2343 Aaron St., Port Charlotte, FL<br>• 779 Medical Drive Ste. 6, Englewood, FL<br>• 3390 Tamiami Trl., Ste. 105, Port Charlotte, FL<br>• 2343 Aaron St., Port Charlotte, FL<br>• 3440 Tamiami Trl., Unit 2, Port Charlotte, FL<br>• 333 Miami Ave. W., Venice, FL<br>• 1287 US Highway 41 BYP S., Venice, FL<br>• 13815 Tamiami Trl., North Port, FL<br>• 2400 S McCall Rd Ste. C, Englewood, FL<br>• 190 W Dearborn St., Englewood, FL<br>• 13440 Parker Commons Blvd., Ste. 101, Fort Myers, FL<br>• 400 8th St. N., 2nd Floor, Naples, FL<br>• 800 Goodlette Rd., Ste. 200, Naples, FL<br>• 8421 Pointe Loop Dr., Venice, FL<br>• 16251 N. Cleveland Ave., North Fort Myers, FL<br>• 2002 Del Prado Blvd. South, Ste. 100, Cape Coral, FL<br>• 3530 Fruitville Rd., Sarasota, FL<br>• 126 Del Prado Blvd. N., Ste. 104, Cape Coral, FL | $0.00 | NeighborMD Partners of Gulf Coast, LLC |

EAST\174535686.2

**LIST OF MATERIAL CONTRACTS - EXECUTORY CONTRACTS TO BE ASSUMED AND ASSIGNED**

| DEBTOR ENTITY | CONTRACT COUNTER-PARTY(IES) | CONTRACT NAME / DESCRIPTION | CURE AMOUNT | ASSIGNEE |
|---|---|---|---|---|
| | | <ul><li>2684 Swamp Cabbage Ct., Fort Myers, FL</li><li>60 Westminster St. North, Suite A, Lehigh Acres, FL</li><li>10484 Stringfellow Rd., Ste. 1, St. James City, FL</li><li>1708 Cape Coral Parkway W., Ste. 6, Cape Coral, FL</li><li>13691 Metro Parkway Ste. 330,  Fort Myers, FL</li><li>9400 Gladiolus Dr., Ste. 50, Fort Myers, FL</li><li>13691 Metro Parkway, Ste. 110B, Fort Myers, FL</li><li>90 Cypress Way E., Ste. 10, Naples, FL</li><li>4881 Palm Beach Blvd., Ste. 100, Fort Myers, FL</li><li>2525 Harbor Blvd., Ste. 104, Port Charlotte, FL</li><li>13691 Metro Parkway, Ste. 130, Fort Myers, FL</li><li>14350 Metropolis Ave., Ste. 1, Fort Myers, FL</li><li>4525 Thomasson Dr., Naples, FL</li><li>25098 Olympia Ave., Ste. 400, Fort Myers, FL</li><li>12545 New Brittany Blvd, Ste. 26, Fort Myers, FL</li><li>9500 Bonita Beach Rd., Ste. 201, Bonita Springs, FL</li><li>13813 Metro Parkway, Fort Myers, FL</li><li>1528 Del Prado S., Cape Coral, FL</li><li>24600 S. Tamiami Trl., Ste. 500, Bonita Springs, FL</li><li>3571 Del Prado Blvd. N., Unit 2, Cape Coral, FL</li><li>5172 Mason Corbin Ct., Ste. 1, Fort Myers, FL</li><li>1735 SW Health Pkwy., Ste. 201, Fort Myers, FL</li></ul> | | |

4

**LIST OF MATERIAL CONTRACTS - EXECUTORY CONTRACTS TO BE ASSUMED AND ASSIGNED**

| | DEBTOR ENTITY | CONTRACT COUNTER-PARTY(IES) | CONTRACT NAME / DESCRIPTION | CURE AMOUNT | ASSIGNEE |
|---|---|---|---|---|---|
| | | | • 25086 Olympia Ave., Ste. 320, Fort Myers, FL<br>• 12995 S. Cleveland Ave., Ste. 184, Fort Myers, FL | | |
| 14. | First Harbour Health Management, LLC | Pediatric and Internal Medicine Specialists, Inc. | IPA Physician Agreement | $0.00 | NeighborMD Partners of Tampa, LLC |
| 15. | First Harbour Health Management, LLC | Pediatric and Internal Medicine Specialists, Inc. | Humana Affiliate Contract, with respect to services rendered at the following location, and any and all successor location(s): 1990 N Prospect Ave., Lecanto, FL. | $0.00 | NeighborMD Partners of Tampa, LLC |
| 16. | First Harbour Health Management, LLC | Punta Gorda HMA Physician Management, LLC | IPA Physician Group Agreement, as amended by, First Amendment to IPA Physician Group Agreement. | $0.00 | NeighborMD Partners of Gulf Coast, LLC |
| 17. | First Harbour Health Management, LLC | Punta Gorda HMA Physician Management, LLC | Humana Affiliate Contract, with respect to services rendered at the following locations, and any and all successor location(s):<br>• 6101 Pine Ridge Rd., Naples, FL<br>• 15215 Collier Blvd., #320, Naples, FL<br>• 24231 Walden Center Drive, Bonita Springs, FL | $0.00 | NeighborMD Partners of Gulf Coast, LLC |
| 18. | First Harbour Health Management, LLC | Soni Family Practice, PLLC | IPA Physician Agreement, as amended by, First Amendment to IPA Physician Group Agreement. | $0.00 | NeighborMD Partners of Central Florida, LLC |
| 19. | First Harbour Health Management, LLC | Soni Family Practice, PLLC | Humana Affiliate Contract, with respect to services rendered at the following location, and any and all successor location(s): 106 Park Place Blvd., Ste. C, | $0.00 | NeighborMD Partners of Central Florida, LLC |
| 20. | First Harbour Health Management, LLC | Four Corners Internal Medicine, LLC | IPA Physician Agreement, as amended by, First Amendment to IPA Physician Group Agreement. | $0.00 | NeighborMD Partners of Central Florida, LLC |
| 21. | First Harbour Health Management, LLC | Four Corners Internal Medicine, LLC | Humana Affiliate Contract, with respect to services rendered at the following location, and any and all successor location(s): 106 Polo Park Blvd., Davenport, FL. | $0.00 | NeighborMD Partners of Central Florida, LLC |

5

**LIST OF MATERIAL CONTRACTS - EXECUTORY CONTRACTS TO BE ASSUMED AND ASSIGNED**

| | DEBTOR ENTITY | CONTRACT COUNTER-PARTY(IES) | CONTRACT NAME / DESCRIPTION | CURE AMOUNT | ASSIGNEE |
|---|---|---|---|---|---|
| 22. | First Harbour Health Management, LLC | Florida Medical Clinic, LLC / Florida Medical Center, PL | IPA Physician Agreement | $0.00 | NeighborMD Partners of Central Florida, LLC |
| 23. | First Harbour Health Management, LLC | Florida Medical Clinic, LLC / Florida Medical Center, PL | Humana Affiliate Contract, with respect to services rendered at the following location, and any and all successor location(s): 308 Avenue C NE, Winter Haven, FL. | $0.00 | NeighborMD Partners of Central Florida, LLC |
| 24. | First Harbour Medical Centers, LLC | Blue Cross and Blue Shield of Florida, Inc. d/b/a Florida Blue | Commercial Fee for Service Payor Agreements | $0.00 | NeighborMD of Bradenton, LLC |
| 25. | First Harbour Medical Centers, LLC | UnitedHealthcare Insurance Company, on behalf of itself, UnitedHealthcare of Florida, Inc. and its other affiliates for certain products and services | Commercial Fee for Service Payor Agreements | $0.00 | NeighborMD of Bradenton, LLC |
| 26. | First Harbour Medical Centers, LLC | Aetna Health Inc. | Commercial Fee for Service Payor Agreements | $0.00 | NeighborMD of Bradenton, LLC |
| 27. | First Harbour Medical Centers, LLC | WellCare of Florida, Inc. | Commercial Fee for Service Payor Agreements | $0.00 | NeighborMD of Bradenton, LLC |
| 28. | First Harbour Medical Centers, LLC | AARP United Healthcare | Commercial Fee for Service Payor Agreements | $0.00 | NeighborMD of Bradenton, LLC |
| 29. | First Harbour Medical Centers, LLC | CIGNA HealthCare of Florida, Inc. | Commercial Fee for Service Payor Agreements | $0.00 | NeighborMD of Bradenton, LLC |
| 30. | First Harbour Medical Centers, LLC | UMR, Inc. / United HealthCare Services, Inc. | Commercial Fee for Service Payor Agreements | $0.00 | NeighborMD of Bradenton, LLC |
| 31. | First Harbour Medical Centers, LLC | TRICARE South Region | Commercial Fee for Service Payor Agreements | $0.00 | NeighborMD of Bradenton, LLC |

EAST\174535686.2

**LIST OF MATERIAL CONTRACTS - EXECUTORY CONTRACTS TO BE ASSUMED AND ASSIGNED**

| | DEBTOR ENTITY | CONTRACT COUNTER-PARTY(IES) | CONTRACT NAME / DESCRIPTION | CURE AMOUNT | ASSIGNEE |
|---|---|---|---|---|---|
| 32. | First Harbour Medical Centers, LLC | Ambetter from Sunshine Health, an affiliate of Centene Management Company | Commercial Fee for Service Payor Agreement | $0.00 | NeighborMD of Bradenton, LLC |
| 33. | First Harbour Medical Centers, LLC | AARP Medicare Complete | Commercial Fee for Service Payor Agreement | $0.00 | NeighborMD of Bradenton, LLC |
| 34. | Palm Medical Network, LLC | CarePlus Health Plans, Inc. | Network Agreement | $0.00 | NeighborMD Partners of South Florida, LLC and NeighborMD Partners of Central Florida, LLC |
| 35. | Florida Group Healthcare, LLC | CarePlus Health Plans, Inc. | Network Agreement | $0.00 | NeighborMD Partners of South Florida, LLC |
| 36. | Florida Group Healthcare, LLC | Romulo J. Camogliano, M.D. | CarePlus Affiliate Contract, with respect to services rendered at the following location, and any and all successor location(s): 1400 N. US Highway 441, Ste. 902, The Villages, FL. | $0.00 | NeighborMD Partners of Central Florida, LLC |
| 37. | Florida Group Healthcare, LLC | Florida Internal Medicine, PL and Dwaraknadh R. Banala, M.D. | CarePlus Affiliate Contract, with respect to services rendered at the following location, and any and all successor location(s): 620 South Lake St., Ste. 6, Leesburg, FL. | $0.00 | NeighborMD Partners of Central Florida, LLC |
| 38. | Florida Group Healthcare, LLC | Mary Ann Tesalona, M.D., Corp. [*sic*] and Mary Ann Tesalona, M.D. | CarePlus Affiliate Contract / Participation Agreement, with respect to services rendered at the following location, and any and all successor location(s): 32845 Radio Rd., Leesburg, FL. | $0.00 | NeighborMD Partners of Central Florida, LLC |
| 39. | Palm Medical Group, Inc. | The Medical Center Of Winston Towers, Inc. and Michael E. Horowitz, M.D. | CarePlus Affiliate Contract, with respect to services rendered at the following locations, and any and all successor location(s):<br>• 4302 Alton Rd., Ste. 320, Miami Beach, FL<br>• 2845 Aventura Blvd., Ste. 240, Aventura, FL | $0.00 | NeighborMD Partners of South Florida, LLC |

EAST\174535686.2

**LIST OF MATERIAL CONTRACTS - EXECUTORY CONTRACTS TO BE ASSUMED AND ASSIGNED**

| | DEBTOR ENTITY | CONTRACT COUNTER-PARTY(IES) | CONTRACT NAME / DESCRIPTION | CURE AMOUNT | ASSIGNEE |
|---|---|---|---|---|---|
| 40. | Palm Medical Group, Inc. | Mid Florida Adult Medicine, LLC | CarePlus Affiliate Contract, with respect to services rendered at the following locations, and any and all successor location(s):<br>• 7824 Lakes Underhill Rd., Ste. B, Orlando, FL<br>• 280 Wekiva Spring Rd., Ste. 1000, Longwood, FL | $0.00 | NeighborMD Partners of Central Florida, LLC |
| 41. | Florida Group Healthcare, LLC | Physicians Care Centers of Kissimmee, LLC | CarePlus Affiliate Contract, with respect to services rendered at the following location, and any and all successor location(s): 595 Oak Commons Blvd., Ste. A, Kissimmee, FL. | $0.00 | NeighborMD Partners of Central Florida, LLC |
| 42. | Palm Medical Group, Inc. | Amir Fahmy, M.D., P.A. and Amir Fahmy, M.D. | CarePlus Affiliate Contract, with respect to services rendered at the following location, and any and all successor location(s): 3345 Burns Rd., Ste. 204, Palm Beach Gardens, FL. | $0.00 | NeighborMD Partners of South Florida, LLC |
| 43. | Palm Medical Group, Inc. | Hygea of South Florida, Inc. f/k/a Sussman & Staller, M.D., P.A. | CarePlus Affiliate Contract, with respect to services rendered at the following locations, and any and all successor location(s):<br>• 9959 Pines Blvd., Pembroke Pines, FL<br>• 8395 W. Oakland Park Blvd., Ste. D, Oakland Park, FL<br>• 150 NW 168th St., Ste. 301, North Miami Beach, FL | $0.00 | NeighborMD Partners of South Florida, LLC |
| 44. | Hygea Medical Centers of Florida, LLC | Sunshine State Health Plan Inc. | Participating Provider Agreement | $0.00 | NeighborMD Partners of South Florida, LLC |

8

**LIST OF MATERIAL CONTRACTS - EXECUTORY CONTRACTS TO BE ASSUMED AND ASSIGNED**

| | DEBTOR ENTITY | CONTRACT COUNTER-PARTY(IES) | CONTRACT NAME / DESCRIPTION | CURE AMOUNT | ASSIGNEE |
|---|---|---|---|---|---|
| 45. | Palm Medical Group, Inc. | Hygea of South Florida, Inc. f/k/a Sussman & Staller M.D., P.A.[1] and Sheldon Staller, M.D.; Preferred Care Partners, Inc. (Preferred) and Medica HealthCare Plans, Inc. (Medica) | Preferred / Medica Affiliate Contract | $0.00 | NeighborMD Partners of South Florida, LLC |
| **B.  EMPLOYMENT AGREEMENTS** | | | | | |
| 46. | Hygea Health Holdings, Inc. | Alan M. Schwartz, M.D. and Sunrise Cardiology Associates, L.P. | Employment Agreement | $0.00 | NeighborMD of Sunrise, LLC |
| 47. | Hygea Health Holdings, Inc. | Amir Fahmy, M.D. and Amir Fahmy, M.D., P.A. | Employment Agreement | $0.00 | NeighborMD of Palm Beach Gardens, LLC |
| 48. | Hygea Health Holdings, Inc. | Shady Salib, M.D. and Amir Fahmy, M.D., P.A. | Employment Agreement | $0.00 | NeighborMD of Palm Beach Gardens, LLC |
| 49. | Hygea Health Holdings, Inc. | Sheldon Staller, M.D. | Employment Agreement | $0.00 | NeighborMD of North Miami Beach, LLC and NeighborMD of Pembroke Pines, LLC |
| 50. | Hygea Holdings Corp. | Alexander Tirado Nieves PA-C | Employment Agreement | $0.00 | NeighborMD of North Miami Beach, LLC |
| 51. | Hygea Holdings Corp. | Ewaul B. Persaud, Jr., M.D. | Employment Agreement | $0.00 | NeighborMD of South Atlanta, LLC |
| 52. | First Harbour Health Management, LLC and First Harbour Medical Centers, LLC | Jonathan L. Lopez Oliver, M.D. | Employment Agreement | $0.00 | NeighborMD of Bradenton, LLC |

---

[1] Actual counterparty to contract is Sussman & Staller, M.D., P.A., the former name of Hygea of South Florida, Inc.

EAST\174535686.2

**LIST OF MATERIAL CONTRACTS - EXECUTORY CONTRACTS TO BE ASSUMED AND ASSIGNED**

| | DEBTOR ENTITY | CONTRACT COUNTER-PARTY(IES) | CONTRACT NAME / DESCRIPTION | CURE AMOUNT | ASSIGNEE |
|---|---|---|---|---|---|
| 53. | First Harbour Health Management, LLC and First Harbour Medical Centers, LLC | Rosan Vargas Sequeda, M.D. | Employment Agreement | $0.00 | NeighborMD of Bradenton, LLC |
| 54. | First Harbour Medical Centers, LLC | Carlina White-Youssouf, PA | Employment Agreement | $0.00 | NeighborMD of Bradenton, LLC |
| 55. | First Harbour Medical Centers, LLC | James Hanusa, M.D. | Employment Agreement | $0.00 | NeighborMD of Bradenton, LLC |
| 56. | Hygea Holdings Corp. and Hygea Health Holdings, Inc. | Natasha Williamson, ARNP | Employment Agreement | $0.00 | NeighborMD of Atlanta, LLC and NeighborMD Of Newnan, LLC |
| 57. | Hygea Health Holdings, Inc. | Ivette Cardona Ruelle, M.D. | Employment Agreement | $0.00 | NeighborMD of Orlando, LLC |
| 58. | Hygea Health Holdings, Inc. | Ernesto Lazaro Izquierdo, M.D. | Employment Agreement | $0.00 | NeighborMD of Longwood, LLC |
| 59. | Hygea Health Holdings, Corp. [*sic*] | Orlando Benitez, M.D. | Employment Agreement | $0.00 | NeighborMD of Longwood, LLC |
| 60. | Hygea Health Holdings, Inc. | Magalie J. Samson, PA-C | Employment Agreement | $0.00 | NeighborMD of Sunrise, LLC |
| 61. | Hygea Health Holdings, Inc. | Kyrenia Sanchez Rodriguez, M.D. | Employment Agreement | $0.00 | NeighborMD of North Miami Beach, LLC |
| 62. | Hygea Health Holdings, Inc. | Juan F. Arteaga, M.D. | Employment Agreement | $0.00 | NeighborMD of Pembroke Pines, LLC |

10

**LIST OF MATERIAL CONTRACTS - EXECUTORY CONTRACTS TO BE ASSUMED AND ASSIGNED**

| | DEBTOR ENTITY | CONTRACT COUNTER-PARTY(IES) | CONTRACT NAME / DESCRIPTION | CURE AMOUNT | ASSIGNEE |
|---|---|---|---|---|---|
| **C. MANAGEMENT AGREEMENTS** | | | | | |
| 63. | Physician Management Associates East Coast, LLC | Professional Health Choice, Inc. | Management Agreement | $0.00 | NeighborMD Management of Florida, LLC |
| 64. | Physician Management Associates SE, LLC | Daniel Marcus, M.D., P.A. | Management Agreement | $0.00 | NeighborMD Management of Florida, LLC |
| 65. | Physician Management Associates SE, LLC | Florida Institute of Health, Ltd., L.L.L.P. | Management Agreement | $0.00 | NeighborMD Management of Florida, LLC |
| 66. | Physician Management Associates SE, LLC | Kissimmee Medical Specialties, P.A. | Management Agreement | $0.00 | NeighborMD Management of Florida, LLC |
| 67. | Physician Management Associates SE, LLC | Mid Florida Adult Medicine, LLC | Management Agreement | $0.00 | NeighborMD Management of Florida, LLC |
| 68. | Physician Management Associates SE, LLC | Premier South Medical Group, P.C. and Ewaul B. Persaud, Jr, M.D. | Management Agreement | $0.00 | NeighborMD Management of Georgia, LLC |
| 69. | Physician Management Associates SE, LLC | Hygea of South Florida, Inc. f/k/a Sussman & Staller, M.D., P.A. and Sheldon Staller, M.D. | Management Agreement | $0.00 | NeighborMD Management of Florida, LLC |
| 70. | Physician Management Associates SE, LLC | The Medical Center of Winston Towers, Inc. | Management Agreement | $0.00 | NeighborMD Management of Florida, LLC |

11

**LIST OF MATERIAL CONTRACTS - EXECUTORY CONTRACTS TO BE ASSUMED AND ASSIGNED**

| | DEBTOR ENTITY | CONTRACT COUNTER-PARTY(IES) | CONTRACT NAME / DESCRIPTION | CURE AMOUNT | ASSIGNEE |
|---|---|---|---|---|---|
| **D. OTHER VENDOR AGREEMENTS** | | | | | |
| 71. | First Harbour Medical Centers, LLC | eClinicalWorks, LLC | Software License and Support Cloud Agreement for Electronic Medical Records (EMR) and Practice Management | $0.00 | NeighborMD Management of Florida, LLC |
| 72. | Hygea of Georgia, LLC | eClinicalWorks, LLC | Software License and Support Cloud Agreement for Electronic Medical Records (EMR) and Practice Management, with respect to EMR for Premier South Medical Group, P.C. | $0.00 | NeighborMD Management of Georgia, LLC |
| 73. | Hygea Health Holdings, Inc. | Alleus Health Ltd. (f/k/a Alleus Services, LLC) d/b/a Alleus Health Analytics | Services Agreement | $0.00 | NeighborMD Management of Florida, LLC |
| 74. | Hygea Holdings Corp. | CT Solutions South, Inc. (as vendor) and GreatAmerica Financial Services Corporation (as lessor) | Master Agreement No. 1188778 (Pre-Fund and Add-On Equipment Lease), with respect to equipment delineated on schedules attached thereto. | $0.00 | NeighborMD Management of Florida, LLC |

EAST\174535686.2

**LIST OF MATERIAL CONTRACTS – UNEXPIRED LEASES TO BE ASSUMED AND ASSIGNED**

| # | Agreement | Location/Address | Assignees | Cure Amount |
|---|-----------|------------------|-----------|-------------|
| 1. | Lease Agreement, effective November 1, 2018, by and among Fischer Family Trust, Robert Fischer, Trustee and Hygea Health Holdings, Inc. and Hygea Holdings Corp. | 595 Oak Commons Blvd., Suite A, Kissimmee, FL 34741 | NeighborMD Management of Florida, LLC and NeighborMD of Kissimmee, LLC | $0 |
| 2. | Retail Lease, effective October 1, 2019, by and between Palm Square Center, LLC and Hygea Holdings Corp. | 9959 Pines Blvd., Pembroke Pines, FL 33024 | NeighborMD Management of Florida, LLC and NeighborMD of Pembroke Pines, LLC | $0 |
| 3. | Office Lease Agreement, dated January 1, 2010, by and between Sunrise Cardiology Associates, P.A. and Sunrise Medical Park, LLC, as amended by (i) Sublease Agreement, dated July 1, 2011, (ii) Lease and Sublease Extension and Amendment, dated November 12, 2014, (iii) Lease Extension Agreement, dated August 17, 2016, (iv) Amendment to Lease Agreement and Termination of Sublease Agreement, dated November 1, 2017, (v) Lease Extension and Amendment to Lease, effective March 1, 2018, by and between Sunrise Medical Park, LLC and Hygea Holdings Corp., (vi) Assignment of Lease by and among Sunrise Cardiology Associates, P.A. (as assignor), Hygea Holdings Corp. (as assignee), and Sunrise Medical Park, LLC (as Landlord), and (vii) correspondence, dated May 1, 2020, from Sunrise Medical Park, LLC, confirming ongoing month-to-month arrangement. | 8393 W. Oakland Park Blvd., Sunrise, FL 33351 | NeighborMD Management of Florida, LLC and NeighborMD of Sunrise, LLC | $0 |
| 4. | Lease Agreement, dated September 29, 2014, by and between International City Building, LLC and Hygea Holdings, Inc. [*sic*], as amended by, Renewal Option Letter, dated March 6, 2020. | 152 NW 168 St., Suite 301, North Miami Beach, FL 33169 | NeighborMD Management of Florida, LLC and NeighborMD of North Miami Beach, LLC | $0 |
| 5. | Medical Office Building Lease, effective October 1, 2013, by and between HTA - Camp Creek, LLC and Premier South Medical Group, P.C., as amended by, First Amendment to Medical Office Building Lease, effective April 23, 2020, by and between HTA - Camp Creek, LLC and Physician Management Associates SE, LLC. | 3885 Princeton Lakes Way, Suite 412, Atlanta, GA 30331 (Camp Creek Medical Center II) | NeighborMD Management of Georgia, LLC and NeighborMD of South Atlanta, LLC | $0 |

## LIST OF MATERIAL CONTRACTS – UNEXPIRED LEASES TO BE ASSUMED AND ASSIGNED

| # | Agreement | Location/Address | Assignees | Cure Amount |
|---|-----------|------------------|-----------|-------------|
| 6. | Commercial Lease Agreement, effective March 1, 2020, by and between Prime Ventures Corporation and Hygea Holdings Corp. | 770 Greison Trail, Suite F, Newnan, GA 30263 | NeighborMD Management of Georgia, LLC and NeighborMD of Newnan, LLC | $0 |
| 7. | Office Lease, dated May 8, 2019, by and between Flagler West Corporate Center, LLC and Hygea Holdings Corp. | 8700 West Flagler Street, Suite 280, Miami, FL 33174 | NeighborMD Management of Florida, LLC | $0 |
| 8. | Office Lease, effective November 1, 2019, by and between Flagler West Corporate Center, LLC and Hygea Holdings Corp. | 8700 West Flagler Street, Suite 290, Miami, FL 33174 | NeighborMD Management of Florida, LLC | $0 |
| 9. | Sublease Agreement, dated February 2020, by and between Halos Systems, LLC and Hygea Health Holdings, Inc. | 7316 Delainey Court, Sarasota, FL 34240 (Parcel Id 0188-07-1012)  7320 Delainey Court, Sarasota, FL 34240 (Parcel Id 0188-07-101S)  7324 Delainey Court, Sarasota, FL 34240 (Parcel Id 0188-07-1013 and Parcel Id 0188-07-1014) | NeighborMD Management of Florida, LLC | $0 |

EAST\174551983.1

## **EXHIBIT F**

List of Retained Causes of Action

## RETAINED CAUSES OF ACTION

The definition of Creditors' Trust Causes of Action shall exclude Causes of Action against the counterparties to all Material Contracts to be assumed and assigned pursuant to the Plan and the following individuals and entities, together with their respective affiliates, subsidiaries and successors-in-interest:

1.  Go-Forward Landlords

    (a)  Fischer Family Trust (and Robert Fischer, as Trustee thereof)

    (b)  Palm Square Center, LLC

    (c)  Protegrity Properties Inc.

    (d)  Sunrise Medical Park, LLC

    (e)  Fahmy Properties, LLC

    (f)  Mount Sinai Medical Center of Florida, Inc.

    (g)  Leisure Colony Management Corp. and Kings Point Plaza, Ltd.

    (h)  Lake Underhill Professional Group, LLC

    (i)  Atlanta Medical Center, Inc.

    (j)  Prime Ventures Corporation

    (k)  HTA – Camp Creek, LLC

    (l)  International City Building, LLC

    (m)  Govin T. Rajan

    (n)  Flagler West Corporate Center, LLC

    (o)  Halos Systems, LLC

2.  Affiliated Practices

    (a)  Collier Boulevard HMA Physician Management, LLC

    (b)  Collier HMA Physician Management, LLC

    (c)  CHS/Community Health Systems, Inc.

    (d)  Florida Medical Center, PL

    (e)  Florida Medical Clinic, LLC

    (f)  Four Corners Internal Medicine, LLC

    (g)  Global TPA, LLC

    (h)  Gulf Coast HMA Physician Management, LLC

    (i)  Gulf Coast HMA Physician Management, Inc.

    (j)  S. Reddy Kosanam, M.D.

    (k)  Meadowcrest Family Physicians, P.A.

    (l)  Millennium Physician Group, LLC

    (m)  Pediatric and Internal Medicine Specialists, Inc.

1

(n)    Punta Gorda HMA Physician Management, LLC

(o)    Soni Family Practice, PLLC

(p)    First Harbour Medical Centers, LLC

(q)    Romulo J. Camogliano, M.D., P.A.

(r)    Florida Internal Medicine, PL

(s)    Dwaraknadh R. Banala, M.D.

(t)    Mary Ann Tesalona, M.D., Corp.

(u)    Mary Ann Tesalona, M.D.

(v)    The Medical Center of Winston Towers, Inc.

(w)    Amir Fahmy, M.D., P.A.

(x)    Mid Florida Adult Medicine, LLC

(y)    Sunrise Cardiology Associates, L.P.

(z)    Physicians Care Centers of Kissimmee, LLC

(aa)   Kissimmee Medical Specialties, P.A.

(bb)   Hygea of South Florida, Inc. f/k/a Sussman & Staller, M.D., P.A.

(cc)   Florida Institute of Health, Ltd., L.L.L.P.

(dd)   Premier South Medical Group, P.C.

(ee)   Daniel Marcus, M.D., P.A.

(ff)   Daniel E. Marcus, M.D., P.A.

3.   <u>Health Plans</u>

(a)    Humana
       (i)    Humana Insurance Company
       (ii)   Humana Health Insurance Company of Florida, Inc.
       (iii)  Humana Medical Plan, Inc.
       (iv)   Humana, Inc.

(b)    CarePlus Health Plans, Inc.

(c)    Simply Healthcare Plans, Inc.

(d)    Medica / Preferred / United Healthcare
       (i)    Medica HealthCare Plans, Inc.
       (ii)   Preferred Care Partners, Inc.
       (iii)  United HealthCare Services, Inc.
       (iv)   United Healthcare of Florida, Inc.
       (v)    United Healthcare Insurance Company
       (vi)   AARP United Healthcare
       (vii)  UMR, Inc.

(e)    Florida Blue
       (i)    Blue Cross and Blue Shield of Florida, Inc. d/b/a Florida Blue

(f)    AARP Medicare Complete

2

(g)     Freedom Health, Inc.

(h)     Optimum Healthcare, Inc.

(i)     Ambetter / Centene
    (i)     Sunshine State Health Plan, Inc.
    (ii)    Centene Management Company LLC
    (iii)   Centene Corporation
    (iv)    Ambetter from Sunshine Health
    (v)     Celtic Insurance Company

(j)     WellCare / Centene
    (i)     WellCare Health Plans, Inc.
    (ii)    Centene Corporation

(k)     Aetna / Coventry / Summit
    (i)     Aetna
        (A)     Aetna Health Inc.
        (B)     Aetna Better Health of Florida Inc.
    (ii)    Coventry Health Care of Florida
        (A)     Coventry Health Care, Inc.
        (B)     Coventry Health and Life Insurance Company
        (C)     Vista Healthplan, Inc.
        (D)     Vista Health Plan of South Florida, Inc.
        (E)     Summit Health Plan, Inc.
        (F)     First Health Life and Health Insurance Company
        (G)     First Health Group Corp.
        (H)     Coventry Health Care Workers' Compensation Services, Inc.
    (iii)   Summit Health Plan, Inc.
        (A)     SHP Healthplan, Inc.

(l)     Molina Healthcare of Florida, Inc.

(m)     MMM of Florida, Inc. f/k/a Health Advantage Florida, Inc.

(n)     Devoted Health, Inc.

(o)     CIGNA HealthCare of Florida, Inc.

(p)     TRICARE South Region

4.     <u>Vendors</u>

(a)     HeathExcel, Ltd.

(b)     NextGen Healthcare Inc.

(c)     eClinicalWorks, LLC

(d)     Healthcare Advisory Solutions, L.L.C.

(e)     Care Optimize, LLC a/k/a Care Optimize

(f)     Care Alliance, LLC a/k/a Practice Alliance

(g)     Alleus Health Ltd. (f/k/a Alleus Services, LLC) d/b/a Alleus Health Analytics

(h)     GreatAmerica Financial Services Corporation

(i)     CT Solutions South, Inc.

## **EXHIBIT G**

List of Dissolved Entities

| | Entity | Jurisdiction | Owner |
|---|---|---|---|
| 1. | Hygea Holdings Corp. | Nevada | |
| 2. | Hygea of Delaware, LLC | Delaware | Hygea Holdings Corp. |
| 3. | Physicians Group Alliance, LLC | Florida | Hygea Holdings Corp. |
| 4. | Hygea Acquisitions Atlanta, LLC | Georgia | Hygea Holdings Corp. |
| 5. | Palm Medical Group, Inc. | Florida | Hygea Holdings Corp. |
| 6. | Physicians Group Alliance of South Florida, LLC | Florida | Hygea Holdings Corp. |
| 7. | Florida Group Healthcare LLC | Florida | Hygea of Delaware, LLC |
| 8. | All Care Management Services, Inc. | Florida | Hygea of Delaware, LLC |
| 9. | Hygea of Georgia, LLC | Georgia | Hygea of Delaware, LLC |
| 10. | Palm A.C. MSO, LLC | Florida | Hygea Health Holdings, Inc. |
| 11. | Palm Allcare Medicaid MSO, Inc. | Florida | Hygea Health Holdings, Inc. |
| 12. | Palm Allcare MSO, Inc. | Florida | Hygea Health Holdings, Inc. |
| 13. | Palm MSO System, Inc. | Florida | Hygea Health Holdings, Inc. |
| 14. | Palm Medical MSO, LLC | Florida | Hygea Health Holdings, Inc. |
| 15. | Palm PGA MSO, Inc. | Florida | Hygea Health Holdings, Inc. |
| 16. | Palm Medical Network, LLC | Florida | Hygea Health Holdings, Inc. |
| 17. | Gemini Healthcare Fund, LLC | Florida | Hygea Health Holdings, Inc. |
| 18. | Medlife Activity Center, LLC | Florida | Hygea Health Holdings, Inc. |
| 19. | Hygea Florida, LLC | Florida | Hygea Health Holdings, Inc. |
| 20. | Hygea Primum Acquisition, Inc. | Florida | Hygea Health Holdings, Inc. |
| 21. | Primum Alternatives Inc. | Florida | Hygea Health Holdings, Inc. |
| 22. | Primum Healthcare, LLC | Florida | Hygea Health Holdings, Inc. |
| 23. | Hygea IGP of Central Florida, Inc. | Florida | Hygea Health Holdings, Inc. |
| 24. | Mobile Clinic Services, LLC | Florida | Hygea Health Holdings, Inc. |
| 25. | Hygea Medical Partners, LLC | Florida | Hygea Health Holdings, Inc. |
| 26. | Hygea IGP, LLC | Florida | Hygea Health Holdings, Inc. |
| 27. | Hygea Acquisition Orlando, LLC | Florida | Hygea Health Holdings, Inc. |
| 28. | Hygea Acquisition Longwood, LLC | Florida | Hygea Health Holdings, Inc. |
| 29. | Hygea of North Miami Beach 1, LLC | Florida | Hygea Health Holdings, Inc. |
| 30. | Hygea of North Miami Beach 2, LLC | Florida | Hygea Health Holdings, Inc. |
| 31. | Hygea of Pembroke Pines, LLC | Florida | Hygea Health Holdings, Inc. |
| 32. | Professional Health Choice, Inc. | Florida | Hygea Health Holdings, Inc. |
| 33. | Physician Management Associates SE, LLC | Florida | Hygea Health Holdings, Inc. |
| 34. | Physician Management Associates East Coast, LLC | Florida | Hygea Health Holdings, Inc. |
| 35. | Hygea Medical Centers of Florida, LLC | Florida | Hygea Health Holdings, Inc. |
| 36. | First Harbour Health Management, LLC | Florida | Hygea Health Holdings, Inc. |

# **EXHIBIT H**

Form of Creditors' Trust Agreement

## CREDITORS' TRUST AGREEMENT

THIS CREDITORS' TRUST AGREEMENT (the "Agreement") is entered into this day of _____, 2020, by and among Hygea Holdings Corp., and its affiliated debtors and debtors in possession (collectively, the "Debtors"); Bridging Finance Inc. and Bridging Income Fund LP (collectively, "Bridging"); the Official Committee of Unsecured Creditors of the Debtors (the "Committee"); Advisory Trust Group, LLC, in its capacity as the trustee (the "Trustee") of the Creditors' Trust (defined below); and the Creditors' Trust Oversight Committee members whose names appear as such on the signature pages to this Agreement (collectively, the "Parties").

## W I T N E S S E T H :

**WHEREAS**, on February 19, 2020 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), thereby commencing the Debtors' chapter 11 cases, which were jointly administered by the Bankruptcy Court under Case No. 20-10361 (KBO);

**WHEREAS**, on May 1, 2020, the Debtors filed the *First Amended Joint Chapter 11 Plan of Reorganization of Hygea Holdings Corp. and Its Affiliated Debtors* [Docket No. 382] (as amended, modified, or supplemented, the "Plan") and *First Amended Disclosure Statement with Respect to First Amended Joint Chapter 11 Plan of Reorganization of Hygea Holdings Corp. and its Affiliated Debtors* [Docket No. 383-1] (the "Disclosure Statement") with the Bankruptcy Court;

**WHEREAS**, on June ___, 2020, the Bankruptcy Court entered an order confirming the Plan (the "Confirmation Order") [Docket No. ___];

**WHEREAS**, the Plan provides, among other things, for the establishment of a creditors' trust (the "Creditors' Trust") for the benefit of its Beneficiaries (defined below) and for the appointment of the Trustee as the trustee and manager of the Creditors' Trust, in consultation with the Creditors' Trust Oversight Committee;

**WHEREAS**, the Trustee has agreed to act as trustee under this Agreement for purposes herein provided;

**WHEREAS**, the Creditors' Trust is established for the sole purpose of implementing the Creditors' Trust Functions (defined below), in accordance with Treasury Regulations Section 301.7701-4(d), with no objective or authority to continue or engage in the conduct of a trade or business;

**WHEREAS**, the Creditors' Trust is intended to qualify as a liquidating trust within the meaning of Treasury Regulations Section 301.7701-4(d) that is treated as "grantor trust" for federal and applicable state income tax purposes;

**NOW, THEREFORE**, for and in consideration of the promises and mutual covenants herein contained, pursuant to the Plan, the Parties do hereby covenant and agree as follows:

# ARTICLE I

## Definitions; Interpretive Rules.

1.1     <u>Terms Defined in Plan</u>.  Any capitalized term used and not defined herein shall have the meaning assigned to it in the Plan.

1.2     <u>Interpretive Rules</u>.  For purposes of this Agreement, except as otherwise expressly provided herein or unless the context otherwise requires: (a) references to "Articles", "Sections", and other subdivisions, without reference to a particular document, are to be designated Articles, Sections, and other subdivisions of this Agreement; (b) the use of the term "including" means "including but not limited to"; and (c) the words "herein", "hereof", "hereunder", and other words of similar import refer to this Agreement as a whole and not to any particular provision (unless otherwise specified).  The enumeration and headings contained in this Agreement are for convenience of reference only and are not intended to have any substantive significance in interpreting this Agreement.  The singular shall include the plural and the plural the singular, when the context so requires, and the feminine, the masculine, and the neuter genders shall be mutually inclusive.  Wherever the conjunctive (*e.g.*, "and") is used herein, it shall also be read as if phrased in the disjunctive (*e.g.*, "or"), and vice versa.

# ARTICLE II

## Establishment of the Creditors' Trust, Appointment of the Trustee

2.1     <u>Establishment of the Creditors' Trust</u>.  Pursuant to the Plan, the Parties hereby establish the Creditors' Trust, effective as of the Effective Date.  Advisory Trust Group, LLC is hereby appointed as the Trustee, effective as of the Effective Date, and hereby accepts such appointment.  On the Effective Date, the Creditors' Trust will become effective, in order to implement the Creditors' Trust Functions (defined below).  On the Effective Date or as soon thereafter as practicable, pursuant to the Plan and Bankruptcy Code Sections 1123, 1141 and 1146(a), the Debtors, their Estates, Bridging, and the Committee (as the case may be) will transfer, grant, assign, convey, set over, and deliver to the Trustee, for the benefit of the Creditors' Trust, all of the Debtors', their Estates', and Bridgings' right, title and interest in and to the Creditors' Trust Assets, including, but not limited to (i) the Creditors' Trust Loan; (ii) the Creditors' Trust Causes of Action, (iii) the Creditor Committee Equity, (iv) the Put Election, and (iii) all other unencumbered assets of the Debtors' Estates remaining after all required payments have been made pursuant to the Plan, Confirmation Order, and this Agreement, as applicable, free and clear of all Liens, Claims, encumbrances or interests of any kind in such property, except as otherwise provided for in the Plan.  On the Effective Date and automatically and without further action, the Trustee, in consultation with the Creditors' Trust Oversight Committee, will have full power and authority as the trustee of the Creditors' Trust in accordance with the Plan and this Agreement.  On and after the Effective Date, the Trustee, on behalf of the Creditors' Trust, will take any and all actions as he believes may be necessary, desirable or appropriate with respect to the Creditors' Trust, subject to the terms of the Plan and this Agreement.  The Creditors' Trust is organized and established as a trust for the benefit of the Beneficiaries and is intended to qualify as a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d).  In accordance with Treasury Regulation 301.7701-4(d), the sole Beneficiaries of the Creditors' Trust will be the

Holders of Allowed General Unsecured Claims against the Debtors that are entitled to Distributions. Such Beneficiaries shall be bound by this Agreement. The interests of the Beneficiaries in the Creditors' Trust shall be uncertificated and nontransferable except upon death of the interest holder or by operation of law. Neither Bridging nor any of its participants shall be entitled to any Distributions from the Creditors' Trust on account of Bridging's Deficiency Claim. The Creditors' Trust will not be deemed a successor-in-interest of the Estates for any purpose other than as specifically set forth in the Plan and this Agreement.  This Agreement and the Creditors' Trust created pursuant to the Plan and this Agreement are hereby declared to be irrevocable and the Debtors and Bridging shall not have any right at any time to withdraw any of the property held hereunder or to revoke, annul, or cancel the Creditors' Trust in whole or in part, or to alter, amend, or modify this Agreement in any respect.  In the event of any inconsistency between this Agreement, the Plan, and the Confirmation Order, the Confirmation Order and Plan, in that order, shall govern.

2.2    <u>Vesting of Estate Assets, Free and Clear of Liens</u>.  Upon the Effective Date, the Creditors' Trust will be vested with all right, title, and interest in the Creditors' Trust Assets, and such property will become the property of the Creditors' Trust free and clear of all Claims, Liens, charges, other encumbrances, and Interests, except as set forth in the Plan.

2.3    <u>Trust Name</u>.  The trust created hereby shall be known as the "Creditors' Trust of Hygea Holdings Corp.", in which name the Trustee may, among other things, carry out the Creditors' Trust Functions, conduct the business of the Creditors' Trust, retain counsel and other professionals and pay fees and costs incurred by counsel and other professionals, make and execute contracts on behalf of the Creditors' Trust, sue and be sued on behalf of the Creditors' Trust, and take such other actions as the Trustee is authorized to take under the Plan and this Agreement.

### ARTICLE III

### Creditors' Trust, Purpose, Administration

3.1    <u>Purpose of the Creditors' Trust</u>.  The Creditors' Trust shall be established for the purpose of carrying out the Creditors' Trust Functions and liquidating, distributing and resolving claims to the Creditors' Trust Assets, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except only in the event and to the extent necessary for, and consistent with, the purpose of the Creditors' Trust. Accordingly, the Trustee, in consultation with the Creditors' Trust Oversight Committee, shall, in an expeditious but orderly manner, carry out the Creditors' Trust Functions, liquidate and convert the Creditors' Trust Assets to Cash, make timely Distributions and not unduly prolong the duration of the Creditors' Trust.

3.2    <u>Governance of the Creditors' Trust</u>.  The Creditors' Trust will be administered and controlled by the Trustee, in consultation with the Creditors' Trust Oversight Committee.

3.3    <u>Purpose of this Agreement and Creditors' Trust Functions</u>.  The parties hereby enter into this Agreement for the purposes of establishing the Creditors' Trust contemplated by the Plan and authorizing the Trustee, in consultation with the Creditors' Trust Oversight Committee, to, among other things, implement and carry out the Creditors' Trust functions as follows: (a)

establishing reserves and investing Cash; (b) liquidating non-Cash Creditors' Trust Assets; (c) retaining and paying professionals as necessary to carry out the purposes of the Creditors' Trust; (d) preparing and filing tax returns for the Creditors' Trust; (e) preparing and filing reports and other documents necessary to conclude and close the Chapter 11 Cases; (f) objecting to, reconciling, seeking to subordinate, compromising or settling any or all Claims and administering Distributions on account of General Unsecured Claims; (g) evaluating, filing, litigating, settling, or otherwise pursuing any Creditors' Trust Causes of Action; (h) abandoning any property of the Creditors' Trust that cannot be sold or distributed economically; (i) making interim and final Distributions of Creditors' Trust Assets (after payment of or reserve for all Creditors' Trust expenses) to the Creditors' Trust Beneficiaries pursuant to this Agreement; (j) winding up the affairs of the Creditors' Trust and dissolving it under applicable law; (k) destroying records; and (l) such other responsibilities as may be vested in the Trustee pursuant to the Plan, this Agreement or Bankruptcy Court order or as may be necessary and proper to carry out the provisions of the Plan (collectively "<u>Creditors' Trust Functions</u>").

       3.4    <u>Administration of the Creditors' Trust Assets</u>. From and after the Effective Date, the Trustee, in consultation with the Creditors' Trust Oversight Committee, shall take all steps necessary to liquidate all Creditors' Trust Assets and distribute the proceeds in accordance with the Plan, Confirmation Order, and this Agreement, including prosecuting, litigating, settling or otherwise liquidating and reducing the Creditors' Trust Assets to Cash, or abandoning the Creditors' Trust Assets on such terms and for such consideration as he deems to be reasonable and in the best interests of the Beneficiaries.

       3.5    <u>Authority of the Trustee</u>. The Trustee will serve as a fiduciary to the Beneficiaries of the Creditors' Trust and, in consultation with the Creditors' Trust Oversight Committee, will be empowered to implement the Creditors' Trust Functions, effect all actions, execute, and deliver all agreements, instruments, and other documents, make the distributions contemplated, and perform all of the obligations and agreements of the Creditors' Trust and/or of the Trustee necessary to implement the provisions of the Plan and this Agreement (to the extent applicable) and otherwise in furtherance of the purposes of the Creditors' Trust. The Trustee shall pursue or not pursue any Creditors' Trust Causes of Action as the majority of the Creditors' Trust Oversight Committee determines is in the best interests of the Creditors' Trust's Beneficiaries and consistent with the purposes of the Creditors' Trust, and shall have no liability for the outcome of his decision, other than those decisions constituting liability for bad faith, willful misconduct, reckless disregard of duty, criminal conduct, gross negligence, fraud, or self-dealing.

       3.6    <u>Creditors' Trust Oversight Committee Majority Approval</u>. With respect to any Material Action (as defined in Section 5.6 herein), the Trustee must obtain majority approval from the Creditors' Trust Oversight Committee.

       3.7    <u>Expenses of the Creditors' Trust</u>. Only the Creditors' Trust Assets will be used to pay all liabilities, costs and expenses of the Creditors' Trust, including compensation then due and payable to the Trustee, his agents, representatives, professionals, and employees, and all costs, expenses, and liabilities incurred by the Trustee in connection with the performance of his duties. The reasonable fees and expenses of the Trustee and his counsel and agents will be paid from the Creditors' Trust Assets. The Trustee shall not be required to file a fee application to receive

compensation, but shall provide a report of such expenses to the Creditors' Trust Oversight Committee.

3.8     Tax Treatment of Creditors' Trust.  For United States federal and applicable state income tax purposes, the transfer of the Creditors' Trust Assets to the Creditors' Trust pursuant to and in accordance with the Plan shall be treated as a disposition of such assets directly to and for the benefit of the Beneficiaries.  The Beneficiaries will be treated as the grantors and owners of the Creditors' Trust.  All earnings of the Creditors' Trust shall be currently taxable to the Beneficiaries in the year in which such earnings are realized, including earnings retained in any established reserves, in accordance with their respective rights to such earnings.  The Creditors' Trust is intended to qualify as a liquidating trust that is treated as a "grantor trust" for federal income tax purposes, and the Trustee shall use his best efforts to operate and maintain the Creditors' Trust in compliance with Internal Revenue Service Revenue Procedure 94-45, 1994- 2 C.B. 684, and Treasury Regulation sections 1.671-4(a) and 301.7701-4(d) and all subsequent guidelines regarding liquidating trusts issued by the Internal Revenue Service.

3.9     Incorporation of Plan.  The Plan, as confirmed by the Confirmation Order, is hereby incorporated into this Agreement and made a part hereof by this reference; provided, however, unless otherwise specified herein, to the extent that there is conflict between the provisions of this Agreement, the provisions of the Plan, and/or the Confirmation Order, each such document shall have controlling effect in the following rank order: (1) the Confirmation Order; (2) the Plan; and (3) this Agreement.

## ARTICLE IV

### Duties, Rights and Powers of Trustee

4.1     Status of the Trustee.  The Trustee, acting on behalf of the Creditors' Trust, shall be the "representative of the estate" as that phrase is used in Bankruptcy Code section 1123(b)(3)(B) with respect to the rights and powers granted in this Agreement and in the Plan and Confirmation Order.  Except as otherwise set forth in the Plan and Confirmation Order, the Creditors' Trust shall be the successor-in-interest to the Debtors with respect to all Creditors' Trust Assets, including all Creditors' Trust Causes of Action that were or could have been commenced by the Debtors or the Estates prior to the Effective Date and shall be deemed substituted for the same as the party in such action.  All actions, claims, rights, or interests constituting Creditors' Trust Assets are preserved and retained and may be enforced by the Creditors' Trust as the representative of the Debtors and/or the Estates pursuant to Bankruptcy Code section 1123(b)(3)(B).  The Creditors' Trust shall be a party-in-interest as to all matters over which the Bankruptcy Court has jurisdiction and shall be the only party to have standing to file, prosecute, settle, or compromise all Creditors' Trust Assets, including all Creditors' Trust Causes of Action. Further, for the avoidance of any doubt, the Trustee may bring or assert Creditors' Trust Causes of Action under any primary director and officer liability, employment practices liability, or fiduciary liability insurance policies, as insolvency trustees, receivers, examiners, conservators, liquidators, rehabilitators or similar officials, as those terms are used in the policies.

4.2     Duties of the Trustee.  The Trustee, in consultation with the Creditors' Trust Oversight Committee, shall have the exclusive right and duty to administer and liquidate the

Creditors' Trust Assets, file, prosecute, litigate, compromise, settle, and abandon Creditors' Trust Causes of Action assigned and delivered to the Creditors' Trust, pursue and, subject to the Plan and Section 7.4 hereof, oversee the objections to and resolution of Claims and related processes, collect all income, make Distributions to the Beneficiaries from the Creditors' Trust Assets, and make payments to other parties, all as provided in this Agreement, the Plan, and the Confirmation Order.

4.3     Standard of Care.  The Trustee shall exercise his rights and powers vested in him by this Agreement and use reasonable business judgment in his exercise of his duties.  Subject to applicable law, the Trustee shall not be liable to the Creditors' Trust or any Beneficiary for any act he may do or omit to do as a Trustee while acting in good faith and in the exercise of his reasonable business judgment.  The foregoing limitation on liability will apply equally to the agents, professionals, accountants, attorneys, and/or employees of the Trustee acting on behalf of the Trustee in the fulfillment of the Trustee's duties hereunder.

4.4     Bond.  The Trustee shall not be required to post a bond.

4.5     Trustee's Rights and Powers.  The Trustee shall act on behalf of the Creditors' Trust and, except as otherwise provided for under the Plan and this Agreement, shall be vested with all rights, powers, privileges, and benefits afforded to the Debtors' Estates and/or a "trustee" under Bankruptcy Code sections 704 and 1106, including, without limitation, the attorney-client and work product privilege, and he shall be vested with any such rights, powers, privileges and benefits of the Debtors and their Estates, including the right to assert the attorney-client privilege or any other privilege of and on behalf of the Debtors and Estates, and the right to enforce contracts, and assert claims, defenses, offsets and privileges.  The Trustee shall have all the powers and authority set forth herein and in the Plan and Confirmation Order necessary to effect the disposition, orderly liquidation, and/or distribution of all Creditors' Trust Assets and proceeds thereof, in consultation with the Creditors' Trust Oversight Committee.  As of the Effective Date, the rights and powers of the Trustee shall include, subject to the limitations set forth in the Plan, Confirmation Order and this Agreement, the right and power, without further Bankruptcy Court approval, to:

(a)     Liquidate or otherwise reduce to Cash the Creditors' Trust Assets in accordance with the Plan and this Agreement;

(b)     Settle, resolve and object to Claims, and file, prosecute, compromise and settle Creditors' Trust Causes of Action assigned and delivered to the Creditors' Trust, whether or not the Creditors' Trust Causes of Action or objections to Claims have been commenced prior to the Effective Date, and the Trustee shall be substituted as the real party in interest in any such action or objection by or against the Debtors or the Committee;

(c)     Make the payments provided for in the Plan and Section 7.1 hereof, including Distributions to the Creditors' Trust's Beneficiaries;

(d)     Seek an estimation of contingent or unliquidated Claims under Bankruptcy Code section 502(c);

(e)     Determine, satisfy, object to, and estimate any and all claims or liabilities created, incurred or assumed by the Creditors' Trust;

-6-

(f)      Invest the Creditors' Trust Assets as set forth in Section 4.13 herein;

(g)      Establish, maintain and administer a reserve for payment of the expenses of the Creditors' Trust;

(h)      Maintain and administer the Cash in the Creditors' Trust;

(i)      Pay and satisfy from the Creditors' Trust Assets all Allowed Claims and Creditors' Trust expenses, including professional fees and expenses, and all fees due pursuant to Section 1930 of Chapter 123 of Title 28 of the United States Code until such time as the Bankruptcy Court enters a final decree closing the Chapter 11 Cases;

(j)      Enforce, carry out, and comply with the terms of the Plan, Confirmation Order, and this Agreement;

(k)      Enforce, carry out, and perform the Trustee's duties and Creditors' Trust Functions under this Agreement and the Plan;

(l)      Retain counsel or special counsel, financial advisors or accountants, and employ other individuals in connection with the administration of the Creditors' Trust or the liquidation of the Creditors' Trust Assets, and pay all reasonable and necessary costs of any litigation directly or indirectly involving the Debtors, the Estates, or the Creditors' Trust Assets;

(m)      Prepare and deliver written statements or notices, quarterly or otherwise, required by law or by the terms of this Agreement to be delivered to Beneficiaries;

(n)      Seek authority from the Bankruptcy Court to close the Chapter 11 Cases in accordance with the Bankruptcy Code, Bankruptcy Rules and the Plan;

(o)      If at any time the Trustee determines, in reliance upon such professionals as the Trustee may retain, that the expense of administering the Creditors' Trust so as to make a final distribution to the Beneficiaries is likely to exceed the value of the assets remaining in the Creditors' Trust, the Trustee shall apply to the Bankruptcy Court for authority to (i) reserve any amounts necessary to close the Chapter 11 Cases, (ii) donate the balance to the Charity, and (iii) close the Chapter 11 Cases in accordance with the Bankruptcy Code and Bankruptcy Rules;

(p)      Hold legal title to any and all rights of the Beneficiaries in or arising from the Creditors' Trust or Creditors' Trust Assets;

(q)      Execute and file any and all documents, regulatory filings, and transfer applications and take any and all other actions related to, or in connection with, the liquidation of the Creditors' Trust, the exercise of the Trustee's powers granted herein, and the enforcement of any and all instruments, contracts, agreements, claims, or causes of action relating to the Creditors' Trust or the Creditors' Trust Assets;

(r)      Open and maintain bank accounts and deposit funds, draw checks and make disbursements in accordance with this Agreement and the Plan;

(s)     If necessary, prepare and file, or have prepared and filed, any and all tax and information returns with respect to the Creditors' Trust treating the Creditors' Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and pay taxes properly payable by the Creditors' Trust, if any, and make distributions to Beneficiaries net of any such taxes;

(t)     In the event the Trustee determines that any of the Beneficiaries of the Creditors' Trust may, will, or has become subject to adverse tax consequences, take such actions that in his reasonable discretion will, or are intended to, alleviate such adverse tax consequences, such as dividing the Creditors' Trust Assets into several trusts or other structures and/or paying certain Beneficiaries in a manner different than that originally contemplated hereunder (but not otherwise inconsistent with the provisions of this Agreement or the Plan), provided, however, the Trustee shall be under no obligation to take any such actions;

(u)     Withhold from the amount allocable, payable or distributable to any Entity such amount as may be sufficient or required to pay any tax or other charge which the Creditors' Trust has determined, in his reasonable discretion, is required to be withheld therefrom under the income tax laws of the United States or of any state or political subdivision thereof, and to pay or deposit such withheld tax with the appropriate governmental authority.  In the exercise of his discretion and judgment, the Trustee may enter into agreements with taxing or other governmental authorities for the payment of such amounts as may be withheld in accordance with the provisions hereof;

(v)     Seek any relief from or resolution of any disputes concerning the Plan, the Creditors' Trust, or the Creditors' Trust Assets by the Bankruptcy Court or any other court with proper jurisdiction;

(w)     Appear and participate in any proceeding before the Bankruptcy Court or any other court with proper jurisdiction with respect to any matter regarding or relating to this Agreement, the Plan, Confirmation Order, Creditors' Trust, or the Creditors' Trust Assets;

(x)     Review and object to professional fee claims; and

(y)     Take such other actions as shall be necessary to implement the Plan, Confirmation Order, and the terms of this Agreement, wind down the affairs of the Creditors' Trust and effect the closing of the Chapter 11 Cases, carry out the Creditors' Trust Functions and related obligations, exercise his and the Creditors' Trust's rights in accordance with and subject to the Plan and Confirmation Order, and perform all of the duties, responsibilities and obligations as set forth in this Agreement.

4.6     <u>Limitations on Trustee</u>.  For U.S. federal income tax purposes, the Trustee shall not be authorized to engage in any trade or business with respect to the Creditors' Trust Assets or any proceeds therefrom except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Creditors' Trust.  The Trustee shall take such actions consistent with the prompt orderly liquidation of the Creditors' Trust Assets as required by applicable law and consistent with the treatment of the Creditors' Trust as a liquidating trust under Treasury Regulations Section 301.7701-4(d), to the extent such actions are permitted by this Trust Agreement.  The Trustee shall, on behalf of the Creditors' Trust, hold the Creditors' Trust out as

a trust in the process of liquidation and not as an investment company. The Trustee shall not become a market-maker for the Beneficial Interests (defined below) or otherwise attempt to create a secondary market for the Beneficial Interests. The Trustee shall be restricted to the liquidation of the Creditors' Trust Assets on behalf, and for the benefit, of the Holders of Allowed Claims and the distribution and application of Creditors' Trust Assets for the purposes set forth in, and the conservation and protection of the Creditors' Trust Assets and the administration thereof in accordance with, the provisions of this Agreement, the Plan and the Confirmation Order.

4.7    Estimation of Claims. The Trustee, may (but is not required to) at any time request that the Bankruptcy Court estimate any contingent, unliquidated and/or Disputed Claim pursuant to Bankruptcy Code section 502(c) for any reason, regardless of whether an objection was previously filed with the Bankruptcy Court with respect to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to such objection. In the event that the Bankruptcy Court estimates any contingent, unliquidated, and/or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Trustee may pursue supplementary proceedings to object to the allowance of such Claim. The Trustee, is further authorized to file a Proof of Claim or Interest as provided under Bankruptcy Code section 501(c).

4.8    Selection of Agents. The Trustee may select and employ, and determine compensation for, any professionals, including accountants, financial advisors, legal advisors, brokers, consultants, custodians, investment advisors, asset services, auditors, and other agents, as the Trustee deems necessary (collectively, the "Trustee Professionals") to assist it in carrying out his duties, with the reasonable fees and expenses of such professionals to be paid by the Creditors' Trust. Subject to the Plan and this Agreement, the Trustee may pay the salaries, fees, and expenses of such persons or firms out of the Creditors' Trust Assets. The Trustee shall not be liable for any loss to the Debtors, the Estates, or the Creditors' Trust or any person interested therein, including Beneficiaries, by reason of any mistake or default of any such agent or consultant.

4.9    Signature. As of the Effective Date of the Plan, the Trustee shall have the signature power and authority on behalf of the Creditors' Trust to (a) open and close accounts with any banking, financial or investment institution; (b) make deposits and withdrawals of cash and other property into or from any such account; (c) make or endorse checks with respect to any such account; and (d) effectuate purchases and sales of securities and give security purchase and sale orders to brokers or any other third parties, and the exercise of such power and authority shall be deemed to be authorized by and to represent the decision of the Trustee then entitled to make such decision.

4.10    Maintenance of Register. The Trustee shall at all times maintain or cause to be maintained a register of the Creditors' Trust's Beneficiaries, which shall include the names and addresses of each Beneficiary, the amount of each Beneficiary's Allowed Claim(s), and the amounts paid to each Beneficiary by the Creditors' Trust.

4.11    Liability of Trustee.

(a)    Liability.  The Trustee, the Trustee Professionals, and the Trustee's agents and servants, shall not in any way be liable for any acts or omissions to act except by reason of their bad faith, willful misconduct, reckless disregard of duty, criminal conduct, gross negligence, fraud, or self-dealing.

(b)    Indemnification.  The Creditors' Trust shall indemnify the Trustee, the Trustee Professionals, and the Trustee's agents and servants and hold them harmless from and against any and all liabilities, expenses, claims, damages and losses incurred by them as a direct result of actions taken or omissions to act by them in such capacity or otherwise related to this Agreement or the Creditors' Trust.  The Creditors' Trust shall indemnify and hold harmless any Entity who was, or is, a party, or is threatened to be made a party, to any pending or contemplated action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that such Entity is or was the Trustee, a Trustee Professional, or the Trustee's agent or servant, against all costs, expenses, judgments, fines and amounts paid in settlement actually and reasonably incurred by such Entity in connection with such action, suit or proceeding, or the defense or settlement of any claim, issue or matter therein, to the fullest extent permitted by applicable law, unless such costs and expenses, judgments, fines or amounts paid in settlement are found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Entity's bad faith, willful misconduct, reckless disregard of duty, criminal conduct, gross negligence, fraud, or self- dealing.  Costs or expenses incurred by any Entity entitled to the benefit of the provisions of this Section 4.11 in defending any such action, suit or proceeding may be paid by the Creditors' Trust in advance of the institution or final disposition of such action, suit or proceeding, if authorized by the Trustee, subject to providing an undertaking to repay all such advanced amounts if it is subsequently determined that such Entity is not entitled to indemnification under this Section 4.11.  Any dispute regarding such indemnification of the Trustee shall be resolved only by the Bankruptcy Court, which shall retain jurisdiction over matters relating to the indemnification provided under this Section 4.11.  The Trustee may in his discretion purchase and maintain insurance on behalf of any Entity who is or was a beneficiary of this provision.  Promptly after receipt by an indemnified party or parties (the "Indemnified Party") of notice of any claim, or notice of commencement of any action, suit, or proceeding by an Entity other than the Trustee, in respect of which the Indemnified Party may seek indemnification from the Creditors' Trust pursuant to this Section 4.11, the Indemnified Party, if not the Creditors' Trust, shall notify the Trustee of such claim, action, suit or proceeding and shall thereafter promptly convey all further communications and information in respect thereof to the Trustee.  If the Indemnified Party is the Trustee, the Trustee shall notify the Bankruptcy Court of such claim, action, suit, or proceeding and shall thereafter promptly convey all further communications and information in respect thereof to the Bankruptcy Court.  The Trustee shall, if it so elects, have sole control at the expense of the Creditors' Trust over the contest, settlement, adjustment, or compromise of any claim, action, suit, or proceeding in respect of which this Section 4.11 requires that the Creditors' Trust indemnify the Indemnified Party.  If the Trustee is the Indemnified Party, he shall obtain the written approval of Bankruptcy Court before settling, adjusting, or compromising any claim, action suit, or proceeding in respect of which this Section 4.11 requires that the Creditors' Trust indemnify the Indemnified Party.  The Indemnified Party shall cooperate with the reasonable requests of the Trustee in connection with such contest, settlement, adjustment, or compromises, provided that (i) the Indemnified Party may, if it so elects, employ counsel at its

own expense to assist in (but not control) the handling of such claim, action, suit, or proceeding, (ii) the Trustee shall obtain the prior written approval of the Indemnified Party before entering into any settlement, adjustment, or compromise of such claim, action, suit, or proceeding, or ceasing to defend against such claim, action, suit, or proceeding, if pursuant thereto or as a result thereof injunction or other relief would be imposed upon the Indemnified Party, and (iii) the Indemnified Party shall obtain the prior written approval of the Trustee, or, if the Trustee is the Indemnified Party, the prior written approval of the Bankruptcy Court, before entering into any settlement, adjustment or compromise of such claim, action, suit, or proceeding, or ceasing to defend against such claim, action, suit, or proceeding, and no such settlement, adjustment, or compromise shall be binding on the Creditors' Trust without such approval.

(c)     Exculpation Relating to the Creditors' Trust.  No Holder of a Claim or Interest or any other party in interest will have, or otherwise pursue, any claim or cause of action against the Trustee, the Creditors' Trust or the employees or professionals thereof (solely in the performance of their duties), for making payments and Distributions in accordance with the Plan or for fulfilling any functions incidental to implementing the provisions of the Plan or this Agreement, except for any acts or omissions to act that are the result of bad faith, willful misconduct, reckless disregard of duty, criminal conduct, gross negligence, fraud, or self- dealing.

(d)     No Liability for Acts of Predecessor.  No successor Trustee shall be in any way responsible for the acts or omissions of any Trustee in office prior to the date on which such person becomes a Trustee, nor shall he be obligated to inquire into the validity or propriety of any such act or omission, unless such successor Trustee expressly assumes such responsibility.  Any successor Trustee shall be entitled to accept as conclusive any final accounting and statement of the Creditors' Trust Assets furnished to such successor Trustee by such predecessor Trustee and shall further be responsible only for those Creditors' Trust Assets included in such statement.

(e)     No Implied Obligations.  The Trustee shall not be liable except for the performance of such duties and obligations as are specifically set forth herein, in the Plan and Confirmation Order, and no other or further covenants or obligations shall be implied into this Agreement.  The Trustee shall not be responsible in any manner whatsoever for the correctness of any recitals, statements, representations, or warranties herein or in any documents or instrument evidencing or otherwise constituting a part of the Creditors' Trust Assets.  The Trustee makes no representations as to the value of the Creditors' Trust Assets or any part thereof, nor as to the validity, execution, enforceability, legality, or sufficiency of this Agreement; and the Trustee shall incur no liability or responsibility with respect to any such matters.

(f)     Reliance by Trustee on Documents or Advice of Counsel or Other Entities.  Except as otherwise provided herein, the Trustee may rely and shall be protected in acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, and other paper or document reasonably believed to be genuine and to have been signed or presented by the proper party or parties, and shall have no liability or responsibility with respect to the form, execution, or validity thereof.  None of the provisions hereof shall require the Trustee to expend or risk his own funds or otherwise incur financial liability or expense in the performance of any duties hereunder.

-11-

(g)      No Personal Obligation for Debtors' Liabilities.  Beneficiaries, Holders of Claims, Holders of Interests, or other persons dealing with the Trustee in his capacity as Trustee within the scope of this Agreement shall look solely to the Creditors' Trust Assets to satisfy any liability incurred by the Trustee to such person in carrying out the terms of this Agreement, and the Trustee shall have no personal or individual obligation to satisfy any such liability.

4.12    Establishment of Trust Accounts.  The Trustee may establish or cause to be established and maintained any accounts needed in connection with the purposes of the Creditors' Trust (the "Trust Account").  Such accounts shall be maintained only at FDIC insured financial institutions and shall bear a designation clearly indicating that the funds deposited therein are held for the benefit of the Creditors' Trust.

4.13    Investment of Cash.  Cash in the Trust Account(s) and any other amounts contemplated by this Agreement shall be maintained in United States dollars or shall be invested by the Trustee in (i) direct obligations of, or obligations guaranteed by, the United States of America, (ii) obligations of any agency or corporation that is or may hereafter be created by or pursuant to an act of Congress of the United States of America as an agency or instrumentality thereof, or (iii) such other obligations or instruments as may from time to time be permitted under Bankruptcy Code section 345; provided that the Trustee may, to the extent necessary to implement the provisions of the Plan and this Agreement, deposit moneys in demand deposits, time accounts or checking accounts at any banking institution or trust company having combined capital stock and surplus in excess of $100,000,000 based upon its most recently available audited financial statements, regardless of whether such investments and deposits are insured or as otherwise provided in Section 4.12 above; provided further, that in all cases, investments by the Trustee in accordance with this Section 4.13 shall be made only in such investments that a liquidating trust, within the meaning of Treasury Regulation section 301.7701-4(d), may be permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings, other IRS pronouncements or otherwise.  Such investments shall mature in such amounts and at such times as the Trustee, in his discretion, shall deem appropriate to provide funds when needed to transfer funds in accordance with the Plan and Confirmation Order, make payments to the Trust Accounts or make Distributions in accordance with this Agreement and the Plan and Confirmation Order.  The Creditors' Trust may not retain cash or cash equivalents in excess of a reasonable amount to meet claims and contingent liabilities or to maintain the value of the Creditors' Trust Assets in liquidation or maintain or fund on adequate and sufficient reserve.

4.14    Tax Returns.  From and after the Effective Date, to the extent required, the Trustee shall be responsible for the preparation and filing of any and all federal and state tax returns or other filings as required by law to be filed on behalf of the Creditors' Trust.  Such returns shall be consistent with the treatment of the Creditors' Trust as a liquidating trust within the meaning of Treasury Regulations Section 301.7701-4(d) that is a grantor trust pursuant to Section 1.671-4(a) of the Treasury Regulations.

4.15    Compensation for Trustee.  The Trustee shall be paid fair and reasonable compensation, in an amount equal to $5,000 per month.  The Trustee shall be entitled to reasonable and actual out-of-pocket expenses, to be paid monthly from the Creditors' Trust Assets, pursuant to the terms of this Agreement.

4.16    Reimbursement of the Trustee's and Trustee Professionals' Fees and Expenses. Pursuant to the terms of the Plan, Confirmation Order, and this Agreement, the Trustee may pay from the Creditors' Trust Assets all reasonable fees and expenses incurred in connection with the duties and actions of the Trustee, including, but not limited to, fees and expenses of any agents or consultants employed pursuant to this Agreement and Trustee Professionals retained under this Agreement and fees and expenses to pay insurance, taxes and other expenses arising in the ordinary course of business in maintaining, liquidating, disposing of, and distributing the Creditors' Trust Assets and compensation to the Trustee.

## ARTICLE V

## Creditors' Trust Oversight Committee

5.1    General.  The affairs of the Creditor' Trust shall be monitored by the Creditors' Trust Oversight Committee, which except as expressly set forth in this Agreement shall have only consultation rights in the administration of the Creditors' Trust.

5.2    Creditors' Trust Oversight Committee Membership.

(a)    The Creditors' Trust Oversight Committee shall consist of three (3) Creditors' Trust Oversight Committee Members, and shall initially consist of the "Initial Oversight Committee Members" named on the signature page hereof. Each Creditors' Trust Oversight Committee Member that is a natural person shall be at least 18 years of age. The initial Oversight Committee Members are set forth on the signature page to this Agreement. By execution hereof, each Oversight Committee Member agrees to the terms set forth herein.

(b)    Each Oversight Committee Member shall hold office until the earlier of (i) the termination of the Creditors' Trust, (ii) the resignation, death or disability of such Creditors' Trust Oversight Committee Member or (iii) the removal of such Creditors' Trust Oversight Committee Member in accordance with this Agreement.

(c)    Any Creditors' Trust Oversight Committee Member may resign upon thirty (30) days' prior written notice to the other members of the Creditors' Trust Oversight Committee and the Trustee.

(d)    A Creditors' Trust Oversight Committee Member may be removed only for cause by order of the Bankruptcy Court upon application of the Trustee or the other members of the Creditors' Trust Oversight Committee acting unanimously, with the reasonable costs of such application (and any objection or response thereto) to be paid for by the Creditors' Trust.

(e)    In the event of a vacancy on the Creditors' Trust Oversight Committee, whether as a result of the resignation, death, disability or removal of a Creditors' Trust Oversight Committee Member, (i) if, prior to the termination of service of such Creditors' Trust Oversight Committee Member other than as a result of removal, such Creditors' Trust Oversight Committee Member has designated in writing an individual to succeed him or her, such individual shall be his or her successor, subject to the consent of the Trustee and each of the remaining Creditors' Trust Oversight Committee Members, with such consent not to be unreasonably withheld, or (ii) if such Creditors' Trust Oversight Committee Member did not designate a successor prior to the

-13-

termination of his or her service in accordance with clause (i) of this Section 5.2(e), the remaining Creditors' Trust Oversight Committee Members, acting by unanimous vote, shall select a replacement Oversight Committee Member, subject to the consent of the Trustee, with such consent not to be unreasonably withheld. If, thirty (30) days after the occurrence of such vacancy, the remaining Creditors' Trust Oversight Committee Members cannot agree on a replacement Creditors' Trust Oversight Committee Member, the remaining Creditors' Trust Oversight Committee Members and the Trustee, acting by majority vote, shall select a replacement Creditors' Trust Oversight Committee Member.

    5.3    <u>Compensation</u>. The Creditors' Trust Oversight Committee members shall not be compensated.

    5.4    <u>Authority</u>. Except as otherwise expressly provided herein, the Creditors' Trust Oversight Committee shall have no authority to act on behalf of the Creditor' Trust.

    5.5    <u>Rights and Powers of the Creditors' Trust Oversight Committee</u>. In addition to such other rights as are set forth in this Agreement, the Creditors' Trust Oversight Committee shall have the right to:

        (a)    consent to the taking of any Material Action by the Trustee, as set forth in Section 5.6 herein;

        (b)    receive and review the reports of the Trustee and consult with same on any matters related to the Creditors' Trust or the Creditors' Trust Assets;

        (c)    review and consult with the Trustee regarding: (i) distributions to Beneficiaries; (ii) the prosecution, settlement, transfer, release or abandonment of any Creditors' Trust Causes of Action on behalf of the Creditors' Trust; (iii) the amendment of this Agreement as provided in Section 12.10 of this Agreement; and (iv) such other actions as are specified in this Agreement;

        (d)    appoint a successor Trustee as provided in Section 8.3 this Agreement;

        (e)    apply to the Bankruptcy Court for the removal of a Creditors' Trust Oversight Committee member as provided in Section 5.2(d) of this Agreement;

        (f)    have access, upon reasonable notice and during normal business hours, to all reports, documents, memoranda and other work product of the Trustee; and

        (g)    monitor the actions of the Trustee and receive, upon request, periodic status reports from the Trustee as to the status of (i) the litigation, settlement, administration and pursuit of the Creditors' Trust Causes of Action and (ii) the administration of the Creditors' Trust Assets. For the avoidance of doubt, the failure to specifically identify rights in this Section 5.5 shall not limit or otherwise impair the right of the Trustee or the members of the Creditors' Trust Oversight Committee to consult with the Trustee or members of the Creditors' Trust Oversight Committee individually or collectively on any or all issues that he or they may determine to be relevant or appropriate.

5.6    <u>Material Actions</u>.  "Material Action" means each of the following:

(a)    the filing of any complaint or initiation of any proceeding in respect of any Creditors' Trust Causes of Action;

(b)    the settlement or dismissal of any Creditors' Trust Cause of Action;

(c)    The settlement of any Claim which would result in such Claim being Allowed in an amount greater than $100,000;

(d)    Exercise of the Put Election;

(e)    Sale or assignment of the Creditor Committee Equity;

(f)    entry into any contingency fee agreement or litigation funding agreement in connection with any Creditors' Trust Cause of Action; and

(g)    the selection and engagement of any material legal, financial, accounting, investment, auditing, experts, and other advisors and professionals as the Creditors' Trust requires.

5.7    <u>Duties; Standard of Care</u>

(a)    Each Creditors' Trust Oversight Committee Member's rights and powers hereunder are exercisable solely on behalf of the Creditors' Trust, consistent with, and in furtherance of, the purpose of the Creditors' Trust and not otherwise, and in accordance with applicable law. Each Creditors' Trust Oversight Committee Member in the exercise of his or her rights and powers hereunder shall act in accordance with principles of good faith and fair dealing.

(b)    No Creditors' Trust Oversight Committee Member shall have the authority to bind the Creditors' Trust.

### ARTICLE VI

### Beneficiaries

6.1    <u>Identification of Beneficiaries</u>.  The Creditors' Trust is created for the benefit of Holders of Allowed Claims in Class 4 (General Unsecured Claims) (the "<u>Beneficiaries</u>").  The Beneficiaries shall each have an undivided beneficial interest in the assets of the Creditors' Trust ("<u>Beneficial Interest</u>").

6.2    <u>Rights of Beneficiaries</u>.  Each Beneficiary shall be entitled to participate in the rights due to a Beneficiary hereunder and in the Plan.  Each Beneficiary shall take and hold its Beneficial Interest subject to all in the terms and provisions of this Agreement and the Plan.  The Beneficial Interests shall not be certificated.  No Beneficiary shall have legal title to any part of the Creditors' Trust Assets. The interest of a Beneficiary of the Creditors' Trust is in all respects personal property, and upon the death, insolvency or incapacity of an individual Beneficiary, such

Beneficiary's Beneficial Interest shall pass to the legal representative of such Beneficiary. A Beneficiary shall have no title to, or any right to possess, manage or control, the Creditors' Trust Assets, or any portion thereof or interest therein, except as expressly provided herein. No surviving spouse, heir, or devisee of any deceased Beneficiary shall have any right of dower, homestead or inheritance, or of partition, or any other right, statutory or otherwise, in the Creditors' Trust Assets, but the whole title to all the Creditors' Trust Assets shall be vested in the Trustee and the sole interest of the Beneficiaries shall be the rights and benefits provided to such persons under this Agreement and the Plan.

## ARTICLE VII

### Distributions

7.1    <u>Distributions under the Plan</u>. Subject to the terms of the Plan and the Confirmation Order, distributions by the Creditors' Trust under the Plan shall be made as follows:

(a)    The Creditors' Trust will make Distributions from the Creditors' Trust Assets to holders of Beneficial Interests of the Creditors' Trust in accordance with the terms of the Plan, Confirmation Order and this Agreement.

(b)    The first One Million One Hundred Thousand Dollars ($1,100,000.00) distributed from the Creditors' Trust shall be distributed evenly (50/50) between Bridging or its designee and the Creditors' Trust to repay the Creditors' Trust Loan. Upon repayment of the Creditors' Trust Loan in full, Bridging shall not be entitled to any additional Distributions from the Creditors' Trust.

(c)    Distributions to be made by the Creditors' Trust may be made by any Person(s) designated or retained to serve as the disbursing agent(s) without the need for any further order of the Bankruptcy Court.

(d)    The Trustee shall be authorized, in his discretion, to delay Distributions to holders of Beneficial Interests or otherwise determine reasonable distribution dates for such holders, including, without limitation, based upon the status and progress of the liquidation of Creditors' Trust Assets, the total number of and/or asserted claim amounts of Disputed Claims, and any other relevant factors.

7.2    <u>Distributions on Account of Disputed Claims</u>. Except as otherwise provided in the Plan, by Final Order or as agreed by the relevant parties, Distributions on account of Disputed Claims that become Allowed after the Effective Date will be made by the Trustee at such periodic intervals as the Creditors' Trust determine to be reasonably prudent.

7.3    <u>No Distributions Pending Allowance</u>. Notwithstanding anything herein to the contrary: (a) no Distribution will be made with respect to any Disputed Claim until such Claim becomes an Allowed Claim, and (b) unless determined otherwise by the Trustee, no Distribution will be made to any Person that holds both (i) an Allowed Claim and (ii) a Disputed Claim until such Person's Disputed Claim has been resolved by settlement or Final Order.

7.4     Objection Deadline.  On and after the Effective Date, the Reorganized Debtors and the Trustee shall be entitled to file objections to all Claims and Interests that are otherwise not deemed Allowed Claims or Interests, including Claims listed on the Debtors' Schedules, under the Plan, or otherwise.  Any objections to Claims shall be served and filed on or before the later of (i) 180 days after the Effective Date, or (ii) such later date as may be fixed by the Bankruptcy Court after reasonable notice and opportunity to object.

7.5     Disputed Claims Reserve.

(a)     On and after the Effective Date, the Creditors' Trust will maintain in reserve such Cash as the Creditors' Trust estimates to be reasonably necessary to satisfy the Distributions to holders of Beneficial Interests that could be required to be made under the Plan and the Creditors' Trust Agreement (the "Disputed Claims Reserve").

(b)     The Trustee may, in the Trustee's sole discretion, determine the best way to report for tax purposes with respect to any reserve for Disputed Claims Reserve, including (i) filing a tax election to treat any and all reserves for Disputed General Unsecured Claims as a Disputed Ownership Fund ("DOF") within the meaning of Treasury Income Tax Regulation section 1.468B-9 for federal income tax purposes rather than to tax such reserve as a part of the Creditors' Trust or (ii) electing to report as a separate trust or sub-trust or other entity.  If an election is made to report any reserve for disputed claims as a DOF, the Creditors' Trust shall comply with all federal and state tax reporting and tax compliance requirements of the DOF, including but not limited to the filing of a separate federal tax return for the DOF and the payment of federal and/or state income tax due.

7.6     Settling Disputed Claims (or Interests).  The Trustee will be authorized to settle, or withdraw any objections to, any Disputed Claims following the Effective Date without need for approval of the Bankruptcy Court.

7.7     Distributions in Cash.  The Trustee will make any required Cash payments to the Holders of Allowed Claims by checks drawn on accounts maintained by the Trustee, or by wire transfer if the circumstances justify, at the option of the Trustee.  Payments to Bridging on account of the Creditors' Trust Loan shall be made by wire transfer.

7.8     Unclaimed Distributions.  If any Distribution to a Holder of an Allowed Claim is returned as undeliverable, the Trustee shall have no obligation to determine the correct current address of such Holder, and no Distribution to such Holder shall be made unless and until the Trustee is notified, in writing, by the Holder of the current address of such Holder within 90 days of such Distribution, at which time a Distribution shall be made to such Holder without interest; provided that such Distributions shall be deemed unclaimed property under Bankruptcy Code section 347(b) at the expiration of six months from the Distribution.  After such date, all unclaimed property or interest in property shall revert to the Creditors' Trust to be distributed in accordance with the terms of this Agreement and the Plan, and the Claim of any other holder to such property or interest in property shall be discharged and forever barred.

7.9     Setoff.  The Debtors and the Trustee, pursuant to the Bankruptcy Code (including Bankruptcy Code section 553), applicable bankruptcy or nonbankruptcy law, with the approval of

-17-

the Bankruptcy Court and upon no less than three (3) days' notice to the applicable Holder of a Claim, or as may be agreed to by the Holder of a Claim, may, but shall not be required to, set off against any Allowed Claim and the Distributions to be made pursuant to the Plan on account of such Allowed Claim (before any Distribution is to be made on account of such Allowed Claim), any claims of any nature whatsoever that the Debtors may have against the Holder of such Allowed Claim, provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtors or the Trustee of any such claim the Debtors may have against the Holder of such Claim.

7.10    Taxes. Pursuant to Bankruptcy Code section 346(f), the Trustee will be entitled to deduct and withhold any federal, state, or local taxes from any Cash payments made with respect to Allowed Claims. The Trustee will be authorized to take all actions necessary to comply with applicable withholding and recording requirements. Notwithstanding anything herein to the contrary, each Holder of an Allowed Claim that has received a Distribution of Cash under the Plan will have sole and exclusive responsibility for the satisfaction or payment of any tax obligation imposed by any governmental unit, including income, withholding and other tax obligation, on account of such distribution. For tax purposes, Distributions received in respect of Allowed Claims will be allocated first to the principal amount of such Claims, with any excess allocated to unpaid accrued interest.

7.11    Legal Proceedings. If any Creditors' Trust Causes of Action, including Avoidance Actions, are asserted and if such claims or any other legal proceedings are initiated or prosecuted against any Creditor pursuant to the Plan, Confirmation Order, or this Agreement, or asserted as an objection to any Claim, then notwithstanding anything to the contrary contained in the Plan or Confirmation Order, until such proceeding or contested matter is finally resolved and all payments to the Debtors' Estates required by such resolution have been made, such Creditor shall only receive Distributions under the Plan or Confirmation Order to the extent that the distributions to which such Creditor is otherwise entitled exceed the maximum liability of such Creditor to the Debtors' Estates asserted in such proceedings.

7.12    De Minimis Distributions. No payment of Cash in an amount of less than $10.00 shall be required to be made on account of any Allowed Claim. Such undistributed amount may instead be used in accordance with the Plan and this Agreement.

7.13    Abandonment. Notwithstanding anything to the contrary in the Plan, if in the Trustee's reasonable judgment, any Creditors' Trust Assets cannot be sold or distributed in a commercially reasonable manner or the Trustee believes in good faith that such property has inconsequential value to the Creditors' Trust or its Beneficiaries or determines to be too impractical to distribute to Beneficiaries, the Trustee shall have the right to cause the Creditors' Trust to abandon or otherwise dispose of such property, including by donation of such property to a charity.

-18-

# ARTICLE VIII

## Removal or Resignation of the Trustee

8.1     <u>Removal of the Trustee</u>.  The Trustee appointed pursuant to the Plan, Confirmation Order and this Agreement may be removed for "cause" upon order of the Bankruptcy Court after notice and opportunity for a hearing.  For purposes of this Agreement, the term "cause" shall mean (a) the Trustee's gross negligence, willful misconduct or willful failure to perform his duties under the Plan, the Confirmation Order and this Agreement, or (b) the Trustee's misappropriation or embezzlement of any Creditors' Trust Assets or the proceeds thereof.  If a Trustee is removed for cause, such Trustee shall not be entitled to any accrued but unpaid fees, reimbursements or other compensation under this Agreement or otherwise.  If the Trustee is removed by the Bankruptcy Court other than for "cause", or is unwilling or unable to serve (a) by virtue of his inability to perform his duties under this Agreement due to death, illness, or other physical or mental disability, or (b) for any other reason whatsoever other than for "cause," subject to a final accounting, the Trustee shall be entitled to all accrued and unpaid fees, reimbursement, and other compensation, to the extent incurred or arising or relating to events occurring before such removal, and to any out-of-pocket expenses reasonably incurred in connection with the transfer of all powers and duties and all rights to any successor Trustee.

8.2     <u>Resignation of the Trustee</u>.  The Trustee may resign as Trustee at any time by giving prior written notice thereof to the Bankruptcy Court and Bridging (the "<u>Notice</u>"); <u>provided</u>, <u>however</u>, that such resignation shall not be effective earlier than thirty (30) days after the date of such Notice, unless an earlier effective date is allowed by the Bankruptcy Court.  If the Trustee resigns from his position hereunder, subject to a final accounting, he shall be entitled to all accrued unpaid fees, reimbursement, and other compensation to the extent incurred or arising or relating to events occurring before such resignation, and any out-of-pocket expenses reasonably incurred in connection with the transfer of all powers and duties to the successor Trustee.

8.3     <u>Successor to the Trustee</u>.  In the event of the resignation, removal or death of the Trustee, the Bankruptcy Court or the undersigned Chairperson of the Committee may designate a disinterested person to serve as the successor Trustee.  A notice identifying any proposed successor Trustee with an affidavit of disinterestedness from such proposed successor Trustee will be filed with the Bankruptcy Court and served on Bridging and any post-Confirmation service list.  The successor Trustee, without any further act, will become fully vested with all of the rights, powers, duties, and obligations of his predecessor.

# ARTICLE IX

## Effect of the Agreement on Third Parties

9.1     There is no obligation on the part of any person dealing with the Debtors' Estates, the Debtors, the Trustee, or the Trustee's Professionals, to see to the application of the money or other consideration paid or delivered to the Trustee, or any agent of the Trustee, or to inquire into the validity, expediency, or propriety of any such transaction, or the authority of the Trustee, or any agent of the Trustee, to enter into or consummate the same, except upon such terms as the Trustee may deem advisable.

-19-

# ARTICLE X

## Waiver

10.1     No failure or delay of any party to exercise any right or remedy pursuant to this Agreement shall affect such right or remedy or constitute a waiver by such party of any right or remedy pursuant thereto.  Resort to one form of remedy shall not constitute a waiver of alternative remedies.

# ARTICLE XI

## Termination of the Agreement and Amendment

11.1     Termination of the Agreement.  This Agreement (other than Sections 4.11, 4.15, 4.16, and related provisions) shall terminate and the Creditors' Trust shall dissolve and terminate and be of no further force or effect upon the latest to occur of (i) all of the Creditors' Trust Assets have been liquidated, (ii) all duties and obligations of the Trustee under the Creditors' Trust Agreement have been fulfilled, (iii) all Distributions required to be made by the Creditors' Trust under the Plan and the Creditors' Trust Agreement have been made; (iv) all payments on account of repayment of the Creditors' Trust Loan have been wired to Bridging; and (v) the Chapter 11 Cases have been closed; provided, however, that in no event shall the Creditors' Trust be dissolved later than five (5) years from the Effective Date unless the Bankruptcy Court, upon motion within the six-month period prior to the fifth anniversary (or the end of any extension period approved by the Bankruptcy Court), determines that a fixed period extension not to exceed one (1) year is necessary to facilitate or complete the recovery and liquidation of the Creditors' Trust Assets.  If warranted by the facts and circumstances involved in resolving any Creditors' Trust Causes of Action, upon (i) a favorable ruling from the Internal Revenue Service that any further extension would not adversely affect the status of the Creditors' Trust as a grantor trust for federal income tax purposes, and (ii) application to, and if approved by, the Bankruptcy Court upon a finding such further extension is necessary for purposes of resolving such Creditors' Trust Causes of Action and distributing the proceeds to Creditors' Trust's Beneficiaries, the term of the Creditors' Trust may be further extended by the Trustee for a specified, finite term.  Notwithstanding the foregoing, the Creditors' Trust shall be automatically terminated in the event that the Chapter 11 Cases are converted or dismissed.  The Trustee will not unduly prolong the duration of the Creditors' Trust and will at all times endeavor to resolve, settle or otherwise dispose of all Claims and the Creditors' Trust Assets, to effect Distributions to Beneficiaries and repayment of the Creditors' Trust Loan in accordance with the terms hereof, the Plan and Confirmation Order and to terminate the Creditors' Trust as soon as practicable in a prompt and timely fashion.  In the event that the Trustee elects to terminate the Creditors' Trust, he shall provide twenty (20) days prior notice thereof to the Office of United States Trustee and Bridging, and file such notice with the Bankruptcy Court and upon such termination, the Trustee shall cease to act as the Trustee, such that the Trustee shall not have any further duties or responsibilities under the Agreement or otherwise.

11.2     Amendment of the Agreement.  Except as otherwise set forth herein, any provisions of this Agreement may be amended, modified, terminated, revoked, or altered only in writing by the Trustee and pursuant to an Order of the Bankruptcy Court.  Notwithstanding this Section 11.2, any amendments to this Agreement shall not be inconsistent with the purpose and intention of the

-20-

Creditors' Trust to liquidate in an expeditious but orderly manner the Creditors' Trust Assets in accordance with Treasury Regulations Section 301.7701- 4(d) and this Agreement.

## ARTICLE XII

### Miscellaneous

12.1    <u>Intention of Parties to Establish the Creditors' Trust</u>.  This Agreement is not intended to create, and shall not be interpreted as creating, an association, partnership or joint venture of any kind.  It is intended as a trust to be governed and construed in all respects as a trust.

12.2    <u>Filing Documents</u>.  A copy of this Agreement and all amendments thereof shall be maintained in an office or residence of the Trustee and shall be available for inspection.

12.3    <u>Books and Records</u>.

(a)    Upon the Effective Date or as soon thereafter as is practicable, the Debtors shall provide the Trustee with a mirror image of their server which shall provide access to the Debtors' books and records through the Effective Date, including access to (i) the Debtors' e-mail server, (ii) the Debtors' company server, and (iii) all account records held within Quickbooks (the "<u>Books and Records</u>").  All fees and costs related to the Debtors and Reorganized Debtors providing access to the Books and Records shall be paid by the Creditors' Trust.  The Books and Records shall be used for the limited purposes of pursuing Creditors' Trust Causes of Action and claim objections, subject to the Reorganized Debtors retaining all other rights, interests and privileges with respect to the Books and Records.  The Books and Records shall not be shared with any other party absent prior written consent from the Reorganized Debtors.  In the event the Creditors' Trust receives a request to disclose all or any part of the Books and Records under the terms of a subpoena or other order issued by a court of competent jurisdiction or by a governmental agency, the Creditors' Trust shall, unless prohibited by law, rule or regulation: (a) promptly notify the Reorganized Debtors of the existence, terms and circumstances surrounding such a request; (b) consult with the Reorganized Debtors on the advisability of taking steps to resist or narrow such request; (c) if disclosure of such Books and Records is required, furnish only such portion of the Books and Records as the Creditors' Trust believes in good faith it is legally required to disclose; and (d) reasonably cooperate with the Reorganized Debtors in their efforts to obtain an order or other reliable assurance that confidential treatment will be accorded to such portion of the Books and Records that is required to be disclosed.  The Creditors' Trust's access to the Reorganized Debtors' books and records shall be governed by that certain Stockholders Agreement by and among Neighborhood Holdings Corp. and its stockholders.

(b)    A Reorganized Debtor shall provide the Creditors' Trust with seven (7) calendar days' notice prior to its dissolution.  The Trustee, in his sole discretion, may after receipt of notice and prior to a Reorganized Debtor's dissolution, seek to retain those documents maintained by such Reorganized Debtor in the ordinary course of business and which were not otherwise transferred to the Reorganized Debtor pursuant to the Plan.  All fees and costs related to maintaining such documents shall be paid by the Creditors' Trust.  After receipt of such documents, the Trustee shall be authorized to destroy any documents he deems necessary or appropriate in his reasonable judgment; provided, however, that the Trustee shall not destroy any

documents, including but not limited to tax documents, that the Creditors' Trust is required to retain under applicable law. After notice to the Creditors' Trust, the Reorganized Debtor shall be authorized to abandon all originals and/or copies of documents and business records that the Creditors' Trust does not seek to retain.

12.4    <u>Tax Identification Numbers</u>. The Trustee may require any Beneficiary to furnish to the Trustee, (i) its employer or taxpayer identification number as assigned by the Internal Revenue Service, and (ii) such other information, records or documents necessary to satisfy the Trustee's tax reporting obligations (including certificates of non-foreign status). The Trustee may condition the payment of any Distribution to any Beneficiary upon receipt of such identification number and requested documents. If a Beneficiary does not timely provide the Trustee with its taxpayer identification number in the manner and by the deadline established by the Trustee, then the Distribution to such Beneficiary shall be administered as an unclaimed distribution, without further order of the Bankruptcy Court, in accordance with Section 7.8 of this Agreement and Section 7.8(d) of the Plan.

12.5    <u>U.S. Trustee Fees and Post-Confirmation Reports</u>. After the Effective Date, the Creditors' Trust shall pay any statutory fees due for the post-Effective Date period pursuant to 28 U.S.C. § 1930(a)(6) and such fees shall be paid until entry of a final decree or an order converting or dismissing the Chapter 11 Cases. After the Effective Date, the Trustee will file post-confirmation status reports on a quarterly basis up to the entry of a final decree closing the Chapter 11 Cases or as otherwise ordered by the Court.

12.6    <u>Privilege</u>.

(a)    Other than the Retained Privileges (defined below), on and subject to the terms of the Plan, all of the Debtors' privileges (the "<u>Privileges</u>"), including, but not limited to, corporate privileges, confidential information, work product protections, attorney-client privileges, and other immunities or protections solely relating to the Creditors' Trust Causes of Action, in each instance arising on or after the earlier of (i) two (2) years prior to the Petition Date, and (ii) the applicable statute of limitations governing any such Creditors' Trust Cause of Action (but in no event more than six (6) years prior to the Petition Date) (the "<u>Transferred Privileges</u>"), shall be transferred, assigned and delivered to the Creditors' Trust, without waiver, limitation or release, and shall vest with the Creditors' Trust on the Effective Date and be jointly held by the Reorganized Debtors and the Creditors' Trust on and after the Effective Date; provided, however, that notwithstanding the foregoing, Transferred Privileges do not and shall not include Privileges relating in any way to (a) the preparation, filing or prosecution of the Chapter 11 Cases, or (b) any negotiations with the Debtors, the Committee, or Bridging.

(b)    The Creditors' Trust, Bridging, and Reorganized Debtors shall each hold and each be the beneficiary of all Transferred Privileges and entitled to assert all Transferred Privileges. No Privilege shall be waived by disclosures to the Trustee of the Debtors' documents, information (including the Books and Records described above) or communications subject to any privilege, protection or immunity or protections from disclosure jointly held by the Reorganized Debtors, Bridging, and the Creditors' Trust.

-22-

(c)     Notwithstanding the foregoing or anything else in the Plan or otherwise to the contrary, no Privileges other than the Transferred Privileges (all Privileges other than the Transferred Privileges being the "Retained Privileges") shall be transferred, assigned or delivered to the Creditors' Trust and such Retained Privileges shall not vest with the Creditors' Trust.  The Creditors' Trust shall not hold nor be the beneficiary of any Retained Privileges or entitled in any way to assert any Retained Privileges, which shall be held solely by the Debtors and/or the Reorganized Debtors.

(d)     The Trustee shall have until one (1) year after the Effective Date to request documents or information related to the period prior to the Effective Period subject to the Transferred Privileges (each an "Information Request"); provided, however, that with respect to any action involving Transferred Privileges filed on or before two (2) years after the Effective Date, the Trustee may make an Information Request subject to the Transferred Privileges involved in such action until the final resolution of such action, including any appeals.

(e)     Notwithstanding anything in this Section 12.6 to the contrary, to the extent that the Debtors, the Reorganized Debtors or the Trustee seek to waive any of the Privileges and such waiver could result in (i) a waiver of any of any Privilege relating to the Creditors' Trust Causes of Action, or (ii) any negative impact on the Reorganized Debtors or the Trustee, as applicable, shall be required to receive the written consent of the Reorganized Debtors or the Trustee, as applicable, waiving such Privilege.

(f)     To the extent of any conflict between this Section 12.6 of the Agreement and any other provision of the Agreement relating to Privileges, this Section 12.6 shall control.

12.7     Valuation of the Creditors' Trust Assets.  After the Effective Date, the Trustee, in his discretion, and in reliance upon such professionals as the Trustee may retain, may make a good faith valuation of the Creditors' Trust Assets.  Such valuation shall be made available from time to time, to the extent relevant, as reasonably determined by the Trustee in reliance on his professionals, and used consistently by all parties, including, without limitation, the Creditors' Trust, and Beneficiaries, for all purposes, including federal income tax purposes.

12.8     Governing Law.     THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT REFERENCE TO ITS CONFLICT OF LAW PROVISIONS, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

12.9     Severability.  If any one or more of the provisions herein, or the application thereof in any circumstances, is held invalid, illegal or unenforceable in any respect for any reason, the validity, legality and enforceability of any such provision in every other respect, and of the remaining provisions, shall not be in any way impaired or affected.  In such event, there shall be added as part of this Agreement a provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible and be legal, valid and enforceable.  The effective date of the added provision shall be the date upon which the prior provision was held to be invalid, illegal or unenforceable.

12.10  <u>Entire Agreement</u>.  This Agreement (including the recitals), the Plan and the Confirmation Order constitute the entire agreement of the parties and there are no representations, warranties, covenants, or obligations except as set forth herein or therein.  This Agreement, the Plan, and the Confirmation Order supersede all prior and contemporaneous agreements, understandings, negotiations, and discussions, written or oral, of the parties hereto, relating to any transaction contemplated hereunder.  In the event of any inconsistency between this Agreement, the Plan, and the Confirmation Order, the Confirmation Order and Plan, in that order, shall govern; <u>provided</u>, <u>however</u>, that the Trustee may amend, modify and/or correct the terms hereof to supersede the Plan and/or the Confirmation Order, with the approval of the Bankruptcy Court. Except as otherwise specifically provided herein, nothing in this Agreement is intended or shall be construed to confer upon or to give any person other than the parties hereto and their respective heirs, administrators, executors, successors, and assigns any rights or remedies under or by reason of this Agreement.

12.11  <u>Jurisdiction; Venue</u>.  Each party hereto irrevocably agrees that any suit, action or proceeding with respect to this Agreement shall be brought in the United States Bankruptcy Court for the District of Delaware, and by execution and delivery of this Agreement, each party (a) irrevocably submits to each such jurisdiction and venue, (b) waives, to the fullest extent permitted by law, any objection that it may have to the laying of the venue of any such suit, action or proceeding brought in such court has been brought in an inconvenient forum, and (c) agrees that final judgment in any such suit, action or proceeding brought in such a court shall be conclusive and binding upon it and may be enforced in any court to the jurisdiction of which such party is subject by a suit upon such judgment, provided that service of process is effected as otherwise permitted by law.

12.12  <u>Notices</u>.  Unless otherwise expressly specified or permitted by the terms hereof, any notice, request, submission, instruction or other document to be given hereunder by a party shall be in writing and shall be deemed to have been given, (a) when received if given in person, (b) upon delivery or refusal of delivery, if delivered by a nationally known commercial courier service providing next day delivery service (such as Federal Express), or (c) upon delivery or refusal of delivery, if deposited in the U.S. mail, certified or registered mail, return receipt requested, postage prepaid:

**If to the Trustee, addressed as follows:**


With a copy to:

[_____]

**If to the Debtors, addressed as follows:**


**With a copy to counsel:**

**If to the Reorganized Debtors, addressed as follows:**

    **With a copy to counsel:**

**If to Bridging, addressed as follows:**

    **With a copy to counsel:**

or to such other individual or address as a party hereto may designate for itself by notice given as herein provided.

12.13   <u>WAIVER OF JURY TRIAL</u>.  EACH PARTY TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED THEREBY.

12.14   <u>Further Assurances</u>.  Each Party hereto (and his respective successors and assigns) shall, upon the Trustee's reasonable request, execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, such further instruments, and do or cause to be done, such further acts, as may be necessary to carry out the purposes of this Agreement and to vest in the Trustee the powers and duties contemplated hereunder.

12.15   <u>Exculpatory Provisions and Survival Thereof</u>.  Whether or not expressly therein so provided, any and all exculpatory provisions, immunities and indemnities, and any limitations and negations of liability contained in this Agreement, in each case inuring to the benefit of the Trustee, shall survive (i) the termination or revocation of this Agreement, and (ii) as to any person who has served as Trustee, the resignation or removal of such person as Trustee.

12.16   <u>Conflicts</u>.  In the event of any inconsistency between the Plan or Confirmation Order, on the one hand, and this Agreement, on the other, the terms and provisions of the Plan or Confirmation Order shall govern.

12.17   <u>Headings</u>.  The headings of the various Articles and Sections herein are for convenience of reference only and shall not define or limit any of the terms or provisions hereof.

12.18   <u>Successors and Assigns</u>.  All covenants and agreements contained herein shall, as applicable, be binding upon, and inure to the benefit of the Committee, the Trustee and his successors, the Estates and the Debtors and their successors all as herein provided.

12.19    <u>Separate Counterparts</u>.  This Agreement may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute but one and the same instrument.

**IN WITNESS WHEREOF**, the undersigned have either executed and acknowledged this Agreement or caused it to be executed and acknowledged on their behalf by their duly authorized officers all as of the date first above written.

TRUSTEE:


By:_____
Name: Robert Michaelson
Title: Member of Advisory Trust Group, LLC


DEBTORS AND DEBTORS IN POSSESSION:


By:_____
Name:
Title:

BRIDGING:


By:_____
Name:
Title:


COMMITTEE:

By:_____
Name: Claudio F. Arellano
Title: Chairperson

CREDITORS' TRUST OVERSIGHT COMMITTEE MEMBERS:

By:_____
Name: Claudio F. Arellano

By:_____
Name: Hal Coble, on behalf of Adoptive Healthcare Solutions, LLC

By:_____
Name: Amanda Ocheltree, on behalf of NextGen Healthcare, Inc.

## **EXHIBIT I**

Identity of Trustee for the Creditors' Trust and
Members of Creditors' Trust Oversight Committee

Trustee:

Robert N. Michaelson, Esq., member of Advisory Trust Group, LLC

Creditors' Trust Oversight Committee Members:

1. Claudio F. Arellano
2. Hal Coble, on behalf of Adoptive Healthcare Solutions, LLC
3. Amanda Ocheltree, on behalf of NextGen Healthcare, Inc.